Nicole Owens
Interim Executive Director
Jonah J. Horwitz, Idaho Bar No. 10494
Christopher M. Sanchez, New York Bar No. 5414099
Miles Pope, Alaska Bar No. 1508066
Assistant Federal Defenders
Federal Defender Services of Idaho
702 W. Idaho Street, Suite 900, Boise, ID 83702
T: (208) 331-5530; F: (208) 331-5559
ECF: Jonah_Horwitz@fd.org; Christopher_M_Sanchez@fd.org; Miles_Pope@fd.org

Stanley J. Panikowski, California Bar No. 290663
(admitted *pro hac vice*)
**DLA Piper LLP (US)**
401 B Street, Suite 1700, San Diego, CA 92101-4297
T: (619) 699-2700; F: (619) 699-2701; ECF: Stanley.Panikowski@dlapiper.com

Amanda Laufer Camelotto, New Jersey Bar No. 902142012
(admitted *pro hac vice*)
**DLA Piper LLP (US)**
51 John F. Kennedy Parkway, Ste. 120, Short Hills, NJ 07078-2704
Tel: (973) 520-2550; ECF: Amanda.Camelotto@dlapiper.com

*Attorneys for Plaintiff Gerald Ross Pizzuto, Jr.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| **GERALD ROSS PIZZUTO, JR.,** | ) | **CASE NO. 1:21-cv-359-DCN** |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **AMENDED COMPLAINT FOR** |
| | ) | **EQUITABLE, DECLARATORY,** |
| **JOSH TEWALT**, Director, Idaho Department | ) | **AND INJUNCTIVE RELIEF** |
| of Correction, in his official capacity, **TIM** | ) | |
| **RICHARDSON**,[1] Warden, Idaho Maximum | ) | |
| Security Institution, in his official capacity | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

[1] Tim Richardson is now Warden of the Idaho Maximum Security Institution. *See* https://www.idoc.idaho.gov/content/locations/prisons/idaho_maximum_security_institution. As such, he should be automatically substituted in for Tyrell Davis in this case. *See* Fed. R. Civ. P. 25(d).

AMENDED COMPLAINT – Page 1

## I.   Nature of the Action

1.   Plaintiff Gerald Ross Pizzuto, Jr. is a death-row inmate in Idaho[2] who brings this action pursuant to 42 U.S.C. § 1983 for violations and threatened violations of his constitutional rights in connection with the State's effort to execute him.

## II.   Justiciable Case or Controversy

2.   For the reasons set forth below, absent judicial intervention, Mr. Pizzuto will be executed in violation of his constitutional rights.

3.   There is a real and justiciable case or controversy between the parties.

## III.   Jurisdiction and Venue

4.   This action arises under 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments to the United States Constitution.

5.   The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights violations), 2201(a) (declaratory relief), and 2202 (further relief).

6.   The Court has personal jurisdiction over the defendants as they are residents of the State of Idaho and are presently located in the State of Idaho, or are appointed officials of the State of Idaho or otherwise acting on behalf of the State of Idaho.

7.   Venue in this Court is proper under 28 U.S.C. § 1391 because most of the events giving rise to the claims—including Mr. Pizzuto's potential execution and the procurement and maintenance of drugs used in that execution—have occurred, are occurring, or will occur in the District of Idaho.

---

[2] Mr. Pizzuto refers to Idaho as "Idaho," "the State of Idaho," and "the State." Likewise, throughout this complaint, Mr. Pizzuto refers to the defendants, variously, as "the defendants," "the State," "IDOC," and other phrases, as appropriate. His use of these expressions does not limit the scope of the claims, which are brought against each and every named defendant.

8.      Venue is further proper because, upon information and belief, the defendants both reside in the District of Idaho.

**IV.     Parties**

9.      Mr. Pizzuto is a person within the jurisdiction of the State of Idaho.

10.     Mr. Pizzuto is an inmate under the supervision of the Idaho Department of Correction ("IDOC").

11.     Mr. Pizzuto is confined at the Idaho Maximum Security Institution ("IMSI").

12.     Mr. Pizzuto is under sentence of death.

13.     As set forth in greater detail below, the defendants are state officials responsible for developing, overseeing, and/or implementing death by lethal injection in Idaho.

14.     Defendant Josh Tewalt ("Director Tewalt" or "now-Director Tewalt") is the Director of IDOC.

15.     Director Tewalt is responsible for approving the substances and procedures to be used in any execution performed by IDOC.

16.     Defendant Tim Richardson is Warden of IMSI.

17.     Warden Richardson is the official executioner for inmates in Idaho state custody.

18.     Upon information and belief, Mr. Pizzuto and the defendants are all United States citizens.

19.     The defendants are all officials of the State of Idaho.

20.     All of the actions that have been and will be taken by the defendants towards executing Mr. Pizzuto and any other actions at issue in this Complaint were or will be taken under color of state law.

21.     The defendants are all sued in their official capacities.

## V.    General Factual Allegations

22.    Mr. Pizzuto incorporates each and every statement and allegation set forth throughout this complaint as if fully rewritten.

23.    Mr. Pizzuto was convicted of first-degree murder for the killing of Delbert and Berta Herndon and sentenced to death in Idaho County District Court.

24.    Mr. Pizzuto's murder convictions and sentence were upheld on direct appeal in 1991.

25.    Mr. Pizzuto was scheduled to be executed on June 2, 2021.

26.    On May 18, 2021, Mr. Pizzuto's execution was stayed until his commutation proceedings are complete.

27.    A commutation hearing is expected to take place on November 30, 2021.

28.    If Mr. Pizzuto's petition for commutation is denied, he anticipates that the State will secure another death warrant, which will set a date for his execution within the following thirty days.

29.    By statute, lethal injection is the only authorized method of execution in Idaho.

30.    The same statute gives the IDOC Director the power and responsibility to approve the lethal injection protocols and methods, which includes the authority to approve the drug(s) and the procedures used in an execution.

