UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GERALD ROSS PIZZUTO, JR., | Case No. 1:21-cv-00359-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| JOSH TEWALT, Director, Idaho Department of Correction, in his official capacity, TIMOTHY RICHARDSON, Warden, Idaho Maximum Security Institution, in his official capacity, | |
| Defendants. | |

Before the Court is Plaintiff's Motion to Compel Discovery (Dkt. 82). For the reasons explained below, the Court will partially grant and partially deny the motion.

## BACKGROUND[1]

Plaintiff Gerald Ross Pizzuto, Jr. is on death-row in Idaho for murdering Berta and Del Herndon. He filed this lawsuit in September of 2021 to prevent the State from using compounded pentobarbital to execute him. *See generally Am.*

---

[1] The Court assumes the truth of all factual allegations in Pizzuto's Amended Complaint (Dkt. 13) and relies upon those allegations to set forth this Background section.

*Compl.*, Dkt. 13. Pointing to his various medical conditions, Pizzuto claims that using that particular drug would substantially increase his risk of suffering severe pain during the execution and, therefore, would constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. *Id.*

Discovery is ongoing, and the parties have already encountered numerous discovery disputes. Counsel resolved several of those disputes during an informal conference with the Court on April 3, 2023. But some of the stickier issues could not be resolved informally. Namely, the parties disagree on the significance and scope of Idaho Code § 19-2716A. Defendants believe that statute creates a privilege prohibiting disclosure of any information that might directly or indirectly disclose the identity of a person or entity involved in preparing for, supplying drugs for, or administering lethal injections in Idaho. Pizzuto disagrees, arguing that § 19-2716A, a state law, does not control here, and, in any event, that Defendants read that statute too broadly.

At a standstill on several discovery request, Pizzuto filed a Motion to Compel Discovery (Dkt. 82) on April 13, 2023, seeking a court order directing Defendants to answer numerous inquiries: Interrogatories 3, 4, 7, 8, 15, and 19; Requests for Admission 54 and 89; and Request for Production 16. Dkt. 82. That motion is now fully briefed and ready for a decision.

## LEGAL STANDARDS

Under Rule 37 of the Federal Rules of Civil Procedure, a party seeking discovery may move for an order compelling another party to provide an "answer, designation, production, or inspection." FED. R. CIV. P. 37(a)(3)(B). While that rule authorizes courts to compel discovery, it does not set forth the underlying standard for analyzing such motions. For that, courts must look to the other discovery rules and decide "whether the information in question is within the proper scope of discovery and whether the information falls within a required disclosure duty or is the subject of a proper party-initiated discovery request." FED. R. CIV. P. 37, Rules and Commentary Rule 37.

The federal rules give courts broad discretion to permit, prohibit, or limit discovery in civil cases. FED. R. CIV. P. 26(c)(1); *see generally Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063 (9th Cir. 2004). Thus, in compelling discovery responses under Rule 37(a), courts may limit the scope of discovery and craft other conditions governing the compelled disclosures. FED. R. CIV. P. 26(c)(1); *see also Degen v. United States*, 517 U.S. 820, 826 (1996).

## ANALYSIS

Pizzuto seeks a court order compelling Defendants to answer several of his Interrogatories, Requests for Admission, and Requests for Production. Defendants object that the information sought by those discovery requests is not relevant and,

even if it were, is privileged under Idaho Code § 19-2716A. Pizzuto retorts that Defendants waived any relevancy or privilege objections by failing to timely assert those objections in discovery responses. And even on the merits, Pizzuto argues, Defendants' objections fail.

Both sides have some winning arguments. First, the Court agrees with Pizzuto that Defendants waived their objections to Interrogatory 19 by failing to object in a timely discovery response. They did not, however, waive their objections to the other discovery requests, because the Court finds good cause to excuse those short delays. Next, the Court agrees with Defendants that Interrogatory 15 seeks information that is not relevant to this case and therefore not discoverable. Finally, the Court disagrees with Defendants' position that Idaho Code § 19-2716A creates a federal evidentiary privilege. That said, though, the Court ultimately reaches a similar result under Federal Rule of Civil Procedure 26(c)(1) because requiring Defendants to identify members of their execution team and their execution drug-supplier would unduly burden their efforts to enforce Idaho's death penalty laws.

In this Order, the Court charts a tailored course forward by requiring Defendants to provide further discovery responses but protecting any information that would, to a reasonable degree of certainty, identify any person or entity

involved in preparing for, supplying drugs for, or administering the death penalty in Idaho.

## 1.    Waiver

Pizzuto first argues that Defendants waived many of their relevancy and privilege objections by failing to make a timely objection. Defendants concede that several of their discovery responses were untimely but ask the Court to excuse those delays.

