Exhibit C

Nicole Owens
EXECUTIVE DIRECTOR
Deborah A. Czuba, Idaho Bar No. 9648
Mary E. Spears, Indiana Bar No. 27353-49
ASSISTANT FEDERAL DEFENDERS
Federal Defender Services of Idaho
702 W. Idaho Street, Suite 900
Boise, ID 83702
Telephone: (208) 331-5530
Facsimile: (208) 331-5559
ECF:   Mary_Spears@fd.org
        Deborah_A_Czuba@fd.org

Attorneys for Plaintiff Thomas Eugene Creech

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| **THOMAS EUGENE CREECH,** | ) | **CASE NO. 1:20-cv-114-AKB** |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM IN SUPPORT OF** |
| | ) | **MOTION FOR PRELIMINARY** |
| **JOSH TEWALT**, Director, Idaho Department | ) | **INJUNCTION** |
| of Correction; **TIM RICHARDSON**, Warden, | ) | |
| Idaho Maximum Security Institution; **CHAD** | ) | |
| **PAGE**, Chief, Division of Prisons, Idaho | ) | **Execution Scheduled for** |
| Department of Correction; and **Unknown** | ) | **February 28, 2023** |
| **Employees, Agents, or Contractors of the** | ) | |
| **Idaho Department of Correction,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Thomas Eugene Creech respectfully asks the Court to enjoin Defendants from

executing him until the claims he has presented have been resolved. "To prevail on a motion for

a preliminary injunction," Mr. Creech "must show that: (1) he is likely to succeed on the merits

on his . . . federal claims; (2) he is likely to suffer irreparable harm in the absence of preliminary

relief; (3) the balance of equities tips in his favor; and (4) a preliminary injunction is in the public

interest." *Cuviello v. City of Vallejo*, 944 F.3d 816, 825 (9th Cir. 2019).[1] Mr. Creech can satisfy

each factor. Every part of this memorandum is incorporated into every other part.

**I.   Mr. Creech is likely to succeed on the merits of his claims.**

Mr. Creech will separately address the likelihood of success on the merits of each of the

three claims from his second amended complaint (Dkt. 119), in a slightly different order chosen

because of the relationship between the issues: his Eighth Amendment theory based on the risk

of a torturous execution (Claim 1); his due process challenge to the Idaho Department of

Correction's (IDOC's) deprivation of execution-related information (Claim 3); and the

constitutional problems flowing from the lack of a valid protocol (Claim 2).

**A.   There is a likelihood of success on Claim 1.**

To prevail on an Eighth Amendment claim of the type Mr. Creech alleges, he must

demonstrate: (1) that the State's chosen method exposes the prisoner to a substantial risk of

severe pain; and (2) that there is a "feasible and readily implemented alternative" that would not

do so. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019). Mr. Creech can establish a likelihood

of success "that the State's chosen method exposes the prisoner to a substantial risk of severe

pain."[2] There are four factors collectively creating a substantial risk of pain here: (1) Mr.

---

[1] In this pleading, unless otherwise noted, all internal quotation marks and citations are omitted, and all emphasis is added.

[2] Undersigned counsel explained in Mr. Creech's second amended complaint why his counsel were ethically prohibited from asserting a more humane alternative in certain respects in the absence of an order to the contrary, *see* Dkt. 119 at 53–54, and this Court found the pleading standard had been satisfied under the circumstances, *see* Dkt. 118 at 13–14. Mr. Creech again reserves the right to elaborate on the more humane alternative requirement if this Court orders counsel to do so following briefing and resolution of the ethical conflict issue. Counsel does not make this assertion in a vacuum; they have consulted with a national expert on legal ethics who has advised that this indeed poses an ethical issue. In addition, it is difficult to propose an alternative method of execution when it is unknown what precisely the Director will deem

Creech's health concerns; (2) issues regarding the reliability of the drugs; (3) problems with

visibility in the execution chamber; and (4) an absence of necessary safeguards in the protocol.

**1. Mr. Creech's health concerns create a substantial risk of severe pain.**

Mr. Creech's complex and serious medical situation makes pentobarbital an

unconstitutionally risky drug to use at his execution given the danger of an excruciating heart

attack, the effects of which Mr. Creech will acutely experience before he is adequately sedated.

On October 23, 2022, doctors at Saint Alphonsus Hospital detected in Mr. Creech an

abdominal aortic aneurysm measuring 6.1 centimeters by 6.3 centimeters, which was later

surgically repaired. *See* Ex. 1 at 7–8. Mr. Creech also has a history of uncontrolled high blood

pressure. *See, e.g.*, Ex. 2. Based on those facts, University of Pennsylvania cardiologist and

associate professor Dr. Michael Fradley judges Mr. Creech to be at an "elevated risk from a

cardiovascular perspective given his multiple risk factors and his known vascular disease." Ex. 3.

