UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GERALD ROSS PIZZUTO, JR., | Case No. 1:21-cv-00359-BLW |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| JOSH TEWALT, Director, Idaho Department of Correction, in his official capacity, TIMOTHY RICHARDSON, Warden, Idaho Maximum Security Institution, in his official capacity, | |
| Defendants. | |

Before the Court are three Motions to Compel Discovery (Dkts. 102, 108 & 116) filed by Plaintiff Gerald Ross Pizzuto, Jr. For the reasons explained below, the Court will partially grant and partially deny the first motion (Dkt. 102). The Court will also grant the second and third motions (Dkts. 108 & 116) in their entirety.

## BACKGROUND

Plaintiff Gerald Ross Pizzuto, Jr. is an inmate on Idaho's death-row. He filed this lawsuit in September of 2021 to prevent the State from executing him with pentobarbital. *See generally Am. Compl.*, Dkt. 13. Pointing to his various medical

conditions, Pizzuto claims that using pentobarbital would substantially increase the risk that he will suffer severe pain during the execution. Accordingly, he claims, doing so would constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. *Id.*

On March 9, 2023, this Court agreed to stay Pizzuto's execution pending the resolution of his Petition for Writ of Habeas Corpus in *Pizzuto v. Richardson*, Case No. 1:22-cv-00452-BLW, Dkt. 19. At this time, execution proceedings remain stayed pursuant to that Order.

Discovery in this case is ongoing. On April 13, 2023, Pizzuto filed a Motion to Compel Discovery (Dkt. 82), challenging Defendants' objections to several of his discovery requests. Defendants responded by arguing that Idaho's "secrecy statute," Idaho Code § 19-2716A, creates an "enforceable privilege" in any information that "would allow identification" of an execution team member, the source of an execution chemical, or a medical equipment supplier, "by any indirect means, as well as any direct means." *Def.'s Resp.* at 12, Dkt. 84.[1]

---

[1] Idaho Code § 19-2716A(4) provides:

> [T]he identities of any of the following persons or entities involved in the planning, training, or performance of an execution shall be confidential, shall not be subject to disclosure, and shall not be admissible as evidence or discoverable in any proceeding before any court, tribunal, board, agency, or person:
>> (a)  The on-site physician and any member of the escort team or medical team; and
>> (b)  Any person or entity who compounds, synthesizes, tests, sells, supplies, manufactures, stores, transports, procures, dispenses, or

In a Memorandum Decision and Order (Dkt. 88) issued July 25, 2023, this Court rejected Defendants' broad assertion of privilege, but nevertheless agreed to protect the identities of people and entities involved in performing executions under Federal Rule of Civil Procedure 26(c). The Court held, first, that Idaho's secrecy statute does not create a federal evidentiary privilege. Nor would the Court agree to carve out a brand-new federal privilege to incorporate that state law. The Court nevertheless recognized that requiring Defendants to identify members of their execution team and the supplier of their execution drug would seriously harm their interest in enforcing Idaho's death penalty laws. Applying the undue burden test under Rule 26(c)(1), the Court therefore allowed Defendants to withhold information that would, to a reasonable degree of certainty, identify a person or entity involved in preparing for, supplying drugs for, or administering the death penalty in Idaho. *See Mem. Decision & Order* at 4–5, Dkt. 88.

In October 2023, an Idaho state court issued a death warrant for Thomas Creech, another death-row inmate. Shortly thereafter, Pizzuto served additional discovery requests and asked Defendants to supplement their responses to several of his earlier requests in light of developments in the Creech case. *See Pl.'s Sixth*

---

prescribes the chemicals or substances for use in an execution or that provides the medical supplies or medical equipment for the execution process.

*Set of Req. for Adm.*, Ex. 7, Dkt. 102-8; *Horwitz Letter*, Ex. 1, Dkt. 102-2. In response, Defendants objected to several of the requests on confidentiality grounds. *See* Dkts. 102, 108 & 116. Defendants also produced a redacted purchase order showing that they had obtained pentobarbital for use in the Creech execution. *IDOC Purchase Order*, Ex. 3, Dkt. 102-4.

Pizzuto now challenges Defendants' confidentiality objections and seeks to compel them to answer his discovery requests. *See* Dkts. 102, 108 & 116. The motions are fully briefed and ripe for decision.

