Nicole Owens
Executive Director
Jonah J. Horwitz, Idaho Bar No. 10494
Christopher M. Sanchez, New York Bar No. 5414099
Assistant Federal Defenders
Federal Defender Services of Idaho
702 W. Idaho Street, Suite 900, Boise, ID 83702
T: (208) 331-5530; F: (208) 331-5559
ECF: Jonah_Horwitz@fd.org; Christopher_M_Sanchez@fd.org

Stanley J. Panikowski, California Bar No. 290663
(admitted *pro hac vice*)
**DLA Piper LLP (US)**
401 B Street, Suite 1700, San Diego, CA 92101-4297
T: (619) 699-2700; F: (619) 699-2701; ECF: Stanley.Panikowski@dlapiper.com

*Attorneys for Plaintiff Gerald Ross Pizzuto, Jr.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **GERALD ROSS PIZZUTO, JR.,** | **CASE NO. 1:21-cv-359-BLW** |
| Plaintiff, | |
| v. | **SECOND AMENDED COMPLAINT FOR EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF** |
| **JOSH TEWALT**, Director, Idaho Department of Correction, in his official capacity, **RANDY VALLEY**,[1] Warden, Idaho Maximum Security Institution, in his official capacity; **LIZ NEVILLE**, Deputy Chief of Prisons, Idaho Department of Correction, in her official capacity, | |
| Defendants. | |

---

[1] Randy Valley is now Warden of the Idaho Maximum Security Institution. *See* https://www.idoc.idaho.gov/content/locations/prisons/idaho_maximum_security_institution. As such, he should be automatically substituted in for Tyrell Davis in this case. *See* Fed. R. Civ. P. 25(d).

SECOND AMENDED COMPLAINT – Page 1

## I.     Nature of the Action

1.     Plaintiff Gerald Ross Pizzuto, Jr. is a death-row inmate in Idaho[2] who brings this action pursuant to 42 U.S.C. § 1983 for violations and threatened violations of his constitutional rights in connection with the State's effort to execute him.

2.     This Second Amended Complaint is filed with the written consent of the defendants.  *See* Fed. R. Civ. P. 15(a)(2).

## II.     Justiciable Case or Controversy

3.     For the reasons set forth below, absent judicial intervention, Mr. Pizzuto will be executed in violation of his constitutional rights.

4.     There is a real and justiciable case or controversy between the parties.

## III.     Jurisdiction and Venue

5.     This action arises under 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments to the United States Constitution.

6.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights violations), 2201(a) (declaratory relief), and 2202 (further relief).

7.     The Court has personal jurisdiction over the defendants as they are residents of the State of Idaho and are presently located in the State of Idaho, or are appointed officials of the State of Idaho or otherwise acting on behalf of the State of Idaho.

8.     Venue in this Court is proper under 28 U.S.C. § 1391 because most of the events giving rise to the claims—including Mr. Pizzuto's potential execution and the procurement and

---

[2] Mr. Pizzuto refers to Idaho as "Idaho," "the State of Idaho," and "the State."  Likewise, throughout this Second Amended Complaint, Mr. Pizzuto refers to the defendants, variously, as "the defendants," "the State," "IDOC," and other phrases, as appropriate.  His use of these expressions does not limit the scope of the claims, which are brought against each and every named defendant.

maintenance of drugs used in that execution—have occurred, are occurring, or will occur in the District of Idaho.

9.     Venue is further proper because, upon information and belief, the defendants all reside in the District of Idaho.

**IV.    Parties**

10.     Mr. Pizzuto is a person within the jurisdiction of the State of Idaho.

11.     Mr. Pizzuto is an inmate under the supervision of the Idaho Department of Correction ("IDOC").

12.     Mr. Pizzuto is confined at the Idaho Maximum Security Institution ("IMSI").

13.     Mr. Pizzuto is under sentence of death.

14.     As set forth in greater detail below, the defendants are state officials responsible for developing, overseeing, and/or implementing death by lethal injection in Idaho.

15.     Defendant Josh Tewalt ("Director Tewalt" or "now-Director Tewalt") is the Director of IDOC.

16.     Director Tewalt is responsible for approving the substances and procedures to be used in any execution performed by IDOC.

17.     Defendant Randy Valley is Warden of IMSI.

18.     Warden Valley is the official executioner for inmates in Idaho state custody.

19.     Defendant Liz Neville is Deputy Chief of Prisons for IDOC.

20.     Deputy Chief Neville is responsible for coordinating and monitoring the training and conduct of the IDOC medical team.

21.     As part of those responsibilities, Deputy Chief Neville is tasked with conducting inquiries into the qualifications and backgrounds of the medical team members.

SECOND AMENDED COMPLAINT – Page 3

22.     The medical team is comprised of the individuals who assess the inmate's veins before the execution, prepare the lethal chemicals for administration, set the peripheral IV lines, and administer the lethal chemicals.

23.     Deputy Chief Neville is in charge of requesting the equipment that will be used at executions.

24.     Deputy Chief Neville is in charge of maintaining the equipment that will be used at executions.

25.     Deputy Chief Neville assists Director Tewalt in his choice of source for execution chemicals.

26.     Upon information and belief, Mr. Pizzuto and the defendants are all United States citizens.

27.     The defendants are all officials of the State of Idaho.

28.     All of the actions that have been and will be taken by the defendants towards executing Mr. Pizzuto and any other actions at issue in this Second Amended Complaint were or will be taken under color of state law.

29.     The defendants are all sued in their official capacities.

## V.     General Factual Allegations

30.     Mr. Pizzuto incorporates each and every statement and allegation set forth throughout this Second Amended Complaint as if fully rewritten.

31.     Mr. Pizzuto was convicted of first-degree murder for the killing of Delbert and Berta Herndon and sentenced to death in Idaho County District Court.

32.     Mr. Pizzuto's murder convictions and sentence were upheld on direct appeal in 1991.

SECOND AMENDED COMPLAINT – Page 4

33.     Mr. Pizzuto has received three death warrants within the last four years, each scheduling an execution date.

34.     Each time the State obtained those three death warrants despite the fact that IDOC lacked the drugs necessary to carry out an execution.

35.      It is likely that the State will secure another death warrant for Mr. Pizzuto, which will set a date for his execution within the following thirty days.

36.     By statute, lethal injection is the primary authorized method of execution in Idaho.

37.     The same statute gives the IDOC Director the power and responsibility to approve the lethal injection protocols and methods, which includes the authority to approve the drug(s) and the procedures used in an execution.

**A.     Procedural History**

38.     IDOC electronically publishes its rules and procedures governing a variety of matters, including lethal injection.  IDOC's website includes a copy of Idaho's Standard Operating Procedure ("SOP") for "Execution Procedures," Control Number 135.02.01.001 (hereinafter "SOP 135").

