Jonah J. Horwitz, Idaho Bar No. 10494
Christopher M. Sanchez, Idaho Bar No. 12070
Federal Defender Services of Idaho
702 W. Idaho Street, Suite 900
Boise, ID 83702
Telephone: (208) 331-5530
ECF: Jonah_Horwitz@fd.org; Christopher_M_Sanchez@fd.org

*Attorneys for Plaintiff Gerald Ross Pizzuto, Jr.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| **GERALD ROSS PIZZUTO, JR.,**<br><br>Plaintiff,<br>v.<br><br>**JOSH TEWALT, et al.,**<br><br>Defendants. | **CASE NO. 1:21-cv-00359-BLW**<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF SECOND MOTION TO PRESERVE EVIDENCE [DKT. 166]** |

The defendants' mischaracterization of Mr. Pizzuto's request and their misunderstanding of various constitutional doctrines do not bar a preservation order.

## I. Mr. Pizzuto is seeking an order to preserve evidence.

As an initial matter, Mr. Pizzuto is seeking an order from this Court requiring the defendants to preserve evidence—he is not seeking injunctive relief. *See* Dkt. 173 at 2–4. Accordingly, this Court should apply the same legal test that it employed last time: the three-factor test under *Truckstop.net, L.L.C. v. Sprint Commc'ns Co.*, No. CV-04-561, 2005 WL 8166974, at *2 (D. Idaho Feb. 18, 2005) (hereinafter "the *Truckstop* factors"). Dkt. 160 at 4. The defendants previously agreed that the *Truckstop* factors were the appropriate legal standard under which to analyze motions to preserve evidence. Dkt. 145 at 2–3. Here, the defendants offer no reasoning as

to their shift in preferred legal standards beyond merely proclaiming that "upon review . . . it is clear that [Mr.] Pizzuto is seeking" injunctive relief. Dkt. 173 at 2. Yet the defendants point to no new case law decided in the interim, nor do they provide any argument as to how Mr. Pizzuto's current preservation request differs from his prior one such that a different standard is warranted.

Further, the adoption of the preliminary injunction test here makes no sense. While preservation orders may be similar to injunctive relief, they are different animals. A preservation order relies on a federal court's "inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of relevant evidence." *See Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993). Such an order seeks to enforce the defendants' already-existing duty to preserve relevant evidence. *See Silvestri v. GMC*, 271 F.3d 583, 591 (4th Cir. 2001). In contrast, a preliminary injunction typically seeks to prevent the defendants from engaging in the allegedly unlawful conduct at the heart of the plaintiff's underlying claims during the pendency of the lawsuit, until a full determination on the merits may be made. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). These differences render the preliminary injunction test inapposite here. For example, a plaintiff seeking a preliminary injunction must first establish that he is likely to succeed on the merits. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Under the defendants' suggested approach here, Mr. Pizzuto would be required to show that he is likely to be successful on the merits of his underlying Eighth Amendment claim in order to prevent the defendants from destroying evidence material to proving that claim—evidence they are duty-bound to preserve anyway. "[S]uch an approach would be decidedly to put the cart before the horse." *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 138 n.8 (2004).

Nor does the Prison Litigation Reform Act require a different result. The defendants do not explain why they believe that Act applies to preservation orders, *see* Dkt. 173 at 13–14, and it is

difficult to fathom why it would. As is made clear by the text of the Act itself, it is concerned with how comity affects the fashioning of a remedy "to correct the violation of the Federal right." 18 U.S.C. § 3626. No such correction is at issue in the instant request. Preserving the evidence from Mr. Creech's execution will not correct the constitutional problems with Mr. Pizzuto's own execution. It will simply allow him the opportunity to demonstrate that there is a violation of his federal rights. Application of the "need-narrowness-intrusive" test—which is effectively a codification of the usual injunction test utilized by the federal courts, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 782–83 (9th Cir. 2019)—is inapplicable when the relief being sought is merely evidence preservation, not a substantive remedy. In sum, applying the preliminary injunction test is inappropriate here, and the *Truckstop* factors are the proper ones.

## II. Mr. Pizzuto's request satisfies the *Truckstop* factors.

Mr. Pizzuto's request satisfies all three of the *Truckstop* factors. As to the first, the defendants are now affirmatively fighting for their right to destroy the evidence, so the risk of destruction is plainly present.

