Jonah J. Horwitz, Idaho Bar No. 10494
Christopher M. Sanchez, Idaho Bar No. 12070
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho Street, Suite 900, Boise, ID 83702-8929
Telephone: (208) 331-5530; Facsimile: (208) 331-5559
ECF: jonah_horwitz@fd.org
         christopher_m_sanchez@fd.org

Stanley J. Panikowski, California Bar No. 224232
(admitted *pro hac vice*)
DLA PIPER LLP (US)
401 B Street, Suite 1700, San Diego, CA 92101-4297
Telephone: (619) 699-2700; Facsimile: (619) 699-2701
ECF: stanley.panikowski@dlapiper.com

Sarah E. Kalman, Pennsylvania Bar No. 325278
(admitted *pro hac vice*)
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street, Suite 500, Philadelphia, PA 19103-7301
Telephone: (215) 656-2438; Facsimile: (215) 656-3301
ECF: sarah.kalman@dlapiper.com

*Attorneys for Plaintiff Gerald Ross Pizzuto, Jr.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| **GERALD ROSS PIZZUTO, JR.,** | ) | **CASE NO. 1:21-cv-00359-BLW** |
| | ) | |
| Plaintiff, | ) | **RESPONSE TO MOTION TO** |
| | ) | **VACATE NOTICES OF** |
| v. | ) | **DEPOSITION FOR MEDICAL** |
| | ) | **TEAM LEADER AND CENTRAL** |
| **JOSH TEWALT**, Director, Idaho Dept. of | ) | **LINE VOLUNTEER [DKT. 175]** |
| Correction, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

For the reasons that follow, Plaintiff Gerald Ross Pizzuto, Jr. respectfully asks the Court

to deny the defendants' motion to vacate the notices of deposition. *See* Dkt. 175.

I.    **Legal Standards**

A "party resisting discovery carries the 'heavy burden' of showing specifically why the discovery request is irrelevant, unduly burdensome, disproportional to the needs of the case, or otherwise improper." *Falk v. HP Inc.*, No. 1:17-cv-401-BLW, 2018 WL 3636536, at *1 (D. Idaho July 31, 2018); *accord Apple Inc. v. Samsung Elecs. Co.*, 282 F.R.D. 259, 263 (N.D. Cal. 2012) ("[A] party seeking to prevent a deposition 'carries a heavy burden to show why discovery should be denied.'").[1] "It is very unusual for a court to prohibit the taking of a deposition altogether and absent extraordinary circumstances, such an order would likely be in error." *Salter v. Upjohn Co.*, 593 F.2d 649, 651 (5th Cir. 1979).

The burden is also on a "party requesting a protective order" under Federal Rule of Civil Procedure 26(c). *See Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1130 (9th Cir. 2003). That is because the discovery system is founded "on the general principle that litigants have a right to every man's evidence, and that wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for the truth." *Kelleher v. Fred Meyer Stores Inc.*, 302 F.R.D. 596, 597 (E.D. Wash. 2014).

II.    **Argument**

Here, the defendants cannot remotely satisfy their heavy burden where they are protesting the deposition of the two people *most* involved in Mr. Pizzuto's execution and where they offer nothing more than the predictably vague concerns about secrecy—concerns that are easily satisfied without either quashing the notices or creating a new protective order. Mr. Pizzuto will

---

[1] Unless otherwise noted, all internal quotation marks and citations are omitted, all emphasis is added, and all citations are cleaned up.

first explain why it would be inappropriate for the Court to quash the notices of deposition. Then, he will establish that no new protective order is called for.

## A.  The Court should not quash the notices of deposition.

The defendants have three bases to quash the notices: 1) burdensomeness; 2) relevance; and 3) proportionality. *See* Dkt. 175-1 at 4–12. None are persuasive.

### 1.  The depositions are not unduly burdensome.

Following the usual playbook, the defendants seek to evade their discovery responsibilities with perfunctory appeals to secrecy needs that have already been accommodated. *See id.* at 5–6. And as it has before, *see* Dkts. 88, 123, 158, the Court can easily reject the defendants' unsupported and self-serving assurances, *see Hanak v. Dyncorp Int'l LLC*, No. SA-09-CA-752, 2012 WL 13136448, at *1 (W.D. Tex. Apr. 30, 2012) (reiterating that when a party moves to quash a deposition in its entirety it "must show a particular and compelling need for such a protective order, as conclusory assertions of injury are insufficient").

As a general matter, the biggest flaw in the defendants' presentation on burdensomeness is that it has nothing to do with quashing the depositions. They regard depositions as too burdensome because they supposedly undermine "the confidentiality of IDOC's execution team members." Dkt. 175-1 at 5. Yet the defendants do not offer a single piece of evidence that an execution team member being deposed automatically jeopardizes his identity, or a single case agreeing with such a proposition. Instead, the defendants insist that the deposition ought not to involve recordings of the deponents' "faces and voices." *Id.* If true, that still does not speak to the quashing question. At most, it would mean that the deposition ought not to include a video or audio recording, questions addressed below. *See infra* at Part II.B.

