*Gerald Ross Pizzuto v. Josh Tewalt,* Case No. 1:21-cv-359-BLW
Filed in Support of Plaintiff's Response to
Motion to Vacate Notices of Deposition [Dkt. 175]

# EXHIBIT 1

**(Transcript of Deposition of Tim Richardson, Oct. 18, 2024)**

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                     FOR THE DISTRICT OF IDAHO

 3

 4      GERALD ROSS PIZZUTO, JR.,         )

 5              Plaintiff,                ) Case No. 1:21-cv-00359-BLW

 6      vs.                               )      ~~CONFIDENTIAL~~

 7      JOSH TEWALT, et al.,              )  ~~UNREDACTED VERSION~~

 8              Defendants.               )

 9      _____ )

10

11            COMPLETE UNREDACTED TRANSCRIPT OF THE

12          VIDEOTAPED DEPOSITION OF TIM RICHARDSON

13                  TAKEN OCTOBER 18, 2024

14

15

16              CONTAINS CONFIDENTIAL PORTIONS

17         (See Index for complete list of confidential

18                      designations)

19

20

21      REPORTED BY:

22      ANDREA L. CHECK, CSR No. 748, RPR, CRR

23      Notary Public

24

25

                                              Page 1
```

| | |
|---|---|
| 1 THE VIDEOTAPED DEPOSITION OF TIM RICHARDSON | 1 I N D E X |
| 2 was taken on behalf of the Plaintiff at the offices of | 2 TESTIMONY OF TIM RICHARDSON PAGE |
| 3 Capital Habeas Unit of Federal Defender Services of | 3 Examination by Mr. Horwitz 10 |
| 4 Idaho, 702 West Idaho Street, Suite 900, Boise, Idaho, | 4 |
| 5 commencing at 9:36 a.m. on October 18, 2024, before | 5 E X H I B I T S |
| 6 Andrea L. Check, Certified Shorthand Reporter and Notary | 6 NO. DESCRIPTION PAGE |
| 7 Public within and for the State of Idaho, in the | 7 Exhibit 1 Email from Ross Castleton to 29 |
| 8 above-entitled matter. | 8 Timothy Richardson and |
| 9 APPEARANCES: | 9 Amanda Gentry, Dated 10-21-21, |
| 10 For the Plaintiff: | 10 IDOC00006061 and 9 098665 |
| 11 Federal Defender Services of Idaho | 11 Exhibit 2 Idaho Department of Correction 31 |
| 12 BY MR. JONAH J. HORWITZ, ESQ | 12 Standard Operating Procedure |
| 13 & MR. CHRISTOPHER M. SANCHEZ, ESQ. | 13 135.02.01.001, Version 4 |
| 14 702 West Idaho Street, Suite 900 | 14 Exhibit 3 Training Agenda Medical Team, 34 |
| 15 Boise, Idaho 83702 | 15 August 2022, 9 087457 - 9 087458 |
| 16 jonah_horwitz@fd.org | 16 Exhibit 4 Training Agenda Medical Team, 35 |
| 17 christopher_m_sanchez@fd.org | 17 October 25th, 2022, IDOC00008683 - |
| 18 | 18 IDOC00008684 and 9 101990 - |
| 19 | 19 9 101991 |
| 20 | 20 Exhibit 5 Training Agenda Medical Team, 36 |
| 21 | 21 November 2022, 9 099271 - 9 099272 |
| 22 | 22 Exhibit 6 Training Agenda Medical Team, 38 |
| 23 | 23 May 10, 2023, IDOC00012329 - |
| 24 | 24 IDOC00012330 and 9 105855 - |
| 25 Page 2 | 25 9 105856 Page 4 |

**Page 2 / Page 4 Index and Exhibits**

| | |
|---|---|
| 1 A P P E A R A N C E S (Continued) | 1 E X H I B I T S (Continued) |
| 2 | 2 |
| 3 For the Defendants: | 3 Exhibit 7 Training Agenda Medical Team, 41 |
| 4 Office of the Attorney General | 4 June 22, 2023 (Confidential - |
| 5 BY MS. KRISTINA M. SCHINDELE, ESQ. | 5 Attorneys' Eyes Only) |
| 6 1299 North Orchard Street, Suite 110 | 6 Exhibit 8 Chain of Custody Forms 47 |
| 7 Boise, Idaho 83706 | 7 Exhibit 9 DEA Form-222, 9 111767 58 |
| 8 krschind@idoc.idaho.gov | 8 Exhibit 10 Plaintiff's Sixth Set of Requests 60 |
| 9 & | 9 for Admission |
| 10 Moore Elia & Kraft, LLP | 10 Exhibit 11 Defendants' Responses to 63 |
| 11 BY MR. TANNER J. SMITH, ESQ. | 11 Plaintiff's Sixth Request for |
| 12 Key Financial Center | 12 Admissions, 9 111620 - 9 111630 |
| 13 702 West Idaho Street, Suite 800 | 13 Exhibit 12 Handwritten Temperature Log, 64 |
| 14 P.O. Box 6756 | 14 October 11, 2023 through June 28, |
| 15 Boise, Idaho 83707 | 15 2024, 09 118063 - 09 118067 |
| 16 tanner@melawfirm.net | 16 Exhibit 13 Handwritten Temperature Logs, 71 |
| 17 Also Present: | 17 February 19, 2024 through June 28, |
| 18 Chris Ennis, Videographer | 18 2024, 09 118060 - 09 118062 |
| 19 Hollis Ruggieri | 19 Exhibit 14 Handwritten Temperature Log, 71 |
| 20 Christine Hanley | 20 09 118070 - 09 118071 |
| 21 Beryl Price | 21 Exhibit 15 Idaho Department of Correction 86 |
| 22 Katie Fidrych | 22 Purchase Order (Confidential) |
| 23 | 23 Exhibit 16 Certificate of Analysis 89 |
| 24 | 24 Exhibit 17 Post Log Book, 9 116754 - 9 116769 90 |
| 25 Page 3 | 25 (Confidential) Page 5 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

09 118507

| | |
|---|---|
| 1     E X H I B I T S (Continued) | 1     MR. HORWITZ: That's all -- those are all the |

EXHIBITS (Continued)

1

2

3  Exhibit 18  Idaho Department of Correction   94

4          Execution Chemicals Preparation

5          and Administration

6  Exhibit 19  Handwritten Peripheral IV Attempt  106

7          Log, 9 116746 - 9 116748

8  Exhibit 20  Handwritten Expense Log,    136

9          IDOC00005219 - IDOC00005221 and

10          9 097804 - 9 097806

11

12

13

14       CONFIDENTIAL DESIGNATIONS

15         40:24 through 47:12

16         86:22 through 89:14

17         90:17 through 94:12

18         106:13 through 136:1

19

20

21

22

23

24

25

Page 6

---

PROCEEDINGS

1

2

3      VIDEOGRAPHER: So the camera is rolling, and

4  we are on the record. Today's date is October 18th,

5  2024. The time is 9:36 a.m. For the record, this is

6  the videotaped deposition of Tim Richardson. It's taken

7  by the plaintiffs in the matter of Pizzuto versus

8  Tewalt, et al. It's Case No. 1:21-cv-00359-BLW. It's

9  in the United States District Court for the District of

10  Idaho.

11      The videotaped deposition is being held at the

12  offices of Capital Habeas Unit of Federal Defender

13  Services of Idaho. And the videotaped deposition is

14  being recorded by Chris Ennis and reported by

15  Andrea Check of Veritext Idaho.

16      And if counsel will please state their

17  appearances and any stipulations for the record.

18      MR. HORWITZ: Yes. I'm Jonah Horwitz. I

19  represent the plaintiff, Gerald Pizzuto.

20      MR. SANCHEZ: Christopher Sanchez for Gerald

21  Pizzuto.

22      MS. SCHINDELE: Kristina Schindele on behalf

23  of the Department of Correction.

24      MR. SMITH: And Tanner Smith, Moore Elia Kraft

25  & Stacey for the Department of Correction.

Page 7

---

1      MR. HORWITZ: That's all -- those are all the

2  attorneys --

3      VIDEOGRAPHER: Okay.

4      MR. HORWITZ: -- yeah.

5      VIDEOGRAPHER: Okay. Great. And if the court

6  reporter will please swear the witness.

7      COURT REPORTER: Okay. Will you raise your

8  right hand.

9

10      TIM RICHARDSON,

11  first duly sworn to tell the truth relating to said

12  cause, testified as follows:

13

14      MR. HORWITZ: Okay. So I think we're going to

15  start by talking about the process for objections. And

16  our understanding is that if the defendants have a

17  secrecy-type objection, they'll make the objection,

18  they'll instruct Warden Richardson not to answer the

19  question, we'll move on to other questions.

20      And our understanding is that in that way the

21  secrecy dispute will be preserved, and Mr. Pizzuto will

22  be able to file a motion to compel in the federal

23  district court. If it's granted, the deposition would

24  be reopened for purposes of Warden Richardson answering

25  those particular questions.

Page 8

---

1      MS. SCHINDELE: The specific objection that we

2  are talking about is going to be referred to by defense

3  counsel as the "confidentiality objection." It is a

4  very lengthy objection, so I'm going to preserve that

5  for the record now, and throughout the deposition we

6  will just simplify it by using the words

7  "confidentiality objection."

8      That objection is that the defendants object

9  that the requested information is unreasonable under

10  Federal Rule of Civil Procedure 26. We object to the

11  disclosure of this information, as Federal Rule of Civil

12  Procedure 26(b) provides that disclosure of a -- of

13  information that could produce an undue burden on the

14  Department that is -- that involves immaterial or

15  irrelevant information, or is not -- is -- sorry, I lost

16  my language here -- or is disproportional to the needs

17  of the case, and that the risk and burden on the

18  defendants outweighs the benefit to Plaintiff Pizzuto.

19      So the objection will be pursuant to 26 --

20  Rule 26(b) and would be subject to a request for a

21  protective order under Federal Rule of Civil Procedure

22  26(c). Thank you.

23      MR. HORWITZ: Thank you.

24      MR. SMITH: And, sorry, just to add to that, I

25  may say "secrecy" or something along those lines, but as

Page 9

| | |
|---|---|
| 1 long as we all understand that's one and the same. | 1 before answering, and I'll do my best to rephrase it or |
| 2 MR. HORWITZ: Yeah. Yeah. Absolutely. We | 2 ask it in a better way. |
| 3 understand. Thank you. | 3 A. Okay. |
| 4 Okay. Why don't we go around the room and | 4 Q. But if you don't tell me that, I'll assume |
| 5 have the support staff introduce themselves just so the | 5 you're understanding the question. |
| 6 record is clear. | 6 And is there anything today that would be a |
| 7 MS. FIDRYCH: Katie Fidrych. | 7 problem for you testifying, sickness, medication, |
| 8 MR. HORWITZ: And if you could say just your | 8 anything like that? |
| 9 role at the office. | 9 A. No. |
| 10 MS. FIDRYCH: I'm a mitigation officer | 10 Q. Okay. If you need a break, just let us know. |
| 11 investigator for the CHU. | 11 You know, anytime is fine. The only thing I would ask |
| 12 MS. PRICE: I'm Beryl Price. I am an | 12 is that if there's a question that's on the table, that |
| 13 investigator with the CHU. | 13 you finish responding to it before we take the break. |
| 14 MR. RUGGIERI: I'm Hollis Ruggieri. I'm a | 14 A. Great. |
| 15 paralegal with the CHU. | 15 Q. And if anyone else needs a break, you know, |
| 16 MS. HANLEY: And I'm Christine Hanley. I'm an | 16 feel free to chime in. |
| 17 investigator with the CHU. | 17 Okay. In terms of your preparation for today, |
| 18 MR. HORWITZ: Okay. Thank you. | 18 can you give me an idea of what you did to get ready for |
| 19 | 19 the deposition? |
| 20 EXAMINATION | 20 A. Had a meeting -- I believe it was Wednesday -- |
| 21 QUESTIONS BY MR. HORWITZ: | 21 at IDOC Central Office, with counsel present. They just |
| 22 Q. Good morning, Warden. | 22 kind of briefed me on what to expect, as in, that you're |
| 23 A. Good morning. | 23 going to be asking questions, you know, the same thing, |
| 24 Q. Is "Warden" the best term to address you by? | 24 answer a "yes"/answer a "no." And it was a pretty short |
| 25 A. "Tim's" fine -- | 25 meeting, just kind of discussed what, potentially, could |
| Page 10 | Page 12 |

| | |
|---|---|
| 1 Q. Okay. | 1 come up, and what could not, and a little preparation. |
| 2 A. -- or "Warden," however you want to. | 2 Q. Got it. And was it just counsel that was |
| 3 Q. All right. | 3 present at that meeting? |
| 4 A. Yeah. | 4 A. Yes. |
| 5 Q. Sounds good. I appreciate it. | 5 Q. Okay. Did you review any documents in |
| 6 Have you been deposed before? | 6 preparation for today? |
| 7 A. Yes, I have. | 7 A. I did. |
| 8 Q. Could you give me a sense of what -- how many | 8 Q. What did you review? |
| 9 times, what sort of cases they were? | 9 A. IDOC -- the SOP, execution SOP. I reviewed |
| 10 A. I believe once or twice. The last one I | 10 the temperature logs. I reviewed chain of custody logs. |
| 11 recall would have been for the Balla -- Balla case. | 11 And I believe that's it. |
| 12 Q. Okay. So you probably know the drill, but | 12 Q. When you say "the SOP," which SOP was that? |
| 13 I'll just run through, kind of, the formalities just so | 13 A. I knew you were going to ask me the number. |
| 14 we're on the same page. | 14 It's 135; is that right? Never mind. |
| 15 So if I ask you a "yes" or "no" question, I | 15 Q. Yeah, the -- |
| 16 think it would be best if you give a "yes" or "no" | 16 A. IDOC policy on execution. |
| 17 answer just to start, and I'll follow up if I need to. | 17 Q. Right. |
| 18 And I will want a verbal response to any | 18 A. I don't remember the exact number. |
| 19 question. You know, no headshaking, that sort of thing. | 19 Q. Sure. Was it the -- |
| 20 A. Perfect. | 20 A. I know it, but it's not coming to mind. |
| 21 Q. And please, if you can, try to wait until each | 21 Q. Yeah. Yeah. That makes sense. What I'm more |
| 22 question is finished, just so the record is clear, and | 22 curious about is, was it the most recently approved one? |
| 23 then you can begin responding. | 23 A. No, it was not. It would have been the |
| 24 If you ever are not following me or having | 24 previous one. |
| 25 trouble understanding a question, just ask to clarify | 25 Q. Okay. |
| Page 11 | Page 13 |

| | |
|---|---|
| 1  A. I have not reviewed the new one for 2024. | 1  State Correctional Center. |
| 2  Q. Got it.  Did you also review the chemicals | 2  Q. Okay.  Let's go one more. |
| 3  preparation document? | 3  A. All right.  From 2011, I believe, to 2014 I |
| 4  A. I did, yes. | 4  was a lieutenant at the Idaho Maximum Security |
| 5  Q. Did you bring any documents with you? | 5  Institution. |
| 6  A. I did not. | 6  Q. And the one before that? |
| 7  Q. Okay.  Thank you for that. | 7  A. 2011-ish to 2005 I was the sergeant at the |
| 8  I'd like to turn to your background a little | 8  Idaho Maximum Security Institution. |
| 9  bit.  Can you tell me what your educational experience | 9  Q. Okay.  One more. |
| 10  has been? | 10  A. And then from 2005 to 2000 I was a |
| 11  A. High school, high school diploma. | 11  correctional officer at the Idaho State Correctional |
| 12  Q. Okay.  Have you had any training or education | 12  Institution. |
| 13  in the medical field? | 13  Q. I'm sorry, can you say the starting year |
| 14  A. I have not. | 14  again? |
| 15  Q. What about in the pharmaceutical area? | 15  A. I went from 2000 to 2005 -- |
| 16  A. I have not. | 16  Q. Okay. |
| 17  Q. I want to go through your job history, and I'd | 17  A. -- as a correctional officer at the Idaho |
| 18  like to start at the present and work backwards, if we | 18  State Correctional Institution, which July 10th, 2000, |
| 19  can. | 19  was my hire date with IDOC. |
| 20  A. Certainly. | 20  Q. Okay.  And was that your first job out of high |
| 21  Q. So what's your current position? | 21  school, or did you have work outside of corrections? |
| 22  A. Warden at the Idaho Department of Correction. | 22  A. I've worked outside of corrections.  I worked |
| 23  Q. At what institution? | 23  for Boise Cascade for a while.  I was in the Army for a |
| 24  A. Mountain View Transformation Center. | 24  period.  And then before that high school. |
| 25  Q. And what was your role previous to that? | 25  Q. What was your role in the Army? |
| *Page 14* | *Page 16* |

| | |
|---|---|
| 1  A. Warden at the Idaho Maximum Security | 1  A. Patriot missiles. |
| 2  Institution. | 2  Q. Where were you stationed? |
| 3  Q. When -- and what was the period of time where | 3  A. Fort Bliss, El Paso, Texas. |
| 4  you were warden at IMSI? | 4  Q. And what period of time was that that you were |
| 5  A. It was either September or October of 2000 -- | 5  in the military? |
| 6  or 2021 to -- I think it was May or June of '24, this | 6  A. '90 -- it was two years, so '98 to 2000. |
| 7  year. | 7  Q. And I don't believe I've asked this:  What |
| 8  Q. And since that time you've been warden at your | 8  year did you graduate from high school? |
| 9  current facility? | 9  A. 1995. |
| 10  A. Yes. | 10  Q. Okay.  So just as an overview of your career |
| 11  Q. Okay.  What about prior to the job as warden | 11  at IDOC, it seems like it's fair to say you've bounced |
| 12  at IMSI? | 12  back and forth between institutions with some of -- with |
| 13  A. Prior to the job there, I was the warden -- or | 13  some different roles at IMSI over time? |
| 14  deputy warden, excuse me, at the Idaho State | 14  A. Yes. |
| 15  Correctional Institution from 20 -- I want to say | 15  Q. Okay.  And you mentioned the Balla deposition. |
| 16  2017-ish to 2021. | 16  Is there another deposition that you've had that you can |
| 17  Q. And what about prior to 2017? | 17  recall the case? |
| 18  A. Prior to that I was a deputy warden of | 18  A. I believe there was another deposition, but, |
| 19  security at the Idaho Maximum Security Institution | 19  no, I do not recall the case. |
| 20  from -- during 2017.  I was there about ten months and | 20  Q. Okay.  What about trial testimony, have you |
| 21  transferred. | 21  ever -- or in-court testimony? |
| 22  Q. Okay.  Let's go one step back from there. | 22  A. Yes.  Twice, I believe.  The first one I don't |
| 23  A. One step back from 2017 -- | 23  recall, the second one would have been Balla at the |
| 24  Q. Right. | 24  federal courthouse. |
| 25  A. -- to 2014, I was the captain at the Idaho | 25  Q. Okay.  Okay.  I'd like to move on to the 2011 |
| *Page 15* | *Page 17* |

1  and 2012 executions in Idaho, so Paul Rhoades and
2  Richard Leavitt.
3       And starting with Rhoades, did you have any
4  involvement in that execution?
5       A.  No direct involvement, no.
6       Q.  Did you have any indirect involvement?
7       A.  I was at the facility during the period of
8  both executions.
9       Q.  And did you come into contact with the
10  execution in any way, even if it was indirect?
11      A.  No.  I was a shift commander during both of
12  those.
13      Q.  Did you volunteer to assist with either of
14  those executions?
15      A.  No.
16      Q.  Were you asked to assist by anyone?
17      A.  No.
18      Q.  Okay.  I'd like to ask you some questions
19  about execution training.
20      And I'll start by asking:  For all the time
21  before you were the warden at IMSI, did you have any
22  involvement with the execution trainings?
23      A.  No.
24      Q.  When did you start attending those, if you can
25  recall?

Page 18

1       A.  When I was promoted to warden at IMSI.
2       Q.  As soon as you became warden --
3       A.  Yes.
4       Q.  -- you started attending?
5       Do you know how the frequency of those
6  trainings was determined, who was in charge of calling
7  for the trainings, basically?
8       A.  So if I'm understanding your question, I think
9  I'll answer it -- the best I can answer it is how those
10  trainings were established from when they -- when we
11  started them, clear back prior to the 2011 and 2012
12  executions, I don't know.  I know that they were
13  established when I became warden as monthly trainings,
14  so I just followed what was already established when I
15  became warden.
16      Q.  Got it.  Would that frequency ever change, or
17  would they continue to be monthly no matter the
18  circumstances?
19      A.  Monthly unless they were -- unless they were
20  altered at the direction of the Idaho Department of
21  Correction, Director Tewalt.  Our SOP is very clear, it
22  says that he's the only one that can deviate from that.
23      Q.  When would he deviate from that?
24      A.  I guess whenever he sees fit, to give you a
25  short answer, or if the chief of prisons or somebody

Page 19

1  requested.  I wasn't involved in those conversations to
2  deviate from our normal training schedule.
3       Q.  Do you remember deviations happening?
4       A.  No.  We trained monthly, every month.  There
5  were some months we trained twice in a month, during
6  holiday season, so that we got our two trainings done.
7  I believe that was in December -- it would have been in
8  December.
9       Q.  What about when a death warrant was issued,
10  would that affect the frequency of the trainings?
11      A.  Yes.
12      Q.  How so?
13      A.  Yes.  We would go to once a week for the next
14  30 days, except for the 48 hours leading to the
15  execution day we would train four times.
16      Q.  And would that change be at the direction of
17  Mr. Tewalt, or who would make that decision?
18      A.  To deviate from that?
19      Q.  Yeah, to go to once a week.
20      A.  So that's established in policy, SOP.  But any
21  deviations, yes, would be at the direction -- or
22  discretion of the director.
23      Q.  Can you give me a sense of what your role was
24  at the trainings just in general terms?
25      A.  Yeah.  So we would -- you know, during the

Page 20

1  training my job was to guide the escort team, if you
2  will, through their procedures, with role players, and
3  then also read the worksheet that we have that we --
4  that outlines what we say and what steps we take during
5  the execution.
6       Q.  What sort of interactions would there be
7  between you and the -- so I want to make sure we're
8  clear about terminology.
9       A.  Certainly.
10      Q.  So the phrase that I've seen, "SOP" is medical
11  team.  So we -- I think you have a sense of what that
12  refers to?
13      A.  I do.
14      Q.  Okay.  So would you interact with the medical
15  team members at the trainings?
16      A.  Yes.
17      Q.  What would that interaction be like?
18      A.  It would kind of just be a greeting -- let
19  them in, greet them at the door, hello, be in the back
20  talking to them about various things, interacting with
21  them when they would enter the chamber to prepared the
22  condemned.
23      Q.  And would you be giving them instruction --
24      A.  No.
25      Q.  -- on the training?

Page 21

1    Who would give them instruction, if anyone?
2    A. That would be the administrative team, deputy
3  chief of prisons that's in the back.
4    Q. The deputy chief of prisons, is that someone
5  who was the same person throughout your time as warden
6  at IMSI?
7    A. No.
8    Q. Who -- can you tell me who it was?
9    A. Yeah. So the two -- the two that were --
10  would have been in charge of the medical team, the first
11  one was Deputy Chief Ross Castleton, and then it
12  transferred to Deputy Chief Liz Neville.
13    Q. Do you know when that transfer happened?
14    A. I would have to speculate.
15    Q. Sure. Would you interact with that person,
16  Mr. Castleton and Ms. Neville, during the trainings?
17    A. Yes.
18    Q. What would that interaction look like?
19    A. Just setting, you know, guidelines for the
20  training. They would tell me when their medical team
21  was prepared. They would tell me to get my escort team
22  prepared. So, basically, that deputy chief and I would
23  coordinate so that the escort team and the medical team
24  could pair up at the appropriate times.
25    Q. And can you tell me what the escort team would

Page 22

1  do during the training?
2    A. Yes. So the escort team would do, simply,
3  everything that we do the day of an execution. So they
4  would -- we would -- they would be in there to prepare
5  the condemned to be escorted into the chamber, then they
6  would conduct that escort into the chamber. They would
7  secure the condemned -- during trainings, a role player,
8  obviously -- to the table, and then they would exit the
9  room.
10    Q. Do you know why Mr. Castleton transitioned out
11  of that role?
12    A. He retired from the Department of Correction.
13    Q. So you referred to a role player just now, and
14  that's a person who's sort of acting as the inmate?
15    A. Correct as a condemned, yes.
16    Q. Who would that person be?
17    A. Volunteers.
18    Q. And would they be -- would they be on one of
19  those teams, either the escort team or the medical team,
20  or outside of those teams?
21    A. There has been volunteers from the escort
22  team, yes.
23    Q. And also volunteers who are not on the teams?
24    A. Yes.
25    Q. And if they're not on the teams, are they IDOC

Page 23

1  staff?
2    A. Yes.
3    Q. Is there a process for choosing that person
4  who is the role player?
5    A. There is not a formal process, no. It's at
6  the discretion of the warden.
7    Q. So there's a person involved in the process
8  that we refer to as the "rescue doctor."
9    Do you know who that is?
10    Or, I guess, all I'm asking at first is: Are
11  you familiar with that role, "the rescue doctor"? Does
12  that phrase make sense to you?
13    A. Familiar with the role, do not know the
14  person.
15    Q. Okay. Would you interact with that person at
16  the trainings?
17    A. I have been around that person. I guess you
18  could say I would interact. So I've seen the person,
19  but don't know their name, anything of that sort.
20    Q. What would they do at the trainings?
21    A. I do not know.
22    Q. Would you see them at the training?
23    A. I would see them at the training, but once the
24  training started, I was not in the back room with the
25  medical team.

Page 24

1    Q. Okay.
2    A. That would have been the deputy chief.
3    Q. Okay. And the rescue doctor is in that back
4  room?
5    A. Correct.
6    Q. And by "back room," are we -- there's a room
7  that we sometimes call "the chemical room" where the --
8    A. Yes, that's the medical team staging area.
9    Q. Okay.
10    A. And then you have the room off adjacent to
11  that, the small room.
12    Q. Right.
13    A. I don't know if you've been back there, but
14  it's monitors and has the rescue cart right there.
15  That's where the rescue doctor would be staged during
16  training and/or an actual event.
17    Q. In the small room?
18    A. In that small room, yes.
19    Q. Got it. Can you tell me who was on the admin
20  team?
21    A. It would have been myself, Deputy Chief Liz
22  Neville, and Chief of Prisons Chad Page.
23    Q. What was Mr. Page's role? What were his
24  responsibilities on the team?
25    A. So this role, when we are under an active

Page 25

7 (Pages 22 - 25)

1    death warrant, is he is the incident commander when we
2    stand at the incident command system. And then he is a
3    liaison to -- for me to contact -- or the liaison
4    between me and the director. If I need some contacting
5    or needed some questions answered or advice or anything
6    I would need, generally, I would run it through him. Or
7    any deviations from SOP that I thought were necessary,
8    or any type of -- anything I wanted to implement, you
9    could say, I would run it through the chief of prisons
10   prior.
11       Q. What were Ms. Neville's responsibilities?
12       A. The medical team; that is her sole
13   responsibility, is to make sure that she trains the
14   medical team.
15       Q. Would Director Tewalt attend the trainings?
16       A. He has trained -- I mean, excuse me -- has
17   attended the trainings.
18       Q. How frequently?
19       A. I would say every couple, every two or three
20   he would be there, you know, except for when we're under
21   an active death warrant, then he's there for every
22   training.
23       Q. Is there anyone else who would attend that we
24   haven't mentioned yet?
25       A. You've had -- our deputy director has attended

Page 26

1        A. Yes.
2        Q. What sort of interactions do you have?
3        A. The same as the medical team, let them in,
4    talk to them, tell them where they're staged, give them
5    direction on where they need to be, potentially, when
6    we're starting, and then after that it's all the deputy
7    chief that directs them.
8        Q. Where is the coroner staged?
9        A. The coroner is always staged in the same room
10   that the rescue doctor stages.
11       Q. The smaller room?
12       A. The smaller room, correct.
13       Q. Did you take notes at the trainings?
14       A. No.
15       Q. Never?
16       A. [Witness shakes head.]
17       Q. There is a -- I think we'll look at some of
18   them in particular, but just generally there's a chart
19   that we see associated with the trainings that has
20   spaces for the chemicals and typically some notations
21   about the administration of the chemicals.
22           Do you have an idea of what I'm --
23       A. I do not.
24       Q. -- referring to? Okay. Well, we'll wait
25   until we get there.

Page 28

1    trainings, our soon-to-be-former chief of staff,
2    Christine Starr, has attended. You've had various
3    wardens and deputy wardens and various captains.
4    Basically, facility leadership have -- other facilities'
5    leadership has attended trainings, yes.
6        Q. How is that determined which of those people
7    come?
8        A. So, generally, when they come, it's a training
9    when we are under the 30-day notice, and we generally
10   have them staged in the condemned and State witnesses
11   state -- rooms, just as a mock, as you will, as it
12   could, potentially, be the day of.
13       Q. And those people that are invited, is that
14   because they'll have some role at the execution itself?
15       A. That, I'm uncertain of. So our deputy
16   director and our chief of staff, I'm not sure what roles
17   they assumed during execution period. The reason I say
18   that is I'm not involved. I'm not in the incident
19   command structure, as I'm solely dedicated to the
20   condemned and the training of the processes for 30 days
21   leading up to the execution.
22       Q. What about the coroner, is there someone from
23   the coroner's office who attends the training?
24       A. Yes.
25       Q. Do you interact with that person?

Page 27

1            There is an inmate's name that's typically at
2    the top of the agendas for the training; is that
3    something you're familiar with?
4        A. No. I'm not even familiar with an agenda for
5    the training.
6        Q. Okay. Do you know who was involved in
7    preparing those agendas?
8        A. I don't even know about an agenda.
9            (Exhibit 1 marked.)
10       Q. (BY MR. HORWITZ) Okay. I'd like to turn to
11   Exhibit 1.
12           Do you have that in front of you? I think
13   it's just beneath the index there.
14       A. This one right here?
15       Q. Yeah, the email. And does everyone else have
16   exhibits who needs one? Okay.
17           So Exhibit 1 is an email from Ross Castleton
18   to you and Amanda Gentry.
19       A. Uh-huh.
20       Q. And it says -- it's dated October 21st, 2021.
21   It says, "On November 1, I have someone that will be
22   observing our medical team training. They will be at
23   the front lobby...If one of you could be there and
24   escort him down."
25           Do you recall who that person was?

Page 29

1     A.  I do not know who this person was.

2     Q.  Okay.

3     A.  I do recall them coming, but I do not recall

4  who the person was.

5     Q.  Okay.  In terms of your recollection of them

6  coming, did you know who they were at that time, or --

7  maybe that's not a clear question.

8       But when you -- as far as you recall, when you

9  saw that person at that time, was it a person you were

10  familiar with?

11     A.  Yes.

12     Q.  Okay.  Do you know what their role was?

13     A.  Yes.

14     Q.  Can you tell me what their role was?

15     A.  Potential medical team member.

16     Q.  And why were they coming?

17     A.  My assumption is that -- I'm guessing that

18  there was a medical team opening at that time.  I could

19  be incorrect with that, but I do know that that's why

20  this individual came, was to observe it.

21     Q.  To observe it to see if they would join the

22  medical team themselves?

23     A.  Yes.

24     Q.  Do you recall any other interactions you had

25  with that person?

Page 30

1     A.  No.

2       (Exhibit 2 marked.)

3     Q.  (BY MR. HORWITZ)  Okay.  Okay.  I've got some

4  questions about the SOP that you mentioned earlier.  So

5  this is Exhibit 2, and this is SOP Control No.

6  135.02.01.001, Version 4.0.  And it was approved on

7  March 30th, 2021.  And I'll just refer to it as "the

8  SOP" and we'll --

9     A.  Perfect.

10     Q.  Okay.  So the first thing I wanted to ask you

11  about is on page 8.

12       So at the very top there's some text that

13  appears after the word "Note."  And it says, "Licensing

14  and certification, and criminal history reviews will be

15  conducted prior to placement on the Medical Team,

16  annually after placement on the Medical Team and after

17  issuance of a death warrant."

18       Do you see the text that I'm --

19     A.  I do.

20     Q.  -- describing?

21       These reviews, is that something that you were

22  involved in?

23     A.  I was not, no.

24     Q.  Do you know who was involved in them?

25     A.  I do not, no.

Page 31

1     Q.  And do you know how often they took place or

2  how they were scheduled?

3     A.  I do not, no.

4     Q.  Okay.  Okay.  In the same exhibit, on

5  page 20 -- sorry, give me just a second to find -- so

6  the bullet point that's five up from the bottom begins

7  with, "Confirm with all IDOC South Boise Complex

8  facility Wardens that the training schedule has been

9  activated ensuring that staff members participating in

10  the execution have received adequate training, written

11  instruction, and practice, and that all training has

12  been documented."

13       Do you see the text that I read?

14     A.  I do.

15     Q.  Is that something that you -- this process

16  here, is that something you were involved in?

17     A.  Was not.

18     Q.  So the reference here to "all IDOC South Boise

19  Complex facility Wardens," would that include the IMSI

20  warden?

21     A.  Most likely, yes, but not myself.

22     Q.  Okay.  Can you tell me why?

23     A.  As outlined in SOP 135, once a death warrant

24  is issued, within 24 hours the warden is relieved of his

25  duties for the next 30 days to focus on the task at

Page 32

1  hand.

2     Q.  And so the person who becomes the acting

3  warden -- is that the appropriate phrase?

4     A.  Correct.

5     Q.  The person who becomes the acting warden, is

6  that the person who would have the role that's described

7  in this bullet point, do you think?

8     A.  As the way this is described, I would assume

9  so, but I can't give you a definite "yes" or "no"

10  because this is not a task I'm tasked with.  As it

11  states, it's the deputy chief of the division of prisons

12  that's tasked with taking care of that process.

13     Q.  Okay.  During the death warrants that were

14  issued while you were warden at IMSI, who would that

15  person have been, the acting warden?

16     A.  Deputy Warden Dagoberto Martinez.

17     Q.  For each of the warrants?

18     A.  Yes.  I believe he -- I believe he did all

19  four times, I believe.  The four death warrants that

20  I've served, yes.

21     Q.  And was that his title, deputy chief of the

22  division of prisons?

23     A.  No, deputy warden of security at the Idaho

24  Maximum Security Institution.

25     Q.  Okay.

Page 33

9 (Pages 30 - 33)

1    A. If I said that wrong, I apologize.
2    Q. No, no. I think that was my mistake. Thank
3    you.
4       (Exhibit 3 marked.)
5    Q. (BY MR. HORWITZ) Okay. Let's go to
6    Exhibit 3. So this is an example of what I referred to
7    earlier as a training agenda.
8       Is this the type of document that you ever --
9    have you ever seen these?
10   A. Not until today.
11   Q. Okay. The section where it says,
12   "Administrative Team, and then lists four people, so it
13   lists Ms. Neville, Ms. Gentry, Mr. Page, and then you,
14   and there's an "X" next to your name, but that's not an
15   "X" that you would have made?
16   A. No.
17      MR. SMITH: Is that a "no"?
18      THE WITNESS: No.
19   Q. (BY MR. HORWITZ) And maybe you've already
20   answered this, but just to be clear, you don't know who
21   did prepare these agendas?
22   A. I do not, no.
23   Q. Okay. Well, this is probably just asking the
24   obvious, but, again, in the interest of
25   comprehensiveness, if you turn the page of this exhibit,
                                                Page 34

1    Q. Okay. And you weren't involved in the
2    decision-making about -- and I guess I should say
3    "chart" instead of "method." You weren't involved in
4    the decision-making about Chart 4 being used as opposed
5    to a different chart?
6    A. No.
7    Q. Do you know who was making that decision?
8    A. My assumption would have been a director.
9    Q. Okay. What would -- what's that assumption
10   based on?
11   A. The director is the one who decides what
12   method's being used and what chemicals they can -- the
13   Department can obtain.
14      (Exhibit 5 marked.)
15   Q. (BY MR. HORWITZ) Got it. Okay. Exhibit 5 is
16   another training agenda. This is from November 2022,
17   and if you look at the list -- the numbered list at the
18   bottom of the page, Item 6 says, "Review credentials."
19      Do you know what that would have been
20   referring to?
21   A. No, I do not.
22   Q. And do you know who would have been reviewing
23   the credentials?
24   A. I do not.
25   Q. Or who would have written this list?
                                                Page 36

1    there's a document that's called "Sequence of Chemical
2    Form."
3       Do you see what I'm talking about?
4    A. Yes.
5    Q. Is this something you've ever seen?
6    A. No.
7    Q. Okay. And you don't know who filled -- who
8    would have been filling these out?
9    A. No.
10      (Exhibit 4 marked.)
11   Q. (BY MR. HORWITZ) Okay. So I'll still refer
12   to these exhibits, understanding that they're new to
13   you, but I think they'll be helpful just as a way to ask
14   a few questions.
15      So Exhibit 4 is another training agenda. It's
16   from October 25th, 2022. And one thing I'd like to ask
17   you about with this is on the second page, again the
18   Sequence of Chemical Form, this is using "Chemical Chart
19   4," and the only chemical -- the only drug that appears
20   in this is "Pentobarbital."
21      Did that -- is that something you were aware
22   of during these trainings, what -- which of the methods
23   had been chosen between Method 1, Method 2, Method 3,
24   and Method 4?
25   A. No.
                                                Page 35

1    A. I do not.
2    Q. Okay. And I'll ask the same -- I expect
3    they'll be the same answers, but just to make sure, the
4    item right below "Review credentials" says, "Directives
5    on obligation to report any disqualifying criminal
6    history."
7       Do you know what that referred to?
8    A. I do not.
9    Q. And you don't know who wrote that or who would
10   have been issuing that directive?
11   A. No.
12   Q. Is that something that you were -- were you
13   ever asked about your own criminal history in connection
14   with your role?
15   A. No.
16   Q. Do you have any criminal history?
17   A. I do not.
18   Q. During the trainings, did you observe anyone
19   taking notes?
20   A. No.
21   Q. Did you observe anyone holding paperwork?
22   A. I probably have observed somebody holding
23   paperwork.
24   Q. Do you recall who?
25   A. No.
                                                Page 37

Veritext Legal Solutions
Calendar-Idaho@veritext.com   208-343-4004
09 118515

1    Q.  And do you know what the paperwork might have
2  been?
3    A.  No.
4      (Exhibit 6 marked.)
5    Q.  (BY MR. HORWITZ)  Exhibit 6 is a training
6  agenda from May 10th, 2023.  And if you see, the
7  administrative team is listed here, again, as
8  Ms. Neville, Ms. Gentry, Mr. Page, but this time --
9  Dagoberto, I think, is his full -- first name; is that
10  correct?
11    A.  That's correct.
12    Q.  Mr. Martinez?  And you are not listed.
13      Do you know why that would have been?
14    A.  Assumption, I would have been absent from the
15  facility.
16    Q.  This is a moment in time that you would have
17  been warden of IMSI, May 10th, 2023?
18    A.  Yes.
19    Q.  And so you would have been on the
20  administrative team at that time?
21    A.  Yes.
22    Q.  Okay.  Did you ever have to fill out any
23  paperwork in connection with the trainings?
24    A.  No.
25    Q.  And I may have asked this, but just to make

Page 38

1  sure, if you go to the second page of this training
2  agenda --
3      MR. SMITH:  Exhibit 6.
4      MR. HORWITZ:  Exhibit 6, thank you.
5    Q.  (BY MR. HORWITZ) -- the notations that you
6  see, the handwritten notations, you don't know who would
7  have filled those out?
8    A.  No.
9    Q.  Does the language in them mean anything to
10  you, the sort of medical-looking indications, "NSR,"
11  "ectopy," those phrases?
12    A.  No.
13    Q.  Or the numbers don't have any significance?
14    A.  No.
15    Q.  And do you know who would have insight into
16  what those things mean?
17    A.  I do not.
18    Q.  Okay.  And one thing I think I was trying to
19  ask you about earlier, but without an agenda to look at,
20  is if you look at the top of this same page, it says,
21  "Offender:  Gerald Ross Pizzuto," that's what I was
22  wondering is whether you knew who made the decision
23  about which inmate to put there?
24    A.  I do not know.
25    Q.  Okay.  Did you have an opinion for a given

Page 39

1  training about whether it was successful or not?
2      MR. SMITH:  Object to form.
3      You can answer.
4      THE WITNESS:  Gotcha.  Sorry, I'm not sure --
5  familiar with legal terms.
6    Q.  (BY MR. HORWITZ)  Yeah, it's always safest to
7  wait.
8    A.  If you are asking my opinion, my opinion is
9  that all trainings were successful.
10    Q.  And what would that opinion be based on?
11    A.  Based off how -- you know, what our policies
12  require us to do, what procedures we take during a
13  training, and just in general how well the training
14  went.
15    Q.  And you never saw something that happened at a
16  training that made you think this training has been less
17  than successful?
18    A.  No.
19    Q.  Is there anything -- you know, maybe this is a
20  tough question to answer, but can you think of anything
21  that would have given you that impression?
22    A.  No.
23    Q.  Okay.
24      (The following testimony has been
25      designated confidential.)

Page 40

1      (Exhibit 7 marked.)
2    Q.  (BY MR. HORWITZ)  So Exhibit 7 is a training
3  agenda for June 22nd, 2023, and your name, again,
4  appears on the administrative team.
5      Do you know why it would have reverted back,
6  why you're again listed?
7    A.  Assumption is I was probably on leave, on
8  vacation.
9    Q.  For the preceding agenda?
10    A.  Correct.
11    Q.  And now you've returned?
12    A.  Returned.
13    Q.  Got it.
14      Okay.  I'd like to ask some questions about
15  the medical team.  Do you know how those members are
16  selected?
17    A.  I do not.
18    Q.  Who would know?
19    A.  My assumption would be through the director.
20    Q.  But that's not something you -- you don't have
21  direct knowledge that it's the director?  Or do you have
22  some information that the director is --
23    A.  No direct knowledge or information.  It's just
24  purely an assumption on my part that the director would
25  be the one responsible for that.

Page 41

11 (Pages 38 - 41)

1    Q. Okay. Do you know whether the medical team
2  members initiate the process that leads to their
3  consideration for the team, or what --
4    A. I do not know.
5    Q. Okay. And do you know anything about the
6  interview process for them or the selection --
7    A. No.
8    Q. -- process for them?
9    COURT REPORTER: And I'm going to remind you
10 to remember to wait until he's all the way done with his
11 question before you answer.
12   THE WITNESS: Yeah, thank you.
13   MR. SMITH: Yeah, just try to give him a
14 second in between.
15   THE WITNESS: Gotcha.
16   MR. HORWITZ: It's very unnatural, I
17 understand.
18   Q. (BY MR. HORWITZ) Maybe I already asked this,
19 I don't think that I did, though.
20   Do you know who the -- or did you when you
21 were a warden know who the members of the medical team
22 were?
23   A. No.
24   Q. Did you ever see them in any other context
25 apart from trainings?

1    A. No.
2    Q. Do you know what their qualifications were?
3    A. No.
4    Q. Do you know what kind of documentation was
5  generated in connection with their being selected for
6  the medical team?
7    A. No.
8    Q. And you don't know the medical team leader
9  either --
10   A. No.
11   Q. -- who that person is?
12      And did you see that person outside of
13 training?
14   A. No.
15   Q. At the trainings, did you know who the medical
16 team leader was?
17   A. Yes.
18   Q. How did you know?
19   A. By face.
20   Q. And how did you know that they were the
21 medical team leader?
22   A. Just through training, working with them.
23   Q. I guess what I'm trying to get at is what
24 about -- I mean, was it explicitly discussed at those
25 trainings that they were the medical team leader, or

1  were they doing things that made it clear to you that
2  they were the medical team leader?
3    A. I would say expressed to me that that was the
4  medical team leader. I don't have the knowledge of what
5  they're doing back there.
6    Q. Okay. And you didn't see the medical team
7  leader taking action that you associated with their role
8  as leader in particular?
9    A. No.
10   Q. Did you see the leader doing anything at the
11 trainings?
12   A. Just working with the team, preparing
13 everything that they're preparing back there for
14 training.
15   Q. "Back there" being the what I would call
16 chemical room?
17   A. Yes.
18   Q. And would you go in that chemical room during
19 the trainings at all?
20   A. Yes.
21   Q. What would lead you to go back there?
22   A. I would go back there before the training
23 started just to greet -- well, I'd let the medical team
24 in, and then when I'd escort them back there and greet
25 them, and then periodically I would walk in there to see

1  if they're ready to commence with training.
2    Q. Would you be back there at all during the
3  training itself after it had started?
4    A. No.
5    Q. Can you give me a sense of what they were
6  doing in the chemical room before the training for them
7  to get ready?
8    A. My assumption is just preparing whatever
9  medical devices that they need -- they would use to
10 carry out an execution.
11   Q. Did you see them working with any equipment in
12 particular?
13   A. Not in particular, no.
14   Q. Do you know what kind of background or
15 criminal history checks were done on the medical team --
16   A. Do not.
17   Q. -- members?
18   A. No.
19   Q. Do you know who would do those checks?
20   A. I do not.
21   Q. Do you know who might have information about
22 that?
23   A. Assumption would be the director of the Idaho
24 Department of Corrections.
25   Q. How would people be referred to at the

1    trainings?
2        Would -- and I guess I'm specifically thinking
3    the medical team members, would you refer to them by
4    name, or what would you call them if you were to speak
5    with them?
6        A. "Sir" or "ma'am."
7        Q. Was there any use of designations like "M1,"
8    "M2," that sort of thing?
9        A. Not to my knowledge, no.
10       Q. Are you familiar with that system, M1, M2?
11       A. I am not.
12       Q. Okay. Okay. I think that's all I have on
13   medical team for now. I'd like to now ask some
14   questions about the lethal injection chemicals in
15   particular.
16       At the time you were warden, did you have any
17   sort of license to possess controlled substances?
18       A. No.
19       Q. And this is, I think, probably repeating the
20   question, but just to be clear, you were never involved
21   in decisions about which chemical to choose?
22       A. Correct. No, I was not.
23       Q. Were you involved in searching for chemicals
24   at all?
25       A. No.

Page 46

1        Q. Were you ever asked to be involved in that?
2        A. No.
3        Q. Do you know who was involved in that?
4        A. I do not.
5        Q. Do you know who might have information about
6    who was involved in that?
7        A. My assumption would be the director of the
8    Idaho Department of Correction.
9        Q. Have you had any communications with potential
10   chemical sources?
11       A. No.
12       (End of confidential designation.)
13       (Exhibit 8 marked.)
14       Q. (BY MR. HORWITZ) I'd like to talk a little
15   bit about Exhibit 8. So this is a chain of custody
16   form.
17       Is this your -- do you see your handwriting on
18   this form?
19       A. Yes.
20       Q. Where is it?
21       A. Do you mean where it's written "Warden Tim
22   Richardson" with the date and time --
23       Q. Uh-huh.
24       A. -- and the dosage and the chemical in the more
25   of the bolder -- bolder writing, if you will, on the

Page 47

1    exhibit, appears to be mine.
2        Q. Okay. All right. Can you tell me about how
3    you came into possession of this pentobarbital on
4    October 12th, 2023?
5        A. I can, yes. It was delivered to me.
6        Q. Who delivered it?
7        MS. SCHINDELE: Objection; based on
8    confidentiality rule.
9        Q. (BY MR. HORWITZ) I'll ask the question, and
10   if Tina wants to object, she can.
11       Do you know who the person was who delivered
12   it to you?
13       MS. SCHINDELE: We would object based on
14   confidentiality.
15       But this is one you can answer this specific
16   question.
17       THE WITNESS: Yes.
18       MR. HORWITZ: And I might ask a series of
19   questions where it's the same sort of situation, so --
20       MR. SMITH: Tim, just since we anticipate
21   there might be objections, just try to give two seconds.
22       THE WITNESS: I will.
23       Q. (BY MR. HORWITZ) That person who delivered
24   the chemicals, were they an IDOC employee?
25       MS. SCHINDELE: Objection; confidentiality.

Page 48

1        Do not answer this one.
2        Q. (BY MR. HORWITZ) Okay. I think we'll move
3    back to what I expect to be safer territory.
4        Can you tell me what the chemicals -- how the
5    chemicals were packaged when they came into your
6    possession?
7        MR. SMITH: Object to the form, vague.
8        You can answer.
9        THE WITNESS: They were in boxes, I guess you
10   could say, manufactured OEM boxes, if you will.
11       Q. (BY MR. HORWITZ) What was it? What kind of
12   boxes?
13       A. I said -- referenced like OEM, original
14   equipment manufacturer --
15       Q. Uh-huh.
16       A. -- just in the box that it would come from
17   from the manufacturer.
18       Q. Right. Okay. Do you remember where you were
19   when you took possession of the chemicals? And I guess
20   we'll stick, for now, to October 12th, 2023.
21       A. Yes.
22       Q. Where were you?
23       A. The Idaho Maximum Security Institution.
24       Q. Where within IMSI?
25       A. I was in the parking lot, I believe.

Page 49

13 (Pages 46 - 49)

1    Q. And maybe it's worth confirming, too, that --
