Jonah J. Horwitz, Idaho Bar No. 10494
Christopher M. Sanchez, Idaho Bar No. 12070
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho Street, Suite 900, Boise, ID 83702-8929
Telephone: (208) 331-5530; Facsimile: (208) 331-5559
ECF: jonah_horwitz@fd.org
       christopher_m_sanchez@fd.org

Sarah E. Kalman, Pennsylvania Bar No. 325278
(admitted *pro hac vice*)
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street, Suite 500, Philadelphia, PA 19103-7301
Telephone: (215) 656-2438; Facsimile: (215) 656-3301
ECF: sarah.kalman@dlapiper.com

*Attorneys for Plaintiff Gerald Ross Pizzuto, Jr.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **GERALD ROSS PIZZUTO, JR.,** | **CASE NO. 1:21-cv-359-BLW** |
| Plaintiff, | **MEMORANDUM IN SUPPORT OF EIGHTH MOTION TO COMPEL DISCOVERY AND FOR LEAVE TO SERVE ADDITIONAL INTERROGATORIES** |
| v. | |
| **JOSH TEWALT**, Director, Idaho Dept. of Correction, et al. | |
| Defendants. | |

   Plaintiff Gerald Ross Pizzuto, Jr. respectfully requests leave to serve Interrogatories 39, 42, 44, and 47 and asks the Court to compel the defendants to respond to them, along with Request for Admission (RFA) 544. Every part of this memorandum is incorporated in every other.

### I.  The discovery requests and responses

   Pursuant to Dist. Idaho Loc. Civ. R. 37.2, the discovery requests at issue and the objections to them are provided verbatim below.

**Interrogatory 39**: Describe in detail what led the First Set of Execution Drugs to be placed in—and removed from—a refrigerator, including an explanation of why the drugs were refrigerated, why they were taken out of the refrigerator, why those two events took place on the dates when they did, who was involved in both decisions, and so forth.

**Defendants' Response**: Defendants object to Interrogatory 39 as it is beyond the scope of Federal Rule of Civil Procedure 33(a)(1) and the parties' Discovery Plans. *See* Dkts. 21, 41. In addition, Defendants object to this Interrogatory under Federal Rule of Civil Procedure 26(b)(1), on grounds that the Interrogatory creates an undue burden on the IDOC [Idaho Department of Correction], is not relevant to Plaintiff's claims, and is not proportional to the needs of the case. Defendants also object to this interrogatory to the extent the information is protected by the work product and/or attorney-client privileges. Defendants also object to this interrogatory to the extent it calls for an expert opinion, which requires specialized knowledge, skill, experience, training, or education. *See* Fed. R. Civ. P. 702.

Finally, Defendants object to the Interrogatory as the question is overbroad, exceeds the scope of Plaintiff's claims, and is not relevant to the issues raised in Plaintiff's *as applied* Eighth Amendment Claim as the execution chemicals that IDOC obtained in October 2023 (identified by Plaintiff as First Set of Execution Drugs) will not be used in Plaintiff's execution.

**Interrogatory 42**: Explain in detail why Defendant Tewalt provided an incorrect expiration date when he responded to RFA 290 on June 10, 2024.

**Defendants' Response**: Defendants object to Interrogatory 42 as it is beyond the scope of Federal Rule of Civil Procedure 33(a)(1) and the parties' Discovery Plans. *See* Dkts. 21, 41. In addition, Defendants object to this Interrogatory under Federal Rule of Civil Procedure 26(b)(1), on grounds that the Interrogatory creates an undue burden on the IDOC, is not relevant to Plaintiff's claims, and is not proportional to the needs of the case. Defendants also object to this interrogatory to the extent the information is protected by the work product and/or attorney-client privileges. Finally, Defendants object to the Interrogatory as the question is not relevant to the issues raised in Plaintiff's *as applied* Eighth Amendment Claim as the execution chemicals that IDOC obtained in or about February 2024 (identified by Plaintiff as Second Set of Execution Drugs) will not be used in Plaintiff's execution.

**Interrogatory 44**: Explain in detail why SOP 135 removed from the previous version of the protocol the requirement that a physician be available to revive the inmate if necessary.

**Defendants' Response**: Defendants object to Interrogatory 44 as it is beyond the scope of Federal Rule of Civil Procedure 33(a)(1) and the parties' Discovery Plans. *See* Dkts. 21, 41. Defendants also object to this interrogatory as its use of the term "previous version of the protocol" is undefined and subject to multiple interpretations. In addition, Defendants object to this Interrogatory under Federal Rule of Civil Procedure 26(b)(1), on grounds that the Interrogatory creates an undue burden on the IDOC, is not relevant to Plaintiff's claims, and is not proportional to the needs of the case.

**Interrogatory 47**: Describe the licensing and certification status of the laboratory that generated the certificates of analysis that you have produced to [Mr. Pizzuto's counsel], including but not limited to what bodies (if any) they are accredited with, what accreditations they possess, their regulatory histories, what due diligence you have done into their licensure and regulatory histories, and so forth.

