*Gerald Ross Pizzuto, Jr. v. Josh Tewalt,* Case No. 1:21-cv-359-BLW
Submitted in Support of Eighth Motion to Compel Discovery

# EXHIBIT 9

## SUPPLEMENTAL EXPERT DECLARATION OF DR. MICHAELA ALMGREN

1. My name is Michaela Almgren, Pharm.D., M.S. I am over the age of eighteen and competent to testify to the truth of the matters contained herein. The factual statements I make here are true and correct to the best of my knowledge.

2. I have been asked by the Federal Defender Services of Idaho ("FDSI"), who represent death-sentenced prisoner Thomas Creech, to submit a supplemental declaration explaining how Certificates of Analysis are issued for manufactured drug products and about the unusual pricing drug pricing practice documented on the Idaho Department of Correction (IDOC) Purchase Order.

3. I have described my experience and qualifications in the declarations filed in this case as Dkts.123-8 and 165-4. In addition to my experience with medication compounding, I have worked extensively in the drug manufacturing sector and have substantial knowledge of that area. I also hold a Master's Degree with focus on Pharmaceutical Chemistry. I currently work for a company with both pharmaceutical manufacturing and compounding divisions. I have appended to this declaration my CV as Attachment A, which details my experience with pharmaceutical manufacturing in addition to my pharmacist professional background.

4. In the declaration filed as Dkt. 165-4, I also listed the documents that I reviewed for purposes of preparing that report. In addition to those documents, I have also relied upon the following in preparing this declaration:

   a. IDOC Purchase Order document dated 10/24/2024

   b. Declaration of Randy Valley dated 10/31/2024

   c. Certificate of Analysis filed in this case as Dkt. 171-3

**I. Explanation of the Issuance Process of the Certificate of Analysis for a Finished Drug Product and Concerns Related to the Certificates of Analysis Provided.**

5. A drug's Certificate of Analysis (CoA) is an official document that verifies the quality, purity, and potency of a pharmaceutical finished product according to the standards

EXPERT DECLARATION OF DR. MICHAELA ALMGREN - 1

and using methodology specified by the regulatory agencies and standard-setting bodies, including pharmacopeial standards, such as USP. It is issued by a manufacturer or an authorized testing laboratory, usually after a batch of a drug product has been tested according to the specific drug quality standards. The CoA ensures that each manufactured medication batch meets established safety and efficacy standards before distribution, providing an assurance of quality to both regulators and end-users. A CoA is specific to each lot number of each batch manufactured. One CoA cannot be used to represent all product batches manufactured, even when considering the same manufacturer, as each lot number of the medication has its own unique CoA representing the quality of that batch only.

6. Each manufactured drug lot will have a unique CoA issued reflecting the results that are specific for that particular lot. Two different drug lots are very unlikely to have identical results on their CoA due to several inherent variations in the manufacturing and testing processes. Factors such as variability in raw material quality, finished product quality variability, manufacturing conditions, and equipment and analyst/operator variability all contribute to variations of the results, though they may still be within established and acceptable specifications.

7. Expiration dates for manufactured medications are calculated from the date a batch is manufactured. Since each lot is typically produced on a different date, its expiration period is counted from that specific production date. For example, if a product is determined to be stable for two years, a batch manufactured in January 2024 would expire in January 2026, while a batch made in March 2024 would expire in March 2026. And each of those batches will have a unique CoA issued.

8. Each CoA issued is specific to the specific batch and lot number of the manufactured medication. It is highly unlikely that two different drug lots will have identical

EXPERT DECLARATION OF DR. MICHAELA ALMGREN - 2

results on their CoA because of several inherent variations in the manufacturing and testing processes discussed above.

9. I have reviewed the declaration of Randy Valley dated October 31, 2024 and its attachments. Exhibit B to Mr. Valley's declaration is a CoA. Mr. Valley indicates that the CoA is for the execution chemicals that IDOC obtained in October 2024, which he characterizes as vials 3–8. I have also reviewed the CoA for the execution chemicals that IDOC acquired in October 2023. Mr. Valley characterizes those as vials 1–2.

10. From my review of the two CoAs, they are clearly identical. Every single character on each CoA is the same. All test results listed on the CoA are also identical.

11. As noted above, drugs with different expiration dates should have different CoAs. It is virtually impossible that the two CoAs would turn out to be identical. While some of the information in a CoA is more generic in nature, other aspects of it are quite specific and involve data that would almost always differ in some respect. Indeed, even if the same batch were tested twice, I would expect to see at least some of the results differ.

12. The fact that the two CoAs at issue here are identical in every respect indicates to me that they were not the result of two separate tests, as would be appropriate. Instead, it appears that the same CoA was copied and provided twice. That is inappropriate, and it raises serious questions about whether the results in the CoAs accurately pertain to the chemicals that they are supposed to be associated with.

