UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| GERALD ROSS PIZZUTO, JR., <br><br> Plaintiff, <br><br> v. <br><br> JOSH TEWALT, Director, Idaho Department of Correction, in his official capacity, TIMOTHY RICHARDSON, Warden, Idaho Maximum Security Institution, in his official capacity, <br><br> Defendants. | Case No. 1:21-cv-00359-BLW <br><br> **MEMORANDUM DECISION AND ORDER** |

# INTRODUCTION

Before the Court are Plaintiff's Sixth Motion to Compel Discovery (Dkt. 148), Plaintiff's Eighth Motion to Compel Discovery and for Leave to Serve Additional Interrogatories, (Dkt. 183), and Defendants' Motion to Seal Exhibit A to the Sixth Declaration of Tanner J. Smith (Dkt. 188). As explained below, the Court will partly grant and partly deny Plaintiff's Sixth Motion to Compel; grant Plaintiff's Eighth Motion to Compel; and grant Defendants' Motion to Seal.

# BACKGROUND

Plaintiff Gerald Ross Pizzuto, Jr., brought this action to challenge the Idaho

Department of Correction's (IDOC) plan to execute him using pentobarbital. The discovery process has been long and contentious, and one major area of conflict concerns the IDOC's sourcing of execution drugs. As the Court recognized early on, Defendants have a strong interest in maintaining the confidentiality of the IDOC's lethal drug supplier, as the publication of the supplier's identity would compromise Idaho's ability to carry out executions. Accordingly, the Court has shielded "any information that would, to a reasonable degree of certainty, identify any person or entity involved in preparing for, supplying drugs for, or administering the death penalty in Idaho." Dkt. 88 at 4-5.

Defendants have repeatedly—and unsuccessfully—argued that this test offers insufficient protection. In March 2024, the Court ordered Defendants to provide information such as the dates the chemicals were obtained, whether they were produced domestically, and whether they were from a veterinary source. Dkt. 123. In that decision, the Court again emphasized Defendants' secrecy interest but concluded that they had failed to explain how the disclosures would, with a reasonable degree of certainty, lead to the identification of the IDOC's drug source. Defendants appealed, and the Court stayed the order pending resolution in the Ninth Circuit. *See* Dkt. 150.

In June 2024, shortly before the Court ordered that stay, a related dispute arose regarding Pizzuto's Request for Admission (RFA) 240, which asks

Defendants to "[a]dmit or deny that IDOC has obtained New Execution Drugs from the source of the Old Execution Drugs."[1] Dkt. 148. Defendants objected on secrecy grounds, and Pizzuto filed his Sixth Motion to Compel Discovery. Because the dispute implicated the same issue raised in Defendants' appeal, the Court deferred a ruling until the Ninth Circuit issued its decision.

On March 21, 2025, the Ninth Circuit affirmed this Court's discovery order and endorsed the "reasonable degree of certainty" standard. *See* Dkt. 182. The appellate court rejected Defendants' subsequent request for a rehearing en banc, though it issued an amended order clarifying a minor point of procedure. *See* Dkt. 192. A mandate followed on May 22, 2025. Dkt. 195. The Sixth Motion to Compel is now ripe for adjudication.

Shortly after the Ninth Circuit's initial ruling, Pizzuto filed his Eighth Motion to Compel Discovery and for Leave to Serve Additional Interrogatories. Dkt. 183. That motion seeks to compel a response to four interrogatories and one RFA. These concern, respectively, the improper refrigeration of execution drugs (Interrogatory 39); Defendant Tewalt's past misstatement about the drugs' expiration date (Interrogatory 42); changes to the execution protocol that remove

---

[1] The RFA defines "Old Execution Drugs" as chemical obtained in October 2023 or earlier for use in Creech's February 2024 execution. "New Execution Drugs" are chemicals obtained after February 28, 2024, or being sought for future executions. Dkt. 148-1 at 2 n.1.