### A.    Procedural History

31.    IDOC electronically publishes its rules and procedures governing a variety of matters, including lethal injection. IDOC's website includes a copy of Idaho's Standard Operating Procedure ("SOP") for "Execution Procedures," Control Number 135.02.01.001 (hereinafter "SOP 135").

AMENDED COMPLAINT – Page 4

32.     The defendants issued version 4.0 of SOP 135 on March 30, 2021.

33.     Mr. Pizzuto will henceforth refer to version 4.0 of SOP 135 as "the Protocol."[3]

**B.      General Problems with Executions**

34.     A host of issues have arisen with respect to executions across the country that increase the risk of problems arising at any given execution.

35.     Those problems increase the possibility of something going wrong at a particular execution, such as the use of an unreliable drug.

36.     Such problems increase the risk of an unconstitutionally painful execution in violation of the Eighth Amendment.

37.     As a result, the problems exacerbate the risks described below in Claim One that create a danger that Mr. Pizzuto in particular will suffer an execution in violation of the Eighth Amendment.

**1.      Other States' Use of Unreliable Sources for Execution Drugs**

38.     States around the country, including but not limited to Arizona, Arkansas, California, Georgia, Nebraska, South Carolina, South Dakota, and Tennessee, have resorted to dubious international sources for lethal injection drugs.

39.     For example, several states, including but not limited to Arizona, Arkansas, California, Georgia, South Carolina, and Tennessee, purchased mislabeled sodium thiopental for use in lethal injections from Dream Pharma, Inc., a fly-by-night pharmaceutical wholesaler/distributor who operated out of a storefront driving school in London, England.

---

[3] When Mr. Pizzuto refers to the Protocol here, he also includes the associated documents hyperlinked therein, including the Execution Chemicals Preparation and Administration document, which was also updated and posted to IDOC's website on March 30, 2021.

AMENDED COMPLAINT – Page 5

40.     Before the thiopental was seized by the federal government, it was used in two executions in September 2010 and January 2011 and both inmates' eyes were open in the midst of their executions, suggesting that they were inadequately sedated.

41.     States have used unreliable domestic sources for executions as well.

42.     For example, a pharmacy in Oklahoma called the Apothecary Shoppe provided drugs for at least three Missouri executions in 2013 and 2014.

43.     The Apothecary Shoppe had its license put on probation after it admitted to committing 1,892 regulatory violations, including the improper extension of expiration dates and the use of questionable sterilization practices.

44.     After the Apothecary Shoppe stopped providing drugs to Missouri for executions, Missouri turned to Foundation Care, a compounding pharmacy in St. Louis.

45.     Missouri used drugs from Foundation Care for seventeen executions.

46.     Prior to Missouri's selection of Foundation Care, the Food and Drug Administration ("FDA") determined that the company was not testing all of its drugs for sterility and bacterial contamination, that it had inadequate controls for sterility, and that some of its drugs were contaminated with bacteria.

47.     The FDA deemed Foundation Care a high-risk pharmacy.

48.     Other states' questionable practices, like Idaho's questionable practices described below, make it likely that Idaho will continue to try to obtain chemicals from unreliable sources, thereby increasing the risk of problems arising at the execution that would increase the pain and suffering felt by Mr. Pizzuto.

AMENDED COMPLAINT – Page 6

### 2. Compounding Pharmacies

49. The two most recent executions in Idaho were those of Paul Ezra Rhoades in November 2011 and Richard Leavitt in June 2012.

50. For Mr. Leavitt's execution, IDOC obtained its chemicals from a compounding pharmacy.

51. At the time of Mr. Leavitt's execution, Jeff Zmuda was the Deputy Chief of the Bureau of Prisons for IDOC.

52. Mr. Zmuda was the Deputy Director of IDOC in 2008 and early 2009 at the time of the relevant trial proceedings in *Cover v. Idaho Bd. of Corr.*, Ada Cty., No. CV01-18-3877 (hereinafter "the *Cover* case").

53. Mr. Zmuda testified in the *Cover* case that the drugs for Mr. Leavitt's execution were acquired from a compounding pharmacy.

54. Mr. Zmuda further testified in the *Cover* case that the compounding pharmacy who provided the drugs for Mr. Leavitt's execution could not supply chemicals to IDOC for future executions because it was not in compliance with current regulations.

55. IDOC has therefore previously relied upon an unreliable source for execution drugs, which in turn suggests a greater chance that it will do so again.

56. Apart from specific problems with IDOC's previous source, its use of a compounding pharmacy suggests that it may do so again, and that in and of itself raises serious questions.

57. Compounding is a practice used by pharmacists to combine, mix, or alter ingredients to create drugs.

AMENDED COMPLAINT – Page 7

58. Compounding pharmacies typically follow informal recipes and attempt to approximate the patented process used in manufacturing drugs approved by the FDA.

59. The finished product is designed to replicate a variation of—but is not the same as—an FDA-approved manufactured drug that goes by the same name.

60. Compounded drugs are not FDA-approved.

61. Compounding pharmacies are not subject to the FDA's good manufacturing practice regulations.

62. The FDA does not verify the safety or effectiveness of drugs prepared by compounding pharmacies.

63. Compounding involves the use of raw ingredients, including Active Pharmaceutical Ingredients ("APIs"), which are the active ingredients in the compounded drug.

64. There are significant questions about the quality of APIs used in compounding.

65. Many APIs come from plants in India and China that are not registered with the FDA.

66. In some instances, APIs are made on the same equipment as pesticides.

67. Compounding pharmacies have been identified as a chief outlet for counterfeit bulk drugs.

68. With compounders, it is difficult to trace the raw chemicals back to the original manufacturer for information about their quality and integrity, and difficult to determine expiration dates of individual ingredients.

69. Accordingly, a chemical labeled as a particular active ingredient may actually be a different ingredient, and there is no way to have confidence that the APIs are free from contamination.