A party generally must respond to discovery requests within 30 days after their receipt. FED. R. CIV. P. 33(b)(2), 34(b)(2)(A), 36(a)(3). Failure to timely respond to a discovery request ordinarily constitutes a waiver of any objections the responding party may have to the discovery request. FED. R. CIV. P. 33(b)(4); *Sprague v. Fin. Credit Network, Inc.*, Case No. 1:18-cv-00035-SAB, 2018 WL 4616688, at *2 (E.D. Cal. 2018) (Rules 34 incorporates Rule 33's waiver provision) (citing *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992)). That said, district courts have discretion to excuse the untimeliness of an objection for good cause. FED. R. CIV. P. 33(b)(4).

In determining whether good cause exists, courts in the Ninth Circuit use a "holistic reasonableness analysis, intended to forestall needless waste of time and resources, as well as tactical manipulation of the rules and the discovery process." *Burlington Northern & Sante Fe Ry Co. v. U.S. Dist. Court for Dist. of Mont.*, 408

F.3d 1142, 1149 (9th Cir. 2005), *cert. denied*, 546 U.S. 939 (2005). Relevant

factors include whether a delay was "inadvertent, defiant, or part of a larger

calculated strategy of noncompliance," the presence of "any resulting prejudice or

lack thereof," and "the need to preserve the integrity of the rules by serving as a

warning to other litigants." *Erie Ins. Prop. & Cas. Co. v. Johnson*, 272 F.R.D. 177,

182 (S.D. W. Va. 2010) (quoting *Drexel Heritage Furnishings, Inc. v. Furniture*

*USA, Inc.*, 200 F.R.D. 255, 259 (M.D.N.C. 2001)).

      Both parties suggest that the four-factor test for "excusable neglect" used in

other contexts is a helpful analogue to guide the Court's good-cause analysis under

Rule 33. Under that test, courts consider four factors ("the *Pioneer* factors") when

determining whether a delay is the result of excusable neglect: "(1) the danger of

prejudice to the [requesting party], (2) the length of delay and its potential impact

on judicial proceedings, (3) the reason for delay, including whether it was within

the reasonable control of the [objecting party], and (4) whether the [objecting

party's] conduct was in good faith." *Pincay v. Andrews*, 389 F.3d 853, 855 (9th

Cir. 2004) (citing *Pioneer Inv. Services Co. v. Brunswick Associates Ltd.*

*Partnership*, 507 U.S. 380 (1993)). This Court agrees that the *Pioneer* factors

provide a helpful analytical framework in this context for determining whether

good cause exists to excuse the untimeliness of Defendants' discovery objections.

A.     **Discovery Requests Served October 14 & October 28, 2022, and January 20, 2023**

Pizzuto served discovery requests on October 14, 2022 (Interrogatories 3 & 4), October 28, 2022 (Request for Production 16), and January 20, 2023 (Request for Admission 54). Defendants' responses were late by four days, two days, and one day, respectively. Defense counsel explains that they "inadvertently overlooked or missed the deadlines" due to juggling other duties such as responding to other discovery requests, engaging in motion practice, and preparing for depositions. *Def.'s Resp.* at 7, Dkt. 84.

Three of the *Pioneer* factors support finding good cause to excuse Defendants' untimeliness: the delays did not prejudice Pizzuto, were very brief, and were not the result of bad faith. The other factor supports deeming the objections waived: the delay was entirely within Defendants' control. All things considered, Defendants' minor untimeliness in responding to these three discovery requests is excusable under the circumstances. *See, e.g.*, *Pincay*, 389 F.3d at 860 (affirming excusal of untimeliness despite attorney's "negligen[ce]"); *Marx v. Loral Corp.*, 87 F.3d 1049 (9th Cir. 1996) (affirming extension of time to file notice of appeal despite attorney's calendaring error), *overruled on other grounds*, 693 F.3d 896 (9th Cir. 2012). That is not to say that Defendants and their attorneys were in any way justified in failing to comply with the 30-day response deadline.

They were not. Nevertheless, given that three of the *Pioneer* factors support

finding excusable neglect, and taking all other factors into consideration, the Court

finds good cause to excuse Defendants' untimeliness as to these three requests.

### B.      Interrogatories Served November 27, 2022

Pizzuto served his Second Set of Interrogatories, including Interrogatory 15,

on November 27, 2022. Dkt. 82-2. Four days later, Defendants responded with a

meet-and-confer letter identifying their objections to Interrogatory 15 and asking to

schedule a phone conference to discuss those objections with opposing counsel.

Dkt. 82-11. Ultimately, Defendants' objections were not resolved during the

telephone conference, and Defendants did not serve their formal discovery

response until January 17, 2023—twenty-one days late.