If Mr. Creech does have heart disease, the "cardiovascular risks associated with"

pentobarbital would cause "serious complications during the execution." *Id.* That risk is not

hypothetical. Two inmates with coronary artery disease in Alabama were executed with

pentobarbital and they had visibly painful executions. *See* Ex. 4 at 4, 6; Ex. 5 at 5; *see also*

*Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011) (per curiam). If Mr. Creech does have

significant heart disease, there would be a grave prospect of him suffering an agonizing heart

attack brought on by a large dose of pentobarbital. However, to fully assess the precise contours

of these risks, further testing is necessary, *see* Ex. 3, which Mr. Creech is moving for today.

---

"available" in his unfettered discretion. *See id.* at 13 (agreeing with Mr. Creech's argument that
"one of the challenges of identifying an alternative execution method in this case is that IDOC
has not disclosed to Creech the exact method of lethal injection it certified as available for his
execution").

**2. Drug reliability issues create a substantial risk of severe pain.**

The risks posed to Mr. Creech by pentobarbital generally are intensified by the serious doubts surrounding the reliability of the specific chemicals obtained by IDOC. To begin, there is reason to suspect that IDOC has chosen a dubious source for its drugs, as it has in the past. IDOC has claimed in a separate proceeding involving death-row inmate Gerald Ross Pizzuto, Jr. that the pentobarbital in its possession is manufactured. *See* Ex. 6 at 8.[3] For a number of years, states have not had access to manufactured pentobarbital for executions. *See* Ex. 7 at 9; *see also Swearingen v. Collier*, No. 4:19-cv-3079, 2019 WL 3935285, at *1 (S.D. Tex. Aug. 20, 2019) (describing "manufactured pentobarbital" as "unavailable" in a Texas execution case). That stems from the fact that the major manufacturers, who want their products associated with saving and not forcibly ending lives, have placed strict controls on their pentobarbital, forbidding its use in executions. *See id.*; *see also Arthur v. Dunn*, No. 2:11-cv-438, 2016 WL 1551475, at *5 n.4 (M.D. Ala. Apr. 15, 2016) (observing how the manufacturer of pentobarbital at the time had "restricted its sale for use in human executions, making it unavailable to departments of corrections"), *aff'd*, 840 F.3d 1268 (11th Cir. 2016). In reaction, death states turned to compounding pharmacies, which make drugs specifically to order rather than manufacturing them. *See* Ex. 7 at 9; *accord Jordan v. Comm'r, Miss. Dept. of Corr.*, 947 F.3d 1322, 1332 (11th Cir. 2020). It appears to have been more than ten years since the public has been informed of a state using manufactured pentobarbital in an execution, while compounded pentobarbital has during the same time been used in many executions. *See, e.g.*, *McGehee v. Tex. Dept. of Crim. Just.*, No. H-18-1546, 2018 WL 3996956, at *3 n.9 (S.D. Tex. Aug. 21, 2018) (recounting how,

---

[3] All exhibits are incorporated in this memorandum as if fully set forth herein. To the extent it is necessary for the Court to take judicial notice of any exhibits, Mr. Creech asks it to do so.

in 2013, "a loss of suppliers forced Texas to use compounded pentobarbital instead of

manufactured pentobarbital").

Yet IDOC has now somehow managed to get its hands on manufactured pentobarbital.

How? Although IDOC has refused to say, there are a few different scenarios, and each of them is

troubling. One likely answer is that the drugs were manufactured by Akorn, a now-defunct

company that recently issued massive recalls because of pervasive defects in its merchandise.

Akorn had been one of the American manufacturers of pentobarbital. *See* Ex. 7 at 10–12. In fact,

at one time at least, Akorn was the sole supplier of pentobarbital in the U.S. *See* Barri Dean,

Note, *What Are Those Ingredients You Are Mixing Up Behind Your Veil*, 62 How. L.J. 309, 313

(2018). Like the other manufacturers, Akorn refused to sell drugs for executions. *See* James

Gibson & Corinna Barrett Lain, *Death Penalty Drugs and the International Moral Marketplace*,

103 Geo. L.J. 1215, 1228 n.71 (2015). Then, the company declared bankruptcy in February

2023, shuttered all of its American operations, and laid off its staff. *See* Ex. 7 at 10–11; Ex. 8. It

is common for manufactured pentobarbital to have an expiration date of two years. *See* Ex. 7 at

10. According to IDOC, its pentobarbital will expire in February 2025. *See* Ex. 9 at 2. There is a

good chance, then, that the pentobarbital was made in February 2023, right around the time of

Akorn's bankruptcy. *See* Ex. 7 at 11. A company entering bankruptcy and terminating its

workforce is a company with a sharply reduced ability to enforce its distribution agreements. *See*

*id.* at 10–11. The specter of IDOC's drugs originating from Akorn is undeniable.

It is a worrisome prospect. Before it imploded, Akorn recalled all of its products. *See* Ex.

7 at 13; Ex. 10 (posting a "[d]rug recall notice for all Akorn drug products"). These recalls were

driven in part by widespread concerns regarding the quality of the medications—a main driving

force behind the bankruptcy to begin with. *See* Ex. 7 at 11–12; Ex. 11 (remarking that "Akorn

weathered a series of . . . warning letters" from the Food and Drug Administration (FDA), as well as "citations" and other regulatory actions before it ultimately declared bankruptcy and "laid off all of its staffers"). Regulators noted many of the principal issues regarding the quality of the medications. *See* Ex. 7 at 11–12. If IDOC intends to inject an Akorn drug into Mr. Creech's veins, there is by definition a risk of severe pain. And that is a question—like all of the others—that IDOC won't answer. *See* Ex. 12 at 2–3.