## LEGAL STANDARDS

### 1.    Motions to Compel Discovery

A Requests for Admission (RFA) is a discovery device that requires the receiving party to admit or deny the truth of any matter within the scope of Rule 26(b)(1) relating to facts, the application of law to facts, opinions of either, or the genuineness of any described document. FED. R. CIV. P. 36(a)(1). A receiving party may object to an RFA and state the grounds for its objection. *Id.* at 36(a)(5). But if the receiving party neither answers nor objects within thirty days, the matter is deemed admitted. *Id.* at 36(a)(3).

When a receiving party objects to a discovery request, Federal Rule of Civil Procedure 37 allows the serving party to "move for an order compelling disclosure or discovery." FED. R. CIV. P. 37(a)(1). In determining whether an objection is

valid, a court must consider "whether the information in question is within the proper scope of discovery" and "is the subject of a proper party-initiated discovery request." FED. R. CIV. P. 37, Rules and Commentary Rule 37.

Federal courts have broad discretion to permit, prohibit, or limit discovery in civil cases. FED. R. CIV. P. 26(c)(1); *see generally Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063 (9th Cir. 2004). Thus, in ruling on a motion to compel discovery under Rule 37(a), a court may limit the scope of discovery or impose other conditions on the compelled disclosures. FED. R. CIV. P. 26(c)(1); *see also Degen v. United States*, 517 U.S. 820, 826 (1996).

## 2.    Good Cause and Undue Burden

Under Federal Rule of Civil Procedure 26(c)(1), a court may, for good cause, limit discovery "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including [by] prohibiting the requested discovery altogether, limiting the scope of the discovery, or fixing the terms of disclosure." *Rivera*, 364 F.3d at 1063 (quoting FED. R. CIV. P. 26(c)). To determine whether there is good cause to limit discovery, a court must balance the competing needs and interests of the parties. On one hand is the requesting party's need for the evidence. And on the other hand is the harm that disclosure may have on the objecting party.

As this Court has recognized, it can be unduly burdensome for a state to disclose information that would identify the supplier of its execution drugs. *See Mem. Decision & Order* at 4–5, Dkt. 88. But two things must be made clear about the undue burden analysis in this context. First, it must always be applied with an eye toward the underlying purpose of ensuring that the state can enforce its criminal laws. *See id.* at 22. Put another way, otherwise-discoverable information cannot be withheld simply because it is tangentially related to the acquisition or testing of execution drugs. It may only be withheld if its disclosure would identify a drug supplier, and in doing so, would impose an undue burden on the state.

Second, the undue burden balancing test must be applied on a case-by-case basis. For example, after describing the undue burden standard in its prior Memorandum Decision and Order (Dkt. 88), this Court went on to apply the balancing test to each disputed discovery request, weighing the parties' competing interests with respect to each specific item of information sought. *See id.* at 24–29. This kind of careful, item-by-item analysis is essential to prevent the limited protection for execution-drug suppliers' identities from morphing into a rigid and expansive privilege in all information related to execution drugs.

## ANALYSIS

Pizzuto seeks to compel Defendants to answer several of his Requests for Admission (RFAs). Defendants object on various grounds, but primarily argue that

Pizzuto's questions pertain to confidential identifying information. The Court will consider the disputed discovery requests one at a time.

## 1.    Identification and Acquisition Dates

Pizzuto first requests the dates on which Defendants identified their execution drug supplier and acquired the execution drugs. *Pl.'s Memo. in Supp.* at 3–4, Dkt. 102-1. RFAs 146 and 147 ask Defendants to admit or deny that the Idaho Department of Correction (IDOC) *identified* a source of execution drugs prior to October 10 and October 11, 2023, respectively. *See* Dkt. 102-6 at 1–3. RFAs 150 and 151 ask Defendants to admit or deny that the IDOC *obtained* execution drugs prior to October 10 and October 11, 2023, respectively. *See* Dkt. 102-6 at 3–5. Finally, Pizzuto asks the Court to direct Defendants to remove the redaction of the purchase date on the Purchase Order provided during discovery.