39.     The defendants issued version 4.0 of SOP 135 on March 30, 2021.

40.     Mr. Pizzuto will henceforth refer to version 4.0 of SOP 135 as "the Protocol."[3]

**B.     General Problems with Executions**

41.     A host of issues have arisen with respect to executions across the country that increase the risk of problems arising at any given execution.

---

[3] When Mr. Pizzuto refers to the Protocol here, he also includes the associated documents hyperlinked therein, including the Execution Chemicals Preparation and Administration document, which was also updated and posted to IDOC's website on March 30, 2021.

SECOND AMENDED COMPLAINT – Page 5

42.     Those problems increase the possibility of something going wrong at a particular execution, such as the use of an unreliable drug.

43.     Such problems increase the risk of an unconstitutionally painful execution in violation of the Eighth Amendment.

44.     As a result, the problems exacerbate the risks described below in Claim One that create a danger that Mr. Pizzuto in particular will suffer an execution in violation of the Eighth Amendment.

**1.     Other States' Use of Unreliable Sources for Execution Drugs**

45.     States around the country, including but not limited to Arizona, Arkansas, California, Georgia, Nebraska, South Carolina, South Dakota, and Tennessee, have resorted to dubious international sources for lethal injection drugs.

46.     For example, several states, including but not limited to Arizona, Arkansas, California, Georgia, South Carolina, and Tennessee, purchased mislabeled sodium thiopental for use in lethal injections from Dream Pharma, Inc., a fly-by-night pharmaceutical wholesaler/distributor who operated out of a storefront driving school in London, England.

47.     Before the thiopental was seized by the federal government, it was used in two executions in September 2010 and January 2011 and both inmates' eyes were open in the midst of their executions, suggesting that they were inadequately sedated.

48.     States have used unreliable domestic sources for executions as well.

49.     For example, a pharmacy in Oklahoma called the Apothecary Shoppe provided drugs for at least three Missouri executions in 2013 and 2014.

50.     The Apothecary Shoppe had its license put on probation after it admitted to committing 1,892 regulatory violations, including the improper extension of expiration dates and the use of questionable sterilization practices.

51.     After the Apothecary Shoppe stopped providing drugs to Missouri for executions, Missouri turned to Foundation Care, a compounding pharmacy in St. Louis.

52.     Missouri used drugs from Foundation Care for seventeen executions.

53.     Prior to Missouri's selection of Foundation Care, the Food and Drug Administration ("FDA") determined that the company was not testing all of its drugs for sterility and bacterial contamination, that it had inadequate controls for sterility, and that some of its drugs were contaminated with bacteria.

54.     The FDA deemed Foundation Care a high-risk pharmacy.

55.     Another state, Texas, used a compounding pharmacy in San Antonio called Rite-Away to compound its pentobarbital from 2019 until at least 2023.

56.     Rite-Away produced execution drugs for more than twenty executions during this time period.

57.     The Texas State Board of Pharmacy investigated Rite-Away and found it violated more than a dozen rules over the course of a decade.

58.     Some of the rules apparently violated included those governing sterility in preparing drugs.

59.     Rite-Away was also sued by the federal government for fueling and profiting from the opioid epidemic.

60.     Rite-Away agreed to pay a $275,000 penalty in that case.

61.     Other states' questionable practices, like Idaho's questionable practices described below, make it likely that Idaho will continue to try to obtain chemicals from unreliable sources, thereby increasing the risk of problems arising at the execution that would increase the pain and suffering felt by Mr. Pizzuto.

### 2.     IDOC's Conduct in 2011 and 2012

62.     The two most recent executions in Idaho were those of Paul Ezra Rhoades in November 2011 and Richard Leavitt in June 2012.

63.     For Mr. Leavitt's execution, IDOC obtained its chemicals from a compounding pharmacy.

64.     At the time of Mr. Leavitt's execution, Jeff Zmuda was the Deputy Chief of the Bureau of Prisons for IDOC.

65.     Mr. Zmuda was the Deputy Director of IDOC in 2008 and early 2009 at the time of the relevant trial proceedings in *Cover v. Idaho Bd. of Corr.*, Ada Cty., No. CV01-18-3877 (hereinafter "the *Cover* case").

66.     Mr. Zmuda testified in the *Cover* case that IDOC obtained the drugs for the Leavitt execution from a compounding pharmacy that could not supply chemicals to IDOC for future executions because it was not in compliance with current regulations.

67.     IDOC has therefore previously relied upon an unreliable source for execution drugs, which in turn suggests a greater chance that it will do so again.

68.     On information and belief, to prepare for Mr. Leavitt's execution, Kevin Kempf and now-Director Tewalt boarded a chartered plane on or around May 30, 2012.

69.     On this flight, Mr. Kempf and now-Director Tewalt had in their possession a suitcase containing more than $10,000 in cash.

SECOND AMENDED COMPLAINT – Page 8

70.     Both Mr. Kempf and now-Director Tewalt were IDOC employees at the time of this trip.

71.     Upon information and belief, at the time of the May 30, 2012 trip, Mr. Kempf was the Division Chief of Operations for IDOC.

72.     Upon information and belief, at the time of the May 30, 2012 trip, now-Director Tewalt was the Deputy Chief of the Bureau of Prisons for IDOC.

73.     With their suitcase full of cash, Mr. Kempf and now-Director Tewalt flew to Tacoma Narrows Airport in Washington State.

74.     After their plane landed, Mr. Kempf and now-Director Tewalt exchanged the money for lethal injection drugs.

75.     Upon information and belief, this occurred in a Walmart parking lot.

76.     Mr. Kempf and now-Director Tewalt then brought the drugs back to Idaho.

77.     These drugs were obtained to be used in Mr. Leavitt's execution.

78.     On information and belief, Mr. Kempf at that time had no training in pharmacy science or medicine, and no education on the proper transportation and storage of drugs.

79.     On information and belief, now-Director Tewalt at that time had no training in pharmacy science or medicine, and no education on the proper transportation and storage of drugs.

80.     Upon information and belief, Mr. Kempf and now-Director Tewalt were directed to take the aforementioned trip to Tacoma by Brent Reinke, who was the Director of IDOC at the time.

81.     On information and belief, Mr. Reinke was authorized by then-Governor Butch Otter to approve the trip.

SECOND AMENDED COMPLAINT – Page 9

82.     After they bought drugs for an execution with a suitcase full of cash, Mr. Kempf and now-Director Tewalt were both later promoted, at separate times, to IDOC Director, the highest position in the organization.

83.     Compounded pentobarbital is a high-risk sterile injectable.

84.     As such, compounded pentobarbital is meant to be administered within twenty-four hours, if stored at room temperature, and within seventy-two hours, if kept refrigerated.

85.     A pentobarbital preparation cannot be frozen because freezing degrades the preparation.

86.     Mr. Leavitt was executed on June 12, 2012, thirteen days after the pentobarbital was obtained.

87.     The plane that carried the drugs from Tacoma to Boise was parked for about three hours and was in the air for approximately one hour and twenty minutes, after which the chemicals presumably had to be driven elsewhere.