### A. Mr. Pizzuto will likely be irreparably harmed without an order.

Turning to the second factor, if the defendants destroy the evidence, Mr. Pizzuto will likely be irreparably harmed. In their attempt to avoid the relevance of what Mr. Pizzuto seeks to have preserved, the defendants mischaracterize what Mr. Pizzuto has actually asked for. For example, the defendants complain that Mr. Pizzuto seeks to preserve clothing worn by witnesses such as the Governor, the media, and the victim's family. Dkt. 173 at 9–10, 14. But Mr. Pizzuto specifically cabined his request to items that are within the Execution Chamber and the Execution Preparation Room "while Mr. Creech is in the same room" or that is "reasonably within the vicinity of Mr. Creech's body after death is pronounced[.]" Dkt. 166-1 at 4–6. Under the terms of the defendants'

execution protocol, each witness is required to stay in a certain area; i.e., media representatives are required to stay in the "State of Idaho Witness Area" and are not permitted inside the Execution Chamber or any other area. Dkt. 166-2 at 13–15.

The defendants' proclamation that "Director Tewalt's suit and shoes" are irrelevant likewise misses the point. *See id.* at 9–10. As Mr. Pizzuto explained in his opening memorandum, physical evidence showing how much of Mr. Creech's blood spatters during the execution is directly relevant to whether the Execution Team made mistakes during that event, which in turn sheds light on whether or not the Execution Team is likely to make similar mistakes at Mr. Pizzuto's execution. Dkt. 166-1 at 10–11. As Director Tewalt is allowed to be present in both the Execution Chamber and the Execution Preparation Room, Dkt. 166-2 at 14–15, how much blood spatters onto his suit and shoes also matters. Additionally, the medical supplies both used and unused during Mr. Creech's execution are unquestionably relevant here. The defendants' argument that the same needle cannot be used on both Mr. Creech and Mr. Pizzuto is confusing. *See* Dkt. 173 at 10, 17–18. Mr. Pizzuto's request is not based on the equipment being re-used—it is based on the prospect of the equipment showing problems with the Creech execution.

Tellingly, at no point do the defendants specifically contest the relevance of an audiovisual recording of Mr. Creech's execution. *See generally* Dkt. 173. While they claim some of the items Mr. Pizzuto has listed are not material, they categorically fail to describe which items those are, or if the recording is one of them. *Id.* at 10. The defendants' refusal to engage with any of Mr. Pizzuto's arguments regarding the relevance of the audiovisual recording suggests they understand the happenings at Mr. Creech's execution are relevant to Mr. Pizzuto's Eighth Amendment claim. Given the obvious relevance of the evidence Mr. Pizzuto has sought to preserve to his Eighth Amendment claim, the second *Truckstop* factor weighs in his favor.

**B. The defendants are capable of maintaining the evidence Mr. Pizzuto seeks.**

The third and final factor also militates in Mr. Pizzuto's favor. All of the evidence is within the defendants' possession and control. All the defendants need do is not dispose of it.

The defendants repeatedly assert they have no power over non-IDOC personnel and, therefore, cannot preserve evidence outside of their direct possession. Dkt. 173 at 9–10, 14–16. But their duty to preserve material evidence for litigation purposes is not eliminated simply because they hand off evidence to a third party. *See Silvestri*, 271 F.3d at 591–92 (faulting a party for the failure to "take any steps" to prevent spoliation of evidence, even where he did not "control it in a legal sense"). Given that the execution protocol affirmatively states that "[i]ndividuals who fail to adhere to the requirements and directives of IDOC may be escorted out of the Execution Unit, IMSI, or IDOC premises[,]" Dkt. 166-2 at 13, it is puzzling for the defendants to now claim Director Tewalt has no control over them. The defendants could easily require these parties to transfer the evidence to IDOC. Or the Court might simply include in its preservation order instructions to the third parties themselves, as it routinely does in capital habeas cases. *See, e.g.*, *Hall v. Davis*, No. 1:18-cv-218, 2022 WL 16574136, at *3 (D. Idaho Nov. 1, 2022).

It is likewise unavailing for the defendants to fall back on the possibility that their purportedly competent medical team will "inadvertent[ly]" destroy evidence that they have been compelled to preserve by the Court. *See* Dkt. 173 at 16–17. Mr. Pizzuto has explicitly requested that all "waste bins, waste bags, waste receptacles, sharps bins, sharps bags, and sharps receptacles" be preserved. Dkt. 166-1 at 6. Thus, any items that the Execution Team is "accustomed to disposing of" will still be preserved, *see* Dkt. 173 at 16–17, absent willful destruction by the Execution Team or the defendants. Similarly, Mr. Pizzuto's request does not "prevent the Execution Teams from freely moving about the execution chamber as needed[.]" *Id.*

at 15. Again, Mr. Pizzuto clearly contemplated that the execution would proceed as planned, including the disposal of medical waste into the appropriate bins during the execution. His preservation request is focused on the *aftermath* of Mr. Creech's execution and seeks to preserve the material evidence in the "unaltered state" it is in at *that* point in time. *See* Dkt. 166-1 at 4–6.