Otherwise, the defendants' only specific ground for their secrecy fears is that "potential inquiries into the specific education, qualifications, experience, and training of the" individuals "create a grave risk of disclosure of their identities." Dkt. 175-1 at 6. Again, this is a problem—if it exists—that relates to the terms of a protective order, not the propriety of the depositions as a whole. Indeed, the parties have already settled on a methodology for depositions to ameliorate the defendants' anxieties. Plaintiff's counsel deposed Warden Tim Richardson in October. *See* Ex. 1. There, plaintiff's counsel indicated at the outset that, "if the defendants have a secrecy-type objection, they'll make the objection, they'll instruct Warden Richardson not to answer the question," and the parties would "move on to other questions." *Id.* at 8.[2] If the plaintiff later wished to challenge such objections, he would do so through a motion to compel. *Id.* The defendants' counsel then clarified that they would use the shorthand "confidentiality objection." *Id.* at 9. During the deposition, the parties used that convention numerous times without incident. *See, e.g.*, *id.* at 48–49, 52, 57. Mr. Pizzuto is amenable to the same proven framework now.

Without these specific points to rely on, the defendants have nothing other than their catechism about how "[t]he team members' identities must remain inviolate." Dkt. 175-1 at 6. As they acknowledge, though, plaintiff's counsel have already agreed that the identities will not be disclosed at the depositions. *See id.* at 5; *see also* Ex. 2.

In light of the above, it is unsurprising that the defendants do not cite a single case in which a court concluded that the deposition of an execution-team member is properly blocked in its entirety because of secrecy. In lieu of that authority, the defendants reference a pair of non-

---

[2] The deposition transcript was initially marked "confidential." Ex. 1 at 1. However, the defendants later stated that they would "not designate any confidential materials within the transcript." Dkt. 172 at 2. As such, Mr. Pizzuto is now filing the transcript publicly, consistent with the terms of the protective order the parties agreed to by stipulation, *see* Dkt. 81 at 8–9, which the Court adopted, *see* Dkt. 83.

execution cases about interlocutory appellate jurisdiction. *See* Dkt. 175-1 at 5. At best, these cases shed light on whether the defendants will be entitled to pursue an immediate appeal from an order denying the present motion. They have no bearing on whether such an order should be issued in the first place. The defendants also invoke *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322 (11th Cir. 2020). *See* Dkt. 175-1 at 6. To the extent *Jordan* relates to secrecy, though, it was because the plaintiff there was explicitly requesting a drug source, *see* 947 F.3d at 1326, whereas Mr. Pizzuto is doing the opposite—making a commitment to anonymity.

Importantly, execution team members have routinely been deposed in other comparable lethal-injection actions elsewhere. *See, e.g.*, *Nance v. Oliver*, No. 1:20-cv-107, Dkt. 132-19 (N.D. Ga. May 16, 2024); *King v. Parker*, No. 3:18-cv-1234, Dkt. 184-1 (M.D. Tenn. Mar. 17, 2022); *In re: Ohio Execution Protocol Litig.*, No. 2:11-cv-1016, Dkt. 2461-39 (S.D. Ohio Sept. 6, 2019) (hereinafter "Ohio Deposition").[3] In those cases, depositions of execution-team members were safely conducted without unveiling any identities, and they can be done here. *See* Dkt. 123 at 9 (rebuffing the defendants' secrecy argument because they failed to "provide any examples of" confidentiality problems "in other states" where similar information was disclosed).

### 2. The depositions are relevant.

Relevance does not put the defendants on more solid footing. Preliminarily, even if there were legitimate questions about the relevance of the prospective deponents' testimony, quashing would not be the right remedy. Disputes over the relevance of deposition testimony go "to the issue of whether [the] deposition may be used at trial, as opposed to whether it should be taken in the first instance." *In re: NC Swine Farm Nuisance Litig.*, No. 5:15-cv-013, 2016 WL 3742135,

---

[3] Mr. Pizzuto respectfully asks the Court to take judicial notice of any filings from other cases referenced here. *See Rico v. Ducart*, 980 F.3d 1292, 1295 n.2 (9th Cir. 2020).

at *3 (E.D.N.C. July 7, 2016). "Thus, during the taking of a deposition, routine objections based on relevancy should be briefly noted for the record and witnesses should thereafter be instructed to answer the question." *Britton v. Dallas Airmotive, Inc.*, No. CV-07-547, 2009 WL 10677843, at *5 (D. Idaho July 2, 2009). Nothing counsels for a different approach in this case.