2  so the chain of custody, the first date on it is
3  October 12th, 2023.
4        Is that when you received the chemicals?
5    A. I believe so, yes.
6    Q. And the time that's noted here seems to say
7  "16:18"?
8    A. Correct.
9    Q. Is that how you read that?
10   A. Yes.
11   Q. And do you think that's the time that you
12 received the chemicals?
13   A. I believe so, yes.
14   Q. Do you believe that you began filling this
15 form out -- can you tell me when you added those
16 notations to the form?
17   A. As soon as I took custody of the chemicals.
18   Q. And did you -- so the redaction covers the
19 first -- the top line with what's visible on the form,
20 which says "Received From."
21       Did you fill out that -- did you write a name
22 in that space?
23   A. Can you point out where you're talking?
24   Q. Sure. Yeah. So right here.
25   A. I see something redacted here.

Page 50

1    Q. Yeah. I guess this is what I was thinking,
2  "Received From." And I'm assuming that there's a line
3  there for a name to be added.
4        Is that -- is my assumption correct?
5    A. Your assumption is correct.
6    Q. And did you write a name on that line?
7    A. I did write a name on that line.
8    Q. And what about that redaction, the one that
9  you just pointed out to me which is directly above the
10 "18" in "16:18"; do you know what that redacts?
11   A. I do not.
12   Q. Did you open the box when you received the
13 chemicals?
14   A. I did not.
15   Q. What did you do with the box?
16   A. I put the boxes in my refrigerator in my
17 office.
18   Q. Did you inspect the box at all?
19   A. I did not, no, not at that time.
20   Q. How many boxes did you receive at that time?
21   A. I believe -- I believe it was six.
22   Q. Six separate boxes?
23   A. Six separate boxes.
24   Q. How did you know to go to the parking lot to
25 accept the boxes; do you recall?

Page 51

1    A. I believe it would have been by phone call.
2    Q. Do you know who called you?
3    A. I do.
4    Q. Who was that?
5        MS. SCHINDELE: Objection; confidentiality
6  rule.
7        Do not answer.
8    Q. (BY MR. HORWITZ) Were any instructions
9  conveyed to you at the time that you received the box
10 about how to store the chemicals?
11   A. Yes.
12   Q. What were those instructions?
13   A. That the chemicals need to go into the
14 refrigerator.
15   Q. And who told you that?
16   A. The individual that delivered the chemicals.
17   Q. That individual, do you know whether they had
18 a job in the pharmaceutical industry?
19   A. I do not.
20       MR. SMITH: Objection; confidentiality.
21       MR. HORWITZ: And is that an instruction not
22 to answer?
23       MR. SMITH: Yeah, don't answer that. Sorry.
24       MR. HORWITZ: Okay. Thank you.
25   Q. (BY MR. HORWITZ) Were there any written

Page 52

1  instructions as far as storage conditions at that time
2  that you were aware of?
3    A. No.
4    Q. Was there -- do you recall any writing that
5  you -- any writing on the packaging that you read at the
6  time you received the drugs?
7    A. No.
8    Q. And I'll ask just some "yes" or "no"
9  questions.
10       Do you know who the vendor was for the drugs?
11   A. No.
12   Q. Do you know who the manufacturer was?
13   A. No.
14   Q. Do you know what kind of vendor it was?
15   A. No.
16   Q. Do you know what country the drugs were
17 manufactured in?
18   A. No.
19   Q. Okay. Okay. Just one more question about
20 Exhibit 8.
21       So, again, if you look at the time "16:18,"
22 does it appear to you that those numbers were changed at
23 some point, the "16" in particular?
24   A. It appears that I -- I -- that I wrote it, so
25 it appears that I either miswrote or did something to

Page 53

14 (Pages 50 - 53)

| | |
|---|---|
| 1  it, yes. | 1      Q.  Okay.  Thank you.  So outside the complex, so |
| 2      Q.  Do you recall why? | 2  where we -- we go through the gates -- |
| 3      A.  I do not. | 3      A.  Yes. |
| 4      Q.  And would you understand "16:18" here to refer | 4      Q.  -- where we would enter the visiting area, the |
| 5  to 4:18 p.m.? | 5  front lobby, would it be outside those gates? |
| 6      A.  Yes. | 6      A.  No.  Outside when you first turn in off |
| 7      MR. SMITH:  Jonah, are you done with the | 7  Pleasant Valley onto Darrington Way -- |
| 8  exhibit? | 8      Q.  Okay. |
| 9      MR. HORWITZ:  What's that? | 9      A.  -- where the big complex sign is, if you will. |
| 10      MR. SMITH:  Are you done with it? | 10      Q.  Uh-huh. |
| 11      MR. HORWITZ:  Yeah.  Yeah. | 11      A.  It would have been right outside of that. |
| 12      MR. SMITH:  Are we good to take a five-minute | 12      Q.  Okay.  And that location was determined in a |
| 13  break? | 13  conversation between you and the person bringing the |
| 14      MR. HORWITZ:  Yeah, that's good.  Yeah. | 14  chemicals? |
| 15      VIDEOGRAPHER:  Okay.  So the time is | 15      A.  Correct.  I believe I am the one that directed |
| 16  10:32 a.m. And we are off the record. | 16  where I would meet them; but, yes -- |
| 17      (Break taken.) | 17      Q.  Okay. |
| 18      VIDEOGRAPHER:  All right.  So the camera is | 18      A.  -- they were aware of it, obviously. |
| 19  rolling.  The time is 10:42 a.m.  And we are back on the | 19      Q.  Okay.  Were there other conversations with |
| 20  record. | 20  different people about that exchange that you were |
| 21      MR. HORWITZ:  Thank you. | 21  having? |
| 22      Q.  (BY MR. HORWITZ)  Warden, I just want to | 22      A.  No. |
| 23  follow up on a few things about the -- sort of going | 23      Q.  How -- do you remember who called who when you |
| 24  back to the time where the chemicals came into your | 24  spoke to the person delivering the chemicals? |
| 25  possession on October 12th, 2023. | 25      A.  I do not. |
| Page 54 | Page 56 |

| | |
|---|---|
| 1      Can you tell me why they were given to you in | 1      Q.  So on Exhibit 8, it looks like these chemicals |
| 2  the parking lot? | 2  were given by you to Warden Valley on June 24th, 2024; |
| 3      A.  I don't think I have a real answer to give you | 3  is that -- am I reading that correctly? |
| 4  as far as -- you know, it's just where we determined to | 4      A.  You're reading it correctly, but I don't |
| 5  meet that I would come out and get them. | 5  recall the date other than what's documented on this |
| 6      Q.  And you don't know how that determination was | 6  chain of custody document. |
| 7  made? | 7      Q.  Okay.  Do you know why it would have happened |
| 8      A.  I believe I said I would meet the individuals | 8  on that date? |
| 9  out there, but... | 9      A.  That would, most likely, have been the date |
| 10      Q.  Okay.  And apart from -- so you said the | 10  that -- or right around in there -- that the wardens |
| 11  person who gave you the chemicals told you to | 11  switched roles, Brian went to MVTC and Warden Valley |
| 12  refrigerate them. | 12  came over to the IMSI. |
| 13      Did that person tell you anything else about | 13      Q.  Can you tell me a little bit more about the |
| 14  how they should be stored or handled? | 14  phone call that you had with the person bringing the |
| 15      A.  No, not that I recall. | 15  chemicals? |
| 16      Q.  One more question about Exhibit 8, in | 16      Was that the first time you had spoken to that |
| 17  particular. | 17  person? |
| 18      A.  Can I clarify something real quick? | 18      A.  No. |
| 19      Q.  Sure, sure. | 19      Q.  When had you spoken to them previously? |
| 20      A.  It's -- now that I'm thinking about it, | 20      MS. SCHINDELE:  Objection; confidentiality |
| 21  initially we were going to meet in the parking lot, and | 21  rule. |
| 22  we did not.  We met right outside the front gates of the | 22      Do not answer. |
| 23  complex on what we refer to as the "tank tracks," if you | 23      Q.  (BY MR. HORWITZ)  Okay.  Do you know if |
| 24  will, right there.  So I just wanted to clarify the | 24  someone introduced you to that person or made |
| 25  record for that, now that my mind's thinking. | 25  arrangements for you to speak to that person? |
| Page 55 | Page 57 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 118520

1     A. No.
2        (Exhibit 9 marked.)
3     Q. (BY MR. HORWITZ) Okay. Let's go to
4  Exhibit 9. So Exhibit 9 is entitled, "DEA FORM-222."
5        Is this something you've seen before?
6     A. It is not.
7     Q. Do you know who would have filled this out?
8     A. I do not, no.
9     Q. That makes that exhibit easy.
10       Okay. I'd like to get into a little more
11  detail in terms of the storage of the chemicals. And
12  let's continue to focus just on the chemicals that were
13  received in October of 2023.
14       So you said you put them in a refrigerator.
15  Does that refrigerator have a freezer?
16    A. Yes.
17    Q. And the chemicals were in the refrigerator
18  compartment of the item?
19    A. Yes.
20    Q. Was anything else stored in the refrigerator?
21    A. No.
22    Q. For how long were the chemicals in the
23  refrigerator?
24    A. It was a period until they were transferred.
25    Q. You don't recall how long?

Page 58

1  what you did after you saw the information about the
2  recommended temperature storage? Did you take the
3  chemicals out of the refrigerator immediately?
4     A. Not immediately, no. Nope. No. I made
5  contacts to individuals within the Department to obtain
6  a decision whether they should be moved from
7  refrigerator to a dry storage, if you will.
8     Q. Who were those individuals?
9     A. It would have been through -- I believe it was
10  through Chad Page, which consulted with the director,
11  Director Tewalt.
12    Q. And what was the decision that was made?
13    A. To take them out of the fridge and store them
14  in dry storage.
15    Q. How long did it take for that decision to be
16  made?
17    A. I don't recall. It wasn't very long, I don't
18  believe. It could have been the same day.
19    Q. Did you talk to anyone outside of IDOC about
20  the temperature issue?
21    A. No.
22       (Exhibit 10 marked.)
23    Q. (BY MR. HORWITZ) Let's talk about Exhibit 10.
24  So this is the Plaintiff's Sixth Set of Requests for
25  Admission. And I'll direct you to Request for Admission

Page 60

1     A. I don't recall, no.
2     Q. Do you recall why they were taken out of the
3  refrigerator?
4     A. I do.
5     Q. Why?
6     A. They were taken out of the refrigerator
7  because at some point as I was doing a temperature check
8  is when I read on the back of one of the boxes -- I
9  guess that would be a manufacturer recommendation of a
10  range, which the refrigerator was outside of that
11  temperature range.
12    Q. Do you recall what the range was?
13    A. I do not.
14    Q. Do you recall when that was?
15    A. I do not.
16    Q. Are you familiar with a phrase that is "brief
17  excursion"?
18       Does that have any significance to you?
19    A. It does not, no.
20    Q. When you read the instructions on the
21  packaging about temperature storage, do you recall
22  whether it said anything about whether exceptions could
23  be made to that temperature range?
24    A. I do not.
25    Q. And can you tell me in a little more detail

Page 59

1  170, which is on page 6.
2        Are you with me?
3     A. Yep.
4     Q. So Request for Admission -- I'll say "RFA" for
5  short -- RFA 170 says, "Admit or deny that the Execution
6  Chemicals currently in IDOC's possession are in a
7  refrigerator." And for reference, this RFA, this set of
8  RFAs, was served on October 27th, 2023.
9        Do you recall seeing this RFA?
10    A. No, I do not.
11    Q. Do you recall someone -- even if you didn't
12  see it directly -- do you recall someone mentioning to
13  you that this question had been asked in discovery?
14    A. Yes. So I recall several sets of RFAs that
15  were sent to me to review and answer for our Attorney
16  General's Office. When I say, no, that's referring to
17  this specific set of RFAs in question. But, yes, I
18  would have seen this at one point in time, yes, to
19  answer your question; I just do not recall the specifics
20  of this particular one.
21    Q. Okay. Do you recall a conversation -- even if
22  you don't recall seeing the specific RFA -- do you
23  recall a conversation with counsel about the nature of
24  this request or this question whether the chemicals were
25  refrigerated?

Page 61

| | |
|---|---|
| 1    A. I do not. | 1    A. No. Excuse me. |
| 2    Q. So you can't tell me anything about how the | 2    Q. No problem. |
| 3  answer -- how your answer to this RFA was formulated? | 3    (Exhibit 12 marked.) |
| 4    A. Well, my answer would have been formulated off | 4    Q. (BY MR. HORWITZ) Let's talk about Exhibit 12. |
| 5  the fact of if the chemicals were, in fact, refrigerated | 5  So we have three exhibits that are all temperature logs. |
| 6  or nonrefrigerated in dry storage at the time I answered | 6  They were separate PDFs that we received in discovery. |
| 7  this question. Because the question asked a specific | 7  And focusing just on Exhibit 12 for now, is this your |
| 8  "are they located in a refrigerator?" The date that I | 8  handwriting? |
| 9  would have answered this, if they were not in a | 9    A. Your Exhibit 12; correct? |
| 10  refrigerator, I would have said "no"; if they were, I | 10    Q. Yeah, Exhibit 12. |
| 11  would have said "yes." | 11    A. Yes, it is. |
| 12    Q. Got it. The date being the date you were | 12    Q. And are you the one that looked at the |
| 13  answering? | 13  temperature, that noted the temperature on the |
| 14    A. The date that I was answering, correct. | 14  thermometer? |
| 15    Q. Okay. And can you -- | 15    A. Yes. |
| 16    A. That question would tell me that at that time | 16    Q. Do you know the -- this temperature log was |
| 17  were they in a refrigerator or not -- | 17  created for the chemicals that we've been talking about |
| 18    Q. Right. | 18  that were received on October 12th, Exhibit 12? |
| 19    A. -- and whatever the answer was at this time. | 19    A. Correct, if that was the date on the log. I |
| 20    Q. Got it. Can you tell me what you mean by "dry | 20  don't recall the exact date, but, yes. |
| 21  storage"? | 21    Q. So the first date in the log, Exhibit 12, is |
| 22    A. Referring to in an area that's | 22  October 11th, 2023? |
| 23  nonrefrigerated, and there's no moisture, there's | 23    A. Correct. |
| 24  nothing there other than just ambient air. | 24    Q. So you began the log for the chemicals that |
| 25    Q. Where did you move the chemicals to after you | 25  you received the following day? |
| Page 62 | Page 64 |

| | |
|---|---|
| 1  took them out of the refrigerator? | 1    A. Correct. |
| 2    A. To my desk drawer. | 2    Q. And is that because you were told -- or can |
| 3    Q. Were they still in the same six boxes that you | 3  you tell me when you were told that the chemicals were |
| 4  referred to? | 4  going to be received? |
| 5    A. Yes. | 5    MS. SCHINDELE: Objection; confidentiality |
| 6    Q. And were they placed in any other kind of | 6  rule. |
| 7  item, like a bigger box or a bag or anything like that? | 7  Do not answer. |
| 8    A. No. | 8    Q. (BY MR. HORWITZ) If you'd turn to -- well, |
| 9    (Exhibit 11 marked.) | 9  let me go back to that later. |
| 10    Q. (BY MR. HORWITZ) Okay. I don't think that we | 10  So if you look at the temperatures from |
| 11  need to talk about Exhibit 11. I think you've already | 11  October 11th through November 27th, which are all on the |
| 12  answered my questions that I had about that. | 12  first page of this exhibit, the temperatures are all in |
| 13  Was anything else in the drawer that the | 13  the 30s or 40s. |
| 14  chemicals were moved to? | 14  Is that Celsius or Fahrenheit? |
| 15    A. I believe so, yes. | 15    A. Fahrenheit. |
| 16    Q. What was in there? | 16    Q. And during this period of time, are the |
| 17    A. I believe that that would have been -- in the | 17  chemicals in the refrigerator? |
| 18  same drawer would have been the -- anything execution | 18    A. I believe so, yes. |
| 19  related, the policies. I had some, like, manila folder, | 19    Q. So the chemicals would have been put into the |
| 20  fine folders, if you would; that had all that in there. | 20  refrigerator on October 12th and removed from the |
| 21    Q. Was it locked? | 21  refrigerator on November 27th? |
| 22    A. Yes. | 22    A. I do not recall specific dates. By looking at |
| 23    Q. Who had the key? | 23  the dates and the temperatures notated on this log, I |
| 24    A. Myself. | 24  would say that you're correct. |
| 25    Q. Anyone else? | 25    Q. Can you tell me a little bit more about how |
| Page 63 | Page 65 |

17 (Pages 62 - 65)

| | |
|---|---|
| 1 you took the temperature inside the refrigerator? You<br>2 had a thermometer?<br>3    A. [Witness nods head.]<br>4    Q. And was the thermometer -- did it remain in<br>5 the refrigerator during this time?<br>6    A. Yes. It was a digital thermometer and<br>7 remained in the fridge the entire time.<br>8    Q. And so when you recorded the temperature on a<br>9 given day, you'd open the refrigerator, take out the<br>10 thermometer, look at it, record what it said?<br>11    A. I would not take the thermometer out of the<br>12 refrigerator. I would open the refrigerator, look at<br>13 what the thermometer stated, and then notate that in the<br>14 log.<br>15    Q. Okay. Do you remember what kind of<br>16 thermometer it was?<br>17    A. It was a digital.<br>18    Q. Did you -- how did you come into possession of<br>19 it?<br>20    A. I purchased it.<br>21    Q. Where?<br>22    A. At a store, I believe. It may have been<br>23 Walmart. Don't quote me on that, but I purchased the<br>24 thermometer.<br>25    Q. Do you remember what brand it was?<br><div align="right">Page 66</div> | 1    Q. Was there any connection between the question<br>2 that we talked about in RFA 170 about the drugs being<br>3 refrigerated and the drugs being taken out of the<br>4 refrigerator? Were those two things related?<br>5    A. Can you clarify that question?<br>6    Q. Sure. Maybe the simpler way to ask it would<br>7 be: Was it -- is it the fact that you were told that a<br>8 question had been asked about the refrigerator, in<br>9 discovery, that led to the chemicals being removed from<br>10 the refrigerator?<br>11    A. I do not recall if anything was asked in<br>12 discovery that led to that, no.<br>13    Q. Was there a reason you looked at -- when you<br>14 opened the refrigerator and saw the instructions on the<br>15 packaging for the first time about temperature, was<br>16 there something that led you to look, to look on that<br>17 day?<br>18    A. I would have to say something led me to look<br>19 at it, but I do not recall what the specifics of that<br>20 would be.<br>21    Q. Okay. Let's talk a little bit about the<br>22 temperature process after the chemicals were removed<br>23 from the refrigerator.<br>24        Where did you place the thermometer at that<br>25 time?<br><div align="right">Page 68</div> |
| 1    A. I do not.<br>2    Q. Do you know if it was medical grade?<br>3    A. I do not. I can tell you that it was<br>4 stainless steel.<br>5    Q. Did you take any steps to confirm that the<br>6 thermometer's readings were accurate?<br>7    A. No. The only step I took is to start the<br>8 fridge the day prior to see if it would -- what the<br>9 temperature would be, and then, obviously, to verify<br>10 that it would maintain.<br>11    Q. Did you say "start the fridge the day prior"?<br>12    A. Plug it in.<br>13    Q. Plug it in, okay. Did you get any<br>14 instructions on what type of thermometer to purchase?<br>15    A. I did not.<br>16    Q. Did someone tell you to purchase a<br>17 thermometer?<br>18    A. I do not recall.<br>19    Q. Do you recall anything about what led you to<br>20 acquire the thermometer?<br>21    A. It would have been as -- to know that we're<br>22 going to start a temperature log and to -- I mean, and<br>23 document what the temperature is that's maintained in<br>24 the refrigerator, would have led me to buy the temp --<br>25 the thermometer.<br><div align="right">Page 67</div> | 1    A. In the drawer on top of the boxes of the<br>2 chemical.<br>3    Q. Okay. And it stayed there?<br>4    A. It did, yes.<br>5    Q. And you would look at it sort of in the same<br>6 way you did with the refrigerator; you'd look at it<br>7 without moving it and note the temperature?<br>8    A. Yes, correct.<br>9    Q. Was there a certain time of day that you took<br>10 the temperature?<br>11    A. Generally, in the mornings when I got to work<br>12 it was one of the first things I would do.<br>13    Q. Around when would you get to work?<br>14    A. Between 7:00 and 8:00 a.m.<br>15    Q. What was your working schedule like at the<br>16 time? Would you work Monday through Friday and be off<br>17 Saturday and Sunday, or was it a different sort of<br>18 schedule?<br>19    A. Correct, Monday through Friday, off Saturday,<br>20 Sunday.<br>21    Q. Would you take the temperature on the<br>22 weekends?<br>23    A. No.<br>24    Q. Would anyone?<br>25    A. No.<br><div align="right">Page 69</div> |

<div align="right">18 (Pages 66 - 69)</div>

Page 70

1    Q. Did anyone ever take the temperature apart
2  from you?
3    A. Not that I recall, no.
4    Q. I want to talk about some gaps in the log.
5  And I'll just describe the gaps first in the record, for
6  the record, which might be a little tedious, but just in
7  the interest of clarity. So we see gaps between
8  November 2nd and November 5th, November 22nd and
9  November 27th, December 23rd and January 1st,
10  January 5th and January 15th, January 19th and
11  January 29th, March 20th and March 30th, April 10th and
12  April 14th, April 25th and April 28, May 11th and
13  May 19th, and June 5th and June 10th.
14        So understanding that my question is about the
15  gaps or about those gaps, unless I'm asking more
16  specifically, were temperatures taken during those
17  periods of time, the periods where we're not seeing a
18  temperature on the log?
19    A. No. Anywhere you see a gap would tell me that
20  temperatures were not recorded, as I -- I can't speak
21  for the -- between the June 4th and the 11th because,
22  obviously, that's different writing, so those aren't my
23  notations in there starting June 11th. But anytime I
24  would have been away from the facility, whether it was
25  on personal leave or business, travel, or whatever it

Page 71

1  may be, there wouldn't have been a temperature taken.
2    Q. And those are the reasons for those gaps?
3    A. Yes.
4    Q. And you said that the handwriting changes in
5  June, so is it your handwriting up and through May --
6  until -- through May 31, 2024?
7    A. It appears to be my writing through -- it
8  appears my last notation would have been June 4th, 2024,
9  on the very last page.
10    Q. Okay. And the subsequent notations are
11  someone else?
12    A. Correct.
13    Q. Do you know who that was?
14    A. I do not.
15    Q. Did you ask anyone to take the temperature
16  when you were away?
17    A. No.
18        (Exhibits 13 and 14 marked.)
19    Q. (BY MR. HORWITZ) Let's move on to Exhibit 13,
20  so this is another temperature log.
21        Is this your handwriting up and through --
22  well, yeah, where does your handwriting start and stop?
23    A. It appears it starts on page 1 on
24  February 19th of 2024 and then would stop on the last
25  notation, June 4th, 2024.

Page 72

1    Q. Was this log, Exhibit 13, created for the
2  chemicals that we've been talking about that you
3  received in October, or was it created for a different?
4    A. Created for a different batch.
5    Q. When was this batch acquired, or when did you
6  come into possession of this batch?
7    A. Without seeing a chain of custody log in front
8  of me, my assumption would be February 19th, 2024, where
9  I notated the initial placement.
10    Q. And with that February 19th line, there's a
11  parenthetical after "Temperature" that says "Failed
12  placement."
13        Can you tell me what that means?
14    A. That's "Initial placement."
15    Q. Oh, "Initial placement"?
16    A. Yes.
17    Q. I see. I was misreading that. Okay.
18        And what does that mean, "Initial placement"?
19    A. Initial placement would have been when I
20  initially obtained the product and placed them into
21  storage.
22    Q. So it's just a notation to indicate this is
23  when it's beginning the temperature log?
24    A. Yes.
25    Q. Got it. And the temperature -- or, I'm sorry,

Page 73

1  the thermometer that was used to create this temperature
2  log, is it the same thermometer that was used to create
3  the one that we were discussing in Exhibit 12?
4    A. Yes.
5    Q. And let me ask the same question about gaps in
6  this log: Would you have the same answers that if there
7  are gaps in this log, they were the result of you not
8  being present in the office?
9    A. Yes.
10    Q. And, again, you were the only one keeping
11  track of the temperature?
12    A. Yes.
13    Q. Let me go back to Exhibit 8 for just a moment.
14    A. 8, is that what you said?
15    Q. 8. Thank you.
16        So I'm looking at the line where the date
17  reads, "February 28th, 2024." I guess there are two
18  lines that say that, and one of them indicates, it seems
19  to me, that the chemicals were given by you to
20  Ms. Neville; is that correct?
21    A. Correct.
22    Q. Where did that transfer take place?
23    A. In F Block, in what you had referred to as
24  "the chemical room."
25    Q. So you brought the chemicals from your office

| | |
|---|---|
| 1 to F Block on February 28th? | 1 about when -- so at some point you took the vials out of |
| 2   A. I did. | 2 the boxes? |
| 3   Q. Were they still in those six original boxes? | 3   A. I wouldn't say -- no, I did not take them out |
| 4   A. Yes. | 4 of the boxes. |
| 5   Q. And you still had not opened them? | 5   Q. Okay. |
| 6   A. Still had not. | 6   A. I'd say I opened the boxes to see the vials. |
| 7   Q. And the boxes, you can't see anything through | 7   Q. Okay. I see. |
| 8 them; you can't see the actual liquid in the vials | 8   A. Yes. |
| 9 through the boxes? | 9   Q. And do you know when that would have been? |
| 10   A. Correct. No, you cannot. | 10   A. My assumption is I did that, probably, when I |
| 11   Q. You handed the boxes, themselves, to | 11 took possession of them. |
| 12 Ms. Neville? | 12   Q. And what led you to open them in that way? |
| 13   A. Correct. | 13   A. Validation, to validate that you're getting -- |
| 14   Q. And you didn't open them. Were they opened at | 14 I mean, you're putting your name to something that you |
| 15 that time in your presence? | 15 received saying that you received it. |
| 16   A. No. | 16   Q. So what are you looking for to validate at |
| 17   Q. "No"? | 17 that time? |
| 18   A. No. | 18   A. That there's a vial in there; that's it. |
| 19   Q. Did you ever see the bottles or the vials, | 19   Q. Okay. Are you looking at words on the vial? |
| 20 themselves? | 20   A. No. |
| 21   A. Yes. | 21   Q. Were there words on the vial? |
| 22   Q. When did you see them? | 22   A. Yes. |
| 23   A. I opened the boxes and seen one of them at | 23   Q. Just in general terms, can you tell me what |
| 24 some point in time. | 24 type of language was on the vial? |
| 25   Q. These chemicals that we're talking about, the | 25   A. No, I don't know the language. Looking at it, |
| Page 74 | Page 76 |
| 1 ones that you received in October? | 1 it would be no more than some type of a label like on |
| 2   A. Yes. | 2 any type of bottle, any type of medicine bottle or water |
| 3   Q. Can you tell me -- | 3 bottle or something of that nature. |
| 4   A. In fact, I would say -- I would say that I -- | 4   Q. But you're not -- when you open them, you're |
| 5 at one point in time I opened all six of them to | 5 not looking to confirm something about the words on the |
| 6 validate that there was chemicals in them, yes. It | 6 bottle, like the name of the drug or the quantity -- |
| 7 would have been in short -- probably around the time | 7   A. No. |
| 8 we -- I assumed possession of them, yes. | 8   Q. -- or anything like that? |
| 9   Q. Okay. I guess I -- | 9   A. No. |
| 10   A. I think that's when I did open them, yeah. | 10   Q. Okay. |
| 11   Q. Okay. I guess I had thought you had said that | 11   A. No. |
| 12 you did not open them. I thought, just now, you said | 12   Q. Are you looking at the liquid itself through |
| 13 you brought them to Ms. Neville still unopened? But | 13 the bottle? |
| 14 that's not -- | 14   A. I have -- well, you can see a liquid in there, |
| 15   A. Well, so when you look at these boxes, I mean, | 15 yes. |
| 16 I guess you've got to determine unopened/opened. | 16   Q. Did you -- were you looking for anything in |
| 17 They're not -- it's not a sealed box. It's just a box | 17 particular when you looked at the liquid? |
| 18 of -- it has a top on it that you could just -- it has | 18   A. No. |
| 19 little flaps you would push down in. They're not | 19   Q. And so the -- you opened the boxes shortly |
| 20 sealed, they're not taped, there's nothing sealed about | 20 after receiving them? |
| 21 them. So when I -- when you're saying "opened" to me, | 21   A. [Witness nods head.] |
| 22 to me, that would be like if they were sealed with tape | 22   Q. To validate them? |
| 23 and I undid, like, a seal of some sort. There was no | 23   A. [Witness nods head.] |
| 24 seal on the boxes, no. | 24   Q. And then they stay in the boxes in the |
| 25   Q. And can you give me any more spec ificity | 25 refrigerator? |
| Page 75 | Page 77 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 118525

1    A.  Correct.
2    Q.  And when you moved them out of the
3 refrigerator into the drawer, they're still in those
4 boxes?
5    A.  Correct.
6    Q.  And the -- are the boxes open during all the
7 time, or are you --
8    A.  No, they're closed.
9    Q.  Okay.  You close it back up?
10    A.  Yeah.
11    Q.  Okay.  And you bring the boxes, still, to
12 Ms. Neville?
13    A.  Yes.
14    Q.  On February 28th?
15    A.  Correct.
16    Q.  And she takes them away?
17    A.  [Witness nods head.]
18    Q.  Did you see her removing the bottles or the
19 vials from the boxes?
20    A.  No, I did not.
21    Q.  Did you ever see those vials again after
22 Ms. Neville took possession of them?
23    A.  Yes.
24    Q.  When?
25    A.  After the event on February 28th.

Page 78

1    Q.  Let's talk about that.  What did you see after
2 the -- and by "event" we're referring to the attempted
3 execution of Mr. Creech?
4    A.  Yes, we are.
5    Q.  And after that attempted execution, what was
6 the next time that you came into contact with the vials?
7    A.  It would have been -- it would have been the
8 same day of -- I don't recall a time -- the same day of
9 when it was returned back into my possession.  And I
10 believe it's notated on here.  Yeah, 14:40, is when it
11 was returned to me.  It would have been, I believe, two
12 full bottles of 2.5 milligrams each.  And then I believe
13 it was four empty vials, bottles, that would have been
14 drawn for the attempted execution, yes.
15    Q.  What did you do with the empty bottles?
16    A.  Stored them in my drawer.
17    Q.  And when you stepped down as warden of IMSI,
18 were the empty bottles still in the drawer?
19    A.  Yes.
20    Q.  And what did you do with the two full bottles?
21    A.  They were still in the same storage.
22    Q.  You put them in the drawer as well?
23    A.  Yes.
24    Q.  Did you look at the liquid at that time?
25    A.  I validated that the vials were in there.  I

Page 79

1 would open the top and validate them and then close
2 them, yes.
3    Q.  Open the top of the -- of what?
4    A.  Open the top of the box that contained the
5 vials.
6    Q.  So they were still in the box at that time?
7    A.  Yes.
8    Q.  After the attempted execution?
9    A.  Yes.
10    Q.  And when you stepped down as warden, they were
11 still in the box?
12    A.  Yes.
13    Q.  Did you check the seals on the full bottles?
14    A.  I have not checked the seals, no.
15    Q.  So I'm going to go back, and this will maybe
16 be a little tedious, but I do want to ask the same
17 questions, essentially, that I asked about the October
18 chemicals that you received in October.  And I want to
19 ask them about the chemicals that you received in
20 February of 2024.
21    A.  Okay.
22    Q.  And maybe just to start, as a general matter,
23 did you treat those chemicals in the same way that you
24 treated the earlier chemicals?
25    A.  Yes.

Page 80

1    Q.  Can you describe how you received the -- that
2 February batch?
3    A.  The same as the first -- in October.  I
4 believe it was -- is that I met with individuals and
5 took possession of the chemicals and then took them to
6 my office at the Idaho Maximum Security Institution and
7 stored them in my desk drawer.
8    Q.  Multiple individuals?
9    A.  Yes.
10    Q.  Where did you meet them?
11    A.  Outside of the prison complex.
12    Q.  In the same place that you met them in
13 October?
14    A.  No.
15    Q.  Where did you meet them?
16    A.  On the corner of Pleasant Valley and 10 Mile
17 Creek.
18    Q.  And the person that you received the chemicals
19 from in October, was that person present when you
20 received the February chemicals?
21    MS. SCHINDELE:  Objection; confidentiality
22 rule.
23    Do not order -- do not respond -- sorry.
24 Goodness.
25    Q.  (BY MR. HORWITZ)  Did you know -- the person

Page 81

21 (Pages 78 - 81)

1  who was not the individual that you had interacted with
2  previously and who was present for the February
3  handoff -- I guess maybe first let me ask: Were there
4  two people present for that handoff in February?
5      A. Yes. There were multiple individuals, yes.
6  Two.
7      Q. Two, okay. And did you know who they were?
8      A. Yes.
9      Q. And let me just ask you, knowing there will be
10 an objection, but so that the question is on the table:
11 Who were those individuals?
12     MS. SCHINDELE: Objection.
13     MR. SMITH: Confidentiality. Don't answer.
14     Q. (BY MR. HORWITZ) Okay. And the second batch
15 of chemicals, you obtained them -- can you describe the
16 kind of packaging they were in?
17     A. Yes. They were in boxes, obviously. I would
18 call them the original -- I would assume the original
19 boxes from the manufacturer. Instead of six, I believe,
20 if I recall correctly, there was 15 of those, due to the
21 fact I believe they were like 1 milliliter, or whatever
22 it is, versus the 2.5, so they were smaller vials, which
23 constituted more.
24     Q. Those boxes, did they look the same to you as
25 the previous boxes?

Page 82

1      MR. SMITH: Objection; confidentiality.
2      Do you think he can answer that?
3      THE WITNESS: Good to answer?
4      MR. SMITH: Hold on.
5      MS. SCHINDELE: No. I would say do not answer
6  that one.
7      But you may have additional questions you can
8  try.
9      MR. HORWITZ: Okay.
10     MS. SCHINDELE: I think that one, that one we
11 would object to release of that information.
12     MR. HORWITZ: Okay. I appreciate you thinking
13 about it.
14     Q. (BY MR. HORWITZ) Did you open that box in the
15 same way that you described opening the October box --
16 let me start, are there -- these are multiple boxes that
17 we're talking about in February or just one box?
18     A. Multiple boxes. I believe there was 15 of
19 them.
20     Q. 15 boxes?
21     A. 15 boxes, I believe, yes.
22     Q. And one vial in each box?
23     A. Correct.
24     Q. And did you open each box in February?
25     A. Yes.

Page 83

1      Q. And did you follow the same process that you
2  described in October?
3      A. Yes.
4      Q. So you looked to confirm that there was a
5  vial?
6      A. Correct.
7      Q. But did not look at the text of the vial for
8  anything in particular?
9      A. Correct.
10     Q. Were you alone when you opened the box -- the
11 boxes in February?
12     A. Yes.
13     Q. And were you alone when you opened the boxes
14 in October?
15     A. Yes.
16     MR. SMITH: Tim, can you just give him one
17 second between?
18     THE WITNESS: Yeah.
19     MR. HORWITZ: Yeah.
20     Q. (BY MR. HORWITZ) Were you the only person
21 receiving the -- well, let me ask this: When you
22 received the February chemicals, there was you, and
23 there were two individuals, and those two individuals
24 were bringing the chemicals to you?
25     A. Yes.

Page 84

1      Q. And was anyone else present for that
2  encounter?
3      A. No.
4      Q. With the October boxes, so that's three
5  vials -- or how many vials are involved?
6      A. Six.
7      Q. Six vials in October. And was it the same
8  deal, they each had a separate box, in October?
9      A. Correct, six of them.
10     Q. Okay. Did you look -- when you received the
11 February chemicals, did you look for instructions about
12 recommended temperature ranges?
13     A. Yes.
14     Q. And did you find them?
15     A. Yes.
16     Q. Where were they?
17     A. On the back of the box.
18     Q. And what did they say?
19     A. I don't recall the exact temperatures, but it
20 was two different temperatures with a range in between
21 them.
22     Q. Do you recall whether it was the same as the
23 instructions with the previous set of chemicals? In
24 other words, it was the same temperature range?
25     A. I believe so. I don't recall the exact

Page 85

22 (Pages 82 - 85)

1   temperature range, but I believe it was the same
2   temperature range, yes.
3       Q. And just in general terms, do you remember
4   what that temperature range was?
5       A. I do not.
6       Q. With the temperature logs, whenever there's a
7   gap in them, do you have any information about what the
8   temperature would have been on a day where it's not
9   recorded?
10      A. No.
11      Q. And with the February chemicals, did you look
12  at the liquid itself through the vials?
13      A. I could see liquid when I ascertained that
14  there was a vial in there, yes.
15      Q. Were you looking for anything in particular
16  when you saw the liquid?
17      A. No.
18      Q. Do you remember what the liquid looked like,
19  like whether it was clear, whether it was opaque,
20  anything like that?
21      A. I do not, no.
22          (The following testimony has been
23          designated confidential.)
24          (Exhibit 15 marked.)
25      Q. (BY MR. HORWITZ)  Let's move on to Exhibit 15.

Page 86

1   expenditures, asking for funding, that sort of thing,
2   related to the purchase of the drugs?
3       A. No.
4       Q. And the same question for the February?
5       A. Correct.
6       Q. Okay.  The same?
7       A. The answer would be "no"; yes.
8       Q. Got it.  And negotiation of a price, did you
9   have any involvement in that?
10      A. No.
11      Q. For either -- for neither October nor
12  February?
13      A. Correct.  No, I did not.
14      Q. The Exhibit 15 has two witnesses who signed at
15  the bottom.
16          Do you see where I'm looking?
17      A. I do.
18      Q. Do you know who wrote those signatures?
19      A. I do not.
20      Q. I'm sorry to keep toggling back and forth, but
21  to go back again to Exhibit 8.
22          So June 24th is the date, it appears, that
23  Warden Valley took over the chemicals from you; is that
24  correct?
25      A. Correct, it appears so.

Page 88

1   And this is a confidential exhibit, or has been marked
2   "Confidential," I should say.
3       COURT REPORTER:  And so the transcript will be
4   marked confidential while you talk about this exhibit?
5       MR. SMITH:  Yeah.
6       MS. SCHINDELE:  Yes.
7       Q. (BY MR. HORWITZ)  So this exhibit is a
8   purchase order, I would call it.
9           Is this something you've seen?
10      A. No, it is not.
11      Q. Okay.  Were you involved in the financial
12  aspect of the purchase of the chemicals at all?
13      A. No.
14      Q. Do you know who would have been -- and
15  referring now to both February and October, do you know
16  who would have been?
17      MR. SMITH:  Can you clarify what you mean by
18  "financial aspect"?
19      MR. HORWITZ:  Sure.  Yeah, I'll try to
20  rephrase the question.
21      Q. (BY MR. HORWITZ)  Do you know who would have
22  been -- and maybe I'll just ask the question separately
23  about October and February to be clear.
24          So with respect to the October drugs, do you
25  know who at IDOC would have been involved in making

Page 87

1       Q. Did you look at the vials at that point in
2   time?
3       A. I do not recall if I opened the boxes to look
4   at vials or not.
5       Q. Okay.  I'd like to move on to some questions
6   about the testing of drugs.
7           Is that something you've been involved in at
8   all, the process by which execution chemicals are tested
9   for potency, sterility, and so forth?
10      A. No.
11      Q. Do you know who would have been involved in
12  that?
13      A. I do not.
14          (End of confidential designation.)
15      MR. SMITH:  Hey, Jonah, do you want to --
16  since you marked the record confidential?
17      MR. HORWITZ:  Oh, yeah, that's a good point,
18  we should.  Yeah, I think we're done with that exchange.
19  Thank you, Tanner, yeah.
20          (Exhibit 16 marked.)
21      Q. (BY MR. HORWITZ)  Let's go on to Exhibit 16.
22          So this is a "Certificate of Analysis."  Is
23  this something you've seen?
24      A. It is not.
25      Q. Do you know how this came to be?

Page 89

23 (Pages 86 - 89)

| | |
|---|---|
| 1   A. I do not. | 1   to serve a death warrant, which in this case would be to |
| 2   Q. Do you know anything about this certificate? | 2   Mr. Creech, and notate that we did that. And then any |
| 3   A. I do not. | 3   meetings that we had, either he had, we had, or I had, |
| 4   Q. Do you know who might have information about | 4   if you will, he would keep a documentation of that. |
| 5   the certificate? | 5   Q. Meetings with anyone? |
| 6   A. My assumption would be the director. | 6   A. With the condemned. |
| 7   Q. Do you know whether -- so the chemicals that | 7   Q. Just with the condemned? |
| 8   were received in February, do you know whether they were | 8   A. Just with the condemned. |
| 9   tested? | 9   Q. Okay. So that's the focus of the logbook? |
| 10   A. I do not. | 10   A. Correct. |
| 11   Q. Who would know about that? | 11   Q. Okay. The final date on the logbook is |
| 12   A. Director Tewalt. | 12   March 5th, 2024. |
| 13   Q. Do you know whether IDOC has obtained any | 13      Do you know why, why that's the final date? |
| 14   chemicals since the February chemicals that we've been | 14      MR. SMITH: Object to form. Calls for |
| 15   discussing? | 15   speculation. |
| 16   A. I do not. | 16      You can answer. |
| 17      (The following testimony has been | 17   Q. (BY MR. HORWITZ) And if you want, you could |
| 18      designated confidential.) | 18   answer with a "yes" or "no" answer, to begin, just |
| 19      (Exhibit 17 marked.) | 19   whether you know why March 5th was when the logbook |
| 20   Q. (BY MR. HORWITZ) Okay. I'd like to ask you | 20   ended? |
| 21   some questions about the attempted execution of | 21   A. Yes. After reading this, yes. |
| 22   Mr. Creech in February. And I'll start with Exhibit 17. | 22   Q. Why is that? |
| 23   This is also marked confidential, so any questions while | 23   A. To document that I had approved Mr. Creech's |
| 24   we're discussing this exhibit will be sealed. | 24   property that your office had obtained to come back into |
| 25      So turning to the text in this document, is | 25   the facility into his possession. |
| Page 90 | Page 92 |

| | |
|---|---|
| 1   this your handwriting? | 1   Q. And why were there no entries after March 5th? |
| 2   A. It is not. | 2      MR. SMITH: Object to the form. Calls for |
| 3   Q. Do you know whose it is? | 3   speculation. |
| 4   A. This is the warden's log; correct? | 4      THE WITNESS: I believe that would have closed |
| 5   Q. Yes. Yes. Well, I call it "the warden's | 5   the log out. That would have been -- that was what I |
| 6   log." It does say "Post Log Book," and handwritten it | 6   would say is the end of that period of the attempted |
| 7   says "Warden's Log" on the page, yeah. | 7   execution, so... |
| 8   A. Okay. It appears to be, and I believe it | 8   Q. (BY MR. HORWITZ) Did you tell Mr. Phillips to |
| 9   would be Brett Phillips -- | 9   stop making entries at this date? |
| 10   Q. Okay. | 10   A. I don't recall. |
| 11   A. -- management assistant at the Idaho Maximum | 11   Q. Do you know why there are no entries between |
| 12   Security Institution. | 12   February 28th and March 5th? |
| 13      COURT REPORTER: Okay. Wait. Say that one | 13   A. Yes. Technically, the log would have ended |
| 14   more time. | 14   March -- or February 28th, the day of the attempted |
| 15      THE WITNESS: Brett Phillips. He's the | 15   execution. That's when the log would be discontinued, |
| 16   management assistant at the Idaho Maximum Security | 16   but it appears that Mr. Phillips notated it in here that |
| 17   Institution. | 17   we gave his property back. |
| 18   Q. (BY MR. HORWITZ) Did he write these notes at | 18   Q. Were there meetings between you and Mr. Creech |
| 19   your direction? | 19   between February 28th and March 5th? |
| 20   A. Yes. | 20   A. Yes. Yes. |
| 21   Q. And what direction did you give him? | 21   Q. Would those have been documented? |
| 22   A. So Brett was -- so Brett was assigned as a | 22   A. No. |
| 23   liaison between the condemned and myself, as outlined in | 23      MR. SMITH: Was that a "no"? |
| 24   SOP 135. So he was directed to start the log, a | 24      THE WITNESS: No. |
| 25   chronological log, if you will, from the day we go down | 25      MR. HORWITZ: I don't think we need to go back |
| Page 91 | Page 93 |

24 (Pages 90 - 93)

| | |
|---|---|
| 1  to the exhibit, but I'll just quote from SOP 135, which | 1    Q.  -- to the medical team leader? |
| 2  says that the warden will create "a log documenting the | 2    A.  No. |
| 3  events leading up to the execution date that serves as a | 3    Q.  Did someone else give him an instruction? |
| 4  permanent record of the execution activities." | 4    A.  No. |
| 5       Is that this log? | 5    Q.  How did the medical team leader know to begin |
| 6       THE WITNESS:  Correct.  Yes. | 6  administering? |
| 7    Q.  (BY MR. HORWITZ)  There's no other document | 7    A.  The medical team leader never administered |
| 8  that would be the log that is referred to in the text | 8  chemicals until Mr. Creech's attempted execution, so |
| 9  that I just read? | 9  they would have never -- that opportunity would have |
| 10    A.  No other log referred to as "the warden's | 10  never arose to advise them to commence delivering |
| 11  log," no. | 11  medication. |
| 12       (End of confidential designation.) | 12    Q.  Were you -- you were prepared to give that |
| 13       MR. HORWITZ:  Okay.  And now we're moving to | 13  instruction? |
| 14  an exhibit that's not confidential.  And that is | 14    A.  Correct.  My tummy. |
| 15  Exhibit 18. | 15       MR. SMITH:  Smart.  I was in a deposition once |
| 16       (Exhibit 18 marked.) | 16  where they spilt water everywhere. |
| 17    Q.  (BY MR. HORWITZ)  So this is what I would call | 17    Q.  (BY MR. HORWITZ)  So on page 10 of the |
| 18  the chemicals protocol, as a shorthand.  And if you go | 18  chemicals protocol, in the first sentence of the final |
| 19  to page 7 -- | 19  paragraph, it says, "Any Medical Team member who |
| 20    A.  You said 18, correct, Jonah? | 20  determines that any part of the execution process is not |
| 21    Q.  Yeah, Exhibit 18. | 21  proceeding according to procedure must advise the |
| 22    A.  Page 7? | 22  Medical Team leader who must immediately notify the IMSI |
| 23    Q.  Uh-huh.  Give me just a moment to find the | 23  Warden." |
| 24  language I had in mind. | 24       Is that something that happened? |
| 25       It's sort of in the middle of the page, a | 25       MR. SMITH:  Jonah, where does it say that? |
| Page 94 | Page 96 |

| | |
|---|---|
| 1  little below the middle.  It's in the section with the | 1       MR. HORWITZ:  Oh, sorry, it's the first |
| 2  heading "Intravenous Lines," and it's in a paragraph | 2  sentence of the final paragraph on page 10 -- |
| 3  that begins, "The primary IV catheter."  But the | 3       MR. SMITH:  Thank you. |
| 4  sentence that I am looking at says, "Any failure of a | 4       MR. HORWITZ:  -- of Exhibit 18. |
| 5  venous access line must be immediately reported to the | 5    Q.  (BY MR. HORWITZ)  And if I could simplify the |
| 6  IMSI Warden." | 6  question, Warden, maybe the way to do so would be to |
| 7       Is that something that happened on | 7  ask:  Did the medical team leader notify you that a |
| 8  February 28th? | 8  problem had arisen? |
| 9    A.  Yes.  I was informed by the director of the | 9    A.  No. |
| 10  Department of Correction that we were unable to | 10    Q.  Can you tell me what did happen, how that |
| 11  establish IV lines. | 11  information was communicated to you? |
| 12    Q.  Okay. | 12    A.  The medical team leader consulted with |
| 13    A.  And that was the period when I made the | 13  Director Tewalt, and then Director Tewalt related to me, |
| 14  announcement, too, that we were going to delay the | 14  and that's when we delayed the execution. |
| 15  execution, yes. | 15    Q.  Okay.  I'll probably come back to that -- |
| 16    Q.  Okay.  And then on the next page, page 8, the | 16    A.  Okay. |
| 17  second paragraph says, "Upon receiving the order to | 17    Q.  -- in a second.  But just to ask you a few |
| 18  commence the execution process from the Director of the | 18  questions about the lead-up to the attempted execution: |
| 19  IDOC, the IMSI Warden will instruct the Medical Team | 19  Did you have any information regarding Mr. Creech's |
| 20  leader to begin administrating the chemicals." | 20  veins before the execution began on February 28th? |
| 21       Did that -- was that instruction given to you? | 21    A.  No specific medication [sic] other than |
| 22    A.  No. | 22  Mr. Creech himself saying that he would use the word |
| 23    Q.  Or, I'm sorry, did you give that | 23  "bad veins"; so other than that, no. |
| 24  instruction -- | 24    Q.  When did Mr. Creech tell you that? |
| 25    A.  No. | 25    A.  Numerous times. |
| Page 95 | Page 97 |

<div align="right">25 (Pages 94 - 97)</div>

Page 98