**Defendants' Response**: Defendants object to Interrogatory 47 as it is beyond the scope of Federal Rule of Civil Procedure 33(a)(1) and the parties' Discovery Plans. *See* Dkts. 21, 41. Defendants also object to this interrogatory as the terms "licensing and certification status," "due diligence," "certificates of analysis," "histories," and "bodies" are undefined and subject to multiple reasonable interpretations. Defendants also object to this interrogatory as it is overbroad and not sufficiently confined in scope. Defendants also object to this interrogatory as it contains compound, conjunctive, or disjunctive questions. Defendants also object to this interrogatory as it is vague and uncertain in its use of the term "and so forth." Defendants also object to this interrogatory as it asks for confidential information and implicates the privacy interests of third parties.

In addition, Defendants object to this Interrogatory under Federal Rules of Civil Procedure 26(b)(1), on grounds that the Interrogatory creates an undue burden on the IDOC, is not relevant to Plaintiff's claims, and is not proportional to the needs of the case. Finally, Defendants object to this Interrogatory as the question may lead to the disclosure of the identity of the source or manufacturer of IDOC's execution chemicals. Defendants submit Idaho Code § 19-2716A(4) requires IDOC staff keep the identities of such persons or entities confidential. This statutory mandate informs IDOC's undue burden analysis as disclosure impedes the Department's ability to carry out an execution and interferes with its statutory and constitutional duties to carry out lawfully imposed death sentences. The limited relevance of Plaintiff's claims is greatly outweighed by the harm and risk of harm to IDOC.

Finally, Defendants object to the Interrogatory as the information requested is not relevant to the issues raised in Plaintiff's *as applied* Eighth Amendment claim as the execution chemicals that IDOC obtained in October 2023 and October 2024 (identified by Plaintiff as First Set of Execution Drugs and Third Set of Execution Drugs) will not be used in Plaintiff's execution.

**RFA 544**: Admit or deny that IDOC has obtained execution drugs Manufactured by a company that opposes the use of its products in executions.

**Defendant Tewalt's Response**: Defendant Tewalt objects to RFA 544 under Federal Rule of Civil Procedure 26(b)(1). Defendant Tewalt asserts the subject of this RFA creates an undue burden on the IDOC and interferes with the agency's duty to carry out a lawfully imposed death sentence. The Idaho Legislature enacted Idaho Code § 19-2716A to prohibit the disclosure of the identities of any person or entity who compounds, synthesizes, tests, sells, supplies, manufactures, stores, transports, procures, dispenses, or prescribes the chemicals or substances for use in an execution. Defendant Tewalt objects to disclosure of any information that could lead to the identification of these confidential persons or entities. Defendant Tewalt

asserts disclosure of the requested information specifically seeks information about the identity of a person or entity who compounds, synthesizes, tests, sells, supplies, manufactures, stores, transports, procures, dispenses, or prescribes the chemicals or substances for use in an execution.

Defendant Tewalt objects to disclosure of any information that could lead to the identity of a person or entity that compounds, synthesizes, tests, sells, supplies, manufactures, stores, transports, procures, dispenses, or prescribes the chemicals or substances for use in an execution. Defendant Tewalt specifically objects to disclosing any information that could confirm or dispel any information regarding the identity of these statutorily designated confidential persons or entities, including information or inferences that the person or entity is or is not the same person or entity that has communicated with IDOC, Defendant Tewalt, or any other Idaho official or agency.

Defendant Tewalt asserts the information requested increases the risk of disclosure of a person or entity that compounded, synthesized, tested, sole, supplied, manufactured, stored, transported, procured, dispensed, or prescribed the chemicals or substances for use in an execution. These identities are expressly protected by state law and incorporated into Federal Rule of Civil Procedure 26. Such risk creates an undue burden on IDOC, especially where disclosure is immaterial to the claims raised in Plaintiff's as applied method-of-execution claim and is disproportionate to his needs in this litigation. Plaintiff's interest in disclosure is outweighed by the State's interest in protecting its execution chemical sources.

Defendant Tewalt also objects to this request as it is vague, ambiguous, confusing, misleading, and/or subject to being misconstrued because the terms "obtained" and "opposes" are undefined and subject to multiple reasonable interpretations as used in RFA 544.

## II.    Additional interrogatories are necessary.

The Court's scheduling order limits the parties to twenty-five interrogatories each. *See* Dkt. 21 at 4; Dkt. 22 at 3. "Good cause" is the standard for both additional interrogatories under Rule 33(a)(1), *see McClellan v. Kern Cnty. Sheriff's Off.*, No. 1:10-cv-386, 2015 WL 5732242, at *1 (E.D. Cal. Sept. 28, 2015), and for modification of the discovery plan, *see United States v. Howe*, No. 2:19-cv-421, 2022 WL 3227736, at *4 n.11 (D. Idaho Aug. 10, 2022).[1] "The aim of this limitation is not to prevent needed" interrogatories, "but to provide judicial scrutiny before parties

---

[1] Unless otherwise indicated, all internal quotations are omitted, all emphasis is added, and all citations are cleaned up.

make potentially excessive use of" them. Dkt. 178 at 4. There is good cause here because each of the interrogatories at issue was necessitated by developments that occurred after Mr. Pizzuto had already reached the maximum, which happened on August 3, 2023. *See* Dkt. 91-3 at 5.