## II. The USP and storage conditions for compounded pentobarbital.

13. As I described in my previous report, the United States Pharmacopeia (USP) compiles standards to ensure the quality, purity, strength, and consistency of medication and other products.

14. The USP is the gold standard for the pharmaceutical industry. It is relied upon by everyone in the field across the country as well as internationally. The USP's standards are

EXPERT DECLARATION OF DR. MICHAELA ALMGREN - 3

widely recognized and are enforced by regulatory agencies, such as the FDA, to ensure products are safe and meet quality benchmarks.

15. The standards that I described in my previous report, filed as Dkt. 165-4, related to temperature, storage, and so forth, do not differ from location to location. Like the USP, those standards are national in nature. They apply to everyone across the United States, including in Idaho.

16. The USP Compendium does not only apply to compounded drugs. It applies to manufactured drugs as well. General Chapters 659 and 1079 also apply to manufactured drugs. USP chapters like 795, 797, and 800 set compounding guidelines, but there are also standards for other practices that support healthcare and patient safety.

17. The current version of Chapter 659 is appended to this declaration as Attachment B. Chapter 659 includes the following text: "An article for which storage at Controlled room temperature is directed may, alternatively, be stored and shipped in a cool place or refrigerated, unless otherwise specified in the individual monograph or on the label."

18. The purpose of Chapter 659 is to clarify that, when a drug label says nothing more than that it should be stored at room temperature, the item can be refrigerated. For example, a common over-the-counter medication like aspirin might indicate on its label that it should be stored at room temperature, with no further guidance as to temperature. In a situation like that, Chapter 659 explains that it is permissible to refrigerate the medication temporarily.

19. Chapter 659 does not apply to drugs where the labelling gives specific instructions on the temperature range that is appropriate for storage. When labelling has such instructions, it must be followed. Under those circumstances, the conditions are "otherwise specified" within the meaning of Chapter 659.

EXPERT DECLARATION OF DR. MICHAELA ALMGREN - 4

20. I have reviewed packaging for manufactured pentobarbital injection that is publicly available. In the package insert[1] I have reviewed, the manufacturer provides specific instructions regarding the range of temperature in which pentobarbital injection must be stored. Specifically, the manufacturer indicates that the preparation must be stored "at 20° to 25°C (68° to 77°F), however, brief excursions are permitted between 15° to 30°C (59° to 86°F)." Chapter 659 does not allow such chemicals to be refrigerated for weeks at a time, as the pentobarbital was according to the records reviewed. Rather, this would fall into "otherwise specified" category of drugs that must be kept between 68 and 77 degrees Fahrenheit, with only brief temperature excursions excepted as described. The manufacturer's instructions must be followed.

21. A qualified professional with the necessary clinical training would not use manufactured pentobarbital that had been refrigerated for 37 days. This individual would dispose of the pentobarbital due to the significant risk that improper storage could have caused irreversible damage to the drug.

### III. The Atypical Drug Pricing Practice Recorded on the IDOC Purchase Order.

22. The "Red Book" is a reference publication that provides comprehensive information about medications, including drug pricing. Average Wholesale Prices (AWP), as well as Wholesale Acquisition Costs (WAC) are listed in the Red Book to provide pricing information compiled from various sources, including pharmaceutical manufacturers, wholesalers, and market data. The WAC package price in the Red Book refers to the Wholesale Acquisition Cost (WAC) of a specific package or formulation of a drug and AWP Package Price is a standardized reference for the average wholesale cost of a specific drug package.

---

[1] https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=5c380ab0-4386-48b6-80ab-ca594b23bc74

EXPERT DECLARATION OF DR. MICHAELA ALMGREN - 5

23. When consulted the Micromedex[2] Red Book resource, it appears that there are only two currently available pentobarbital injection products that are 50mg/mL strength providing 2.5 total grams of pentobarbital (50mL). They are both very similar in pricing—The cost of a single vial ranges from $2,700.00 (Sagent Pharmaceuticals) to $2.708.40 (Hikma Pharmaceuticals). For 6 vials the cost should be in the range of $16,200.00 to $16,250.40.

24. The price listed in the invoice for the 6 received vials of pentobarbital injection 50mg/mL, in 50mL is $50,000.00 which is significantly higher cost than expected. This also raises the question of legitimacy of the supplier, since the price of the drug vials is so severely inflated. A drug supplier who marks prices 2-3 times higher than expected may be viewed as suspicious or illegitimate, leading to concerns about ethical practices and even regulatory compliance.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 2nd day of November 2024.

_Michaela M. Almgren_
Dr. Michaela M. Almgren

---

[2] https://www-micromedexsolutions-com.eu1.proxy.openathens.net/

EXPERT DECLARATION OF DR. MICHAELA ALMGREN - 6