MEMORANDUM DECISION AND ORDER - 3

the requirement that a physician be available to revive the inmate if necessary (Interrogatory 44); the licensing and certification status of the laboratory that generated the Certificates of Analysis for the execution drugs (Interrogatory 47); and whether the IDOC has obtained pentobarbital manufactured by a company opposed to the use of its products in executions (RFA 544).

Specifically, Pizzuto's requests are as follows:

> **Interrogatory 39**: Describe in detail what led the First Set of Execution Drugs to be placed in—and removed from—a refrigerator, including an explanation of why the drugs were refrigerated, why they were taken out of the refrigerator, why those two events took place on the dates when they did, who was involved in both decisions, and so forth.
> **Interrogatory 42**: Explain in detail why Defendant Tewalt provided an incorrect expiration date when he responded to RFA 290 on June 10, 2024.
> **Interrogatory 44**: Explain in detail why SOP 135 removed from the previous version of the protocol the requirement that a physician be available to revive the inmate if necessary.
> **Interrogatory 47**: Describe the licensing and certification status of the laboratory that generated the certificates of analysis that you have produced to [Mr. Pizzuto's counsel], including but not limited to what bodies (if any) they are accredited with, what accreditations they possess, their regulatory histories, what due diligence you have done into their licensure and regulatory histories, and so forth.
> **RFA 544**: Admit or deny that IDOC has obtained execution drugs Manufactured by a company that opposes the use of its products in executions.

Defendants objected to each of the interrogatories as irrelevant and disproportionate, among other shortcomings. In response to RFA 544, Defendants objected that the admission could reveal the IDOC's lethal drug source. To support

MEMORANDUM DECISION AND ORDER - 4

this argument, they submitted an exhibit compiling all Pizzuto's past RFAs—549 total—which Defendants argue create a mosaic of identifying information. Defendants also moved the Court for an order sealing the exhibit or, alternatively, allowing them to claw back the material. Dkt. 188.

## LEGAL STANDARD

Federal courts have broad discretion to permit, prohibit, or limit discovery in civil cases. Fed. R. Civ. P. 26(c)(1). "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." R. 26(b)(1). For good cause, however, the court may limit discovery "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including [by] prohibiting the requested discovery altogether, limiting the scope of the discovery, or fixing the terms of disclosure." *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063 (9th Cir. 2004). This requires the court to balance the requesting party's need for the evidence against the harm the disclosure may pose to the objecting party.

## ANALYSIS

1. **Plaintiff's Sixth Motion to Compel**

RFA 240 asks Defendants to admit or deny that the New Execution Drugs, obtained after February 2024, are from the same source as the Old Execution Drugs. As the Court has observed repeatedly in this case, the balancing task under

Rule 26(c) is especially sensitive when discovery relates to the source of execution drugs. Dkt. 88 at 22-23. The State has a strong interest in enforcing its death penalty laws, and the disclosure of a lethal drug manufacturer or supplier would compromise the State's ability to conduct executions. For this reason, "it can be unduly burdensome for a state to disclose information that would identify the supplier of its execution drugs." Dkt. 123 at 6.

     This principle, however, does not create a blanket protection for all information about the procurement of lethal chemicals: "otherwise-discoverable information cannot be withheld simply because it is tangentially related to the acquisition or testing of execution drugs." *Id.* Rather, this Court conducts a particularized analysis of each disputed discovery request "to prevent the limited protection for execution-drug suppliers' identities from morphing into a rigid and expansive privilege in all information related to execution drugs." *Id.* Defendants may withhold relevant discovery based on their secrecy interest only if it "would, *to a reasonable degree of certainty*, identify a person or entity involved in preparing for, supplying drugs for, or administering the death penalty in Idaho." *Id.* at 3 (emphasis added); *see Pizzuto v. Tewalt*, No. 24-2275, slip op. at 14 (9th Cir. May 14, 2025).