AMENDED COMPLAINT – Page 8

70.     Compounded drugs often degrade and lose efficacy more quickly than non-compounded drugs.

71.     Compounded drugs are not required to meet the stringent requirements regarding contamination, dilution, and degradation that manufactured drugs are required to meet.

72.     Compounding pharmacies generally are unable to test chemicals to confirm their identity, potency, and purity, or to detect contamination.

73.     While a compounding pharmacist might accurately measure or weigh individual ingredients, he or she would have no way of discovering in a pharmacy setting if the ingredients themselves were adulterated or counterfeit.

74.     This method for creating drugs unnecessarily adds enormous risk that the drugs will be ineffective, sub-potent, expired, or contaminated, or that they will contain unintended additives or a substantial level of particulates.

75.     Any one of these problems increases the danger that a compounded drug would not work as it is intended to and would therefore lead to a substantial risk of serious harm in an execution.

76.     Preparation of drugs intended for intravenous ("IV") administration is one of the most difficult of all pharmaceutical processes to execute.

77.     For a drug to be compounded effectively, the process must be carried out under specific environmental conditions, using precise equipment, and performed by highly trained personnel.

78.     There is little tolerance for error.

79.    If compounded drugs are prepared improperly, the pH can become off-balance, making the preparation more caustic than a manufactured version of the product, and causing intense, burning pain to the inmate upon injection.

80.    An out-of-balance pH can also cause ingredients to fall out of the solution in the form of particles, creating risks that the particle becomes contaminated or lodged in small blood vessels or in a prisoner's lungs, which would be extremely painful.

81.    If the preparation is created from non-sterile ingredients, or at a facility or by an individual who lacks the expertise to maintain sterility and quality of the drug, the drug can become contaminated with fungi, bacteria, and other contaminants.

82.    Contaminants could include endotoxins, which would elicit an inflammatory reaction and can result in shock, or the preparations can become contaminated with a different drug from the same facility.

83.    Cross-contamination can occur during compounding when the air supply for the room in which one drug is being compounded is not scrupulously segregated from the air supply in the room in which another, allergy-causing agent is being produced.

84.    The consequence of contamination can be immediate anaphylaxis, i.e., a serious, life-threatening allergic reaction.

85.    These various problems with compounded drugs create a substantial risk of serious pain.

86.    Sterile preparations manufactured from non-sterile ingredients must be stored and transported within specific temperature requirements.

AMENDED COMPLAINT – Page 10

87.     If these temperature requirements are not followed, there is increased risk of microbial growth, chemical degradation, contamination from physical damage to packaging, and permeability of plastic packaging.

88.     Compounded drugs must be kept in carefully prescribed conditions related to the stability and properties of the specific medicine in question.

89.     Especially for solutions, stability depends on the purity and concentration of specific ingredients, the type of packaging, protection from environmental exposure, and proper storage.

90.     Small changes in any one of those variables can cause rapid loss of drug strength or much shorter than expected shelf life.

91.     It is imperative to test both stability and sterility multiple times over a drug's shelf life, not just shortly after it is compounded.

92.     Many laboratories that hold themselves out as facilities that test compounded drugs are sub-standard.

93.     Correctional departments have had problems with properly maintaining compounded drugs.

94.     For example, in March 2015, the Georgia Department of Corrections discovered the compounded pentobarbital that it had acquired for an execution had become cloudy because poor storage conditions affected the temperature of the drugs.

95.     Some executions with compounded drugs have been problematic.

96.     For example, in January 2014, while Michael Lee Wilson was being executed in Oklahoma with compounded pentobarbital he cried out, upon administration of the drug, that he felt his "whole body burning."

97.     A report prepared after the Wilson execution found that the injection likely contained cross-contaminants that the prisoner was allergic to, as well as bacteria and endotoxins.

98.     An April 2014 Texas execution of Jose Luis Villegas involving compounded pentobarbital likewise spurred the inmate to complain of a burning sensation.

99.     In October 2012, Eric Robert, a South Dakota inmate being executed with compounded pentobarbital, gasped heavily, and observers noticed that his skin turned a blue-purplish hue, his eyes remained open throughout the execution, and his heart continued to beat ten minutes after he stopped breathing.

100.     Subsequent analysis of the pentobarbital used in the South Dakota execution indicated that it was contaminated with fungi.

101.     All of the foregoing events are consistent with the administration of a compounded drug that was contaminated or sub-potent.

102.     The fact that other states have had problems with compounded drugs makes it more likely that Idaho will, which in turn means that there is a greater risk that Mr. Pizzuto will suffer an unconstitutional degree of pain at his execution.

103.     The manufacturers of pentobarbital prohibit its use in executions.

104.     Therefore, when pentobarbital is used in executions, it is either compounded pentobarbital or it is manufactured pentobarbital that was obtained through deceptive means.

    **3.     IDOC's Misconduct**

105.     On information and belief, to prepare for Mr. Leavitt's execution, Kevin Kempf and now-Director Tewalt boarded a chartered plane on or around May 30, 2012.

106.     On this flight, Mr. Kempf and now-Director Tewalt had in their possession a suitcase containing more than $10,000 in cash.

AMENDED COMPLAINT – Page 12

107.   Both Mr. Kempf and now-Director Tewalt were IDOC employees at the time of this trip.

108.   Upon information and belief, at the time of the May 30, 2012 trip, Mr. Kempf was the Division Chief of Operations for IDOC.

109.   Upon information and belief, at the time of the May 30, 2012 trip, now-Director Tewalt was the Deputy Chief of the Bureau of Prisons for IDOC.

110.   With their suitcase full of cash, Mr. Kempf and now-Director Tewalt flew to Tacoma Narrows Airport in Washington State.

111.   After their plane landed, Mr. Kempf and now-Director Tewalt exchanged the money for lethal injection drugs.

112.   Upon information and belief, this occurred in a Walmart parking lot.

113.   Mr. Kempf and now-Director Tewalt then brought the drugs back to Idaho.

114.   These drugs were obtained to be used in Mr. Leavitt's execution.

115.   On information and belief, Mr. Kempf at that time had no training in pharmacy science or medicine, and no education on the proper transportation and storage of drugs.