The parties disagree on whether Defendants' meet-and-confer letter

constituted a "response" which preserved their objection to Interrogatory 15. Under

Rule 33, a party can take one of two steps after receiving a set of interrogatories:

answer or object. If answering, the party must respond to each interrogatory

"separately and fully in writing under oath." FED. R. CIV. P. 33(b)(3).[2] If objecting,

---

[2] In his Reply, Pizzuto argues that Defendants' meet-and-confer letter did not constitute an objection because it did not "answer" Interrogatory 15 "separately and fully in writing under oath." *Pl.'s Reply* at 2, Dkt. 85. This argument falls flat, however, because that part of Rule 33 applies only when a party is answering—not objecting to—an interrogatory.

the party must state its grounds for doing so "with specificity." FED. R. CIV. P. 33(b)(4).

Defendants' letter described their objection to Interrogatory 15 and asked Pizzuto to withdraw that interrogatory. Under Idaho Code § 19-2716A, they wrote, any information that could lead to the identification of an execution team member or source of execution drugs is privileged. Dkt. 82-11. That statement was sufficiently specific under Rule 33(b)(4) to preserve Defendants' objection, even though they did not follow up with a formal discovery response until later.[3]

### C.    Interrogatories Served January 20, 2022

Pizzuto served his Third Set of Interrogatories, including Interrogatory 19, on January 20, 2022. Dkt. 82-4. Defendants did not respond until March 22, 2023, one month after the deadline. Dkt. 82-5. The reason for this delay is unclear— Defendants offer only a general reference to defense counsel's heavy workload. Unlike the short delays discussed above, Defendants' delay in responding to Interrogatory 19 was substantial. Accordingly, two of the *Pioneer* factors (length and reason for day) weigh against excusing Defendants' neglect. Ultimately,

---

[3] Pizzuto notes that the meet-and-confer letter only referenced Interrogatory 15, not the other two interrogatories contained in the Second Set of Interrogatories. *Pl.'s Reply* at 2, Dkt. 85. But those other interrogatories (16 & 17) are not at issue in this Motion to Compel. The question is only whether Defendants waived their objection to Interrogatory 15. As explained, they did not.

Defendants have not shown good cause to excuse their untimely response and their objections to Interrogatory 19 are therefore deemed waived.[4]

### D.     Conclusion

The Court finds that Defendants waived their objections to Interrogatory 19 by failing to timely respond. But the Court finds good cause to excuse Defendants' other untimely objections and will proceed now to the merits of those objections.

## 2.     Relevance

Defendants raise relevancy and privilege objections to Pizzuto's discovery requests. Those defenses play distinct roles. Relevance is a first-tier defense, like a lineman, through which a discovery request must pass before a responding party is obligated to respond. Privilege is a second-tier defense, like a linebacker, that a responding party may raise after a discovery request breaks through the first line of defense. For that reason, when both defenses are raised simultaneously, the Court first takes up the threshold question of relevance and then, if necessary, analyzes privilege.

Federal litigants "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the

---

[4] The Court's discussion, below, of Defendants' interest in protecting the identities of execution team members does not alter this conclusion. Answering Interrogatory 19 will not impose an undue burden on Defendants because they can do so in general terms without identifying any person involved in the State's execution process.

case." FED. R. CIV. P. 26(b)(1). Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. FED. R. EVID. 401.

To succeed on his Eighth Amendment claim, Pizzuto must (1) "establish that [Defendants'] method [of execution] presents a risk that is sure or very likely to cause serious illness and needless suffering," and (2) "identify an alternative that is feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain." *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (quoting *Baze v. Rees*, 553 U.S. 35, 50, 52 (2008)) (cleaned up). The heart of Pizzuto's claim is that, because of his various medical conditions, executing him with compounded pentobarbital will create a substantial risk of an extraordinarily painful death. *Am. Compl.* ¶ 37, Dkt. 13. He further claims that the risks of using compounded pentobarbital are "exacerbated when the compounding is conducted by a pharmacy with known regulatory violations," and when no anesthesiologist is present, and when no brain consciousness monitor is used during the execution. *Id.* ¶ 221. All these factors "independently and collectively" form the basis of Pizzuto's Eighth Amendment claim. *Id.* ¶ 286.

## A.      Execution-Drug Supplier

Two of Pizzuto's disputed interrogatories seek to identify the manufacturer or compounding pharmacy that will provide the drugs for his execution. Interrogs.

3 & 4. He believes that information is relevant because it could support his claim that Defendants will use unreliable drugs for his execution. For example, if the State's chosen drug supplier has a history of regulatory violations, there will be a greater risk of the execution drug being contaminated or diluted, of lesser potency or purity, or derived from expired ingredients. *Am. Compl.* ¶¶ 63–104, Dkt. 13. Evidence of those increased risks, in turn, would strengthen his claim that Defendants' planned method-of-execution "unnecessarily adds enormous risk that the drugs will . . . lead to a substantial risk of serious harm in an execution." *Id.* ¶¶ 74–75.

Defendants object that information about their source of execution drugs is irrelevant because the drugs—once acquired—will be tested for "purity and potency" and will therefore "speak for [themselves]." *Def.'s Resp.* at 13, Dkt. 84. But that argument misconceives the standard for relevance. Relevance is not analyzed with a view toward some future event or anticipated test result. It is enough to say that here, the reliability or unreliability of Defendants' execution-drug supplier does have *some* tendency—if slight—to show whether the drugs used to execute Pizzuto will be reliable. The supplier's identity is therefore at least marginally relevant.