The other scenarios are hardly more reassuring. One is that the pentobarbital came from a veterinarian. IDOC has highlighted this possibility by refusing to deny it. *See* Ex. 6 at 5.[4] If the drugs were made for animals, it would incontrovertibly create a risk of severe pain to administer them to a human being, which Mr. Creech remains despite being a death-row inmate. Those risks are explored in the attached declaration of Dr. Michaela Almgren, a professor of pharmacy who has many years' experience working and teaching in the field. *See* Ex. 7 at 12.

Then there are manufacturers other than Akorn. If IDOC has accessed pentobarbital made by an American or European company, it would be acting surreptitiously in violation of restrictions on using the drug for executions. *See* Ex. 7 at 9 (referencing the distribution restrictions imposed by American manufacturers); Ex. 13 at 7 (reflecting the acknowledgment by the Attorney General here that the European Union prohibits the provision of "products to be used with capital punishment"). In other words, IDOC would have deliberately circumvented lawful limitations to use a product to kill someone against the wishes of the businesses entitled to prevent that from happening. *See, e.g.*, *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072

---

[4] In an untimely assertion, IDOC implausibly claimed that it didn't understand what it was being asked when the straightforward question was posed to it of whether the drugs "came from a veterinary source," Ex. 13 at 8, something it notably did not say when originally responding, *see* Ex. 6 at 5.

Memorandum In Support of Motion for Preliminary Injunction – Page 6

(2021) (categorizing "[t]he right to exclude" as "one of the most treasured rights of property ownership"). Such backdoor dealings occur outside the legal channels that exist for the very reason of ensuring a safe and reliable drug and a trustworthy chain of custody. *See* Ex. 7 at 9–10. The resulting reliability concerns are unavoidable.

Finally, if the pentobarbital originated from a manufacturer who has not barred its use in an execution, that company would have to be based somewhere other than America or Europe. Importing pentobarbital from the third world implicates a separate set of concerns. For one, there have been numerous quality-control issues with international drug manufacturers. *See id.* at 10. Such issues have been particularly widespread with supplies from China and India. *See id.* If America and Europe are ruled out, China and India become likely sources of IDOC's drugs. For example, the U.S. and Europe collectively manufacture 54% of the active pharmaceutical ingredients (APIs) in the world—the components from which drugs are made. *See* Dr. Janet Woodcock, Director of the Center for Drug Evaluation and Research at the FDA, Cong. Test., Oct. 30, 2019, available at Safeguarding Pharmaceutical Supply Chains in a Global Economy - 10/30/2019 | FDA. China and India make up 31% of the remaining 46%. *See id.* In short, wherever IDOC got the drugs from, there are reliability issues.[5]

The likelihood that IDOC selected a questionable source is enhanced by its past behavior, which creates an additional risk factor. *See West v. Brewer*, No. 2:11-cv-1409, 2011 WL 2912699, at *3 (D. Ariz. July 20, 2011) (considering a correctional department's past practices while ruling on an execution claim). For Idaho's most recent executions, of Paul Rhoades and Richard Leavitt in 2011 and 2012, IDOC first tried to get its drugs from Chris Harris, a salesman

---

[5] If the Court concludes that the risks concerning the drugs do not establish an Eighth Amendment violation, Mr. Creech contends that the uncertainties described above should still be taken into account in connection with Claim 3, described below.

in India who falsely told a pharmaceutical company that execution chemicals were intended for philanthropic use in Africa and whose shipment was seized by the FDA because it was illegal. *See* Ex. 14; Ex. 15; Ex. 16. Eventually, IDOC (partly through its current Director, Defendant Tewalt) acquired the drugs for the Leavitt execution in a Walmart parking lot with a suitcase full of $15,000 in cash. *See* Ex. 17. What is more, the pharmacies chosen by IDOC for both the Rhoades and Leavitt executions were riddled with regulatory violations, including expired products, poor hygiene, bad documentation, and many additional types of misconduct—all of which led to numerous fines as well as probation and other sanctions. *See* Ex. 18.

   3.   **Visibility issues in the execution chamber create a substantial risk of severe pain.**

   The danger of the execution going painfully awry is increased further by profound and unnecessary flaws in the physical layout of the execution chamber. As Columbia University anesthesiologist Dr. Mark Heath described after inspecting the chamber, Idaho's chamber doesn't allow for the execution team to watch Mr. Creech while it is pumping the lethal fluid into his body. *See* Ex. 19 at 2. Instead, the execution team sees Mr. Creech only on screens through a camera system. *See id.* Dr. Heath regards that arrangement as "unsuitable for conducting lethal injection procedures" because it "substantially and gratuitously increases the risk of a botched execution." *See id.* at 3. This kind of remote monitoring, Dr. Heath continues, is not only unheard of in the medical setting. It is also unlike any of the eleven other execution chambers he has inspected, each of which permits the kind of visual access Dr. Heath recommends. *See id.* Given the novelty of Idaho's set-up, the more humane alternative is clear—IDOC could and should have done what every other state did.