Defendants initially objected to all four RFAs. Answering, they explained, "could lead to the identity of the source of execution chemicals" and therefore unduly burden the State in "carry[ing] out lawfully imposed death sentences." *Id.* In a supplemental response to RFAs 146 and 147, however, Defendant Tewalt admitted that he "had identified a *potential* source of chemical on or about October 12, 2023." *Id.* (emphasis in original). He characterized the source as merely "potential" because the identified supplier "could have withdrawn from consideration at any time." *Id.*

RFAs 146 and 147 have been adequately answered. Defendant Tewalt admitted that a potential source of execution drugs was identified "on or about October 12, 2023." Pizzuto acknowledges that Defendants "partially" answered his question, but he objects to Defendants' use of the word "potential" as a qualifier. The Court does not share Pizzuto's concern. RFAs 146 and 147 merely asked whether the IDOC had "identified *a source*" of execution drugs before October 10 and 11. (emphasis added). Defendant Tewalt answered that question by providing the date on which "a source" was identified.

That leaves RFAs 150 and 151, which request the date on which the execution drugs were "obtained." *See* Dkt. 102-6 at 3–5. According to Pizzuto, disclosing that date would not jeopardize the confidentiality of the drug supplier's identity. *Pl.'s Memo. in Supp.* at 4–7, Dkt. 102-1. Defendants counter that disclosing that date "would allow individuals or entities to file public records requests and receive information identifying the State's supplier" and employees who are involved in administering the death penalty. *Def.'s Resp.* at 3–4, Dkt. 104. That is, "collateral information," such as "expenditure reports," could be obtained from other state departments or agencies that would "easily lead to the identification of the State's source." *Id.* at 6–7.

Defendants explain how a person could plausibly identify the State's supplier by cross-referencing the date on which the drugs were purchased with

records obtained from other state departments and agencies. However, beyond their cursory parenthetical references to "expenditure reports," "travel records," and "communication records," Defendants do not explain what kinds of "other records" might be used as cross references. Nor do they provide any examples of this kind of sleuthing having ever occurred in other states that disclose execution-drug purchase dates.

For support, Pizzuto cites the D.C. Circuit Court of Appeals' recent decision in *Citizens for Responsibility & Ethics in Washington v. United States Department of Justice*, 58 F.4th 1255 (D.C. Cir. 2023) (hereinafter "*CREW*"). In that case, the Citizens for Responsibility and Ethics in Washington (CREW) challenged the Bureau of Prisons' (BOP) decision to withhold information related to its procurement of pentobarbital for use in lethal injections. *Id.* at 1259. In response to a request submitted by the CREW under the Freedom of Information Act (FOIA), the BOP provided various records but withheld "any information that could identify companies in the government's pentobarbital supply chain." *Id.* In doing so, the BOP relied on a FOIA exemption "which protects, among other things, trade secrets and confidential commercial information." *Id.* The district court ruled in favor of the BOP and the CREW appealed.

One key issue on appeal was whether the information the BOP withheld, including drug prices, quantities, and dates of purchase, was "confidential." *Id.* at

1269. The BOP argued—and the district court agreed—that those records were confidential because "they could lead to the identity of individuals or companies involved in its pentobarbital supply." *Id.* (internal quotation marks omitted). On appeal, however, the D.C. Circuit reversed and held that the BOP had not explained "*how* the contract terms [were] identifying." *Id.* at 1271. On remand, the D.C. Circuit instructed the district court to determine whether "the withheld contract terms are in fact identifying," without relying on "conclusory, vague, or sweeping assertions as to their identifying power." *Id.* (internal quotation marks omitted).

The *CREW* decision rested on an entirely different legal framework than governs in this case. Nevertheless, that decision reflects a key principle that applies equally here: courts should not shield the government from its ordinary disclosure obligations based upon sweeping and unsupported assertions that disclosures could lead to the identification of execution drug suppliers. Here, as in *CREW*, Defendants have only broadly alluded to the "identifying power" of the purchase date, without explaining or supporting their theory that disclosing that date would lead to the identification of their drug supplier.

Defendants have not shown that disclosing the date on which they obtained the execution drugs would unduly burden the State's ability to enforce the death penalty. They offer only bare speculation that the purchase date could be used in

conjunction with "other records" to trace the execution drugs to a particular supplier. The Court will therefore overrule Defendants' objection and order them to answer RFAs 150 and 151 and remove the redaction of the purchase date on the Purchase Order.

## 2.      Information About the Source of Execution Drugs

Pizzuto next seeks to compel responses to nine discovery requests related to Defendants' source of execution drugs. Five of the requests pertain to the geographic origin of the execution drugs (RFAs 174, 175, 192, 193 & 196). The other four relate to the kind of source that supplied the execution drugs (RFAs 190, 191, 194 & 195). The Court will again consider the requests one at a time.