88.     Based on the previous facts, there is reason to suspect, on information and belief, that the pentobarbital acquired by Mr. Kempf and now-Director Tewalt may not have been properly stored during the time between when they obtained it and when it was used at Mr. Leavitt's execution, or that it was held too long before it was administered.

89.     The Idaho Board of Correction appointed Mr. Kempf as IDOC Director in December 2014.

90.     The Idaho Board of Correction appointed Director Tewalt as IDOC Director in November 2018.

91.     Director Tewalt is currently IDOC Director.

92.     Mr. Kempf is now the Executive Director of the Correctional Leaders Association ("CLA"), formerly known as the Association of State Correctional Administrators ("ASCA").

93.     Mr. Kempf took over in that position in December 2016.

94.     CLA's members are the leaders of each U.S. state correctional system.  In those roles, CLA members oversee more than 400,000 correctional professionals and are in charge of more than eight million inmates and other convicts.

95.     Between approximately 2016 and 2018, now-Director Tewalt was Director of Operations for CLA.

96.     IDOC's approach to acquiring drugs for Mr. Leavitt's execution makes it more likely that the organization will engage in similar conduct in connection with future executions, increasing the risk that it will acquire unreliable drugs.

97.     IDOC's history of resorting to questionable sources for its execution drugs makes it more likely that it will do so again.

98.     In March 2011—as IDOC was preparing to execute Messrs. Rhoades and Leavitt— Randy Blades, then the Warden of IMSI, started trying to obtain lethal injection chemicals.

99.     To get the chemicals, Mr. Blades contacted a man named Chris Harris to inquire about the possibility of purchasing the drugs from him.

100.    At the time, Mr. Harris was based in Kolkata, India.

101.    Mr. Harris was a salesman whose career involved positions at a duty-free airport shop and call centers.

102.    On information and belief, Mr. Harris had no training in the practice of pharmacy or medicine.

103.    Mr. Harris has attempted to import drugs into the United States without the requisite approval by the FDA.

104.    On information and belief, Mr. Harris has also engaged in acts of dishonesty.

105.    To obtain drugs to send to Nebraska for executions, for example, Mr. Harris falsely told Naari, a pharmaceutical company, that the medications would be shipped to Africa so they could be used for anesthetic purposes in the developing world.

106.    IDOC ultimately acquired the drugs for Mr. Leavitt's execution in 2012 from Union Avenue Compounding Pharmacy ("Union") of Tacoma, Washington.

107.    On information and belief, the pharmacist who provided the drugs for Union was Kimela Burkes.

108.    In 2015, regulators inspected Union and found that it had twenty-seven outdated or expired items in its drug stock, and that it failed to properly record in its system the chronic conditions of a number of patients.

109.    A follow-up inspection in 2016 discovered that Union had not fixed several of the problems, despite being warned by officials, and that some of them had actually gotten worse.

110.    As a result of the regulators' complaint, Ms. Burkes agreed to a series of sanctions, including having her license placed on probation for a year.

111.    For Mr. Rhoades' execution in 2011, IDOC obtained the drugs from University Pharmacy ("University") in Salt Lake City.

112.    University compounded the drugs for Mr. Rhoades' execution.

113.    There are significant reasons to question the reliability of University.

114.    For example, state and federal regulators have cited University for a number of violations, including many in the few years before and after Mr. Rhoades' execution.

SECOND AMENDED COMPLAINT – Page 12

115.    In 2017, state regulators inspected University and concluded that it was in violation of six different rules, including those having to do with documentation, labeling, and expiration dates.

116.    The regulators noted nineteen different items, comprising twenty-seven vials total, where there were problems with the documentation of the products' expiration dates.

117.    In 2014, state regulators inspected University and found that 232 medications and compounding ingredients were expired or had indeterminate expiration dates in the pharmacy's regular stock.  Officials fined University $1,050 and filed a cease-and-desist order.

118.    In 2013, federal regulators with the FDA conducted several inspections of University and filed a report finding a number of problems.

119.    These inspections were done only fourteen months after University provided drugs for Mr. Rhoades' execution.

120.    In its report, the FDA concluded that University committed a variety of violations, including: failing to sanitize equipment enough to protect the integrity of the drugs; allowing spills, splatter, rust, and so forth to remain in sensitive areas; a technician taking out garbage in the middle of a sterilization process and then sticking his hand back into the equipment without changing his gloves; and not checking products properly to make sure they were stable and could last.

121.    In 2009, state regulators cited University for dispensing sixty prescriptions to practitioners around the country based on orders that did not include the patients' names and addresses, in violation of state law.

122.    University admitted the misconduct and was issued a cease-and-desist order.

123.    In 2008, FDA officials observed nineteen separate problems with University after a series of inspections.  The problems included issues with the pharmacy's sterilization practices,

poor maintenance of its equipment, failure to properly document testing, inadequate measures to make sure drugs were clean and stable before they were sent to patients, improper storage of chemicals, flaws in the training regimen, and so forth.

124.   IDOC has claimed that it had the drugs used in the executions of Messrs. Rhoades and Leavitt tested by Professional Compounding Centers of America (PCCA).

125.   However, IDOC has never shown those results to anyone.

126.   For example, IDOC did not provide the test results for Mr. Rhoades' execution to the condemned inmate's counsel.

127.   Likewise, IDOC failed to share the test results for the Leavitt execution with that prisoner's attorneys.

128.   PCCA itself also maintains that it no longer has the test results.

129.   Eagle Analytical is the testing arm of PCCA.

130.   Regulatory authorities have found numerous violations at Eagle.

131.   In 2013, the FDA determined that due to a host of deficiencies the company's "controls do not include the establishment of scientifically sound and appropriate specifications, standards, and test procedures designed to assure that components conform to appropriate standards of identity, strength, quality, and purity."

132.   Several of these deficiencies are related to contamination, including the failure to "calculate endotoxin limits for drug product samples, the failure to properly test for microbial contamination," and the failure to validate for potency assays.

133.   Eagle responded to the FDA that it "does not hold itself out as compliant with current good manufacturing practices."

SECOND AMENDED COMPLAINT – Page 14

C.      **Human Error at Executions**

134.    Correctional staff and agents have made a variety of serious mistakes at executions.

135.    As a consequence, there is a higher risk that mistakes will be made at Mr. Pizzuto's execution, making a torturous death more likely.

136.    For example, between July 28, 2022 and November 17, 2022, Alabama failed at three straight execution attempts to put the inmates to death.

137.    These failures were largely due to issues accessing the prisoners' veins.

138.    On November 17, 2022, the final of these three incidents took place.

139.    That episode, involving Kenneth Eugene Smith, is the longest in U.S. history at over three hours.

140.    Similarly, between May 11, 2022 and November 16, 2022, Arizona struggled to set IV lines at three consecutive executions.

141.    At the Oklahoma execution of Clayton Lockett in April 2014, the executioners apparently had problems setting an IV line, which took them fifty-one minutes to do.