The defendants' slippery slope is imaginary. Someone spilling a can of Coca-Cola Zero "somewhere in the facility" far removed from the execution would not create a danger, because the defendants would be permitted to clean up such a spill, as it is clearly not material evidence. *See* Dkt. 173 at 15. Further, nothing in Mr. Pizzuto's request would force the defendants to leave medical waste lying about in an "unsecured manner." *See id.* Given the many restrictions on who is allowed inside F-block, *see* Dkt. 166-2 at 13–15, it strains credulity to imply that errant lethal chemicals will be left out for some unsuspecting person to find. *See* Dkt. 173 at 15–16.

Likewise a strain on credulity: the defendants' assertion that Mr. Pizzuto will somehow discover the identity of the members of the Execution Team based on DNA that "may [be] implicate[d]" by retaining medical supply packaging. *See id.* at 19. Precisely how Mr. Pizzuto would obtain this DNA in a useable amount and then convince a law enforcement agency to run it through an appropriate database is known only to the defendants.[1] The defendants also claim secrecy concerns prevent the disclosure of packaging because they "believe that there may also be other items . . . that may have information about protected persons and entities." Dkt. 173 at 19.

[1] Indeed, if the defendants adhere to their own execution protocol, then even in a hypothetical world in which Mr. Pizzuto were able to obtain such DNA profiles, it would be unavailing. Private parties have available to them no DNA database to search, and the federal government's database, CODIS, contains profiles only from convicted criminals. *United States v. Kriesel*, 720 F.3d 1137, 1140 (9th Cir. 2013). The defendants' execution protocol requires members of the Execution Team to not have criminal records. *See* Dkt. 166-2 at 8–9.

This "belief" that there "may" be items present that "may" contain protected information is unsupported and simply falls into the defendants' usual unexplained secrecy catechism.

Nor have the defendants shown that Mr. Pizzuto's request will negatively impact the decency or dignity of Mr. Creech's execution. Most importantly, it is not for IDOC to assert the dignity interests of Mr. Creech, a man they wish to kill. He can speak for himself, and he has explicitly consented to the recording being made available for this litigation. *See* Dkt. 173 at 18. Moreover, the request does not "require [Mr.] Creech's corpse to be stripped naked in front of the witnesses" assembled in F-block. *See id.* The clothing can be taken elsewhere, at a private moment. Plus, the recording Mr. Pizzuto seeks is simply that of the audio and visuals already broadcast under the protocol. Why is it more undignified for the same recording to merely be preserved?

Likewise devoid of any explanation, the defendants state that they do not "have the present ability to record executions." *Id.* at 13. While the third *Truckstop* factor takes into account the "physical, spatial, and financial burdens created by ordering preservation[,]" it does not create an absolute bar based on "present ability." *Truckstop.net, L.L.C.*, 2005 WL 8166974, at *2. What is more, the defendants do not claim that it would be impossible to gain that ability. *See id.* The defendants already have the video cameras and microphones and broadcasting equipment. They only lack the recording ability, a small piece of the puzzle that is not unduly burdensome.

Finally, despite the defendants' protestations, Mr. Pizzuto has provided an inclusive, carefully thought-out list of pieces of material evidence he seeks to preserve. That he cannot name every potentially material piece of evidence individually should not bar his request, particularly where the defendants continually add items to their execution protocol without warning.

**III. This Court has the power to grant Mr. Pizzuto's request.**

The defendants throw constitutional spaghetti at the wall. Yet none of the many doctrines they invoke foreclose the motion. Mr. Pizzuto will respond to each point separately.

First, the defendants contend that this Court somehow "lacks jurisdiction" over Mr. Pizzuto's request because Mr. Creech is not a party to this case. Dkt. 173 at 4. But federal courts are not categorically banned from requiring non-parties to submit evidence. *See, e.g.*, Fed. R. Civ. P. 45 (allowing federal courts the power to issue subpoenas for non-parties). In addition, Mr. Creech has already agreed to the recording of his execution. Dkt. 166-5. Entertaining the defendants' objection on Mr. Creech's behalf when he himself has voiced his non-opposition makes little sense. Moreover, Mr. Creech is not responsible for his own execution—the defendants are. And it would be the defendants that this Court would order to preserve the evidence Mr. Pizzuto requests, not Mr. Creech.