If the Court's analysis proceeds further, the same result obtains. In short, it is difficult to imagine more obviously relevant witnesses in a lethal-injection lawsuit than the people who will be directly inserting the needles into the inmate's veins. Relevance is construed "broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). "The standard for relevance is quite low." Dkt. 123 at 15; *accord Sandoval v. Cty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) (describing relevance as a "low bar"). Mr. Pizzuto clears that modest bar with ease.

To jerry-rig an attack on relevance, the defendants construe Mr. Pizzuto as asserting nothing more than "an as-applied Eighth Amendment method-of-execution claim" rooted in his "specific health conditions." Dkt. 175-1 at 4. The defendants then reason that the two putative deponents "will shed no light on the question whether lethal injection using pentobarbital will result in superadded pain to Plaintiff." *Id.* at 8. The defendants' reading of the complaint is incomplete. While Mr. Pizzuto is partly challenging pentobarbital as a result of his compromised heart and prescription-drug history, *see* Dkt. 153 at 17–24, his claim sweeps much more broadly than that. In fact, Mr. Pizzuto has pled a series of allegations that directly implicate the central-line volunteer and the medical-team leader. For one, Mr. Pizzuto has an entire section on "problems with a central line." Dkt. 153 at 32–36. It would be implausible to determine that the *central-line* volunteer was somehow irrelevant to a claim targeting *the central line*. Similarly,

Mr. Pizzuto has in his complaint singled out the risks associated with the placement of a peripheral IV line at his execution. *See id.* at 31–32. Because the medical-team leader has primary responsibility for inserting the peripheral IV line, *see* Dkt. 175-7 at 7, 26; Dkt. 175-8 at 1, 6, he is unquestionably a source of salient information. More generally, the complaint includes a subsection regarding human errors at executions and how they contribute to the risk that Mr. Pizzuto will experience an unconstitutional degree of pain and suffering at his own. *See* Dkt. 153 at 15–17. The most costly errors that could conceivably be made at Mr. Pizzuto's execution would be committed by the medical-team leader and the central-line volunteer—the two people who will be poking and prodding him when he is put to death.

A separate word is in order with respect to Mr. Creech's botched execution on February 28, 2024. The defendants baldly aver that facts relating to the botch have "little weight" in terms of the "risk that [Mr. Pizzuto] will experience superadded pain during his own execution." Dkt. 175-1 at 8. This Court has said otherwise. Faulting the defendants for endorsing "too narrow an understanding of relevance," the Court previously explained that Mr. Pizzuto's claim is "based on a constellation of medical factors and alleged systemic problems with executions in Idaho." Dkt. 158 at 6. Thus, while the claim is "based on his particular circumstances," that "in no way suggests that other executions and execution attempts are *irrelevant* to him." *Id.* (emphasis in original). The Court consequently concluded that the defendants "strain credulity by asserting that the IDOC's recent bungled execution of an individual who shares important characteristics with Pizzuto has no material bearing on Pizzuto's case." *Id.* Now, the defendants are straining credulity with the same untenable perspective again. Similarly, the defendants are wrong to assume that Mr. Creech's botched execution must be found *unconstitutional* in order for it to be relevant here. *See* Dkt. 175-1 at 9. All that must be found is that it contributes to the *risk* of pain

at Mr. Pizzuto's execution. *See Glossip v. Gross*, 576 U.S. 863, 877 (2015) (adopting the "substantial risk of serious harm" test for execution challenges). It incontrovertibly does.

IDOC's single citation on this issue does not nullify the Court's well-founded conclusion. *See* Dkt. 175-1 at 9. In the referenced case, one of the two counts in the complaint had previously been dismissed. *See Bucklew v. Lombardi*, No. 14-8000, 2017 WL 11683573, at *1 (W.D. Mo. Apr. 11, 2017). It was the dismissed count that implicated the qualifications of the execution team. *See id.* at *2. Here, Mr. Pizzuto's allegations regarding executioner qualifications remain live, *see* Dkt. 153 at 15–17, and he has a right to develop them in discovery. The same analysis applies to the central line. IDOC touts the central line as "constitutionally sound." Dkt. 175-1 at 10. The question is not whether the central line is on paper a violation of the Eighth Amendment. It is whether the use of a central line on Mr. Pizzuto poses intolerably high risks of pain in the real world. It is the central-line volunteer himself who can shed light on those risks.

### 3. The depositions are proportional.

Reiterating their familiar desire to be spared from commonplace discovery based on their own self-serving confidence in their plans, the defendants call the depositions disproportionate. *See id.* at 6–11. Just as the Court has previously rebuffed the defendants' just-trust-us model of discovery, *see, e.g.*, Dkt. 123 at 14, it should do the same again now.