```
 1        Q.  You didn't hear anything about his veins from
 2   anyone other than Mr. Creech in the lead-up to the
 3   attempted execution?
 4        A.  No.
 5        Q.  Were you communicating with any medical
 6   personnel about Mr. Creech's veins prior to the
 7   attempted execution?
 8        A.  No.
 9        Q.  Did you have any reason to believe that
10   Mr. Creech was dehydrated when he went into the
11   execution chamber?
12        A.  No.
13        Q.  Did you observe him drinking during the hours
14   preceding the attempted execution?
15        A.  Yes.
16        Q.  What was he drinking?
17        A.  Coffee.
18        Q.  Anything else?
19        A.  He had -- no.  He had other items to drink in
20   his cell, yes; but did I witness him drinking them, no.
21        Q.  When did you witness him drinking the coffee?
22        A.  It would have been the morning of.
23        Q.  Let's talk about the actual attempt in more
24   detail.
25           So where were you when Mr. Creech was brought
```

Page 99

```
 1   into what I'll call "the execution chamber"?  And by
 2   that I mean the room with the gurney where the condemned
 3   is strapped down.  Where were you when Mr. Creech was
 4   brought into that room?
 5        A.  So you're referring to the execution chamber
 6   where he's strapped to the table, not the gurney prior,
 7   leading to?
 8        Q.  Correct.  Correct.
 9        A.  When he came into the chamber, I was within
10   the chamber at the podium.
11        Q.  Okay.  Where -- can you describe your
12   movements throughout the attempted execution from that
13   moment where Mr. Creech is brought in and you're at the
14   podium?
15        A.  My movements were pretty minimal.  I was
16   standing at the podium just -- you know, I observed the
17   escort team bring him in and secure him to the table.  I
18   observed the medical team come in and had the
19   attempted -- to establish the IV line.
20        Q.  And you were at the podium that whole time?
21        A.  The podium the whole time, correct.
22        Q.  When did you leave the podium?
23        A.  I left the podium after I made the
24   announcement that we were going to delay the execution.
25   And at that point in time I walked over to Tom, and I
```

Page 100

```
 1   put my hand on -- either on his leg or on his chest or
 2   something and said -- explained to him, "Hey, we're
 3   delaying the execution, and I'll explain it to you in a
 4   little bit."
 5        Q.  And he was still on the table at that point?
 6        A.  He was on the table at that point.
 7        Q.  And did you leave the room after that
 8   exchange?
 9        A.  No.
10        Q.  Where did you go then?
11        A.  I remained in the execution chamber until the
12   witnesses were excused, and then Mr. Creech was removed
13   from the table by the escort team and returned back to
14   his assigned housing within F Block.
15        Q.  Where were you standing during that later
16   period of time after you had gone over to him?
17        A.  I believe the podium.  It could have been --
18   it could have been right next to the podium adjacent to
19   it, right next to the table, but right there in that
20   vicinity right there.
21        Q.  Why don't you take me through what you
22   observed starting with the attempt to place -- why don't
23   you just take me through your observations about the
24   attempt to place an IV.
25        A.  So my observations were solely from the podium
```

Page 101