Interrogatories 39 and 40 both relate to the refrigeration of the First Set of Execution Drugs, i.e., those IDOC obtained in October 2023. On November 27, 2023, the defendants responded to an RFA asking them whether those drugs were at that time "in a refrigerator," and they responded with one-word denials. *See* Dkt. 102-7 at 10. The defendants provided a temperature log to Mr. Pizzuto on August 7, 2024, *see* Ex. 1 at 2, which reflects that the First Set of Execution Drugs were in fact refrigerated for six weeks, ending on November 27, 2023—the day they informed Mr. Pizzuto that the drugs were not in a refrigerator. *See* Dkt. 102-7 at 10. Mr. Pizzuto thus could not have inquired about the refrigeration issue before he had exceeded twenty-five interrogatories.

Interrogatory 42 asks why Defendant Tewalt provided an incorrect expiration date in an RFA response on June 10, 2024, which Mr. Pizzuto had no ability to investigate until after the cap had been reached. As for Interrogatory 44, it deals with a change to the execution protocol. The protocol was revised on October 11, 2024, *see* Dkt. 166-2 at 1, and the Court has already recognized that such modifications justify new interrogatories, *see* Dkt. 178 at 6. Interrogatory 47 concerns the certificates of analysis (COAs) for IDOC's drugs. The defendants first disclosed a COA on January 24, 2024, *see* Ex. 1 at 2, which was also after he had already served his twenty-fifth interrogatory. In short, each of these interrogatories were prompted by events that took place only after Mr. Pizzuto had reached his limit and there is good cause for all of them.[2]

---

[2] Rule 33(a)(1) states that "[l]eave to serve additional interrogatories may be granted to the extent consistent with Rule 26(b)(1) and (2)." For its part, Rule 26(b)(1) calls for "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the

**III.    Responses to the Discovery Requests Should be Ordered.**

The Court should also compel the defendants to respond to the interrogatories, along with RFA 544. As an initial matter, almost all of the defendants' objections to the requests are inadequately developed. Most of the objections are recitations of legal rules with no elaboration. "[B]oilerplate objections are presumptively insufficient." *Burlington N. & Santa Fe. Ry. Co. v. U.S. Dist. Ct. for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005). If the analysis proceeds further, the result is the same. Mr. Pizzuto will take each interrogatory in turn, incorporating previous points in the interest of economy and reserving the right to engage in more detail with the defendants' position after they offer fuller accounts of their perfunctory objections.

**A.  Interrogatory 39**

Starting with the relevance of Interrogatory 39, it calls for the defendants to outline why they placed the First Set of Execution Drugs in a refrigerator and then removed them from it. The defendants' only reasoning for their relevancy objection is that the drugs in question will not be used at Mr. Pizzuto's execution, as they are now expired. But relevance is construed "broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any" claim. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). That "low bar," *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021), is easily cleared here.

Mr. Pizzuto has alleged that risks regarding the reliability of the pentobarbital that will be used at his execution add to the danger that he will suffer severe pain and suffering. *See, e.g.*, Dkt. 153 at 11, 36. He has also asserted that the chances of human errors being made at the execution worsen the danger, and that IDOC's record of mistakes increases the probability of error. *See, e.g.*,

---

needs of the case." The specific factors in Rule 26(b)(1) are all addressed below in the section of the brief detailing the motion to compel, and they are incorporated by reference here.

*id.* at 8–15. The refrigeration issue implicates both concerns. As the defendants have admitted, the manufacturer of the drugs that IDOC refrigerated indicates on the packaging that the chemicals are supposed to be stored between 68 and 77 degrees Fahrenheit. *See* Dkt. 155-6 at 7. Mr. Pizzuto's expert pharmacologist, Michaela Almgren, explains that the improper refrigeration of the pentobarbital jeopardized the integrity of the chemicals. *See* Ex. 2 at 4. The refrigeration therefore goes directly to the drug-reliability issues that are at the heart of the case.

Although the exact drugs discussed above are now expired, that does not make the refrigeration misadventure irrelevant. To begin, Warden Richardson testified at his deposition that the reason he refrigerated the drugs was because he was advised to do so by "[t]he individual that delivered the chemicals." Dkt. 177-1 at 52. Future execution drugs might well be brought to IDOC by the same person. Thus, IDOC's presumptive drug supplier going forward is apparently so ill-informed about the pharmaceutical industry that he would instruct his customer to refrigerate drugs in packages that tell the consumer not to place them in cold temperatures. That raises serious questions about how the supplier will handle the next shipment, including whether he will himself wrongly refrigerate the chemicals. The refrigeration issue accordingly remains a live one.