     The Court now applies this rule to the dispute at hand. RFA 240 is relevant, because the Court ordered Defendants to disclose certain details about the old

drugs—like whether they were manufactured domestically or internationally—and this RFA effectively seeks the same information about the new drugs. In other words, if the New Execution Drugs are from the same source as the Old Execution Drugs, details that the Court has ordered disclosed about the former will also likely be true of the latter. Relevance is a low bar, and Pizzuto's allegations about the quality of the IDOC's lethal drugs place this information within the scope of discovery. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

Additionally, the evidence is proportional to the needs of the case. Defendants contend that RFA 240 is cumulative because Pizzuto has served other RFAs covering the same subject matter about the New Execution Drugs, such as the place of manufacture and whether they come from a veterinary source. *See* Dkt. 151 at 6-8. This point would carry some weight if Defendants had in fact disclosed this information about the New Execution Drugs. Defendants, however, have objected to each of the relevant RFAs. The argument that Pizzuto already "has access to the information" sought in RFA 240 is misleading given that Defendants have not actually disclosed the information. Dkt. 151 at 9.

The final question is whether the disclosure of this information would likely reveal the source of the IDOC's lethal drugs. Defendants first ask the Court to

replace the "reasonable degree of certainty" test with a standard that protects all information that could "possibly lead to the identity of people/entities in the administration of the death penalty." Dkt. 151 at 13. This issue has already been litigated and resolved. In the light of the Ninth Circuit opinion affirming the "reasonable degree of certainty" test, the Court will decline Defendants' invitation to revisit the matter.

      Defendants have not shown that the RFA would, with a reasonable degree of certainty, reveal the IDOC's drug source. Although they suggest that Pizzuto can use this response combined with other disclosures to uncover the source's identity, Defendants have again failed to explain how that would happen. As before, this bare speculation fails to establish an undue burden. *See* Dkt. 123 at 17 ("[T]he Court will not discard Pizzuto's discovery requests based on some unquantified risk that Defendants' answers could theoretically lead to the identification of the drug supplier."); *see also Pizzuto v. Tewalt*, No. 24-2275, slip op. at 31 ("This speculation is insufficient to support a finding that the district court abused its discretion in concluding that the disclosures do not unduly burden Defendants."). Defendants cannot merely invoke the specter of John Oliver every time Pizzuto asks for information about the drugs with which the IDOC plans to execute him.

      Nonetheless, the Court recognizes that RFA 240 is potentially more sensitive

MEMORANDUM DECISION AND ORDER - 8

than other disputed discovery because it relates directly to the current supplier's identity. Although Defendants have not established the merit of their confidentiality objections, there is a potentially less burdensome means of providing Pizzuto with the underlying information he seeks. He explains that RFA 240 is essentially a way to obtain the "same information" about the new drug source as he has already obtained about the old drug source. *Pl.'s Rep.* at 4, Dkt. 152. As an alternative to answering RFA 240, Defendants may instead answer the RFAs that request the same details about the New Execution Drugs that the Court has ordered disclosed about the Old Execution Drugs. *See* Dkt. 123. These include RFAs about the New Execution Drugs' geographic origin, whether they were made for veterinary use, whether they came from a veterinary source, and whether they were sold by a wholesaler/distributor. This approach will mitigate any legitimate concerns about explicitly identifying a link between the old and new drug sources while ensuring that Pizzuto has access to necessary discovery.

2. **Plaintiff's Eighth Motion to Compel**

    **A. RFA 544**

Turning to the Eighth Motion to Compel, the Court will begin by addressing RFA 544, which implicates the same secrecy concerns discussed above. Pizzuto asks Defendants to "[a]dmit or deny or deny that IDOC has obtained execution drugs Manufactured by a company that opposes the use of its products in

executions." Defendants argue that this might lead to the identification of the drug source. But rather than concretely explaining how the admission could reveal the source's identity, Defendants recycle their past arguments about the Court's standard for resolving these disputes. They again ask the Court to either create a new evidentiary privilege for the identities of those involved in executions or to replace the "reasonable degree of certainty" test with the "possibility" test for protecting information related to the drug source.

There is no need to spend much time on these contentions, which have been addressed at length both by this Court and the Ninth Circuit. Regarding the privilege argument, the Ninth Circuit explicitly declined "to declare a new federal evidentiary privilege in the identity of a state's execution drug supplier." *Pizzuto v. Tewalt*, No. 24-2275, slip op. at 11. And, as explained above, the Court will not revisit the "possibility" test given the Ninth Circuit's recent ruling. The fact that Pizzuto has apparently invoked the "possibility" test when litigating subpoenas in other circuits does not change this conclusion.