116.   On information and belief, now-Director Tewalt at that time had no training in pharmacy science or medicine, and no education on the proper transportation and storage of drugs.

117.   Upon information and belief, Mr. Kempf and now-Director Tewalt were directed to take the aforementioned trip to Tacoma by Brent Reinke, who was the Director of IDOC at the time.

118.   On information and belief, Mr. Reinke was authorized by then-Governor Butch Otter to approve the trip.

AMENDED COMPLAINT – Page 13

119.    After they bought drugs for an execution with a suitcase full of cash, Mr. Kempf and now-Director Tewalt were both later promoted, at separate times, to IDOC Director, the highest position in the organization.

120.    Compounded pentobarbital is a high-risk sterile injectable.

121.    As such, compounded pentobarbital is meant to be administered within twenty-four hours, if stored at room temperature, and within seventy-two hours, if kept refrigerated.

122.    A pentobarbital preparation cannot be frozen because freezing degrades the preparation.

123.    Mr. Leavitt was executed on June 12, 2012, thirteen days after the pentobarbital was obtained.

124.    The plane that carried the drugs from Tacoma to Boise was parked for about three hours and was in the air for approximately one hour and twenty minutes, after which the chemicals presumably had to be driven elsewhere.

125.    Based on the previous facts, there is reason to suspect, on information and belief, that the pentobarbital acquired by Mr. Kempf and now-Director Tewalt may not have been properly stored during the time between when they obtained it and when it was used at Mr. Leavitt's execution, or that it was held too long before it was administered.

126.    The Idaho Board of Correction appointed Mr. Kempf as IDOC Director in December 2014.

127.    The Idaho Board of Correction appointed Director Tewalt as IDOC Director in November 2018.

128.    Director Tewalt is currently IDOC Director.

129.    Mr. Kempf is now the Executive Director of the Correctional Leaders Association ("CLA"), formerly known as the Association of State Correctional Administrators ("ASCA").

130.    Mr. Kempf took over in that position in December 2016.

131.    CLA's members are the leaders of each U.S. state correctional system.  In those roles, CLA members oversee more than 400,000 correctional professionals and are in charge of more than eight million inmates and other convicts.

132.    Between approximately 2016 and 2018, now-Director Tewalt was Director of Operations for CLA.

133.    IDOC's approach to acquiring drugs for Mr. Leavitt's execution makes it more likely that the organization will engage in similar conduct in connection with future executions, increasing the risk that it will acquire unreliable drugs.

134.    IDOC's history of resorting to questionable sources for its execution drugs makes it more likely that it will do so again.

135.    In March 2011—as IDOC was preparing to execute Messrs. Rhoades and Leavitt—Randy Blades, then the Warden of IMSI, started trying to obtain lethal injection chemicals.

136.    To get the chemicals, Mr. Blades contacted a man named Chris Harris to inquire about the possibility of purchasing the drugs from him.

137.    At the time, Mr. Harris was based in Kolkata, India.

138.    Mr. Harris was a salesman whose career involved positions at a duty-free airport shop and call centers.

139.    On information and belief, Mr. Harris had no training in the practice of pharmacy or medicine.

140.    Mr. Harris has attempted to import drugs into the United States without the requisite approval by the FDA.

141.    On information and belief, Mr. Harris has also engaged in acts of dishonesty.

142.    To obtain drugs to send to Nebraska for executions, for example, Mr. Harris falsely told Naari, a pharmaceutical company, that the medications would be shipped to Africa so they could be used for anesthetic purposes in the developing world.

143.    IDOC ultimately acquired the drugs for Mr. Leavitt's execution in 2012 from Union Avenue Compounding Pharmacy ("Union") of Tacoma, Washington.

144.    On information and belief, the pharmacist who provided the drugs for Union was Kimela Burkes.

145.    In 2015, regulators inspected Union and found that it had twenty-seven outdated or expired items in its drug stock, and that it failed to properly record in its system the chronic conditions of a number of patients.

146.    A follow-up inspection in 2016 discovered that Union had not fixed several of the problems, despite being warned by officials, and that some of them had actually gotten worse.

147.    As a result of the regulators' complaint, Ms. Burkes agreed to a series of sanctions, including having her license placed on probation for a year.

148.    For Mr. Rhoades' execution in 2011, IDOC obtained the drugs from University Pharmacy ("University") in Salt Lake City.

149.    University compounded the drugs for Mr. Rhoades' execution.

150.    There are significant reasons to question the reliability of University.

151.    For example, state and federal regulators have cited University for a number of violations, including many in the few years before and after Mr. Rhoades' execution.

AMENDED COMPLAINT – Page 16

152.    In 2017, state regulators inspected University and concluded that it was in violation of six different rules, including those having to do with documentation, labeling, and expiration dates.

153.    The regulators noted nineteen different items, comprising twenty-seven vials total, where there were problems with the documentation of the products' expiration dates.

154.    In 2014, state regulators inspected University and found that 232 medications and compounding ingredients were expired or had indeterminate expiration dates in the pharmacy's regular stock.  Officials fined University $1,050 and filed a cease-and-desist order.

155.    In 2013, federal regulators with the FDA conducted several inspections of University and filed a report finding a number of problems.

156.    These inspections were done only fourteen months after University provided drugs for Mr. Rhoades' execution.

157.    In its report, the FDA concluded that University committed a variety of violations, including: failing to sanitize equipment enough to protect the integrity of the drugs; allowing spills, splatter, rust, and so forth to remain in sensitive areas; a technician taking out garbage in the middle of a sterilization process and then sticking his hand back into the equipment without changing his gloves; and not checking products properly to make sure they were stable and could last.

158.    In 2009, state regulators cited University for dispensing sixty prescriptions to practitioners around the country based on orders that did not include the patients' names and addresses, in violation of state law.