### B.    Selection and Acquisition of Execution Drugs

Pizzuto also served two interrogatories seeking information about Defendants' criteria for choosing particular execution drugs and drug suppliers. Interrogs. 7 & 8. Pizzuto argues this information bears on the risks associated with compounded pentobarbital—risks which are at the heart of his claim—and on the reliability of Defendants' source of drugs. Defendants again argue that their future drug testing will eliminate the relevance of information about its choice of drugs and drug suppliers. But again, that argument falls flat.

Interrogatory 7 asks "how the drugs were chosen for Mr. Pizzuto's execution." The answer might, among other things, include a discussion of the perceived effectiveness of the execution drug or its relative availability compared to alternatives. That information, in turn, may bear on Pizzuto's claim that the selected drug will have a uniquely painful effect on him due to his medical conditions. Defendants' relevancy objection therefore fails. Interrogatory 8 asks "how the source of drugs was chosen for Mr. Pizzuto's execution." Much of Pizzuto's Eighth Amendment claim is premised on the alleged risks of using pentobarbital that is compounded by unreliable sources. The criteria Defendants use to select a drug supplier are therefore relevant to Pizzuto's claim because they bear on the likelihood that the execution drugs will be unreliable. Once again, Defendants' relevancy objection fails.

In contrast, Interrogatory 15 seeks a wide range of information about Defendants' past, unsuccessful efforts to acquire execution drugs. But unlike information about the execution drug and supplier actually selected for Pizzuto's execution, information about Defendants' prior unsuccessful attempts to acquire execution drugs is not relevant. Again, Pizzuto's claim rests on the assertion that the drug the State will use to execute him will inflict severe pain. The truth of that assertion does not depend on the details of Defendants' prior unsuccessful efforts to obtain other drugs from other sources. Defendants' relevancy objection therefore stands, and they need not provide any further response to Interrogatory 15.

Pizzuto also served Request for Admission 54 asking whether Defendants will inquire with the compounding pharmacy (if one is used) to identify the manufacturer of the execution drug's Active Pharmaceutical Ingredients (API). Defendants initially responded by objecting "under Idaho Code § 19-2716A," but then provided an answer by denying that Director Tewalt will make such inquiries. *Pl.'s Memo. in Supp.* at 7, Dkt. 82-1. Since Defendants answered this discovery request, no further analysis or ruling from the Court is necessary.

In sum, information about Defendants' criteria for selecting execution drugs and drug suppliers is relevant, but information about their prior unsuccessful efforts to acquire execution drugs is not.

## 3.    Privilege

Next, Defendants argue that the information Pizzuto seeks is protected by an evidentiary privilege arising under Idaho Code § 19-2716A. That statute provides that "the identities" of certain persons and entities "involved in the planning, training, or performance of an execution shall be confidential, shall not be subject to disclosure, and shall not be admissible as evidence or discoverable in any proceeding before any court, tribunal, board, agency, or person." I.C. § 19-2716A(4). Many states have enacted similar laws, known as "secrecy statutes," in order to prevent the public from identifying individuals and entities involved in preparing for and administering the death penalty. *See Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1340 (11th Cir. 2020) (citing examples of state secrecy statutes).

Defendants argue that Idaho's secrecy statute creates an "enforceable privilege" in any information that "would allow identification" of an execution team member, the source of an execution chemical, or a medical equipment supplier, "by any indirect means, as well as any direct means." *Def.'s Resp.* at 12, Dkt. 84. Pizzuto responds, first, that state secrecy statutes do not create federal evidentiary privileges at all. Moreover, he continues, the Court should not "federalize" Idaho's secrecy statute by carving out a coextensive federal privilege. Even if it did, though, any such privilege should cover only the *identities* of the

execution team members and execution-drug suppliers; not all information that could theoretically lead to the disclosure of such identities.

Pizzuto is correct on both points: Idaho's secrecy statute does not create a federal evidentiary privilege, and the Court will not incorporate it into federal law by carving out a brand-new federal privilege here.