**4.   The now-outdated protocol creates a substantial risk of severe pain.**

The risks above are intensified by the 2021 protocol, which the State apparently intends

to employ in Mr. Creech's execution notwithstanding the fact that it does not account for the

current statute. *See infra* at Part I.C. Under the protocol, the medical team is instrumental to

carrying out the execution. Most critically, it is the medical team that inserts the IVs, administers

the lethal chemicals, and monitors the inmate's "level of consciousness." Dkt. 55-13 at 7.

Members of the medical team are required by the now-outdated protocol to have only "three

years of medical experience," which they can acquire by serving in any number of roles,

including as nurses, paramedics, phlebotomists, and emergency medical technicians ("EMTs").

*Id.*

But individuals with those backgrounds do not have the requisite training to properly

administer the chemicals in the 2021 protocol while accurately evaluating the possibility that the

inmate is conscious, sensate, or in pain. *See* Ex. 20 at ¶ 22. Only a practicing anesthesiologist

would be fully qualified to perform that function during such an inherently risky execution. *Id.*

Furthermore, the individual "may be experiencing pain and yet not expressing it" in a way that is

"visible to the naked eye." *Id.* ¶ 24. For example, "an inmate could receive a large dose of

pentobarbital at an execution and appear to go to sleep, yet still be going through a painful

experience." *Id.* The members of the medical team utilized in Idaho's executions are all either

EMTs, paramedics, or nurses. *Id.* ¶ 22. They are consequently unqualified to handle the risks

associated with the execution. *Id.*

In addition to their training, anesthesiologists rely on brain monitors, which are

sophisticated pieces of equipment that measure and convert brain signals so that doctors can

determine a patient's level of consciousness and his depth of anesthesia. *Id.* ¶ 24. The now-

outdated protocol does not provide for the use of a brain consciousness monitor. *Id.* "If an individual without proper training were handling the drug administration at the execution" as directed under this protocol, "and without a brain consciousness monitor, they would essentially be 'guessing' the stage of consciousness and pain sensation." *Id.* Again, such guesswork is unacceptable when it comes to executing a man with numerous and complicated medical issues.

In these ways, the absence of a practicing anesthesiologist and a brain consciousness monitor add yet more risk for pain at Mr. Creech's execution. That is, Mr. Creech's medical conditions, in conjunction with IDOC's use of unreliable drugs and the visibility issues, create a risk of a painful execution. Then, the fact that the proper personnel and equipment will not be present at the execution makes it more likely that the medical team will fail to notice or properly address Mr. Creech's pain, increasing his suffering even more.

There is also the concern of human error at executions which has been underscored by recent incidents in Alabama. In September 2022, Alabama called off Alan Miller's execution after the personnel involved were unable to access his veins. *See* Ex. 21. This was only two months after the State took three hours to set an IV line on Joe James. *See id.* An autopsy afterwards revealed numerous bruised puncture sites and open wounds. Ex. 22. In light of these incidents, the Eleventh Circuit observed that the Alabama Department of Corrections had "show[n] a pattern of difficulty . . . in achieving IV access with prolonged attempts." *Smith v. Comm'r, Ala. Dept. of Corr.*, No. 22-13781, 2022 WL 17069492, at *4 (11th Cir. Nov. 17, 2022) (per curium), *vacated in unexplained order*, 2022 WL 17039195 (2022). Such access is physiologically made more difficult by the inevitable anxiety suffered by the condemned during the process and the effect the stress has on their veins. *See id.* at *5.

And Mr. Creech's advanced age of seventy-three is an additional risk factor increasing

the likelihood of vein-access problems arising. *See, e.g.*, *Bible v. Davis*, No. 4:18-cv-1893, 2018

WL 3068804, at *6 (S.D. Tex. June 21, 2018). That factor is especially notable for Mr. Creech,

who is significantly older than the average executed inmate. *See* Death Penalty Information

Center, Execution Database, available at [https://deathpenaltyinfo.org/executions/execution-database](https://deathpenaltyinfo.org/executions/execution-database) (showing that Mr. Creech is older than the last twenty-eight prisoners executed in

America, a group with the average age of 54). If these problems can be so vexing in Alabama, a

state with substantially more execution experience than Idaho, *see id.*, they are certainly an issue

here. At a minimum, they are part of the constellation of risk factors creating a perfect storm for

a botched execution of Mr. Creech.

**B. There is a likelihood of success on Claim 3.**

Claim 3 asserts that IDOC has, in violation of the Due Process Clause, deprived Mr.

Creech of information that would allow him to attack the constitutionality of Idaho's execution

plans. *See* Dkt. 119 at 57–67. The Ninth Circuit has clarified that the crux of such a claim is

whether a state's obstructionism denies an inmate "the opportunity to have an Eighth

Amendment method-of-execution challenge heard at a meaningful time and in a meaningful

manner." Dkt. 95 at 27. That is precisely what IDOC has done. Even though executions are of

the utmost public interest, IDOC has shrouded its plans for the exercise of this awesome

governmental power in a level of secrecy more extreme than any other state in the country.