### A.      Geographic Origin of the Execution Drugs

Pizzuto first seeks information about the geographic origin of the execution drugs. Specifically, he asks whether the execution drugs were made "in America" or "outside of America" (RFAs 174 & 175), whether they "came from" a "domestic source" or "foreign source" (RFAs 192 & 193), and whether they were "imported" (RFA 196). Defendants object on three grounds. First, they claim that answering these questions risks identifying their execution drug supplier. Second, they argue that the geographic origin of the drugs is not relevant because the Certificate of Analysis (which they have provided to Pizzuto) "establishes the safety of the execution chemicals." *Def.'s Br.* at 6–7, Dkt. 109. Finally, Defendants

object that Pizzuto's five requests about geographic origin contain vague and ambiguous terms.

Defendants' first objection is unpersuasive. They argue in broad terms that disclosing any information about the geographic location of their drug source would increase the risk that their supplier will be identified. That is probably true as a general matter. But Defendants fail to go further and explain, in concrete terms, how their answers to these particular questions may actually lead to the identification of their supplier. In fact, Pizzuto offers evidence suggesting precisely the opposite. According to Dr. Michaela Almgren, Defendants' answers—whether affirmative or negative—would not enable her or anyone else to identify which company was responsible for manufacturing the execution drugs. *Pl.'s Memo. in Supp.* at 3–4, Dkt. 108-1; *Almgren Decl.* ¶¶ 14–15, Dkt. 108-2.

Ultimately, the Court is left with very little information about the likelihood that answering these RFAs would result in the identification of the drug supplier. The Court is told by Dr. Almgren that there are "numerous" companies throughout the world that manufacture pentobarbital, and that "several" companies in the United States are "registered to manufacture pentobarbital." *Almgren Decl.* ¶¶ 14–15, Dkt. 108-2. Defendants push back, stating that there are "only a few willing providers" of pentobarbital in the world, so disclosing the geographic origin of the drugs would lead to the supplier's identification. *Def.'s Br.* at 7–8, Dkt. 109. But

the meaning of the terms "several," "numerous," and "a few" in this context is not clear. And without knowing how many manufacturers there are in the United States and elsewhere, the Court cannot critically evaluate Defendants' assertion that answering RFAs 174, 175, 192, 193, and 196 would result in the identification of their supplier.

To prevail on his Motion to Compel Discovery (Dkt. 108), Pizzuto need not prove a negative by showing that Defendants' answers will *not* lead to the identification of their supplier. Rather, Defendants must show good cause for shielding them from Pizzuto's discovery requests. FED. R. CIV. P. 26(c)(1). They cannot do so by simply relying upon unsupported speculation, but instead must "demonstrate[e] harm or prejudice that will result from the discovery." *Rivera*, 364 F.3d at 1063 (citing *Phillips ex rel. Estates of Byrd v. General Motors Corp.*, 307 F.3d 1206, 1210–11 (9th Cir. 2002)). Defendants have not made that showing, and the Court will therefore overrule their objection.

The next question is whether the geographic origin of the execution drugs is relevant to this case.[2] Pizzuto thinks so, noting that importing medications from

---

[2] Pizzuto argues that Defendants waived any relevancy objection. The Court disagrees. Although Defendants did not use the word "relevance" in their initial objection, they asserted that the Certificate of Analysis "establishes the quality and safety of the execution chemicals." Dkt. 108-3 at 2. In doing so, Defendants challenged Pizzuto's need for—i.e., the relevance of—the requested information.

other countries can create certain pronounced safety risks. *Pl.'s Memo. in Supp.* at 10, Dkt. 108-1 (citing *Almgren Decl.* at 5–6, Dkt. 108-2). Defendants disagree, arguing that the drug's geographic origin is irrelevant because its reliability is conclusively established by the Certificate of Analysis. That Certificate contains the results of the chemical testing performed on the drug and ostensibly shows that it is "of a particular composition and quality" and "meets the relevant regulatory and quality standards." *Def.'s Br.* at 8, Dkt. 109.

Defendants cannot use the Certificate of Analysis to shield themselves from all discovery related to the reliability of the execution drugs. As Pizzuto notes, Defendants have not identified the entity responsible for performing the chemical analysis. And, for the reasons Pizzuto suggests, the geographic origin of the execution drugs may bear on the reliability of the drugs, which is a material issue in this case.