142.    During Mr. Lockett's execution, staff punctured multiple parts of his body at least twelve times before essentially jury-rigging a solution by inserting a too-short catheter in his right femoral vein and attempting to secure it with tape.

143.    As a result of that failure, Mr. Lockett began to writhe and gasp after he had already been declared unconscious, kicked his leg, rolled his head, grimaced, and grunted, all for more than thirty minutes.

144.    In the course of Mr. Lockett's execution, some of the lethal injection drugs massed in his tissue, creating a swelling under his skin larger than a golf ball.

145.    Eventually, Mr. Lockett died of a heart attack.

146.    At the Arizona execution of Robert Towery in March 2012, it took fifty-nine minutes to set the IV lines.

147.    An autopsy later revealed that Mr. Towery had been punctured at least eleven times.

148.    At a Florida execution in December 2006, a misplaced IV line allowed caustic lethal injection drugs to leak into the soft tissue of the arms of inmate Angel Nieves Diaz.

149.    The drugs accordingly failed to render Mr. Diaz unconscious while causing chemical burns so severe that a great deal of the skin on his arms sloughed away.

150.    On information and belief, Mr. Diaz likely suffocated to death before the execution drugs could end his life.

151.    In 2009 in Ohio, in attempting to execute Romell Broom, the execution team stabbed him with needles for an hour and a half while trying to find a vein, using eighteen needle sticks in the process.  Finally, the Governor halted the execution.

152.    Training and regular experience are required in order to obtain IV access.

153.    Errors in placing IV lines cause chemical solutions to escape into subcutaneous tissue, which can cause excruciating pain.

154.    Problems in executions can also be caused by errors in preparing IVs, labeling syringes, preventing IVs from leaking, preventing veins from leaking, waiting the appropriate amount of time between injections, and injecting the chemicals properly.

155.    Members of execution teams in other states have been revealed to have histories that raised questions about their suitability for the task.

156.    For example, a member of the execution team in Arizona had his nursing license suspended and had a lengthy arrest record.

157.   Similarly, it was found that a surgeon involved in Missouri executions was dyslexic and had prepared lower-than-expected amounts of anesthesia for several inmates who were put to death.

158.   Execution equipment in some states has been found wanting.  For instance, there have been issues raised about adequate lighting in the room where the chemicals are prepared and about adequate sightlines from that room into the execution chamber.

## VI.   Claims

### A.   Claim One – The Use of Pentobarbital[4] at Mr. Pizzuto's Execution Violates the Eighth Amendment.

#### 1.   Mr. Pizzuto's Health Concerns

159.   Mr. Pizzuto incorporates each and every statement and allegation set forth throughout this Second Amended Complaint as if fully rewritten.

160.   The use of pentobarbital at Mr. Pizzuto's execution creates a substantial risk of serious pain and suffering because of his health conditions and medical history, amongst other factors, all in violation of the Eighth Amendment of the United States Constitution, as incorporated against the states by the Fourteenth Amendment.

161.   The pain described below that Mr. Pizzuto is at risk of suffering is created by his heart condition, his medication history, his veins, and the other factors specific to his execution discussed below.

---

[4] If the defendants do not select pentobarbital for use at Mr. Pizzuto's execution, he reserves the right to challenge their choice on whatever grounds are appropriate, which may include the State's violation of Mr. Pizzuto's First Amendment right to access the courts, his Due Process right to notice and hearing, his Eighth Amendment right to be free from cruel and unusual punishment, and potentially other violations.

162.    As a consequence, one would not expect the average inmate to be at risk of the same pain at another pentobarbital execution.

163.    Therefore, the use of pentobarbital creates a risk of cruelly superadding pain to Mr. Pizzuto's execution.

164.    Mr. Pizzuto has terminal bladder cancer.

165.    Mr. Pizzuto has coronary artery disease.

166.    Mr. Pizzuto has type 2 diabetes.

### a. Mr. Pizzuto's Heart Condition

167.    Mr. Pizzuto has had at least two heart attacks—the first in September 2006 and the second in July 2019.

168.    During the 2006 heart attack, Mr. Pizzuto became unresponsive and his breathing and pulse stopped.

169.    He was brought back to life through electrical shocks and other CPR measures.

170.    Mr. Pizzuto's heart problems have also led to the placement of four separate stents.

171.    Mr. Pizzuto's heart condition creates a substantial risk of serious harm at an execution involving pentobarbital.

172.    There is a high likelihood that Mr. Pizzuto's left circumflex artery has clinically significant obstructive disease.

173.    Mr. Pizzuto has severe, complex coronary artery disease.

174.    It is very uncommon for individuals to have severe, complex coronary disease to the extent that Mr. Pizzuto does and for individuals to have the kind of extensive history of heart problems that Mr. Pizzuto has.

175.    On February 13, 2024, medical staff at St. Alphonsus Hospital in Boise found that Mr. Pizzuto had coronary artery disease and poor heart function.

176.    On March 15, 2024, Mr. Pizzuto's IMSI medical records reflect that he was diagnosed with chronic systolic (congestive) heart failure.

177.    On March 18, 2024, Mr. Pizzuto received a fourth stent.

178.    In individuals with severe obstructive coronary artery disease, a sudden drop in blood pressure is likely to cause myocardial ischemia and/or infarction, or what is commonly known as a heart attack.

179.    Large doses of pentobarbital are likely to cause acute drops in blood pressure.

180.    Onset of a heart attack under these circumstances is nearly immediate.

181.    The sedating effects of pentobarbital are likely to occur minutes after the heart attack begins.

182.    Heart attacks often cause substantial physical suffering, including chest pain, the feeling of a crushing weight, and difficulty breathing.

183.    Heart attacks often cause substantial psychological discomfort, including a feeling of impending doom, anxiety, or fear.

184.    It is likely that a pentobarbital execution of Mr. Pizzuto would induce an acute heart attack.

185.    It is likely that Mr. Pizzuto would experience cruel and unusual pain and suffering from the heart attack.

186.    It is likely that Mr. Pizzuto would experience cruel and unusual pain and suffering from the heart attack for a significant amount of time before the pentobarbital completely sedated him.

SECOND AMENDED COMPLAINT – Page 19

187.    Two previous executions—that of Roy Blankenship in Georgia and Eddie Powell in Alabama—confirm the risk posed to Mr. Pizzuto by a pentobarbital execution.

188.    Autopsies of Messrs. Blankenship and Powell indicated that both had clinically significant obstructive coronary disease.

189.    The two men were both executed by pentobarbital.

190.    Both men appeared to be in substantial pain during their executions, with witnesses observing grimacing, writhing, thrashing, and so forth.

191.    The observations of both men's executions were consistent with the physical manifestation associated with heart attacks.

192.    Other pentobarbital executions have taken place on different inmates who did not have obstructive coronary artery disease.