Next, the defendants assert that which evidence should be kept after an execution is a political question appropriately left to the Idaho legislature. Dkt. 173 at 4–6. But establishing that a question is of the nonjusticiable political variety requires heavy lifting that the defendants have not done: they have failed to show that this question has been constitutionally committed to state legislatures and failed to showcase a lack of manageable judicial standards for resolving such a question. *See Alperin v. Vatican Bank*, 410 F.3d 532, 544 (9th Cir. 2005). Even questions that "have significant political overtones" are not necessarily nonjusticiable. *Corrie v. Caterpillar*, 503 F.3d 974, 982 (9th Cir. 2007). Courts are required to "undertake a discriminating case-by-case analysis to determine whether the question posed lies beyond judicial cognizance." *Id.* Contrary to the defendants' approach, the Supreme Court has not held that federal judges lack the power to hear any case regarding access to prisons; indeed, the Ninth Circuit has done precisely that. *See,*

*e.g.*, *Cal. First Amendment Coal. v. Woodford*, 299 F.3d 868, 885–86 (9th Cir. 2002) (holding a procedure limiting the media's view of an execution was unconstitutional). Nor does the mere fact that the Idaho legislature passed a statute bring Mr. Pizzuto's request outside of this Court's purview, as the defendants seemingly imply. *See* Dkt. 173 at 5–6. If it did, the Court would have been acting ultra vires for the last two years as it has resolved numerous discovery disputes here.

The defendants next turn to the Tenth Amendment, attempting to extend the prohibition against forcing the states to regulate from Congress to the federal judiciary. Dkt. 173 at 6–7. While the defendants focus solely on the meaning of the phrase "the United States" within the text of the Tenth Amendment, they forget that the reason the anti-commandeering doctrine applies to Congress is because that power was "not delegated" to Congress. *See New York v. United States*, 505 U.S. 144, 180 (1992). In contrast, the Supreme Court has explained that Article III of the Constitution "plainly confers" upon federal courts the power "to order state officials to comply with federal law." *Id.* at 179. Mr. Pizzuto is not asking that this Court issue an order forcing the Idaho legislature to regulate their execution procedure in a manner the Court likes better. Rather, Mr. Pizzuto is asking this Court to issue an order requiring *the defendants* to comply with their pre-existing duty to preserve material evidence with respect to his Eighth Amendment lawsuit.

The defendants' reliance on the mootness doctrine fares no better. "The burden of demonstrating mootness is a heavy one," *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988), that the defendants have not carried. They contend that the lack of an active death warrant for Mr. Creech renders Mr. Pizzuto's request moot. Dkt. 173 at 7–8. But the lack of a current death warrant does not foreclose a future one. At no point has the State affirmatively promised to refrain from seeking another warrant. If IDOC's theory were correct, a method of execution case could never be litigated in the absence of a warrant, which is patently not the law.

The defendants' wish to relitigate this (now fully briefed) issue under an expedited timeline once another death warrant is obtained would simply waste judicial resources.

Perhaps the most perplexing of the defendants' arguments comes from the anti-claim-splitting doctrine. Dkt. 173 at 8–9. The anti-claim-splitting doctrine prevents the same party from bringing the same cause of action in multiple cases. *Adams v. Cal. Dep't of Health Servs.*, 487 F.3d 684, 688 (9th Cir. 2007), *overruled on other grounds by Taylor v. Sturgell*, 553 U.S. 880, 904 (2008). As the defendants have noted, Mr. Creech is not a party to this case. *See* Dkt. 173 at 4. And at the risk of stating the obvious, Mr. Creech is not Mr. Pizzuto. Mr. Pizzuto is not seeking in this case to protect Mr. Creech's constitutional rights at his own execution. Rather, he is seeking to preserve the evidence to aid this Court in determining whether the same issues will arise during his own execution, which is highly relevant to his own as-applied Eighth Amendment challenge.

Nor is Mr. Pizzuto's request barred because he failed to raise a First Amendment issue in his Second Amended Complaint regarding the recording of Mr. Creech's execution. *See id*. 173 at 10–13. Simply put, Mr. Pizzuto is not asserting a First Amendment claim, nor invoking his rights as a member of the public. His request is made as a litigant, seeking to preserve evidence that is relevant to his constitutional claim against the defendants. The "constitutional basis" he relies on for his recording request is the Eighth Amendment, not the First. *See id*. 173 at 12. The cases the defendants cite regarding public and media access to record executions as a general matter are thus not apropos. And in the only case the defendants cite that involves an inmate's lawsuit, there was no recording request. *See McGehee v. Hutchinson*, 463 F. Supp. 3d 870, 921 n.9 (E.D. Ark. 2020).

**IV. Conclusion**

In light of the above, Mr. Pizzuto respectfully asks that this Court enter an order requiring that evidence regarding the execution of Thomas Creech be preserved.

DATED this 22nd day of November 2024.

*/s/ Jonah J. Horwitz*
Jonah J. Horwitz
Christopher M. Sanchez
Federal Defender Services of Idaho

*Attorneys for Plaintiff Gerald Ross Pizzuto, Jr.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 22nd day of November 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Kristina Schindele
krschind@idoc.idaho.gov

Mary Karin Magnelli
kmagnell@idoc.idaho.gov

Michael Elia
mje@melawfirm.net

Tanner Smith
tanner@melawfirm.net

*/s/ L. Hollis Ruggieri*
L. Hollis Ruggieri