One main plank of the defendants' account of proportionality is that there are already such unassailable safeguards in place that Mr. Pizzuto has no need to question his executioners. *See* Dkt. 175-1 at 7. According to the defendants, everyone's mind can be put at ease by the fact that "IDOC's execution protocol requires the Department to confirm the qualifications of its team members and ensure they train at least 10 times a year." *Id.* Of course, that was also true in the years leading up to February 28, 2024, when IDOC forced Mr. Creech to lay on a table for

nearly an hour while its executioners tried and failed to kill him. *See* Dkt. 153 at 24. It is likewise true in every other death-penalty state in the country, nearly all of which have these boilerplate requirements about trainings and qualifications. *See* Death Penalty Information Center (DPIC), State-by-State Execution Protocols, available at https://deathpenaltyinfo.org/executions/methods-of-execution/state-by-state-execution-protocols (collecting execution protocols). Those protocols have not prevented lethal-injection executions from being dramatically botched in numerous cases. *See, e.g.*, Dkt. 153 at 15–16, 35–36; DPIC, Botched Executions, available at https://deathpenaltyinfo.org/executions/botched-executions.

What's more, Mr. Pizzuto is entitled to subject IDOC's guarantees to adversarial testing. By way of one illuminating example, the Arizona Department of Corrections was also compelled in theory by its protocol to ensure that IV lines would "be placed only by medically licensed individuals." *West v. Brewer*, No. CV-11-1409, 2011 WL 6724628, at *3 (D. Ariz. Dec. 21, 2011). Then it turned out that five executions had been conducted during which a medical-team member "did not hold a medical license." *Id.* at *6. That is why Mr. Pizzuto must question the executioners about their qualifications. *See Stevens v. Corelogic, Inc.*, 899 F.3d 666, 678 (9th Cir. 2018) ("[T]he whole point of discovery is to learn what a party does not know or, without further information, cannot prove."). The defendants are correct that the executioners "are not responsible for drafting the" protocol, Dkt. 175-1 at 10, but that is a reason for Mr. Pizzuto to depose *other* witnesses in addition to the executioners.

Furthermore, there is reason to doubt whether the protocol really is as all-encompassing a document as the defendants portray. For instance, the prior version of the protocol mandated the use of a central-line execution in the event that peripheral IV placement proved impossible. *See* Dkt. 54-14 at 7. Yet at the botched attempt to execute Mr. Creech no such central line was

RESPONSE TO MOTION TO VACATE NOTICES OF DEPOSITION – Page 9

attempted. Afterwards, Defendant Tewalt implied to the public that IDOC was not prepared to attempt a central-line placement. *See* Dkt. 141-2 at 13–14 ("When we get into establishing what's referred to as a central line, you're, essentially, talking about a surgical procedure. And so, you know, our team is qualified and competent at establishing *peripheral lines*."). Apparently, the protocol was not so conclusive then.

Nor has it been followed with particular rigor when it comes to the expiration of execution chemicals. The protocol provides: "If chemicals are on site, check the expiration dates on each item to ensure they will not expire before the execution date." Dkt. 175-7 at 20. Despite that directive, IDOC managed to misrepresent in discovery the expiration date of execution chemicals before realizing its mistake months later—shortly before an execution—and abruptly disposing of the drugs. *Compare* Dkt. 156-4 at 6 (reflecting Defendant Tewalt's statement under oath that IDOC's second set of execution drugs expired later than February 28, 2025), *with* Ex. 3 at 6–7 (containing Defendant Tewalt's subsequent admission that the second set actually expired in September 2024, as indicated on the chemicals' packaging).

And on top of all that there is the fact that the "Director may revise, suspend, or rescind any procedural steps, at any time, at the Director's sole discretion." Dkt. 175-7 at 1. The bottom line is that the protocol is a transient thing that IDOC abides by or ignores at its will. It is not so decisive a document as to prevent the plaintiff's counsel from questioning individuals who have key information about how Mr. Pizzuto's execution will actually be conducted.

Plus, the protocol offers only platitudes about the phenomenon at the heart of Mr. Pizzuto's claim: pain and suffering. *See, e.g.*, Dkt. 175-7 at 5 (committing to an execution that "[d]oes not cause the condemned person to suffer cruelly during the execution"). These bromides give the executioners no real guidance on how they should avoid "unnecessary pain or

suffering," no direction on how to detect pain and suffering, no information about how much

pain and suffering is too much, and no blueprint for what to do in the event the inmate does

begin to feel pain and suffering—all of which questions are best answered by the executioners.