```
 1   with the medical team members.  You know, they attempted
 2   several times to establish IVs in his arms, and
 3   eventually, I believe -- I believe they attempted in the
 4   hand, and then I believe they attempted in the foot at
 5   one point in time.  I believe that they -- I believe
 6   they were just able to establish, I think, one line but
 7   not two, but I could be wrong there.
 8           But during the event it was -- I, primarily,
 9   was just watching them try to establish and then a lot
10   of not watching the condemned directly, but just looking
11   at the State's and the condemned's witnesses.  A lot of
12   it was looking forward.
13        Q.  Looking forward towards the witnesses?
14        A.  Towards the witness rooms, more in a neutral
15   area, if you will.
16        Q.  How did you know when the -- you said you
17   thought one IV line was established; how did you know
18   that?
19        A.  I believe I was told that after the fact.
20        Q.  Were you communicating with anyone while the
21   medical team was trying to establish an IV line?
22        A.  No.
23        Q.  And so the first communication you have is
24   from the director during this period of time?
25        A.  Correct.
```

1    Q. And tell me more about what that communication
2  looked like.
3    A. The director just approached me and said that,
4  "We're going to delay the execution because they can't
5  establish appropriate IV lines." And I said, "Okay."
6  And he said, "I need you to make an announcement." He
7  asked me if I wanted him to make the announcement, and I
8  said, "No, I'll make the announcement."
9       And then I, then, made the announcement to the
10 witnesses over the intercom and to the condemned, if you
11 will, and then that's when the process stopped.
12    Q. And that conversation was just between you and
13 the director?
14    A. Yes, sir.
15    Q. Did you communicate with any of the medical
16 team members?
17    A. No.
18    Q. The person who was trying to establish the IV
19 lines, was that the medical team leader?
20    A. I do not recall. There were multiple team
21 members in there.
22    Q. Do you think multiple team members were trying
23 to establish IV lines?
24    A. I think that there was -- yeah, I would say
25 there was more than one, yes, yes.

Page 102

1    Q. The people in the room who were medical team
2  members, were they all people that you had seen at
3  trainings?
4    A. Yes.
5    Q. What about physically, can you tell me what --
6  there were times, it sounds like, when you did look at
7  Mr. Creech while the attempt was being made to establish
8  the IV lines. Did you observe anything about his body
9  or the way the attempts were affecting his body or
10 anything like that?
11    A. So Mr. Creech literally slept through most of
12 it. He was audible snoring. He was -- I'm guessing it
13 was the medication, the sedatives he took before. You
14 could tell -- I think it was maybe once or twice that he
15 maybe experienced a little discomfort, but most of the
16 time he was asleep. There were actually periods of time
17 during the execution that I don't believe Mr. Creech
18 even knew they were trying to establish an IV in him
19 because he was so sound asleep.
20    Q. What were the signs of discomfort that you did
21 notice?
22    A. Maybe like a twitch. And I believe at one
23 time he made an audible something, but I don't -- after
24 watching it, I don't believe it was because of the IV
25 attempt; I believe it was because he had a cramp in his

Page 103

1  leg.
2    Q. What's that -- what's that based on, the idea
3  that it was a cramp in his leg?
4    A. I believe he said that it was cramping. Don't
5  quote me on that, Jonah, but I believe that's what I
6  heard.
7    Q. Well, I can't promise not to quote you.
8    A. Yeah. Yeah. Yeah.
9    Q. Do you know what equipment was being used in
10 the attempts to establish the IV?
11    A. Just medical equipment that the medical team
12 brought in on their medical cart.
13    Q. Do you have any information about when the
14 medical team was trying different needles or different
15 gauges?
16       Is that something you had knowledge of?
17    A. No.
18    Q. Were the medical team members, as far as you
19 observed, communicating with each other during the
20 attempt?
21    A. Yes.
22    Q. And were they communicating with anyone else?
23       MR. SMITH: Object to the form; calls for
24 speculation.
25    Q. (BY MR. HORWITZ) That you observed?

Page 104

1    A. Just themselves.
2    Q. Just themselves.
3       So just let me get to your observations, and
4  tell me if you didn't observe it. The medical team,
5  when it reported that -- as I understood you, they
6  reported to the director that there was a problem --
7    A. Correct.
8    Q. -- is that correct?
9    A. I believe it was the team leader.
10    Q. Okay. And that was a conversation, from your
11 observation, that was just between the two of them?
12    A. I did not observe that conversation.
13    Q. Okay. Do you know where that conversation
14 took place?
15    A. Somewhere outside of the chamber, either in
16 where the rescue doctor staged or back in the area you
17 referred to as "the chemical room."
18    Q. And you were still in the execution chamber?
19    A. Correct.
20    Q. Do you know who was in the chemical room
21 during the attempted execution?
22    A. Yes and no. I want to say, yes, I believe it
23 was the deputy chief, part of the admin, administrative
24 team, which would have been Liz Neville, and the medical
25 team members.

Page 105

27 (Pages 102 - 105)

| | |
|---|---|
| 1    Q.  So you think some of the medical team members | 1    A.  No. |
| 2  were in the execution chamber, some were in the | 2    Q.  Okay.  Is that something that you looked |
| 3  execution -- or in the chemical room? | 3  into -- |
| 4    A.  I know that some were in the chamber as well | 4    A.  No. |
| 5  as the chemical room. | 5    Q.  -- yourself? |
| 6    Q.  Do you know how many were in each? | 6    Okay.  And in terms of the October chemical |
| 7    A.  Not specifically.  I believe it was -- I | 7  acquisition, I think that we were -- maybe I was |
| 8  believe it's three and three, but I... | 8  inconsistent.  I know that at times I was talking about |
| 9    Q.  Do you know if all of the members of the | 9  a person who brought them to you.  But were there |
| 10  medical team were at the execution either in the chamber | 10  multiple people that came with the October chemicals? |
| 11  or in the chemical room? | 11    A.  Yes. |
| 12    A.  I do not, do not recall. | 12    Q.  And were there two? |
| 13    (The following testimony has been | 13    A.  Yes. |
| 14    designated confidential.) | 14    Q.  Okay.  And this is a question I think you will |
| 15    (Exhibit 19 marked.) | 15  probably be instructed not to answer but, again, just to |
| 16    Q.  (BY MR. HORWITZ)  Let me move to Exhibit 19. | 16  ask it:  Were they the same two people who were involved |
| 17  This is also marked confidential, so this exchange will | 17  in the February transaction? |
| 18  be under seal. | 18    MS. SCHINDELE:  Objection; confidentiality |
| 19    So Exhibit 19 doesn't have a, sort of, heading | 19  rule. |
| 20  that we have seen, but from what I can gather, it's a | 20    Do not answer. |
| 21  pretty detailed description of the IV placement | 21    Q.  (BY MR. HORWITZ)  And then just a few |
| 22  attempts. | 22  questions about, sort of, the circumstances of the -- |
| 23    Is this a document you've seen? | 23  you obtaining the chemicals, and maybe we'll start with |
| 24    A.  It is not, no. | 24  October. |
| 25    Q.  Do you recognize the handwriting? | 25    So in October, did you drive to the place |
| Page 106 | Page 108 |

| | |
|---|---|
| 1    A.  I do not, no. | 1  where you obtained the chemicals? |
| 2    Q.  Do you know who would have prepared this? | 2    A.  Yes. |
| 3    A.  I do not, no. | 3    Q.  And did you -- where did you drive after you |
| 4    Q.  Do you know who might have an idea? | 4  obtained them? |
| 5    A.  I do not. | 5    A.  Back to IMSI. |
| 6    MR. HORWITZ:  Why don't we take a lunch break | 6    Q.  You didn't stop anywhere else? |
| 7  now, if it works for you-all. | 7    A.  No. |
| 8    MR. SMITH:  Yeah. | 8    Q.  And let me ask the same question about the |
| 9    VIDEOGRAPHER:  Okay.  So the time is | 9  February -- the February pickup. |
| 10  11:50 a.m., and we are off the record. | 10    You drove to that location? |
| 11    (Lunch break taken.) | 11    A.  Yes. |
| 12    VIDEOGRAPHER:  All right.  So the camera is | 12    Q.  And did you drive straight back to the prison |
| 13  rolling.  The time is 12:42 p.m., and we are back on the | 13  at that time? |
| 14  record. | 14    A.  Yes. |
| 15    Q.  (BY MR. HORWITZ)  I'd like to just follow up | 15    Q.  The people that brought the chemicals, did |
| 16  on a few things that we talked about this morning, which | 16  they drive to that -- to those -- well, let's do it |
| 17  should be pretty quick, I think. | 17  again separately. |
| 18    So after the October chemicals were -- after | 18    So October, the people that brought the |
| 19  there was a discussion -- or during the discussion about | 19  chemicals, did they drive to the location where they |
| 20  the fact that they were in a refrigerator, whether they | 20  gave you the chemicals? |
| 21  should be moved, et cetera, and then a decision was made | 21    A.  Yes. |
| 22  to take them out of the refrigerator, I'm wondering if | 22    Q.  Did you see their car? |
| 23  there was any discussion that you were a part of about | 23    A.  Yes. |
| 24  whether the time that the chemicals spent in the | 24    Q.  Can you describe what type of vehicle it was? |
| 25  refrigerator damaged them? | 25    MS. SCHINDELE:  Objection; confidentiality |
| Page 107 | Page 109 |

28 (Pages 106 - 109)

1   rule.
2       Do not answer.
3       Q. (BY MR. HORWITZ)  And then in February, the
4   people who brought you the chemicals, they drove to that
5   location?
6       A. Yes.
7       Q. Did you see that vehicle?
8       A. Yes.
9       Q. What type of vehicle was it?
10      MS. SCHINDELE:  Objection; confidentiality
11  rule.
12      Do not answer.
13      Q. (BY MR. HORWITZ)  Was it the same vehicle in
14  February as in October?
15      MR. SMITH:  Objection; confidentiality.
16      Don't answer.
17      Q. (BY MR. HORWITZ)  In October, how was the
18  location for the pickup determined?
19      A. It was -- I believe it was determined by me.
20      Q. And why did you choose that place?
21      A. To take it off site to pick it up, not in a
22  parking lot like we initially discussed, to pick it up
23  in a -- I won't say undisclosed but a different area
24  other than right in front of the facility.
25      Q. What was the reason to not have it right in

Page 110

1   front of the facility?
2       A. To not draw attention to it.
3       Q. And in February would you say the same things
4   about that --
5       A. Correct.
6       Q. Is there a reason why it was a different
7   location in February as opposed to October?
8       A. The same, to not draw attention to it.
9       Q. Did you see the chemicals in the vehicle in
10  October, the vehicle of the people who brought the
11  chemicals?
12      A. Yes.
13      Q. Where were they positioned in the vehicle?
14      A. They were -- I believe when I -- because I got
15  into the vehicle.  I believe they were in the back area,
16  in the back-seat-type area.
17      Q. Were they in any kind of compartment or bag or
18  anything like that?
19      A. Yes.
20      Q. What were they in?
21      A. They were in a -- like, a small cardboard box.
22      Q. Were they refrigerated?
23      A. No.
24      Q. Do you know how far the people drove with the
25  chemicals?

Page 111

1       A. No.
2       Q. Do you know whether the people traveled with
3   the chemicals through a different means other than
4   driving before the chemicals were in the car?
5       A. No idea.
6       MS. SCHINDELE:  Objection; confidentiality
7   rule.
8       Do not answer.
9       Q. (BY MR. HORWITZ)  Okay.  And I was asking all
10  those questions about October, and maybe to not drag
11  things out too much, all those same questions about
12  February, are there any different answers?
13      A. No.  No deviations, no.
14      Q. Okay.  Do you know what compounded drugs are?
15      A. Very little.
16      Q. What do you know?
17      A. That it's certain drugs, I guess, if you will,
18  or pharmaceuticals that could be compounded together to
19  achieve an end result.
20      Q. Do you know anything about compounded drugs in
21  terms of refrigeration?
22      A. No.
23      Q. Did anyone ever tell you about the October
24  drugs that they were compounded?
25      A. No.

Page 112

1       Q. Did anyone tell you they were manufactured?
2       A. No.
3       Q. Did you understand them to be manufactured?
4       A. My belief -- well, my belief is that they
5   probably were, because I was -- they were in, like, an
6   original-type manufacturer's box.
7       Q. Uh-huh.  And did you have that same belief
8   about the February drugs?
9       A. Yes.
10      Q. So we talked a little bit about the fact that
11  the temperature log starts on October 11th, and the
12  chain of custody form describes you obtaining the drugs
13  on October 12th.  And I asked a couple questions about
14  it.  And I just want to follow up a little bit.
15      So why don't I start by asking:  When you --
16  so you plugged the refrigerator in on October 11th, you
17  said?
18      A. Correct.
19      Q. And that was in the expectation that you would
20  refrigerate the chemicals?
21      A. Correct.
22      Q. And what was that expectation based on?
23      A. That expectation was based off information
24  that I received that I believe came through the director
25  of the Department of Correction's office.

Page 113

29 (Pages 110 - 113)

1    Q. So you think the director told you that the
2  drugs would be -- would need to be refrigerated?
3    A. Yes. I think the director told me through
4  other means, not directly.
5    Q. How did he tell you?
6    A. Through other people.
7    Q. Who were the other people?
8      MS. SCHINDELE: Objection; confidentiality
9  rule.
10     Do not answer.
11    Q. (BY MR. HORWITZ) And that was all in verbal
12  conversations?
13    A. Yes.
14    Q. And those conversations, do you know when they
15  took place?
16    A. I do not. It would have been somewhere right
17  in the time of acquisition of the chemicals, somewhere
18  in there.
19    Q. And they would have to be -- those
20  conversations would have been either October 11th or
21  earlier, correct, if you started the temperature log on
22  October 11th --
23    A. Yes.
24    Q. -- with the refrigerator?
25    A. I think that's fair to state, yes.

Page 114

1  warden, would the SOP be referring to him?
2    A. I think it would depend on what aspect of the
3  SOP you're referring to. You know, it's -- because I
4  think the way it's written is that some would be
5  directed towards me, and then some would be directed
6  towards who's the acting warden, depending on what part
7  of it it is. So in all fairness, I think there could be
8  some clarity in there.
9    Q. How would you go about that if you -- if you
10  were looking at the SOP, how would you decide whether it
11  was a directive that related to you as opposed to
12  Mr. Martinez?
13    A. I'd make that conclusion off whatever that
14  certain aspect within the policy is saying needs to be
15  done.
16    Q. Okay. The very first exhibit that we started
17  with, the email that had to do with someone attending a
18  training, who I think you described as a potential
19  medical team member, do you know whether they became a
20  member of the medical team?
21    A. I do not.
22    Q. You don't know one way or the other?
23    A. No. No, I do not recall.
24    Q. Would you -- if they had become a member, you
25  would have seen them at subsequent trainings; correct?

Page 116

1    Q. Okay. Okay. Can you describe for me Amanda
2  Gentry's role?
3      Focusing, again, on your time as warden at
4  IMSI, what was Amanda Gentry's role with respect to
5  executions?
6    A. So her role, she's part of the admin team.
7  Her role is to kind of outline the SOP. She initiates
8  certain aspects of the incident command system, makes
9  sure specialty teams are activated, this and that. She
10  attends all trainings. She is also there as a potential
11  backup to the warden, which is me, going through the
12  trainings, and so if something were to happen or if
13  something came up that I couldn't participate in the
14  actual day of an execution, she would be the backup.
15    Q. And Dagoberto Martinez -- is that his last
16  name?
17    A. Yes, sir.
18    Q. So he was the acting warden during the
19  warrants, you said; right?
20    A. I'm not 100 percent certain at all four
21  of them, but I know he was during Tom's.
22    Q. Can you help me understand the SOP, when it
23  refers to the warden, do you take that to be a
24  reference -- just generally -- do you take that to be a
25  reference to you, or if Mr. Martinez has become acting

Page 115

1    A. I would have seen them, but correlating the
2  two with one visit to another, that I don't recall.
3    Q. Okay. At the trainings, does anyone -- is
4  anyone wearing a mask or obscuring their face in any
5  way?
6    A. Yes.
7    Q. Who?
8    A. The medical team.
9    Q. All of them?
10    A. Yes.
11    Q. What do they wear?
12    A. Balaclavas.
13    Q. And what do they wear at the execution itself?
14    A. So they have balaclavas to enter the building.
15  So to clarify and give you the whole picture, they wear
16  balaclavas into the building into what you would call
17  the chemical room, even during trainings and/or the day
18  of, and then they take it off. And then during
19  training, they don't wear those in the back during
20  training. Only certain people are allowed access to
21  that room. And then the day of they would come in
22  balaclava, derobe that, and then put on the medical gown
23  and hood that they wear.
24    Q. Right. Would you see -- during the trainings,
25  would you see them without anything --

Page 117

30 (Pages 114 - 117)

1   A. Yes.
2   Q. -- obscuring their face?
3      Did they know each other's names, that you
4   know of?
5   A. The medical team?
6   Q. Yeah.
7   A. Yes.
8   Q. And do they address each other by name --
9   A. Yes.
10   Q. -- during the trainings?
11      I want to ask a few questions about the
12   decision to call off the attempted execution. You had
13   described that as the director's decision?
14   A. Yes.
15   Q. Did the director ever tell you how he made
16   that decision?
17   A. No.
18   Q. Or did anyone else share with you information
19   about how the director made that decision?
20   A. Well, let me clarify. So leading up to
21   telling me the decision was to delay it, no.
22   Afterwards, yes.
23   Q. What did he tell you about the decision
24   afterwards?
25   A. He told me that he delayed the execution

Page 118

1   because they could not establish an IV into Mr. Creech,
2   and they were not going to continue to try to establish
3   one.
4   Q. Did he say --
5   A. Out of care -- basically, out of -- not quoted
6   terms -- out of care/concern for the condemned, we were
7   not going to continue that, that it was the right thing
8   to do.
9   Q. Did he share anything else about how he
10   decided that it had reached the point where it would be
11   called off?
12   A. No.
13   Q. Did you have an opinion about whether it
14   should be called off?
15   A. Yeah, I have an opinion on it.
16   Q. What -- let's talk first about what was your
17   opinion at the time it was called off by the director?
18   A. That it was the right call to make.
19   Q. Why do you say that?
20   A. Because I don't think it would have been right
21   to keep subjecting Mr. Creech to that environment, if
22   you will, after we have attempted eight times, to keep
23   going.
24   Q. Did you -- when did you come to that
25   conclusion?

Page 119

1   A. I think it crossed my mind during and, most
2   definitely, when it occurred, to stop. I'm like, yeah,
3   that's the right thing to do; it's the humane thing to
4   do.
5   Q. Do you recall whether there was a particular
6   moment in time earlier where you had thought to
7   yourself, this should be called off?
8   A. I don't recall that crossing -- no.
9   Q. Where was the director standing -- where was
10   he positioned during the attempted execution?
11   A. Directly to my left. So execution chamber,
12   myself, the director.
13   Q. So he is -- and maybe I'm turned around. Is
14   he closer to Mr. Creech than you or farther?
15   A. Further away.
16   Q. Okay. Did he move during the attempt?
17   A. He left at one time, he left the execution
18   chamber. And I believe that's when he went back and
19   consulted the medical team that had departed the area.
20   I think there was only one medical team member, and I
21   believe it was the team leader, that departed, and they
22   went back and had their conversation, and then they came
23   back and...
24   Q. Apart from that departure he was in that same
25   position next to you?

Page 120

1   A. Yes.
2   Q. What door did the director exit from?
3   A. The door that enters the small room where the
4   rescue doctor is during that procedure.
5   Q. Was the coroner there on the day of the
6   attempted execution?
7   A. Yes.
8   Q. Or someone from the coroner's office?
9   A. Yes.
10   Q. And were they in that small room as well?
11   A. I don't know the answer to that. I would
12   believe so because that's how we trained, but I wasn't
13   back there, so I'm not sure.
14   Q. Do you know if anyone else was consulted about
15   the decision to call off the execution apart from the
16   conversation between the director and the medical team
17   leader?
18   A. No, I do not.
19   Q. So we talked about your observations of the
20   attempts to set the IV lines. I'm wondering if you have
21   any additional observations.
22      When you approached Mr. Creech after the
23   decision was made to call off the attempt, did you
24   observe anything about his physical person at that time?
25   A. I don't know if I'd say physical. You know,

Page 121

Veritext Legal Solutions
Calendar-Idaho@veritext.com   208-343-4004

09 118536

1   it's a -- other than him looking at me kind of like,
2   what just happened?  What's going on here?  You know,
3   that type of thing, which, you know -- and I -- it
4   wasn't even a verbal.  It's just I know Tom just from
5   20-some years with him.  But when he gives me a look, I
6   know when he's wanting something or doesn't understand
7   something.  So I quickly knew, and that's why I told
8   him, "I'll explain it to you later."  And then, of
9   course, I did explain it to him later.
10      Q.  Can you tell me what -- did you have any
11  observations about the areas where the team had been
12  attempting to set the IV line?
13      A.  No.  Other than the visual of it.  They were,
14  obviously, trying, but I didn't zone in on any
15  particular areas, no.
16      Q.  And you didn't see anything about the puncture
17  areas or the bleeding, anything like that after -- when
18  you approached Mr. Creech?
19      A.  No.  I think it would be fair to say that,
20  obviously, I knew they had done it, but to tell exactly
21  what they looked like, no, I don't recall.
22      Q.  What about later, did you look at those areas
23  after?
24      A.  Yeah.  I looked at them the day of, after, and
25  then, obviously, the -- let's see, the attempted

Page 122

1   execution was on a Wednesday, I believe, and then I met
2   with Tom that following Monday, and you could notice a
3   little like yellowish-type bruising around them.
4       Q.  Do you recall meeting with him between those
5   two?  You said the attempted execution on Wednesday, and
6   you were looking at the areas on a Monday; did you see
7   him between?
8       A.  I did not meet with Tom after February 28th,
9   the close of business there on the 28th.  I did meet
10  with him after the attempt, and then once he was moved
11  out of F Block and put back into J block, I did not meet
12  with him until that following Monday.
13      Q.  Okay.  During the trainings, was there any
14  discussion about the possibility that vein access might
15  be difficult?
16      A.  I had heard from Mr. Creech that his veins and
17  that he may have a hard time, but I had also heard that
18  from Mr. Pizzuto too.
19      Q.  And at the trainings, themselves, did you
20  observe any discussion of that between medical team
21  members or anyone else that -- not involving Mr. Creech,
22  but just strictly during the execution trainings?
23      A.  I believe they had the same information as I
24  had, is that Mr. Creech had said his veins weren't very
25  good, and so you go off -- they were going off

Page 123

1   information that I believe of what Tom Creech told them.
2   No other medical entity, I don't believe, had advised
3   them of anything wrong with his veins, no.
4       Q.  Was there a plan that you were aware of for
5   what the team would do in the event of difficulty
6   accessing the veins?
7       A.  No, not a plan that I was in discussion with.
8       Q.  Were you part of any discussions that
9   addressed the possibility of a central line?
10      A.  No.
11      Q.  Do you know what a central line is?
12      A.  Vaguely, yes.
13      Q.  Did you have an understanding of -- just you
14  personally -- did you have an understanding of whether a
15  central line was a possibility on February 28th?
16      A.  I knew -- it was not a possibility on
17  February 28th, no.
18      Q.  Why do you say that?
19      A.  Because it's -- my understanding from the
20  director was that this was it, that's why he called it
21  off, and that was after the fact.  And we don't train --
22  we didn't train to central line, so...
23      Q.  You haven't been part of any trainings that
24  involved a central line?
25      A.  No, I have not.

Page 124

1       Q.  Were you aware of the concerns that had been
2   raised in litigation about vein access prior to
3   February 28th?
4       A.  Not that I recall.  I don't believe so, no.
5       Q.  After February 28th, was there any kind of
6   review of what happened on that day?
7       A.  I don't believe I was involved in any formal
8   review.  I mean, there was discussion, you know, amongst
9   the admin team of what happened; and other than that,
10  whatever happened outside of me being present, I'm not
11  aware of anything.
12      Q.  Was there any kind of report written that you
13  know of?
14      A.  Not that I'm aware of, no.
15      Q.  Was any sort of documentation produced from
16  the meetings that you were part of involving the admin
17  team?
18      A.  Not that I'm aware of, no.
19      Q.  Do you know if any interviews were conducted?
20      A.  Not that I'm aware of, no.
21      Q.  Do you know if any photographs were taken
22  after -- either on February 28th or afterwards within
23  IDOC that were part of an effort to...
24      A.  I believe, yes, that there was photos.  I
25  believe it could have been directly after.  I believe

Page 125

32 (Pages 122 - 125)

1  there was two sets of photos taken, I believe.
2      Q. Do you know who took them?
3      A. No, I do not.
4      Q. Do you know what happened to them?
5      A. No.  No, I don't.
6      Q. What about video?
7      A. And I don't think there was any video, no.
8      Q. Are you aware of any reports being written