It also remains an issue because Mr. Pizzuto has concerns about what led to the end of the refrigeration experiment. Warden Richardson claimed at his deposition that he took the drugs out of the refrigerator because "at some point as" he "was doing a temperature check" he "read on the back of one of the boxes" the recommended "temperature range." *Id.* at 59. According to Warden Richardson, he was not aware of any connection between the discovery request inquiring into refrigeration being answered on November 27, 2023 and the drugs being removed from the refrigerator the exact same day. *Id.* at 68. In an RFA, Mr. Pizzuto asked the defendants to admit or

deny that it was a mistake to refrigerate the drugs. *See* Ex. 3 at 4. Defendant Tewalt replied, implausibly, that he was unsure what the word "mistake" meant. *See id.* at 5.

The most reasonable inference to draw from the facts above is that the defendants realized that refrigeration was inappropriate when Mr. Pizzuto's discovery requests alerted them to it and then refused to illuminate either why they had reversed course or to own up to the fact that they did something wrong. That series of actions gives rise to real fears about the integrity of the defendants' systems for handling execution drugs more generally, and the credibility of IDOC's witnesses, which Mr. Pizzuto is entitled to explore through discovery, making the area relevant.

The defendants' reliance upon proportionality fares no better. Once "a threshold showing of relevance" has been made, as it just was, the defendants have "the heavy burden of showing specifically why the discovery request is . . . disproportional to the needs of the case." *Cleaver v. Transnation Title & Escrow, Inc.*, No. 1:21-cv-031, 2022 WL 623251, at *2 (D. Idaho Mar. 2, 2022). A proportionality analysis takes into account "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). The defendants cannot satisfy their heavy burden on these factors.

First, the stakes are life and death. Second, Mr. Pizzuto has no access to information about why IDOC handled refrigeration in the way it did. Third, while the refrigerated drugs are expired, the issue remains important. That is partly because IDOC's new approach to executions makes it unlikely that Mr. Pizzuto will be able to timely learn anything of import with respect to the *next* set of drugs. The defendants have clarified that they do not currently possess execution drugs. *See* Ex. 4 at 3. Mr. Pizzuto consequently has no way to gather any direct information at this time about

the drugs that will be used to execute him. In the absence of such knowledge, facts showing that IDOC handles execution drugs carelessly or that it refuses to confess its missteps are critical to proving his claim that there are unconstitutional risks associated with his execution. *See West v. Brewer*, No. 2:11-cv-1409, 2011 WL 2912699, at *3 (D. Ariz. July 20, 2011) (recognizing that a correctional department's past practices are relevant when upcoming executions are the subject of a pending constitutional challenge). Fourth, any burden or expense generated by Interrogatory 39 is minimal. The defendants would have only to explain why their agents took a single set of drugs out of a refrigerator on one particular day just two years ago. Interrogatory 39 is proportional.

The defendants' objection that the interrogatory "calls for an expert opinion" is unavailing. For one, it is not cognizable. "An interrogatory is not objectionable because it calls for an expert opinion." *Dallas v. Marion Power Shovel Co.*, 126 F.R.D. 539, 542 (S.D. Ill. 1989). In any event, Mr. Pizzuto is not soliciting an expert's opinion. He is asking the defendants about facts within their agents' personal knowledge, namely, why *IDOC* put the drugs into—and took them out of— a refrigerator. If IDOC personnel did either of those things at an expert's direction, they should disclose as much in discovery. And though it is unclear from their responses, if the defendants are complaining that they are not yet required under the scheduling order to reveal their experts, that theory would fail. The defendants have "an obligation to timely respond to discovery in good faith and in full fashion, insofar as a party is able to do at the time of receiving such discovery, and not use the fact of an expert disclosure deadline as a means of skirting the discovery rules." *Diversified Metal Prods. v. Bechtel Nat'l, Inc.*, No. 09-415, 2011 WL 98540, at *5 (D. Idaho Jan. 6, 2011).

The defendants' cursory allusion to attorney-client and work-product privilege misses the mark. "As the party asserting the privilege, [the defendants were] obliged by federal law to establish the privileged nature of the communications and, if necessary, to segregate the privileged

information from the non-privileged information." *United States v. Ruehle*, 583 F.3d 600, 609 (9th Cir. 2009). The defendants have not established that anything is privileged, because they have failed to elaborate on what type of information is at issue. Moreover, "[o]ne of the elements that the asserting party must prove is that it has not waived the privilege." *Weil v. Inv./Indicators, Rsch. & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981). If the defendants' are justifying their handling of the drugs with reference to their attorneys' guidance, then they would be effectively relying on the "defense of advice of counsel," which "waives the attorney client privilege," *In re Fresh & Process Potatoes Antitrust Litig.*, No. 4:10-md-2186, 2014 WL 1413676, at *5 (D. Idaho Apr. 11, 2014), as well as the "work product protection," *Pesky v. United States*, No. 1:10-186, 2011 WL 13227946, at *1 (D. Idaho Aug. 29, 2011). In all events, the defendants are still duty-bound to provide the non-privileged information responsive to the interrogatory, which they have not done.