The Court will therefore proceed with the undue burden analysis under the "reasonable degree of certainty" test. First, the information is relevant and proportionate. Pizzuto explains that "the purchase of drugs for executions against the wishes of the manufacturer raises reliability concerns, since it means longer chains of custody, greater risks of improper storage (as has occurred in Idaho),

poor transportation conditions, and unqualified handlers." Dkt. 183-1 at 19; *see Expert Decl. of Dr. Michaela Almgren*, Dkt. 116-7. This certainly bears on the claim that his execution via pentobarbital would be unconstitutionally painful, and the request is not disproportionate given the stakes of the case.

The last question is whether the admission would reveal the drug manufacturer's identity. Defendants have barely even attempted to make this showing. They state that the disclosure will narrow down potential drug manufacturers—of which there are apparently only four—because some but not all oppose the use of their products in executions. Defendants do not, however, explain how far this would narrow things down, nor do they articulate the specific causal chain that would allow Pizzuto's attorneys (or John Oliver) to ascertain the manufacturer. Again, this bare speculation is insufficient. The burden was on Defendants, and they have not established that answering RFA 544 would, to a reasonable degree of certainty, reveal the manufacturer's identity. For this reason, the Court will order Defendants to respond to the RFA.

### B. Requests for Additional Interrogatories

The Court now considers Pizzuto's request for additional interrogatories. Under the parties' stipulated discovery plan, and consistent with Federal Rule of Civil Procedure 33(a)(1), each party was permitted twenty-five interrogatories. Pizzuto reached this limit on August 3, 2023. The Court subsequently granted

Pizzuto leave to serve six additional interrogatories, all of which concerned events that occurred after that date. He now seeks leave to serve four more interrogatories and for an order compelling Defendants to respond.

Rule 33's presumptive limit on interrogatories functions "not to prevent needed discovery, but to provide judicial scrutiny before parties make potentially excessive use of this discovery device." Fed. R. Civ. P. 33, advisory committee notes to 1993 amendments. Thus, "[l]eave to serve additional interrogatories may be granted to the extent consistent with Rule 26(b)(1) and (2)." Fed. R. Civ. P. 33(a)(1). The moving party must "make a 'particularized showing' as to why additional discovery is necessary," evaluated based on the Rule 26(b)(1) factors such as the importance of the issues at stake, the importance of the discovery, the parties' relative access to information, and the burden of the proposed discovery. *Stephenson v. Clendenin*, No. 2:22-CV-01521-DAD, 2024 WL 2924687, at *1 (E.D. Cal. May 14, 2024) (quoting *Archer Daniels Midland Co. v. Aon Risk Services, Inc. of Minn.*, 187 F.R.D. 578, 586 (D. Minn. 1999)). The Court will analyze the merits of each interrogatory in turn.

      i.    **Interrogatory 39**

Interrogatory 39 concerns the improper refrigeration of the First Set of Execution Drugs. As Warden Richardson testified in a recent deposition, he received this set of drugs in October 2024 and immediately refrigerated them at the

instruction of the delivery person. *See* Dkt. 177-1. After an unknown period of time, he realized that the drugs were supposed to be stored at room temperature, and IDOC staff moved them to dry storage. Pizzuto seeks details about that decision-making process: "an explanation of why the drugs were refrigerated, why they were taken out of the refrigerator, why those two events took place on the dates when they did, who was involved in both decisions, and so forth."

Pizzuto has shown a particularized need for this information. To start, the interrogatory is relevant. Pizzuto's complaint contains allegations regarding the reliability of the IDOC's pentobarbital as well as the broad risk of human error due to various flaws in the execution protocol. The refrigeration incident clearly touches on both matters. The interrogatory is also proportionate. This is an important piece of evidence a case where the stakes are Pizzuto's potential torturous death. Although Defendants suggest that Pizzuto can obtain the information without further interrogatories, they do not explain how more RFAs or future depositions will provide a sufficient explanation of what occurred.