159.    University admitted the misconduct and was issued a cease-and-desist order.

160.    In 2008, FDA officials observed nineteen separate problems with University after a series of inspections.  The problems included issues with the pharmacy's sterilization practices,

maintenance of its equipment, failure to properly document testing, inadequate measures to make sure drugs were clean and stable before they were sent to patients, improper storage of chemicals, flaws in the training regimen, and so forth.

### C.    Human Error at Executions

161.    Correctional staff and agents have made a variety of serious mistakes at executions.

162.    As a consequence, there is a higher risk that mistakes will be made at Mr. Pizzuto's execution, making a torturous death more likely.

163.    For example, at the Oklahoma execution of Clayton Lockett in April 2014, the executioners apparently had problems setting an IV line, which took them fifty-one minutes to do.

164.    During Mr. Lockett's execution, staff punctured multiple parts of his body at least twelve times before essentially jury-rigging a solution by inserting a too-short catheter in his right femoral vein and attempting to secure it with tape.

165.    As a result of that failure, Mr. Lockett began to writhe and gasp after he had already been declared unconscious, kicked his leg, rolled his head, grimaced, and grunted, all for more than thirty minutes.

166.    In the course of Mr. Lockett's execution, some of the lethal injection drugs massed in his tissue, creating a swelling under his skin larger than a golf ball.

167.    Eventually, Mr. Lockett died of a heart attack.

168.    At the Arizona execution of Robert Towery in March 2012, it took fifty-nine minutes to set the IV lines.

169.    An autopsy later revealed that Mr. Towery had been punctured at least eleven times.

170.    At a Florida execution in December 2006, a misplaced IV line allowed caustic lethal injection drugs to leak into the soft tissue of the arms of inmate Angel Nieves Diaz.

AMENDED COMPLAINT – Page 18

171.    The drugs accordingly failed to render Mr. Diaz unconscious while causing chemical burns so severe that a great deal of the skin on his arms sloughed away.

172.    On information and belief, Mr. Diaz likely suffocated to death before the execution drugs could end his life.

173.    In 2009 in Ohio, in attempting to execute Romell Broom, the execution team stabbed him with needles for an hour and a half while trying to find a vein, using eighteen needle sticks in the process.  Finally, the governor halted the execution.

174.    Training and regular experience are required in order to obtain IV access.

175.    Errors in placing IV lines cause chemical solutions to escape into subcutaneous tissue, which can cause excruciating pain.

176.    Problems in executions can also be caused by errors in preparing IVs, labeling syringes, preventing IVs from leaking, preventing veins from leaking, waiting the appropriate amount of time between injections, and injecting the chemicals properly.

177.    Members of execution teams in other states have been revealed to have histories that raised questions about their suitability for the task.

178.    For example, a member of the execution team in Arizona had his nursing license suspended and had a lengthy arrest record.

179.    Similarly, it was found that a surgeon involved in Missouri executions was dyslexic and had prepared lower-than-expected amounts of anesthesia for several inmates who were put to death.

180.    Execution equipment in some states has been found wanting.  For instance, there have been issues raised about adequate lighting in the room where the chemicals are prepared and about adequate sightlines from that room into the execution chamber.

AMENDED COMPLAINT – Page 19

VI.    **Claims**

A.  **Claim One – The Use of Compounded Pentobarbital[4] at Mr. Pizzuto's Execution Violates the Eighth Amendment.**

1.    **Mr. Pizzuto's Health Concerns**

181.    Mr. Pizzuto incorporates each and every statement and allegation set forth throughout this complaint as if fully rewritten.

182.    The use of pentobarbital at Mr. Pizzuto's execution creates a substantial risk of serious pain and suffering because of his health conditions and medical history, amongst other factors, all in violation of the Eighth Amendment of the United States Constitution, as incorporated against the states by the Fourteenth Amendment.

183.    The pain described below that Mr. Pizzuto is at risk of suffering is created by his heart condition, his medication history, and the other factors specific to his execution discussed below.

184.    As a consequence, one would not expect the average inmate to be at risk of the same pain at another pentobarbital execution.

185.    Therefore, the use of pentobarbital creates a risk of cruelly superadding pain to Mr. Pizzuto's execution.

186.    Mr. Pizzuto has terminal bladder cancer.

187.    Mr. Pizzuto has coronary artery disease.

188.    Mr. Pizzuto has type 2 diabetes.

---

[4] If the defendants do not select pentobarbital for use at Mr. Pizzuto's execution, he reserves the right to challenge their choice on whatever grounds are appropriate, which may include the State's violation of Mr. Pizzuto's First Amendment right to access the courts, his Due Process right to notice and hearing, his Eighth Amendment right to be free from cruel and unusual punishment, and potentially other violations.

189.     As a result of Mr. Pizzuto's many health issues, and in particular his bladder cancer, he was placed on hospice care on November 1, 2019 because his life expectancy was six months or less.

190.     Mr. Pizzuto has been on hospice care from November 1, 2019 to the present.

191.     Mr. Pizzuto expects to be on hospice care until he passes away.

192.     Given Mr. Pizzuto's decision to enroll in hospice, his medical team has discontinued any medication intended to extend his life.

193.     Instead, Mr. Pizzuto is only on comfort care, i.e., he is only accepting medications designed to ameliorate his pain and discomfort.

### a.  Mr. Pizzuto's Heart Condition

194.     Mr. Pizzuto has had at least two heart attacks—the first in September 2006 and the second in July 2019.

195.     During the 2006 heart attack, Mr. Pizzuto became unresponsive and his breathing and pulse stopped.

196.     He was brought back to life through electrical shocks and other CPR measures.

197.     Mr. Pizzuto's heart problems have also led to the placement of four separate stents.

198.     Mr. Pizzuto's heart condition creates a substantial risk of serious harm at an execution involving pentobarbital.

199.     There is a high likelihood that Mr. Pizzuto's left circumflex artery has clinically significant obstructive disease.