Information that is privileged may be withheld during discovery even if it is relevant. FED. R. CIV. P. 26(b)(1); *see Baldridge v. Shapiro*, 455 U.S. 345, 360 (1982). In federal court, matters of privilege are governed by the Federal Rules of Evidence. *See Campbell v. Gerrans*, 592 F.2d 1054, 1056 (9th Cir. 1979). Rule 501 of the Federal Rules of Evidence identifies the four sources of law from which an evidentiary privilege may arise: federal common law, the United States Constitution, a federal statute, or the Federal Rules of Evidence. FED. R. EVID. 501. You'll notice that all four of those sources are federal. That is no accident.[5]

The bottom line is that states cannot immunize themselves from federal law by creating statutory privileges. Federal Rule of Evidence 501 plainly forecloses that possibility—and, for good reason.  If states could impose evidentiary privileges on federal courts, they could easily dodge federal judicial review by

---

[5] Rule 501 does identify one exception: state law governs privilege in federal court when state law provides the rule of decision for the underlying substantive claim or defense at issue. FED. R. EVID. 501. But that exception is plainly inapplicable in cases like this one that do not involve any substantive issues of state law.

broadly exempting themselves from the discovery process. *See Kelly v. City of San Jose*, 114 F.R.D. 653, 655–56 (N.D. Cal. 1987) ("If state law controlled, state authorities could effectively insulate themselves from constitutional norms simply by developing privilege doctrines that made it virtually impossible for plaintiffs to develop the kind of information they need to prosecute their federal claims."); *see also ACLU of Miss., Inc. v. Finch*, 638 F.2d 1336, 1343–44 (5th Cir. 1981) ("[T]here is a 'special danger' in permitting state governments to define the scope of their own privilege when the misconduct of their agents is alleged.") (internal citation omitted).

Idaho's secrecy statute does not create an evidentiary privilege that binds federal courts in federal question cases. To be sure, that law purports to do so by barring the disclosure of certain information in "any proceeding before any court." I.C. § 19-2716A. But, as explained above, however sweeping that pronouncement, such an attempt by a state to exempt itself from federal judicial review is ineffectual.

None of the cases cited by Defendants say otherwise. In fact, each of those cases reaffirms just the opposite: state secrecy laws do *not* create federal evidentiary privileges.[6] *See, e.g.*, *Jordan*, 947 F.3d at 1341 (holding Georgia's state

---

[6] One exception is *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 395, 406–07 (E.D. Mich. 2003). There, a federal district court denied a motion to compel discovery based on a state "press

secrecy laws "do not give rise to a federal evidentiary privilege"); *Martin v. Ward*, Case No. 1:18-cv-4617-MLB, 2021 WL 1186749, at *10 (N.D. Ga. Mar. 30, 2021) (same); *Convertino v. U.S. Dep't of Just.*, No. 07-CV-13842, 2008 WL 4104347, at *6 (E.D. Mich. Aug. 28, 2008) (holding Michigan's reporters' shield law did not create a federal privilege); *Calhoun v. Robinson*, No. C08-5744 RJB/KLS, 2009 WL 3326760, at *2 (W.D. Wash. Oct. 13, 2009) ("The question of privilege is determined by reference to the Federal Rules of Evidence."); *Compuware Corp. v. Moody's Investors Services, Inc.*, 222 F.R.D. 124, 131 (E.D. Mich. 2004) (applying Michigan privilege law in diversity case because both underlying claims arose under state law); *see also In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 239–40 (6th Cir. 2016) (holding Ohio's secrecy statute did not create a federal privilege).

Nor has Pizzuto persuaded the Court to federalize Idaho's secrecy statute by declaring a new, coextensive federal privilege in the identities of states' execution-drug suppliers. Federal privileges "are not lightly created nor expansively construed." *U.S. v. Nixon*, 418 U.S. 683, 710 (1974). And, as fleshed out below,

---

shield law" that privileged certain kinds of confidential information. But that decision lacks any relevant analysis and is entirely unpersuasive. That is especially true since, five years later, that same court arrived at precisely the opposite conclusion about that very same statute in *Convertino v. U.S. Dep't of Just.*, No. 07-CV-13842, 2008 WL 4104347, at *6 (E.D. Mich. Aug. 28, 2008).

Defendants' policy concerns are better addressed through a case-specific analysis under Federal Rule of Civil Procedure 26(c)(1) than through creation of a brand-new privilege applicable in every death penalty case.

**4.      Good Cause and Undue Burden**

Federal courts have broad discretion to permit, prohibit, or limit discovery in civil cases. FED. R. CIV. P. 26(c). On finding good cause, a court may "issue any protective order 'which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense,' including any order prohibiting the requested discovery altogether, limiting the scope of the discovery, or fixing the terms of disclosure." *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063 (9th Cir. 2004) (quoting FED. R. CIV. P. 26(c)). The party objecting to discovery has the burden to show good cause "by demonstrating harm or prejudice that will result from the discovery." *Id.* (citing *Phillips ex rel. Estates of Byrd v. General Motors Corp.*, 307 F.3d 1206, 1210–11 (9th Cir. 2002)).

To determine whether good cause exists, courts must balance the competing needs and interests of the parties. On one hand is the requesting party's need for the evidence. And on the other hand is the harm that disclosure may have on the objecting party.