When IDOC issued its last death warrant for Mr. Creech, in October 2023, it did so two

days after claiming that it did "not have the present ability to carry out an execution via lethal

injection or firing squad," making it impossible for undersigned counsel to even know what

method they were supposed to evaluate. Ex. 23 at 5. For the current death warrant, IDOC's

strategic secretiveness has only lessened slightly. Mr. Creech knows (by virtue of discovery in another inmate's case) that IDOC intends to use supposedly manufactured pentobarbital for his execution. But he knows essentially nothing else. As sketched out above, IDOC has not told him who made the drugs—a now-bankrupt company that initiated massive recalls, a fly-by-night operator in the third world, or someone else. As established above, these are precisely the sort of questions that Mr. Creech would challenge with a full-throated Eighth Amendment claim if IDOC's obfuscations hadn't hamstrung his ability to do so. *See supra* at Part I.A.

IDOC has not even informed Mr. Creech what *kind* of source it has gotten its drugs from: e.g., was it a veterinarian, a pharmacy, a hospital or some other type of business? As Mr. Creech has already demonstrated, the question of the type of source goes to the reliability of the drugs, as for example with veterinarians, and is therefore relevant to the Eighth Amendment inquiry. *See supra* at Part I.A. That degree of secrecy is unprecedented. For instance, IDOC refuses to say whether it obtained its drugs from a pharmacy based on supposed concerns about disclosing an identity, *see* Ex. 6 at 7, but there are over sixty thousand pharmacies it could be, *see* Ex. 7 at 14, and other states have carried out executions with the necessary confidentiality while routinely divulging the same fact. *See, e.g.*, *Jordan*, 947 F.3d at 1332 ("Thus, the *pharmacy* that supplied the GDC with the pentobarbital used in Georgia's most recent executions did so under the assurance of absolute confidentiality provided by this Georgia statute."); *In re Miss. Dept. of Corr.*, 839 F.3d 732, 734–35 (8th Cir. 2016) (similar); *King v. Parker*, No. 3:18-cv-1234, 2020 WL 4883014, at *7 (M.D. Tenn. July 20, 2020) (similar). Of the voluminous cases where secrecy-related issues have been litigated by death-row inmates challenging their methods of execution, undersigned counsel are not aware of a single one in which a court has adopted the

defendants' outlandish position that the mere disclosure of what *industry* a source comes from is protected from discovery.

IDOC's refusal to shed light on what part of the world the drugs came from is likewise at odds with the Due Process Clause. The Department's excuse is to posit, without any citation or authority, that the answer might limit the realm of possible regions to those outside of the United States and Europe. *See* Ex. 13 at 7. More than 7 billion people live in such regions, spread out among roughly 150 countries. Undersigned counsel would need superhuman detective skills to use this information to identify a source. What counsel have instead are the ordinary tools to assert an Eighth Amendment claim when they have adequate information, which IDOC will not share.

IDOC feels that the testing of the drugs makes up for all of its caginess. *See* Ex. 13 at 2. To that end, the only meaningful documentation IDOC has given to Mr. Creech is the certificate of analysis for its pentobarbital. *See* Ex. 24. IDOC's stance is that the certificate addresses any Eighth Amendment question Mr. Creech might have about the quality of the chemicals. It doesn't. Although the certificate of analysis includes various statements about the makeup of the chemicals, it is most noteworthy for what it lacks: any information on who is doing the testing. That text is of course redacted. *See* Ex. 24. It is hardly persuasive for the defendants to tell Mr. Creech that he can skip his own due diligence into the reliability of the drugs based entirely on the say-so of a completely anonymous testing facility. How is Mr. Creech—or the Court—to know that the testing facility itself is reliable? If it isn't, the results are meaningless.

And there is reason to doubt the quality of any testing laboratory selected by the defendants. The last time IDOC tapped a company to assess execution drugs, it went to the testing arm of Professional Compounding Centers of America (PCCA), *see* Ex. 25 at 3, a

laboratory that has been cited by regulators for numerous violations, *see generally* Ex. 26. Some

of those violations relate to precisely the sort of failures that have plagued lethal injections, like

improper testing for "endotoxin limits" and "microbial contamination." *Id.* at 9; *see* Ex. 27 at 4

(noting that problems with endotoxin testing led to a moratorium on executions in Tennessee for

an independent review to be conducted). Confidence in the integrity of IDOC's testing systems is

further shaken by the fact that the PCCA results have mysteriously vanished both from the

defendants' and that company's possession. *See* Ex. 28 at 7–8.

Apart from the complete mystery surrounding who produced it, the contents of the

certificate trigger doubts about its trustworthiness. As Dr. Almgren recounts in her declaration,

the certificate does not indicate that the testing was performed according to the United States

Pharmacopeia (USP)—the proper standard, and the one she would expect to see referenced. *See*

Ex. 7 at 5–6 . The formulation used by the laboratory is an unfamiliar one, with unknown

credibility. *See id.* And test results are only as good as the methodologies used in the testing.