To be clear, however, the drug tester's anonymity does not eliminate the evidentiary value of the Certificate of Analysis. In fact, the Ninth Circuit recently affirmed this Court's conclusion that the Certificate demonstrates that "IDOC now possesses certified, manufactured pentobarbital." *Creech v. Tewalt*, No. 24-978, 2024 WL 755721, at *2 (9th Cir. Feb. 24, 2024) (citing *Creech v. Tewalt*, Case No. 1:20-cv-00114-AKB, 2024 WL 756356 (D. Idaho Feb. 23, 2024)). The Ninth Circuit further affirmed this Court's rejection of Thomas Creech's "purely

speculative" challenges to the quality and reliability of the execution drugs based upon his expert's "conjecture" about the drug tester's accreditation. *Creech*, 2024 WL 756356 at *5.

Here, the Court decides only that the existence of the Certificate of Analysis does not make all other information about the drug's reliability irrelevant. The standard for relevance is quite low. And although this Court has relied upon the test results reflected in the Certificate in another case, Pizzuto should not be prohibited from challenging those results in this case. Defendants' relevance objection is therefore overruled.

Finally, Defendants claim that Pizzuto's discovery requests are "vague, ambiguous, and otherwise uncertain." *Def.'s Br.* at 8, Dkt. 109. The Court is tempted to deem this objection waived as untimely because it was first raised in Defendants' brief. But doing so would be problematic because, waiver or no waiver, a party must understand a question in order to answer it. The Court agrees with Defendants that the terms "domestic source" and "foreign source" are ambiguous as used in RFAs 192 and 193.[3] Depending on how those terms are

---

[3] Defendants also take issue with the terms "made," "in," "outside," "came," "sold," "pharmacy," "imported" and "America." None of those terms are ambiguous when viewed in the context of each discovery request. Although it is imprecise to refer to the United States simply as "America," the meaning of that term is clear in context, especially in light of Pizzuto's use of the terms "America" and "the United States" interchangeably in his brief. *See Pl.'s Memo. in Supp.* at 4, Dkt. 108-1.

defined, a manufacturer could be both foreign and domestic in different respects.[4]

Pizzuto will be allowed fourteen days to define those two terms or otherwise clarify these two discovery requests. If he does so, Defendants must answer RFAs 192 and 193. If he fails to do so, Defendants need not answer those requests.

### B.    The Kind of Execution Drug Supplier

Pizzuto next seeks information about the kind of source that provided the execution drugs. Specifically, he asks whether the drugs came from a "veterinary source" (RFA 190) or a hospital (RFA 191), and whether the drugs were sold by a "wholesaler/distributor" (RFA 194) or a pharmacy (RFA 195). Defendants again raise three objections. First, they claim that answering these questions "would lead to the source being identified" through a "process of elimination." *Def.'s Br.* at 9, Dkt. 109. Second, they argue that the requested information is irrelevant because the Certificate of Analysis definitively establishes the execution drugs' reliability. And third, they object that Pizzuto's requests are vague.

Defendants again fail to provide any support for their confidentiality objection. Instead, they merely offer a bare assertion that "apparent identification concerns" exist. *Def.'s Br.* at 9, Dkt. 109. Pizzuto, on the other hand, again relies upon Dr. Almgren's declaration that Defendants' answers "would not give [her] or

---

[4] For example, a domestic corporation may operate foreign manufacturing plants, or vice versa.

anyone else insight" into the identity of the source, because there are "tens of thousands of veterinarians," "six thousand hospitals," "more than 800 . . . distributors," and "over sixty thousand . . . retail pharmacies" registered with the DEA and authorized to possess pentobarbital in the United States. *Almgren Decl.* ¶¶ 16 & 18, Dkt. 108-2.

To be clear, those high numbers, alone, do not rule out the possibility that Defendants' answers will lead to the identification of their drug supplier. These four disputed RFAs cannot be viewed in a vacuum. Defendants have provided a variety of information throughout the discovery process that, when combined with the answers to these RFAs, may substantially narrow the list of possible drug suppliers. Nevertheless, however plausible their concerns may be, Defendants have offered no evidence or analysis to support their speculation. And the Court will not discard Pizzuto's discovery requests based on some unquantified risk that Defendants' answers could theoretically lead to the identification of the drug supplier. Defendants' confidentiality objection will therefore be overruled.