193.    Most of those executions did not include the kinds of painful reactions seen when Messrs. Blankenship and Powell were put to death.

194.    As a result of Mr. Pizzuto's heart condition and the facts recited above, the use of pentobarbital at his execution creates a significant risk of pain greater than that to be otherwise expected.

195.    Mr. Pizzuto's uncontrolled diabetes increases the risk of a painful heart attack caused by pentobarbital.

196.    In 2016, Mr. Pizzuto was diagnosed with type-2 diabetes.

197.    Mr. Pizzuto's blood sugar is often elevated.

198.    For example, on March 5, 2024, Mr. Pizzuto was found blacked out and unresponsive on the floor of his cell, and testing found a blood sugar of 428.

199.    On November 6, 2023, Mr. Pizzuto was determined to have a blood sugar of 415.

SECOND AMENDED COMPLAINT – Page 20

200.    A blood sugar over 400 is considered dangerously high.

201.    On March 15, 2024, Mr. Pizzuto's A1Cs were at 9.8.

202.    An A1C of 9.8 is considered a dangerous level.

203.    Mr. Pizzuto's medical records are consistent with high uncontrolled diabetes.

204.    Uncontrolled diabetes often accelerates and worsens coronary artery disease, increasing the risk of occlusive heart disease and myocardial infarction.

205.    As such, Mr. Pizzuto's diabetes contributes to the risk that pentobarbital will subject him to a severely painful execution.

206.    Mr. Pizzuto's hypertension increases the risk of a painful heart attack caused by pentobarbital.

207.    Mr. Pizzuto was diagnosed with hypertension on December 7, 2016.

208.    Mr. Pizzuto's blood pressure is often high.

209.    It is likely that Mr. Pizzuto's hypertension is contributing to his heart disease.

210.    As such, Mr. Pizzuto's hypertension contributes to the risk that pentobarbital will subject him to a severely painful execution.

### b.  Mr. Pizzuto's Medication History

211.    Because of Mr. Pizzuto's medication history, the use of pentobarbital at his execution creates a substantial risk of serious harm.

212.    Mr. Pizzuto has multiple cancerous tumors in his bladder.

213.    Mr. Pizzuto underwent a resection of his bladder tumors in August 2016.

214.    However, the surgeon was unable to remove all of the tumors.

215.    Since then, the tumors have grown back and there has been no effort to remove them.

SECOND AMENDED COMPLAINT – Page 21

216.    In September 2019, bleeding from Mr. Pizzuto's bladder tumors caused him to experience severe sepsis and shock, which triggered an ambulance ride and a five-day hospitalization.

217.    Doctors have prescribed Mr. Pizzuto numerous medications to treat his many ailments, including drugs to help with the pain caused by his bladder cancer.

218.    Over the last six years alone, Mr. Pizzuto has been prescribed at least forty-two different drugs by medical staff, including high doses of powerful painkillers, such as morphine and oxycodone.

219.    Mr. Pizzuto has been given painkillers in such high doses that he began suffering from acute toxic encephalopathy in October 2019, a syndrome of temporary or permanent disturbance of brain functions that can cause mild mental disorders, deep coma, and death.

220.    To treat his pain, Mr. Pizzuto has been prescribed substantial amounts of gabapentin over lengthy periods of time from 2015 to the present.

221.    Currently, Mr. Pizzuto is taking 1,200 milligrams of gabapentin three times a day for a total of 3,600 milligrams.

222.    Over time, taking gabapentin alters the patient's brain chemistry by increasing the number of receptors susceptible to the drug and causing the receptors to become more tailored to the drug.

223.    Consequently, the receptors become less responsive and possibly unresponsive to other drugs.

224.    Such drugs include pentobarbital.

225.    To use pentobarbital in executions, states rely on its ability to decrease activity in the inmate's central nervous system.

SECOND AMENDED COMPLAINT – Page 22

226.    Pentobarbital decreases activity in the nervous system through its effect on gamma-Aminobutyric acid ("GABA"), a chemical in the brain.

227.    Sustained use of gabapentin compromises the mechanism through which pentobarbital facilitates the binding of GABA to its receptors, thereby limiting the drug's capacity for depressing electrical activity in the brain.

228.    The use of pentobarbital at an execution on an individual who has—like Mr. Pizzuto—been given high doses of gabapentin also raises the risk of a seizure.

229.    Gabapentin is an anticonvulsant.

230.    Pentobarbital has the chemical properties of an anticonvulsant.

231.    However, pentobarbital is only used medically as an anticonvulsant in emergencies, because of its undesirable sedative properties and the possibility of triggering paradoxical seizure activity.

232.    Studies have suggested that seizure activity grows after the administration of gabapentin.

233.    When individuals overdose on anticonvulsants, seizure worsening is a common paradoxical manifestation.

234.    The combination of massive doses of two anticonvulsants—gabapentin and pentobarbital—introduces a significant, gratuitous risk of seizure.

235.    Such a seizure carries with it a substantial risk of serious pain.

236.    Based on the above, at a pentobarbital execution, there is a substantial risk that the lethal chemical would not render Mr. Pizzuto unconscious, as intended, while exposing him to a series of substantial harms, including: a prolonged and painful death process; awareness of the process of dying, an increased likelihood of seizures, the possibility of additional paradoxical

reactions, and acute pulmonary edema, a buildup of fluid in the lungs which creates a sensation akin to suffocating or drowning, and accompanying feelings of terror.

237.    The pulmonary edema that Mr. Pizzuto would suffer in the scenario described in the preceding paragraph would subject him to significant additional pain that he does not experience with his current health conditions.

### c.  Mr. Pizzuto's Veins

238.    Another significant risk factor is the prospect that IDOC will have difficulty accessing Mr. Pizzuto's veins.

239.    The likelihood of problems arising with respect to Mr. Pizzuto's veins at his execution are highlighted by what occurred when IDOC attempted to execute Thomas Eugene Creech on February 28, 2024.

240.    At approximately 10:01 AM on that day, Mr. Creech was placed on the execution table and restrained with straps.

241.    The execution team then spent nearly an hour unsuccessfully attempting to gain access to Mr. Creech's veins.

242.    During that time, the execution team poked needles into at least eight different locations on Mr. Creech's body, including his arms, hands, and ankles.

243.    Mr. Creech hydrated himself normally in the lead-up to the execution attempt.

244.    Mr. Creech did not dehydrate himself in the lead-up to the execution attempt.

245.    The members of the execution team on February 28, 2024 still fill those roles today.

246.    During the lead-up to February 28, 2024, Ms. Neville was responsible for coordinating and monitoring the training and conduct of the IDOC medical team.

247.    Ms. Neville remains in the same position today.

SECOND AMENDED COMPLAINT – Page 24

248. Ms. Neville does not have any medical or pharmaceutical training or experience.

249. Defendant Tewalt does not have any medical or pharmaceutical training or experience.

250. Defendant Valley does not have any medical or pharmaceutical training or experience.

251. Age is one of the major factors correlating with vein-access problems in execution attempts.

252. For example, a study published in April 2024 found that the chances of a botched execution increase by 6% for each additional year of age.