Nor can they be answered by other IDOC witnesses. IDOC proposes that Defendants Liz

Neville and Josh Tewalt would be more suitable witnesses. *See* Dkt. 175-1 at 11. Like the

protocol, though, these individuals cannot answer any of the questions above about pain and

suffering at an execution. For they are not the ones physically interacting with Mr. Pizzuto at his

execution. Even in terms of the experience of the executioners, which the defendants' place

overwhelming reliance on, they are incorrect to offer Defendant Neville as an omniscient source

of information. The guidance offered by the protocol on that front is scant. Consider the criteria

for the central-line volunteer. All the protocol says is that he must be a "[m]edically-licensed

physician" and "[h]ave current central venous line catheter placement proficiency." Dkt. 175-7 at

8. What is current proficiency? How often does the doctor perform central-line placements? How

many times have his central-line placements gone awry? What happened when they did? What

caused the problems? These are just a few of the many questions that the plaintiff's counsel

would pose to the central-line doctor, along with similar queries for the medical-team leader.[4]

None of them can be answered by Defendants Neville or Tewalt, or anyone other than the

executioners themselves. Mr. Pizzuto appreciates that that IDOC's own lay staff have

"confidence in the qualifications and competency of the Medical Team," Dkt. 175-2 at 3, but if

they are qualified and competent they can prove it themselves at depositions rather than relying

---

[4] These questions are also not answered by the declaration of Dr. Alvin Perry, *see Creech v. Tewalt*, D. Idaho, No. 1:20-cv-114, Dkt. 171-2, the expert the defendants are using in an attempt to shield the real source of information—the central-line volunteer—from having to establish his own competence, *see* Dkt. 175-1 at 11 n.4.

on the third-hand word of the untrained individuals volunteering to help put Mr. Pizzuto to death, *see Spirit of Aloha Temple v. Cnty. of Maui*, 49 F.4th 1180, 1192 (9th Cir. 2022) ("We are not bound by officials' promises that they will enforce the guidelines responsibly.").

So, too, for any of the numerous technical questions that Mr. Pizzuto must direct to the executioners to fully investigate his claim. Though the defendants now promote themselves as the only acceptable witnesses,[5] they have already admitted otherwise. The defendants' answer to Mr. Pizzuto's operative complaint is replete with statements that they "do not have sufficient knowledge" to engage with a host of medical questions, including: 1) whether training and regular experience are required in order to obtain IV access; 2) whether errors in IV placement can cause excruciating pain from tissue infiltration; 3) whether age is a risk factor for vein deterioration; 4) whether central lines are an invasive surgical procedure; 5) whether central lines pose risks for pain that peripheral IVs do not; and 6) what kind of medical professionals can use central lines, *compare* Dkt. 153 at 16, 32, 34, *with* Dkt. 154 at 9, 19, 32. In one particularly telling passage in their answer, the defendants' responded to eight detailed allegations about medical issues and executions with the blanket disclaimer that they lacked "sufficient knowledge" about every single point. *Compare* Dkt. 153 at 27–28, *with* Dkt. 154 at 15. Having already fessed up to their lack of insight in these key areas, the defendants cannot now force Mr. Pizzuto to ask them his questions and be told that they have no idea what the answers are. The executioners are the ones who have "sufficient knowledge," and they are the appropriate witnesses.

---

[5] The defendants point out that the parties stipulated to five depositions per side. *See* Dkt. 175-1 at 2 n.1. Of course, Mr. Pizzuto has the right to seek the Court's leave to conduct additional depositions. *See, e.g.*, *Cty. of Inyo v. DOI*, 873 F. Supp. 2d 1232, 1239 (E.D. Cal. 2012). In any event, it is Mr. Pizzuto's prerogative to determine his own deposition strategy and the question of other potential witnesses is not before the Court.

**B.  No new protective order is necessary.**

The defendants seek a protective order in the alternative, *see* Dkt. 175-1 at 12–14,

forgetting that one already exists and that it sufficiently safeguards any legitimate secrecy

interests IDOC has. In April 2023, the parties stipulated to a protective order in this case. *See*

Dkt. 81. The protective order specifically addresses confidentiality concerns regarding

depositions. *See id.* at 8–9. Most significantly, it includes a section providing for the deposition

of the medical-team leader in particular. For that deposition, the transcript is to remain

confidential in its entirety unless and until the Court rules otherwise at Mr. Pizzuto's request. *See*

*id.* at 9.[6] The Court endorsed the protective order in the form drafted by the parties. *See* Dkt. 83.

As mentioned above, the process established by the parties worked well in the single deposition

thus far conducted in the case, where the defendants' counsel was able to object to any question

they wished on secrecy grounds and to advise the witness not to answer. *See supra* at Part II.A.1.

Moreover, Mr. Pizzuto's counsel has agreed that the defendants need not identify the

executioners by name. *See* Ex. 2. Those measures are adequate to guarantee that the defendants

will not have to disclose "information that would, to a reasonable degree of certainty, identify a

person or entity involved in" executions. Dkt. 123 at 3.[7]

Experience in other jurisdictions proves that the existing secrecy restrictions are enough.