9  otherwise?  You know, you said no report came out of the
10  meetings with the admin team that you were a part of.
11      A. Uh-huh.
12      Q. Do you know if any reports were written about
13  what happened apart from that?
14      A. I do not, no.
15      Q. Were you surprised that there was no formal
16  review?
17      A. No, I wouldn't say I was surprised.  You know,
18  I think it was pretty clear, you know, just through our
19  training and discussions, you know, what had taken
20  place.  And so, no, I wasn't surprised for it, no.
21      Q. Let's talk a little more about the central
22  line.
23        So you said it was your understanding that it
24  was not an option on February 28th?
25      A. [Witness nods head.]

Page 126

1      Q. Were you involved in any discussions after
2  February 28th about a central line?
3      A. Yes.
4      Q. And what was the nature of those discussions?
5      A. The nature was that the Department was looking
6  at, potentially implementing, potentially using central
7  lines as a way to access -- as an alternate way to
8  access if they could not establish -- I'm not sure of
9  the word -- peripheral IVs, whatever it was, so, yes.
10      Q. Who else was involved in the discussions about
11  the central line that you were having?
12      A. I believe it was me and the director and, most
13  likely, members of the admin team.
14      Q. What was your opinion about that?
15      A. Like, I didn't have an opinion, one
16  establishment versus another, no opinion on it.
17      Q. During those discussions, was anyone involved
18  with a medical background that you were aware of?
19      A. Not that I'm aware of, no.
20      Q. Were you part of any discussions that
21  considered where the central line placement would take
22  place within F Block?
23      A. Yes.
24      Q. And can you describe those discussions?
25      A. Yeah.  The discussion was -- you know, initial

Page 127

1  discussion was where to build a -- to remodel to
2  establish a medical suite, if you will.  And there was a
3  couple areas that were being discussed, and it
4  finally -- the end result was where the current -- I
5  don't know if you've been out there or not -- where the
6  current medical suite is, which is in the back of the
7  building, the back -- I can't remember what direction it
8  is, that would be south, north, something corner.
9      Q. Who was part of those discussions?
10      A. I was in a few of those discussions, then --
11  most of it happened downtown, so my assumption is
12  director and whatever else he had on his team, and then
13  I would be part of the discussions whenever there would
14  be walk-throughs to talk about where we would,
15  potentially, create that medical suite.
16      Q. And was anyone with a medical background in
17  those discussions, that you were aware of?
18      A. Not that I'm aware of.  I don't know.
19      Q. Did you have any opinion about the, sort of,
20  physical placement of where that procedure would take
21  place?
22      A. I did have a personal opinion.
23      Q. What was that?
24      A. Just my opinion was to put it where it sat
25  versus where we were talking about it, just because

Page 128

1  it -- less construction time.
2      Q. "Where it sat," can you clarify?
3      A. Where the medical -- the new medical suite has
4  been established within F Block.
5      Q. That's where you wanted the central-line
6  procedure to take place?
7      A. That's where I recommended they put it, yes,
8  because it was already a room that was established
9  versus if we went to a previous, we would have had to do
10  a lot more construction.
11      Q. And what was that room previously?
12      A. Storage.
13      Q. What was the alternative option or the
14  alternatives to that placement?
15      A. Down the hallway where the condemned's -- you
16  guys have been in the condemned's cell across -- you
17  have showers across the way, and then there's two other
18  cells off on the opposite side of his, to demo those out
19  and put it right there.
20      Q. Was there any consideration to having the
21  central-line procedure take place in the execution
22  chamber?
23      A. No.  Not that I'm aware of, no.
24      Q. Do you know why that wasn't an option?
25      A. I don't.

Page 129

33 (Pages 126 - 129)

| | |
|---|---|
| 1    Q. And no one expressed an opinion one way or | of that nature. So, yes, my bad. There are cameras |
| 2  another about that? | above the condemned that the -- thank you for reminding |
| 3    A. No. Not that I recall, no. | me -- that the medical team can see via four monitors in |
| 4    Q. Do you -- can you tell me about the cameras in | the back. Yeah, there's four monitors in the medical |
| 5  the -- what would you refer to the room where the | suite, and there's four monitors where the rescue doctor |
| 6  central-line placement would take place, the medical | is, too, yes. |
| 7  suite? | Q. Have you looked at those monitors while the |
| 8    A. Yes. So it's -- it was still being | cameras have been operating? |
| 9  constructed when I departed as warden there. So it's | A. Uh-huh. Not -- |
| 10  just a room that, I believe, has like a sink and a | MS. SCHINDELE: Just a minute. Make sure |
| 11  counter and a couple lights in it. And I don't know | you're answering "yes" or "no" -- |
| 12  about camera placement. None of that was in there when | THE WITNESS: "Yes" or "no." Yes. |
| 13  I departed IMSI. | MS. SCHINDELE: -- for the court reporter. |
| 14    Q. Were there discussions about camera placement | THE WITNESS: Yes. But I haven't looked at |
| 15  before you left? | them with an actual live person or the condemned on the |
| 16    A. Uh-huh. | table, no. |
| 17    Q. What were the nature of those discussions? | Q. (BY MR. HORWITZ) Were you looking at them |
| 18    A. The discussion was to have a camera in there | during trainings? |
| 19  so that State's and condemned witnesses could watch the | A. No. |
| 20  placement of the IV, the central line. | Q. When would you have looked at them? |
| 21    Q. Did you have an opinion about anything related | A. When I turned them on in the back. So when we |
| 22  to the cameras? | started training -- before trainings, I went down and |
| 23    A. No. Nope. | turned everything on, so I would see just an empty |
| 24    Q. Who was making -- who was making all those | execution chamber and an empty bed. |
| 25  decisions, if it was the same person, where the space | Q. Would you manipulate the cameras at all? |
| Page 130 | Page 132 |

| | |
|---|---|
| 1  would be, where the cameras would be, and so on? | A. No. |
| 2    A. The director. | Q. Do you know who -- do you know anything about |
| 3    Q. The director. Do you know if any medical | the -- how the cameras could be manipulated? |
| 4  doctors were consulted about anything related to the | A. I believe there's -- |
| 5  new -- the medical suite? | MR. SMITH: Object to form. Do you mean like |
| 6    A. I do not. | moved the -- yeah. |
| 7    Q. And you don't know anything about the camera | MR. HORWITZ: Yeah, yeah, yeah. |
| 8  setup, who would control it, what it would display? | Q. (BY MR. HORWITZ) Just to clarify, do you know |
| 9    A. No. My information is little, is that there | anything about how to -- |
| 10  would be cameras, and it would be, I believe, | A. There's a panel in the back that has, like, |
| 11  closed-circuit-television type of thing. | a -- some buttons and, like, a little joystick-type |
| 12    Q. Did you ever -- during the trainings or | thing, if you will. Who moves them, I don't know |
| 13  otherwise, did you have any exposure to the cameras in | whether it's the admin team, deputy chief, or whether |
| 14  the execution chamber? | it's the medical team; I don't know that answer. |
| 15      Did you look at the monitors in the chemical | Q. Were there ever any issues with technology |
| 16  room, for example? | during the trainings? |
| 17    A. There is no cameras in the execution chamber | A. No. |
| 18  or the chemical room. | Q. Just a few questions about the firing squad. |
| 19    Q. There are no cameras in the execution chamber? | Have you had any duties with respect to a |
| 20    A. No. | possible firing squad method? |
| 21    Q. How -- the people who are in the chemical | A. I have not. |
| 22  room, do they have any visibility on the condemned? | Q. Were you involved at all in efforts to |
| 23    A. Okay, yes, I see what you're saying. So there | construct a firing squad facility? |
| 24  are cameras over the condemned. I'm thinking, like, | A. No, I was not. |
| 25  institutional cameras that could be recording something | Q. Do you know who would have been involved in |
| Page 131 | Page 133 |

1  that?
2      A. Most likely the director.
3      Q. To your knowledge, had anything been done in
4  the direction of a firing squad protocol during your
5  time as IMSI warden?
6      A. No.
7      Q. Was there any discussion about that?
8      A. No.
9      Q. Do you know why that was not discussed?
10     A. I do not.
11     Q. So I think at the very beginning of the
12 deposition we had a dialog about the new SOP. And I
13 believe you said you have not seen it?
14     A. I have not.
15     Q. Were you involved at all in its creation?
16     A. No, I was not.
17     Q. Do you know who was involved?
18     A. I do not.
19     Q. During your time as warden, was there any
20 discussion about revising the protocol that existed at
21 that time?
22     A. No, there was not.
23     Q. Let's move on to -- do you know if any
24 safeguards were in place if problems did arise with the
25 technology in the -- around the execution chamber?
Page 134

1      A. No, I was not.
2      Q. I want to ask a few questions about
3  bookkeeping-type things.
4      A. Okay.
5      Q. And I think, actually, you might have already
6  answered this question, which is whether you were
7  involved in any expenditures made in connection with
8  executions?
9      A. [Witness nods head.]
10     Q. Is that a "yes"?
11     A. That's -- yes, that's a "yes."
12     Q. Okay, sorry. Can you tell me about that
13 involvement?
14     A. That I wasn't involved?
15     Q. Oh, you said you were not involved?
16     A. Yeah. So, well, I guess you -- no, my answer
17 was "no," and it's still "no."
18     Q. Okay.
19     A. And so when we talk about expenditures versus
20 what I think you're going to go here, what I'm saying no
21 to expenditures is obtaining chemicals, whatever else
22 expenditures happen outside of what I deal with. Who
23 designates what financials to what, no, I was not
24 involved in any of that.
25 ///
Page 135

1      (End of confidential designation.)
2      (Exhibit 20 marked.)
3      Q. (BY MR. HORWITZ) Okay. Okay. Yeah, let's --
4  let us talk about Exhibit 20.
5      Is this a document you've seen before?
6      A. It is.
7      Q. And how would you describe this document?
8      A. This is -- this log comes out of no more than
9  just a college-ruled, spiral notebook. It's a log that
10 we -- to keep track of expenses dealing with the
11 trainings.
12     Q. And it's limited to execution trainings, this
13 log?
14     A. Execution trainings, yep.
15     Q. Who keeps it?
16     A. The warden does.
17     Q. Is your handwriting on this log?
18     A. It is.
19     Q. Is all of the handwriting yours?
20     A. No. I believe all of it starting from --
21 starting on 10-18 was, where you see documented the
22 9-30, it was transferred from Warden Davis to me.
23     Q. Okay. Do you know the handwriting that's not
24 yours, do you know whose it is?
25     A. I do not. Talking up above on page 1?
Page 136

1      Q. Right.
2      A. I do not know. My assumption would be Warden
3  Davis as he was the warden prior to me.
4      Q. What about otherwise, just looking at the
5  document as a whole, do you recognize any of the
6  handwriting that's not your own?
7      A. Not other than from 9-30 up to 7-27, no.
8      Q. And the 9-30-21 entry says, "Money transfer
9  from Warden Davis to Warden Richardson."
10     Do you recall what that was for?
11     A. Uh-huh.
12     Q. What was it for?
13     A. That is money that's kept to pay for exactly
14 what's documented on here, meals for training,
15 honorariums; that's all it's for.
16     Q. Can you tell me what honorariums means?
17     A. Yes. Honorarium is a specified amount of
18 money that's given to the medical team members on a day
19 of training.
20     Q. Do you use that word for other payments
21 outside of the execution context?
22     A. No.
23     Q. Is this money cash?
24     A. Yes.
25     Q. Where is it kept?
Page 137

35 (Pages 134 - 137)

1    A. In the warden's office in a safe.
2    Q. And is the warden the one that disburses it?
3    A. Yes.
4    Q. After the trainings?
5    A. Yeah. It's divvied -- counted out --
6  accounted for before the training and then given to the
7  medical team at the beginning of training.
8    Q. How much do the medical team makers --
9  members, rather, get for each training?
10    A. So each -- so there's six members, five
11  members get 300 apiece, and the team leader gets 350.
12    Q. How is that amount determined?
13    A. I couldn't tell you.
14    Q. Was that your --
15    A. Other than that's what I was told they get
16  paid, so when we did the transition and when I took
17  warden from Warden Davis, so...
18    Q. Did Warden Davis talk to you about executions
19  otherwise, apart from the money?
20    A. Yeah. We had general conversation about --
21  you know, and I attended trainings with him, so when we
22  switched the reins, if you will, yeah.
23    Q. Did he have any guidance for you in connection
24  with executions?
25    A. I wouldn't say nothing specific, just walked

Page 138

1  me through the ins and outs of it, of what the
2  formalities of the training looks like; that would be
3  it.
4    Q. Did he -- from what you know, did he do
5  anything differently in connection with the trainings
6  than what you've told us that you do --
7    A. I don't believe so, no.
8    Q. -- or have done?
9      The honorariums, are they preapproved?
10    A. Yes.
11    Q. What does that process look like?
12    A. Well, preapproved, I mean, that's -- I've been
13  told what the set amounts are, so every training they --
14  each member gets the 300 except the team leader gets the
15  350.
16    Q. And is there any documentation of that system
17  apart from this?
18    A. Not that I'm aware of, no.
19    Q. To your knowledge, are the payments still
20  referred to as honorariums?
21    A. Yes.
22    Q. Is a different amount paid to the medical team
23  members on the day of an execution?
24    A. Yes.
25    Q. What's that amount?

Page 139

1    A. It's triple. So I believe it's 900 per for
2  the five, 1,050, or whatever that equals to, for the
3  team leader.
4    Q. And was that also passed down to you --
5    A. Yes.
6    Q. -- that amount?
7      So this document ends October 25th, 2022. Did
8  the payments, the honorariums, did they continue after
9  that date?
10    A. They did.
11    Q. Would a new log have been created?
12    A. I don't believe -- everything was in the same
13  log.
14    Q. You think everything was in the same log?
15    A. Everything. Yeah, there was only one logbook
16  that I ever wrote in, yeah.
17    Q. So you think there should be more pages -- if
18  we were to have a full log, it would be this just with
19  additional pages?
20    A. Correct.
21    Q. Okay. Just one -- just going back to the
22  central line very quickly. Do you know anything about a
23  medical doctor who would be involved in a central-line
24  execution?
25    A. I do not know specifically a medical doctor,

Page 140

1  but I've been told that it would be a medical doctor
2  that would establish the central line, yes.
3    Q. Have you been told anything else about that
4  medical doctor?
5    A. No.
6    Q. Who told you about the medical doctor?
7    A. The director.
8    Q. And when was it that you had that discussion?
9    A. It would have been after -- sometime after the
10  attempted to the time I left, in the discussion of
11  creating the medical suite and how, potentially, they
12  were going to establish IVs.
13    Q. Have you been part of anything execution
14  related since you left IMSI?
15    A. No.
16    MR. HORWITZ: Can we take a ten-minute break?
17    MS. SCHINDELE: Sure.
18    VIDEOGRAPHER: Okay. So the time is
19  1:23 p.m., and we are off the record.
20    (Break taken.)
21    VIDEOGRAPHER: All right. So the camera is
22  rolling. The time 1:35 p.m., and we are back on the
23  record.
24    Q. (BY MR. HORWITZ) Okay. I think I just have a
25  handful of questions following up on a few different

Page 141

36 (Pages 138 - 141)

1    areas, and then we'll let you-all go.
2        So on the log with the payments, we see a
3    notation that says, "D.C. Reimbursement"?
4        MR. SMITH:  Jonah, just for the record, what
5    exhibit?
6        MR. HORWITZ:  Oh, sorry.  That's Exhibit 20.
7        THE WITNESS:  And where is that at, Jonah?
8        MR. SANCHEZ:  I think bottom of page 2.
9        Q.  (BY MR. HORWITZ)  Do you see that, the very
10    last notation on the second page of the exhibit?
11        A.  I do.
12        Q.  Do you know what that refers to?
13        A.  My assumption is deputy chief reimbursement,
14    but that's an assumption.  My assumption is she
15    either -- she had to pay for something or be reimbursed
16    for something that had to do with it.
17        Q.  That would be Ms. Neville --
18        A.  Correct.
19        Q.  -- deputy chief?
20        A.  Yeah.
21        Q.  The cash that you would disburse, where would
22    it come from?
23        A.  From the warden's office, inside the safe.
24        Q.  And how would it get into the safe?
25        A.  It would -- oh, it would be given to me

Page 142

1    through central office.
2        Q.  In October when you obtained the execution
3    chemicals, did I hear you to say you got in the car of
4    the people who were delivering the chemicals?
5        A.  I believe it was in February I said I got into
6    it --
7        Q.  Okay.
8        A.  -- yeah.
9        Q.  And not in October?
10        A.  I don't believe I got into it in October.  I
11    don't recall.  But I know I did in February, yeah.
12        Q.  Yeah, why did you get in the car?
13        A.  To do the transfer of the chemicals.
14        Q.  Was any -- did any money change hands at that
15    moment?
16        A.  No.
17        Q.  And what about in October, was any money
18    involved in that in --
19        A.  No.
20        Q.  Also on Exhibit 20, there's a reference to
21    someone named Lisa Johnson.
22        Do you know who that person is?
23        A.  I do.  She was -- I don't remember her title,
24    but she was in fiscal at central office.  She's no
25    longer employed with the agency.

Page 143

1        Q.  And why would she have appeared on this
2    ledger?
3        A.  She would be, I guess, the middle person, if
4    you would, when the -- when I was given a certain amount
5    of cash -- amounts of cash to put in the log to ensure
6    that there was three parties accounting for it, plus
7    copies of the log would go to her.
8        Q.  "Accounting for it" in the sense that -- in
9    what sense exactly?
10        A.  In the sense of whatever amount of money I was
11    being given was there -- it was triple verified that
12    that amount was actually given to me, as well as to
13    account rectify what the ledger says was the balance
14    prior to going in there.
15        Q.  And would someone come from central office
16    with that cash?
17        A.  Yes.
18        Q.  Who was that?
19        A.  Deputy chief.
20        Q.  You mentioned Christine Starr.  Is she still
21    at IDOC?
22        A.  Through today.
23        Q.  Today is her last day?
24        A.  Today is her last day.
25        Q.  There was one question that I asked that I

Page 144

1    just want to make sure that we're on the same page
2    about, and the question is:  The October location for
3    the handoff of the chemicals was different from the
4    February location.  And I'm wondering if there's a
5    reason why those two locations were different from each
6    other?
7        A.  So they were areas that were chosen by me to
8    meet them.  Just, "Hey, I'll meet you here."  And "I'll
9    meet you here."  It's just so you can not have, I guess,
10    a visual on what you're doing.
11        Q.  Okay.  With the SOP, was there any kind of
12    process in place for people to suggest changes?
13        A.  Not that I'm aware of, not through me.
14        Q.  Were you ever asked if you had suggestions for
15    changes to be made to it?
16        A.  No.
17        Q.  On the -- on Exhibit 20, on the second page,
18    about halfway down, it looks like there is a circled
19    initial on the side of the page, on the right side next
20    to the number?
21        A.  Uh-huh.
22        Q.  Do you see what I'm talking about?
23        A.  I do.
24        Q.  Do you know whose initials those were?
25        A.  It's mine.

Page 145

37 (Pages 142 - 145)

1    Q. And why did you initial that?
2    A. I believe -- and this is an area where I had
3  to go back, and I had things out of order, I believe,
4  when it comes to the chronologicalness of the log of the
5  money, and so I initialed it, acknowledging that I'm the
6  one that made the changes.
7    Q. And on the first page of Exhibit 20, about six
8  lines up from the bottom, it looks like there's some
9  text written in the left margin next to the date. I
10  can't really read the date, actually. But the amount on
11  the far right that corresponds with it looks like it's
12  $50.00.
13    Do you see --
14    A. Correct. Uh-huh.
15    Q. What is that that's written in the left
16  margin?
17    A. It says "Back log."
18    Q. What does that mean?
19    A. That would mean that I -- obviously, when I
20  was logging something, I forgot to add it, so I went
21  back and backlogged it somehow. I'm assuming that's
22  what I did.
23    Q. Backlogged it in the sense of adding an item
24  later, adding a line later?
25    A. I wouldn't have been able to add a line later,

Page 146

1  so I would have to -- I don't know if it was from -- I
2  can't -- because I can't make out the date. Obviously,
3  it's February-something, but my assumption is it's
4  probably something I forgot up here, and before I
5  continued down here, I backlogged it, because I seen a
6  receipt or somebody gave me a receipt of, "Hey, this
7  needs to be in there," so...
8    Q. Okay. Is there any record -- so the
9  transactions that are reflected in Exhibit 20, would
10  there have been any other records generated in
11  connection with them?
12    A. Not that I'm aware of, no.
13    Q. Any receipts?
14    A. As far as purchases?
15    Q. Yeah. Anything related to this -- to these
16  transactions.
17    A. Yes. There would have been food receipts,
18  yes. And now that I think of it, there's honorarium
19  receipts as well. It's just a page. It's no different
20  than -- well, it's similar to this. It has medical, but
21  it's --
22    MR. SMITH: And when you say "this," what are
23  you referring to?
24    THE WITNESS: Exhibit 4. It's similar to
25  Exhibit 4, but it's -- it's, you know, in landscape

Page 147

1  mode, but has Medical 1 through 6, and it's the same
2  thing. They put an "X" on it, and then the deputy chief
3  signs it that they were given the honorarium.
4    Q. (BY MR. HORWITZ) Okay. So on the first page
5  of Exhibit 20, again, towards the top this time, about
6  six or seven lines from the top, next to "9/30/21," it
7  looks like there might be multiple initials next to this
8  item?
9    A. Yes.
10    Q. Can you tell me whose initials those are?
11    A. In order it's Ty Davis, myself, and Amanda
12  Gentry.
13    Q. Why would Amanda Gentry have been --
14    A. To be that third-party validation, the same
15  process as we use when we interject cash into the pool,
16  the same as when we're accounting for it for the
17  transfer; she's the third party of it.
18    Q. Do you know if any documentation is generated
19  as far as taxes go related to the expenditures on
20  Exhibit 20?
21    A. I do not.
22    Q. Do you know who would have that knowledge?
23    A. I do not.
24    Q. The medical team, when they come to trainings,
25  how do they get into the facility?

Page 148

1    A. The medical team?
2    Q. Yeah.
3    A. Through the back door of F Block. They come
4  in through the rear sally port and then --
5    COURT REPORTER: Okay. Wait -- oh, "rear
6  sally port"?
7    THE WITNESS: Rear sally port of the facility,
8  yep. And then they come to the back door of F Block.
9    Q. (BY MR. HORWITZ) Are they escorted into the
10  facility?
11    A. They are.
12    Q. By whom?
13    A. Myself and Deputy Chief Liz Neville.
14    Q. What about on the day of an attempted
15  execution?
16    A. They are escorted by myself and Deputy Chief
17  Liz Neville as well.
18    Q. Sorry to keep going back to Exhibit 20.
19    A. You're good.
20    Q. My team is thinking of more and more
21  questions.
22    MR. SANCHEZ: Yeah.
23    Q. (BY MR. HORWITZ) In the middle of the first
24  page, where it says "2/2/22 Honorarium," and the amount,
25  it looks like, is "2,100.00"?

Page 149

38 (Pages 146 - 149)

| | |
|---|---|
| 1    A. Okay. | 1         (Break taken.) |
| 2    Q. That scribble in the middle, do you know what | 2         VIDEOGRAPHER:  All right.  So the camera is |
| 3  that says? | 3  rolling, the time is 1:48 p.m., and we are back on the |
| 4    A. I do not. | 4  record. |
| 5    Q. Is that your handwriting? | 5         MR. HORWITZ:  And we had just conferred, and I |
| 6    A. I would assume it would have to be because I'm | 6  think both sides are good with ending this deposition. |
| 7  the only one that logged into this log, yeah, other than | 7         MS. SCHINDELE:  Counsel for defendants agree. |
| 8  when people initialed that we did the others. | 8         VIDEOGRAPHER:  Okay.  Then this concludes our |
| 9    Q. The honorariums, do they go to members of the | 9  video deposition with Tim Richardson.  It's |
| 10  escort team as well? | 10  October 18th, 2024.  The time is 1:49 p.m., and we are |
| 11    A. No.  Just medical team. | 11  off the record. |
| 12    Q. Just the medical team. | 12         COURT REPORTER:  So I'm going to ask really |
| 13       Was the escort team paid anything separate? | 13  quick, you guys are ordering the original transcript; |
| 14    A. No. | 14  right? |
| 15    Q. Can you tell me why you stepped down as warden | 15         MR. HORWITZ:  Yeah. |
| 16  of IMSI? | 16         COURT REPORTER:  And, Ms. Schindele, do you |
| 17    A. I requested it.  I requested a change just to | 17  want a copy? |
| 18  go to a different custody level.  You know, I've done 15 | 18         MS. SCHINDELE:  Yes, ma'am. |
| 19  out of my 24 years in that building, and in 10 months | 19         COURT REPORTER:  And, Mr. Smith, do you need a |
| 20  leading up to when I asked, you know, I was ready for a | 20  copy? |
| 21  change. | 21         MR. SMITH:  No. |
| 22    Q. Was that related at all to the attempted | 22 |
| 23  execution? | 23         (Deposition concluded at 1:49 p.m.) |
| 24    A. I could say that's part of it.  You know, we | 24         (Signature requested.) |
| 25  had a series of things happen.  We had a homicide I had | 25 |
| Page 150 | Page 152 |

| | |
|---|---|
| 1  to deal with.  We had an attempted execution.  And then | 1         REPORTER'S CERTIFICATE |
| 2  I had those three staff that got shot at the hospital. | 2         I, ANDREA L. CHECK, CSR No. 748, Certified |