### B. Interrogatory 42

Interrogatory 42 presses the defendants to explain why Mr. Tewalt mischaracterized the expiration date of the Second Set of Execution Drugs when he responded to RFA 290 on June 10, 2024. In RFA 290, Mr. Pizzuto called on Mr. Tewalt to admit or deny that the Second Set had "an expiration date later than February 28, 2025." Dkt. 155-4 at 6. He wrote "[a]dmit" in a response that he certified, "under penalty of perjury," as being "true and correct." *Id.* at 6, 22. Despite the oath, Mr. Tewalt's statement was false. In fact, as IDOC's own chain-of-custody form would later reveal, the drugs were "returned to supplier" on October 24, 2025 because they were "expired." Ex. 5 at 1. Mr. Tewalt subsequently admitted that the Second Set actually expired in September 2024, *see* Dkt. 177-3 at 6, at least five months earlier than the date he previously swore to.

Given this history, the defendants' relevance objection to Interrogatory 42 is meritless. The defendants gave under oath the wrong expiration date for a drug they planned to use at an

execution, even though the right day was displayed "on the packaging" of the chemical. *Id*. at 7. It is far-fetched for the defendants to maintain that such a serious lapse has no implications for IDOC's competence at performing basic execution-related tasks. At a minimum, the miscue gives rise to doubts about whether IDOC is adhering to its own protocol, which itself forbids the use of expired drugs at executions. *See* Dkt. 166-2 at 21. Whether a correctional department follows its protocol is relevant to an Eighth Amendment challenge. *See, e.g.*, *Dickens v. Brewer*, 631 F.3d 1139, 1146 (9th Cir. 2011) (calling the analysis into a department's compliance with its execution protocol "an important inquiry" in a similar Eighth Amendment case).

Regarding undue burden, Interrogatory 42 is quite narrow: it relates to a single admitted error that occurred in connection with one batch of drugs. *See, e.g.*, *Cableview Communications of Jacksonville, Inc. v. Time Warner Cable Southeast, LLC*, No. 3:13-cv-306, 2015 WL 12838176, at *5 n.5 (M.D. Fla. Aug. 18, 2015) (finding an interrogatory neither overbroad nor unduly burdensome where it was "specifically limited in scope to a single and discrete incident").

As to the work product and attorney-client privileges, the basic logic above in the discussion of Interrogatory 39 is applicable here as well. Specifically, the defendants have taken an impermissibly overbroad approach to claiming that information is protected by privilege. And, as above, if the defendants are submitting that Mr. Tewalt's false statement is somehow less problematic because counsel were involved in its creation, then the attorneys have placed their own conduct at issue and the privileges are waived. If the defendants intend to employ the privileges in some other way, it is their responsibility to clarify, so Mr. Pizzuto can respond.

## C. Interrogatory 44

In Interrogatory 44, Mr. Pizzuto invited the defendants to explain why IDOC "removed from the previous version of the protocol the requirement that a physician be available to revive

the inmate if necessary." (Mr. Pizzuto will call this physician the "rescue doctor.") The defendants resist Interrogatory 44 on the ground that "the term 'previous version of the protocol' is undefined and subject to multiple interpretations." That objection is now moot, as undersigned counsel noted during the meet and confer that the language refers to the version of Idaho's execution protocol that was in effect prior to the adoption of the current iteration, which was approved on October 11, 2024. *See* Ex. 1 at 1. In addition, the terms have "a plain and ordinary meaning," especially in the context of this case—where the modifications to the protocol are obviously germane—and there is no cause to construe them "hyper-technically." Dkt. 123 at 18.

The defendants' next objection is relevance and it is misplaced. In the earlier protocol, IDOC provided that "[a] licensed physician will be on-site at the Execution Unit during the execution to provide any necessary resuscitation effort of the condemned person and first aid emergency care for any person in the immediate area if needed." Dkt. 54-12 at 8. The prior protocol further established that the physician would "not participate in the execution in any way." *Id.* In other words, the physician was there for the purpose of providing treatment to the condemned, if it became necessary, rather than to facilitate his involuntary death. As such, the physician was a safeguard implemented by IDOC to help prevent the unnecessary pain and suffering of the inmate—a goal the Department itself ties to its protocol. *See* Dkt. 166-2 at 5 (declaring that the protocol was written in part to guarantee that an execution complies with the U.S. Constitution and that it "[d]oes not cause the condemned person to suffer cruelly during the execution").

The removal of such a safeguard is unquestionably relevant to Mr. Pizzuto's claim that an unconstitutional likelihood of pain attends his execution. That is especially true when Mr. Pizzuto has specifically put forward allegations about how IV-access issues and central lines compound the risks of massive medical complications. *See* Dkt. 153 at 32–36. These are, of course, the kind