Nor do Defendants establish that Interrogatory 39 poses an undue burden. For instance, it does not raise any secrecy concerns. And while responding is undoubtedly inconvenient for Defendants, the imposition is minor given that discovery in this case has lasted more than three years, largely due to Defendants' own unwillingness to provide information. As the matter has dragged on, the

broader tumult surrounding executions in Idaho has impacted Pizzuto's claim and necessitated expanded discovery.

Finally, Defendants mention attorney-client privilege but make no attempt to establish that the privilege applies. The party invoking the privilege must "establish the privileged nature of the communications and, if necessary, to segregate the privileged information from the non-privileged information." *United States v. Ruehle*, 583 F.3d 600, 609 (9th Cir. 2009). Given the lack of any explanation from Defendants, the Court will not analyze this issue further.

The Court will, therefore, grant Pizzuto leave to serve Interrogatory 39 and compel Defendants to respond.

### ii.     Interrogatory 42

Interrogatory 42 asks for an explanation of Director Tewalt's misstatement in June 2024 regarding the expiration date of the Second Set of Execution Drugs, made in response to RFA 290. There, Director Tewalt indicated that the drugs had an expiration date later than February 28, 2025. The drugs, however, were returned to the supplier in October 2024 because they had expired, and Director Tewalt subsequently admitted that the expiration date was actually September 2024. *See* Dkts. 177-3, 183-6. This inaccuracy, he has explained, was inadvertent.

The analysis here largely tracks that of Interrogatory 39. The information is relevant because it relates to the quality of execution drugs and the IDOC's ability

to abide by its own execution protocols. Weighing the importance of the evidence against the burden on Defendants shows that the interrogatory is proportionate, and that the information could not be obtained in a less burdensome fashion. Again, the half-hearted invocation of attorney-client privilege, with no attempt to establish that the privilege applies, does not suffice to defeat Pizzuto's request. In sum, Pizzuto has made a particularized showing that the additional interrogatory is necessary, and the Court will order Defendants to respond to Interrogatory 42.

### iii. Interrogatory 44

Interrogatory 44 seeks information about the modification of the execution protocol to remove "the requirement that a physician be available to revive the inmate if necessary." A prior version of the protocol required a licensed physician to be on hand "to provide any necessary resuscitation effort of the condemned person and first aid emergency care for any person in the immediate area if needed." Dkt. 187-14 at 9. The new version instead provides that "[e]mergency medical personnel and ambulance service will be present near the Execution Unit as determined by the Administrative Team to provide emergency medical assistance and transport to anyone requiring such care during the process, including any necessary resuscitation of the condemned person." Dkt. 166-2 at 9-10. Defendants suggest that the change is both meaningless and irrelevant.

Neither argument is availing. There is an obvious difference between having

a licensed physician present at the execution and having "emergency medical personnel" at some unknown location nearby. The change in the standard of care is relevant because it impacts the risk of excessive pain in Pizzuto's execution. He allegedly faces a high risk of major medical complications, for instance due to drug interactions and IV access issues—complications analogous to problems that have occurred at other executions. *See* Dkt. 183-1 at 12-13. In such situations, under the prior protocol, the rescue doctor would potentially have intervened to resuscitate the inmate, thereby preventing an excruciating death. This bears directly on Pizzuto's Eighth Amendment claim. Further, the reasoning behind the protocol's modification can shed broader light on the IDOC's ability to execute Pizzuto without creating an unnecessary risk of severe pain.

With relevance established, Pizzuto has shown a particularized need to serve the interrogatory. It is proportionate given the stakes of the case, the importance of the information, and the slight burden on the IDOC. The Court will, therefore, grant leave to serve the interrogatory and order Defendants to respond.

    iv.    **Interrogatory 47**

Finally, Interrogatory 47 inquires about the licensing and certification of the laboratory that generated the Certificates of Analysis for the execution drugs. Specifically, Pizzuto asks "what bodies (if any) they are accredited with, what accreditations they possess, their regulatory histories, what due diligence you have

done into their licensure and regulatory histories, and so forth." Defendants assert that the request is disproportionate, ambiguous, compound, and will potentially reveal identity of entities involved in executions.