200.     Mr. Pizzuto has severe, complex coronary artery disease.

AMENDED COMPLAINT – Page 21

201.    It is very uncommon for individuals to have severe, complex coronary disease to the extent that Mr. Pizzuto does and for individuals to have the kind of extensive history of heart problems that Mr. Pizzuto has.

202.    In individuals with severe obstructive coronary artery disease, a sudden drop in blood pressure is likely to cause myocardial ischemia and/or infarction, or what is commonly known as a heart attack.

203.    Large doses of pentobarbital are likely to cause acute drops in blood pressure.

204.    Onset of a heart attack under these circumstances is nearly immediate.

205.    The sedating effects of pentobarbital are likely to occur minutes after the heart attack begins.

206.    Heart attacks often cause substantial physical suffering, including chest pain, the feeling of a crushing weight, and difficulty breathing.

207.    Heart attacks often cause substantial psychological discomfort, including a feeling of impending doom, anxiety, or fear.

208.    It is likely that a pentobarbital execution of Mr. Pizzuto would induce an acute heart attack.

209.    It is likely that Mr. Pizzuto would experience cruel and unusual pain and suffering from the heart attack.

210.    It is likely that Mr. Pizzuto would experience cruel and unusual pain and suffering from the heart attack for a significant amount of time before the pentobarbital completely sedated him.

211.    Two previous executions—that of Roy Blankenship in Georgia and Eddie Powell in Alabama—confirm the risk posed to Mr. Pizzuto by a pentobarbital execution.

AMENDED COMPLAINT – Page 22

212.    Autopsies of Messrs. Blankenship and Powell indicated that both had clinically significant obstructive coronary disease.

213.    The two men were both executed by pentobarbital.

214.    Both men appeared to be in substantial pain during their executions, with witnesses observing grimacing, writhing, thrashing, and so forth.

215.    The observations of both men's executions were consistent with the physical manifestation associated with heart attacks.

216.    Other pentobarbital executions have taken place on different inmates who did not have obstructive coronary artery disease.

217.    Most of those executions did not include the kinds of painful reactions seen when Messrs. Blankenship and Powell were put to death.

218.    As a result of Mr. Pizzuto's heart condition and the facts recited above, the use of pentobarbital at his execution creates a significant risk of pain greater than that to be otherwise expected.

219.    Mr. Pizzuto's uncontrolled diabetes increases the risk of a painful heart attack caused by pentobarbital.

220.    The use of *compounded* pentobarbital in particular increases the risk of a painful heart attack because of the issues with compounding summarized earlier involving reliability, purity, potency, sterility, efficacy, and so forth.

221.    This risk is further exacerbated when the compounding is conducted by a pharmacy with known regulatory violations like the two pharmacies IDOC selected for the Rhoades and Leavitt execution drugs.

### b.  Mr. Pizzuto's Medication History

222.    Because of Mr. Pizzuto's medication history, the use of pentobarbital at his execution creates a substantial risk of serious harm.

223.    Mr. Pizzuto has multiple cancerous tumors in his bladder.

224.    Mr. Pizzuto underwent a resection of his bladder tumors in August 2016.

225.    However, the surgeon was unable to remove all of the tumors.

226.    Since then, the tumors have grown back and there has been no effort to remove them.

227.    In September 2019, bleeding from Mr. Pizzuto's bladder tumors caused him to experience severe sepsis and shock, which triggered an ambulance ride and a five-day hospitalization.

228.    Doctors have prescribed Mr. Pizzuto numerous medications to treat his many ailments, including drugs to help with the pain caused by his bladder cancer.

229.    Over the last two years alone, Mr. Pizzuto has been prescribed at least forty-two different drugs by medical staff, including high doses of powerful painkillers, such as morphine and oxycodone.

230.    Mr. Pizzuto has been given painkillers in such high doses that he began suffering from acute toxic encephalopathy in October 2019, a syndrome of temporary or permanent disturbance of brain functions that can cause mild mental disorders, deep coma, and death.

231.    To treat his pain, Mr. Pizzuto has been prescribed substantial amounts of gabapentin over lengthy periods of time from 2015 to the present.

232.    Currently, Mr. Pizzuto is taking 1,200 milligrams of gabapentin three times a day for a total of 3,600 milligrams.

233.    Over time, taking gabapentin alters the patient's brain chemistry by increasing the number of receptors susceptible to the drug and causing the receptors to become more tailored to the drug.

234.    Consequently, the receptors become less responsive and possibly unresponsive to other drugs.

235.    Such drugs include pentobarbital.

236.    To use pentobarbital in executions, states rely on its ability to decrease activity in the inmate's central nervous system.

237.    Pentobarbital decreases activity in the nervous system through its effect on gamma-Aminobutyric acid ("GABA"), a chemical in the brain.

238.    Sustained use of gabapentin compromises the mechanism through which pentobarbital facilitates the binding of GABA to its receptors, thereby limiting the drug's capacity for depressing electrical activity in the brain.

239.    The use of pentobarbital at an execution on an individual who has—like Mr. Pizzuto—been given high doses of gabapentin also raises the risk of a seizure.

240.    Gabapentin is an anticonvulsant.

241.    Pentobarbital has the chemical properties of an anticonvulsant.

242.    However, pentobarbital is only used medically as an anticonvulsant in emergencies, because of its undesirable sedative properties and the possibility of triggering paradoxical seizure activity.

243.    Studies have suggested that seizure activity grows after the administration of gabapentin.

244.     When individuals overdose on anticonvulsants, seizure worsening is a common paradoxical manifestation.

245.     The combination of massive doses of two anticonvulsants—gabapentin and pentobarbital—introduces a significant, gratuitous risk of seizure.

246.     Such a seizure carries with it a substantial risk of serious pain.

247.     Based on the above, at a pentobarbital execution, there is a substantial risk that the lethal chemical would not render the person unconscious, as intended, while exposing the individual to a series of substantial harms, including: a prolonged and painful death process; awareness of the process of dying, an increased likelihood of seizures, the possibility of additional paradoxical reactions, and acute pulmonary edema, a buildup of fluid in the lungs which creates a sensation akin to suffocating or drowning, and accompanying feelings of terror.