Many federal courts have applied this balancing test in the context of states seeking to protect the identities of their execution team members and drug

suppliers. And many have found that requiring a state or its officials to identify such individuals and entities would impose an undue burden that outweighs the inmate's interest in obtaining that information. *See, e.g., Jordan*, 947 F.3d at 1340 (holding that compelling the Georgia Department of Corrections to identify its execution-drug supplier would impose an undue burden); *In re Missouri Dep't of Corr.*, 839 F.3d 732, 736 (8th Cir. 2016) ("[T]he disclosure of [the execution-drug supplier's] identity will result in an undue burden on [the Missouri Department of Corrections]."); *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 238–39 (6th Cir. 2016) (finding that, if required to identify their execution-drug supplier, "Defendants will suffer an undue burden and prejudice in effectuating Ohio's execution protocol and practices."); *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 192 (4th Cir. 2019) (holding that compelling the Virginia Department of Corrections to disclose its execution-drug supplier's identity would "impede Virginia's ability to carry out executions by chilling Virginia's current drug supplier, as well as potential future suppliers, from providing drugs for executions."); *see also Martin*, 2021 WL 1186749, at *9; *McGehee v. Texas Dep't of Crim. Just.*, No. H-18-1546, 2018 WL 3996956, at *9–10 (S.D. Tex. Aug. 21, 2018); *Jordan v. Hall*, Civ. Action No.: 3:15CV295HTW-LRA, 2018 WL 1546632, at *8–12 (S.D. Miss. Mar. 29, 2018).

In this context, the first step is to measure the Defendants' interest in keeping the execution team members' and drug supplier's identities confidential. Federal courts at all levels have found this interest significant. *See id.* The United States Supreme Court explained why with a helpful historical review in *Glossip v. Gross*, 576 U.S. 863, 869–70 (2015). When states first began using pentobarbital for executions around 2010, a "practical obstacle soon emerged as anti-death penalty advocates pressured pharmaceutical companies to refuse to supply" pentobarbital for that purpose. *Id.* Over time, it became increasingly difficult—and eventually impossible—for states to obtain pentobarbital directly from the drug manufacturers. *Id.* at 871 ("Before long . . . pentobarbital . . . became unavailable."); *Jordan*, 947 F.3d at 1331 ("[T]he ultimate outcome of this very effective advocacy by death penalty opponents has been to make it difficult—if not impossible—for states to acquire . . . pentobarbital for use in executions[.]"); *McGehee*, 2018 WL 3996956, at *7 (describing "a 'firestorm' of angry emails, protests, and media coverage that ultimately dissuaded [a] pharmacy from continuing to supply [Texas] with lethal-injection drugs."); *see also Am. Compl.* ¶ 103, Dkt. 13 ("The manufacturers of pentobarbital prohibit its use in executions.").

Unable to obtain pentobarbital from drug manufacturers, states turned to another source for the drug: compounding pharmacies. *Am. Compl.* ¶ 104, Dkt. 13.

Predictably, however, given the public pressures and potential backlash that compounding pharmacies would themselves face if publicly identified, those pharmacies have generally conditioned their supply of execution-drugs on states' assurances that their identities will not be disclosed. *See, e.g.*, *Jordan*, 947 F.3d at 1332 ("[G]iven the vehement objection visited on lethal injection drug manufacturers, these compounding pharmacies have agreed to supply the compounded pentobarbital only when confidentiality is guaranteed either by contract or statute."); *McGehee*, 2018 WL 3996956, at *7.

Turning to this case, two things are clear upfront. First, the State of Idaho and its officials have a strong interest in enforcing the State's criminal laws, including its death penalty laws. *In re Blodgett*, 502 U.S. 236, 239 (1992) (recognizing the "great weight" of a state's interest in "exercising its sovereign power to enforce the criminal law"); *see also Nelson v. Campbell*, 541 U.S. 637, 644 (2004). And second, that interest will be harmed if Defendants are forced to disclose the identity of their execution-drug supplier, because doing so will presumably make it more difficult—or impossible—to obtain execution drugs in the future. [7] True, Defendants have not indicated whether their chosen supplier has

---

[7] For similar reasons, Defendants have a strong interest in protecting the identities of the individuals and entities otherwise involved in preparing for, providing equipment for, and administering lethal injections in Idaho. *See Jordan*, 2018 WL 1546632, at *11 ("With regard to the identity of people involved in the execution process . . . protecting the identities of execution

conditioned its provision of drugs on strict anonymity.[8] Nevertheless, the Court

finds ample support in case law for the conclusion that disclosing the identity of an

execution-drug supplier seriously jeopardizes a state's ability to obtain execution-

drugs in the future. *See, e.g.*, *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 803 F.3d

565, 569 (11th Cir. 2015) ("To require . . . that Georgia open up about its source of

pentobarbital would result in the drug becoming completely unavailable for use in

executions."); *Jordan*, 947 F.3d at 1341 (disclosing execution-drug suppliers'

identities "predictabl[y]" leads to anti-death penalty advocates "hound[ing] the

supplier of that drug until the supplier capitulates and ceases supplying the drug.").