Given these doubts, if the certificate is to serve the ambitious role IDOC has in mind, more

information is needed, like the paperwork confirming the soundness of the testing

methodologies. *See id.* at 6–7.

Another set of questions arises from a comparison of the various documents produced by

IDOC regarding the drugs. Specifically, a juxtaposition of the certificate of analysis with IDOC's

purchase order with its Drug Enforcement Administration (DEA) Form 222 is confusing and

concerning. The DEA Form 222 describes six vials of pentobarbital in liquid form coming into

IDOC's custody, *see* Ex. 36, and the certificate of analysis appears to reflect that a single one of

the vials was tested, *see* Ex. 24. Yet the purchase order notes a single "quantity" of fifteen grams.

See Ex. 37. As Dr. Almgren shows, the way the purchase order is written is most consistent with

Memorandum In Support of Motion for Preliminary Injunction – Page 14

the ordering of a powdered drug intended to be compounded, *see* Ex. 7 at 13, which would be inconsistent with both the DEA Form 222 and the certificate of analysis, as well as with IDOC's claim that the chemicals are manufactured.

A final worry engendered by these documents relates to how much of the drugs IDOC still has, and in what condition. The single-drug-pentobarbital method chosen by Defendant Tewalt calls for fifteen grams of pentobarbital to be placed in three sets of syringes, the latter two as backups to be administered to the condemned in the event of hiccups with the earlier rounds of injections. *See* Dkt. 55-12 at 5, 9–10. Apparently, IDOC bought only fifteen grams of pentobarbital, paying $50,000 for a single execution. *See* Ex. 37. It would seem that at least a sixth of the purchased pentobarbital was sent out for testing. *See* Ex. 24. Dr. Almgren clarifies that the testing "is a destructive process that renders the entire vial of medication unusable." Ex. 7 at 9. IDOC consequently either has less than what it needs for an execution, or it intends to use "unusable" drugs. This is just one of many key questions left hanging by IDOC's extraordinary secrecy. Without answers, Mr. Creech lacks the means to fully press an Eighth Amendment challenge, violating his due process rights.

**C. There is a likelihood of success on Claim 2.**

Lastly, there is a likelihood of success on Claim 2, which asserts that the absence of a valid execution protocol violates Mr. Creech right to due process. On July 1, 2023, an amended version of Idaho Code § 19-2716 went into effect. *See* Senate Law 2023, ch. 141, § 1. The new statute made the firing squad an alternative method to lethal injection based on the IDOC Director's sole discretion to determine whether drugs are "available" or not. *See* Idaho Code § 19-2716. IDOC is purporting to follow the new statute here. After the latest death warrant issued, Defendant Tewalt issued a certification that lethal injection was available, *see* Ex. 29,

which is part of the amended statute, *see* Idaho Code § 19-2716(3). But IDOC hasn't updated its

execution protocol since March 2021, well before the statute's amendment. *See*

http://forms.idoc.idaho.gov/WebLink/0/edoc/283090/Execution%20Procedures.pdf. The

protocol speaks only to lethal injection, not the firing squad. *See id.* Since the enactment

contemplates a revised protocol, and since none has been issued, there is no valid protocol.

      These developments are merely the latest installment in IDOC's perpetual effort to do

exactly what the Ninth Circuit has forbidden: "amend[] its execution protocol on an ad hoc

basis—through add-on practices, trial court representations and acknowledgments, and last

minute written amendments—leaving the courts with a rolling protocol that forces" the courts

"to engage with serious constitutional questions and complicated factual issues in the waning

hours before executions." *Towery v. Brewer*, 672 F.3d 650, 653 (9th Cir. 2012). IDOC has

chosen to adopt a protocol that gives the Director four execution cocktails to choose from and

Defendant Tewalt has then refused to specify the drug when executions were mere days away.

*See* Dkt. 55-12. IDOC has repeatedly announced that the protocol was "suspended" during

warrant periods while offering no clarity about what that means. *See* Dkt. 95 at 14. IDOC has for

years declined to amend a protocol that includes a blatantly unconstitutional prohibition on

spiritual advisors in the execution chamber, *see* Ex. 30; *Ramirez v. Collier*, 142 S. Ct. 1264,

1280–81 (2022), while claiming to fix the error by amending the protocol through an ad hoc

declaration, *see* Ex. 31 at 2 (purporting to "revise[]" the protocol via a four-page declaration filed

in court). And IDOC has insisted throughout on providing to Defendant Tewalt the authority to

"revise, suspend, or rescind" anything in the protocol, at any time, for any reason, "at the

Director's sole discretion"—rendering even the outdated protocol meaningless. Dkt. 55-13 at 2.

The Ninth Circuit has declared that "[t]his approach cannot continue," *Towery*, 672 F.3d at 653, and only a preliminary injunction will stop it.