Defendants also object to Pizzuto's discovery requests on relevance and vagueness grounds. As explained above, however, the production of a redacted Certificate of Analysis does not shield Defendants from all discovery requests related to the reliability of the execution drugs. Nor does the Court share Defendants' opinion that the undefined terms within these RFAs are vague. *See*

*Def.'s Br.* at 9, Dkt. 109 (challenging, as vague, the terms "came from," "veterinary source," "hospital," "sold by," "wholesaler/distributor," and "pharmacy"). Each of those terms has a plain and ordinary meaning and the Court will not manufacture ambiguity by reading those words hyper-technically. Defendants' relevance and vagueness objection are also overruled.

### 3.    Information about Akorn and the Date Redaction

Pizzuto raises two distinct issues in his final motion. First, he seeks to compel Defendants to admit or deny that the execution drugs were manufactured by Akorn, a now-bankrupt pharmaceutical company. And second, Pizzuto objects to the redaction of the "Report Date" on the Certificate of Analysis produced by Defendants.

### A.    Request for Admission 203

On January 5, 2024, Pizzuto served RFA 203 asking Defendants to "[a]dmit or deny that the Execution Drugs were manufactured by Akorn." Dkt. 115-2 at 3. Defendant Tewalt objected on three grounds. First, he explained that answering the question could result in the identification of the execution drug supplier and, therefore, could hamper the State's ability to obtain lethal injection chemicals in the future. Second, Defendant Tewalt objected that Pizzuto's question is not relevant because the Certificate of Analysis conclusively establishes the drug's

reliability. Finally, Defendant Tewalt objected that this information's value "to Plaintiff, if any, is disproportionate to his needs."

Pizzuto first argues that Defendant Tewalt's confidentiality objection is misplaced because Akorn went bankrupt and ceased operating in February of 2023. Thus, according to Pizzuto, even if Akorn is identified as Defendants' supplier, that disclosure will not impact the State's ability to obtain execution drugs in the future, because Akorn cannot be subjected to the kind of societal pressures typically exerted on execution drug suppliers. Defendants respond that, notwithstanding Akorn's bankruptcy, identifying Akorn as the drug manufacturer would have a chilling effect on other potential suppliers of execution drugs in the future. That is, the fact that the company is "no longer in business does not prevent individualized attacks or pressures against the prior employees or executives." *Def.'s Br.* at 6, Dkt. 115. And the anticipation of such attacks and pressures, they argue, will dissuade other potential suppliers from transacting with the State in the future.

Defendants' argument is unpersuasive. This Court previously concluded that requiring a state to identify its execution drug supplier can unduly burden the state's enforcement of the death penalty by causing the identified source to cease supplying execution drugs to the state. *See Mem. Decision & Order* at 4, Dkt. 88. It does not necessarily follow, however, that requiring a state to identify a now-

defunct and bankrupt supplier would have the same detrimental impact on the state's acquisition of drugs in the future. Moreover, although Defendants repeatedly state that execution drug suppliers "believe that their identities will _always_ be kept secret," they offer no support for that assertion. _See Def.'s Br._ at 4 & 6, Dkt. 115.

Defendants also argue that _denying_ RFA 203 could lead to the identification of their execution drug supplier. But, again, Defendants have not provided any basis for that conclusion. The Court has been informed only that there are "several," "numerous," or "a few" pentobarbital manufacturers worldwide. On that flimsy basis, it is not clear that ruling out one possible source would reveal the identity of the State's supplier.

Ultimately, the Court will not merely speculate that requiring Defendants to admit or deny whether a now-defunct company provided its execution drugs would impact—much less unduly burden—the State's ability to obtain lethal injection chemicals in the future. Defendants' confidentiality objection is therefore overruled.

Defendants' relevance objection also fails. According to Dr. Almgren, Akorn has a history of regulatory violations, it recalled many of its drugs just before going bankrupt, and it has historically prohibited the use of its drugs in lethal injections. _See Almgren Decl._ ¶¶ 18–20, Dkt. 116-7. Given those concerns,

Akorn's involvement in the manufacture of the execution drugs does clear the low bar of relevance. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (Relevance "broadly . . . encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."). The relevance objection is therefore also overruled.

Finally, Defendants' proportionality objection fares no better. The proportionality of discovery depends upon "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." FED. R. CIV. P. 26(b)(1). Much is at stake in this capital case, and due to the confidentiality protections afforded Defendants' drug supplier, Pizzuto has limited access to information about the drug source. As explained above, the burden of answering RFA 203 is minor and Akorn's involvement in manufacturing the execution drugs may bear on the issues in this case. In sum, Defendants' proportionality objection is also overruled, and Defendants are directed to answer RFA 203.