253. Mr. Pizzuto is sixty-eight years old.

254. As such, Mr. Pizzuto is notably older than the average executed inmate.

255. For example, the average age of the inmates executed so far in 2024 is fifty-four.

256. Consequently, there is a substantial risk that IDOC's execution team will struggle to obtain vein access.

257. The risk that IDOC's difficulties obtaining vein access will repeat are heightened by the State's refusal to conduct any meaningful and transparent inquiry into what went wrong on February 28, 2024.

258. For example, IDOC will not have an independent review conducted into the events of February 28, 2024.

259. Nor will IDOC issue a written report about what occurred that day.

260. Idaho's resistance to any public accounting of its problems is out of step with the approach taken elsewhere after problematic executions.

SECOND AMENDED COMPLAINT – Page 25

261.    For example, in 2022, after issues with execution-drug testing in Tennessee, the Governor commissioned a former federal prosecutor to conduct an investigation into the matter and he issued a full public report.

262.    Similarly, the Governor of Arizona in 2023 appointed a former federal magistrate judge to conduct a similar investigation after a series of problematic executions, including several involving vein-access issues.

263.    Idaho's refusal to take any of the same basic measures reflects a desire for the State to avoid a public accounting of IDOC's problems, which will only increase the likelihood of more flawed executions taking place in the future.

264.    When execution teams encounter difficulty with obtaining vein access, the inmates involved experience serious physical and psychological pain and suffering.

265.    Vein-access problems lead to prolonged executions.

266.    A protracted death process is an Eighth Amendment injury.

267.    The movements of the needles during such executions cause an Eighth Amendment injury as the inmate experiences sharp stabbing sensations while the equipment punctures the skin and is moved around.

268.    Efforts to move inmates' bodies during these executions cause severe pain, as—for example—when Alabama left Alan Eugene Miller hanging vertically from an execution gurney for twenty minutes as staff responded to vein-access difficulties.

269.    These executions also cause inmates intense emotional anguish.

270.    For example, Mr. Creech was forced to look into the face of his wife of twenty-five-plus years over the course of nearly an hour while both expected him to die.

SECOND AMENDED COMPLAINT – Page 26

271.    Similarly, during his failed execution, Mr. Creech did not realize that the team had been unable to set his IV up, so he thought the lethal chemicals were being administered every time he felt a prick in one of his extremities.

### 2.    Problems with the Protocol

272.    The risks outlined above are exacerbated by flaws in the Protocol.

273.    Under the Protocol, the medical team members are instrumental to the carrying out of executions, as they are the ones preparing and administering the lethal chemicals, as well as monitoring the inmate's level of consciousness.

274.    The Protocol requires that members of the medical team have "three years of medical experience" in various positions, including as nurses, paramedics, and phlebotomists.

275.    Individuals with those backgrounds do not have the requisite training to properly administer the chemicals in the Protocol while accurately evaluating the possibility that the inmate is conscious, sensate, or in pain when the individual has the kind of complicated medical status that Mr. Pizzuto does.

276.    Only a practicing anesthesiologist would be fully qualified to perform that function.

277.    Under the Protocol, members of the medical team need not be physicians.

278.    The Protocol does not require that any member of the medical team be an anesthesiologist.

279.    No member of IDOC's medical team is a practicing anesthesiologist.

280.    No member of IDOC's medical team is even a physician.

281.    Rather, IDOC's medical team consists entirely of EMTs, paramedics, and nurses.

282.    Anesthesiologists understand the pharmacology of anesthetic drugs and their interactions, which determines the sequence and timing of how chemicals should be injected.

SECOND AMENDED COMPLAINT – Page 27

283.    Other types of medical professionals, like nurses and paramedics, do not have that scientific background.

284.    When drugs are administered and the pacing is off, it can create a painful reaction.

285.    A person may be experiencing pain and yet not expressing it in a way that is visible to the naked eye.

286.    For example, an inmate could receive a large dose of pentobarbital at an execution and appear to go to sleep, yet still be going through a painful experience.

287.    Anesthesiologists are experts in determining whether there is pain in such circumstances and adapting to those circumstances.

288.    To do so, they rely on their clinical training.

289.    Anesthesiologists also rely on brain monitors, sophisticated pieces of equipment that measure and convert brain signals so that doctors can understand a patient's level of consciousness and depth of anesthesia.

290.    The Protocol does not provide for the use of a brain consciousness monitor.

291.    On information and belief, IDOC does not plan on using a brain consciousness monitor at Mr. Pizzuto's execution.

292.    If an individual without proper training were handling the drug administration at the execution under the Protocol, and without a brain consciousness monitor, they would essentially be "guessing" the stage of consciousness and pain sensation.

293.    The absence of a practicing anesthesiologist and a brain consciousness monitor add yet more risk for pain at Mr. Pizzuto's execution in addition to the dangers described earlier.

294.    In other words, Mr. Pizzuto's health conditions and prescription drug history create the risk of a painful execution and the flaws in the Protocol make it more likely that the

SECOND AMENDED COMPLAINT – Page 28

executioners will not respond appropriately, which would increase and prolong Mr. Pizzuto's suffering.

295.    This is because, if the execution does become unduly painful, the lack of a brain monitor and anesthesiologist would impede the execution team's ability to gauge the pain and therefore respond appropriately to it, such as by administering more or less pentobarbital.

296.    As a result, the presence of an anesthesiologist and a brain consciousness monitor at the execution would assist IDOC in avoiding a substantial risk of significant pain during Mr. Pizzuto's execution process.

297.    The protocol "is subject to revision at the discretion of the Director of the IDOC."

298.    "The Director may revise, suspend, or rescind any procedural steps" in the Protocol "at any time, at the Director's sole discretion."

299.    These qualifications further increase the risks associated with Mr. Pizzuto's execution because they mean that the most important documents supposedly governing the process have no constancy or reliability.

300.    IDOC has taken advantage of its unfettered discretion with respect to the protocol.

301.    For example, IDOC has "amended" the protocol through a declaration signed by the Director and filed in court that has never been incorporated into the protocol and that is squarely inconsistent with the language in the protocol.

302.    IDOC has also created confusion over what in the protocol is in effect at any given moment in time by periodically "suspending" the document while the Department purportedly continues to adhere to some unclear number of provisions within it.

303.    The deficiencies in the protocol are exacerbated by the complete lack of oversight that any actor or agency—let alone the public—exercises over its drafting and revision.

304.    For instance, the Board of Correction—the entity that nominally oversees the Director—has no role in approving the protocol.

305.    Furthermore, the Board seems to barely exercise any oversight function more generally.

306.    The Board went more than a year—from February 24, 2023 until March 25, 2024—without having a single meeting.

307.    The Board failed to meet for that thirteen-month period despite the fact that it is legally required to meet four times a year.