Notably, Mr. Pizzuto has voluntarily accepted conditions more favorable to the defendants'

---

[6] If the central-line volunteer is deposed, Mr. Pizzuto's counsel will assume the same provisions govern that transcript as well. He has no objection to a modification of the protective order stating as much, should the Court deem it necessary.

[7] The defendants do not contest the standard quoted above for purposes of the motion at bar, and they have therefore forfeited their ability to do so. *See in re Uphealth Holdings, Inc.*, No. 24 Misc. 377, 2024 WL 4203228, at *3 (S.D.N.Y. Sept. 16, 2024) (finding arguments raised for the first time in reply in support of a motion to quash "unequivocally waived").

secrecy interests than those adopted by another district court. *See Morales v. Woodford*, No. C06 219, 2006 WL 1646106, at *1 (N.D. Cal. June 9, 2006) (observing that the court had previously ruled that execution-team member names would be divulged to the plaintiff's investigator). In lethal-injection litigation in Ohio, which has been ongoing for more than thirteen years, generated nearly four thousand docket entries, and involved numerous depositions, execution-team members have been questioned in person with pseudonyms, just as Mr. Pizzuto has suggested here. *See, e.g.*, Ohio Deposition. IDOC has not even tried to show that these standard deposition practices have been problematic. The Court should follow the same well-trod path.

IDOC proffers no authority to bolster its own recommendations for the depositions. It remarks that "[a] burden on state actors' ability to perform executions has been recognized as good cause for entering a protective order." Dkt. 175-1 at 12. Mr. Pizzuto agrees—that is why he stipulated to one. *See* Dkt. 81. The defendants' burden now is to demonstrate that an *additional* protective order is warranted, and they have not done so. To the contrary, they cite *In re Ohio Execution Protocol Litig.*, 845 F.3d 231 (6th Cir. 2016), *see* Dkt. 175-1 at 12, but that opinion says nothing about depositions. What is more, it arose from district court proceedings in which none of the defendants' secrecy measures were implemented. *See, e.g.*, Ohio Deposition. The defendants' next citation is invoked for the proposition that identifying information should be protected. *See* Dkt. 175-1 at 12. Again, Mr. Pizzuto acquiesces—he is not asking for such information and, if IDOC believes it is implicated by a question, counsel can object and advise the witness not to answer, as they ably did at the previous deposition. *See supra* at Part II.A.1.

As for the citation that appears after the defendants enumerate the list of conditions they are requesting for the depositions, it is *King v. Parker*, No. 3:18-cv-1234, 2020 WL 4883014 (M.D. Tenn. July 20, 2020). *See* Dkt. 175-1 at 13. The passage highlighted by the defendants is

one in which the *King* court recounted how it had previously allowed execution-related witnesses to testify from behind a screen. *See King*, 2020 WL 4883014, at *11. Crucially, though, the proceeding under consideration in *King* was an *evidentiary hearing* held in a federal district court. *See also Harbison v. Little*, 511 F. Supp. 2d 872, 874 (M.D. Tenn. 2007), *vacated and remanded on other grounds*, 571 F.3d 531 (6th Cir. 2009) (describing this hearing). It makes sense that a hearing held in court—which is presumptively open to the public—demands steps to mask the faces of execution-team members. Those risks are not present with a deposition, which takes place in a private space, in front of a small group of people, all of whom are bound by the terms of the protective order the parties stipulated to. *King* itself recognized the distinction. With respect to *depositions* in *King*, the district court only ruled out questions "seeking information" that was "calculated or otherwise likely to lead to the identification of th[e] pseudonymously identified individuals," 2020 WL 4883014, at *11, which is precisely what Mr. Pizzuto has already agreed to do in compliance with the Court's order and what the established discovery framework will facilitate, *see supra* at Part II.A.1.

The defendants' absence of caselaw is inevitable, for their proposed restrictions are at odds with common sense. They want the witnesses to "remain at an undisclosed remote location" and to have "an audio-only deposition" that "will not be recorded." Dkt. 175-1 at 13. But since the witnesses' names will remain unknown to plaintiff's counsel, these conditions are excessive. The plaintiff's counsel do not have the kind of face-recognition software that law enforcement might possess. They will not be able to identify the witnesses by looking at the faces of two entirely anonymous people.