| 3  So at that point I was ready for a change, Jonah. | 3  Shorthand Reporter, certify; |
| 4    Q. I can definitely understand that. | 4         That the foregoing proceedings were taken |
| 5    A. Being on call constantly, the phone ringing, | 5  before me at the time and place therein set forth, at |
| 6  yeah. | 6  which time the witness was put under oath by me; |
| 7    Q. Sure. | 7         That the testimony and all objections made |
| 8    A. Yep, that was all driven by me. | 8  were recorded stenographically by me and transcribed by |
| 9    Q. Right.  Okay. | 9  me or under my direction; |
| 10       Were any -- are there temporary employees who | 10         That the foregoing is a true and correct |
| 11  work at IMSI in connection with an attempted execution? | 11  record of all testimony given, to the best of my |
| 12    A. No. | 12  ability; |
| 13         MR. HORWITZ:  I think that's all I have.  Is | 13         I further certify that I am not a relative or |
| 14  there anything else you-all want to talk about on the | 14  employee of any attorney or party, nor am I financially |
| 15  record before we close it out? | 15  interested in the action. |
| 16         MR. SMITH:  Do you want to take a break real | 16         IN WITNESS WHEREOF, I set my hand and seal |
| 17  quick and chat or -- I'm the same [unintelligible] -- | 17  this 25th day of October, 2024. |
| 18         COURT REPORTER:  Wait.  I didn't hear.  "I'm | 18 |
| 19  the same"? | 19 |
| 20         MR. HORWITZ:  We can go off the record for a | 20         _Andrea Check_ |
| 21  bit. | 21         ANDREA L. CHECK, CSR No. 748, RPR, CRR |
| 22         MR. SMITH:  We can go off the record.  I'm | 22         Notary Public |
| 23  sorry about that. | 23         1109 West Main Street, Suite 220 |
| 24         VIDEOGRAPHER:  Okay.  So the time is | 24         Boise, Idaho 83702 |
| 25  1:48 p.m., and we are off the record. | 25  My Commission expires July 20, 2028. |
| Page 151 | Page 153 |

39 (Pages 150 - 153)

1   MS. KRISTINA M. SCHINDELE, ESQ.

2   krschind@idoc.idaho.gov

3         October 25th, 2024

4   RE:  Pizzuto, Jr.  v. Tewalt, Et Al.

5     10/18/2024, Tim Richardson, Conf (#6890426)

6     The above-referenced transcript is available for

7   review.

8     Within the applicable timeframe, the witness should

9   read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12     The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   (Calendar-Idaho@veritext.com).

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22       Yours,

23       Veritext Legal Solutions

24

25

                      Page 154

---

1   Pizzuto, Jr.  v. Tewalt, Et Al.

2   Tim Richardson, Conf (#6890426)

3       ACKNOWLEDGEMENT OF DEPONENT

4     I, Tim Richardson, Conf, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11   _____  _____

12   Tim Richardson, Conf       Date

13   *If notary is required

14     SUBSCRIBED AND SWORN TO BEFORE ME THIS

15   _____ DAY OF _____, 20___.

16

17

18   _____

19   NOTARY PUBLIC

20

21

22

23

24

25

                      Page 156

---

1   Pizzuto, Jr.  v. Tewalt, Et Al.

2   Tim Richardson, Conf (#6890426)

3       E R R A T A  S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____  _____

24   Tim Richardson, Conf       Date

25

                      Page 155

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 118545

**[& - 2014]**

| & |
| --- |
| **&**   2:13 3:9,10 7:25 |

| 0 |
| --- |
| **00359**   1:5 7:8 |
| **087457**   4:15 |
| **087458**   4:15 |
| **09**   5:15,15,18 5:18,20,20 |
| **097804**   6:10 |
| **097806**   6:10 |
| **098665**   4:10 |
| **099271**   4:21 |
| **099272**   4:21 |

| 1 |
| --- |
| **1**   4:7 29:9,11 29:17,21 35:23 71:23 82:21 136:25 148:1 |
| **1,050**   140:2 |
| **10**   4:3,23 5:8 60:22,23 81:16 96:17 97:2 150:19 |
| **10-18**   136:21 |
| **10-21-21**   4:9 |
| **10/18/2024** 154:5 |
| **100**   115:20 |
| **101990**   4:18 |
| **101991**   4:19 |
| **105855**   4:24 |
| **105856**   4:25 |

**106**   6:6
**106:13**   6:18
**10:32**   54:16
**10:42**   54:19
**10th**   16:18 38:6 38:17 70:11,13
**11**   5:10,14 63:9 63:11
**110**   3:6
**1109**   153:23
**111620**   5:12
**111630**   5:12
**111767**   5:7
**116746**   6:7
**116748**   6:7
**116754**   5:24
**116769**   5:24
**118060**   5:18
**118062**   5:18
**118063**   5:15
**118067**   5:15
**118070**   5:20
**118071**   5:20
**11:50**   107:10
**11th**   64:22 65:11 70:12,21 70:23 113:11 113:16 114:20 114:22
**12**   5:13 64:3,4 64:7,9,10,18,21 73:3
**1299**   3:6
**12:42**   107:13

**12th**   48:4 49:20 50:3 54:25 64:18 65:20 113:13
**13**   5:16 71:18 71:19 72:1
**135**   13:14 32:23 91:24 94:1
**135.02.01.001** 4:13 31:6
**136**   6:8
**14**   5:19 71:18
**14:40**   79:10
**14th**   70:12
**15**   5:21 82:20 83:18,20,21 86:24,25 88:14 150:18
**15th**   70:10
**16**   5:23 53:23 89:20,21
**16:18**   50:7 51:10 53:21 54:4
**17**   5:24 90:19 90:22
**170**   61:1,5 68:2
**18**   1:13 2:5 6:3 51:10 94:15,16 94:20,21 97:4
**18th**   7:4 152:10
**19**   5:17 6:6 106:15,16,19

**1995**   17:9
**19th**   70:10,13 71:24 72:8,10
**1:21**   1:5 7:8
**1:23**   141:19
**1:35**   141:22
**1:48**   151:25 152:3
**1:49**   152:10,23
**1st**   70:9

| 2 |
| --- |
| **2**   4:11 31:2,5 35:23 142:8 |
| **2,100.00**   149:25 |
| **2.5**   79:12 82:22 |
| **2/2/22**   149:24 |
| **20**   6:8 15:15 32:5 122:5 136:2,4 142:6 143:20 145:17 146:7 147:9 148:5,20 149:18 153:25 156:15 |
| **2000**   15:5 16:10,15,18 17:6 |
| **2005**   16:7,10,15 |
| **2011**   16:3,7 17:25 19:11 |
| **2012**   18:1 19:11 |
| **2014**   15:25 16:3 |

**[2017 - 90]**

**2017**  15:16,17
15:20,23
**2021**  15:6,16
29:20 31:7
**2022**  4:15,17,21
35:16 36:16
140:7
**2023**  4:23 5:4
5:14 38:6,17
41:3 48:4
49:20 50:3
54:25 58:13
61:8 64:22
**2024**  1:13 2:5
5:15,17,18 7:5
14:1 57:2 71:6
71:8,24,25
72:8 73:17
80:20 92:12
152:10 153:17
154:3
**2028**  153:25
**20th**  70:11
**21st**  29:20
**22**  5:4
**220**  153:23
**222**  5:7 58:4
**22nd**  41:3 70:8
**23rd**  70:9
**24**  15:6 32:24
150:19
**24th**  57:2 88:22
**25th**  4:17 35:16
70:12 140:7
153:17 154:3

**26**  9:10,12,19
9:20,22
**27th**  61:8 65:11
65:21 70:9
**28**  5:14,17
70:12
**28th**  73:17 74:1
78:14,25 93:12
93:14,19 95:8
97:20 123:8,9
124:15,17
125:3,5,22
126:24 127:2
**29**  4:7
**29th**  70:11
**2nd**  70:8

**3**

**3**  4:14 34:4,6
35:23
**30**  20:14 27:9
27:20 32:25
154:16
**300**  138:11
139:14
**30s**  65:13
**30th**  31:7 70:11
**31**  4:11 71:6
**32238**  153:20
**34**  4:14
**35**  4:16
**350**  138:11
139:15
**36**  4:20
**38**  4:22

**4**

**4**  4:13,16 35:10
35:15,19,24
36:4 147:24,25
**4.0.**  31:6
**40:24**  6:15
**40s**  65:13
**41**  5:3
**47**  5:6
**48**  20:14
**4:18**  54:5
**4th**  70:21 71:8
71:25

**5**

**5**  4:20 36:14,15
**50.00.**  146:12
**58**  5:7
**5th**  70:8,10,13
92:12,19 93:1
93:12,19

**6**

**6**  4:22 36:18
38:4,5 39:3,4
61:1 148:1
**60**  5:8
**63**  5:10
**64**  5:13
**6756**  3:14
**6890426**  154:5
155:2 156:2

**7**

**7**  5:3 41:1,2
94:19,22

**7-27**  137:7
**702**  2:4,14 3:13
**71**  5:16,19
**748**  1:22 153:2
153:21
**7:00**  69:14

**8**

**8**  5:6 31:11
47:13,15 53:20
55:16 57:1
73:13,14,15
88:21 95:16
**800**  3:13
**83702**  2:15
153:24
**83706**  3:7
**83707**  3:15
**86**  5:21
**86:22**  6:16
**89**  5:23
**8:00**  69:14

**9**

**9**  4:10,15,15,18
4:19,21,21,24
4:25 5:7,7,12
5:12,24,24 6:7
6:7,10,10 58:2
58:4,4
**9-30**  136:22
137:7
**9-30-21**  137:8
**9/30/21**  148:6
**90**  5:24 17:6

Page 2

## [900 - announcement]

| | | | |
|---|---|---|---|
| **900** 2:4,14 140:1 | **acknowledg...** 154:12 | **addressed** 124:9 | 29:4,8 34:7 35:15 36:16 |
| **90:17** 6:17 | **acquire** 67:20 | **adequate** 32:10 | 38:6 39:2,19 |
| **94** 6:3 | **acquired** 72:5 | **adjacent** 25:10 | 41:3,9 |
| **98** 17:6 | **acquisition** 108:7 114:17 | 100:18 | **agendas** 29:2,7 34:21 |
| **9:36** 2:5 7:5 | **acting** 23:14 | **admin** 25:19 105:23 115:6 | **agree** 152:7 |

**a**

**a.m.** 2:5 7:5 54:16,19 69:14 107:10

**ability** 153:12

**able** 8:22 101:6 146:25

**above** 2:8 51:9 132:2 136:25 154:6 156:7

**absent** 38:14

**absolutely** 10:2

**accept** 51:25

**access** 95:5 117:20 123:14 125:2 127:7,8

**accessing** 124:6

**account** 144:13

**accounted** 138:6

**accounting** 144:6,8 148:16

**accuracy** 154:9

**accurate** 67:6

**achieve** 112:19

**acknowledge...** 156:3

**acknowledging** 146:5

**acquisition** 108:7 114:17

**acting** 23:14 33:2,5,15 115:18,25 116:6

**action** 44:7 153:15

**activated** 32:9 115:9

**active** 25:25 26:21

**activities** 94:4

**actual** 25:16 74:8 98:23 115:14 132:15

**actually** 103:16 135:5 144:12 146:10

**add** 9:24 146:20,25

**added** 50:15 51:3

**adding** 146:23 146:24

**additional** 83:7 121:21 140:19

**additions** 156:6

**address** 10:24 118:8

**admin** 25:19 105:23 115:6 125:9,16 126:10 127:13 133:13

**administered** 96:7

**administering** 96:6

**administrating** 95:20

**administration** 6:5 28:21

**administrative** 22:2 34:12 38:7,20 41:4 105:23

**admission** 5:9 60:25,25 61:4

**admissions** 5:12

**admit** 61:5

**advice** 26:5

**advise** 96:10,21

**advised** 124:2

**affect** 20:10

**affecting** 103:9

**agency** 143:25

**agenda** 4:14,16 4:20,22 5:3

29:4,8 34:7 35:15 36:16 38:6 39:2,19 41:3,9

**agendas** 29:2,7 34:21

**agree** 152:7

**air** 62:24

**al** 1:7 7:8 154:4 155:1 156:1

**allotted** 154:19

**allowed** 117:20

**altered** 19:20

**alternate** 127:7

**alternative** 129:13

**alternatives** 129:14

**amanda** 4:9 29:18 115:1,4 148:11,13

**ambient** 62:24

**amount** 137:17 138:12 139:22 139:25 140:6 144:4,10,12 146:10 149:24

**amounts** 139:13 144:5

**analysis** 5:23 89:22

**andrea** 1:22 2:6 7:15 153:2,21

**announcement** 95:14 99:24

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004
09 118548

**[announcement - attempted]**

| | | | |
|---|---|---|---|
| 102:6,7,8,9 | 139:17 | 146:2 | **assistant** 91:11 |
| **annually** 31:16 | **apiece** 138:11 | **areas** 122:11,15 | 91:16 |
| **answer** 8:18 | **apologize** 34:1 | 122:17,22 | **associated** |
| 11:17 12:24,24 | **appear** 53:22 | 123:6 128:3 | 28:19 44:7 |
| 19:9,9,25 40:3 | **appearances** | 142:1 145:7 | **assume** 12:4 |
| 40:20 42:11 | 2:9 7:17 | **arisen** 97:8 | 33:8 82:18 |
| 48:15 49:1,8 | **appeared** 144:1 | **arms** 101:2 | 150:6 |
| 52:7,22,23 | **appears** 31:13 | **army** 16:23,25 | **assumed** 27:17 |
| 55:3 57:22 | 35:19 41:4 | **arose** 96:10 | 75:8 |
| 61:15,19 62:3 | 48:1 53:24,25 | **arrangements** | **assuming** 51:2 |
| 62:3,4,19 65:7 | 71:7,8,23 | 57:25 | 146:21 |
| 82:13 83:2,3,5 | 88:22,25 91:8 | **ascertained** | **assumption** |
| 88:7 92:16,18 | 93:16 | 86:13 | 30:17 36:8,9 |
| 92:18 108:15 | **appended** | **asked** 17:7 | 38:14 41:7,19 |
| 108:20 110:2 | 156:7 | 18:16 37:13 | 41:24 45:8,23 |
| 110:12,16 | **applicable** | 38:25 42:18 | 47:7 51:4,5 |
| 112:8 114:10 | 154:8 | 47:1 61:13 | 72:8 76:10 |
| 121:11 133:14 | **appreciate** 11:5 | 62:7 68:8,11 | 90:6 128:11 |
| 135:16 | 83:12 | 80:17 102:7 | 137:2 142:13 |
| **answered** 26:5 | **approached** | 113:13 144:25 | 142:14,14 |
| 34:20 62:6,9 | 102:3 121:22 | 145:14 150:20 | 147:3 |
| 63:12 135:6 | 122:18 | **asking** 12:23 | **attached** |
| **answering** 8:24 | **appropriate** | 18:20 24:10 | 154:11 |
| 12:1 62:13,14 | 22:24 33:3 | 34:23 40:8 | **attempt** 6:6 |
| 132:11 | 102:5 | 70:15 88:1 | 98:23 100:22 |
| **answers** 37:3 | **approved** | 112:9 113:15 | 100:24 103:7 |
| 73:6 112:12 | 13:22 31:6 | **asleep** 103:16 | 103:25 104:20 |
| **anticipate** | 92:23 | 103:19 | 120:16 121:23 |
| 48:20 | **april** 70:11,12 | **aspect** 87:12,18 | 123:10 |
| **anytime** 12:11 | 70:12,12 | 116:2,14 | **attempted** 79:2 |
| 70:23 | **area** 14:15 25:8 | **aspects** 115:8 | 79:5,14 80:8 |
| **apart** 42:25 | 56:4 62:22 | **assigned** 91:22 | 90:21 93:6,14 |
| 55:10 70:1 | 101:15 105:16 | 100:14 | 96:8 97:18 |
| 120:24 121:15 | 110:23 111:15 | **assist** 18:13,16 | 98:3,7,14 |
| 126:13 138:19 | 111:16 120:19 | | 99:12,19 101:1 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 118549

Tim Richardson 17-1   October 03, 2024

**[attempted - believe]**

| | | | |
|---|---|---|---|
| 101:3,4 105:21<br>118:12 119:22<br>120:10 121:6<br>122:25 123:5<br>141:10 149:14<br>150:22 151:1<br>151:11<br>**attempting**<br>122:12<br>**attempts** 103:9<br>104:10 106:22<br>121:20<br>**attend** 26:15,23<br>**attended** 26:17<br>26:25 27:2,5<br>138:21<br>**attending**<br>18:24 19:4<br>116:17<br>**attends** 27:23<br>115:10<br>**attention** 111:2<br>111:8<br>**attorney** 3:4<br>61:15 153:14<br>154:13<br>**attorneys** 5:5<br>8:2<br>**audible** 103:12<br>103:23<br>**august** 4:15<br>**available** 154:6<br>**aware** 35:21<br>53:2 56:18<br>124:4 125:1,11 | 125:14,18,20<br>126:8 127:18<br>127:19 128:17<br>128:18 129:23<br>139:18 145:13<br>147:12<br>**b**<br>**b** 4:5 5:1 6:1<br>9:12,20<br>**back** 15:22,23<br>17:12 19:11<br>21:19 22:3<br>24:24 25:3,6<br>25:13 41:5<br>44:5,13,15,21<br>44:22,24 45:2<br>49:3 54:19,24<br>59:8 65:9<br>73:13 78:9<br>79:9 80:15<br>85:17 88:20,21<br>92:24 93:17,25<br>97:15 100:13<br>105:16 107:13<br>109:5,12<br>111:15,16<br>117:19 120:18<br>120:22,23<br>121:13 123:11<br>128:6,7 132:4<br>132:21 133:10<br>140:21 141:22<br>146:3,17,21<br>149:3,8,18<br>152:3 | **background**<br>14:8 45:14<br>127:18 128:16<br>**backlogged**<br>146:21,23<br>147:5<br>**backup** 115:11<br>115:14<br>**backwards**<br>14:18<br>**bad** 97:23<br>132:1<br>**bag** 63:7<br>111:17<br>**balaclava**<br>117:22<br>**balaclavas**<br>117:12,14,16<br>**balance** 144:13<br>**balla** 11:11,11<br>17:15,23<br>**based** 36:10<br>40:10,11 48:7<br>48:13 104:2<br>113:22,23<br>**basically** 19:7<br>22:22 27:4<br>119:5<br>**batch** 72:4,5,6<br>81:2 82:14<br>**bed** 132:24<br>**began** 50:14<br>64:24 97:20<br>**beginning**<br>72:23 134:11 | 138:7<br>**begins** 32:6<br>95:3<br>**behalf** 2:2 7:22<br>**belief** 113:4,4,7<br>**believe** 11:10<br>12:20 13:11<br>16:3 17:7,18<br>17:22 20:7<br>33:18,18,19<br>49:25 50:5,13<br>50:14 51:21,21<br>52:1 55:8<br>56:15 60:9,18<br>63:15,17 65:18<br>66:22 79:10,11<br>79:12 81:4<br>82:19,21 83:18<br>83:21 85:25<br>86:1 91:8 93:4<br>98:9 100:17<br>101:3,3,4,5,5<br>101:19 103:17<br>103:22,24,25<br>104:4,5 105:9<br>105:22 106:7,8<br>110:19 111:14<br>111:15 113:24<br>120:18,21<br>121:12 123:1<br>123:23 124:1,2<br>125:4,7,24,25<br>125:25 126:1<br>127:12 130:10<br>131:10 133:4 |

Veritext Legal Solutions<br>Calendar-Idaho@veritext.com  208-343-4004

09 118550

**[believe - care]**

134:13 136:20
139:7 140:1,12
143:5,10 146:2
146:3
**beneath** 29:13
**benefit** 9:18
**beryl** 3:21
10:12
**best** 10:24
11:16 12:1
19:9 153:11
**better** 12:2
**big** 56:9
**bigger** 63:7
**bit** 14:9 47:15
57:13 65:25
68:21 100:4
113:10,14
151:21
**bleeding**
122:17
**bliss** 17:3
**block** 73:23
74:1 100:14
123:11,11
127:22 129:4
149:3,8
**blw** 1:5 7:8
**body** 103:8,9
**boise** 2:4,15 3:7
3:15 16:23
32:7,18 153:24
**bolder** 47:25,25
**book** 5:24 91:6

**bookkeeping**
135:3
**bottle** 77:2,2,3
77:6,13
**bottles** 74:19
78:18 79:12,13
79:15,18,20
80:13
**bottom** 32:6
36:18 88:15
142:8 146:8
**bounced** 17:11
**box** 3:14 49:16
51:12,15,18
52:9 63:7
75:17,17 80:4
80:6,11 83:14
83:15,17,22,24
84:10 85:8,17
111:21 113:6
**boxes** 49:9,10
49:12 51:16,20
51:22,23,25
59:8 63:3 69:1
74:3,7,9,11,23
75:15,24 76:2
76:4,6 77:19
77:24 78:4,6
78:11,19 82:17
82:19,24,25
83:16,18,20,21
84:11,13 85:4
89:3
**brand** 66:25

**break** 12:10,13
12:15 54:13,17
107:6,11
141:16,20
151:16 152:1
**brett** 91:9,15
91:22,22
**brian** 57:11
**brief** 59:16
**briefed** 12:22
**bring** 14:5
78:11 99:17
**bringing** 56:13
57:14 84:24
**brought** 73:25
75:13 98:25
99:4,13 104:12
108:9 109:15
109:18 110:4
111:10
**bruising** 123:3
**build** 128:1
**building**
117:14,16
128:7 150:19
**bullet** 32:6 33:7
**burden** 9:13,17
**business** 70:25
123:9
**buttons** 133:11
**buy** 67:24

**c**

**c** 3:1 7:1 9:22
**calendar**
154:15

**call** 25:7 44:15
46:4 52:1
57:14 82:18
87:8 91:5
94:17 99:1
117:16 118:12
119:18 121:15
121:23 151:5
**called** 35:1 52:2
56:23 119:11
119:14,17
120:7 124:20
**calling** 19:6
**calls** 92:14 93:2
104:23
**camera** 7:3
54:18 107:12
130:12,14,18
131:7 141:21
152:2
**cameras** 130:4
130:22 131:1
131:10,13,17
131:19,24,25
132:1,8,25
133:3
**capital** 2:3 7:12
**captain** 15:25
**captains** 27:3
**car** 109:22
112:4 143:3,12
**cardboard**
111:21
**care** 33:12
119:5,6

Veritext Legal Solutions
Calendar-Idaho@veritext.com   208-343-4004

09 118551

**[career - chime]**

| | | | |
|---|---|---|---|
| **career** 17:10 | 117:20 144:4 | **changes** 71:4 | 61:6,24 62:5 |
| **carry** 45:10 | **certainly** 14:20 | 145:12,15 | 62:25 63:14 |
| **cart** 25:14 | 21:9 | 146:6 154:10 | 64:17,24 65:3 |
| 104:12 | **certificate** 5:23 | 156:6 | 65:17,19 68:9 |
| **cascade** 16:23 | 89:22 90:2,5 | **charge** 19:6 | 68:22 72:2 |
| **case** 1:5 7:8 | 153:1 | 22:10 | 73:19,25 74:25 |
| 9:17 11:11 | **certification** | **chart** 28:18 | 75:6 80:18,19 |
| 17:17,19 92:1 | 31:14 | 35:18 36:3,4,5 | 80:23,24 81:5 |
| **cases** 11:9 | **certified** 2:6 | **chat** 151:17 | 81:18,20 82:15 |
| **cash** 137:23 | 153:2 | **check** 1:22 2:6 | 84:22,24 85:11 |
| 142:21 144:5,5 | **certify** 153:3,13 | 7:15 59:7 | 85:23 86:11 |
| 144:16 148:15 | **cetera** 107:21 | 80:13 153:2,21 | 87:12 88:23 |
| **castleton** 4:7 | **chad** 25:22 | **checked** 80:14 | 89:8 90:7,14 |
| 22:11,16 23:10 | 60:10 | **checks** 45:15 | 90:14 94:18 |
| 29:17 | **chain** 5:6 13:10 | 45:19 | 95:20 96:8,18 |
| **catheter** 95:3 | 47:15 50:2 | **chemical** 25:7 | 107:18,24 |
| **cause** 8:12 | 57:6 72:7 | 35:1,18,18,19 | 108:10,23 |
| **cell** 98:20 | 113:12 | 44:16,18 45:6 | 109:1,15,19,20 |
| 129:16 | **chamber** 21:21 | 46:21 47:10,24 | 110:4 111:9,11 |
| **cells** 129:18 | 23:5,6 98:11 | 69:2 73:24 | 111:25 112:3,4 |
| **celsius** 65:14 | 99:1,5,9,10 | 105:17,20 | 113:20 114:17 |
| **center** 3:12 | 100:11 105:15 | 106:3,5,11 | 135:21 143:3,4 |
| 14:24 16:1 | 105:18 106:2,4 | 108:6 117:17 | 143:13 145:3 |
| **central** 12:21 | 106:10 120:11 | 131:15,18,21 | **chest** 100:1 |
| 124:9,11,15,22 | 120:18 129:22 | **chemicals** 6:4 | **chief** 19:25 |
| 124:24 126:21 | 131:14,17,19 | 14:2 28:20,21 | 22:3,4,11,12,22 |
| 127:2,6,11,21 | 132:24 134:25 | 36:12 46:14,23 | 25:2,21,22 |
| 129:5,21 130:6 | **change** 19:16 | 48:24 49:4,5 | 26:9 27:1,16 |
| 130:20 140:22 | 20:16 143:14 | 49:19 50:4,12 | 28:7 33:11,21 |
| 140:23 141:2 | 150:17,21 | 50:17 51:13 | 105:23 133:13 |
| 143:1,24 | 151:3 155:4,7 | 52:10,13,16 | 142:13,19 |
| 144:15 | 155:10,13,16 | 54:24 55:11 | 144:19 148:2 |
| **certain** 69:9 | 155:19 | 56:14,24 57:1 | 149:13,16 |
| 112:17 115:8 | **changed** 53:22 | 57:15 58:11,12 | **chime** 12:16 |
| 115:20 116:14 | | 58:17,22 60:3 | |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 118552

**[choose - confirm]**

| | | | |
|---|---|---|---|
| **choose** 46:21 110:20 | **close** 78:9 80:1 123:9 151:15 | 104:19,22 | 131:24 132:2 132:15 |
| **choosing** 24:3 | **closed** 78:8 93:4 131:11 | **communication** 101:23 102:1 | **condemned's** 27:10 101:11 129:15,16 |
| **chosen** 35:23 145:7 | **closer** 120:14 | **communicati...** 47:9 | **conditions** 53:1 |
| **chris** 3:18 7:14 | **coffee** 98:17,21 | **compartment** 58:18 111:17 | **conduct** 23:6 |
| **christine** 3:20 10:16 27:2 144:20 | **college** 136:9 | **compel** 8:22 | **conducted** 31:15 125:19 |
| **christopher** 2:13,17 7:20 | **come** 13:1 18:9 27:7,8 49:16 55:5 66:18 72:6 92:24 97:15 99:18 117:21 119:24 142:22 144:15 148:24 149:3,8 | **complete** 1:11 1:17 156:8 | **conf** 154:5 155:2,24 156:2 156:4,12 |
| **chronological** 91:25 | | **completed** 154:16 | **conferred** 152:5 |
| **chronologica...** 146:4 | | **complex** 32:7 32:19 55:23 56:1,9 81:11 | **confidential** 1:6,16,17 5:4 5:22,25 6:14 40:25 47:12 86:23 87:1,2,4 89:14,16 90:18 90:23 94:12,14 106:14,17 136:1 |
| **chu** 10:11,13 10:15,17 | **comes** 136:8 146:4 | **compounded** 112:14,18,20 112:24 | |
| **circled** 145:18 | **coming** 13:20 30:3,6,16 | **comprehensi...** 34:25 | |
| **circuit** 131:11 | **command** 26:2 27:19 115:8 | **concern** 119:6 | |
| **circumstances** 19:18 108:22 | **commander** 18:11 26:1 | **concerns** 125:1 | |
| **civil** 9:10,11,21 | **commence** 45:1 95:18 96:10 | **concluded** 152:23 | **confidentiality** 9:3,7 48:8,14 48:25 52:5,20 57:20 65:5 81:21 82:13 83:1 108:18 109:25 110:10 110:15 112:6 114:8 |
| **clarify** 11:25 55:18,24 68:5 87:17 117:15 118:20 129:2 133:8 | **commencing** 2:5 | **concludes** 152:8 | |
| | **commission** 153:25 | **conclusion** 116:13 119:25 | |
| **clarity** 70:7 116:8 | **communicate** 102:15 | **condemned** 21:22 23:5,7 23:15 27:20 91:23 92:6,7,8 99:2 101:10 102:10 119:6 130:19 131:22 | |
| **clear** 10:6 11:22 19:11,21 21:8 30:7 34:20 44:1 46:20 86:19 87:23 126:18 | **communicated** 97:11 | | **confirm** 32:7 67:5 77:5 84:4 |
| | **communicating** 98:5 101:20 | | |

**[confirming - creating]**

| | | | |
|---|---|---|---|
| confirming 50:1 | continue 19:17 58:12 119:2,7 140:8 | 56:15 62:14 64:9,19,23 65:1,24 69:8 | correlating 117:1 |
| connection 37:13 38:23 43:5 68:1 135:7 138:23 139:5 147:11 151:11 | continued 3:1 5:1 6:1 147:5 | 69:19 71:12 73:20,21 74:10 74:13 78:1,5 78:15 83:23 | corresponds 146:11 |
| | control 31:5 131:8 | | counsel 7:16 9:3 12:21 13:2 61:23 152:7 154:14 |
| consideration 42:3 129:20 | controlled 46:17 | 84:6,9 85:9 88:5,13,24,25 91:4 92:10 | counted 138:5 |
| considered 127:21 | conversation 56:13 61:21,23 102:12 105:10 105:12,13 120:22 121:16 138:20 | 94:6,20 96:14 99:8,8,21 101:25 105:7,8 105:19 111:5 113:18,21 114:21 116:25 140:20 142:18 146:14 153:10 156:8 | counter 130:11 |
| constantly 151:5 | | | country 53:16 |
| constituted 82:23 | | | couple 26:19 113:13 128:3 130:11 |
| construct 133:23 | conversations 20:1 56:19 114:12,14,20 | | course 122:9 |
| constructed 130:9 | conveyed 52:9 | | court 1:1 7:9 8:5,7,23 17:21 42:9 87:3 91:13 132:13 149:5 151:18 152:12,16,19 |
| construction 129:1,10 | coordinate 22:23 | correction 4:11 5:21 6:3 7:23 7:25 14:22 19:21 23:12 47:8 95:10 | |
| consulted 60:10 97:12 120:19 121:14 131:4 | copies 144:7 154:14 | | courthouse 17:24 |
| | copy 152:17,20 | | covers 50:18 |
| contact 18:9 26:3 79:6 | corner 81:16 128:8 | correction's 113:25 | cramp 103:25 104:3 |
| contacting 26:4 | coroner 27:22 28:8,9 121:5 | correctional 15:15 16:1,11 16:11,17,18 | cramping 104:4 |
| contacts 60:5 | coroner's 27:23 121:8 | corrections 16:21,22 45:24 156:6 | create 73:1,2 94:2 128:15 |
| contained 80:4 | correct 23:15 25:5 28:12 33:4 38:10,11 41:10 46:22 50:8 51:4,5 | | created 64:17 72:1,3,4 140:11 |
| contains 1:16 | | correctly 57:3 57:4 82:20 | |
| context 42:24 137:21 | | | creating 141:11 |

**[creation - department]**

| | | | |
|---|---|---|---|
| **creation** 134:15 | **cv** 1:5 7:8 | 125:6 137:18 | 9:8,18 152:7 |
| **credentials** | **d** | 139:23 144:23 | **defender** 2:3,11 |
| 36:18,23 37:4 | **d** 4:1 7:1 | 144:24 149:14 | 7:12 |
| **creech** 79:3 | **d.c.** 142:3 | 153:17 156:15 | **defense** 9:2 |
| 90:22 92:2 | **dagoberto** | **days** 20:14 | **definite** 33:9 |
| 93:18 97:22,24 | 33:16 38:9 | 27:20 32:25 | **definitely** 120:2 |
| 98:2,10,25 | 115:15 | 154:16 | 151:4 |
| 99:3,13 100:12 | **damaged** | **dea** 5:7 58:4 | **dehydrated** |
| 103:7,11,17 | 107:25 | **deal** 85:8 | 98:10 |
| 119:1,21 | **darrington** | 135:22 151:1 | **delay** 95:14 |
| 120:14 121:22 | 56:7 | **dealing** 136:10 | 99:24 102:4 |
| 122:18 123:16 | **date** 7:4 16:19 | **death** 20:9 26:1 | 118:21 |
| 123:21,24 | 47:22 50:2 | 26:21 31:17 | **delayed** 97:14 |
| 124:1 | 57:5,8,9 62:8 | 32:23 33:13,19 | 118:25 |
| **creech's** 92:23 | 62:12,12,14 | 92:1 | **delaying** 100:3 |
| 96:8 97:19 | 64:19,20,21 | **december** 20:7 | **delivered** 48:5 |
| 98:6 | 73:16 88:22 | 20:8 70:9 | 48:6,11,23 |
| **creek** 81:17 | 92:11,13 93:9 | **decide** 116:10 | 52:16 |
| **criminal** 31:14 | 94:3 140:9 | **decided** 119:10 | **delivering** |
| 37:5,13,16 | 146:9,10 147:2 | **decides** 36:11 | 56:24 96:10 |
| 45:15 | 155:24 156:12 | **decision** 20:17 | 143:4 |
| **crossed** 120:1 | **dated** 4:9 29:20 | 36:2,4,7 39:22 | **demo** 129:18 |
| **crossing** 120:8 | **dates** 65:22,23 | 60:6,12,15 | **deny** 61:5 |
| **crr** 1:22 153:21 | **davis** 136:22 | 107:21 118:12 | **departed** |
| **csr** 1:22 153:2 | 137:3,9 138:17 | 118:13,16,19 | 120:19,21 |
| 153:21 | 138:18 148:11 | 118:21,23 | 130:9,13 |
| **curious** 13:22 | **day** 20:15 23:3 | 121:15,23 | **department** |
| **current** 14:21 | 27:9,12 60:18 | **decisions** 46:21 | 4:11 5:21 6:3 |
| 15:9 128:4,6 | 64:25 66:9 | 130:25 | 7:23,25 9:14 |
| **currently** 61:6 | 67:8,11 68:17 | **declare** 156:4 | 14:22 19:20 |
| **custody** 5:6 | 69:9 79:8,8 | **dedicated** | 23:12 36:13 |
| 13:10 47:15 | 86:8 91:25 | 27:19 | 45:24 47:8 |
| 50:2,17 57:6 | 93:14 115:14 | **deemed** 156:6 | 60:5 95:10 |
| 72:7 113:12 | 117:17,21 | **defendants** 1:8 | 113:25 127:5 |
| 150:18 | 121:5 122:24 | 3:3 5:10 8:16 | |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 118555

**[departure - discovery]**

| | | | |
|---|---|---|---|
| **departure** | 118:13 | 112:13 | **director** 19:21 |
| 120:24 | **describes** | **devices** 45:9 | 20:22 26:4,15 |
| **depend** 116:2 | 113:12 | **dialog** 134:12 | 26:25 27:16 |
| **depending** | **describing** | **different** 17:13 | 36:8,11 41:19 |
| 116:6 | 31:20 | 36:5 56:20 | 41:21,22,24 |
| **deponent** | **description** 4:6 | 69:17 70:22 | 45:23 47:7 |
| 154:13 156:3 | 106:21 | 72:3,4 85:20 | 60:10,11 90:6 |
| **deposed** 11:6 | **designated** | 104:14,14 | 90:12 95:9,18 |
| **deposing** | 40:25 86:23 | 110:23 111:6 | 97:13,13 |
| 154:13 | 90:18 106:14 | 112:3,12 | 101:24 102:3 |
| **deposition** 1:12 | **designates** | 139:22 141:25 | 102:13 105:6 |
| 2:1 7:6,11,13 | 135:23 | 145:3,5 147:19 | 113:24 114:1,3 |
| 8:23 9:5 12:19 | **designation** | 150:18 | 118:15,19 |
| 17:15,16,18 | 47:12 89:14 | **differently** | 119:17 120:9 |
| 96:15 134:12 | 94:12 136:1 | 139:5 | 120:12 121:2 |
| 152:6,9,23 | **designations** | **difficult** 123:15 | 121:16 124:20 |
| **deputy** 15:14 | 1:18 6:14 46:7 | **difficulty** 124:5 | 127:12 128:12 |
| 15:18 22:2,4 | **desk** 63:2 81:7 | **digital** 66:6,17 | 131:2,3 134:2 |
| 22:11,12,22 | **detail** 58:11 | **diploma** 14:11 | 141:7 |
| 25:2,21 26:25 | 59:25 98:24 | **direct** 18:5 | **director's** |
| 27:3,15 28:6 | **detailed** 106:21 | 41:21,23 60:25 | 118:13 |
| 33:11,16,21,23 | **determination** | **directed** 56:15 | **directs** 28:7 |
| 105:23 133:13 | 55:6 | 91:24 116:5,5 | **disburse** |
| 142:13,19 | **determine** | **direction** 19:20 | 142:21 |
| 144:19 148:2 | 75:16 | 20:16,21 28:5 | **disburses** 138:2 |
| 149:13,16 | **determined** | 91:19,21 128:7 | **disclosure** 9:11 |
| **derobe** 117:22 | 19:6 27:6 55:4 | 134:4 153:9 | 9:12 |
| **describe** 70:5 | 56:12 110:18 | **directive** 37:10 | **discomfort** |
| 81:1 82:15 | 110:19 138:12 | 116:11 | 103:15,20 |
| 99:11 109:24 | **determines** | **directives** 37:4 | **discontinued** |
| 115:1 127:24 | 96:20 | **directly** 51:9 | 93:15 |
| 136:7 | **deviate** 19:22 | 61:12 101:10 | **discovery** |
| **described** 33:6 | 19:23 20:2,18 | 114:4 120:11 | 61:13 64:6 |
| 33:8 83:15 | **deviations** 20:3 | 125:25 | 68:9,12 |
| 84:2 116:18 | 20:21 26:7 | | |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 118556

**[discretion - ennis]**

| | | | |
|---|---|---|---|
| **discretion** 20:22 24:6 | 132:5 140:23 140:25 141:1,4 141:6 | 78:3 79:16,18 79:22 81:7 | **easy** 58:9 |
| **discussed** 12:25 43:24 110:22 128:3 134:9 | **doctors** 131:4 **document** 14:3 34:8 35:1 57:6 67:23 90:25 | **drawn** 79:14 **drill** 11:12 **drink** 98:19 | **ectopy** 39:11 **education** 14:12 **educational** 14:9 |
| **discussing** 73:3 90:15,24 | 92:23 94:7 106:23 136:5,7 | **drinking** 98:13 98:16,20,21 **drive** 108:25 | **effort** 125:23 **efforts** 133:22 |
| **discussion** 107:19,19,23 123:14,20 | 137:5 140:7 **documentation** 43:4 92:4 | 109:3,12,16,19 **driven** 151:8 **driving** 112:4 | **eight** 119:22 **either** 15:5 18:13 23:19 |