of complications that—if they were serious enough—would bring the rescue doctor into the picture. Consider the case of Clayton Lockett, which Mr. Pizzuto's operative complaint refers to explicitly and repeatedly. *See* Dkt. 153 at 15, 35. At Mr. Lockett's Oklahoma execution in 2014, he was seen "twitching and convulsing" and then he "began to buck and writhe," "clenching his teeth and grimacing in pain." *Estate of Lockett by and through Lockett v. Fallin*, 841 F.3d 1098, 1105 (10th Cir. 2016). Of note for present purposes, Mr. Lockett's execution went so far off the rails that the proceeding "was called off" and it was only "ten minutes later" that he was declared dead. *Estate of Clayton Lockett ex rel. Lockett v. Fallin*, No. 14-1119, 2015 WL 3874883, at *2 (W.D. Okla. June 23, 2015). Put another way, ten minutes passed in a situation in which Mr. Lockett was undisputedly suffering an "unnecessarily prolonged and horribly painful" experience, *Lockett*, 841 F.3d at 1113, and in which—under Idaho's protocol—the rescue doctor would have intervened. The defendants cannot seriously contend that the removal of this doctor is irrelevant to Mr. Pizzuto's Eighth Amendment claim. Indeed, it is ironic that IDOC would in the latest protocol remove the licensed physician whose role was to minimize pain while adding a different licensed physician whose role it is to kill Mr. Pizzuto. *See* Dkt. 175-7 at 7–8. It was IDOC's prerogative to make that substitution, but one consequence is that the change must be explained in the present lawsuit.

Concerning undue burden, as with the preceding interrogatories, the present one goes to a single alteration in a discrete portion of the protocol. And on proportionality, the rescue-doctor issue is particularly important in light of concerns about the defendants' habits, patterns, practices, motives, and even credibility. Also, it must be remembered that we are dealing with a case in which IDOC "recent[ly] bungled [the] execution of an individual who shares important characteristics

with Pizzuto." Dkt. 158 at 6. Given that set of circumstances, the likelihood of a botched execution is higher, making the rescue doctor more significant, and rendering the interrogatory proportional.

### D. Interrogatory 47

Interrogatory 47 queries the defendants about "the licensing and certification status of the laboratory that generated the" COAs that IDOC has produced for its execution drugs, including their accreditations and regulatory histories. The defendants asserted at least eight separate objections to the interrogatory, each of them conclusory in nature. That is grounds—standing alone—for the Court to overrule the objections. *See Sayta v. Martin*, No. 16-cv-3775, 2019 WL 1102989, at *2 (N.D. Cal. Mar. 8, 2019) (discouraging litigants from "raising a litany of scattershot objections to the other side's discovery practices in the abstract"). Nevertheless, Mr. Pizzuto will address the defendants' "blunderbuss" objections, *id.*, as best he can.

To begin, on overbreadth, the defendants indicated during the meet and confer that their primary reservation was with the lack of a time period for the requested regulatory information. *See* Ex. 1 at 1. Mr. Pizzuto advised opposing counsel that he would be satisfied with a search for regulatory violations reaching back three years, *see id.*, thereby taking any potential overbreadth issue off the table, *see Hammond v. Lowe's Home Ctrs.*, 216 F.R.D. 666, 672 (D. Kan. 2003) (limiting an interrogatory to a three-year period in order to cure its facial overbreadth).

The defendants' objection to Interrogatory 47 as improperly "compound, conjunctive, or disjunctive" is misguided. To begin, an interrogatory is not objectionable because it is compound or conjunctive. Those qualities make an *RFA* improper. *See U.S. ex rel. Englund v. LA Cty.*, 235 F.R.D. 675, 684 (E.D. Cal. 2006). But with respect to interrogatories, a compound formulation means only that the request counts multiple times for purposes of the cap. *See, e.g.*, *Minnis v. Washington*, No. C11-5600, 2013 WL 1964832, at *2 (W.D. Wash. May 10, 2013). If

Interrogatory 47 were compound, it would signify at most that Mr. Pizzuto needed leave to serve two or three additional interrogatories, which he respectfully requests in the alternative to the extent it is necessary. That said, Mr. Pizzuto does not believe it is necessary. An interrogatory is not compound when there is a "logical relation between the various requested information in each main question." *Slep-Tone Entertainment Corp. v. Peacock Bar & Grill*, No. 6:13-cv-281, 2013 WL 12311115, at *3 (D. Or. June 28, 2013). Here, the main question is about regulatory status, and the items in the following list simply explain what types of information Mr. Pizzuto is seeking, such as accreditation and regulatory citations. It follows that Interrogatory 47 is not improperly compound or conjunctive. Even if it were, a compound or conjunctive request must still be answered if it is not "misleading, confusing, or ambiguous given the facts of the th[e] case" *Eclipse Grp. LLP v. Target Corp.*, 15cv1411, 2017 WL 2231316, at *8 (S.D. Cal. May 19, 2017). Interrogatory 47 is none of those things. As for the defendants' aside about "disjunctive" requests, that signifies the presence of the word "or," *see id.*, which does not appear in the interrogatory.