First, this is not a compound interrogatory. Under Rule 33(a)(1), if an interrogatory has multiple "discrete subparts," each subpart counts as its own interrogatory.  But "an interrogatory is not objectionable merely because it may be difficult or require a long answer." *Bovarie v. Schwarzenegger*, No. 08cv1661, 2011 WL 719206 (S.D. Cal. Feb. 22, 2022). As a sister district court explained, "interrogatory subparts are to be counted as one interrogatory if they are logically or factually subsumed within and necessarily related to the primary question." *Trevino v. ACB American, Inc.*, 232 F.R.D. 612, 614 (N.D. Cal. 2006). Here, each specific element of information sought by Pizzuto falls within the primary question about the lab's licensing and certification. It therefore counts as a single interrogatory for purposes of Rule 33.

Defendants' other objections fair no better. Any legitimate vagueness issues have been resolved through the meet and confer process. The information is relevant because the IDOC depends on the lab to certify the quality of the pentobarbital. If the lab has a history of regulatory violations, there is a higher chance that the Certificate of Analysis is inaccurate, which would increase the risk of complications at Pizzuto's execution. Indeed, the importance of the

interrogatory is highlighted by Defendants' own invocations of the Certificates of Analysis when pressed for details about the IDOC's pentobarbital. *See, e.g.*, Dkt. 151. As for the secrecy objection, Defendants say only that the "information will be used in ways similar to John Oliver and NPR to identity IDOC's source." Dkt. 187 at 17. Again, the bare mention of John Oliver fails to establish how this could reveal the identity of the drug source.

The Court concludes that Pizzuto has shown a particularized need for this interrogatory and will compel Defendants to respond.

### 3. Defendants' Motion to Seal

Finally, the Court takes up Defendants' Motion to Seal. In support of their opposition to Pizzuto's Eighth Motion to Compel, Defendants compiled Pizzuto's 549 RFAs to attempt to illustrate how the disputed disclosures could identify the lethal drug source. Pursuant to the protective order and the District of Idaho's rules for sealing filings, Defendants marked the document as "Confidential" and asked to file it under seal. Pizzuto objects to this because Defendants did not mark any of their original RFA responses as confidential and, moreover, have publicly filed many of their discovery responses.

The Court will grant the motion to seal. When Defendants seek to withhold evidence from Pizzuto, the Court has imposed a relatively demanding standard to ensure that he, as a civil litigant in a high-stakes case, can obtain relevant

information. For the public, although there is "a strong presumption in favor of access to court records," the calculus is different. *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). The Ninth Circuit has held that "when a party attaches a sealed discovery document to a *nondispositive* motion, the usual presumption of the public's right of access is rebutted." *Phillips v. Gen. Motors Corp.,* 307 F.3d 1206, 1213 (9th Cir. 2002). Here, while none of Defendants' individual responses were confidential, Defendants argue that it is the sum of the parts—the full mosaic of information—that could reveal the identity of the drug source. Recognizing the sensitivity of the issues at stake, the protective order gives each party broad latitude to keep documents confidential and sealed, and Defendants have followed that procedure in submitting the present exhibit. *See* Dkts. 81, 83, 117. The Court, therefore, finds compelling reason to seal that record.

## ORDER

IT IS ORDERED that:

1. Plaintiff's Sixth Motion to Compel (Dkt. 148) is **GRANTED IN PART and DENIED IN PART**. Defendants must either answer RFA 240, or must provide the same specific information about the New Execution Drugs that the Court has previously ordered Defendants to disclose about the Old Execution Drugs.

2. Plaintiff's Eighth Motion to Compel and for Leave to Serve Additional Interrogatories (Dkt. 183) is **GRANTED**.

3. Defendants' Motion to Seal Exhibit A to the Sixth Declaration of Tanner J. Smith (Dkt. 188) is **GRANTED**.

DATED: June 2, 2025

B. Lynn Winmill
U.S. District Court Judge