248.     The pulmonary edema that Mr. Pizzuto would suffer in the scenario described in the preceding paragraph would subject him to significant additional pain that he does not experience with his current health conditions.

249.     Pulmonary edema causes excruciating physical and psychological suffering, and therefore significant pain.

250.     Mr. Pizzuto's history of prescription opioid use further increases the risks associated with a pentobarbital execution.

251.     Mr. Pizzuto has a lengthy history of prescription opioid use, which includes tramadol, fentanyl, and morphine.

252.     Most significantly, Mr. Pizzuto has been taking oxycodone for pain control continuously from November 2019 to the present.

AMENDED COMPLAINT – Page 26

253.    Mr. Pizzuto's dosage of oxycodone has been increased on at least eleven separate occasions during that period.

254.    As of this writing, Mr. Pizzuto is being administered 180 milligrams of oxycodone daily, which is nearly three times more than what was originally prescribed.

255.    That is an unusually high dose of oxycodone.

256.    For example, 80 milligrams per day of oxycodone—less than half of Mr. Pizzuto's dosage—is considered the typical prescription for a terminal cancer patient.

257.    The maximum daily dosage of oxycodone is considered 90 milligrams per day, and Mr. Pizzuto is taking twice that.

258.    Mr. Pizzuto's dosage would likely have immediate detrimental effects in a person who was not tolerant to the drug, such as respiratory depression with catastrophic complications.

259.    Mr. Pizzuto's opioid use makes him even more likely not to respond to the administration of pentobarbital in an execution as intended.

260.    That is because opioids induce the inhibition of GABA-mediated neurotransmitters.

261.    That increases the risk that Mr. Pizzuto will suffer the painful effects described earlier in the discussion of gabapentin.

262.    The risks associated with a pentobarbital execution as a result of Mr. Pizzuto's opioid drug history are increased by the problems with compounding described earlier relating to reliability, potency, purity, sterility, efficacy and so forth.

> **2.      Problems with the Protocol**

263.    The risks outlined above are exacerbated by flaws in the Protocol.

264.     Under the Protocol, the medical team members are instrumental to the carrying out of executions, as they are the ones preparing and administering the lethal chemicals, as well as monitoring the inmate's level of consciousness.

265.     The Protocol requires that members of the medical team have "three years of medical experience" in various positions, including as nurses, paramedics, and phlebotomists.

266.     Individuals with those backgrounds do not have the requisite training to properly administer the chemicals in the Protocol while accurately evaluating the possibility that the inmate is conscious, sensate, or in pain when the individual has the kind of complicated medical status that Mr. Pizzuto does.

267.     Only a practicing anesthesiologist would be fully qualified to perform that function.

268.      Under the Protocol, members of the medical team need not be physicians.

269.      The Protocol does not require that any member of the medical team be an anesthesiologist.

270.     On information and belief, no member of the medical team assembled for Mr. Pizzuto's execution is a practicing anesthesiologist.

271.     Anesthesiologists understand the pharmacology of anesthetic drugs and their interactions, which determines the sequence and timing of how chemicals should be injected.

272.     Other types of medical professionals, like nurses and paramedics, do not have that scientific background.

273.     When drugs are administered and the pacing is off, it can create a painful reaction.

274.     A person may be experiencing pain and yet not expressing it in a way that is visible to the naked eye.

275.    For example, an inmate could receive a large dose of pentobarbital at an execution and appear to go to sleep, yet still be going through a painful experience.

276.    Anesthesiologists are experts in determining whether there is pain in such circumstances and adapting to those circumstances.

277.    To do so, they rely on their clinical training.

278.    Anesthesiologists also rely on brain monitors, sophisticated pieces of equipment that measure and convert brain signals so that doctors can understand a patient's level of consciousness and depth of anesthesia.

279.    The Protocol does not provide for the use of a brain consciousness monitor.

280.    On information and belief, IDOC does not plan on using a brain consciousness monitor at Mr. Pizzuto's execution.

281.    If an individual without proper training were handling the drug administration at the execution under the Protocol, and without a brain consciousness monitor, they would essentially be "guessing" the stage of consciousness and pain sensation.

282.    The absence of a practicing anesthesiologist and a brain consciousness monitor add yet more risk for pain at Mr. Pizzuto's execution in addition to the dangers described earlier.

283.    In other words, Mr. Pizzuto's health conditions and prescription drug history create the risk of a painful execution and the flaws in the Protocol make it more likely that the executioners will not respond appropriately, which would increase and prolong Mr. Pizzuto's suffering.

284.    This is because, if the execution does become unduly painful, the lack of a brain monitor and anesthesiologist would impede the execution team's ability to gauge the pain and therefore respond appropriately to it, such as by administering more or less pentobarbital.

AMENDED COMPLAINT – Page 29

285.     As a result, the presence of an anesthesiologist and a brain consciousness monitor at the execution would assist IDOC in avoiding a substantial risk of significant pain during Mr. Pizzuto's execution process.

286.     The factors arrayed here—including Mr. Pizzuto's heart condition and medication history, as well as IDOC's use of unreliable drugs, the questions surrounding compounding, and the shortcomings in the Protocol—independently and collectively create a substantial risk that his execution will cause him severe pain, in violation of the Eighth Amendment, as incorporated against the states by the Fourteenth Amendment.

### 3.     The Firing Squad

287.     Mr. Pizzuto identifies the firing squad as a more humane alternative to a pentobarbital execution.

288.     The firing squad, if authorized by statute, would be an available method of execution for the defendants.

289.     The firing squad, if authorized by statute, would be a readily implemented method of execution for the defendants.

290.     Between 1982 and 2009, the firing squad was authorized by statute as a method of execution in Idaho in the alternative to lethal injection.