    Accordingly, this Court joins a host of other federal courts in concluding that

requiring Defendants to disclose the identities of their execution team members

and execution-drug supplier would seriously harm their interest in enforcing

Idaho's death penalty laws. *See Virginia Dep't of Corr. v. Jordan*, Civil Action No.

3:17mc02, 2017 WL 5075252, at *17 (E.D. Va. Nov. 3, 2017) ("The Circuit

---

team members [is] akin to protecting the identities of suppliers.") (collecting cases). Just as
disclosing the identities of drug suppliers deters them from providing drugs for executions,
identifying execution team members and equipment providers "creates a risk that [they] would
be deterred from performing their lawful duties." *Id.* (quoting *West v. Schofield*, 460 S.W.3d 113,
128 (Tenn. 2015)). The Court's Rule 26(c)(1) analysis therefore applies equally to execution-
drug providers and other individuals and entities involved in preparing for, providing equipment
for, and administering lethal injections in Idaho.

[8] Indeed, Defendants may not have even selected a drug supplier yet.

Courts concur that requiring disclosure of suppliers of lethal injection chemicals and team members imposes an undue burden on states.") (collecting cases).

The remaining question is how Defendants' interest in confidentiality compares with Pizzuto's interest in the information sought by each disputed discovery request.

### A.    Interrogatories 3 & 4

Interrogatories 3 and 4 ask Defendants to identify the manufacturer or compounding pharmacy that will provide drugs for Pizzuto's execution. *Pl.'s Memo. in Supp.* at 5, Dkt. 82-1. As discussed above, Idaho has a strong interest in keeping its drug supplier's identity confidential. Balancing that interest against the marginal relevance of that identity to Pizzuto's claims, the Court concludes that requiring Defendants to identify their execution-drug supplier would impose an undue burden by creating an unjustifiably high risk that the supplier will be publicly identified and, consequently, that the State will be unable to obtain execution drugs in the future.[9] Accordingly, Defendants need not respond to Interrogatories 3 and 4.

---

[9] Pizzuto suggests that the existing Protective Order (Dkt. 81) adequately protects Defendants' interests in confidentiality. True, that order bars Pizzuto from disclosing information marked "Confidential" and therefore does reduce the risk that Defendants' supplier would be *publicly* identified if the Court compelled a response to Interrogatories 3 and 4. However, the Protective Order does not eliminate that risk because there is always some possibility of inadvertent disclosure during discovery. *See Jordan*, 2018 WL 1546632, at *11 ("Entry of a protective order merely limiting the dissemination of information is an unsatisfactory alternative . . . the inherent

### B.     Interrogatories 7, 8 and Request for Production 16

Interrogatories 7 and 8 ask how the State went about choosing the execution drug and drug supplier. Reading Idaho's secrecy statute broadly, Defendants object that responding to those interrogatories could potentially "lead to the identification of the source" of its execution drugs. *Def.'s Resp.* at 14, Dkt. 84.

As explained above, Defendants have a strong interest in protecting the identity of their execution-drug supplier. But that does not mean Defendants can conceal all information remotely related to their selection of drugs and drug suppliers. On the contrary, Defendants must respond to Pizzuto's discovery requests to the full extent possible without identifying its drug supplier.

In responding to Interrogatory 7, for example, Defendants might explain why they chose to use pentobarbital over another kind of drug, and whether they will use manufactured or compounded pentobarbital. Similarly, in responding to Interrogatory 8, Defendants might describe their criteria for selecting an execution-drug supplier—something they can easily do without disclosing their chosen

---

danger and hardship that would follow even an inadvertent disclosure convince the Court that it must protect the information at issue from discovery."). And once the proverbial cat is out of the bag, there's no going back. Accordingly, given the serious harm of public disclosure in this context, the Court concludes that the existing Protective Order does not adequately protect Defendants' interest in keeping the identity of their drug supplier confidential. *See, e.g.*, *Virginia Dep't of Corr.*, 921 F.3d at 193 ("There is also good reason to think that a confidentiality order would not serve its intended purpose. The goal of the order would be to avoid a chilling effect on Virginia's drug supplier and other, potential suppliers. Yet a drug supplier would probably take little comfort in knowing that disclosure was limited to death-row inmates and their lawyers.").

supplier's identity. True, those answers may somewhat narrow the pool entities that might be supplying the execution drugs. But that kind of information presumably will not identify the supplier with any certainty.

As Pizzuto explains, Interrogatories 7 and 8 seek information about the "process leading up to the contact Defendants make with their suppliers." *Pl.'s Memo. in Supp.* at 19, Dkt. 82-1. The Court agrees that requiring Defendants to provide such information does not unduly burden the State's interest in enforcing its death penalty laws. This is especially true given that Defendants' disclosures will be subject to the existing protective order, which further minimizes the risk of their answers leading to the public identification of their execution-drug supplier.