**II.    Mr. Creech will suffer the most irreparable harm in the absence of an injunction.**

The next factor, irreparable harm, is abundantly present, since Mr. Creech will be put to death in the absence of judicial intervention. *See id.* at 661 (noting that the irreparable-harm factor is always present when the plaintiff is challenging his execution); *accord Battaglia v. Stephens*, 824 F.3d 470, 475 (5th Cir. 2016); *Beaver v. Netherland*, 101 F.3d 977, 979 (4th Cir. 1996). Simply put, Mr. Creech will have no recourse for any constitutional violations after he is killed by the State, and so there is irreparable harm.

**III.    The balance of equities and the public interest favor an injunction.**

The last criterion for a preliminary injunction considers the balance of equities and the public interest, which tip heavily in favor of an injunction. As an initial manner, Mr. Creech has been on death row for more than forty years. *See State v. Creech*, 670 P.2d 463 (Idaho 1983). An injunction for a few more months to allow Mr. Creech to litigate the substantial issues in this case will do the State no harm. *See Mikutaitis v. United States*, 478 U.S. 1306, 1309 (1986) (Stevens, J., in chambers) (granting a stay and emphasizing that the government would not "be significantly prejudiced by additional short delay").

In addition, it would be illogical to suggest that an injunction would unduly injure the State when it is IDOC itself that has in large part made an emergency injunction necessary through its dilatory approach to the litigation. Mr. Creech initiated the instant case almost four years ago. *See* Dkt. 1. He was forced to do so because IDOC had already been stonewalling his requests for more than a year and would not convey to him even the most rudimentary information about his execution, such as the drug the defendants intended to use to put him to

death. *See id.* at 6–7. The defendants then led this Court to dismiss the case for lack of ripeness

in November 2020 on the ground that the plaintiffs had "ongoing appeals for relief from their

convictions." Dkt. 34 at 8. That theory was wrong, as the Ninth Circuit easily concluded on

appeal. *See* Dkt. 47 at 9.

By the time the case was back in the district court on remand, there was an active death

warrant for Mr. Pizzuto (who was a co-plaintiff in this case at the time), setting his execution for

June 2, 2021. Nevertheless, fifteen days out, IDOC had not announced which drug it would use.

*See* Dkt. 60. Nearly two years later, another death warrant was signed for Mr. Pizzuto, setting a

new execution date of March 23, 2023. This time, it was fourteen days before the execution and

IDOC had still not chosen a drug. *See* Ex. 32. It was not until November 27, 2023 that IDOC

revealed it had chosen a cocktail. *See* Ex. 33 at 6; Dkt. 55-12 at 5. This was despite the fact that

the State obtained a death warrant for Mr. Creech on October 12, 2023 and already had the

pentobarbital in hand. *See id.* at 5. In the time between IDOC's actual acquisition of the

pentobarbital and its grudging disclosure of what cocktail it had chosen, the defendants'

exceptional level of non-transparency continued. *See* Dkt. 105-1 at 18 (claiming weakly on

November 13 that Mr. Creech had "been aware of the chemicals" to be used at his execution

because "SOP 135 identifies pentobarbital" (and two other options that don't include

pentobarbital), "singly or in conjunction with other chemicals"); Dkt. 92 at 4 n.3 (acknowledging

on October 18 only that Defendant Tewalt had "focused" his "efforts on a search for

pentobarbital for use *in a single or triple drug protocol*"). Other states routinely reveal their

choice of drugs, but IDOC withholds it for as long as possible, which counts powerfully against

the defendants in the balancing of the equities.

As this Court has recognized, too, factors beyond either of the parties' control have likewise resulted in delay. *See* Dkt. 98 at 19. The Ninth Circuit had before it Mr. Creech's appeal of this Court's dismissal of his complaint in early 2022, *see* Dkt. 78, but did not adjudicate that appeal until October of 2023. In this second opinion, the Ninth Circuit held that Mr. Creech was entitled to seek leave to amend, as he had contended here. *See* Dkt. 88 at 35. Mr. Creech does not fault this Court for its good faith ruling against him in May 2021. Still, he should not be punished for the delay when he was doing everything in his power to proceed expeditiously and the clock was set back by an adverse judicial decision.

IDOC's slowness in Mr. Pizzuto's lethal-injection case should also weigh against the defendants in the balancing of the equities. Mr. Pizzuto made it plain to IDOC as early as April 2023 that he wished to review all of the paperwork associated with the testing of any execution drug to confirm it was done properly. *See* Ex. 34. The testing was done before the drugs came into IDOC's possession, which occurred at the latest on October 12, 2023. *See* Ex. 6 at 8. Yet the certificate of analysis was not turned over to Mr. Pizzuto until January 25, 2024, more than three months later. *See* Ex. 35. Of IDOC's many delays, this is a particularly significant one. The certificate of analysis is the sole document upon which IDOC is relying for the reliability of its drugs. Mr. Creech's claims turn to a substantial extent on his ability to investigate the certificate. The fact that it was not made available until five days before a death warrant—and thirty-three before an execution—speaks directly to why the equities cut so strongly against IDOC.