## B. Certificate of Analysis

The final discovery dispute involves Defendants' redaction of the Report Date on the Certificate of Analysis. On January 25, 2024, Defendants provided

Pizzuto with a copy of a Certificate of Analysis that ostensibly "documents the results of scientific testing completed on the execution chemicals, details the process and materials used during manufacturing, confirms compliance with regulatory and quality standards, and otherwise establishes the quality and safety of the execution chemicals." *Pl.'s Memo. in Supp.* at 2, Dkt. 116-1; *see* Dkt. 116-3. Defendants redacted the Report Date on the Certificate, explaining in their privilege log that the date "could identify a source of supplies, equipment and/or chemical to be used during an execution." *Privilege Log* at 16, Ex. 3, Dkt. 116-4. Explaining further in their brief, Defendants argue that because "other documents and information" are "connected" to the Report Date, disclosing that date would allow members of the public to "find the identities of the individuals and entities within the supply chain." *Def.'s Br.* at 8–9, Dkt. 115.

Defendants' arguments are speculative and conclusory. They have not explained how their supplier could be identified if the Report Date is disclosed. Nor can the Court intuit how that date, which merely reflects when the chemical analysis was performed, is linked to the drug's manufacture. *See Almgren Decl.* ¶ 17, Dkt. 116-7 ("The Certificate of Analysis provides test results characterizing the finished product of manufacturing. It does not offer any specific information about the process and materials used during manufacturing."). Ultimately, Defendants have not justified their redaction of the Report Date.

In their brief, Defendants also object to the relevance of the Report Date. That objection is untimely and deemed waived. Defendants timely objected only on the basis that disclosing the date could lead to the identification of individuals and entities involved in carrying out executions. It is too late to voice a new objection. *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992) ("It is well established that a failure to object to discovery requests within the time required constitutes a waiver of any objection."); *see also Wagner v. St. Paul Fire & Marine Ins. Co.*, 238 F.R.D. 418, 423 (N.D.W.Va. 2006) ("Waiver from the failure to timely object under Rule 34 has been called 'well settled.'"). Moreover, considering relevance on its own, the Court agrees with Pizzuto that the date on which the chemical testing was performed could theoretically bear on the reliability of the test results or the presence of deleterious intervening conditions.

Defendants have not justified their redaction of the Report Date on the Certificate of Analysis. The Court will therefore overrule their objections and direct Defendants to provide Pizzuto with a copy of the Certificate of Analysis with the Report Date unredacted.

## ORDER

**IT IS ORDERED that:**

1.    Pizzuto's Third Motion to Compel Discovery (Dkt. 102) is

**GRANTED in part and DENIED in part**, as follows:

> A.    The Motion (Dkt. 102) is **DENIED** with respect to RFAs 146
>
> and 147;
>
> B.    The Motion (Dkt. 102) is **GRANTED** with respect to RFAs
>
> 150 and 151. Defendants must answer those RFAs in
>
> accordance with, and within fourteen days after issuance of, this
>
> Order; and
>
> C.    The Motion (Dkt. 102) is **GRANTED** with respect to
>
> Defendants' redaction of the date on the Purchase Order.
>
> Defendants must provide an unredacted copy of the Purchase
>
> Order within fourteen days after issuance of this Order.

2.    Pizzuto's Fourth Motion to Compel Discovery (Dkt. 108) is

**GRANTED**, as follows:

> A.    Within fourteen days after issuance of this Order, Defendants
>
> shall answer RFAs 174, 175, 190, 191, 194, 195, and 196 in
>
> accordance with this Order; and
>
> B.    Within fourteen days after issuance of this Order, Pizzuto shall
>
> clarify in writing the meaning of the terms "domestic source"

and "foreign source," as explained above. Defendants must then answer RFAs 192 and 193 within fourteen days after receiving Pizzuto's written clarification.

3.      Pizzuto's Fifth Motion to Compel Discovery (Dkt. 116) is

**GRANTED**, as follows:

A.      Within fourteen days after issuance of this Order, Defendants shall answer RFA 203 in accordance with this Order; and

B.      Within fourteen days after issuance of this Order, Defendants shall provide a copy of the Certificate of Analysis to Pizzuto with the Report Date unredacted.

DATED: March 28, 2024

B. Lynn Winmill
U.S. District Court Judge