308.    During that time, a death warrant was in effect from February 24 until March 23, 2023, from October 12, 2023 until November 8, 2023, and from January 30, 2024 until February 28, 2024.

309.    During the same time, IDOC actually attempted to carry out an execution, on February 28, 2024.

310.    The fact that the Board did not have a single meeting during a period of time in which IDOC had three executions scheduled and one attempted, which implicates by far the most extreme power possessed by the Department, reflects the body's profound indifference to its duties.

311.    The same attitude is reflected in the fact that Board Vice Chairman Dodds Hayden emailed Director Tewalt on February 5, 2023—nineteen days before the issuance of a death warrant—to make light of Director Tewalt's "clandestine trips" to purchase execution drugs.

312.    Despite his apparent indifference to exercising oversight responsibilities with respect to executions, Mr. Hayden offered to attend the Creech execution on February 28, 2024 and was present for that botch.

SECOND AMENDED COMPLAINT – Page 30

313.    The Board's oversight failures create yet more room for mistakes to be made by IDOC in the execution process at the cost of pain and suffering by the inmates.

###    3.    Problems With Visibility

314.    The risk of a painful peripheral-IV execution is compounded by flaws in the physical layout of the execution chamber.

315.    Specifically, the medical team will not be able to directly observe Mr. Pizzuto while the lethal chemicals are injected into his body.

316.    The medical team will not be in the execution chamber with Mr. Pizzuto while the lethal chemicals are injected into his body.

317.    The medical team will be in a room adjoining the execution chamber while the lethal chemicals are injected into Mr. Pizzuto's body.

318.    While the lethal chemicals are being administered, the medical team will only see Mr. Pizzuto on monitors in images projected by cameras in the execution chamber.

319.    There is no window in the wall that will separate the execution chamber from the room holding the medical team.

320.    There is no other type of aperture in the wall that will separate the execution chamber from the room holding the medical team.

321.    The execution will be carried out by remote injection.

322.    Such an arrangement is inappropriate for an execution.

323.    The medical team is unable to directly observe the prisoner and the IV sites.

324.    On information and belief, Idaho's layout is different from every other states' in the country.

325.     On information and belief, every other state in the country either stations the medical team in the chamber or provides a window for direct physical observation.

326.     The fact that Idaho is such an outlier also demonstrates that there is no compelling security reason to preclude direct physical observation.

327.     Video cameras are not an adequate substitution for direct visual observation.

328.     Video cameras are inadequate to detect intravenous infiltration.

329.     Intravenous infiltration involves chemicals being delivered into the tissue instead of the vein.

330.     Intravenous infiltration is a common problem with lethal injection.

Undetected intravenous infiltration is likely to cause the inmate substantial pain.

### 4.     Problems With A Central Line

331.     The potential use of a central line at Mr. Pizzuto's execution further increases the risk that he will suffer an unconstitutional degree of pain and suffering at his death.

332.     IDOC's protocol provides as follows: "If it is not possible to reliably place two peripheral lines, the Medical Team leader will direct Medical Team members to place an IV catheter in a central line for the purpose of administering the chemicals."

333.     As discussed above, the medical team failed to set a peripheral IV line on Mr. Creech.

334.     Mr. Creech and Mr. Pizzuto are both elderly.

335.     Age is one of the most significant factors affecting the quality of an individual's veins.

336.     The same individuals remain on the medical team now as were on it when the group failed to set a peripheral IV line on Mr. Creech.

SECOND AMENDED COMPLAINT – Page 32

337.    Those facts create a substantial risk that the medical team will fail to set a peripheral IV line on Mr. Pizzuto.

338.    That leads to a substantial risk that the medical team will resort to a central line on Mr. Pizzuto.

339.    An execution involving a central line implicates a substantial risk of severe pain.

340.    A central line execution requires gaining access to one of the major veins in an individual's body.

341.    The technique is most commonly attempted on one of three central veins: the internal jugular vein in the neck, the femoral vein in the groin, or the subclavian vein near the clavicle.

342.    Central line placement is more involved than peripheral IV placement, requiring more equipment, time, and expertise.

343.    Central line placement is a procedure that takes place in hospitals.

344.    Insertion of a central line requires a completely sterile field and atmosphere.

345.    The fact that IDOC failed to complete a peripheral IV execution makes it likely that it will also fail to properly carry out the more complicated central-line execution.

346.    To competently insert a central line it is necessary for personnel to have immediate access to a variety of drugs and equipment, including but not limited to an ultrasound machine, an x-ray machine, suction, surgical lighting, surgical instruments, cautery, chest tubes, EKG monitors and equipment, and a defibrillator.

347.    On information and belief, IDOC is renovating its execution facilities in order to create a new room in which a central line can be inserted.

348.    On information and belief, one purpose of this new room is to enable IDOC agents and staff to insert a central line without witnesses having a direct line of sight at the placement of the central line.

349.    On information and belief, even after the renovation, the execution facilities will not contain the necessary equipment for appropriate placement of a central line.

350.    Unlike peripheral IV access, the placement of a central line is an invasive surgical procedure.

351.    On February 29, 2024, Director Tewalt described the setting of a central line to the Idaho legislature as "a surgical procedure."

352.    Central line executions are by nature more painful than peripheral IV executions.

353.    For example, the placement of a central femoral line requires the use of a larger needle than would be used for establishing a peripheral line.

354.    The needle must go not only through the skin, as in a peripheral IV placement, but through the subcutaneous tissue and the muscle.

355.    Painful complications can arise from central lines that are not at issue in peripheral IVs, such as the possibility of puncturing an artery or vein.

356.    Other potential complications from central lines involve tension pneumothorax (a suffocating condition caused by the collection of air in the space between the lung and the inner chest wall), massive hemorrhage, massive stroke, cardiac rhythm disturbances, cardiac perforation, cardiac tamponade (compression of the heart by blood collecting in the surrounding space), painful nerve injury, bowel perforation, and bladder perforation.

357.    The medical team lacks sufficient training and qualifications to competently carry out a central line execution.

SECOND AMENDED COMPLAINT – Page 34

358.    No member of the medical team has ever participated in a central line execution.

359.    The volunteer Director Tewalt selected to insert a central line has never participated in a central line execution.

360.    The volunteer Director Tewalt selected to insert a central line is not a medical doctor.

361.    Central line placement is a procedure properly performed only by a medical doctor.

362.    IDOC has never carried out a central-line execution.

363.    Other states, such as Arizona and Arkansas, have required that only medical doctors could oversee central line executions.

364.    IDOC staff have not trained to place a central line at an execution.

365.    A central line execution has never been performed in Idaho.

366.    Central line executions elsewhere have caused pain and suffering to the prisoners.

367.    In 2014, Arizona used a central line on Mr. Lockett.

368.    When staff tried to set a central line in Mr. Lockett's groin area, blood squirted on the doctor's clothing.

369.    The team hit an artery, sending "blood everywhere."

370.    The warden later described the scene as "a bloody mess."

371.    During the execution attempt, Mr. Lockett groaned, writhed, and repeatedly attempted to speak.

372.    When Alabama tried to execute Doyle Lee Hamm in 2018, staff stabbed his groin roughly six times while attempting to set a central line.