And there are good pragmatic reasons to err on the side of an in-person deposition as opposed to a virtual one. Federal Rule of Civil Procedure 30(b)(4) makes remote depositions the

exception that takes place upon stipulation or order, while in-person testimony is the norm. Remote testimony is only permissible where the party requesting it has highlighted "particularized reasons for why these specific depositions should be conducted remotely rather than in-person." *Watson v. U.S. Army Corps. of Engineers*, No. 1:19-cv-989, 2021 WL 12319912, at *1 (S.D. Miss. Apr. 23, 2021). The presumption in favor of in-person depositions exists because they are more effective. For one thing, "experienced questioners find that witnesses (and particularly adverse or hostile witnesses) will more readily yield admissions to a live questioner." *Huddleston v. Bowling Green Inn of Pensacola*, 333 F.R.D. 581, 587 (N.D. Fla. 2019). "It is undeniable that a remote deposition will have an impact on" counsel's "ability to cross examine" the witness in light of his "demeanor, tone, and body language." *Edwards v. Thomas*, No. 4:19-cv-4018, 2021 WL 8316970, at *2 (W.D. Ark. Nov. 18, 2021). While "[r]elatively unimportant witnesses typically can be deposed telephonically or via video conference," it should not be done with individuals in possession of "a key piece of evidence for both parties." *Huddleston*, 333 F.R.D. at 586. The medical-team leader and the central-line volunteer are unquestionably pivotal to this litigation, as they are the ones who will actually put Mr. Pizzuto to death.

They are also witnesses who will need to be taken through multiple exhibits at their depositions, including—for instance—the execution protocol, *see* Dkt. 175-7, the chemical administration policy, *see* Dkt. 175-8, Dr. Perry's declaration, *see supra* at Part II.A.3, training agendas, and at least some of the many documents generated in connection with Mr. Creech's botched execution, such as the notes taken at that event, *see* Dkt. 175-1 at 11. When "multiple documents" must be used at a deposition, doing it remotely "is very limiting." *Kean v. Bd. of Trs. of the Three Rivers Reg'l Library Sys.*, 321 F.R.D. 448, 453 (S.D. Ga. 2017).

In addition, remote depositions make it more difficult to "ascertain if anyone is listening in or coaching the witness." *United States v. Rock Springs Vista Dev.*, 185 F.R.D. 603, 604 (D. Nev. 1999). And in-person depositions are especially preferable when the credibility of the witness is significant. *See Sampathachar v. Federal Kemper Life Assurance Co.*, No. CIV.A. 03-5905, 2004 WL 2743589, at *2 (E.D. Penn. Nov. 24, 2004). That is undoubtedly the case with respect to the two executioners at issue here, who will presumably be attesting to their own competence while Mr. Pizzuto challenges it. Simply put, in-person testimony is far superior in every respect and the defendants have not justified an inferior deposition method here.

Finally, the defendants strive to turn the protective-order rule into an offensive weapon so they can obstruct Mr. Pizzuto from exploring all of the relevant subjects the executioners have knowledge of. The defendants would be satisfied by an order cabining the scope of the depositions to the witnesses' "compliance with the execution protocol," their "consultation with the Administrative Team," and their "process steps for inserting central line venous access." Dkt. 175-1 at 13. This list is woefully defective.

To begin with, the defendants get the legal framework backwards. It is their burden to list the topics that are *off limits* and demonstrate why they impinge upon IDOC's legitimate secrecy interests. Under Rule 26(c), a court "may issue a protective order *only* if the moving party demonstrates that the basis for the protective order falls within one of the specific categories enumerated in the Rule, i.e., that the requested order is necessary to protect the party from annoyance, embarrassment, oppression, or undue burden or expense." *Cohen-Esrey Real Estate Servs. v. Twin City Fire Ins. Co.*, No. 08-2527, 2009 WL 4571845, at *1 (D. Kan. Dec. 3, 2009) (emphasis in original). The proper way for a litigant to utilize Rule 26(c) is to advise the Court what subjects cross the line. *See, e.g.*, *EEOC v. Bice of Chicago*, 229 F.R.D. 581, 583 (N.D. Ill.

2005) (granting a protective order to preclude questions regarding the witness's immigration status). The defendants have done the opposite. They are asking the Court to limit Mr. Pizzuto to essentially three subjects and forbid him from questioning the witnesses about anything else in the world. That would only make sense if every other topic in the universe encroached on the defendants' zone of secrecy. Yet even they are not making such an outlandish claim.

To take one example, the defendants are lobbying for a protective order "rejecting any effort to inquire into the circumstances of the Medical Team Leader's attempts to gain peripheral IV access to Creech on February 28, 2024." Dkt. 175-1 at 13–14. At the same time, the defendants do not contend that the botched execution poses any secrecy dangers. Rather, they call the botched execution *irrelevant*. *See id.* at 14 (submitting that the botched execution has "no bearing on Plaintiff's as applied Eighth Amendment claim"). Relevance was deliberately omitted from Rule 26(c). *See P.S. v. Farm, Inc.*, No. 07-CV-2210, 2009 WL 483236, at *3 (D. Kan. Feb. 24, 2009) (commenting that "Rule 26(c) does not provide for any type of order to protect a party from having to provide discovery on topics merely because those topics are overly broad or irrelevant"); *accord SEC v. Creative Capital Consortium*, No. 08-81565, 2009 WL 10664429, at *2 (S.D. Fla. May 20, 2009) ("[L]ack of relevance is not listed in Rule 26(c) as a basis for the entry of a protective order.").