| 124:7 125:8 127:25 128:1 130:18 134:7 134:20 141:8 141:10 | 125:15 139:16 148:18 **documented** 32:12 57:5 93:21 136:21 | **drove** 109:10 110:4 111:24 **drug** 35:19 77:6 **drugs** 53:6,10 | 43:9 53:25 88:11 92:3 100:1 105:15 106:10 114:20 125:22 142:15 |
| **discussions** 124:8 126:19 127:1,4,10,17 127:20,24 | 137:14 **documenting** 94:2 **documents** 13:5 14:5 | 53:16 68:2,3 87:24 88:2 89:6 112:14,17 112:20,24 | **el** 17:3 **elia** 3:10 7:24 **email** 4:7 29:15 29:17 116:17 |
| 128:9,10,13,17 130:14,17 | **doing** 44:1,5,10 45:6 59:7 | 113:8,12 114:2 **dry** 60:7,14 | **employed** 143:25 |
| **display** 131:8 **disproportional** 9:16 | 145:10 **door** 21:19 121:2,3 149:3 | 62:6,20 **due** 82:20 **duly** 8:11 | **employee** 48:24 153:14 **employees** |
| **dispute** 8:21 **disqualifying** 37:5 | 149:8 **dosage** 47:24 **downtown** | **duties** 32:25 133:19 | 151:10 **empty** 79:13,15 79:18 132:23 |
| **district** 1:1,2 7:9,9 8:23 | 128:11 **drag** 112:10 | **e** | 132:24 **encounter** 85:2 |
| **division** 33:11 33:22 | **draw** 111:2,8 **drawer** 63:2,13 | **e** 3:1,1 4:1,5 5:1 6:1 7:1,1 155:3 | **ended** 92:20 93:13 |
| **divvied** 138:5 **doctor** 24:8,11 | 63:18 69:1 | 155:3,3 **earlier** 31:4 | **ends** 140:7 **ennis** 3:18 7:14 |
| 25:3,15 28:10 105:16 121:4 | | 34:7 39:19 80:24 114:21 120:6 | |

[ensure - exhibit]

| | | | |
|---|---|---|---|
| **ensure** 144:5 | 102:18,23 | **excursion** | 140:24 141:13 |
| **ensuring** 32:9 | 103:7,18 | 59:17 | 143:2 149:15 |
| **enter** 21:21 | 104:10 119:1,2 | **excuse** 15:14 | 150:23 151:1 |
| 56:4 117:14 | 127:8 128:2 | 26:16 64:1 | 151:11 |
| **enters** 121:3 | 141:2,12 | **excused** 100:12 | **executions** 18:1 |
| **entire** 66:7 | **established** | **execution** 6:4 | 18:8,14 19:12 |
| **entitled** 2:8 | 19:10,13,14 | 13:9,16 18:4 | 115:5 135:8 |
| 58:4 | 20:20 101:17 | 18:10,19,22 | 138:18,24 |
| **entity** 124:2 | 129:4,8 | 20:15 21:5 | **exhibit** 4:7,11 |
| **entries** 93:1,9 | **establishment** | 23:3 27:14,17 | 4:14,16,20,22 |
| 93:11 | 127:16 | 27:21 32:10 | 5:3,6,7,8,10,13 |
| **entry** 137:8 | **et** 1:7 7:8 | 45:10 61:5 | 5:16,19,21,23 |
| **environment** | 107:21 154:4 | 63:18 79:3,5 | 5:24 6:3,6,8 |
| 119:21 | 155:1 156:1 | 79:14 80:8 | 29:9,11,17 |
| **equals** 140:2 | **event** 25:16 | 89:8 90:21 | 31:2,5 32:4 |
| **equipment** | 78:25 79:2 | 93:7,15 94:3,4 | 34:4,6,25 |
| 45:11 49:14 | 101:8 124:5 | 95:15,18 96:8 | 35:10,15 36:14 |
| 104:9,11 | **events** 94:3 | 96:20 97:14,18 | 36:15 38:4,5 |
| **errata** 154:11 | **eventually** | 97:20 98:3,7 | 39:3,4 41:1,2 |
| 154:13,16 | 101:3 | 98:11,14 99:1 | 47:13,15 48:1 |
| **escort** 21:1 | **exact** 13:18 | 99:5,12,24 | 53:20 54:8 |
| 22:21,23,25 | 64:20 85:19,25 | 100:3,11 102:4 | 55:16 57:1 |
| 23:2,6,19,21 | **exactly** 122:20 | 103:17 105:18 | 58:2,4,4,9 |
| 29:24 44:24 | 137:13 144:9 | 105:21 106:2,3 | 60:22,23 63:9 |
| 99:17 100:13 | **examination** | 106:10 115:14 | 63:11 64:3,4,7 |
| 150:10,13 | 4:3 10:20 | 117:13 118:12 | 64:9,10,18,21 |
| **escorted** 23:5 | **example** 34:6 | 118:25 120:10 | 65:12 71:19 |
| 149:9,16 | 131:16 | 120:11,17 | 72:1 73:3,13 |
| **esq** 2:12,13 3:5 | **except** 20:14 | 121:6,15 123:1 | 86:24,25 87:1 |
| 3:11 154:1 | 26:20 139:14 | 123:5,22 | 87:4,7 88:14 |
| **essentially** | **exceptions** | 129:21 131:14 | 88:21 89:20,21 |
| 80:17 | 59:22 | 131:17,19 | 90:19,22,24 |
| **establish** 95:11 | **exchange** 56:20 | 132:24 134:25 | 94:1,14,15,16 |
| 99:19 101:2,6 | 89:18 100:8 | 136:12,14 | 94:21 97:4 |
| 101:9,21 102:5 | 106:17 | 137:21 139:23 | 106:15,16,19 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 118558

**[exhibit - fit]**

116:16 136:2,4
142:5,6,10
143:20 145:17
146:7 147:9,24
147:25 148:5
148:20 149:18
**exhibits** 29:16
35:12 64:5
71:18
**existed** 134:20
**exit** 23:8 121:2
**expect** 12:22
37:2 49:3
**expectation**
113:19,22,23
**expenditures**
88:1 135:7,19
135:21,22
148:19
**expense** 6:8
**expenses**
136:10
**experience** 14:9
**experienced**
103:15
**expires** 153:25
**explain** 100:3
122:8,9
**explained**
100:2
**explicitly** 43:24
**exposure**
131:13
**expressed** 44:3
130:1

**eyes** 5:5

**f**

**f** 73:23 74:1
100:14 123:11
127:22 129:4
149:3,8
**face** 43:19
117:4 118:2
**facilities** 27:4
**facility** 15:9
18:7 27:4 32:8
32:19 38:15
70:24 92:25
110:24 111:1
133:23 148:25
149:7,10
**fact** 62:5,5 68:7
75:4 82:21
101:19 107:20
113:10 124:21
**fahrenheit**
65:14,15
**failed** 72:11
**fails** 154:18
**failure** 95:4
**fair** 17:11
114:25 122:19
**fairness** 116:7
**familiar** 24:11
24:13 29:3,4
30:10 40:5
46:10 59:16
**far** 30:8 53:1
55:4 104:18
111:24 146:11

147:14 148:19
**farther** 120:14
**fd.org** 2:16,17
**february** 5:17
71:24 72:8,10
73:17 74:1
78:14,25 80:20
81:2,20 82:2,4
83:17,24 84:11
84:22 85:11
86:11 87:15,23
88:4,12 90:8
90:14,22 93:12
93:14,19 95:8
97:20 108:17
109:9,9 110:3
110:14 111:3,7
112:12 113:8
123:8 124:15
124:17 125:3,5
125:22 126:24
127:2 143:5,11
145:4 147:3
**federal** 2:3,11
7:12 8:22 9:10
9:11,21 17:24
**feel** 12:16
**fidrych** 3:22
10:7,7,10
**field** 14:13
**file** 8:22
**fill** 38:22 50:21
**filled** 35:7 39:7
58:7

**filling** 35:8
50:14
**final** 92:11,13
96:18 97:2
**finally** 128:4
**financial** 3:12
87:11,18
**financially**
153:14
**financials**
135:23
**find** 32:5 85:14
94:23
**fine** 10:25
12:11 63:20
**finish** 12:13
**finished** 11:22
**firing** 133:18
133:20,23
134:4
**first** 8:11 16:20
17:22 22:10
24:10 31:10
38:9 50:2,19
56:6 57:16
64:21 65:12
68:15 69:12
70:5 81:3 82:3
96:18 97:1
101:23 116:16
119:16 146:7
148:4 149:23
**fiscal** 143:24
**fit** 19:24

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

09 118559

**[five - going]**

| five 32:6 54:12 | formalities | **g** | 91:21 94:23 |
|---|---|---|---|
| 138:10 140:2 | 11:13 139:2 | | 95:23 96:3,12 |
| **flaps** 75:19 | **former** 27:1 | **g** 7:1 | 117:15 |
| **focus** 32:25 | **forms** 5:6 | **gap** 70:19 86:7 | **given** 39:25 |
| 58:12 92:9 | **formulated** | **gaps** 70:4,5,7 | 40:21 55:1 |
| **focusing** 64:7 | 62:3,4 | 70:15,15 71:2 | 57:2 66:9 |
| 115:3 | **fort** 17:3 | 73:5,7 | 73:19 95:21 |
| **folder** 63:19 | **forth** 17:12 | **gates** 55:22 | 137:18 138:6 |
| **folders** 63:20 | 88:20 89:9 | 56:2,5 | 142:25 144:4 |
| **follow** 11:17 | 153:5 | **gather** 106:20 | 144:11,12 |
| 54:23 84:1 | **forward** 101:12 | **gauges** 104:15 | 148:3 153:11 |
| 107:15 113:14 | 101:13 | **general** 3:4 | 156:9 |
| **followed** 19:14 | **four** 20:15 | 20:24 40:13 | **gives** 122:5 |
| **following** 11:24 | 33:19,19 34:12 | 76:23 80:22 | **giving** 21:23 |
| 40:24 64:25 | 79:13 115:20 | 86:3 138:20 | **go** 10:4 14:17 |
| 86:22 90:17 | 132:3,4,5 | **general's** 61:16 | 15:22 16:2 |
| 106:13 123:2 | **free** 12:16 | **generally** 26:6 | 20:13,19 34:5 |
| 123:12 141:25 | **freezer** 58:15 | 27:8,9 28:18 | 39:1 44:18,21 |
| **follows** 8:12 | **frequency** 19:5 | 69:11 115:24 | 44:22 51:24 |
| **food** 147:17 | 19:16 20:10 | **generated** 43:5 | 52:13 56:2 |
| **foot** 101:4 | **frequently** | 147:10 148:18 | 58:3 65:9 |
| **foregoing** | 26:18 | **gentry** 4:9 | 73:13 80:15 |
| 153:4,10 156:5 | **friday** 69:16,19 | 29:18 34:13 | 88:21 89:21 |
| **forgot** 146:20 | **fridge** 60:13 | 38:8 148:12,13 | 91:25 93:25 |
| 147:4 | 66:7 67:8,11 | **gentry's** 115:2 | 94:18 100:10 |
| **form** 5:7 35:2 | **front** 29:12,23 | 115:4 | 116:9 123:25 |
| 35:18 40:2 | 55:22 56:5 | **gerald** 1:4 7:19 | 135:20 142:1 |
| 47:16,18 49:7 | 72:7 110:24 | 7:20 39:21 | 144:7 146:3 |
| 50:15,16,19 | 111:1 | **getting** 76:13 | 148:19 150:9 |
| 58:4 92:14 | **full** 38:9 79:12 | **give** 11:8,16 | 150:18 151:20 |
| 93:2 104:23 | 79:20 80:13 | 12:18 19:24 | 151:22 |
| 113:12 133:5 | 140:18 | 20:23 22:1 | **going** 8:14 9:2 |
| **formal** 24:5 | **funding** 88:1 | 28:4 32:5 33:9 | 9:4 12:23 |
| 125:7 126:15 | **further** 120:15 | 42:13 45:5 | 13:13 42:9 |
| | 153:13 | 48:21 55:3 | 54:23 55:21 |
| | | 75:25 84:16 | |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 118560

**[going - horwitz]**

65:4 67:22
80:15 95:14
99:24 102:4
115:11 119:2,7
119:23 122:2
123:25 135:20
140:21 141:12
144:14 149:18
152:12
**good** 10:22,23
11:5 54:12,14
83:3 89:17
123:25 149:19
152:6
**goodness** 81:24
**gotcha** 40:4
42:15
**gown** 117:22
**grade** 67:2
**graduate** 17:8
**granted** 8:23
**great** 8:5 12:14
**greet** 21:19
44:23,24
**greeting** 21:18
**guess** 19:24
24:10,17 36:2
43:23 46:2
49:9,19 51:1
59:9 73:17
75:9,11,16
82:3 112:17
135:16 144:3
145:9

**guessing** 30:17
103:12
**guidance**
138:23
**guide** 21:1
**guidelines**
22:19
**gurney** 99:2,6
**guys** 129:16
152:13

**h**

**h** 4:5 5:1 6:1
155:3
**habeas** 2:3 7:12
**halfway** 145:18
**hallway** 129:15
**hand** 8:8 33:1
100:1 101:4
153:16
**handed** 74:11
**handful** 141:25
**handled** 55:14
**handoff** 82:3,4
145:3
**hands** 143:14
**handwriting**
47:17 64:8
71:4,5,21,22
91:1 106:25
136:17,19,23
137:6 150:5
**handwritten**
5:13,16,19 6:6
6:8 39:6 91:6

**hanley** 3:20
10:16,16
**happen** 97:10
115:12 135:22
150:25
**happened**
22:13 40:15
57:7 95:7
96:24 122:2
125:6,9,10
126:4,13
128:11
**happening** 20:3
**hard** 123:17
**head** 28:16
66:3 77:21,23
78:17 126:25
135:9
**heading** 95:2
106:19
**headshaking**
11:19
**hear** 98:1 143:3
151:18
**heard** 104:6
123:16,17
**held** 7:11
**hello** 21:19
**help** 115:22
**helpful** 35:13
**hereto** 156:7
**hey** 89:15
100:2 145:8
147:6

**high** 14:11,11
16:20,24 17:8
**hire** 16:19
**history** 14:17
31:14 37:6,13
37:16 45:15
**hold** 83:4
**holding** 37:21
37:22
**holiday** 20:6
**hollis** 3:19
10:14
**homicide**
150:25
**honorarium**
137:17 147:18
148:3 149:24
**honorariums**
137:15,16
139:9,20 140:8
150:9
**hood** 117:23
**horwitz** 2:12
2:16 4:3 7:18
7:18 8:1,4,14
9:23 10:2,8,18
10:21 29:10
31:3 34:5,19
35:11 36:15
38:5 39:4,5
40:6 41:2
42:16,18 47:14
48:9,18,23
49:2,11 52:8
52:21,24,25

09 118561

**[horwitz - initially]**

54:9,11,14,21
54:22 57:23
58:3 60:23
63:10 64:4
65:8 71:19
81:25 82:14
83:9,12,14
84:19,20 86:25
87:7,19,21
89:17,21 90:20
91:18 92:17
93:8,25 94:7
94:13,17 96:17
97:1,4,5
104:25 106:16
107:6,15
108:21 110:3
110:13,17
112:9 114:11
132:17 133:7,8
136:3 141:16
141:24 142:6,9
148:4 149:9,23
151:13,20
152:5,15
**hospital** 151:2
**hours** 20:14
32:24 98:13
**housing** 100:14
**huh** 29:19
47:23 49:15
56:10 94:23
113:7 126:11
130:16 132:9
137:11 145:21

146:14
**humane** 120:3

**i**

**idaho** 1:2 2:4,4
2:4,7,11,14,15
3:7,13,15 4:11
5:21 6:3 7:10
7:13,15 14:22
15:1,14,19,25
16:4,8,11,17
18:1 19:20
33:23 45:23
47:8 49:23
81:6 91:11,16
153:24 154:15
**idea** 12:18
28:22 104:2
107:4 112:5
**idoc** 12:21 13:9
13:16 16:19
17:11 23:25
32:7,18 48:24
60:19 87:25
90:13 95:19
125:23 144:21
**idoc's** 61:6
**idoc.idaho.gov**
3:8 154:2
**idoc00005219**
6:9
**idoc00005221**
6:9
**idoc00006061**
4:10

idoc00008683
4:17
idoc00008684
4:18
idoc00012329
4:23
idoc00012330
4:24
**ificity** 75:25
**immaterial**
9:14
**immediately**
60:3,4 95:5
96:22
**implement** 26:8
**implementing**
127:6
**impression**
40:21
**imsi** 15:4,12
17:13 18:21
19:1 22:6
32:19 33:14
38:17 49:24
57:12 79:17
95:6,19 96:22
109:5 115:4
130:13 134:5
141:14 150:16
151:11
**incident** 26:1,2
27:18 115:8
**include** 32:19
**inconsistent**
108:8

**incorrect** 30:19
**index** 1:17
29:13
**indicate** 72:22
**indicates** 73:18
**indications**
39:10
**indirect** 18:6
18:10
**individual**
30:20 52:16,17
82:1
**individuals**
55:8 60:5,8
81:4,8 82:5,11
84:23,23
**industry** 52:18
**information**
9:9,11,13,15
41:22,23 45:21
47:5 60:1
83:11 86:7
90:4 97:11,19
104:13 113:23
118:18 123:23
124:1 131:9
**informed** 95:9
**initial** 72:9,14
72:15,18,19
127:25 145:19
146:1
**initialed** 146:5
150:8
**initially** 55:21
72:20 110:22

09 118562

**[initials - keep]**

initials  145:24
    148:7,10
initiate  42:2
initiates  115:7
injection  46:14
inmate  23:14
    39:23
inmate's  29:1
ins  139:1
inside  66:1
    142:23
insight  39:15
inspect  51:18
institution
    14:23 15:2,15
    15:19 16:5,8
    16:12,18 33:24
    49:23 81:6
    91:12,17
institutional
    131:25
institutions
    17:12
instruct  8:18
    95:19
instructed
    108:15
instruction
    21:23 22:1
    32:11 52:21
    95:21,24 96:3
    96:13
instructions
    52:8,12 53:1
    59:20 67:14

68:14 85:11,23
interact  21:14
    22:15 24:15,18
    27:25
interacted  82:1
interacting
    21:20
interaction
    21:17 22:18
interactions
    21:6 28:2
    30:24
intercom
    102:10
interest  34:24
    70:7
interested
    153:15
interject
    148:15
interview  42:6
interviews
    125:19
intravenous
    95:2
introduce  10:5
introduced
    57:24
investigator
    10:11,13,17
invited  27:13
involved  20:1
    24:7 27:18
    29:6 31:22,24
    32:16 36:1,3

46:20,23 47:1
    47:3,6 85:5
    87:11,25 89:7
    89:11 108:16
    124:24 125:7
    127:1,10,17
    133:22,25
    134:15,17
    135:7,14,15,24
    140:23 143:18
involvement
    18:4,5,6,22
    88:9 135:13
involves  9:14
involving
    123:21 125:16
irrelevant  9:15
ish  15:16 16:7
issuance  31:17
issue  60:20
issued  20:9
    32:24 33:14
issues  133:15
issuing  37:10
item  36:18 37:4
    58:18 63:7
    146:23 148:8
items  98:19
iv  6:6 95:3,11
    99:19 100:24
    101:17,21
    102:5,18,23
    103:8,18,24
    104:10 106:21
    119:1 121:20

122:12 130:20
ivs  101:2 127:9
    141:12

**j**

j  2:12 3:11
    123:11
january  70:9
    70:10,10,10,11
job  14:17 15:11
    15:13 16:20
    21:1 52:18
johnson  143:21
join  30:21
jonah  2:12,16
    7:18 54:7
    89:15 94:20
    96:25 104:5
    142:4,7 151:3
josh  1:7
joystick  133:11
jr  1:4 154:4
    155:1 156:1
july  16:18
    153:25
june  5:4,14,17
    15:6 41:3 57:2
    70:13,13,21,23
    71:5,8,25
    88:22

**k**

katie  3:22 10:7
keep  88:20 92:4
    119:21,22
    136:10 149:18

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 118563

**[keeping - level]**

| | | | |
|---|---|---|---|
| **keeping** 73:10 | 45:14,19,21 | 133:25 134:9 | 44:4,7,8,10 |
| **keeps** 136:15 | 47:3,5 48:11 | 134:17,23 | 95:20 96:1,5,7 |
| **kept** 137:13,25 | 51:10,24 52:2 | 136:23,24 | 96:22 97:7,12 |
| **key** 3:12 63:23 | 52:17 53:10,12 | 137:2 138:21 | 102:19 105:9 |
| **kind** 11:13 | 53:14,16 55:4 | 139:4 140:22 | 120:21 121:17 |
| 12:22,25 21:18 | 55:6 57:7,23 | 140:25 142:12 | 138:11 139:14 |
| 43:4 45:14 | 58:7 64:16 | 143:11,22 | 140:3 |
| 49:11 53:14 | 67:2,21 71:13 | 145:24 147:1 | **leadership** 27:4 |
| 63:6 66:15 | 76:9,25 81:25 | 147:25 148:18 | 27:5 |
| 82:16 111:17 | 82:7 87:14,15 | 148:22 150:2 | **leading** 20:14 |
| 115:7 122:1 | 87:21,25 88:18 | 150:18,20,24 | 27:21 94:3 |
| 125:5,12 | 89:11,25 90:2 | **knowing** 82:9 | 99:7 118:20 |
| 145:11 | 90:4,7,8,11,13 | **knowledge** | 150:20 |
| **knew** 13:13 | 91:3 92:13,19 | 41:21,23 44:4 | **leads** 42:2 |
| 39:22 103:18 | 93:11 96:5 | 46:9 104:16 | **leave** 41:7 |
| 122:7,20 | 99:16 101:1,16 | 134:3 139:19 | 70:25 99:22 |
| 124:16 | 101:17 104:9 | 148:22 | 100:7 |
| **know** 11:12,19 | 105:13,20 | **kraft** 3:10 7:24 | **leavitt** 18:2 |
| 12:10,11,15,23 | 106:4,6,9 | **kristina** 3:5 | **led** 67:19,24 |
| 13:20 19:5,12 | 107:2,4 108:8 | 7:22 154:1 | 68:9,12,16,18 |
| 19:12 20:25 | 111:24 112:2 | **krschind** 3:8 | 76:12 |
| 22:13,19 23:10 | 112:14,16,20 | 154:2 | **ledger** 144:2,13 |
| 24:9,13,19,21 | 114:14 115:21 | **l** | **left** 99:23 |
| 25:13 26:20 | 116:3,19,22 | **l** 1:22 2:6 153:2 | 120:11,17,17 |
| 29:6,8 30:1,6 | 118:3,4 121:11 | 153:21 | 130:15 141:10 |
| 30:12,19 31:24 | 121:14,25,25 | **label** 77:1 | 141:14 146:9 |
| 32:1 34:20 | 122:2,3,4,6 | **landscape** | 146:15 |
| 35:7 36:7,19 | 124:11 125:8 | 147:25 | **leg** 100:1 104:1 |
| 36:22 37:7,9 | 125:13,19,21 | **language** 9:16 | 104:3 |
| 38:1,13 39:6 | 126:2,4,9,12,17 | 39:9 76:24,25 | **legal** 40:5 |
| 39:15,24 40:11 | 126:18,19 | 94:24 | 154:23 |
| 40:19 41:5,15 | 127:25 128:5 | **lead** 44:21 | **lengthy** 9:4 |
| 41:18 42:1,4,5 | 128:18 129:24 | 97:18 98:2 | **lethal** 46:14 |
| 42:20,21 43:2 | 130:11 131:3,7 | **leader** 43:8,16 | **level** 150:18 |
| 43:4,8,15,18,20 | 133:2,2,8,12,14 | 43:21,25 44:2 | |

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

**[liaison - ma'am]**

liaison 26:3,3
  91:23
license 46:17
licensing 31:13
lieutenant 16:4
lights 130:11
likely 32:21
  57:9 127:13
  134:2
limited 136:12
line 50:19 51:2
  51:6,7 72:10
  73:16 95:5
  99:19 101:6,17
  101:21 122:12
  124:9,11,15,22
  124:24 126:22
  127:2,11,21
  129:5,21 130:6
  130:20 140:22
  140:23 141:2
  146:24,25
  155:4,7,10,13
  155:16,19
lines 9:25 73:18
  95:2,11 102:5
  102:19,23
  103:8 121:20
  127:7 146:8
  148:6
liquid 74:8
  77:12,14,17
  79:24 86:12,13
  86:16,18

lisa 143:21
list 1:17 36:17
  36:17,25
listed 38:7,12
  41:6
lists 34:12,13
literally 103:11
litigation 125:2
little 13:1 14:8
  47:14 57:13
  58:10 59:25
  65:25 68:21
  70:6 75:19
  80:16 95:1
  100:4 103:15
  112:15 113:10
  113:14 123:3
  126:21 131:9
  133:11
live 132:15
liz 22:12 25:21
  105:24 149:13
  149:17
llp 3:10
lobby 29:23
  56:5
located 62:8
location 56:12
  109:10,19
  110:5,18 111:7
  145:2,4
locations 145:5
locked 63:21
log 5:13,19,24
  6:7,8 64:16,19

64:21,24 65:23
66:14 67:22
70:4,18 71:20
72:1,7,23 73:2
73:6,7 91:4,6,6
91:7,24,25
93:5,13,15
94:2,5,8,10,11
113:11 114:21
136:8,9,13,17
140:11,13,14
140:18 142:2
144:5,7 146:4
146:17 150:7
logbook 92:9
  92:11,19
  140:15
logged 150:7
logging 146:20
logs 5:16 13:10
  13:10 64:5
  86:6
long 10:1 58:22
  58:25 60:15,17
longer 143:25
look 22:18
  28:17 36:17
  39:19,20 53:21
  65:10 66:10,12
  68:16,16,18
  69:5,6 75:15
  79:24 82:24
  84:7 85:10,11
  86:11 89:1,3
  103:6 122:5,22

131:15 139:11
looked 64:12
  68:13 77:17
  84:4 86:18
  102:2 108:2
  122:21,24
  132:7,14,20
looking 39:10
  65:22 73:16
  76:16,19,25
  77:5,12,16
  86:15 88:16
  95:4 101:10,12
  101:13 116:10
  122:1 123:6
  127:5 132:17
  137:4
looks 57:1
  139:2 145:18
  146:8,11 148:7
  149:25
lost 9:15
lot 49:25 51:24
  55:2,21 101:9
  101:11 110:22
  129:10
lunch 107:6,11

**m**

m 2:13,17 3:5
  154:1
m1 46:7,10
m2 46:8,10
ma'am 46:6
  152:18

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

09 118565

**[made - meetings]**

| made 34:15 | manipulated | maximum 15:1 | 102:15,19 |
| 39:22 40:16 | 133:3 | 15:19 16:4,8 | 103:1 104:11 |
| 44:1 55:7 | manufactured | 33:24 49:23 | 104:11,12,14 |
| 57:24 59:23 | 49:10 53:17 | 81:6 91:11,16 | 104:18 105:4 |
| 60:4,12,16 | 113:1,3 | meals 137:14 | 105:24 106:1 |
| 95:13 99:23 | manufacturer | mean 26:16 | 106:10 116:19 |
| 102:9 103:7,23 | 49:14,17 53:12 | 39:9,16 43:24 | 116:20 117:8 |
| 107:21 118:15 | 59:9 82:19 | 47:21 62:20 | 117:22 118:5 |
| 118:19 121:23 | manufacturer's | 67:22 72:18 | 120:19,20 |
| 135:7 145:15 | 113:6 | 75:15 76:14 | 121:16 123:20 |
| 146:6 153:7 | march 31:7 | 87:17 99:2 | 124:2 127:18 |
| 156:5 | 70:11,11 92:12 | 125:8 133:5 | 128:2,6,15,16 |
| main 153:23 | 92:19 93:1,12 | 139:12 146:18 | 129:3,3 130:6 |
| maintain 67:10 | 93:14,19 | 146:19 | 131:3,5 132:3 |
| maintained | margin 146:9 | means 72:13 | 132:4 133:14 |
| 67:23 | 146:16 | 112:3 114:4 | 137:18 138:7,8 |
| make 8:17 | marked 29:9 | 137:16 | 139:22 140:23 |
| 20:17 21:7 | 31:2 34:4 | medical 4:14 | 140:25 141:1,4 |
| 24:12 26:13 | 35:10 36:14 | 4:16,20,22 5:3 | 141:6,11 |
| 37:3 38:25 | 38:4 41:1 | 14:13 21:10,14 | 147:20 148:1 |
| 102:6,7,8 | 47:13 58:2 | 22:10,20,23 | 148:24 149:1 |
| 116:13 119:18 | 60:22 63:9 | 23:19 24:25 | 150:11,12 |
| 132:10 145:1 | 64:3 71:18 | 25:8 26:12,14 | medication |
| 147:2 | 86:24 87:1,4 | 28:3 29:22 | 12:7 96:11 |
| makers 138:8 | 89:16,20 90:19 | 30:15,18,22 | 97:21 103:13 |
| makes 13:21 | 90:23 94:16 | 31:15,16 39:10 | medicine 77:2 |
| 58:9 115:8 | 106:15,17 | 41:15 42:1,21 | meet 55:5,8,21 |
| making 36:2,4 | 136:2 | 43:6,8,15,21,25 | 56:16 81:10,15 |
| 36:7 87:25 | martinez 33:16 | 44:2,4,6,23 | 123:8,9,11 |
| 93:9 130:24,24 | 38:12 115:15 | 45:9,15 46:3 | 145:8,8,9 |
| management | 115:25 116:12 | 46:13 67:2 | meeting 12:20 |
| 91:11,16 | mask 117:4 | 95:19 96:1,5,7 | 12:25 13:3 |
| manila 63:19 | matter 2:8 7:7 | 96:19,22 97:7 | 123:4 |
| manipulate | 19:17 80:22 | 97:12 98:5 | meetings 92:3,5 |
| 132:25 | | 99:18 101:1,21 | 93:18 125:16 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 118566

**[meetings - never]**

126:10
**melawfirm.net**
3:16
**member** 30:15
96:19 116:19
116:20,24
120:20 139:14
**members** 21:15
32:9 41:15
42:2,21 45:17
46:3 101:1
102:16,21,22
103:2 104:18
105:25 106:1,9
123:21 127:13
137:18 138:9
138:10,11
139:23 150:9
**mentioned**
17:15 26:24
31:4 144:20
**mentioning**
61:12
**met** 55:22 81:4
81:12 123:1
**method** 35:23
35:23,23,24
36:3 133:20
**method's** 36:12
**methods** 35:22
**middle** 94:25
95:1 144:3
149:23 150:2
**mile** 81:16

**military** 17:5
**milligrams**
79:12
**milliliter** 82:21
**mind** 13:14,20
94:24 120:1
**mind's** 55:25
**mine** 48:1
145:25
**minimal** 99:15
**minute** 54:12
132:10 141:16
**misreading**
72:17
**missiles** 17:1
**mistake** 34:2
**miswrote** 53:25
**mitigation**
10:10
**mock** 27:11
**mode** 148:1
**moisture** 62:23
**moment** 38:16
73:13 94:23
99:13 120:6
143:15
**monday** 69:16
69:19 123:2,6
123:12
**money** 137:8
137:13,18,23
138:19 143:14
143:17 144:10
146:5

**monitors** 25:14
131:15 132:3,4
132:5,7
**month** 20:4,5
**monthly** 19:13
19:17,19 20:4
**months** 15:20
20:5 150:19
**moore** 3:10
7:24
**morning** 10:22
10:23 98:22
107:16
**mornings**
69:11
**motion** 8:22
**mountain**
14:24
**move** 8:19
17:25 49:2
62:25 71:19
86:25 89:5
106:16 120:16
134:23
**moved** 60:6
63:14 78:2
107:21 123:10
133:6
**movements**
99:12,15
**moves** 133:12
**moving** 69:7
94:13
**multiple** 81:8
82:5 83:16,18

102:20,22
108:10 148:7
**mvtc** 57:11

**n**

**n** 3:1 4:1 7:1
**name** 24:19
29:1 34:14
38:9 41:3 46:4
50:21 51:3,6,7
76:14 77:6
115:16 118:8
**named** 143:21
**names** 118:3
**nature** 61:23
77:3 127:4,5
130:17 132:1
**necessary** 26:7
156:6
**need** 11:17
12:10 26:4,6
28:5 45:9
52:13 63:11
93:25 102:6
114:2 152:19
**needed** 26:5
**needles** 104:14
**needs** 9:16
12:15 29:16
116:14 147:7
**negotiation**
88:8
**neither** 88:11
**neutral** 101:14
**never** 13:14
28:15 40:15

Page 22

09 118567

**[never - october]**

46:20 96:7,9
96:10
**neville** 22:12,16
25:22 34:13
38:8 73:20
74:12 75:13
78:12,22
105:24 142:17
149:13,17
**neville's** 26:11
**new** 14:1 35:12
129:3 131:5
134:12 140:11
**nods** 66:3
77:21,23 78:17
126:25 135:9
**nonrefrigerated**
62:6,23
**nope** 60:4
130:23
**normal** 20:2
**north** 3:6 128:8
**notary** 1:23 2:6
153:22 156:13
156:19
**notate** 66:13
92:2
**notated** 65:23
72:9 79:10
93:16
**notation** 71:8
71:25 72:22
142:3,10
**notations** 28:20
39:5,6 50:16

70:23 71:10
**note** 31:13 69:7
154:10
**notebook** 136:9
**noted** 50:6
64:13 156:7
**notes** 28:13
37:19 91:18
**notice** 27:9
103:21 123:2
**notify** 96:22
97:7
**november** 4:21
29:21 36:16
65:11,21 70:8
70:8,8,9
**nsr** 39:10
**number** 13:13
13:18 145:20
**numbered**
36:17
**numbers** 39:13
53:22
**numerous**
97:25

**o**

**o** 7:1
**oath** 153:6
**object** 9:8,10
40:2 48:10,13
49:7 83:11
92:14 93:2
104:23 133:5
**objection** 8:17
8:17 9:1,3,4,7,8

9:19 48:7,25
52:5,20 57:20
65:5 81:21
82:10,12 83:1
108:18 109:25
110:10,15
112:6 114:8
**objections** 8:15
48:21 153:7
**obligation** 37:5
**obscuring**
117:4 118:2
**observation**
105:11
**observations**
100:23,25
105:3 121:19
121:21 122:11
**observe** 30:20
30:21 37:18,21
98:13 103:8
105:4,12
121:24 123:20
**observed** 37:22
99:16,18
100:22 104:19
104:25
**observing**
29:22
**obtain** 36:13
60:5
**obtained** 72:20
82:15 90:13
92:24 109:1,4
143:2

**obtaining**
108:23 113:12
135:21
**obvious** 34:24
**obviously** 23:8
56:18 67:9
70:22 82:17
122:14,20,25
146:19 147:2
**occurred** 120:2
**october** 1:13
2:5 4:17 5:14
7:4 15:5 29:20
35:16 48:4
49:20 50:3
54:25 58:13
61:8 64:18,22
65:11,20 72:3
75:1 80:17,18
81:3,13,19
83:15 84:2,14
85:4,7,8 87:15
87:23,24 88:11
107:18 108:6
108:10,24,25
109:18 110:14
110:17 111:7
111:10 112:10
112:23 113:11
113:13,16
114:20,22
140:7 143:2,9
143:10,17
145:2 152:10
153:17 154:3

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

09 118568

**[oem - p.m.]**

| | | | |
|---|---|---|---|
| **oem** 49:10,13 | 40:23 41:14 | 145:11 147:8 | **opposite** |
| **offender** 39:21 | 42:1,5 44:6 | 148:4 149:5 | 129:18 |
| **office** 3:4 10:9 | 46:12,12 48:2 | 150:1 151:9,24 | **option** 126:24 |
| 12:21 27:23 | 49:2,18 52:24 | 152:8 | 129:13,24 |
| 51:17 61:16 | 53:19,19 54:15 | **once** 11:10 | **orchard** 3:6 |
| 73:8,25 81:6 | 55:10 56:1,8 | 20:13,19 24:23 | **order** 5:22 9:21 |
| 92:24 113:25 | 56:12,17,19 | 32:23 96:15 | 81:23 87:8 |
| 121:8 138:1 | 57:7,23 58:3 | 103:14 123:10 | 95:17 146:3 |
| 142:23 143:1 | 58:10 61:21 | **ones** 75:1 | 148:11 |
| 143:24 144:15 | 62:15 63:10 | **opaque** 86:19 | **ordering** |
| **officer** 10:10 | 66:15 67:13 | **open** 51:12 | 152:13 |
| 16:11,17 | 68:21 69:3 | 66:9,12 74:14 | **original** 49:13 |
| **offices** 2:2 7:12 | 71:10 72:17 | 75:10,12 76:12 | 74:3 82:18,18 |
| **oh** 72:15 89:17 | 75:9,11 76:5,7 | 77:4 78:6 80:1 | 113:6 152:13 |
| 97:1 135:15 | 76:19 77:10 | 80:3,4 83:14 | **outline** 115:7 |
| 142:6,25 149:5 | 78:9,11 80:21 | 83:24 | **outlined** 32:23 |
| **okay** 8:3,5,7,14 | 82:7,14 83:9 | **opened** 68:14 | 91:23 |
| 10:4,18 11:1 | 83:12 85:10 | 74:5,14,23 | **outlines** 21:4 |
| 11:12 12:3,10 | 87:11 88:6 | 75:5,16,21 | **outs** 139:1 |
| 12:17 13:5,25 | 89:5 90:20 | 76:6 77:19 | **outside** 16:21 |
| 14:7,12 15:11 | 91:8,10,13 | 84:10,13 89:3 | 16:22 23:20 |
| 15:22 16:2,9 | 92:9,11 94:13 | **opening** 30:18 | 43:12 55:22 |
| 16:16,20 17:10 | 95:12,16 97:15 | 83:15 | 56:1,5,6,11 |
| 17:15,20,25,25 | 97:16 99:11 | **operating** 4:12 | 59:10 60:19 |
| 18:18 21:14 | 102:5 105:10 | 132:8 | 81:11 105:15 |
| 24:15 25:1,3,9 | 105:13 107:9 | **opinion** 39:25 | 125:10 135:22 |
| 28:24 29:6,10 | 108:2,6,14 | 40:8,8,10 | 137:21 |
| 29:16 30:2,5 | 112:9,14 115:1 | 119:13,15,17 | **outweighs** 9:18 |
| 30:12 31:3,3 | 115:1 116:16 | 127:14,15,16 | **overview** 17:10 |
| 31:10 32:4,4 | 117:3 120:16 | 128:19,22,24 | **own** 37:13 |
| 32:22 33:13,25 | 123:13 131:23 | 130:1,21 | 137:6 |
| 34:5,11,23 | 135:4,12,18 | **opportunity** | |
| 35:7,11 36:1,9 | 136:3,3,23 | 96:9 | **p** |
| 36:15 37:2 | 140:21 141:18 | **opposed** 36:4 | **p** 3:1,1 7:1 |
| 38:22 39:18,25 | 141:24 143:7 | 111:7 116:11 | **p.m.** 54:5 |
| | | | 107:13 141:19 |

**[p.m. - photos]**

141:22 151:25
152:3,10,23
**p.o.** 3:14
**packaged** 49:5
**packaging** 53:5
59:21 68:15
82:16
**page** 4:2,6
11:14 25:22
31:11 32:5
34:13,25 35:17
36:18 38:8
39:1,20 60:10
61:1 65:12
71:9,23 91:7
94:19,22,25
95:16,16 96:17
97:2 136:25
142:8,10 145:1
145:17,19
146:7 147:19
148:4 149:24
155:4,7,10,13
155:16,19
**page's** 25:23
**pages** 140:17
140:19
**paid** 138:16
139:22 150:13
**pair** 22:24
**panel** 133:10
**paperwork**
37:21,23 38:1
38:23

**paragraph**
95:2,17 96:19
97:2
**paralegal** 10:15
**parenthetical**
72:11
**parking** 49:25
51:24 55:2,21
110:22
**part** 41:24
96:20 105:23
107:23 115:6
116:6 124:8,23
125:16,23
126:10 127:20
128:9,13
141:13 150:24
**participate**
115:13
**participating**
32:9
**particular** 8:25
28:18 44:8
45:12,13 46:15
53:23 55:17
61:20 77:17
84:8 86:15
120:5 122:15
**parties** 144:6
**party** 148:14
148:17 153:14
**paso** 17:3
**passed** 140:4
**patriot** 17:1

**paul** 18:1
**pay** 137:13
142:15
**payments**
137:20 139:19
140:8 142:2
**pdfs** 64:6
**pentobarbital**
35:20 48:3
**people** 27:6,13
34:12 45:25
56:20 82:4
103:1,2 108:10
108:16 109:15
109:18 110:4
111:10,24
112:2 114:6,7
117:20 131:21
143:4 145:12
150:8
**percent** 115:20
**perfect** 11:20
31:9
**period** 15:3
16:24 17:4
18:7 27:17
58:24 65:16
93:6 95:13
100:16 101:24
**periodically**
44:25
**periods** 70:17
70:17 103:16
**peripheral** 6:6
127:9

**permanent**
94:4
**person** 22:5,15
23:14,16 24:3
24:7,14,15,17
24:18 27:25
29:25 30:1,4,9
30:9,25 33:2,5
33:6,15 43:11
43:12 48:11,23
55:11,13 56:13
56:24 57:14,17
57:24,25 81:18
81:19,25 84:20
102:18 108:9
121:24 130:25
132:15 143:22
144:3
**personal** 70:25
128:22
**personally**
124:14
**personnel** 98:6
**pharmaceutical**
14:15 52:18
**pharmaceutic...**
112:18
**phillips** 91:9,15
93:8,16