The defendants target a host of words in Interrogatory 47 as unclear, but they are not. "Licensing and certification status" has a commonsense meaning, and it is also defined in the interrogatory itself with reference to accreditations and regulatory violations. "Due diligence" is a term for *the defendants* to define. Interrogatory 47 asks them to explain what due diligence they have done into the laboratory. That is, Mr. Pizzuto wishes to know what the defendants consider to be the proper level of diligence that is due. Only they can define that. "Certificates of analysis" is used in the interrogatory to refer to the COAs that the defendants have provided to undersigned counsel. There are only two such documents, and they are well known to opposing counsel, since they produced them. *See* Ex. 1 at 2. "Bodies" is a clear reference to any agency that might license a drug-testing laboratory, as undersigned counsel also confirmed during the meet and confer. *See*

*id.* at 1. And while "regulatory histories" is perhaps the one phrase that could have been drafted more clearly, undersigned counsel told the defendants during the meet and confer that the language designated violations found by regulators, *see id.*, something that is easily understood. Lastly, the term "and so forth" does not change the calculus. In using that phrase, Mr. Pizzuto was merely clarifying that the examples of "licensing and certification" information (i.e., accreditation and regulatory violations) were non-exhaustive. In all events, if the phrase is ambiguous, the defendants should still answer the question with respect to the items that are listed in the interrogatory and add a clarifying note about how the request was interpreted. It is unpersuasive for them to adopt a "strained and overly technical interpretation[]" of the interrogatory "to avoid [their] obligation under the broad discovery rules." *Omega Engineering, Inc. v. Omega, S.A.*, No. Civ. 398CV2464, 2001 WL 173765, at *7 (D. Conn. Feb. 6, 2001).

Moving to the matter of "confidential information" and "the privacy interests of third parties," the objection is groundless. If the defendants are in possession of information responsive to the interrogatory and subject to a legitimate protection, they can indicate as much while providing Mr. Pizzuto with enough detail so that that he can—if appropriate—challenge IDOC's determination. But much information in this category is generally public. For instance, Eagle Analytical, the company that supposedly performed the testing on IDOC's execution drugs in 2011 and 2012 has many regulatory citations that Mr. Pizzuto found on the Food and Drug Administration's (FDA's) website and in the Washington Post. *See* Dkt. 90 at 8–9 & exhibits cited therein. Such public material triggers no confidential or privacy-interest red flags.

The defendants' relevancy objection is specious. Imagine a scenario in which the laboratory at issue has no accreditation with any organization and has been sanctioned by regulators for the most egregious misconduct, like falsifying testing results. That would obviously

bear on the question of whether the results the laboratory provided to IDOC were trustworthy, and hence whether the drugs were reliable, making the subject-matter relevant.

To see how proportional the interrogatory is, recall how central the COAs are to the defendants' litigation position, and how little information is known about them. The COAs are literally the only evidence the defendants have ever pointed to in their effort to prove the quality of their execution drugs. *See* Dkt. 151 at 3. Yet the defendants have said nothing about who made the COA, when it was created, how it was generated, what kind of testing was used, whether the personnel involved were qualified, or how it ended up in IDOC's possession. The defendants are placing an overwhelming degree of reliance upon a single cryptic piece of paper that has not one single indicia of reliability. Having done so, they cannot fairly obstruct Mr. Pizzuto from making minimal inquiries into the bona fides of the laboratory, and Interrogatory 47 is proportional.

The defendants' secrecy objection to the interrogatory is equally unconvincing. It is quite possible for the defendants to engage with the interrogatory without jeopardizing anyone's anonymity. Accreditations are by definition general, and given to many businesses. And regulatory issues can be sketched out on a high enough level of abstraction that they remain anonymous. Taking Eagle as an illustration again, IDOC could inform Mr. Pizzuto that the FDA fined the laboratory for inadequate contamination-testing measures at some point in the last three years. *See* Dkt. 90 at 9. That would presumably be the case for a number of other laboratories, and Mr. Pizzuto would have no way of locating the business. IDOC's secrecy protestations are overstated.

### E.  RFA 544

Transitioning away from the interrogatories to the final discovery request at issue, RFA 544 asked the defendants to admit or deny that they had "obtained execution drugs Manufactured

by a company that opposes the use of its products in executions." The defendants' objections rest on secrecy and ambiguity.

Starting with the latter, the defendants' appeal to ambiguity is tenuous. Mr. Pizzuto is unsure of what the defendants mean when they assert that the word "obtained" is "subject to multiple reasonable interpretations." The question here is about the execution drugs that IDOC has obtained. Mr. Pizzuto has consistently framed his discovery requests with reference to the three sets of drugs that IDOC has acquired over the last several years, as he did in the latest queries. *See* Ex. 4; Ex. 6. The defendants have had no difficulty understanding such questions and this one is similarly straightforward. "Opposes" is also entirely transparent. Notably, the same term appears in a letter from Sagent, one of the manufacturers of pentobarbital, in a letter that the defendants gave to Mr. Pizzuto in discovery. In that letter, Sagent underscored its "opposition to the misuse of medicines in executions." Ex. 7 at 5. Another pentobarbital manufacturer, Hikma, employed the synonym of "objection." Ex. 8 ("As I have done regularly in the past, I am writing to remind you of Hikma's objection in the strongest possible terms to the use of any of our products for lethal injection . . . ."). RFA 544 is hardly "so ambiguous that the responding party cannot, in good faith, frame an intelligent reply," and the defendants should not be permitted to escape the question "based on an overly-technical reading of the request." *Eclipse Grp.*, 2017 WL 2231316, at *8.