291.     Mr. Pizzuto indicated to IDOC in 2000 that he preferred the firing squad if he were to be executed.

292.     When the firing squad was removed from the statute as an alternative method of execution in Idaho in 2009, the change was not made because IDOC considered the firing squad unavailable.

AMENDED COMPLAINT – Page 30

293.     When the firing squad was removed from statute as an alternative method of execution in Idaho in 2009, the change was not made because of a determination by IDOC regarding whether the firing squad was readily implemented.

294.     When the firing squad was removed from the statute as an alternative method of execution in Idaho in 2009, the change was not made because of a determination by IDOC regarding whether the firing squad was feasible.

295.     In 2014, IDOC officials began inquiring into the possibility of reinstating the firing squad in Idaho.

296.     As part of that inquiry, IDOC officials toured Utah's firing-squad facilities.

297.     Executions by firing squad are currently allowed by statute in Utah, Oklahoma, Mississippi, and South Carolina.

298.     The United States Army adopted a protocol for firing-squad executions in 1944.

299.     The United States Army has successfully carried out executions using the firing squad with no reports of the condemned experiencing extended pain or suffering.

300.     Ronnie Gardner was executed by firing squad in Utah in 2010.

301.     There is no evidence that Mr. Gardner experienced extended pain or suffering at his execution.

302.     IDOC could, if authorized by law, carry out a firing-squad execution following a protocol substantially similar to Utah's.

303.     IDOC employs enough individuals who are sufficiently proficient with weapons such that they could participate in a firing squad under a protocol substantially similar to Utah's.

304.    IDOC would be able to contract with enough individuals who are sufficiently proficient with weapons such that they could participate in a firing-squad execution under a protocol substantially similar to Utah's.

305.    IDOC would be able to conduct trainings to ensure that the members of a firing-squad team were sufficiently proficient with weapons such that they could participate in a firing-squad execution under a protocol substantially similar to Utah's.

306.    The Idaho Peace Officer Standards and Training ("POST") Academy offers courses that include guidance on how to use rifles properly and on marksmanship.

307.    POST training, including in firearms, is required for all security personnel employed by IDOC.

308.    There is a shooting range at the South Boise Correctional Complex available for the use of IDOC staff.

309.    IDOC designates firearms instructors at its correctional facilities.

310.    Every IDOC correctional facility has an armory for the storage of firearms, ammunition, and related equipment.

311.    IDOC employs roughly 2,000 people.

312.    IDOC could solicit its employees to volunteer for service on a firing-squad team.

313.    IDOC's Protocol allows for members of the military to participate in executions.

314.    There are more than 3,000 active-duty members of the Air Force in Idaho.

315.    Every individual who goes through Air Force Basic Training is given instruction on using a rifle.

316.    More than 35,000 guns are registered in Idaho.

317.    IDOC could obtain all of the equipment necessary to conduct a firing-squad execution under a protocol substantially similar to Utah's.

318.    IDOC could construct, or obtain access to, a room for use in a firing-squad execution under a protocol substantially similar to Utah's.

319.    IDOC could use ear protection appropriate for the members of a firing-squad team.

320.    IDOC could obtain eye protection appropriate for the members of a firing-squad team.

321.    At a firing-squad execution, IDOC could use guns appropriate for such an event, such as service rifles of .30 caliber.

322.    At a firing-squad execution, IDOC could use ammunition appropriate for such an event, such as soft-point jacketed .30 caliber bullets of 150–55 grains.

323.    At a firing-squad execution, IDOC could make use of a rack to hold the guns.

324.    At a firing-squad execution, IDOC could use sandbags.

325.    At a firing-squad execution, IDOC could restrain the inmate in a chair.

326.    At a firing-squad execution, IDOC could use armor plating as a safety backdrop.

327.    At a firing-squad execution, IDOC could use bulletproof glass to protect witnesses and others.

328.    At a firing-squad execution, IDOC could use a blindfold or dark hood to obscure the inmate's vision.

329.    At a firing-squad execution, IDOC could use a four-inch round piece of paper as a target.

330.    A firing-squad execution under a protocol substantially similar to Utah's would not pose a substantial risk of causing severe pain to Mr. Pizzuto.

AMENDED COMPLAINT – Page 33

331.     The heart condition of Mr. Pizzuto's discussed above does not create a substantial risk of causing severe pain to Mr. Pizzuto in a firing-squad execution.

332.     Mr. Pizzuto's medication history does not create any potential complications for a firing-squad execution.

333.     Mr. Pizzuto's other health issues do not create any special risks for a firing-squad execution.

## VII.   Prayer for Relief

334.     In light of the above, Mr. Pizzuto respectfully requests that the Court:

a)   Enjoin the defendants from proceeding toward and carrying out an execution of Mr. Pizzuto with pentobarbital;

b)   Declare that any execution of Mr. Pizzuto with pentobarbital is unconstitutional;

c)   If a drug other than pentobarbital is selected, enjoin the defendants from executing Mr. Pizzuto until a new drug has been chosen and there has been sufficient time for his counsel to investigate and to raise any challenges to it;

d)   Enjoin the defendants from executing Mr. Pizzuto until the State can demonstrate that it can do so constitutionally;

e)   Enjoin the defendants from attempting to execute Mr. Pizzuto until the Court orders otherwise;

f)   Authorize appropriate and necessary discovery and an evidentiary hearing to permit Mr. Pizzuto to prove his claims;

g) Grant any such other relief that is just and proper.

DATED this 16th day of November 2021.

/s/ Jonah J. Horwitz
Jonah J. Horwitz
Christopher M. Sanchez
Miles Pope
Federal Defender Services of Idaho

/s/ Stanley J. Panikowski
Stanley J. Panikowski
Amanda Laufer Camelotto
DLA PIPER LLP (US)

*Attorneys for Plaintiff Gerald Ross Pizzuto, Jr.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of November 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Oscar Klaas
oklaas@idoc.idaho.gov

Kristina Schindele
kscchind@idoc.idaho.gov

/s/ Julie Hill
Julie Hill