Request for Production 16 asks Defendants to produce all emails received or sent by various individuals "regarding the choice of, search for, acquisition of, transportation of, and/or maintenance of execution chemicals." *Pl.'s Memo. in Supp.* at 7, Dkt. 82-1. Defendants have provided some responsive documents, but otherwise object to the Request under Idaho's secrecy statute. Pizzuto now challenges several of Defendants' redactions to one of the disclosed documents, Document 5996. Dkt. 82-9. Specifically, Pizzuto argues that some of the redacted text appears related to "pharmacy licensing, federal drug registration, and lethal-injection chemicals." *Pl.'s Memo. in Supp.* at 15, Dkt. 82-1. Defendants respond that the redacted text it contains "personnel information" that "could lead to the

disclosure of a potential source or a team member – the recovery doctor." *Ex. A*, Dkt. 84-2.

Defendants' redactions are only appropriate if the redacted portions of the document would identify an individual or entity involved in providing execution drugs or equipment, preparing for, or administering executions in Idaho. If, after reviewing this Order, Defendants still believe that their redactions are justified, they shall submit an unredacted version of Document 5996 to the Court under seal for *in camera* review. *See, e.g.*, *Mogadam v. Liberty Mut. Fire Ins. Co.*, No. 2:14-cv-224, 2015 WL 6510352, at *2 (D. Idaho Oct. 28, 2015) (ordering submission of unredacted documents for *in camera* review). If necessary, the Court will then determine whether disclosing that information would impose an undue burden on Defendants.

### C.    Request for Admission 89

Request for Admission 89 asks whether Defendants will identify the "person or persons providing the 'technical assistance' and performing the 'technical review' described on page 25 of SOP 135." *Pl.'s Memo. in Supp.* at 7, Dkt. 82-1. Relying again on Idaho's secrecy statute, Defendants object that answering would reveal the identity of a person who is "involved in the performance of an execution." *Def.'s Resp.* at 17, Dkt. 84.

The briefing on this point focuses on the text of Idaho's secrecy statute. *See* I.C. § 19-2716A (specifically listing the covered persons and entities). However, because the Court is analyzing Defendants' objections under the undue burden standard of Rule 26(c) rather than the State's secrecy statute, the statutory particulars do not matter. Instead, the Court concludes that Defendants' interest in protecting the identities of those involved in executions extends to those providing technical assistance under SOP 135. For purposes of confidentiality, the Court sees no reason to treat a person providing technical assistance different than, say, an on-site physician. At the end of the day, both are involved in preparing for and administering executions and both may therefore be subject to the same kinds of external pressures, stigmas, and backlash if publicly identified.

In contrast, Pizzuto's interest in identifying the person who will perform the technical review under SOP 135 is minimal. Information about the minimum qualifications for the person performing that review might be more pertinent to Pizzuto's claim. But the identity of the person, itself, is marginally relevant at best. Balancing the competing interests, the Court concludes that requiring Defendants to identify the person providing technical assistance under SOP 135 would be unduly burdensome. Defendants need not answer Request for Admission 89.

**ORDER**

**IT IS ORDERED that:**

1.   Pizzuto's Motion to Compel Discovery (Dkt. 82) is **GRANTED in part and DENIED in part**, as follows:

   A.   Defendants waived their objections to Interrogatory 19 by failing to timely respond. Pizzuto's motion is therefore **GRANTED** to the extent it seeks to compel a response to Interrogatory 19. Defendants must serve an answer to Interrogatory 19 within twenty-one days after issuance of this Order.

   B.   Defendants' relevancy objection to Interrogatory 15 is sustained. Information about Defendants' prior unsuccessful efforts to acquire execution drugs is not relevant to Pizzuto's claims. Pizzuto's motion is therefore **DENIED** to the extent it seeks to compel a response to Interrogatory 15.

   C.   Requiring Defendants to identify their execution-drug supplier would impose an undue burden by creating a substantial risk of public disclosure that would likely diminish Defendants' ability to enforce Idaho's death penalty laws. Pizzuto's motion is therefore **DENIED** to the extent it seeks to compel responses to Interrogatories 3 and 4. For the same reason, Pizzuto's motion

is **DENIED** to the extent it seeks to compel any answer to Interrogatories 7 & 8 and Request for Production 16 that would identify the State's execution team members or drug suppliers to a reasonable degree of certainty. Conversely, Pizzuto's motion is **GRANTED** to the extent it seeks to compel any answers to Interrogatories 7 & 8 and Request for Production 16 that would not identify such team members and drug suppliers to a reasonable degree of certainty.

D.   Defendants' interests in protecting the identities of execution team members and drug suppliers extend to those providing technical assistance in preparation for and administration of executions. Pizzuto's motion is therefore also **DENIED** to the extent it seeks to compel Defendants to identify the person who will provide technical assistance under SOP 135.

DATED: July 25, 2023

B. Lynn Winmill
U.S. District Court Judge

**MEMORANDUM DECISION AND ORDER - 30**