All of the above goes to show that Mr. Creech's situation is vastly different from the many cases in which the inmate's conduct requires a claim to be disposed of on the eve of an execution. *See, e.g.*, *McKenzie v. Day*, 57 F.3d 1461, 1463, 1468–69 (9th Cir. 1995) (discussing a constitutional claim raised for the first time in opposition to a motion to set an execution date).

Quite to the contrary, Mr. Creech has been exceedingly diligent. He first asked IDOC for the basic facts about his execution in 2018, more than five years ago. *See* Dkt. 1 at 6. Ever since, he has been persistently pushing for more information and to present his claims, while IDOC dragged out the dialogue period, raised incorrect defenses, and hoarded critical information. It took time for Mr. Creech to finally move forward on his claims under all of these circumstances.

Furthermore, the public's interest in finality now is also substantially diminished by the reason it has taken so long to carry out Mr. Creech's death sentence. The reason that Mr. Creech has not yet been executed is that he had first-round challenges pending in court to his convictions and death sentence from the time he was charged in 1981 until the United States Supreme Court denied certiorari in his case on October 10, 2023. *See Creech v. Richardson*, 144 S. Ct. 291 (2023). That litigation took more than forty years because both parties and the courts needed time to ensure that serious claims in a capital case received the searching review that was appropriate. *See Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (plurality op.) ("When a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed."). Many of the delays in Mr. Creech's case cannot be reasonably attributed to him, such as the twelve years it took to get to a resentencing after his constitutional rights were violated at the original sentencing. *See Arave v. Creech*, 507 U.S. 463 (1993). In all events, Mr. Creech's interest in receiving thorough judicial consideration of his execution claims outweighs any interest in hastening the case to its end. Mr. Creech should be afforded time here so that he can obtain meaningful judicial review of his claims, as any party is entitled to do. *See Zagorski v. Haslam*, No. 3:18-cv-01035, 2018 WL 4931939, at *4 (M.D. Tenn. Oct. 11, 2018) (enjoining an execution because the issues could not be resolved before the scheduled execution and delay was necessary to allow "full and fair litigation").

Memorandum In Support of Motion for Preliminary Injunction – Page 20

### IV.   An injunction cannot be denied without an evidentiary hearing.

Mr. Creech submits that the argument above is adequate to justify the entry of a preliminary injunction prohibiting his execution until the claim is completely resolved on its merits.[6] Insofar as the Court disagrees, it would still be inappropriate to *deny* the injunction without holding an evidentiary hearing. Such a hearing is mandatory "if essential facts are in dispute." *Charlton v. Est. of Charlton*, 841 F.2d 988, 989 (9th Cir. 1988). Mr. Creech has presented substantial documentary evidence to meet his burden on all of the preliminary-injunction factors. Therefore, the only reason to refuse an injunction would be if the State contradicts his presentation and the Court agrees with its account. That would represent a dispute over the facts, which would call for an evidentiary hearing.

When a preliminary injunction is denied in an execution case, it means that the plaintiff's claims will forever be mooted by his death. Before the Court sanctions such an "irremediable and unfathomable" act, *Ford v. Wainwright*, 477 U.S. 399, 411 (1986), it should allow Mr. Creech to at least make his case at a live hearing through witnesses. That is the only way for the Court to acquire the confidence necessary to authorize the execution without fearing the possibility of a torturous death. It is perhaps for the same reasons that evidentiary hearings are commonly held by district courts around the country on motions for preliminary injunctions in method-of-execution cases. *See, e.g.*, *Glossip v. Gross*, 576 U.S. 863, 874 (2015) (recounting how a preliminary injunction hearing took place in the district court in an execution case); *Jones v. Kelley*, 854 F.3d 1009, 1012 (8th Cir. 2017) (same); *Chavez v. Fla. SP Warden*, 742 F.3d 1267,

---

[6] On today's date, Mr. Creech is seeking an administrative stay of execution until the request for a preliminary injunction is resolved. To the extent it is necessary, Mr. Creech incorporates here by reference his memorandum in support of his motion for an administrative stay.

1268 (11th Cir. 2014) (same); *Hamilton v. Jones*, 472 F.3d 814, 815 (10th Cir. 2007) (per

curiam) (same). The same level of scrutiny is warranted here.

**V.   Conclusion**

For the reasons set forth above, undersigned counsel respectfully ask the Court to enjoin

Mr. Creech's execution until it has fully adjudicated his claims for relief on the merits and to

hold an evidentiary hearing on the instant request if it will not be granted on the basis of the

papers alone.

DATED this 6th day of February 2024.

/s/ Mary E. Spears
Mary E. Spears

/s/ Deborah A. Czuba
Deborah A. Czuba
Federal Defender Services of Idaho

*Attorneys for Plaintiff Thomas Eugene Creech*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 6th day of February 2024, I electronically filed the foregoing
document with the Clerk of the Court using the CM/ECF system, which is designed to send a
Notice of Electronic Filing to persons including the following:

Kristina Schindele
krschind@idoc.idaho.gov

Karin Magnelli
kmagnell@idoc.idaho.gov

Michael Elia
mje@melawfirm.net

/s/ Julie Hill
Julie Hill