373.    The team may have punctured Mr. Hamm's bladder and his femoral artery.

374.    Mr. Hamm was gushing blood as the execution attempt proceeded and he urinated blood for most of the following day.

375.    When Arizona executed Clarence Dixon in 2022, witnesses observed the inmate grimacing and in pain while staff made an incision and inserted a central line into his groin.

376.    A journalist present at Mr. Dixon's execution noted that after "cutting into the groin," the staff had "to wipe up a fair amount of blood."

377.    The factors arrayed here—including Mr. Pizzuto's heart condition and medication history, as well as IDOC's use of unreliable drugs, the shortcomings in the protocol, and the risks associated with a central line—independently and collectively create a substantial risk that his execution will cause him severe pain, in violation of the Eighth Amendment, as incorporated against the states by the Fourteenth Amendment.

### 5.    The Firing Squad

378.    Mr. Pizzuto identifies the firing squad as a more humane alternative to a pentobarbital execution.

379.    The firing squad is currently authorized by Idaho statute as a backup method to lethal injection by virtue of a legislative amendment that became effective on July 1, 2023.

380.    IDOC has had sufficient time between July 1, 2023 and the present to build firing-squad facilities.

381.    The firing squad is an available method of execution for the defendants.

382.    The firing squad is a readily implemented method of execution for the defendants.

383.    Between 1982 and 2009, the firing squad was authorized by statute as a method of execution in Idaho in the alternative to lethal injection.

384.    Mr. Pizzuto indicated to IDOC in 2000 that he preferred the firing squad if he were to be executed.

385.    In 2014, IDOC officials began inquiring into the possibility of reinstating the firing squad in Idaho.

386.    As part of that inquiry, IDOC officials toured Utah's firing-squad facilities.

387.    Executions by firing squad are currently allowed by statute in Utah, Oklahoma, Mississippi, and South Carolina.

388.    The United States Army adopted a protocol for firing-squad executions in 1944.

389.    The United States Army has successfully carried out executions using the firing squad with no reports of the condemned experiencing extended pain or suffering.

390.    Ronnie Gardner was executed by firing squad in Utah in 2010.

391.    IDOC employs enough individuals who are sufficiently proficient with weapons such that they could participate in a firing squad.

392.    IDOC would be able to contract with enough individuals who are sufficiently proficient with weapons such that they could participate in a firing-squad execution.

393.    IDOC would be able to conduct trainings to ensure that the members of a firing-squad team were sufficiently proficient with weapons such that they could participate in a firing-squad execution.

394.    The Idaho Peace Officer Standards and Training ("POST") Academy offers courses that include guidance on how to use rifles properly and on marksmanship.

395.    POST training, including in firearms, is required for all security personnel employed by IDOC.

396.    There is a shooting range at the South Boise Correctional Complex available for the use of IDOC staff.

397.    IDOC designates firearms instructors at its correctional facilities.

398.    Every IDOC correctional facility has an armory for the storage of firearms, ammunition, and related equipment.

399.    IDOC employs roughly 2,000 people.

400.    IDOC could solicit its employees to volunteer for service on a firing-squad team.

401.    IDOC's Protocol allows for members of the military to participate in executions.

402.    There are more than 3,000 active-duty members of the Air Force in Idaho.

403.    Every individual who goes through Air Force Basic Training is given instruction on using a rifle.

404.    More than 35,000 guns are registered in Idaho.

405.    IDOC could obtain all of the equipment necessary to conduct a firing-squad execution.

406.    IDOC could construct, or obtain access to, a room for use in a firing-squad execution.

407.    IDOC could use ear protection appropriate for the members of a firing-squad team.

408.    IDOC could obtain eye protection appropriate for the members of a firing-squad team.

409.    At a firing-squad execution, IDOC could use guns appropriate for such an event, such as service rifles of .30 caliber.

410.    At a firing-squad execution, IDOC could use ammunition appropriate for such an event, such as soft-point jacketed .30 caliber bullets of 150–55 grains.

SECOND AMENDED COMPLAINT – Page 38

411.    At a firing-squad execution, IDOC could make use of a rack to hold the guns.

412.    At a firing-squad execution, IDOC could use sandbags.

413.    At a firing-squad execution, IDOC could restrain the inmate in a chair.

414.    At a firing-squad execution, IDOC could use armor plating as a safety backdrop.

415.    At a firing-squad execution, IDOC could use bulletproof glass to protect witnesses and others.

416.    At a firing-squad execution, IDOC could use a blindfold or dark hood to obscure the inmate's vision.

417.    At a firing-squad execution, IDOC could use a four-inch round piece of paper as a target.

418.    A firing-squad execution under a proper protocol and with the appropriate training and precautions would not pose a substantial risk of causing severe pain to Mr. Pizzuto.

419.    The heart condition of Mr. Pizzuto's discussed above does not create a substantial risk of causing severe pain to Mr. Pizzuto in a firing-squad execution.

420.    Mr. Pizzuto's medication history does not create any potential complications for a firing-squad execution.

421.    Mr. Pizzuto's other health issues do not create any special risks for a firing-squad execution.

## VII.    Prayer for Relief

422.    In light of the above, Mr. Pizzuto respectfully requests that the Court:

   a)   Enjoin the defendants from proceeding toward and carrying out an execution of Mr. Pizzuto with pentobarbital;

b) Declare that any execution of Mr. Pizzuto with pentobarbital is unconstitutional;

c) If a drug other than pentobarbital is selected, enjoin the defendants from executing Mr. Pizzuto until a new drug has been chosen and there has been sufficient time for his counsel to investigate and to raise any challenges to it;

d) Enjoin the defendants from executing Mr. Pizzuto until the State can demonstrate that it can do so constitutionally;

e) Enjoin the defendants from attempting to execute Mr. Pizzuto until the Court orders otherwise;

f) Authorize appropriate and necessary discovery and an evidentiary hearing to permit Mr. Pizzuto to prove his claims;

g) Grant any such other relief that is just and proper.

DATED this 26th day of July 2024.

 /s/ Jonah J. Horwitz
 Jonah J. Horwitz
 Christopher M. Sanchez
 Federal Defender Services of Idaho

 /s/ Stanley J. Panikowski
 Stanley J. Panikowski
 DLA PIPER LLP (US)

 *Attorneys for Plaintiff Gerald Ross Pizzuto, Jr.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of July 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Kristina Schindele
kscchind@idoc.idaho.gov

Mary Karin Magnelli
kmagnell@idoc.idaho.gov

Michael J. Elia
mje@melawfirm.net

Tanner J. Smith
tanner@melawfirm.net

/s/ Julie Hill
Julie Hill