The gap between the defendants' actual arguments on the one hand and the remedy of a protective order on the other likewise illuminates how inefficient their roadmap is for the depositions. In essence, the defendants want the Court to articulate in advance of two critical depositions a comprehensive recitation of all of the areas of potential examination that might be relevant to the case. Trying to craft such a plan in the abstract is a recipe for confusion and conflict, and it undermines the core goal of "secur[ing] the just, speedy, and inexpensive

determination of every action and proceeding." Fed. R. Civ. P. 1. The technique that has been developed over myriad civil cases is for conventional evidentiary disputes over things like relevance to be sharpened by taking the form of specific objections to specific questions, which can then be presented to the Court in a concrete fashion for resolution. *See supra* at Part. I.A.1. This case is no different, and a protective order is the wrong tool for the defendants' aims.

Even with respect to the areas for which the defendants do have more plausible apprehensions about secrecy, a new protective order remains unwarranted. The defendants maintain that Mr. Pizzuto should be prohibited from asking any questions "about where IDOC's confidential team members work, their positions, work history, and licensing/certification history," as any of those areas "will lead to the disclosure of their identities." Dkt. 175-1 at 13. By the defendants' lights, Mr. Pizzuto need not concern himself with those topics because "IDOC will confirm that the confidential team members are in good standing with state and federal licensing/certifying boards before any execution" and "[s]uch information satisfies Plaintiff's need to know the team members' qualifications." *Id.* There are many situations in which IDOC's anemic due diligence will be inadequate. Take Missouri's erstwhile execution doctor. He was asked at a deposition about discrepancies in the drug dosages that he used over time. *See Taylor v. Crawford*, No. 05-4173, 2006 WL 1779035, at *5 (W.D. Mo. June 26, 2006). In response, he clarified that he was "dyslexic and that is the reason why there are inconsistencies in my testimony. That's why there are inconsistencies in what I call drugs. I can make these mistakes." *Id.* Other investigative efforts revealed that the doctor had also "been sued for malpractice more than 20 times." Cheryl Wittenauer, *Missouri dismisses dyslexic executioner*, AP, July 21, 2008, available at

https://www.columbiamissourian.com/news/local/missouri-dismisses-dyslexic-executioner/article_6b69928b-34d4-5b5a-b206-5c682dfd4d9b.html.

No one could deny that it contributes to the risk of a painful execution when the executioner is a dyslexic doctor who routinely mixes up dosages and has been sued for malpractice more than twenty times. And yet, under the defendants' proposal here, none of that information would come out at a deposition. The doctor's dyslexia and his history of lawsuits would not be covered by the defendants' list of allowed subjects. *See* Dkt. 175-1 at 13. To the contrary, the lawsuits would presumably be explicitly forbidden, since they relate to the doctor's "work history." *Id.* And these restrictions would be in place despite the absence of any meaningful secrecy concerns. The question, "Are you dyslexic?" does not expose a witness's identity. Nor does the question, "How many times have you been sued for malpractice?" In the defendants' ideal world, they would simply confirm that the doctor's board certifications were in good order (as the Missouri physician's were, *see Taylor*, 2006 WL 1779035, at *5) and he would go on his way. The absurdity of this hypothetical underscores how inapt the defendants' requested protective order is. As they have before, the defendants "offer only bare speculation," Dkt. 123 at 10, and that does not satisfy their burden.

## III.    Conclusion

Mr. Pizzuto respectfully asks the Court to deny the defendants' motion to vacate the notices of deposition, Dkt. 175, for the medical-team leader and the central-line volunteer.

DATED this 21st day of January 2025.


    /s/ Jonah J. Horwitz
    Jonah J. Horwitz
    Christopher M. Sanchez
    FEDERAL DEFENDER SERVICES OF IDAHO

RESPONSE TO MOTION TO VACATE NOTICES OF DEPOSITION – Page 20

/s/ Stanley J. Panikowski
Stanley J. Panikowski
Sarah E. Kalman
DLA PIPER LLP (US)

COUNSEL FOR PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of January 2025, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF system, which is designed to send a

Notice of Electronic Filing to persons including the following:

Kristina Schindele
kscchind@idoc.idaho.gov

Mary Karin Magnelli
kmagnell@idoc.idaho.gov

Michael J. Elia
mje@melawfirm.net

Tanner J. Smith
tanner@melawfirm.net

/s/ L. Hollis Ruggieri
L. Hollis Ruggieri

RESPONSE TO MOTION TO VACATE NOTICES OF DEPOSITION – Page 21