**phone** 52:1
57:14 151:5
**photographs**
125:21
**photos** 125:24
126:1

Page 25

**[phrase - prior]**

| | | | |
|---|---|---|---|
| **phrase**  21:10 24:12 33:3 59:16 | 130:12,14,20 **plaintiff**  1:5 2:2 2:10 7:19 9:18 | **pool**  148:15 **port**  149:4,6,7 **portions**  1:16 | 13:6 14:3 **prepare**  23:4 34:21 |

**phrase**  21:10
  24:12 33:3
  59:16
**phrases**  39:11
**physical**  121:24
  121:25 128:20
**physically**
  103:5
**pick**  110:21,22
**pickup**  109:9
  110:18
**picture**  117:15
**pizzuto**  1:4 7:7
  7:19,21 8:21
  9:18 39:21
  123:18 154:4
  155:1 156:1
**place**  32:1
  68:24 73:22
  81:12 100:22
  100:24 105:14
  108:25 110:20
  114:15 126:20
  127:22 128:21
  129:6,21 130:6
  134:24 145:12
  153:5
**placed**  63:6
  72:20
**placement**
  31:15,16 72:9
  72:12,14,15,18
  72:19 106:21
  127:21 128:20
  129:14 130:6

130:12,14,20
**plaintiff**  1:5 2:2
  2:10 7:19 9:18
**plaintiff's**  5:8
  5:11 60:24
**plaintiffs**  7:7
**plan**  124:4,7
**player**  23:7,13
  24:4
**players**  21:2
**pleasant**  56:7
  81:16
**please**  7:16 8:6
  11:21
**plug**  67:12,13
**plugged**  113:16
**plus**  144:6
**podium**  99:10
  99:14,16,20,21
  99:22,23
  100:17,18,25
**point**  32:6 33:7
  50:23 53:23
  59:7 61:18
  74:24 75:5
  76:1 89:1,17
  99:25 100:5,6
  101:5 119:10
  151:3
**pointed**  51:9
**policies**  40:11
  63:19
**policy**  13:16
  20:20 116:14

**pool**  148:15
**port**  149:4,6,7
**portions**  1:16
**position**  14:21
  120:25
**positioned**
  111:13 120:10
**possess**  46:17
**possession**  48:3
  49:6,19 54:25
  61:6 66:18
  72:6 75:8
  76:11 78:22
  79:9 81:5
  92:25
**possibility**
  123:14 124:9
  124:15,16
**possible**  133:20
**post**  5:24 91:6
**potency**  89:9
**potential**  30:15
  47:9 115:10
  116:18
**potentially**
  12:25 27:12
  28:5 127:6,6
  128:15 141:11
**practice**  32:11
**preapproved**
  139:9,12
**preceding**  41:9
  98:14
**preparation**
  6:4 12:17 13:1

13:6 14:3
**prepare**  23:4
  34:21
**prepared**  21:21
  22:21,22 96:12
  107:2
**preparing**  29:7
  44:12,13 45:8
**presence**  74:15
**present**  3:17
  12:21 13:3
  14:18 73:8
  81:19 82:2,4
  85:1 125:10
**preserve**  9:4
**preserved**  8:21
**pretty**  12:24
  99:15 106:21
  107:17 126:18
**previous**  13:24
  14:25 82:25
  85:23 129:9
**previously**
  57:19 82:2
  129:11
**price**  3:21
  10:12,12 88:8
**primarily**
  101:8
**primary**  95:3
**prior**  15:11,13
  15:17,18 19:11
  26:10 31:15
  67:8,11 98:6
  99:6 125:2

**[prior - really]**

137:3 144:14
**prison** 81:11
109:12
**prisons** 19:25
22:3,4 25:22
26:9 33:11,22
**probably** 11:12
34:23 37:22
41:7 46:19
75:7 76:10
97:15 108:15
113:5 147:4
**problem** 12:7
64:2 97:8
105:6
**problems**
134:24
**procedure** 4:12
9:10,12,21
96:21 121:4
128:20 129:6
129:21
**procedures**
21:2 40:12
**proceeding**
96:21
**proceedings**
153:4
**process** 8:15
24:3,5,7 32:15
33:12 42:2,6,8
68:22 84:1
89:8 95:18
96:20 102:11
139:11 145:12

148:15
**processes** 27:20
**produce** 9:13
**produced**
125:15
**product** 72:20
**promise** 104:7
**promoted** 19:1
**property** 92:24
93:17
**protective** 9:21
**protocol** 94:18
96:18 134:4,20
**provides** 9:12
**public** 1:23 2:7
153:22 156:19
**puncture**
122:16
**purchase** 5:22
67:14,16 87:8
87:12 88:2
**purchased**
66:20,23
**purchases**
147:14
**purely** 41:24
**purposes** 8:24
**pursuant** 9:19
**push** 75:19
**put** 39:23 51:16
58:14 65:19
79:22 100:1
117:22 123:11
128:24 129:7
129:19 144:5

148:2 153:6
**putting** 76:14

**q**

**qualifications**
43:2
**quantity** 77:6
**question** 8:19
11:15,19,22,25
12:5,12 19:8
30:7 40:20
42:11 46:20
48:9,16 53:19
55:16 61:13,17
61:19,24 62:7
62:7,16 68:1,5
68:8 70:14
73:5 82:10
87:20,22 88:4
97:6 108:14
109:8 135:6
144:25 145:2
**questions** 8:19
8:25 10:21
12:23 18:18
26:5 31:4
35:14 41:14
46:14 48:19
53:9 63:12
80:17 83:7
89:5 90:21,23
97:18 108:22
112:10,11
113:13 118:11
133:18 135:2
141:25 149:21

**quick** 55:18
107:17 151:17
152:13
**quickly** 122:7
140:22
**quote** 66:23
94:1 104:5,7
**quoted** 119:5

**r**

**r** 3:1 7:1 155:3
155:3
**raise** 8:7
**raised** 125:2
**range** 59:10,11
59:12,23 85:20
85:24 86:1,2,4
**ranges** 85:12
**rather** 138:9
**reached** 119:10
**read** 21:3 32:13
50:9 53:5 59:8
59:20 94:9
146:10 154:9
156:5
**reading** 57:3,4
92:21
**readings** 67:6
**reads** 73:17
**ready** 12:18
45:1,7 150:20
151:3
**real** 55:3,18
151:16
**really** 146:10
152:12

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

09 118572

**[rear - related]**

| | | | |
|---|---|---|---|
| **rear** 149:4,5,7 | **receive** 51:20 | **recorded** 7:14 | **refrigerate** |
| **reason** 27:17 | **received** 32:10 | 66:8 70:20 | 55:12 113:20 |
| 68:13 98:9 | 50:4,12,20 | 86:9 153:8 | **refrigerated** |
| 110:25 111:6 | 51:2,12 52:9 | **recording** | 61:25 62:5 |
| 145:5 154:11 | 53:6 58:13 | 131:25 | 68:3 111:22 |
| 155:6,9,12,15 | 64:6,18,25 | **records** 147:10 | 114:2 |
| 155:18,21 | 65:4 72:3 75:1 | **rectify** 144:13 | **refrigeration** |
| **reasons** 71:2 | 76:15,15 80:18 | **redacted** 50:25 | 112:21 |
| **recall** 11:11 | 80:19 81:1,18 | **redaction** | **refrigerator** |
| 17:17,19,23 | 81:20 84:22 | 50:18 51:8 | 51:16 52:14 |
| 18:25 29:25 | 85:10 90:8 | **redacts** 51:10 | 58:14,15,17,20 |
| 30:3,3,8,24 | 113:24 | **refer** 24:8 31:7 | 58:23 59:3,6 |
| 37:24 51:25 | **receiving** 77:20 | 35:11 46:3 | 59:10 60:3,7 |
| 53:4 54:2 | 84:21 95:17 | 54:4 55:23 | 61:7 62:8,10 |
| 55:15 57:5 | **recently** 13:22 | 130:5 | 62:17 63:1 |
| 58:25 59:1,2 | **recognize** | **reference** 32:18 | 65:17,20,21 |
| 59:12,14,21 | 106:25 137:5 | 61:7 115:24,25 | 66:1,5,9,12,12 |
| 60:17 61:9,11 | **recollection** | 143:20 | 67:24 68:4,8 |
| 61:12,14,19,21 | 30:5 | **referenced** | 68:10,14,23 |
| 61:22,23 64:20 | **recommendat...** | 49:13 154:6 | 69:6 77:25 |
| 65:22 67:18,19 | 59:9 | **referred** 9:2 | 78:3 107:20,22 |
| 68:11,19 70:3 | **recommended** | 23:13 34:6 | 107:25 113:16 |
| 79:8 82:20 | 60:2 85:12 | 37:7 45:25 | 114:24 |
| 85:19,22,25 | 129:7 | 63:4 73:23 | **regarding** |
| 89:3 93:10 | **record** 7:4,5,17 | 94:8,10 105:17 | 97:19 |
| 102:20 106:12 | 9:5 10:6 11:22 | 139:20 | **reimbursed** |
| 116:23 117:2 | 54:16,20 55:25 | **referring** 28:24 | 142:15 |
| 120:5,8 122:21 | 66:10 70:5,6 | 36:20 61:16 | **reimbursement** |
| 123:4 125:4 | 89:16 94:4 | 62:22 79:2 | 142:3,13 |
| 130:3 137:10 | 107:10,14 | 87:15 99:5 | **reins** 138:22 |
| 143:11 | 141:19,23 | 116:1,3 147:23 | **related** 63:19 |
| **receipt** 147:6,6 | 142:4 147:8 | **refers** 21:12 | 68:4 88:2 |
| 154:17 | 151:15,20,22 | 115:23 142:12 | 97:13 116:11 |
| **receipts** 147:13 | 151:25 152:4 | **reflected** 147:9 | 130:21 131:4 |
| 147:17,19 | 152:11 153:11 | | 141:14 147:15 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

09 118573

**[related - rolling]**

148:19 150:22
**relating** 8:11
**relative** 153:13
**release** 83:11
**relieved** 32:24
**remain** 66:4
**remained** 66:7
100:11
**remember**
13:18 20:3
42:10 49:18
56:23 66:15,25
86:3,18 128:7
143:23
**remind** 42:9
**reminding**
132:2
**remodel** 128:1
**removed** 65:20
68:9,22 100:12
**removing**
78:18
**reopened** 8:24
**repeating**
46:19
**rephrase** 12:1
87:20
**report** 37:5
125:12 126:9
**reported** 1:21
7:14 95:5
105:5,6
**reporter** 2:6
8:6,7 42:9 87:3
91:13 132:13

149:5 151:18
152:12,16,19
153:3
**reporter's**
153:1
**reports** 126:8
126:12
**represent** 7:19
**request** 5:11
9:20 60:25
61:4,24
**requested** 9:9
20:1 150:17,17
152:24
**requests** 5:8
60:24
**require** 40:12
**required**
156:13
**rescue** 24:8,11
25:3,14,15
28:10 105:16
121:4 132:5
**respect** 87:24
115:4 133:19
**respond** 81:23
**responding**
11:23 12:13
**response** 11:18
**responses** 5:10
**responsibilities**
25:24 26:11
**responsibility**
26:13

**responsible**
41:25
**result** 73:7
112:19 128:4
**retired** 23:12
**return** 154:13
154:16
**returned** 41:11
41:12 79:9,11
100:13
**reverted** 41:5
**review** 13:5,8
14:2 36:18
37:4 61:15
125:6,8 126:16
154:7
**reviewed** 13:9
13:10 14:1
**reviewing**
36:22
**reviews** 31:14
31:21
**revising** 134:20
**rfa** 61:4,5,7,9
61:22 62:3
68:2
**rfas** 61:8,14,17
**rhoades** 18:1,3
**richard** 18:2
**richardson**
1:12 2:1 4:2,8
7:6 8:10,18,24
47:22 137:9
152:9 154:5
155:2,24 156:2

156:4,12
**right** 8:8 11:3
13:14,17 15:24
16:3 25:12,14
29:14 37:4
48:2 49:18
50:24 54:18
55:22,24 56:11
57:10 62:18
100:18,19,19
100:20 107:12
110:24,25
114:16 115:19
117:24 119:7
119:18,20
120:3 129:19
137:1 141:21
145:19 146:11
151:9 152:2,14
**ringing** 151:5
**risk** 9:17
**role** 10:9 14:25
16:25 20:23
21:2 23:7,11
23:13 24:4,11
24:13 25:23,25
27:14 30:12,14
33:6 37:14
44:7 115:2,4,6
115:7
**roles** 17:13
27:16 57:11
**rolling** 7:3
54:19 107:13
141:22 152:3

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004
09 118574

[room - see]

| room 10:4 23:9 | s | schedule 20:2 | seconds 48:21 |
|---|---|---|---|
| 24:24 25:4,6,6 | | 32:8 69:15,18 | secrecy 8:17,21 |
| 25:7,10,11,17 | s 3:1 4:5 5:1 6:1 | scheduled 32:2 | 9:25 |
| 25:18 28:9,11 | 7:1 155:3 | schindele 3:5 | section 34:11 |
| 28:12 44:16,18 | safe 138:1 | 7:22,22 9:1 | 95:1 |
| 45:6 73:24 | 142:23,24 | 48:7,13,25 | secure 23:7 |
| 99:2,4 100:7 | safeguards | 52:5 57:20 | 99:17 |
| 103:1 105:17 | 134:24 | 65:5 81:21 | security 15:1 |
| 105:20 106:3,5 | safer 49:3 | 82:12 83:5,10 | 15:19,19 16:4 |
| 106:11 117:17 | safest 40:6 | 87:6 108:18 | 16:8 33:23,24 |
| 117:21 121:3 | sally 149:4,6,7 | 109:25 110:10 | 49:23 81:6 |
| 121:10 129:8 | sanchez 2:13 | 112:6 114:8 | 91:12,16 |
| 129:11 130:5 | 2:17 7:20,20 | 132:10,13 | sedatives |
| 130:10 131:16 | 142:8 149:22 | 141:17 152:7 | 103:13 |
| 131:18,22 | sat 128:24 | 152:16,18 | see 1:17 24:22 |
| rooms 27:11 | 129:2 | 154:1 | 24:23 28:19 |
| 101:14 | saturday 69:17 | school 14:11,11 | 30:21 31:18 |
| ross 1:4 4:7 | 69:19 | 16:21,24 17:8 | 32:13 35:3 |
| 22:11 29:17 | saw 30:9 40:15 | scribble 150:2 | 38:6 39:6 |
| 39:21 | 60:1 68:14 | seal 75:23,24 | 42:24 43:12 |
| rpr 1:22 153:21 | 86:16 | 106:18 153:16 | 44:6,10,25 |
| ruggieri 3:19 | saying 75:21 | sealed 75:17,20 | 45:11 47:17 |
| 10:14,14 | 76:15 97:22 | 75:20,22 90:24 | 50:25 61:12 |
| rule 9:10,11,20 | 116:14 131:23 | seals 80:13,14 | 67:8 70:7,19 |
| 9:21 48:8 52:6 | 135:20 | searching | 72:17 74:7,8 |
| 57:21 65:6 | says 19:22 | 46:23 | 74:19,22 76:6 |
| 81:22 108:19 | 29:20,21 31:13 | season 20:6 | 76:7 77:14 |
| 110:1,11 112:7 | 34:11 36:18 | seat 111:16 | 78:18,21 79:1 |
| 114:9 | 37:4 39:20 | second 17:23 | 86:13 88:16 |
| ruled 136:9 | 50:20 61:5 | 32:5 35:17 | 109:22 110:7 |
| run 11:13 26:6 | 72:11 91:7 | 39:1 42:14 | 111:9 117:24 |
| 26:9 | 94:2 95:4,17 | 82:14 84:17 | 117:25 122:16 |
| | 96:19 137:8 | 95:17 97:17 | 122:25 123:6 |
| | 142:3 144:13 | 142:10 145:17 | 131:23 132:3 |
| | 146:17 149:24 | | 132:23 136:21 |
| | 150:3 | | |

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

09 118575

**[see - somebody]**

| | | | |
|---|---|---|---|
| 142:2,9 145:22 146:13 | **sequence** 35:1 35:18 | **shot** 151:2 | **sixth** 5:8,11 60:24 |
| **seeing** 61:9,22 70:17 72:7 | **sergeant** 16:7 | **showers** 129:17 | **slept** 103:11 |
| **seems** 17:11 50:6 73:18 | **series** 48:18 150:25 | **sic** 97:21 | **small** 25:11,17 25:18 111:21 121:3,10 |
| **seen** 21:10 24:18 34:9 35:5 58:5 61:18 74:23 87:9 89:23 103:2 106:20 106:23 116:25 117:1 134:13 136:5 147:5 | **serve** 92:1 | **sickness** 12:7 | |
| | **served** 33:20 61:8 | **side** 129:18 145:19,19 | **smaller** 28:11 28:12 82:22 |
| | **serves** 94:3 | **sides** 152:6 | **smart** 96:15 |
| | **services** 2:3,11 7:13 | **sign** 56:9 154:12 | **smith** 3:11 7:24 7:24 9:24 34:17 39:3 40:2 42:13 48:20 49:7 52:20,23 54:7 54:10,12 82:13 83:1,4 84:16 87:5,17 89:15 92:14 93:2,23 96:15,25 97:3 104:23 107:8 110:15 133:5 142:4 147:22 151:16,22 152:19,21 |
| | **set** 5:8 60:24 61:7,17 85:23 121:20 122:12 139:13 153:5 153:16 | **signature** 152:24 153:20 | |
| | | **signatures** 88:18 | |
| | | **signed** 88:14 154:19 | |
| **sees** 19:24 | **sets** 61:14 126:1 | **significance** 39:13 59:18 | |
| **selected** 41:16 43:5 | | **signs** 103:20 148:3 | |
| **selection** 42:6 | **setting** 22:19 | **similar** 147:20 147:24 | |
| **sense** 11:8 13:21 20:23 21:11 24:12 45:5 144:8,9 144:10 146:23 | **setup** 131:8 | **simpler** 68:6 | |
| | **seven** 148:6 | **simplify** 9:6 97:5 | **snoring** 103:12 |
| | **several** 61:14 101:2 | | **sole** 26:12 |
| | **shakes** 28:16 | **simply** 23:2 | **solely** 27:19 100:25 |
| **sent** 61:15 154:14 | **share** 118:18 119:9 | **sink** 130:10 | **solutions** 154:23 |
| **sentence** 95:4 96:18 97:2 | **sheet** 154:11 | **sir** 46:6 102:14 115:17 | |
| **separate** 51:22 51:23 64:6 85:8 150:13 | **shift** 18:11 | **site** 110:21 | **somebody** 19:25 37:22 147:6 |
| | **short** 12:24 19:25 61:5 75:7 | **situation** 48:19 | |
| | | **six** 51:21,22,23 63:3 74:3 75:5 82:19 85:6,7,9 138:10 146:7 148:6 | |
| **separately** 87:22 109:17 | **shorthand** 2:6 94:18 153:3 | | |
| **september** 15:5 | **shortly** 77:19 | | |

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

09 118576

**[soon - street]**

soon 19:2 27:1
  50:17
sop 13:9,9,12
  13:12 19:21
  20:20 21:10
  26:7 31:4,5,8
  32:23 91:24
  94:1 115:7,22
  116:1,3,10
  134:12 145:11
sorry 9:15,24
  16:13 32:5
  40:4 52:23
  72:25 81:23
  88:20 95:23
  97:1 135:12
  142:6 149:18
  151:23
sort 11:9,19
  21:6 23:14
  24:19 28:2
  39:10 46:8,17
  48:19 54:23
  69:5,17 75:23
  88:1 94:25
  106:19 108:22
  125:15 128:19
sound 103:19
sounds 11:5
  103:6
sources 47:10
south 32:7,18
  128:8
space 50:22
  130:25

spaces 28:20
speak 46:4
  57:25 70:20
spec 75:25
specialty 115:9
specific 9:1
  48:15 61:17,22
  62:7 65:22
  97:21 138:25
specifically
  46:2 70:16
  106:7 140:25
specifics 61:19
  68:19
specified
  137:17
speculate 22:14
speculation
  92:15 93:3
  104:24
spent 107:24
spilt 96:16
spiral 136:9
spoke 56:24
spoken 57:16
  57:19
squad 133:18
  133:20,23
  134:4
stacey 7:25
staff 10:5 24:1
  27:1,16 32:9
  151:2
staged 25:15
  27:10 28:4,8,9

105:16
stages 28:10
staging 25:8
stainless 67:4
stand 26:2
standard 4:12
standing 99:16
  100:15 120:9
starr 27:2
  144:20
start 8:15
  11:17 14:18
  18:20,24 67:7
  67:11,22 71:22
  80:22 83:16
  90:22 91:24
  108:23 113:15
started 19:4,11
  24:24 44:23
  45:3 114:21
  116:16 132:22
starting 16:13
  18:3 28:6
  70:23 100:22
  136:20,21
starts 71:23
  113:11
state 2:7 7:16
  15:14 16:1,11
  16:18 27:10,11
  114:25
state's 101:11
  130:19
stated 66:13

states 1:1 7:9
  33:11
stationed 17:2
stay 77:24
stayed 69:3
steel 67:4
stenographic...
  153:8
step 15:22,23
  67:7
stepped 79:17
  80:10 150:15
steps 21:4 67:5
sterility 89:9
stick 49:20
stipulations
  7:17
stop 71:22,24
  93:9 109:6
  120:2
stopped 102:11
storage 53:1
  58:11 59:21
  60:2,7,14 62:6
  62:21 72:21
  79:21 129:12
store 52:10
  60:13 66:22
stored 55:14
  58:20 79:16
  81:7
straight 109:12
strapped 99:3,6
street 2:4,14
  3:6,13 153:23

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 118577

**[strictly - team]**

strictly 123:22
structure 27:19
subject 9:20
subjecting
  119:21
subscribed
  156:14
subsequent
  71:10 116:25
substances
  46:17
successful 40:1
  40:9,17
suggest 145:12
suggestions
  145:14
suite 2:4,14 3:6
  3:13 128:2,6
  128:15 129:3
  130:7 131:5
  132:5 141:11
  153:23
sunday 69:17
  69:20
support 10:5
sure 13:19 21:7
  22:15 26:13
  27:16 37:3
  39:1 40:4
  50:24 55:19,19
  68:6 87:19
  115:9 121:13
  127:8 132:10
  141:17 145:1
  151:7

surprised
  126:15,17,20
swear 8:6
switched 57:11
  138:22
sworn 8:11
  156:14
system 26:2
  46:10 115:8
  139:16

**t**

t 4:5 5:1 6:1
  155:3,3
table 12:12
  23:8 82:10
  99:6,17 100:5
  100:6,13,19
  132:16
take 12:13 21:4
  28:13 40:12
  54:12 60:2,13
  60:15 66:9,11
  67:5 69:21
  70:1 71:15
  73:22 76:3
  100:21,23
  107:6,22
  110:21 115:23
  115:24 117:18
  127:21 128:20
  129:6,21 130:6
  141:16 151:16
taken 1:13 2:2
  7:6 54:17 59:2
  59:6 68:3

70:16 71:1
107:11 125:21
126:1,19
141:20 152:1
153:4
takes 78:16
talk 28:4 47:14
  60:19,23 63:11
  64:4 68:21
  70:4 79:1 87:4
  98:23 119:16
  126:21 128:14
  135:19 136:4
  138:18 151:14
talked 68:2
  107:16 113:10
  121:19
talking 8:15 9:2
  21:20 35:3
  50:23 64:17
  72:2 74:25
  83:17 108:8
  128:25 136:25
  145:22
tank 55:23
tanner 3:11,16
  7:24 89:19
tape 75:22
taped 75:20
task 32:25
  33:10
tasked 33:10,12
taxes 148:19
team 4:14,16
  4:20,22 5:3

21:1,11,15
22:2,10,20,21
22:23,23,25
23:2,19,19,22
24:25 25:8,20
25:24 26:12,14
28:3 29:22
30:15,18,22
31:15,16 34:12
38:7,20 41:4
41:15 42:1,3
42:21 43:6,8
43:16,21,25
44:2,4,6,12,23
45:15 46:3,13
95:19 96:1,5,7
96:19,22 97:7
97:12 99:17,18
100:13 101:1
101:21 102:16
102:19,20,22
103:1 104:11
104:14,18
105:4,9,24,25
106:1,10 115:6
116:19,20
117:8 118:5
120:19,20,21
121:16 122:11
123:20 124:5
125:9,17
126:10 127:13
128:12 132:3
133:13,14
137:18 138:7,8

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 118578

**[team - think]**

| | | | |
|---|---|---|---|
| 138:11 139:14 | 150:15 | **territory** 49:3 | **thermometer's** |
| 139:22 140:3 | **telling** 118:21 | **tested** 89:8 90:9 | 67:6 |
| 148:24 149:1 | **temp** 67:24 | **testified** 8:12 | **thing** 11:19 |
| 149:20 150:10 | **temperature** | **testifying** 12:7 | 12:11,23 31:10 |
| 150:11,12,13 | 5:13,16,19 | **testimony** 4:2 | 35:16 39:18 |
| **teams** 23:19,20 | 13:10 59:7,11 | 17:20,21 40:24 | 46:8 88:1 |
| 23:23,25 115:9 | 59:21,23 60:2 | 86:22 90:17 | 119:7 120:3,3 |
| **technically** | 60:20 64:5,13 | 106:13 153:7 | 122:3 131:11 |
| 93:13 | 64:13,16 66:1 | 153:11 154:9 | 133:12 148:2 |
| **technology** | 66:8 67:9,22 | 154:17 156:8 | **things** 21:20 |
| 133:15 134:25 | 67:23 68:15,22 | **testing** 89:6 | 39:16 44:1 |
| **tedious** 70:6 | 69:7,10,21 | **tewalt** 1:7 7:8 | 54:23 68:4 |
| 80:16 | 70:1,18 71:1 | 19:21 20:17 | 69:12 107:16 |
| **television** | 71:15,20 72:11 | 26:15 60:11 | 111:3 112:11 |
| 131:11 | 72:23,25 73:1 | 90:12 97:13,13 | 135:3 146:3 |
| **tell** 8:11 12:4 | 73:11 85:12,24 | 154:4 155:1 | 150:25 |
| 14:9 22:8,20 | 86:1,2,4,6,8 | 156:1 | **think** 8:14 |
| 22:21,25 25:19 | 113:11 114:21 | **texas** 17:3 | 11:16 15:6 |
| 28:4 30:14 | **temperatures** | **text** 31:12,18 | 19:8 21:11 |
| 32:22 48:2 | 65:10,12,23 | 32:13 84:7 | 28:17 29:12 |
| 49:4 50:15 | 70:16,20 85:19 | 90:25 94:8 | 33:7 34:2 |
| 55:1,13 57:13 | 85:20 | 146:9 | 35:13 38:9 |
| 59:25 62:2,16 | **temporary** | **thank** 9:22,23 | 39:18 40:16,20 |
| 62:20 65:3,25 | 151:10 | 10:3,18 14:7 | 42:19 46:12,19 |
| 67:3,16 70:19 | **ten** 15:20 | 34:2 39:4 | 49:2 50:11 |
| 72:13 75:3 | 141:16 | 42:12 52:24 | 55:3 63:10,11 |
| 76:23 93:8 | **term** 10:24 | 54:21 56:1 | 75:10 83:2,10 |
| 97:10,24 102:1 | **terminology** | 73:15 89:19 | 89:18 93:25 |
| 103:5,14 105:4 | 21:8 | 97:3 132:2 | 101:6 102:22 |
| 112:23 113:1 | **terms** 12:17 | **thermometer** | 102:24 103:14 |
| 114:5 118:15 | 20:24 30:5 | 64:14 66:2,4,6 | 106:1 107:17 |
| 118:23 122:10 | 40:5 58:11 | 66:10,11,13,16 | 108:7,14 114:1 |
| 122:20 130:4 | 76:23 86:3 | 66:24 67:14,17 | 114:3,25 116:2 |
| 135:12 137:16 | 108:6 112:21 | 67:20,25 68:24 | 116:4,7,18 |
| 138:13 148:10 | 119:6 | 73:1,2 | 119:20 120:1 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 118579

**[think - trainings]**

| | | | |
|---|---|---|---|
| 120:20 122:19 | 53:1,6,21 | **tina** 48:10 | **tough** 40:20 |
| 126:7,18 | 54:15,19,24 | **title** 33:21 | **towards** 101:13 |
| 134:11 135:5 | 57:16 61:18 | 143:23 | 101:14 116:5,6 |
| 135:20 140:14 | 62:6,16,19 | **today** 12:6,17 | 148:5 |
| 140:17 141:24 | 65:16 66:5,7 | 13:6 34:10 | **track** 73:11 |
| 142:8 147:18 | 68:15,25 69:9 | 144:22,23,24 | 136:10 |
| 151:13 152:6 | 69:16 70:17 | **today's** 7:4 | **tracks** 55:23 |
| **thinking** 46:2 | 74:15,24 75:5 | **together** | **train** 20:15 |
| 51:1 55:20,25 | 75:7 76:17 | 112:18 | 124:21,22 |
| 83:12 131:24 | 78:7 79:6,8,24 | **toggling** 88:20 | **trained** 20:4,5 |
| 149:20 | 80:6 89:2 | **told** 52:15 | 26:16 121:12 |
| **third** 148:14,17 | 91:14 99:20,21 | 55:11 65:2,3 | **training** 4:14 |
| **thought** 26:7 | 99:25 100:16 | 68:7 101:19 | 4:16,20,22 5:3 |
| 75:11,12 | 101:5,24 | 114:1,3 118:25 | 14:12 18:19 |
| 101:17 120:6 | 103:16,16,23 | 122:7 124:1 | 20:2 21:1,25 |
| **three** 26:19 | 107:9,13,24 | 138:15 139:6 | 22:20 23:1 |
| 64:5 85:4 | 109:13 114:17 | 139:13 141:1,3 | 24:22,23,24 |
| 106:8,8 144:6 | 115:3 119:17 | 141:6 | 25:16 26:22 |
| 151:2 | 120:6,17 | **tom** 99:25 | 27:8,20,23 |
| **throughs** | 121:24 123:17 | 122:4 123:2,8 | 29:2,5,22 32:8 |
| 128:14 | 129:1 134:5,19 | 124:1 | 32:10,11 34:7 |
| **tim** 1:12 2:1 4:2 | 134:21 141:10 | **tom's** 115:21 | 35:15 36:16 |
| 7:6 8:10 47:21 | 141:18,22 | **took** 32:1 49:19 | 38:5 39:1 40:1 |
| 48:20 84:16 | 148:5 151:24 | 50:17 63:1 | 40:13,13,16,16 |
| 152:9 154:5 | 152:3,10 153:5 | 66:1 67:7 69:9 | 41:2 43:13,22 |
| 155:2,24 156:2 | 153:6 154:18 | 76:1,11 78:22 | 44:14,22 45:1 |
| 156:4,12 | **timeframe** | 81:5,5 88:23 | 45:3,6 116:18 |
| **tim's** 10:25 | 154:8 | 103:13 105:14 | 117:19,20 |
| **time** 7:5 15:3,8 | **times** 11:9 | 114:15 126:2 | 126:19 132:22 |
| 17:4,13 18:20 | 20:15 22:24 | 138:16 | 137:14,19 |
| 22:5 30:6,9,18 | 33:19 97:25 | **top** 29:2 31:12 | 138:6,7,9 |
| 38:8,16,20 | 101:2 103:6 | 39:20 50:19 | 139:2,13 |
| 46:16 47:22 | 108:8 119:22 | 69:1 75:18 | **trainings** 18:22 |
| 50:6,11 51:19 | **timothy** 4:8 | 80:1,3,4 148:5 | 19:6,7,10,13 |
| 51:20 52:9 | | 148:6 | 20:6,10,24 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com 208-343-4004

09 118580

**[trainings - unredacted]**

| | | | |
|---|---|---|---|
| 21:15 22:16 | 58:24 136:22 | twice  11:10 | uncertain |
| 23:7 24:16,20 | **transformation** | 17:22 20:5 | 27:15 |
| 26:15,17 27:1 | 14:24 | 103:14 | **under**  9:9,21 |
| 27:5 28:13,19 | **transition** | **twitch**  103:22 | 25:25 26:20 |
| 35:22 37:18 | 138:16 | **two**  17:6 20:6 | 27:9 106:18 |
| 38:23 40:9 | **transitioned** | 22:9,9 26:19 | 153:6,9 |
| 42:25 43:15,25 | 23:10 | 48:21 68:4 | **understand** |
| 44:11,19 46:1 | **travel**  70:25 | 73:17 79:11,20 | 10:1,3 42:17 |
| 103:3 115:10 | **traveled**  112:2 | 82:4,6,7 84:23 | 54:4 113:3 |
| 115:12 116:25 | **treat**  80:23 | 84:23 85:20 | 115:22 122:6 |
| 117:3,17,24 | **treated**  80:24 | 88:14 101:7 | 151:4 |
| 118:10 123:13 | **trial**  17:20 | 105:11 108:12 | **understanding** |
| 123:19,22 | **triple**  140:1 | 108:16 117:2 | 8:16,20 11:25 |
| 124:23 131:12 | 144:11 | 123:5 126:1 | 12:5 19:8 |
| 132:18,22 | **trouble**  11:25 | 129:17 145:5 | 35:12 70:14 |
| 133:16 136:11 | **true**  153:10 | **ty**  148:11 | 124:13,14,19 |
| 136:12,14 | 156:8 | **type**  8:17 26:8 | 126:23 |
| 138:4,21 139:5 | **truth**  8:11 | 34:8 67:14 | **understood** |
| 148:24 | **try**  11:21 42:13 | 76:24 77:1,2,2 | 105:5 |
| **trains**  26:13 | 48:21 83:8 | 109:24 110:9 | **undid**  75:23 |
| **transaction** | 87:19 101:9 | 111:16 113:6 | **undisclosed** |
| 108:17 | 119:2 | 122:3 123:3 | 110:23 |
| **transactions** | **trying**  39:18 | 131:11 133:11 | **undue**  9:13 |
| 147:9,16 | 43:23 101:21 | 135:3 | **unintelligible** |
| **transcribed** | 102:18,22 | **typically**  28:20 | 151:17 |
| 153:8 | 103:18 104:14 | 29:1 | **unit**  2:3 7:12 |
| **transcript**  1:11 | 122:14 | | **united**  1:1 7:9 |
| 87:3 152:13 | **tummy**  96:14 | **u** | **unnatural** |
| 154:6,19 156:5 | **turn**  14:8 29:10 | **uh**  29:19 47:23 | 42:16 |
| 156:8 | 34:25 56:6 | 49:15 56:10 | **unopened** |
| **transfer**  22:13 | 65:8 | 94:23 113:7 | 75:13,16 |
| 73:22 137:8 | **turned**  120:13 | 126:11 130:16 | **unreasonable** |
| 143:13 148:17 | 132:21,23 | 132:9 137:11 | 9:9 |
| **transferred** | **turning**  90:25 | 145:21 146:14 | **unredacted**  1:7 |
| 15:21 22:12 | | **unable**  95:10 | 1:11 |

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 118581

**[use - warrant]**

use   45:9 46:7
   97:22 137:20
   148:15
used   36:4,12
   73:1,2 104:9
   154:19
using   9:6 35:18
   127:6

| v |
|---|

v   154:4 155:1
   156:1
vacation   41:8
vague   49:7
vaguely   124:12
validate   75:6
   76:13,16 77:22
   80:1
validated   79:25
validation
   76:13 148:14
valley   56:7
   57:2,11 81:16
   88:23
various   21:20
   27:2,3
vehicle   109:24
   110:7,9,13
   111:9,10,13,15
vein   123:14
   125:2
veins   97:20,23
   98:1,6 123:16
   123:24 124:3,6
vendor   53:10
   53:14

venous   95:5
verbal   11:18
   114:11 122:4
verified   144:11
verify   67:9
   154:9
veritext   7:15
   154:14,23
veritext.com
   154:15
version   1:7
   4:13 31:6
versus   7:7
   82:22 127:16
   128:25 129:9
   135:19
vial   76:18,19
   76:21,24 83:22
   84:5,7 86:14
vials   74:8,19
   76:1,6 78:19
   78:21 79:6,13
   79:25 80:5
   82:22 85:5,5,7
   86:12 89:1,4
vicinity   100:20
video   126:6,7
   152:9
videographer
   3:18 7:3 8:3,5
   54:15,18 107:9
   107:12 141:18
   141:21 151:24
   152:2,8

videotaped
   1:12 2:1 7:6,11
   7:13
view   14:24
visibility
   131:22
visible   50:19
visit   117:2
visiting   56:4
visual   122:13
   145:10
volunteer
   18:13
volunteers
   23:17,21,23
vs   1:6

| w |
|---|

wait   11:21
   28:24 40:7
   42:10 91:13
   149:5 151:18
walk   44:25
   128:14
walked   99:25
   138:25
walmart   66:23
want   11:2,18
   14:17 15:15
   21:7 54:22
   70:4 80:16,18
   89:15 92:17
   105:22 113:14
   118:11 135:2
   145:1 151:14
   151:16 152:17

wanted   26:8
   31:10 55:24
   102:7 129:5
wanting   122:6
wants   48:10
warden   8:18,24
   10:22,24 11:2
   14:22 15:1,4,8
   15:11,13,14,18
   18:21 19:1,2
   19:13,15 22:5
   24:6 32:20,24
   33:3,5,14,15,16
   33:23 38:17
   42:21 46:16
   47:21 54:22
   57:2,11 79:17
   80:10 88:23
   94:2 95:6,19
   96:23 97:6
   115:3,11,18,23
   116:1,6 130:9
   134:5,19
   136:16,22
   137:2,3,9,9
   138:2,17,17,18
   150:15
warden's   91:4
   91:5,7 94:10
   138:1 142:23
wardens   27:3,3
   32:8,19 57:10
warrant   20:9
   26:1,21 31:17
   32:23 92:1

Veritext Legal Solutions
Calendar-Idaho@veritext.com   208-343-4004

09 118582

**[warrants - zone]**

| | | | |
|---|---|---|---|
| **warrants** 33:13 | **whereof** 153:16 | **working** 43:22 | 71:22 75:10 |
| 33:17,19 | **witness** 8:6 | 44:12 45:11 | 78:10 79:10 |
| 115:19 | 28:16 34:18 | 69:15 | 84:18,19 87:5 |
| **watch** 130:19 | 40:4 42:12,15 | **works** 107:7 | 87:19 89:17,18 |
| **watching** 101:9 | 48:17,22 49:9 | **worksheet** 21:3 | 89:19 91:7 |
| 101:10 103:24 | 66:3 77:21,23 | **worth** 50:1 | 94:21 102:24 |
| **water** 77:2 | 78:17 83:3 | **write** 50:21 | 104:8,8,8 |
| 96:16 | 84:18 91:15 | 51:6,7 91:18 | 107:8 118:6 |
| **way** 8:20 12:2 | 93:4,24 94:6 | **writing** 47:25 | 119:15 120:2 |
| 18:10 33:8 | 98:20,21 | 53:4,5 70:22 | 122:24 127:25 |
| 35:13 42:10 | 101:14 126:25 | 71:7 | 132:4 133:6,7 |
| 56:7 68:6 69:6 | 132:12,14 | **written** 32:10 | 133:7,7 135:16 |
| 76:12 80:23 | 135:9 142:7 | 36:25 47:21 | 136:3 138:5,20 |
| 83:15 97:6 | 147:24 149:7 | 52:25 116:4 | 138:22 140:15 |
| 103:9 116:4,22 | 153:6,16 154:8 | 125:12 126:8 | 140:16 142:20 |
| 117:5 127:7,7 | 154:10,12,18 | 126:12 146:9 | 143:8,11,12 |
| 129:17 130:1 | **witnesses** 27:10 | 146:15 | 147:15 149:2 |
| **we've** 64:17 | 88:14 100:12 | **wrong** 34:1 | 149:22 150:7 |
| 72:2 90:14 | 101:11,13 | 101:7 124:3 | 151:6 152:15 |
| **wear** 117:11,13 | 102:10 130:19 | **wrote** 37:9 | **year** 15:7 16:13 |
| 117:15,19,23 | **wondering** | 53:24 88:18 | 17:8 |
| **wearing** 117:4 | 39:22 107:22 | 140:16 | **years** 17:6 |
| **wednesday** | 121:20 145:4 | | 122:5 150:19 |
| 12:20 123:1,5 | **word** 31:13 | **x** | **yellowish** 123:3 |
| **week** 20:13,19 | 97:22 127:9 | **x** 4:1,5 5:1 6:1 | **yep** 61:3 |
| **weekends** | 137:20 | 34:14,15 148:2 | 136:14 149:8 |
| 69:22 | **words** 9:6 | **y** | 151:8 |
| **went** 16:15 | 76:19,21 77:5 | **yeah** 8:4 10:2,2 | **z** |
| 40:14 57:11 | 85:24 | 11:4 13:15,21 | **zone** 122:14 |
| 98:10 120:18 | **work** 14:18 | 13:21 20:19,25 | |
| 120:22 129:9 | 16:21 69:11,13 | 22:9 29:15 | |
| 132:22 146:20 | 69:16 151:11 | 40:6 42:12,13 | |
| **west** 2:4,14 | **worked** 16:22 | 50:24 51:1 | |
| 3:13 153:23 | 16:22 | 52:23 54:11,11 | |
| | | 54:14,14 64:10 | |

Page 38

09 118583

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.