The defendants' secrecy objection fails as well, for answering RFA 544 would not, "to a reasonable degree of certainty, identify" a particular company. Dkt. 88 at 4. RFA 544 solicits a non-identifying piece of information: the manufacturer's position on the use of its products in executions. Critically, that piece of information does not narrow the possible universe of manufacturers in any way whatsoever. That is because, to Mr. Pizzuto's knowledge, *every* manufacturer disagrees with the use of its products in executions. *See* Ex. 7 (reflecting Sagent's

opposition); Ex. 8 (Hikma's); *Arthur v. Dunn*, No. 2:11-cv-438, 2016 WL 1551475, at *5 n.4

(M.D. Ala. Apr. 15, 2016), *aff'd*, 840 F.3d 1268 (11th Cir. 2016) (Akorn's); *Arthur v. Thomas*,

No. 2:11-cv-438, 2011 WL 5294656, at *3 (M.D. Ala. Nov. 3, 2011), *rev'd on unrelated grounds*,

674 F.3d 1257 (11th Cir. 2012) (per curiam) (Lundbeck's). An admission that IDOC's drugs come

from a manufacturer hostile to its products being misappropriated for executions would give Mr.

Pizzuto literally zero additional information about which company that is.

Because the defendants have articulated their secrecy objection partly with reference to

proportionality, it is appropriate to revisit the importance of this area of inquiry to Mr. Pizzuto's

claim. As Dr. Almgren has explained, the purchase of drugs for executions against the wishes of

the manufacturer raises reliability concerns, since it means longer chains of custody, greater risks

of improper storage (as has occurred in Idaho), poor transportation conditions, and unqualified

handlers. *See* Dkt. 116-7 at 4–5. As more information surfaces about execution drug acquisition

elsewhere in the U.S., such concerns are increasing. Dr. Almgren observes that the amount of

manufactured pentobarbital required for a single execution, acquired in a lawful manner, would

cost around $16,000. *See* Ex. 9 at 6. IDOC has paid $200,000 for three sets. *See* Dkt. 102-4; Ex.

10; Ex. 11. And the expenditures by similarly situated states are increasing by an order of

magnitude. In Indiana, no one was executed between 2010 and December 2024. *See*

https://deathpenaltyinfo.org/facts-and-research/data/executions?state=Indiana&federal=No. The

cause was an absence of drugs. *See* Isabella Volmert, *Indiana seeks first execution since 2009 after*

*acquiring lethal injection drug, governor says*, AP, June 26, 2024,

https://apnews.com/article/indiana-execution-lethal-injection-drugs-

94da18464a7bab734275a412ecd9931f. Then pentobarbital materialized, just as in Idaho. *See id.*

Apparently, Indiana spent somewhere in the ballpark of $900,000 for its drugs. *See* Ex. 12. From

2018 until this year, Tennessee did not use pentobarbital in executions. *See King v. Parker*, No. 3:18-cv-1234, 2020 WL 4883014, at *1 (M.D. Tenn. July 20, 2020). This year, Tennessee seemingly spent $525,000 for a batch of pentobarbital. *See* Kelly Puente, *Tennessee has paid $600,000 for lethal injection drugs, but specific details remain secret*, The Tennessean, Mar. 20, 2025, https://www.tennessean.com/story/news/crime/2025/03/20/tennessee-death-row-lethal-injection-pentobarbital/82517783007/. No executions took place in Utah between June 2010 and August 2024. *See* https://deathpenaltyinfo.org/facts-and-research/data/executions?state=Utah&federal=No. Utah recently invested $200,000 for pentobarbital that it expressly acknowledged was manufactured, in order to carry out a single execution. *See* Ex. 13 at 2, 3. The strongest inference to draw is that the same profit-seeking actor is roaming the country selling pentobarbital to desperate correctional departments at huge markups, and in the process giving blatantly incorrect storage instructions to officials in at least one state, Idaho, where drugs were refrigerated in violation of the unequivocal directions on the packaging. That narrative gives rise to natural questions about the trustworthiness of the source. A source willing to transgress a manufacturer's distribution controls in order to sell a chemical for personal gain at immense costs does not commend himself as a paragon of reliability. Those reliability questions are at the heart of Mr. Pizzuto's Eighth Amendment claim, and the interrogatory is proportional.

## IV.    Conclusion

In light of the above, Mr. Pizzuto respectfully asks the Court to allow him to serve the additional interrogatories described here and to order the defendants to respond to them and to answer RFA 544.

DATED this 25th day of March 2025.

/s/ Jonah J. Horwitz
Jonah J. Horwitz
Christopher M. Sanchez
FEDERAL DEFENDER SERVICES OF IDAHO

/s/ Sarah E. Kalman
Sarah E. Kalman
DLA PIPER LLP (US)

COUNSEL FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of March 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Kristina Schindele
kscchind@idoc.idaho.gov

Mary Karin Magnelli
kmagnell@idoc.idaho.gov

Michael J. Elia
mje@melawfirm.net

Tanner J. Smith
tanner@melawfirm.net

/s/ L. Hollis Ruggieri
L. Hollis Ruggieri