*Gerald Ross Pizzuto, Jr. v. Josh Tewalt*, U.S. Dist. Ct. No. 1:21-cv-359-BLW
Submitted in Support of Memorandum in Support of Motion to Modify Scheduling Order [Dkt. 198]

# EXHIBIT 5

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF IDAHO

 3

 4     GERALD ROSS PIZZUTO, JR.,        )

 5              Plaintiff,              )   Case No.

 6                    vs.               )   1:21-cv-00359-BLW

 7     JOSH TEWALT, et al.,             )

 8              Defendants.             )   ~~REDACTED VERSION~~

 9     _____  )

10

11

12

13              VIDEO DEPOSITION OF RANDY VALLEY

14                    April 16, 2025

15

16

17

18

19

20

21     REPORTED BY:

22

23     COLLEEN P. DOHERTY, CSR 345

24

25     Notary Public

                                            Page 1
```

| | |
|---|---|
| 1       THE DEPOSITION OF RANDY VALLEY was taken on | 1       I N D E X |
| 2  behalf of the Plaintiff, at the offices of Federal | 2  TESTIMONY OF RANDY VALLEY      PAGE |
| 3  Defender Services of Idaho, located at 702 W. Idaho | 3  Examination by Mr. Horwitz     11 |
| 4  Street, Suite 900, Boise, Idaho, commencing at 9:08 | 4 |
| 5  a.m., on April 16, 2025, before Colleen P. Doherty, | 5 |
| 6  Certified Shorthand Reporter and Notary Public within | 6 |
| 7  and for the State of Idaho, in the above-entitled | 7       E X H I B I T S |
| 8  matter. | 8  DESCRIPTION        PAGE |
| 9       APPEARANCES: | 9  Exhibit 1  Copy of IDOC, Standard Operating   42 |
| 10  For the Plaintiff, Gerald Ross Pizzuto, Jr.: | 10  Procedure 135.02.01.001, Version 5, 10/11/24 |
| 11     FEDERAL DEFENDER SERVICES OF IDAHO | 11  (34 pages) |
| 12     BY MR. JONAH J. HORWITZ | 12  Confidential Exhibit 2      47 |
| 13     BY MR. CHRISTOPHER M. SANCHEZ | 13 |
| 14     Capital Habeas Unit | 14 |
| 15     702 W. Idaho Street, Suite 900 | 15 |
| 16     Boise, Idaho 83702 | 16  Exhibit 3  Copy of Chain of Custody Log    73 |
| 17     Jonah_Horwitz@fd.org | 17  Exhibit 4  Copy of IDOC Pentobarbital    79 |
| 18     Christopher_M_Sanchez@fd.org | 18  Purchase Order, 10/24/2024 |
| 19 | 19  Exhibit 5  Copy of Declaration of Randy    90 |
| 20 | 20  Valley, 10/31/2025 (14 pages) |
| 21 | 21  Exhibit 6  Copy of Defendants' Responses to   108 |
| 22 | 22  Plaintiff's Twelfth Set of Requests for |
| 23 | 23  Admission, 9/3/2024 (14 pages) |
| 24 | 24 |
| 25                       Page 2 | 25                       Page 4 |

| | |
|---|---|
| 1    A P P E A R A N C E S (Continued): | 1       I N D E X |
| 2  For the Defendants: | 2     E X H I B I T S (Continued) |
| 3     STATE OF IDAHO | 3  DESCRIPTION        PAGE |
| 4     OFFICE OF THE ATTORNEY GENERAL | 4  Exhibit 7  Copy of Temperature Log 1,    110 |
| 5     BY MS. KRISTINA M. SCHINDELE | 5  10/11/2023 through 8/19/2024 (10 pages) |
| 6     1299 North Orchard Street, Suite 110 | 6  Exhibit 8  Copy of Temperature Log 2,    128 |
| 7     Boise, Idaho 83706 | 7  6/3/2024 through 10/28/2024 (8 pages) |
| 8     krschind@idoc.idaho.gov -And- | 8  Exhibit 9  Copy of Temperature Log 3,    129 |
| 9     MOORE ELIA KRAFT & STACEY, LLP | 9  10/91/2024 through 12/19/2024 (6 pages) |
| 10     BY MR. TANNER J. SMITH | 10  Exhibit 10  Copy of US Official DEA Form-222   124 |
| 11     702 West Idaho Street, Suite 800 | 11  Exhibit 11  Copy of Certificate of Analysis   135 |
| 12     Boise, Idaho 83702 | 12  (2 pages) |
| 13     tanner@melawfirm.net | 13  Exhibit 12  Copy of Letter from Hikma to   135 |
| 14  THE VIDEOGRAPHER: Mia Shrosbree | 14  Governor Little, 5/10/2021 (2 pages) |
| 15  ALSO PRESENT: Christine Hanley | 15  Exhibit 13  Copy of Letter from Sagent to   138 |
| 16     Beryl Price | 16  Governor Little, 11/14/2024 and 7/30/2024 |
| 17     Julie Hill | 17  (6 pages) |
| 18     Hannah Clark | 18  Exhibit 14  Copy of IDOC Resident Concern   150 |
| 19     Laylaa Bargash | 19  Form (Tom Creech), 6/17/2024 |
| 20 | 20  Exhibit 15  Copy of Offender Grievance   152 |
| 21 | 21  Response (Tom Creech), 8/6/2024 |
| 22 | 22  Exhibit 16  Copy of IDOC Execution Chemicals  159 |
| 23 | 23  Preparation and Administration Protocol |
| 24 | 24  (14 pages) |
| 25                       Page 3 | 25                       Page 5 |

2 (Pages 2 - 5)

| 1 | I N D E X | |
|---|---|---|
| 2 | E X H I B I T S (Continued) | |
| 3 | DESCRIPTION | PAGE |
| 4 | Exhibit 17 Copy of IDOC Resident Concern | 160 |
| 5 | Form, 10/31/2024 (Pizzuto) | |
| 6 | Confidential Exhibit 18 | 161 |
| 7 | | |
| 8 | Confidential Exhibit 19 | 166 |
| 9 | | |
| 10 | | |
| 11 | ATTORNEYS' EYES ONLY DESIGNATION | |
| 12 | LOCATION OF REDACTED TESTIMONY | PAGE |
| 13 | 1. Beginning of Attorneys' Eyes Only Section | 48 |
| 14 | Conclusion of Attorneys' Eyes Only Section | 51 |
| 15 | 2. Beginning of Attorneys' Eyes Only Section | 161 |
| 16 | Conclusion of Attorneys' Eyes Only Section | 168 |
| 17 | *NOTE: For redacted testimony see redacted | |
| 18 | separate transcript (NOT Attorneys' Eyes Only) | |
| 19 | ATTORNEYS' EYES ONLY DESIGNATION | |
| 20 | LOCATION OF CONFIDENTIAL EXHIBITS | PAGE |
| 21 | Exhibit 2 (Confidential) | 47 |
| 22 | Exhibit 18 (Confidential) | 161 |
| 23 | Exhibit 19 (Confidential) | 166 |
| 24 | *NOTE: For redacted testimony see redacted | |
| 25 | separate transcript (NOT Attorneys' Eyes Only) | |

Page 6

1  way of a stipulation. So we were planning on discussing   09:08:46
2  the protocol for today for secrecy-type objections that   09:08:50
3  the defendant makes. And my understanding of the plan   09:08:56
4  is that if opposing counsel has a secrecy-type   09:09:02
5  objection, they will interpose that objection after the   09:09:05
6  question, before the witness starts to answer. They   09:09:09
7  will instruct the witness whether to answer or not to   09:09:09
8  answer.   09:09:09
9      And I think there will be a shorthand for that   09:09:09
10  objection that, Tina, you were planning on explaining.   09:09:17
11      MS. SCHINDELE: I am. So defense counsel   09:09:18
12  throughout the deposition will refer to the objection as   09:09:21
13  the confidentiality objection, or we will say   09:09:26
14  "objection; confidentiality." It's a lengthy objection.   09:09:28
15  So I am going to preserve it for the record, so we don't   09:09:34
16  have to repeat the three paragraphs every time.   09:09:35
17      The objection, defendants object to this   09:09:35
18  question under Federal Rule of Civil Procedure 26(b)(1).   09:09:38
19  Defendants assert the subject of the question creates an   09:09:44
20  undue burden on the Department, and interferes with the   09:09:47
21  Agency's duty to carry out a lawfully imposed death   09:09:52
22  sentence. The Idaho legislature enacted Idaho Code,   09:09:52
23  Section 19-2716(a), to prohibit the disclosure of the   09:09:59
24  identities of any person or entity involved in the   09:10:04
25  acquisition of chemical, and/or serving as a member of   09:10:08

Page 8

1      THE VIDEOGRAPHER: We are on the record.   09:07:30
2  Today's date is April 16th, 2025, and the time is 9:08   09:07:32
3  a.m. For the record, this is the videotaped deposition   09:07:38
4  of Randy Valley, taken by the plaintiffs, in the matter   09:07:42
5  of Pizzuto, Jr. versus Tewalt, et al., Case   09:07:50
6  No. 1:21-cv-00359-BLW, in the United States District   09:07:57
7  Court, for the District of Idaho.   09:08:03
8      The videotaped deposition is being held at the   09:08:05
9  offices of Federal Defender Services of Idaho, whose   09:08:05
10  address is 702 West Idaho Street, Suite 900 in Boise,   09:08:14
11  Idaho. The videotaped deposition is being recorded by   09:08:15
12  Mia Shrosbree, and reported by Colleen P. Doherty of   09:08:21
13  Associated Reporting & Video and M&M, Veritext   09:08:26
14  Companies.   09:08:26
15      Will counsel please state their appearances   09:08:30
16  and any stipulations for the record.   09:08:32
17      MR. HORWITZ: Yes, I'm Jonah Horwitz, on   09:08:32
18  behalf of the plaintiff.   09:08:36
19      MR. SANCHEZ: Christopher Sanchez, on behalf   09:08:38
20  of the plaintiff.   09:08:41
21      MS. SCHINDELE: Kristina Schindele, on behalf   09:08:41
22  of defendants.   09:08:42
23      MR. SMITH: Tanner Smith, on behalf of   09:08:42
24  defendants.   09:08:44
25      MR. HORWITZ: And we do have something in the   09:08:44

Page 7

1  the escort and medical teams, or as a volunteer.   09:10:13
2  Defendants object to disclosure of any information that   09:10:17
3  could lead to the identification of any of these persons   09:10:20
4  or entities.   09:10:23
5      Defendants assert disclosure of the requested   09:10:24
6  information specifically seeks information about the   09:10:27
7  identity of protected persons or entities. Defendants   09:10:31
8  object to disclosure of any information that could lead   09:10:36
9  to the identity of these protected persons or entities.   09:10:39
10      Defendants object to disclosing any   09:10:44
11  information that could confirm or dispel any information   09:10:47
12  regarding the identity of these statutorily designated   09:10:51
13  confidential persons. Defendants assert the information   09:10:56
14  requested increases the risk of disclosure of IDOC's   09:11:01
15  confidential persons or entities. These identities are   09:11:09
16  expressly protected by state law, and incorporated into   09:11:09
17  Federal Rule of Civil Procedure 26. Such risks creates   09:11:09
18  an undue burden on IDOC, especially where disclosure is   09:11:18
19  immaterial to the claims raised in plaintiff's   09:11:26
20  as-applied method of execution claim, and are   09:11:26
21  disproportionate to the needs in this litigation.   09:11:28
22  Plaintiff's interests in disclosure is outweighed by the   09:11:31
23  State's interests in protecting these confidential   09:11:37
24  persons or entities. Additionally, this information may   09:11:39
25  be subject to a protective order under Federal Rule of   09:11:42

Page 9

Veritext Legal Solutions
Calendar-Idaho@veritext.com   208-343-4004

09 121951

Randy Valley, Redacted April 16, 2025

| | |
|---|---|
| 1 | Civil Procedure 26(c).  Thank you.                09:11:43 |
| 2 | MR. HORWITZ:  Sure.  And my understanding,    09:11:47 |
| 3 | consistent with how we approached the last deposition is  09:11:49 |
| 4 | that, if there is an objection on secrecy grounds, we    09:11:52 |
| 5 | will consider that objection after the transcript has    09:11:56 |
| 6 | been prepared.  And if we decide it is appropriate, we    09:11:59 |
| 7 | will file a motion to compel a response to the question.  09:12:04 |
| 8 | If the court grants that motion, we believe the    09:12:08 |
| 9 | deposition should be reopened at a later date.    09:12:11 |
| 10 | MS. SCHINDELE:  And defendants agree with    09:12:11 |
| 11 | that.                          09:12:13 |
| 12 | MR. HORWITZ:  Great.              09:12:13 |
| 13 | MR. SMITH:  And, Jonah, just, Madam Court    09:12:13 |
| 14 | Reporter, did you already get down their names for the    09:12:16 |
| 15 | record, or do we still need to do that?            09:12:11 |
| 16 | MR. HORWITZ:  Our interns.            09:12:11 |
| 17 | THE REPORTER:  I didn't get their names.          |
| 18 | MR. HORWITZ:  Okay.  Do you mind introducing      |
| 19 | yourselves?                        |
| 20 | MS. BANGASH:  I'm Laylaa.  It is L-a-y-l-a-a,  09:12:22 |
| 21 | and then Bangash, B-a-n-g-a-s-h.          09:12:22 |
| 22 | MS. CLARK:  Hannah Clark, H-a-n-n-a-h,        09:12:30 |
| 23 | C-l-a-r-k.                      09:12:30 |
| 24 | MR. HORWITZ:  And they are both law student    09:12:35 |
| 25 | interns at the Federal Defender. |

Page 10

| | |
|---|---|
| 1 | Okay.  Well, good morning, Randy. |
| 2 | THE REPORTER:  I need to swear him in. |
| 3 | MR. HORWITZ:  Oh, I'm sorry.        09:13:01 |
| 4 | THE REPORTER:  Sir, will you please raise your |
| 5 | right hand. |
| 6 | RANDY VALLEY, |
| 7 | first duly sworn to tell the truth relating to said |
| 8 | cause, testified as follows:            09:12:54 |
| 9 | MR. HORWITZ:  Thanks.  Sorry for jumping the  09:12:54 |
| 10 | gun there.                    09:12:56 |
| 11 | EXAMINATION            09:12:58 |
| 12 | QUESTIONS BY MR. HORWITZ:          09:12:58 |
| 13 | Q.  Have you had a deposition before?      09:12:59 |
| 14 | A.  No.                    09:13:01 |
| 15 | Q.  So I'll just describe some kind of rules of    09:13:02 |
| 16 | the road for today, just so we're kind of on the same    09:13:06 |
| 17 | page.  So one thing is, I will ask a lot of yes or no    09:13:09 |
| 18 | questions.  And I would just suggest that you answer yes  09:13:14 |
| 19 | or no to start.  And then if I want to follow up, I    09:13:18 |
| 20 | will.  If you don't mind answering verbally to every    09:13:22 |
| 21 | question, rather than nodding and so forth, and use of  09:13:27 |
| 22 | "yes" or "no," rather than "uh-huh," "un-huh," that sort  09:13:31 |
| 23 | of thing --                    09:13:34 |
| 24 | A.  Uh-huh.                  09:13:34 |
| 25 | Q.  -- just so the record is clear.  And please  09:13:35 |

Page 11

| | |
|---|---|
| 1 | wait, for any given question, wait until I'm done asking  09:13:40 |
| 2 | the question.  And your counsel may want you to wait a  09:13:45 |
| 3 | little bit after that, too, for them to object.  And I    09:13:48 |
| 4 | will try to do the same with your answers, too, to make  09:13:51 |
| 5 | things easier for the court reporter.          09:13:56 |
| 6 | If you don't understand any question, don't    09:13:57 |
| 7 | respond -- don't answer the question.  Just ask me to    09:14:01 |
| 8 | clarify it, and I will do my best to do that.        09:14:03 |
| 9 | A.  Okay.                    09:14:07 |
| 10 | Q.  If you do answer a question, though, I will    09:14:07 |
| 11 | assume that you understood it.  And we'll kind of take    09:14:10 |
| 12 | it from there.  Is there anything that would be an issue  09:14:12 |
| 13 | for you testifying today; illness, medication, anything  09:14:16 |
| 14 | like that?                    09:14:20 |
| 15 | A.  No.                    09:14:20 |
| 16 | Q.  And for everyone, if anyone needs a break, you  09:14:20 |
| 17 | know, please speak up.  We're flexible on the schedule    09:14:23 |
| 18 | today.  We were thinking a mid-morning break, and then a  09:14:28 |
| 19 | lunch break.  And then if we needed an afternoon break,  09:14:32 |
| 20 | you know, we'll kind of play it by ear.        09:14:36 |
| 21 | Okay.  Can you give me a sense of what you did  09:14:39 |
| 22 | to prepare for today's deposition?          09:14:42 |
| 23 | A.  Other than get a briefing on what a deposition  09:14:45 |
| 24 | looked like.  This is my first one, so first experience  09:14:49 |
| 25 | with that.  And I reviewed the policy.          09:14:54 |

Page 12

| | |
|---|---|
| 1 | Q.  Can you explain just so we understand each    09:14:55 |
| 2 | other, what you mean by the policy?          09:14:58 |
| 3 | A.  The policy as far as execution procedures.      09:15:00 |
| 4 | Q.  The SOP --                  09:15:04 |
| 5 | A.  Yes.                    09:15:04 |
| 6 | Q.  -- execution procedures?            09:15:04 |
| 7 | A.  Yes.                    09:15:04 |
| 8 | Q.  Got it.  And who was involved in that briefing  09:15:06 |
| 9 | that you've received?                09:15:09 |
| 10 | A.  I think it was just Tina, myself, and Michael  09:15:10 |
| 11 | Elia.                      09:15:16 |
| 12 | Q.  Did you review any documents apart from -- and  09:15:16 |
| 13 | I'll try to call the -- I'm okay using any kind of    09:15:20 |
| 14 | nomenclature.  I usually refer to it as the protocol, if  09:15:24 |
| 15 | you are comfortable with that --            09:15:29 |
| 16 | A.  Yes.                    09:15:29 |
| 17 | Q.  -- that language?              09:15:30 |
| 18 | So when I say "protocol," I'm referring      09:15:33 |
| 19 | to -- and just so the record is clear, if I say      09:15:34 |
| 20 | "protocol," I will try to use that word when I am    09:15:38 |
| 21 | referencing Control No. 135.02.01.001 and 5.0, in    09:15:44 |
| 22 | particular, the current operation of the SOP.  So apart  09:15:47 |
| 23 | from the protocol, did you review any documents for    09:15:52 |
| 24 | today?                      09:15:55 |
| 25 | A.  Not that I can recall.            09:15:56 |

Page 13

4 (Pages 10 - 13)

1  Q. Did you bring any documents with you today? 09:15:58
2  A. No. 09:16:01
3  Q. Okay. I would like to ask a few questions 09:16:06
4  about your background. Can you tell me what your 09:16:09
5  educational history is? 09:16:13
6  A. High school graduate, attended the College of 09:16:14
7  Southern Idaho for a couple years. I transferred to 09:16:23
8  BSU, took additional credits at BSU, ended up not 09:16:25
9  completing my degree. So as far as higher education, 09:16:31
10  I'm also a certified public manager. So I attended that 09:16:35
11  program through the State. 09:16:39
12  Q. Is that through the university, the certified 09:16:40
13  public manager? 09:16:45
14  A. No, it's through the State of Idaho. 09:16:47
15  Q. Okay. Did you have a major or an area at BSU 09:16:49
16  that were focusing on? 09:16:50
17  A. Yes, I was going to school to be a high school 09:16:52
18  teacher. 09:16:56
19  Q. Where did you go to high school? 09:16:56
20  A. I graduated from a DOD school in Germany. 09:16:59
21  Q. What year did you graduate high school? 09:17:04
22  A. 1992. 09:17:06
23  Q. And what year did you start at BSU, if you 09:17:08
24  remember? 09:17:12
25  A. I believe 1995. 09:17:12

Page 14

1  Q. Do you remember when you left BSU? 09:17:14
2  A. I do not. 09:17:17
3  Q. Okay. Have you had any education or training 09:17:20
4  in pharmacy? 09:17:23
5  A. No. 09:17:25
6  Q. Any education or training in the medical field 09:17:27
7  generally? 09:17:31
8  A. No. 09:17:32
9  Q. I would like to ask some questions about your 09:17:32
10  work history. And why don't we -- why don't we work 09:17:38
11  forwards from when you entered the workforce to the 09:17:45
12  present. So did you work while you were in college? 09:17:48
13  A. Yes. 09:17:51
14  Q. Where? 09:17:52
15  A. Started in Twin Falls, I worked for an 09:17:54
16  Oriental restaurant, McDonald's, waited tables at the 09:18:02
17  Sandpiper while I was in Twin Falls. I worked at a car 09:18:16
18  wash when I first transferred to BSU. I worked at 09:18:20
19  McDonald's, again. And ended up was working at the 09:18:26
20  Boise Centre on the Grove, as a set-up supervisor prior 09:18:29
21  to my starting my career with the Department. 09:18:37
22  Q. And when did you start your career with the 09:18:39
23  Department? 09:18:42
24  A. June of 1997. 09:18:42
25  Q. What was your first position with the 09:18:45

Page 15

1  Department? 09:18:47
2  A. I was a correctional officer. 09:18:48
3  Q. What institution were you at? 09:18:49
4  A. South Idaho Correctional Institution. 09:18:52
5  Q. And what was your next position within the 09:18:54
6  Department? 09:18:57
7  A. I was a correctional corporal at South Idaho 09:18:57
8  Correctional Institution. 09:19:01
9  Q. Do you remember the time period that you had 09:19:02
10  that position? 09:19:06
11  A. Not off the top of my head. 09:19:06
12  Q. What was your position after that? 09:19:08
13  A. I was a correctional sergeant at South Idaho 09:19:10
14  Correctional Institution. 09:19:15
15  Q. Okay. Do you remember the time period for 09:19:15
16  that? 09:19:18
17  A. Not exact dates. 09:19:18
18  Q. Can you give me just a ballpark? 09:19:19
19  A. I believe I promoted to sergeant in 2000, 09:19:22
20  2001. 09:19:30
21  Q. And what was your next role after that? 09:19:32
22  A. I transferred to the Idaho Maximum Security 09:19:34
23  Institution as a sergeant. 09:19:38
24  Q. Was that your choice, did you put in for that 09:19:44
25  transfer? 09:19:48

Page 16

1  A. Yes. I chose that facility. I didn't put in 09:19:48
2  for the transfer. 09:19:51
3  Q. I see. Why did you want to be transferred to 09:19:52
4  IMSI? 09:19:56
5  A. I was -- we lost positions. So my position 09:20:00
6  was no longer available at SICI. So I had my choice of 09:20:05
7  facilities, and IMSI was the other side of the extreme. 09:20:11
8  I had seen minimum custody. So I thought I would go and 09:20:15
9  see what close custody looked like -- 09:20:21
10  Q. Right. 09:20:24
11  A. -- to gain a bit more rounded experience. 09:20:24
12  Q. Got it. And what was your next position after 09:20:27
13  that? 09:20:30
14  A. I held a position as an institutional parole 09:20:30
15  officer. 09:20:36
16  Q. Can you tell me what that job -- what those 09:20:36
17  job responsibilities looked like? 09:20:39
18  A. I essentially I re- -- the position was 09:20:40
19  reclassified after I left. It's essentially, at that 09:20:46
20  time, was a pre-release specialist position. I worked 09:20:48
21  with residents, parole violators specifically, on 09:20:53
22  preparing them for release back in if the commission 09:20:59
23  chose to do so. 09:21:03
24  Q. Where was that job based, physically? 09:21:06
25  A. At Idaho State Correctional Institution. 09:21:09

Page 17

5 (Pages 14 - 17)

Randy Valley, Redacted April 16, 2025

**Page 18**

1  Q. And do you remember the time period that you  09:21:12
2  had that position?  09:21:14
3  A. Roughly 2006.  09:21:15
4  Q. Starting in 2006?  09:21:17
5  A. I believe so.  09:21:19
6  Q. And when did it end, if you remember?  09:21:20
7  A. I was in that position less than a year before  09:21:23
8  I promoted.  09:21:25
9  Q. What was that promotion to?  09:21:27
10  A. I became a correctional lieutenant at the  09:21:30
11  South Idaho Correctional Institution.  09:21:35
12  Q. And how long did you have that job?  09:21:37
13  A. Close to four years, I believe.  09:21:39
14  Q. And what was your next position?  09:21:42
15  A. I became the emergency coordinator at  09:21:43
16  headquarters, in 2010.  09:21:47
17  Q. Headquarters being Orchard Street?  09:21:53
18  A. Yes.  09:21:56
19  Q. What did you do in that role?  09:21:56
20  A. I provided administrative oversight over all  09:21:59
21  of our specialty teams in emergency management kind of  09:22:03
22  agency-wide.  09:22:09
23  Q. And how long were you there?  09:22:10
24  A. Roughly four years.  09:22:11
25  Q. So that would have been when -- when around  09:22:14

**Page 19**

1  would you have left that job?  09:22:17
2  A. 2014.  09:22:19
3  Q. Did that job include any duties related to  09:22:20
4  executions?  09:22:24
5  A. Yes.  09:22:26
6  Q. What were they?  09:22:26
7  A. I was the planning section chief for the  09:22:27
8  executions in 2011 and 2012.  09:22:32
9  Q. Can you tell me what kinds of responsibilities  09:22:37
10  that entailed?  09:22:40
11  A. Meeting minutes, plan organization, I wrote up  09:22:42
12  all the documentation in regards to that event, kind of  09:22:48
13  oversaw documents, collection, that sort of thing.  09:22:53
14  Q. That event being the two executions?  09:22:57
15  A. Yes.  09:22:59
16  Q. Were you involved at all at that time in  09:22:59
17  drafting the protocols that were enforced?  09:23:03
18  A. No.  09:23:06
19  Q. Do you know who was involved in that?  09:23:06
20  A. The only individual that I know at that time  09:23:09
21  that was involved in that would be Jeff Zmuda.  09:23:13
22  Q. And what did you do after stepping down as  09:23:26
23  emergency coordinator?  09:23:29
24  A. I was promoted to deputy warden at the Idaho  09:23:31
25  Maximum Security Institution.  09:23:39

**Page 20**

1  Q. And that was 2014?  09:23:39
2  A. Yes.  09:23:41
3  Q. And how long were you there?  09:23:41
4  A. A little over a year.  09:23:50
5  Q. What did you do -- did you do anything there  09:23:50
6  related to executions?  09:23:55
7  A. No.  09:23:56
8  Q. What did you do after that?  09:23:56
9  A. I was transferred to the South Idaho  09:23:57
10  Correctional Institution.  09:24:01
11  Q. And what was your position there?  09:24:02
12  A. Deputy warden.  09:24:05
13  Q. When did that transfer happen?  09:24:06
14  A. 20- -- I believe 2015.  09:24:09
15  Q. And what was your next role?  09:24:13
16  A. I became the deputy warden at the Idaho State  09:24:16
17  Correctional Institution.  09:24:23
18  Q. When was that?  09:24:23
19  A. Roughly 2017.  09:24:26
20  Q. And what was your next job?  09:24:33
21  A. I became the warden at the South Boise Women's  09:24:36
22  Correctional Officer.  09:24:42
23  Q. How long were you there?  09:24:42
24  A. Three months.  09:24:43
25  Q. What was next?  09:24:44

**Page 21**

1  A. I became the warden at the Idaho State  09:24:45
2  Correctional Center.  09:24:49
3  Q. And when would that have been?  09:24:49
4  A. I believe that was December of '21.  09:24:51
5  Q. What was your next job?  09:24:55
6  A. I became the warden at the Idaho Maximum  09:24:56
7  Security Institution.  09:25:01
8  Q. When did that happen?  09:25:01
9  A. In June of '24.  09:25:02
10  Q. I'm impressed you remember all that. That's a  09:25:05
11  lot. Is there -- did you have any work outside the  09:25:09
12  Department during the period of time that we've been  09:25:16
13  discussing?  09:25:19
14  A. I worked -- yes. Yes.  09:25:19
15  Q. What was that?  09:25:23
16  A. I worked at -- I took a second job working at  09:25:25
17  Costco -- or not Costco. I apologize -- Shopko, for a  09:25:30
18  while, as well as I continued to occasionally assist at  09:25:37
19  the Boise Centre on the Grove.  09:25:40
20  Q. What periods of time were you working outside  09:25:43
21  the Department?  09:25:48
22  A. I quit both doing either of those things when  09:25:48
23  I became a sergeant, in roughly 2001.  09:25:52
24  Q. And since that time, all your work has been  09:25:55
25  within the Department?  09:25:59

6 (Pages 18 - 21)

Randy Valley, Redacted April 16, 2025

| | Page 22 | | Page 24 |
|---|---|---|---|

**Page 22**

1    A. Yes.    09:26:00

2    Q. When you became warden of IMSI, what was your    09:26:01

3    understanding of the role that you would play with    09:26:20

4    respect to executions.    09:26:24

5    A. I knew that I tracked and secured the chemical    09:26:27

6    that was at the facility. And I knew that I would    09:26:29

7    oversee the day of the events, and knew that I,    09:26:34

8    obviously, would manage the time period from serving the    09:26:38

9    warrant through with that individual.    09:26:41

10    Q. How did you learn that those would be your    09:26:45

11    responsibilities?    09:26:49

12    A. A couple of different ways; A, just being a    09:26:49

13    planning section chief during the previous two, I was    09:26:56

14    aware of what were people's roles, and what they did.    09:27:00

15    Just be a part of meetings and hearing, you know, kind    09:27:05

16    of what people were doing. But the majority of it was    09:27:09

17    when I became -- when I just notified that I would be    09:27:12

18    transferring, it was one of the things that I took the    09:27:15

19    time to look, and say what are exactly my    09:27:18

20    responsibilities in this.    09:27:22

21    Q. Where did you look?    09:27:23

22    A. The SOP.    09:27:24

23    Q. How did it come about that you became warden    09:27:26

24    of IMSI?    09:27:32

25    A. I couldn't answer that.    09:27:34

**Page 23**

1    Q. You didn't ask to become warden of IMSI?    09:27:35

2    A. No.    09:27:40

3    Q. Do you know who made that decision?    09:27:40

4    A. No.    09:27:40

5    Q. Did you have any concerns about becoming    09:27:41

6    warden based on the attempted execution of Thomas    09:27:44

7    Creech, in February of 2024?    09:27:48

8    A. No.    09:27:50

9    Q. Can you explain why?    09:27:50

10    A. Can you explain that question?    09:27:52

11    Q. Sure. So one perspective on the attempted    09:27:55

12    execution of Thomas Creech, would be that it was    09:27:59

13    unsuccessful, and that there were problems that    09:28:03

14    occurred. So I guess I'm just wondering, whether that    09:28:07

15    gave you any reservations about becoming warden at IMSI,    09:28:11

16    and overseeing executions there?    09:28:16

17    A. No. Understanding the role and the work that    09:28:21

18    those folks put into doing that, as professionally and    09:28:24

19    with as much dignity as they do, I know that what they    09:28:29

20    did was the best that they could in that moment. And I    09:28:34

21    would expect nothing different going forward.    09:28:39

22    Q. Do you have a plan for when you'll step down    09:28:41

23    as warden of IMSI?    09:28:44

24    A. I can retire in December of this year, but I    09:28:46

25    don't have a specific date in mind at this time.    09:28:50

**Page 24**

1    Q. I asked about prior depositions. But have you    09:29:01

2    ever testified in court?    09:29:06

3    A. No.    09:29:07

4    Q. Do you have a criminal history?    09:29:08

5    A. Yes.    09:29:11

6    Q. Can you tell me what it involved?    09:29:13

7    A. I was -- forgot to renew my hunting license,    09:29:16

8    and was out duck hunting after the first of the year.    09:29:21

9    So I was cited for that. It was originally a citation,    09:29:26

10    and because of the county I was in, it was actually a    09:29:30

11    misdemeanor. And so I picked up a misdemeanor charge in    09:29:36

12    like January 3rd of 2000.    09:29:40

13    Q. What county was that?    09:29:42

14    A. Owyhee.    09:29:44

15    Q. The role that you played at IM- -- or at IDOC,    09:29:48

16    I should say, during the Rhoades and Leavitt executions,    09:29:55

17    is that a role that was -- was that part of the job that    09:30:01

18    you were doing at that time, if that makes sense?    09:30:09

19    A. I couldn't answer that. I wasn't -- it wasn't    09:30:13

20    defined by my position. It was assigned by the people    09:30:19

21    running that operation.    09:30:24

22    Q. Who, who were those people?    09:30:25

23    A. The director at the time, Jeff Zmuda. I    09:30:28

24    couldn't tell you who made that choice, but...    09:30:35

25    Q. When you took over as warden of IMSI, in June    09:30:38

**Page 25**

1    of 2024, was there an overlap with the previous warden,    09:30:44

2    Warden Richardson?    09:30:51

3    A. Define overlap.    09:30:53

4    Q. Were you there at the same time while he was    09:30:55

5    sort of showing you the ropes for a period, or    09:30:55

6    was -- did he leave as soon as you came in?    09:30:55

7    A. We had the same transfer dates.    09:31:03

8    Q. Okay. And was there any kind of informal    09:31:07

9    process where he was helping you transition?    09:31:11

10    A. Yes, we met several times initially to -- so    09:31:11

11    that I understood some of the responsibilities of the    09:31:15

12    day-to-day operations. And then met again to take care    09:31:15

13    of documentation and that sort of thing. And he    09:31:19

14    followed up regularly to make sure I felt comfortable    09:31:19

15    with what I was doing.    09:31:27

16    Q. Did that include any discussion of    09:31:28

17    execution-related items?    09:31:31

18    A. Could you define execution related?    09:31:32

19    Q. Sure, any -- well, maybe we could just start    09:31:36

20    by saying, during that transitional period where you    09:31:41

21    were coming in as warden, did you talk to Warden    09:31:44

22    Richardson about the responsibilities that you would    09:31:48

23    have in regards to executions?    09:31:50

24    A. I don't believe that we spoke about the event    09:31:52

25    of an execution. It was more in regards to the    09:31:55

**Page 26**

1  day-to-day operations in terms of logs and those type  09:32:01
2  things that I would be responsible for.  09:32:05
3     Q.  Did that include any discussion about the  09:32:08
4  chemicals, acquiring the chemicals, or storing them?  09:32:12
5     A.  Storage, not acquisition.  09:32:16
6     Q.  And I'll probably come back to this in more  09:32:18
7  detail.  But since we're on it now, can you give me a  09:32:22
8  sense of what the discussion was about storage?  09:32:25
9     A.  They are secured.  We talked about the daily  09:32:28
10  temp logs.  That was the majority of it.  09:32:35
11     Q.  He showed you where they would be stored?  09:32:40
12     A.  Where they were stored.  09:32:43
13     Q.  Where they were stored.  Got it.  And this is  09:32:44
14  also something I'll come back to.  But before I forget,  09:32:48
15  in terms of the trainings -- and maybe we can make sure  09:32:51
16  we're referring to the same thing.  09:32:54
17     So my understanding is, the medical team meets  09:32:56
18  periodically to go through a training in anticipation of  09:33:00
19  an execution.  Is that a process that you are familiar  09:33:04
20  with?  09:33:07
21     A.  Yes.  09:33:08
22     Q.  And do you attend those trainings?  09:33:08
23     A.  Yes.  09:33:10
24     Q.  Was there a period of time where you and  09:33:11
25  Warden Richardson would both attend them?  09:33:15

**Page 27**

1     A.  No.  09:33:19
2     Q.  Okay.  Did you receive any commendations,  09:33:20
3  awards, that sort of thing, in relation to the Leavitt  09:33:40
4  or Rhoades executions, the Department sort of  09:33:45
5  acknowledging your participation?  09:33:50
6     A.  I believe I received a letter of appreciation  09:33:53
7  as did everyone in conjunction with that for their work  09:33:55
8  with that event.  09:33:59
9     Q.  Who would the letter have come from?  09:34:00
10     A.  I believe it was Jeff Zmuda.  I actually  09:34:03
11  printed them.  09:34:10
12     Q.  Do you still have them?  09:34:11
13     A.  I might have a copy.  I couldn't answer that  09:34:16
14  for sure.  09:34:19
15     Q.  When you say "them," were there multiple  09:34:19
16  letters?  09:34:23
17     A.  Two different events.  09:34:24
18     Q.  For each execution?  09:34:25
19     A.  Yes.  09:34:28
20     Q.  To go back to the Leavitt and Rhoades, or to  09:34:29
21  stick with Leavitt and Rhoades, I guess, did you go to  09:34:38
22  trainings for those executions?  09:34:42
23     MS. SCHINDELE:  The defense is going to object  09:34:45
24  based on relevancy.  09:34:47
25     But knowing that, go ahead and answer the  09:34:48

**Page 28**

1  question.  09:34:51
2     THE WITNESS:  Yes, I attended some trainings.  09:34:51
3     Q.  (BY MR. HORWITZ)  Can you just generally  09:34:53
4  describe what you observed at those trainings?  09:34:55
5     A.  The vast majority of that process.  09:34:57
6     Q.  Did you have any responsibilities at those  09:35:03
7  trainings?  09:35:06
8     A.  I played the condemned at those trainings.  09:35:06
9     Q.  How did that come about?  09:35:10
10     A.  They needed people to do that, and I offered.  09:35:13
11     Q.  And what did you do as the condemned?  09:35:19
12     A.  I played the role of the condemned from  09:35:22
13  initiation all the way through.  09:35:26
14     Q.  Can you tell me what happened to you  09:35:28
15  physically, how they would use you as the condemned?  09:35:31
16     A.  Yes.  I would sit on -- it started in the  09:35:35
17  cell.  They would come in and restrain me; move me into  09:35:40
18  the chamber; IV both, two different locations; and  09:35:44
19  connect EKG leads; go through that process.  And then  09:35:52
20  walk through the entire procedure in terms of reading  09:35:57
21  the warrants, and going through the entire process.  And  09:36:01
22  then they would push saline.  09:36:04
23     Q.  Were there ever any difficulties in  09:36:08
24  establishing IV access?  09:36:11
25     A.  No.  09:36:13

**Page 29**

1     Q.  Do you have any vein issues, yourself?  09:36:13
2     A.  No.  09:36:17
3     Q.  And between that time when you went to the  09:36:26
4  trainings, which I guess was during your tenure at  09:36:29
5  headquarters; is that right?  So between then and when  09:36:34
6  you took over as warden of IMSI in June of 2024, did you  09:36:38
7  attend any execution trainings?  09:36:45
8     A.  Yes.  09:36:47
9     Q.  When was that?  09:36:47
10     A.  I could not give you specific dates.  09:36:49
11     Q.  Can you give me just a rough idea?  09:36:51
12     A.  I attended typically, probably two or three  09:36:54
13  times a year, to play the condemned.  09:36:59
14     Q.  Okay.  And what -- do you know what your job  09:37:02
15  was at the time that you were -- that you were doing  09:37:04
16  that, after you left the headquarters' position?  09:37:08
17     A.  As a deputy warden.  09:37:11
18     Q.  Of IMSI?  09:37:13
19     A.  Of multiple facilities.  09:37:15
20     Q.  Okay.  So both IMSI and SICI?  09:37:18
21     A.  And ISCI.  09:37:22
22     Q.  And ISCI.  I always got those confused.  09:37:24
23     Did you do any anything else at those  09:37:26
24  trainings during that period of time apart from playing  09:37:30
25  the condemned?  09:37:32

8 (Pages 26 - 29)

Randy Valley, Redacted April 16, 2025

**Page 30**

```
 1    A.  No.                              09:37:34
 2    Q.  And if I could just ask the same questions,   09:37:34
 3  since I think my previous questions were limited to when  09:37:37
 4  you were at headquarters.  But for those other times   09:37:41
 5  that you played the part of the condemned, were there   09:37:47
 6  ever issues establishing IV access?      09:37:49
 7    A.  No.                              09:37:53
 8    Q.  Were you compensated for that role?     09:37:54
 9    A.  Not specifically.                 09:37:56
10    Q.  Were you compensated in a more general way?  09:37:58
11    A.  In terms of I'm paid a salary, so it was just  09:38:01
12  a part of my work week.                  09:38:06
13    Q.  Got it.  Well, let's talk now about the   09:38:07
14  trainings that you have attended since you became warden  09:38:15
15  of IMSI, in June of 2024.  Is that something you do   09:38:19
16  regularly?                              09:38:25
17    A.  Yes.                             09:38:26
18    Q.  Would you say that you -- how would you   09:38:27
19  describe -- well, let me start over.      09:38:32
20        Do you try to attend every training, or how do  09:38:37
21  you decide which trainings to attend or not attend?   09:38:40
22    A.  I attempt to attend all of them.      09:38:43
23    Q.  How often are they occurring now, currently?  09:38:47
24    A.  Typically, monthly.               09:38:51
25    Q.  And can you give me a sense of how often   09:38:53
```

**Page 31**

```
 1  they've occurred over the course of that period of time,  09:38:56
 2  since you took over as warden?            09:38:59
 3    A.  I believe monthly.                 09:39:01
 4    Q.  Were they occurring more frequently during the  09:39:02
 5  period where Mr. Creech had an active death warrant?   09:39:07
 6    A.  Yes.                             09:39:12
 7    Q.  How often were they occurring during that   09:39:14
 8  period?                                 09:39:18
 9    A.  I believe we -- policy specifies.  We went   09:39:18
10  weekly, and then we were scheduled.  But the stay was   09:39:22
11  put in place to where there are additional trainings the  09:39:26
12  final week.                             09:39:30
13    Q.  And what is your role at trainings now?   09:39:32
14    A.  I play the role that I will hold during the   09:39:35
15  event.                                  09:39:38
16    Q.  Can you describe that in a little more detail?  09:39:42
17  Can you sort of just walk me through where you go during  09:39:47
18  the training, and who you are talking to, and what sort  09:39:50
19  of instructions you are giving, if any?    09:39:54
20    A.  Yes.  So I am the one that initiates it when  09:40:00
21  it's time to move.  I oversee the vast majority of the   09:40:04
22  operation.  I have to witness the entirety of the event.  09:40:09
23  That's why I'm with the condemned from beginning to end.  09:40:13
24  So I start with me going up to the door to notify them   09:40:17
25  that we would like to come in and do an assessment.  So  09:40:21
```

**Page 32**

```
 1  my team will secure him.  And then the medical team will  09:40:26
 2  come in and do an assessment.            09:40:31
 3        And then we reset.  I come in and explain to   09:40:34
 4  the condemned that it is time to move forward, and ask   09:40:38
 5  for their cooperation.  My team restrains them and   09:40:43
 6  places them on a gurney.  I then escort them into a prep  09:40:48
 7  room, where the medical team provides venous access.   09:40:54
 8        Once that is complete, I'm notified of that.   09:41:05
 9  And we -- I escort the condemned into the chamber.  My   09:41:10
10  team, my security team ensures that they are secured.   09:41:16
11  And I'm notified when they are competent in that.  And   09:41:24
12  then the medical team steps up, and connects the lines,  09:41:27
13  and does the things they need to do.  They notify me   09:41:32
14  when they are ready to proceed.           09:41:36
15        And then from there, I start going through the  09:41:37
16  process of an execution.  Where I read a script, read   09:41:39
17  through the warrant, request to make sure that the   09:41:43
18  director checks to ensure there is no stays, or any   09:41:46
19  reason, impediments to moving forward.     09:41:51
20        And then I give the order to begin the   09:41:55
21  execution.  I ask the condemned a few questions in terms  09:41:59
22  of if they would like to say some words, if they would   09:42:01
23  like some eye covering, and if they would like to say a  09:42:06
24  prayer with their religious advisor, if they have one.   09:42:11
25    Q.  Thank you for that.  You mentioned an   09:42:15
```

**Page 33**

```
 1  assessment sort of towards the beginning of that   09:42:19
 2  process.  What kind of assessment is that?     09:42:23
 3    A.  They come in and assess the condemned, looking  09:42:25
 4  at their veins to see if they -- what would be potential  09:42:28
 5  IV sites.                               09:42:32
 6    Q.  Who is doing that assessment?         09:42:33
 7    A.  The medical team.                  09:42:35
 8    Q.  And is that -- that's done on the person who   09:42:37
 9  is playing the role of the condemned at the training?   09:42:41
10    A.  Correct.                         09:42:45
11    Q.  Are you -- what kind of interactions are you   09:42:45
12  having with the other participants in the training?   09:42:49
13    A.  Can you be specific in terms of --   09:42:52
14    Q.  Sure, I --                       09:42:52
15    A.  -- people?                       09:42:55
16    Q.  Sure, yeah.  So maybe just to start, let's   09:42:56
17  talk about the medical team members.  Are you   09:43:01
18  interacting with them during the training?     09:43:04
19    A.  Very limited during the training.     09:43:06
20    Q.  Are you interacting with other people during   09:43:09
21  the training?                           09:43:11
22    A.  My security team and the medical team, in   09:43:12
23  terms of our roles and functionality.     09:43:15
24    Q.  And is the security team the same as the   09:43:17
25  escort team?                            09:43:21
```

Randy Valley, Redacted April 16, 2025

| | |
|---|---|
| 1 | A. Yes. 09:43:26 |
| 2 | Q. At the trainings is there an understanding 09:43:27 |
| 3 | about who is -- who has decision-making authority? 09:43:32 |
| 4 | A. I couldn't speak for anyone else. I know where 09:43:35 |
| 5 | mine is, or my role in that. And I'm walking through 09:43:39 |
| 6 | that with the director, or someone that's playing the 09:43:43 |
| 7 | role of the director. And so I have a fairly good grasp 09:43:46 |
| 8 | on what our responsibilities are in that. I couldn't 09:43:50 |
| 9 | attest to others. 09:43:54 |
| 10 | Q. What is your understanding of your -- the 09:43:54 |
| 11 | scope of your authority in an execution? 09:43:56 |
| 12 | A. If I feel that we are not going to be able to 09:43:59 |
| 13 | be successful, then I would stop, and talk to the 09:44:01 |
| 14 | director. And we would discuss a path forward on 09:44:04 |
| 15 | whether to stop or -- 09:44:08 |
| 16 | Q. Who would make the ultimate decision? 09:44:09 |
| 17 | A. I believe the director would make that 09:44:12 |
| 18 | ultimate decision. 09:44:15 |
| 19 | Q. And the director attends training? 09:44:16 |
| 20 | A. Yes. 09:44:19 |
| 21 | Q. Do you -- can you give me a sense of how 09:44:19 |
| 22 | many -- how many trainings -- and again, we're just 09:44:24 |
| 23 | talking about since you've become warden at IMSI -- how 09:44:27 |
| 24 | many trainings the director has attended? 09:44:33 |
| 25 | A. I could not answer that. 09:44:35 |

Page 34

| | |
|---|---|
| 1 | Q. What is the director doing at the trainings, 09:44:36 |
| 2 | typically? 09:44:39 |
| 3 | A. Playing his role in that procedure. 09:44:40 |
| 4 | Q. Has the new director -- so the old director 09:44:45 |
| 5 | Josh Tewalt, the new director is Bree Derrick as I 09:44:50 |
| 6 | understand it. Has Ms. Derrick attended execution 09:45:03 |
| 7 | trainings? 09:45:03 |
| 8 | A. Yes. 09:45:03 |
| 9 | Q. And has she done so since becoming director? 09:45:04 |
| 10 | A. No, we have not held training. 09:45:08 |
| 11 | Q. When did the new director take over? 09:45:10 |
| 12 | A. I could not give a specific date. I don't 09:45:13 |
| 13 | know that I know that off the top of my head. 09:45:16 |
| 14 | Q. Have you discussed executions with the new 09:45:19 |
| 15 | director? 09:45:22 |
| 16 | A. While at training, briefly, I mean, I've 09:45:22 |
| 17 | spoken to her at those -- at the trainings. But I 09:45:26 |
| 18 | couldn't give you specifics as to what we discussed. 09:45:31 |
| 19 | Q. Are you familiar with the honorariums that are 09:45:42 |
| 20 | paid out to participants at the execution trainings? 09:45:48 |
| 21 | A. Yes. 09:45:51 |
| 22 | Q. Are you involved in the distribution of those 09:45:51 |
| 23 | honorariums? 09:45:55 |
| 24 | A. Not the distribution. 09:45:56 |
| 25 | Q. Are you involved in some aspect of that 09:45:59 |

Page 35

| | |
|---|---|
| 1 | process? 09:46:02 |
| 2 | A. Yes. 09:46:02 |
| 3 | Q. What aspect? 09:46:02 |
| 4 | A. I prepare the -- I prepare the envelopes that 09:46:04 |
| 5 | go to the various team members. 09:46:07 |
| 6 | Q. The envelopes that have the cash and -- 09:46:10 |
| 7 | A. Yes, the payments, yes. 09:46:14 |
| 8 | Q. Who -- so the -- as I understand it, there is 09:46:18 |
| 9 | an administrative team that's described by the protocol 09:46:23 |
| 10 | relating to executions; is that your understanding as 09:46:29 |
| 11 | well? Are you familiar with that term? 09:46:31 |
| 12 | A. Yes. 09:46:34 |
| 13 | Q. Who do you understand to be in the 09:46:34 |
| 14 | administrative team? 09:46:37 |
| 15 | A. The deputy chief, the chief of prisons, the 09:46:39 |
| 16 | deputy director, and the director. 09:46:45 |
| 17 | Q. And we talked about the director. But who 09:46:47 |
| 18 | else among that group of people is at the execution 09:46:50 |
| 19 | training? 09:46:54 |
| 20 | A. Depending on the training, all of them. 09:46:54 |
| 21 | Q. How is that determined, which ones attend? 09:46:56 |
| 22 | A. I couldn't answer that. 09:47:01 |
| 23 | Q. Who do you think is making that decision? 09:47:03 |
| 24 | A. I -- I don't know. I believe that they are 09:47:06 |
| 25 | all scheduled to be there when available. And so I 09:47:08 |

Page 36

| | |
|---|---|
| 1 | think it's a schedule issue, not a someone assigning 09:47:12 |
| 2 | someone to go or not go. 09:47:17 |
| 3 | Q. We'll talk in more detail about what I would 09:47:20 |
| 4 | describe as the agendas for the trainings. But just 09:47:24 |
| 5 | since we're on the subject. At the top of those 09:47:29 |
| 6 | agendas, there is a list of individuals from the 09:47:32 |
| 7 | administrative team who are present. But I don't 09:47:35 |
| 8 | believe I've ever seen the director listed. So I'm 09:47:39 |
| 9 | wondering, is there a way that attendance is taken of 09:47:43 |
| 10 | people sort of outside that agenda? 09:47:44 |
| 11 | A. Not that I'm aware of. 09:47:49 |
| 12 | Q. Can you think of someone else who might be 09:47:51 |
| 13 | aware of that? 09:47:54 |
| 14 | A. I don't know who manages the agenda as it is. 09:47:55 |
| 15 | Q. That's not you? You are not involved in that, 09:47:59 |
| 16 | the creation of that document? 09:48:04 |
| 17 | A. Negative. 09:48:06 |
| 18 | Q. Where does the cash come from that is in the 09:48:13 |
| 19 | payments? Where does that cash originate? 09:48:17 |
| 20 | A. So I can tell you, I have a set amount of cash 09:48:22 |
| 21 | that's available for me to provide those payments. Is 09:48:28 |
| 22 | that what you're referring to? 09:48:33 |
| 23 | Q. Yeah. Yeah. And that cash, where do you 09:48:35 |
| 24 | obtain that cash from? 09:48:38 |
| 25 | A. I get it from our headquarters. 09:48:40 |

Page 37

1    Q. There is another individual associated with    09:48:46
2    executions, or who at least some times has been    09:48:50
3    associated with executions, that we tend to refer to as    09:48:55
4    the rescue doctor. Is that a phrase you are familiar    09:49:00
5    with?    09:49:03
6    A. Yes.    09:49:04
7    Q. Has the rescue doctor, during your time as    09:49:04
8    warden of IMSI, since June of 2024, has the rescue    09:49:08
9    doctor been attending -- well, let me start by saying    09:49:17
10   or --    09:49:17
11        Do you know who, and I'm not asking you to    09:49:19
12   identify anyone, but if you were to see the rescue    09:49:22
13   doctor at a training, would you know that that was the    09:49:27
14   rescue doctor?    09:49:30
15   A. No.    09:49:32
16   Q. Do you have any knowledge of whether the    09:49:33
17   rescue doctor is attending trainings?    09:49:35
18   A. No.    09:49:39
19   Q. And just to go back to the honorarium for a    09:49:53
20   second. When are those disbursed, is it at the end of    09:49:58
21   the training?    09:50:02
22   A. I provide the envelopes to an administrative    09:50:02
23   team member, that distributes those. I couldn't tell    09:50:06
24   you when they do that.    09:50:09
25   Q. Can you tell me who that administrative team    09:50:10

Page 38

1    member is?    09:50:14
2    A. Yes.    09:50:15
3    Q. Who is that?    09:50:15
4    A. Liz Neville.    09:50:16
5    Q. The coroner also -- sometimes the coroner's    09:50:19
6    office, I should say, sometimes has a representative at    09:50:26
7    execution trainings. Is that -- have you been aware of    09:50:32
8    that person being --    09:50:32
9    A. Could you repeat that.    09:50:32
10   Q. Oh, sure. So the Ada County Coroner's Office,    09:50:33
11   I think, it's called, has a representative who has    09:50:37
12   attended execution trainings as we understand it. Is    09:50:40
13   that a person that you have been aware of attending    09:50:45
14   executions?    09:50:48
15   A. Yes.    09:50:49
16   Q. Is that someone you interact with during the    09:50:49
17   trainings?    09:50:52
18   A. Yes.    09:50:53
19   Q. What's the nature of your interactions with    09:50:53
20   that person?    09:50:56
21   A. I've met them. And then they have a specific    09:50:57
22   function, where they come out and check the condemned at    09:51:00
23   the end of the execution to verify time of death. And    09:51:06
24   they notify me that the condemned is deceased.    09:51:10
25   Q. And that's something that happens during the    09:51:21

Page 39

1    sort of role-playing, for lack of a better phrase,    09:51:23
2    during a training, that the coroner will announce that a    09:51:27
3    death has occurred?    09:51:32
4    A. Yes.    09:51:36
5    Q. And there is someone playing the part of the    09:51:38
6    condemned at the trainings that are happening currently?    09:51:42
7    A. Yes.    09:51:46
8    Q. Have there been any issues with IV access with    09:51:46
9    that individual, or those individuals?    09:51:51
10   A. Describe -- could you be more specific?    09:51:53
11   Q. Sure. Have the medical team -- as I    09:51:57
12   understand it, the medical team members are the ones    09:52:00
13   establishing IV access during the training. Have they    09:52:04
14   ever had any problems with that, where it's been more    09:52:08
15   protracted than it has in the past, or they have not    09:52:11
16   been able to establish the IV, or anything like that?    09:52:15
17   A. I don't know that we've ever had a problem    09:52:18
18   establishing multiple sites.    09:52:21
19   Q. How many sites are established at the    09:52:25
20   trainings?    09:52:28
21   A. Two.    09:52:29
22   Q. Do you take notes at the trainings?    09:52:32
23   A. Only as far as my role, in terms of time of    09:52:35
24   death, and that sort of thing, just in terms of walking    09:52:40
25   through my entire process.    09:52:44

Page 40

1    Q. Apart from time of death, what else are you    09:52:45
2    noting?    09:52:49
3    A. I believe that is it.    09:52:50
4    Q. Are you making that notation -- what sort of    09:52:54
5    document are you making that notation on?    09:52:59
6    A. I have a script in front of me, and I don't    09:53:02
7    always document it. It's just part of the process.    09:53:05
8    Q. Are there other people at the trainings that    09:53:09
9    are taking notes, that you are aware of?    09:53:13
10   A. Not that I'm aware of. I'll correct that.    09:53:15
11   Can -- could you be specific in terms of notes?    09:53:25
12   Q. Sure. Is anyone writing anything down at the    09:53:28
13   trainings to start?    09:53:33
14   A. Yes. So my medical team as they go through    09:53:34
15   their processes document, I believe, it's just times, in    09:53:40
16   which they perform certain procedures. But I've never    09:53:44
17   looked at that document specifically to know what    09:53:48
18   exactly they are documenting.    09:53:51
19   Q. Okay. I'll probably have some follow-up    09:53:53
20   questions for you when we're looking at the agenda. But    09:53:56
21   for now, I think that's good.    09:54:00
22        The person who serves as the individual who is    09:54:03
23   acting as the condemned during the current training    09:54:12
24   since you took over as warden, do you know how that    09:54:17
25   person is chosen?    09:54:20

Page 41

11 (Pages 38 - 41)

Randy Valley, Redacted April 16, 2025

| | |
|---|---|
| 1 | A. Typically, I ask them to do that.    09:54:20 |
| 2 | Q. And are you asking someone who is already in    09:54:23 |
| 3 | the -- on the team associated with executions?    09:54:26 |
| 4 | A. At times.    09:54:29 |
| 5 | Q. And at times you are asking someone who is    09:54:30 |
| 6 | outside of --    09:54:33 |
| 7 | A. Yes.    09:54:34 |
| 8 | Q. How are you deciding who to approach about    09:54:34 |
| 9 | that?    09:54:39 |
| 10 | A. I -- typically, it's someone in upper    09:54:39 |
| 11 | leadership, if it's not one of my active team members.    09:54:42 |
| 12 | And so I have reached out to deputy wardens to offer    09:54:45 |
| 13 | them an opportunity to come down and do that, to see the 09:55:05 |
| 14 | process and participate.    09:54:54 |
| 15 | Q. Has anyone ever declined to do that?    09:54:56 |
| 16 | A. No.    09:55:01 |
| 17 | Q. When you are thinking about approaching    09:55:07 |
| 18 | someone for that purpose, are you considering anything    09:55:09 |
| 19 | about their size, or their health, or anything like    09:55:12 |
| 20 | that?    09:55:15 |
| 21 | A. No.    09:55:17 |
| 22 | Q. Is that person always employed by the    09:55:24 |
| 23 | Department?    09:55:27 |
| 24 | A. Yes.    09:55:27 |
| 25 | (Exhibit 1 marked.)    09:55:27 |

Page 42

| | |
|---|---|
| 1 | Q. (BY MR. HORWITZ) Let's turn to the first    09:55:36 |
| 2 | exhibit, which I think you have a stack of the exhibits  09:55:38 |
| 3 | in front of you. So Exhibit 1 is what I described    09:55:42 |
| 4 | earlier as the protocol. And I have just a few specific  09:55:53 |
| 5 | questions for you based on the text in this document.    09:55:57 |
| 6 | So let's start on page 8. And about three    09:56:06 |
| 7 | full paragraphs in, there is a paragraph that says    09:56:15 |
| 8 | "Note." And I'll just read the text here. It says,    09:56:21 |
| 9 | "Licensing and certification, and criminal history    09:56:24 |
| 10 | reviews will be conducted prior to the placement on the  09:56:27 |
| 11 | medical team, annually after placement on the medical    09:56:31 |
| 12 | team and after issuance of a death warrant.    09:56:31 |
| 13 | Participation on the medical team is contingent on    09:56:31 |
| 14 | passing these reviews."    09:56:31 |
| 15 | Do you see the text that I read?    09:56:44 |
| 16 | A. I do.    09:56:44 |
| 17 | Q. Is that a process you're involved in that,    09:56:45 |
| 18 | those criminal history reviews?    09:56:49 |
| 19 | A. No.    09:56:50 |
| 20 | Q. Do you know who is involved in it?    09:56:50 |
| 21 | A. No. I mean, I assume the administrative team,  09:56:54 |
| 22 | but I don't know who on that team specifically manages   09:56:59 |
| 23 | that, or reviews those.    09:57:02 |
| 24 | Q. Have you ever seen a record of those reviews,  09:57:03 |
| 25 | or any kind of documentation related to those reviews?   09:57:06 |

Page 43

| | |
|---|---|
| 1 | A. No. I believe the last time, without going    09:57:08 |
| 2 | back and looking at the log, that I was notified when    09:57:11 |
| 3 | those were completed, but I did not see them.    09:57:14 |
| 4 | Q. And when, when was that?    09:57:16 |
| 5 | A. During the last death warrant that we had for  09:57:20 |
| 6 | Mr. Creech.    09:57:23 |
| 7 | Q. Do you remember how that notification was    09:57:24 |
| 8 | communicated to you?    09:57:28 |
| 9 | A. Yes.    09:57:31 |
| 10 | Q. How was it?    09:57:31 |
| 11 | A. I received a phone call, I believe, from Liz  09:57:32 |
| 12 | Neville that did follow-up with me.    09:57:37 |
| 13 | Q. And do you recall whether she indicated to you 09:57:41 |
| 14 | that there was any sort of paperwork associated with the 09:57:45 |
| 15 | criminal history review?    09:57:49 |
| 16 | A. Not specifically.    09:57:52 |
| 17 | Q. Was it your understanding that she was the    09:57:56 |
| 18 | person conducting the review?    09:57:59 |
| 19 | A. No.    09:58:04 |
| 20 | Q. Did you have an understanding that someone    09:58:04 |
| 21 | else was doing the review?    09:58:08 |
| 22 | A. I didn't ask that information on who conducted 09:58:11 |
| 23 | the review.    09:58:16 |
| 24 | Q. Got it.    09:58:16 |
| 25 | A. It was just solely notification when I    09:58:17 |

Page 44

| | |
|---|---|
| 1 | received it.    09:58:20 |
| 2 | Q. Got it. Do you remember when in the warrant   09:58:20 |
| 3 | process that notification was transmitted?    09:58:25 |
| 4 | A. No.    09:58:28 |
| 5 | Q. Let's turn to page 21 of Exhibit 1. And here  09:58:28 |
| 6 | I want to talk to you about the text that is six -- I    09:58:36 |
| 7 | think, six or seven bullet points in. It says, "Confirm 09:58:44 |
| 8 | with the IMSI warden." And this is all under "Deputy    09:58:49 |
| 9 | Chief of the Division of Prisons."    09:58:57 |
| 10 | A. Uh-huh.    09:58:57 |
| 11 | Q. The text reads, "Confirm with the IMSI warden  09:58:58 |
| 12 | that the training schedule has been activated ensuring   09:59:01 |
| 13 | that specialty team members have received adequate    09:59:06 |
| 14 | training, written instruction, and practice, and that    09:59:06 |
| 15 | all training has been documented."    09:59:06 |
| 16 | Do you see the text that I'm referring to?    09:59:09 |
| 17 | A. Yes.    09:59:12 |
| 18 | Q. Is this something that you -- did you have the  09:59:12 |
| 19 | conversation or the confirmation that's described here   09:59:16 |
| 20 | with the deputy chief during the execution warrant    09:59:19 |
| 21 | period for Mr. Creech?    09:59:24 |
| 22 | A. Can you be specific, like what you mean by    09:59:28 |
| 23 | that?    09:59:31 |
| 24 | Q. Sure. Well, let's start by maybe clarifying.  09:59:32 |
| 25 | Who is the individual that would be the deputy chief of  09:59:37 |

Page 45

12 (Pages 42 - 45)

Randy Valley, Redacted April 16, 2025

**Page 46**

1  the division of prisons as the SOP describes it?  09:59:41
2  A. There are two. I -- typically, I work with  09:59:45
3  Liz Neville in regards to this.  09:59:49
4  Q. Did Ms. Neville confirm with you that the  09:59:51
5  training schedule had been activated and that the  09:59:56
6  other -- the other items described here had occurred?  10:00:00
7  A. Only in regards to, we worked together to kind  10:00:04
8  of notify me, and what my availability was, and to  10:00:08
9  ensure we had our teams ready, and when we would be  10:00:12
10  training, so...  10:00:17
11  Q. Do you -- so the language here uses the phrase  10:00:18
12  adequate training. Do you see that --  10:00:22
13  A. Yes.  10:00:26
14  Q. -- that phrase?  10:00:26
15  Do you have a definition of adequate training?  10:00:29
16  A. Yes.  10:00:32
17  Q. What do you regard as adequate training?  10:00:34
18  A. For me, it's not about the training. It's  10:00:37
19  about witnessing whether or not they feel competent, and  10:00:41
20  appear competent in their duties. That it goes off  10:00:44
21  repeatedly with no real deviation or issue.  10:00:47
22  Q. And is that a determination that you are  10:00:51
23  making?  10:00:54
24  A. I'm definitely one in terms of my escort team,  10:00:54
25  for sure.  10:01:02

**Page 47**

1  Q. Have you ever had concerns that the training  10:01:04
2  was not adequate?  10:01:10
3  A. No.  10:01:11
4  Q. Has anyone else had those concerns?  10:01:12
5  A. Not to my awareness.  10:01:14
6  Q. Apart from the protocol, is there any document  10:01:27
7  that describes the administrative team's  10:01:30
8  responsibilities?  10:01:34
9  A. Not to my knowledge.  10:01:35
10  Q. Are there trainings that are occurring -- so  10:01:37
11  there are the medical team trainings that we've been  10:01:42
12  focusing on. Are there other trainings that  10:01:44
13  administrative team members are undergoing related to  10:01:47
14  executions, apart from those medical team trainings?  10:01:55
15  A. Not that I'm aware of.  10:01:57
16  (Confidential Exhibit 2 marked.)  10:02:01
17  Q. (BY MR. HORWITZ) Let's move on to Exhibit 2.  10:02:03
18  And we'll come back to the protocol at some point most  10:02:05
19  likely. And I don't think we discussed this at the  10:02:09
20  outset. But my plan with the exhibits that have some  10:02:11
21  kind of confidentiality marking, is I'll acknowledge  10:02:15
22  that on the record, hopefully, and you can correct me if  10:02:19
23  I forget. And I believe that part of the transcript  10:02:23
24  will be sealed under the protective order. And unlike  10:02:26
25  last time, I'll try to do a good job of saying when I'm  10:02:32

**Page 48**

1  moving on from that exhibit. And then we will no longer  10:02:37
2  be having that confidential exchange. And I understand  10:02:43
3  that the whole transcript will be confidential for a  10:02:47
4  period of time under the protective order as well.  10:02:51
5  (Start of confidential portion of  10:02:51
6  transcript.)***  10:02:51
7  10:02:57
8  10:02:58
9  10:02:59
10  10:02:59
11  10:02:59
12  10:03:03
13  10:03:10
14  10:03:11
15  10:03:15
16  10:03:17
17  10:03:25
18  10:03:27
19  10:03:29
20  10:03:33
21  10:03:39
22  10:03:42
23  10:03:50
24  10:03:53
25  10:03:59

**Page 49**

1  10:04:03
2  10:04:06
3  10:04:08
4  10:04:15
5  10:04:16
6  10:04:19
7  10:04:19
8  10:04:21
9  10:04:25
10  10:04:28
11  10:04:33
12  10:04:36
13  10:04:39
14  10:04:43
15  10:04:47
16  10:04:49
17  10:04:52
18  10:04:56
19  10:04:57
20  10:05:02
21  10:05:03
22  10:05:08
23  10:05:12
24  10:05:18
25  10:05:18

13 (Pages 46 - 49)

Randy Valley, Redacted April 16, 2025

## Page 50

| Line | Time |
|---|---|
| 1 | 10:05:24 |
| 2 | 10:05:27 |
| 3 | 10:05:33 |
| 4 | 10:05:36 |
| 5 | 10:05:38 |
| 6 | 10:05:42 |
| 7 | 10:05:42 |
| 8 | 10:05:45 |
| 9 | 10:05:57 |
| 10 | 10:06:00 |
| 11 | 10:06:04 |
| 12 | 10:06:04 |
| 13 | 10:06:08 |
| 14 | 10:06:13 |
| 15 | 10:06:19 |
| 16 | 10:06:24 |
| 17 | 10:06:24 |
| 18 | 10:06:24 |
| 19 | 10:06:28 |
| 20 | 10:06:29 |
| 21 | 10:06:31 |
| 22 | 10:06:35 |
| 23 | 10:06:39 |
| 24 | 10:06:40 |
| 25 | 10:06:45 |

## Page 51

| Line | Text | Time |
|---|---|---|
| 1 | | 10:06:48 |
| 2 | | 10:06:49 |
| 3 | | 10:06:49 |
| 4 | | 10:06:57 |
| 5 | | 10:06:59 |
| 6 | | 10:07:00 |
| 7 | | 10:07:03 |
| 8 | | 10:07:03 |
| 9 | | 10:07:09 |
| 10 | | 10:07:13 |
| 11 | | 10:07:18 |
| 12 | | 10:07:18 |
| 13 | | 10:07:22 |
| 14 | | 10:07:28 |
| 15 | | 10:07:35 |
| 16 | | 10:07:38 |
| 17 | | 10:07:43 |
| 18 | (Conclusion of confidential portion of | 10:07:43 |
| 19 | transcript.)*** | 10:07:43 |
| 20 | MR. SMITH: Jonah, we've been going for about | 10:07:48 |
| 21 | an hour. Is now a good time to break? | 10:07:50 |
| 22 | MR. HORWITZ: Yeah. Yeah, now is a good time. | 10:07:50 |
| 23 | MR. SMITH: Yeah. | 10:07:50 |
| 24 | MR. HORWITZ: Yeah. | 10:07:58 |
| 25 | THE VIDEOGRAPHER: Okay. We are off the | 10:07:58 |

## Page 52

| Line | Text | Time |
|---|---|---|
| 1 | record. The time is 10:08 a.m. | 10:07:59 |
| 2 | (Recess.) | 10:08:04 |
| 3 | THE VIDEOGRAPHER: We are back on the record. | 10:18:18 |
| 4 | The time is 10:19 a.m. | 10:18:20 |
| 5 | Q. (BY MR. HORWITZ) I would like to turn to some | 10:18:24 |
| 6 | questions about the medical team. And I understand you | 10:18:27 |
| 7 | might not be able to answer some of them, but to the | 10:18:30 |
| 8 | extent you can. Do you know how those numbers are | 10:18:34 |
| 9 | selected? | 10:18:38 |
| 10 | A. No. | 10:18:39 |
| 11 | Q. Do you know who would have the answer to that | 10:18:39 |
| 12 | question? | 10:18:41 |
| 13 | A. No. | 10:18:41 |
| 14 | MR. HORWITZ: Are you okay? | 10:18:52 |
| 15 | THE VIDEOGRAPHER: Yeah, I'm good. My knee | 10:19:01 |
| 16 | caught the cord. | 10:19:05 |
| 17 | MR. HORWITZ: Okay. | 10:19:05 |
| 18 | THE VIDEOGRAPHER: Sorry. | 10:19:06 |
| 19 | Q. (BY MR. HORWITZ) Do you know -- and again, | 10:19:06 |
| 20 | this is a yes or no question. Do you know the identity | 10:19:09 |
| 21 | of any of the members of the medical team? | 10:19:13 |
| 22 | A. No. | 10:19:15 |
| 23 | Q. Do you know their qualifications? | 10:19:15 |
| 24 | A. No. | 10:19:18 |
| 25 | Q. There is an individual that has been referred | 10:19:36 |

## Page 53

| Line | Text | Time |
|---|---|---|
| 1 | to in this case as the central line volunteer. Is that | 10:19:39 |
| 2 | a phrase that would make sense to you? | 10:19:43 |
| 3 | A. Yes. | 10:19:46 |
| 4 | Q. Do you know who that person is? | 10:19:47 |
| 5 | A. Know who they are in terms of name? | 10:19:47 |
| 6 | Q. Yes, do you know their name? | 10:19:49 |
| 7 | A. No. | 10:19:50 |
| 8 | Q. Do you know at the trainings, do you know who | 10:19:50 |
| 9 | the central line volunteer is when you see that person? | 10:19:53 |
| 10 | A. Yes. | 10:19:58 |
| 11 | Q. How do you know who they are? | 10:19:58 |
| 12 | A. By functionality, in terms of walking through | 10:20:02 |
| 13 | training, and the role that they take. | 10:20:04 |
| 14 | Q. Can you tell me what they're doing at the | 10:20:07 |
| 15 | trainings? | 10:20:09 |
| 16 | A. Practicing for the event. | 10:20:10 |
| 17 | Q. And can you give me a little more specificity | 10:20:12 |
| 18 | on, just sort of walk me through what you see them | 10:20:16 |
| 19 | doing, in particular? | 10:20:19 |
| 20 | A. Yeah, they observe the -- work to get venous | 10:20:21 |
| 21 | access through a peripheral IV. And then during | 10:20:27 |
| 22 | trainings, we have had a secondary kind of a -- we go | 10:20:33 |
| 23 | through the entire run through. And then we go through | 10:20:39 |
| 24 | sometimes up to two people, where we go back, and he | 10:20:42 |
| 25 | uses the ultrasound equipment to find access points for | 10:20:47 |

14 (Pages 50 - 53)

Randy Valley, Redacted April 16, 2025

| | |
|---|---|
| 1 a central line. Just basically does a walk-through with  10:20:52 | 1    A. Yes.    10:23:41 |
| 2 the equipment to identify viable sites.    10:20:58 | 2    Q. Is someone using the ultrasound, other than  10:23:41 |
| 3    Q. So you said the central line volunteer is  10:21:02 | 3 the central line volunteer on the peripheral side of  10:23:45 |
| 4 observing the attempt to establish IV access?    10:21:06 | 4 things?    10:23:51 |
| 5    A. They typically are in the room when that  10:21:11 | 5    A. Yes.    10:23:51 |
| 6 happens, and watching the process, yes.    10:21:15 | 6    Q. And who is doing that?    10:23:51 |
| 7    Q. And it's the medical team that is obtaining  10:21:16 | 7    A. The medical team.    10:23:54 |
| 8 the IV access?    10:21:19 | 8    Q. Is there a particular person on the medical  10:23:55 |
| 9    A. Correct.    10:21:21 | 9 team?    10:23:58 |
| 10    Q. How are people referred to during the  10:21:21 | 10    A. There is multiple people that I have seen use  10:23:58 |
| 11 trainings? How do they address one another? Do they  10:21:26 | 11 it.    10:24:02 |
| 12 use titles, or anything like that?    10:21:29 | 12    Q. Are you familiar with -- at the trainings, do  10:24:02 |
| 13    A. Not that I can think of.    10:21:31 | 13 you know who the medical team leader is?    10:24:05 |
| 14    Q. Is there some other way that they address one  10:21:33 | 14    A. Yes.    10:24:08 |
| 15 another?    10:21:37 | 15    Q. Can you tell me what that person does  10:24:08 |
| 16    A. To be honest, when I'm present, communication  10:21:37 | 16 specifically at trainings, that is different than the  10:24:11 |
| 17 is very limited. They -- it's very specific on what  10:21:43 | 17 other medical team leaders -- or the other medical team  10:24:14 |
| 18 they are doing. Most of their communication is with the  10:21:46 | 18 members?    10:24:18 |
| 19 condemned, as they walk through the procedure. So most  10:21:50 | 19    A. They -- from witnessing it, they are the ones  10:24:18 |
| 20 of their communication -- yeah, almost all their  10:21:54 | 20 that do all the communication with the condemned  10:24:21 |
| 21 communication is either with the condemned or with me,  10:22:00 | 21 throughout the process, explaining what's going to  10:24:24 |
| 22 when I'm present.    10:22:04 | 22 happen, and what they can expect throughout the process.  10:24:27 |
| 23    Q. Are there -- does the central line volunteer  10:22:06 | 23 So every step is explained to the condemned as we walk  10:24:34 |
| 24 communicate with you?    10:22:13 | 24 through it. And it's the medical team leader that does  10:24:37 |
| 25    A. No, has not.    10:22:15 | 25 that. And it's the medical team leader that  10:24:40 |
| Page 54 | Page 56 |

| | |
|---|---|
| 1    Q. Do you know that person's qualifications?    10:22:17 | 1 communicates with me, where they are in the process, or  10:24:45 |
| 2    A. No.    10:22:21 | 2 whether or not they are complete, or if they have an  10:24:46 |
| 3    Q. Do you know who would be familiar with their  10:22:22 | 3 issue.    10:24:48 |
| 4 qualifications?    10:22:27 | 4    Q. When the ultrasound is being used for  10:24:49 |
| 5    A. Someone on the administrative team. I don't  10:22:28 | 5 peripheral, where on the condemned's body is that taking  10:24:52 |
| 6 know who verifies that.    10:22:32 | 6 place?    10:25:01 |
| 7    Q. Do you know what kind of criminal history  10:22:34 | 7    A. Typically, they are looking at arms.    10:25:01 |
| 8 check would have been performed on the central line  10:22:38 | 8    Q. And are they making statements about what  10:25:03 |
| 9 volunteer?    10:22:42 | 9 they're seeing from the ultrasound?    10:25:06 |
| 10    A. The same one that is done on everyone else, to  10:22:42 | 10    A. Not that I can think of.    10:25:09 |
| 11 the best of my knowledge.    10:22:46 | 11    Q. And what about the ultrasound, when it's being  10:25:10 |
| 12    Q. So the central line volunteer uses an  10:22:48 | 12 used for the central line. That's when the central line  10:25:15 |
| 13 ultrasound, you said, as part of some trainings?    10:22:56 | 13 volunteer is using it. Where on the condemned's body is  10:25:17 |
| 14    A. Yes.    10:23:00 | 14 that happening?    10:25:22 |
| 15    Q. Is that part of every training?    10:23:00 | 15    A. I couldn't tell you firsthand.    10:25:22 |
| 16    A. Since we received it, I believe so, yes.    10:23:02 | 16    Q. Are you not seeing that?    10:25:22 |
| 17    Q. And what's your understanding of the purpose  10:23:06 | 17    A. No, it -- typically, that involves a little  10:25:25 |
| 18 of that use of the ultrasound?    10:23:09 | 18 bit more modesty. And so I tend not to be in the room.  10:25:30 |
| 19    A. Better -- well, I think it's necessary -- I  10:23:12 | 19 We leave it to the medical team to do that, with one of,  10:25:30 |
| 20 believe it is necessary for a central line. But it is  10:23:18 | 20 whoever is the volunteer at that time to have that done.  10:25:30 |
| 21 utilized to identify viable IV sites, best IV sites, for  10:23:20 | 21    Q. In the preparation room?    10:25:37 |
| 22 peripheral access as well.    10:23:29 | 22    A. Yes.    10:25:38 |
| 23    Q. So your understanding is that ultrasound is  10:23:30 | 23    Q. And in the preparation room, is that also  10:25:38 |
| 24 used for both the peripheral IV process and the central  10:23:34 | 24 where the ultrasound is being used for the peripheral?  10:25:40 |
| 25 line process?    10:23:41 | 25    A. Yes.    10:25:45 |
| Page 55 | Page 57 |

15 (Pages 54 - 57)

Randy Valley, Redacted April 16, 2025

**Page 58**

1  Q. Is that the assessment as you understand it,  10:25:46
2  or is the assessment something else?  10:25:49
3  A. No, the assessment is prior to that. It  10:25:52
4  happens in the cell.  10:25:56
5  Q. Is an ultrasound used for the assessment?  10:25:57
6  A. It could be. It is not always. But we'll  10:26:00
7  by -- we'll go through multiple assessments during a  10:26:05
8  warrant. And so it -- I do believe it would be used  10:26:08
9  prior to that moment.  10:26:11
10  Q. Were assessments done on Mr. Creech during the  10:26:12
11  warrant?  10:26:16
12  A. Yes.  10:26:17
13  Q. Were you part of -- or were you a witness to  10:26:17
14  those assessments?  10:26:21
15  A. Yes.  10:26:22
16  Q. Were those performed with an ultrasound?  10:26:22
17  A. Yes.  10:26:28
18  Q. Do you know who was performing the assessment,  10:26:28
19  the assessments?  10:26:32
20  A. Medical team members, I couldn't be more  10:26:33
21  specific than that.  10:26:36
22  MR. SMITH: Jonah, I'm sorry. Are we talking  10:26:38
23  about February or November?  10:26:41
24  MR. HORWITZ: I'm -- thank you.  10:26:43
25  Q. (BY MR. HORWITZ) I am talking about November.  10:26:45

**Page 59**

1  And so I should have clarified this. So you became  10:26:50
2  warden in June of 2024?  10:26:51
3  A. Correct.  10:26:51
4  Q. So I'm assuming you were not -- and you were  10:26:51
5  not at IMSI in the immediately preceding period?  10:26:54
6  A. No.  10:27:00
7  Q. So you were not at IMSI in February of 2024?  10:27:00
8  A. No.  10:27:06
9  Q. And so I'm assuming you were not involved in  10:27:06
10  the preparations leading up to the attempted execution  10:27:10
11  of Mr. Creech in February of 2024?  10:27:11
12  A. No.  10:27:13
13  Q. No, as in I'm --  10:27:13
14  A. I was not a part of that.  10:27:17
15  Q. You were not. Okay. Thank you. Okay.  10:27:17
16  So, yeah, all my questions have been about?  10:27:18
17  A. November.  10:27:18
18  Q. Yes, November.  10:27:22
19  A. Okay.  10:27:23
20  Q. And I think it would include October, because  10:27:23
21  I believe the warrant issued in October?  10:27:24
22  MS. SCHINDELE: It was October 16th.  10:27:29
23  Q. (BY MR. HORWITZ) Right. So from October 16th  10:27:30
24  of 2024, until the stay of execution in November of  10:27:33
25  2024. So with those assessments, would the medical team  10:27:38

**Page 60**

1  member, who was performing the assessment, would they  10:27:42
2  communicate to you about what they were seeing?  10:27:45
3  A. No.  10:27:50
4  Q. Would they communicate to anyone about that,  10:27:50
5  to your knowledge?  10:27:52
6  A. I don't know the answer to that. I believe I  10:27:53
7  would be notified if there was going to be an issue or a  10:27:56
8  concern. But at that time, that wasn't a conversation  10:28:01
9  that was had.  10:28:04
10  Q. So you would just observe them use the  10:28:06
11  ultrasound, but not hear any -- not learn any  10:28:09
12  information about how that was -- what kind of results  10:28:13
13  were being obtained?  10:28:17
14  A. I don't recall having that conversation, no.  10:28:18
15  Q. Would the medical team member be communicating  10:28:24
16  with Mr. Creech during the assessment?  10:28:29
17  A. As far as explaining to the condemned what  10:28:32
18  they are going to do, and what they are going to  10:28:36
19  experience during that assessment, yes.  10:28:39
20  Q. But not communicating about what venous access  10:28:42
21  actually looked like?  10:28:50
22  A. Not at that time, no.  10:28:51
23  Q. So when the central line volunteer is doing  10:28:59
24  the same type of ultrasound process in the preparation  10:29:02
25  room, you said you leave the room for the condemned's  10:29:06

**Page 61**

1  privacy. Who stays in that room?  10:29:12
2  A. When we do it for training, we don't have --  10:29:14
3  Q. Yes, for training.  10:29:16
4  A. -- anyone -- no one but the medical team has  10:29:18
5  been present for those, that I'm aware of.  10:29:23
6  Q. Is there any conversation about -- that you  10:29:26
7  are a part of after that ultrasound is used during  10:29:28
8  trainings, that informs you about what the medical team  10:29:33
9  or the central line volunteer found using the  10:29:40
10  ultrasound?  10:29:48
11  A. No.  10:29:49
12  Q. The -- going back -- and I apologize for the  10:29:51
13  confusion with the warrant and the trainings. But now  10:29:56
14  talking about the warrant period, in October and  10:30:00
15  November, 2024. The assessments that you've been  10:30:02
16  describing, where in F Block did those occur?  10:30:07
17  A. The assessment that I will -- that we  10:30:10
18  conducted, we did in the preparation room.  10:30:14
19  Q. Was there just a single assessment?  10:30:17
20  A. During that time period that -- yes, that I  10:30:20
21  recall. It's the only one I recall.  10:30:24
22  Q. And who was involved in that assessment?  10:30:27
23  A. Myself, escort team, there was a couple  10:30:30
24  members of them, and the medical team as far as I  10:30:39
25  recall.  10:30:42

16 (Pages 58 - 61)

Randy Valley, Redacted April 16, 2025

| | |
|---|---|
| 1 Q. And that assessment, was there a peripheral 10:30:42 | 1 A. I said, I believe. 10:32:57 |
| 2 assessment using an ultrasound at that time? 10:30:48 | 2 Q. Who is the phone call from? 10:32:58 |
| 3 A. Yeah. 10:30:53 | 3 A. Typically, Liz Neville. And then I will 10:33:01 |
| 4 Q. And you were present for that? 10:30:53 | 4 receive an appointment for it as well from her. So I 10:33:08 |
| 5 A. Yes. 10:30:54 | 5 will get it over email in the form of an appointment 10:33:11 |
| 6 Q. Was there also an assessment of the central 10:30:55 | 6 once it's set. 10:33:14 |
| 7 line at that time? 10:30:59 | 7 Q. What time of day are the trainings, outside of 10:33:15 |
| 8 A. I don't believe so. 10:31:00 | 8 the warrant period? 10:33:18 |
| 9 Q. Was the central line volunteer present during 10:31:01 | 9 A. Typically, in the evening. 10:33:20 |
| 10 that exchange? 10:31:04 | 10 Q. I think there will be a somewhat longer chunk 10:33:27 |
| 11 A. I don't recall. 10:31:05 | 11 of the deposition where I'll be asking you questions 10:33:33 |
| 12 Q. Do you know how a decision was made about not 10:31:06 | 12 about the execution chemicals, in particular. And I 10:33:36 |
| 13 doing a central line assessment at that time? 10:31:14 | 13 would like to move into that chapter now. 10:33:40 |
| 14 A. I do not. 10:31:17 | 14 And at the outset, I just want to make sure 10:33:43 |
| 15 Q. Can you tell me, do you remember when -- do 10:31:18 | 15 we're talking about the same chemicals. And you can 10:33:46 |
| 16 you remember what day the assessment occurred? 10:31:25 | 16 clarify whenever you need to. I will try to do the 10:33:49 |
| 17 A. No. 10:31:28 | 17 same. I think different phrases have been used to 10:33:55 |
| 18 Q. Do you remember roughly where in the warrant 10:31:30 | 18 capture different batches of chemicals. 10:34:00 |
| 19 period that it occurred; closer to the warrant, closer 10:31:34 | 19 The way that we often think of them is as a 10:34:04 |
| 20 to the stay? 10:31:38 | 20 first set, the second set, and a third set. And so when 10:34:07 |
| 21 A. Closer to the stay. 10:31:39 | 21 we use that scheme, by first set, we mean the chemicals 10:34:10 |
| 22 Q. Do you remember the time of day? 10:31:42 | 22 obtained in October of 2023. The second set are those 10:34:13 |
| 23 A. Yes. 10:31:44 | 23 obtained in February of 2024. The third set are those 10:34:22 |
| 24 Q. What time of day was it? 10:31:44 | 24 obtained in October of 2024. Are you with me? 10:34:26 |
| 25 A. It was during one -- it was preceding one of 10:31:46 | 25 A. Yes. 10:34:29 |
| Page 62 | Page 64 |

| | |
|---|---|
| 1 our trainings. So it would have been probably 8:00 at 10:31:51 | 1 Q. So can you tell me of these three sets, which, 10:34:30 |
| 2 night. 10:31:55 | 2 if any, you were involved in the acquisition of the 10:34:33 |
| 3 Q. That's the time the trainings -- that's the 10:31:57 | 3 chemical? 10:34:36 |
| 4 time of day for the trainings during the warrant period? 10:32:01 | 4 A. I am not involved in acquisition. 10:34:37 |
| 5 A. They can be. They -- the last time that was 10:32:04 | 5 Q. So you were not involved in obtaining the 10:34:40 |
| 6 typically, we train in the evenings. But there 10:32:08 | 6 third set of execution drugs? 10:34:44 |
| 7 are -- there are sessions in which they will be during 10:32:12 | 7 A. No. 10:34:46 |
| 8 the day. 10:32:15 | 8 Q. And just to drill down that a little bit. 10:34:48 |
| 9 Q. Who is determining those, the scheduling? 10:32:16 | 9 When I say "obtain," partly my question is, did you 10:34:53 |
| 10 A. It's one of the admin team members is 10:32:20 | 10 acquire the third set from -- well, maybe -- maybe I'll 10:34:56 |
| 11 typically trying to get those set up. 10:32:23 | 11 start over. 10:35:04 |
| 12 Q. How is that communicated to you? 10:32:26 | 12 The third set, can you tell me -- can you tell 10:35:05 |
| 13 A. Notified of the date, and whether or not 10:32:28 | 13 me where the third set, when you first saw the third set 10:35:13 |
| 14 that's a date that works for me as well, just a part of 10:32:31 | 14 of execution drugs? So again, I'm talking about the 10:35:18 |
| 15 the folks that need to be there for that. 10:32:35 | 15 drugs that were acquired in October of 2024. 10:35:23 |
| 16 Q. How are you notified of that? 10:32:38 | 16 A. Yes. 10:35:26 |
| 17 A. By administrative team member. 10:32:40 | 17 Q. When did you first see them? 10:35:26 |
| 18 Q. Over what; email, phone, what technology, or 10:32:43 | 18 A. They were delivered to me. I would have to 10:35:28 |
| 19 in person? 10:32:46 | 19 look at the log specifically to see what date, but... 10:35:30 |
| 20 A. Typically phone. 10:32:47 | 20 Q. Okay. So, and, you know, these are ambiguous 10:35:35 |
| 21 Q. A phone call? 10:32:48 | 21 terms. But when I talk about acquisition obtaining, I 10:35:40 |
| 22 A. Usually. 10:32:49 | 22 guess that's partly what I have in mind, is the drugs 10:35:44 |
| 23 Q. What time of day? 10:32:50 | 23 being delivered to you. 10:35:48 |
| 24 A. I believe -- 10:32:54 | 24 So those drugs were delivered to you -- those 10:35:49 |
| 25 Q. Oh, I'm sorry. 10:32:56 | 25 drugs were not delivered to you by Warden Richardson? 10:35:52 |
| Page 63 | Page 65 |

17 (Pages 62 - 65)

Randy Valley, Redacted April 16, 2025

1    A. No.                                    10:35:56
2    Q. They were delivered to you by someone -- and  10:35:56
3  this is a yes or no question -- outside of -- someone  10:36:00
4  who is not an IDOC employee?                10:36:04
5        MS. SCHINDELE: Objection; confidentiality.  10:36:09
6    Q. (BY MR. HORWITZ) Okay. We'll go back to  10:36:12
7  that. But I think we're on the same page now, though,  10:36:14
8  what we are talking about at least.         10:36:19
9        So just a few general questions. Do you have  10:36:20
10  any kind of license to possess controlled substances?  10:36:24
11    A. No.                                   10:36:30
12    Q. Have you ever been -- and this goes back to  10:36:30
13  2011, 2012 as well. And if you have a different answer  10:36:32
14  for those, tell me.                        10:36:36
15        Were you ever involved in the decision about  10:36:36
16  using a one drug, pentobarbital, option for execution?  10:36:41
17    A. No.                                   10:36:47
18    Q. And we talked about this a little bit, but I  10:36:47
19  do want to return to it. When you became warden of  10:36:51
20  IMSI, what was your understanding of your  10:36:56
21  responsibilities with respect to the chemicals, in  10:37:00
22  particular?                              10:37:03
23    A. That I maintain their security, and monitor  10:37:03
24  the temperature in which they are kept, and maintain a  10:37:07
25  temperature log, and maintain a chain of custody  10:37:13

Page 66

1  documentation for them.                     10:37:17
2    Q. When you became warden -- and the date that I  10:37:17
3  have in particular for you becoming warden is June 10th,  10:37:20
4  2024; is that correct?                      10:37:25
5    A. It sounds accurate.                    10:37:26
6    Q. So on that day, when you became warden, were  10:37:27
7  there execution chemicals in your office?   10:37:31
8    A. Yes.                                  10:37:33
9    Q. Can you tell me where they were?       10:37:33
10    A. Yeah, they are secured in the desk.   10:37:36
11    Q. And using the first, second, third  10:37:39
12  terminology, can you tell me which of those were in the  10:37:45
13  desk?                                    10:37:48
14    A. I could only tell you that the third set was  10:37:48
15  not.                                     10:37:52
16    Q. Right.                                10:37:52
17    A. I don't know which -- of what I have, I  10:37:53
18  couldn't tell you without going through documentation,  10:37:57
19  maybe to tell you, if I had still some of the first  10:37:59
20  batch or not. I believe I had at least some of both  10:38:04
21  Batch 1 and Batch 2.                        10:38:09
22    Q. Did you -- let's talk about Batch 1 and Batch  10:38:14
23  2. And that's the first set, second set?    10:38:19
24    A. Yeah, first set. Sorry.               10:38:22
25    Q. No need to apologize. I'm just making sure  10:38:23

Page 67

1  we're talking about the same thing.         10:38:28
2        So did you look at the first and second sets  10:38:30
3  when you became warden?                     10:38:33
4    A. Yes.                                  10:38:34
5    Q. And what did you observe?             10:38:35
6    A. Just I had to account for them. So I knew  10:38:36
7  they were there. I checked them daily to make sure they  10:38:40
8  were still secured in my desk, and checked the  10:38:43
9  temperature for them.                       10:38:46
10    Q. What kind of packaging were they in?   10:38:47
11    A. In boxes.                             10:38:50
12    Q. Would you open the boxes?             10:38:52
13    A. I -- I don't know that I did.          10:38:56
14    Q. You just don't recall one way or the other?  10:39:04
15    A. Not specifically, no.                 10:39:07
16    Q. Did you have an understanding of whether that  10:39:16
17  was part of your responsibilities at all, to visually  10:39:20
18  observe the chemicals?                      10:39:22
19    A. Not -- no, I can't say. I know they are  10:39:27
20  there. I picked them up, that kind of thing. But  10:39:35
21  opening up each individual box, I don't think I did when  10:39:38
22  I first arrived, no.                       10:39:41
23    Q. When would you pick them up?           10:39:43
24    A. Just when I accounted for them, initially,  10:39:45
25  went through the log and that sort of thing. At one  10:39:49

Page 68

1  point, and I couldn't tell you when, I went through and  10:39:52
2  checked expiration dates on everything.     10:39:56
3    Q. How many boxes? And just talking about that  10:40:05
4  period of time now, where there's only the first set and  10:40:08
5  second set in the drawer, how many boxes were there?  10:40:11
6    A. I would have to go back to the log so I could  10:40:14
7  tell you how many I had.                     10:40:17
8    Q. Could you give me a rough estimate?     10:40:18
9    A. Oh, man, eight to 12. There were several  10:40:21
10  different sizes. I couldn't give you an exact count  10:40:30
11  without looking at the log.                  10:40:32
12    Q. Several different sizes of box?        10:40:35
13    A. Yes.                                  10:40:38
14    Q. And was it your understanding that there was  10:40:38
15  one vial? And by vial, I mean, a container within the  10:40:40
16  box. Was it your understanding that there was one vial  10:40:45
17  within each box?                           10:40:48
18    A. Yes.                                  10:40:49
19    Q. How did you -- what was that understanding  10:40:49
20  based on?                                 10:40:52
21    A. The fact that we opened one, and pulled the  10:40:53
22  instructions out to look at the temp range.  10:40:56
23    Q. Did the -- looking at the boxes, did the first  10:41:04
24  set and the second set look different to you?  10:41:12
25    A. I -- no.                              10:41:15

Page 69

18 (Pages 66 - 69)

Randy Valley, Redacted April 16, 2025

| | |
|---|---|
| 1 | Q. What -- 10:41:17 |
| 2 | A. I don't know what was first set and second 10:41:18 |
| 3 | set. 10:41:21 |
| 4 | Q. Were they -- were they marked in some way, 10:41:21 |
| 5 | apart from the -- did the Department mark them in some 10:41:24 |
| 6 | way to differentiate them? 10:41:29 |
| 7 | A. No. 10:41:31 |
| 8 | Q. We'll talk about a declaration that you filed 10:41:33 |
| 9 | in some detail later. But just before I move on, I 10:41:41 |
| 10 | think in the declaration, you used kind of a different 10:41:45 |
| 11 | labeling system than I've been using, where it's 10:41:49 |
| 12 | numbers. So it's 1 through 8, or something like that. 10:41:53 |
| 13 | Does that ring a bell to you? 10:41:57 |
| 14 | A. Yes. 10:41:58 |
| 15 | Q. So were those numbers on the boxes? 10:41:59 |
| 16 | A. No, not at that time. 10:42:02 |
| 17 | Q. Were there numbers added to the box? Were 10:42:04 |
| 18 | those numbers added to the boxes later? 10:42:08 |
| 19 | A. Yes. 10:42:13 |
| 20 | Q. And you said you looked at the expiration 10:42:22 |
| 21 | dates for the first and second sets at some point? 10:42:25 |
| 22 | A. Yes. 10:42:31 |
| 23 | Q. But you don't remember when that was? 10:42:31 |
| 24 | A. Not specifically, no. 10:42:33 |
| 25 | Q. Do you know if something precipitated you 10:42:34 |

Page 70

| | |
|---|---|
| 1 | looking at it, that led you to want to look at the 10:42:38 |
| 2 | expiration date? 10:42:41 |
| 3 | A. Not specifically. I knew that we were in the 10:42:43 |
| 4 | potential of getting a death warrant, and I wanted to 10:42:47 |
| 5 | make sure that we were prepared. So I believe I pulled 10:42:51 |
| 6 | them to look. 10:42:53 |
| 7 | Q. Did someone instruct you to do that? 10:42:55 |
| 8 | A. I don't believe so. 10:42:58 |
| 9 | Q. Do you remember what expiration dates you saw? 10:43:02 |
| 10 | A. Specifically, no. 10:43:06 |
| 11 | Q. Do you remember roughly what expiration dates 10:43:08 |
| 12 | you saw? 10:43:12 |
| 13 | A. I believe there were chemicals that were due 10:43:14 |
| 14 | to expire in September. And then some, I believe, that 10:43:20 |
| 15 | expired in -- so September of '24. And then there were 10:43:28 |
| 16 | some that were set to expire in February of '25, I 10:43:34 |
| 17 | believe. 10:43:42 |
| 18 | Q. Do you recall whether the expiration date was 10:43:42 |
| 19 | expressed in terms of a specific day, as opposed to a 10:43:45 |
| 20 | month and a year? 10:43:49 |
| 21 | A. They are by a month is how it's listed on the 10:43:51 |
| 22 | vial. 10:43:55 |
| 23 | Q. Did you have an understanding of, when you saw 10:43:55 |
| 24 | those two expiration dates -- well, let me start. Did 10:43:59 |
| 25 | you look at every vial? 10:44:03 |

Page 71

| | |
|---|---|
| 1 | A. I did. 10:44:05 |
| 2 | Q. And at that time, there were two sets; there 10:44:06 |
| 3 | was a first set and a second set? 10:44:10 |
| 4 | A. All I had was documentation for what was in 10:44:12 |
| 5 | the drawer. So I know that there were batches that were 10:44:15 |
| 6 | brought in at two different -- or sorry -- sets that 10:44:18 |
| 7 | were brought in two different times. But I didn't know 10:44:22 |
| 8 | whether I had both, or one or the other. 10:44:25 |
| 9 | Q. Was anything communicated to you about 10:44:27 |
| 10 | expiration dates, what they were or -- 10:44:30 |
| 11 | A. Not that I recall. 10:44:35 |
| 12 | Q. We might come back to this a little later. 10:44:36 |
| 13 | But were there vials that were empty at that time? 10:44:57 |
| 14 | A. Yes. 10:45:01 |
| 15 | Q. How many? 10:45:01 |
| 16 | A. I don't recall. 10:45:04 |
| 17 | Q. And those vials that were empty, they were 10:45:06 |
| 18 | also in boxes? 10:45:09 |
| 19 | A. Yes. 10:45:12 |
| 20 | Q. Let's talk about the acquisition now of the 10:45:23 |
| 21 | third set of execution drugs. Well, maybe I'll start 10:45:27 |
| 22 | actually with 2011, 2012, the Rhoades and Leavitt 10:45:34 |
| 23 | executions. Were you involved in the acquisition of 10:45:40 |
| 24 | those drugs at all? 10:45:42 |
| 25 | A. No. 10:45:44 |

Page 72

| | |
|---|---|
| 1 | MS. SCHINDELE: Again, objection based on 10:45:44 |
| 2 | relevance. 10:45:46 |
| 3 | But you can go ahead and answer. 10:45:48 |
| 4 | THE WITNESS: No. 10:45:50 |
| 5 | Q. (BY MR. HORWITZ) You are off the hook on that 10:45:50 |
| 6 | one. 10:45:52 |
| 7 | A. Sorry. 10:45:52 |
| 8 | Q. Were you involved in the, what I would call, 10:45:53 |
| 9 | the search for drugs after becoming warden? And now, 10:45:56 |
| 10 | I'll just be focused on your time as warden at IMSI, so 10:46:01 |
| 11 | starting in June of 2024. Were you involved in the 10:46:06 |
| 12 | search for the chemicals for executions during that 10:46:08 |
| 13 | period? 10:46:10 |
| 14 | A. No. 10:46:10 |
| 15 | Q. Were you asked to be involved? 10:46:10 |
| 16 | A. No. 10:46:12 |
| 17 | Q. Do you know who was involved in that? 10:46:14 |
| 18 | A. No. 10:46:16 |
| 19 | (Exhibit 3 marked.) 10:46:16 |
| 20 | Q. (BY MR. HORWITZ) Let's look at Exhibit 3 now. 10:46:29 |
| 21 | So this is the "Chain of Custody" form. Is this a form 10:46:32 |
| 22 | you've seen before? 10:46:37 |
| 23 | A. Yes. 10:46:38 |
| 24 | Q. Is your handwriting on this? And this is 10:46:38 |
| 25 | double-sided. This is a two-page exhibit. Do you see 10:46:42 |

Page 73

19 (Pages 70 - 73)

Randy Valley, Redacted April 16, 2025

**Page 74**

1  your handwriting on either page?          10:46:46
2      A. Both.                          10:46:48
3      Q. Can you tell me where your handwriting is?   10:46:48
4      A. So on the first page, all of that is my      10:46:51
5  handwriting. Other than probably the receipt   10:46:55
6  which -- and then on the back, my handwriting starts on   10:46:59
7  the section dated 6-24, 2024. That is my handwriting   10:47:04
8  where it says, "Warden Tim Richardson, received by   10:47:10
9  Warden Valley." And that, the rest of that is -- well,   10:47:15
10  yeah, the rest of it's mine.          10:47:18
11      Q. This is just a yes or no question. The places   10:47:22
12  on this form where there are redactions after "Received   10:47:28
13  From." It looks like there are three such redactions.   10:47:33
14  Do you see those?                  10:47:40
15      A. Yes.                          10:47:41
16      Q. Do you know what is redacted?          10:47:41
17      A. In terms of who received them or who delivered   10:47:44
18  them.                          10:47:48
19      Q. Well, do you know the --          10:47:48
20      A. Do I know the person?          10:47:50
21      Q. Yes, do you know the specific words redacted,   10:47:51
22  or text redacted?                  10:47:55
23      A. I would say, not for the first one on this   10:48:00
24  back page. But the others -- what's the date on this?   10:48:03
25  So on the first page, on page 1, yes, I know the name   10:48:17

**Page 75**

1  that is there. And on the first or the second block,   10:48:23
2  dated 10/24/24, I would say, yes. But the bottom one,   10:48:28
3  and the top one on that page, I do not know what was   10:48:33
4  redacted.                          10:48:37
5      Q. Got it. Thank you for your clarity there.   10:48:38
6  Did you write down the name that was redacted for those   10:48:42
7  ones that you said you do know what is redacted?   10:48:46
8      A. Yes.                          10:48:50
9      Q. And again, a yes or no question. Is that, the   10:48:50
10  name that you redacted, is that the person from whom you   10:48:53
11  obtained the third set of execution drugs?      10:48:58
12      A. Yes.                          10:49:02
13      Q. Is it the same name?              10:49:07
14      MS. SCHINDELE: Objection; confidentiality.   10:49:09
15      Q. (BY MR. HORWITZ) Let's talk about the text on   10:49:20
16  the second page of the exhibit, about two-thirds of the   10:49:23
17  way down. It says "Date: 10-24, 2024, time: 8:07   10:49:30
18  a.m." And there is a handwritten notation that says,   10:49:38
19  "Removed expired returned to supplier." Do you see   10:49:42
20  where I am?                      10:49:47
21      A. Yes.                          10:49:48
22      Q. Did you write that?              10:49:48
23      A. Yes.                          10:49:50
24      Q. And did you return the chemicals referred to   10:49:50
25  here to the supplier?                  10:49:50

**Page 76**

1      A. No.                          10:49:54
2      Q. Do you know who did?              10:49:54
3      A. No.                          10:49:55
4      Q. What led you to make this notation?      10:49:58
5      A. The purpose of me delivering the chemical to   10:50:02
6  the person that I did, was so that they could be   10:50:05
7  returned to the supplier.              10:50:10
8      Q. Can you elaborate a little bit? The      10:50:11
9  purpose -- can you say what you just said again?   10:50:16
10      A. Yeah, the chemicals were expired. I knew they   10:50:19
11  were going to be returned to the supplier. And so an   10:50:24
12  individual came and collected those from me to return   10:50:27
13  them. Now, who did that? I don't know.      10:50:30
14      Q. Did you see that person?          10:50:33
15      A. The person that I gave them to, yes.      10:50:35
16      Q. Do you know who that person is?      10:50:38
17      A. That's the person that's redacted.      10:50:40
18      Q. Is that person an IDOC employee?      10:50:49
19      MS. SCHINDELE: Objection; confidentiality.   10:50:54
20      Q. (BY MR. HORWITZ) Can you tell me about the   10:50:57
21  process that led to those chemicals being returned to   10:51:01
22  the supplier? And maybe we can just start with, were   10:51:07
23  you the one that observed that the expiration date had   10:51:11
24  come?                          10:51:16
25      A. Yes.                          10:51:17

**Page 77**

1      Q. And who did you discuss that with?      10:51:17
2      A. A member of the administrative team.      10:51:23
3      Q. Who is that person?              10:51:27
4      A. I believe -- I believe I spoke to Liz Neville   10:51:28
5  regarding that.                      10:51:37
6      Q. And did someone then instruct you to return   10:51:38
7  them to the supplier?                  10:51:42
8      A. I was instructed that someone would be out to   10:51:46
9  pick them up to have them returned to the supplier.   10:51:50
10      Q. Who conveyed that information to you?      10:51:54
11      A. I believe that was Liz Neville.          10:52:02
12      Q. Where did they -- this person who picked up   10:52:05
13  the chemicals, where did that occur?          10:52:08
14      MS. SCHINDELE: Objection; confidentiality.   10:52:11
15      Q. (BY MR. HORWITZ) Maybe -- I assume that will   10:52:15
16  be the same objection, but just to preserve our record.   10:52:16
17  Did that exchange occur at IMSI?          10:52:20
18      MS. SCHINDELE: Objection; confidentiality.   10:52:25
19      Q. (BY MR. HORWITZ) Did you discuss the   10:52:32
20  expiration of the drugs with anyone apart from   10:52:34
21  Ms. Neville?                      10:52:39
22      A. I believe I spoke to the director at one point   10:52:40
23  in regards to that.                  10:52:45
24      Q. Can you tell me about the nature of that   10:52:47
25  conversation?                      10:52:49

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 121968

Randy Valley, Redacted April 16, 2025

| | |
|---|---|
| 1  A. I'm pretty sure I notified him. The full    10:52:50 | 1  A. Chad Page, that appears to be Chad Page's    10:55:49 |
| 2  context of that conversation, I don't recall.    10:52:56 | 2  signature on the left --    10:55:56 |
| 3  Q. And maybe you already answered this. But it    10:52:58 | 3  Q. What --    10:55:56 |
| 4  was Ms. Neville who told you the supplier will be    10:53:02 | 4  A. -- where it says vendor. Yeah, I believe    10:55:58 |
| 5  picking up the drugs, or this individual will be picking    10:53:06 | 5  that's his. I don't -- now, I'm questioning that. The    10:56:01 |
| 6  up the drugs?    10:53:11 | 6  IDOC witness is the top one, I believe, is Liz    10:56:09 |
| 7  A. I was notified, someone would be out to    10:53:13 | 7  Neville's.    10:56:15 |
| 8  collect them.    10:53:18 | 8  Q. And what about the initials in the middle, at    10:56:16 |
| 9  Q. The time on this form, 8:07, does that refer    10:53:18 | 9  the bottom, "CP"?    10:56:19 |
| 10  to the time that the drugs were -- that you handed the    10:53:24 | 10  A. And that's probably why I think that's Chad    10:56:20 |
| 11  drugs off to this person?    10:53:27 | 11  Page's signature. I can't guarantee that.    10:56:26 |
| 12  A. Yes.    10:53:29 | 12  Q. Is Chad Page someone that you've had    10:56:28 |
| 13  Q. Can you give me a sense of that timeline; how    10:53:41 | 13  conversations with about executions?    10:56:34 |
| 14  long it took between when you noted the expiration date,    10:53:46 | 14  A. Yes.    10:56:35 |
| 15  and when you returned them?    10:53:50 | 15  Q. Can you give me a sense of what sort of    10:56:36 |
| 16  A. No.    10:53:51 | 16  conversations those have been?    10:56:39 |
| 17  Q. Just roughly?    10:53:52 | 17  A. No, he's just chief of prison, so he's present    10:56:41 |
| 18  A. Maybe a month. I'm not sure.    10:53:54 | 18  for trainings typically.    10:56:46 |
| 19  Q. Do you know what was happening during that    10:53:59 | 19  Q. What about in terms of the acquisition of the    10:56:46 |
| 20  time?    10:54:03 | 20  drugs, is that something you've talked with him about at    10:56:49 |
| 21  A. Could you be more specific?    10:54:04 | 21  all?    10:56:55 |
| 22  Q. Yeah. Do you have any knowledge about why, if    10:54:06 | 22  A. No.    10:56:55 |
| 23  it was a month, say, why it was a month in particular    10:54:10 | 23  Q. So the acquisition of the third set of    10:56:55 |
| 24  that passed during that time?    10:54:12 | 24  execution drugs, those are drugs that you obtained for    10:56:59 |
| 25  A. No.    10:54:18 | 25  IDOC? I'll stop there. Those are drugs that you    10:57:13 |
| Page 78 | Page 80 |
| 1  Q. Is there any other paperwork associated with    10:54:20 | 1  obtained for IDOC?    10:57:18 |
| 2  the return of the chemical to the supplier after it was    10:54:25 | 2  A. I received them. I did not obtain them.    10:57:21 |
| 3  expired, apart from this form, that you are aware of?    10:54:30 | 3  Q. Okay. We've sort of been using the word    10:57:26 |
| 4  A. Not that I'm aware of.    10:54:34 | 4  "source" or "supplier." Is that a word that you would    10:57:28 |
| 5  (Exhibit 4 marked.)    10:54:41 | 5  use to describe the individual or individuals from whom    10:57:30 |
| 6  Q. (BY MR. HORWITZ) Let's talk about Exhibit 4.    10:54:42 | 6  you acquired these drugs?    10:57:34 |
| 7  So Exhibit 4 is what I -- we'll refer to as a purchase    10:54:49 | 7  MS. SCHINDELE: Objection; confidentiality.    10:57:36 |
| 8  order. And I can just tell you, for purposes of our    10:54:54 | 8  Q. (BY MR. HORWITZ) I guess partly I'm just    10:57:39 |
| 9  conversation, this is a purchase order that, as we    10:54:57 | 9  trying to understand the sort of big picture of your    10:57:41 |
| 10  understand it, is associated with the October 2024    10:55:00 | 10  role. So the third set of execution drugs, they were    10:57:45 |
| 11  acquisition of execution of drugs. So that would be the    10:55:04 | 11  not in IDOC. They were not in possession of an IDOC    10:57:50 |
| 12  third set.    10:55:08 | 12  employee. Let's just assume that with me. And then    10:57:58 |
| 13  Is this a document you've seen?    10:55:09 | 13  they entered the possession of an IDOC employee. And    10:58:01 |
| 14  A. No.    10:55:12 | 14  where I'm -- what I'm trying to start with is just to    10:58:05 |
| 15  Q. Do you -- do you know who made any of the    10:55:18 | 15  establish that you were that -- you were the person    10:58:09 |
| 16  signatures at the bottom of this document?    10:55:20 | 16  that brought the drugs into IDOC's possession?    10:58:11 |
| 17  A. I believe so.    10:55:22 | 17  MS. SCHINDELE: Objection; confidentiality.    10:58:19 |
| 18  Q. Tell me what -- what you know about them?    10:55:24 | 18  Q. (BY MR. HORWITZ) Okay. Well, why don't I    10:58:24 |
| 19  A. I believe that is Chad Page's signature, and I    10:55:27 | 19  just let you tell me, in your own words, since I'm    10:58:25 |
| 20  believe that to be Liz Neville's signature. I don't    10:55:33 | 20  having some trouble here, what your involvement was with    10:58:29 |
| 21  know the witness signature, the second witness    10:55:36 | 21  the third set of execution drugs?    10:58:36 |
| 22  signature. I don't know.    10:55:39 | 22  A. I received them, and put them in    10:58:39 |
| 23  Q. So can you tell me where do you see    10:55:40 | 23  the -- secured them in the drawer with the rest of them.    10:58:41 |
| 24  Ms. Neville's signature, and where do you see Chad    10:55:43 | 24  And I filled out the chain of custody for them. I, at    10:58:45 |
| 25  Page's signature?    10:55:48 | 25  that point, labeled them, so I knew what I had received    10:58:49 |
| Page 79 | Page 81 |

21 (Pages 78 - 81)

Randy Valley, Redacted April 16, 2025

---

1  and could account for them as they were drawn, or     10:58:52
2  pulled, or removed for any reason, I could identify what  10:58:57
3  came when.                                              10:59:00
4      Q. And is that the point at which the labeling      10:59:01
5  system, that we've talked about with the number of      10:59:05
6  vials, that's when that was done?                       10:59:07
7      A. Yes.                                             10:59:07
8      Q. Can you tell me how you labeled the vials?       10:59:10
9      A. I just numbered them. I believe it was 1         10:59:13
10 through 8.                                              10:59:17
11     Q. On the vials, themselves?                        10:59:18
12     A. On the box that they are in.                     10:59:20
13     Q. With what, what did you use to mark them?        10:59:22
14     A. I believe just a pen.                            10:59:24
15     Q. Do you -- and counsel may have some guides for   10:59:28
16 you on this, but can you tell me anything about the      10:59:35
17 immediate lead-up to those drugs being delivered to you? 10:59:43
18 How the arrangements were made? How a day and time were 10:59:47
19 selected, that kind of thing?                           10:59:51
20     A. No.                                              10:59:53
21     Q. Did you get guidance from someone on how to      10:59:53
22 pick up the drugs?                                      11:00:02
23     A. No.                                              11:00:05
24     Q. Did you meet in person the individual or         11:00:08
25 individuals who was handing off the drugs?              11:00:13

Page 82

---

1      A. To me, yes.                                      11:00:18
2      Q. Where did that meeting occur?                    11:00:19
3      MS. SCHINDELE: Objection; confidentiality.          11:00:25
4      Q. (BY MR. HORWITZ) And I think it will be the      11:00:28
5  same thing again, but did that meeting occur at IMSI?    11:00:30
6      MS. SCHINDELE: Objection; confidentiality.          11:00:37
7      Q. (BY MR. HORWITZ) Maybe to go back to the         11:00:39
8  earlier question. If you did meet that person --         11:00:41
9      If you met with that individual or individuals      11:00:49
10 in person, how did you know to be at the place that you  11:00:53
11 met them that day and time?                              11:00:56
12     A. I was notified of that they would be             11:00:58
13 delivering to me.                                        11:01:01
14     Q. Who notified you?                                11:01:02
15     MS. SCHINDELE: Objection; confidentiality.          11:01:06
16     Q. (BY MR. HORWITZ) Was it an IDOC employee that    11:01:10
17 notified you?                                            11:01:13
18     MS. SCHINDELE: Objection; confidentiality.          11:01:14
19     Q. (BY MR. HORWITZ) What was the method by which    11:01:17
20 that notification was transmitted?                       11:01:21
21     A. I believe a phone call.                          11:01:23
22     Q. Can you tell me what, if anything, you did,      11:01:32
23 apart from the labeling, in the way of a visual          11:01:36
24 inspection of the third set of execution chemicals?      11:01:41
25     A. Not that I can think of.                         11:01:45

Page 83

---

1      Q. Did you look at the -- did you open the boxes? 11:01:48
2      A. I believe so.                                    11:01:54
3      Q. And did you look at the vials?                   11:01:54
4      A. I believe so, yes.                               11:01:57
5      Q. Can you tell me what you saw when you looked     11:01:58
6  at the vials?                                           11:02:03
7      A. I was looking for just to ensure that there      11:02:06
8  was chemical there, and to verify expiration dates, so I 11:02:09
9  knew that I wouldn't have to go in later and identify    11:02:14
10 that.                                                    11:02:17
11     Q. Do you recall what the chemical looked like?     11:02:20
12     A. Not specifically.                                11:02:23
13     Q. Were you looking for anything in particular      11:02:25
14 when you observed the chemical?                          11:02:28
15     A. No.                                              11:02:31
16     Q. Was the box sealed in any way before you         11:02:34
17 opened it?                                               11:02:37
18     A. No, I don't believe so.                          11:02:41
19     Q. Did it appear to you that the box had been       11:02:43
20 opened previously?                                       11:02:47
21     A. No, not that I recall.                           11:02:48
22     Q. Can you describe what the boxes look like,       11:03:04
23 just in general terms?                                   11:03:08
24     A. I'm not sure. Can you be more specific?          11:03:09
25     Q. Sure, would they -- were they boxes              11:03:12

Page 84

---

1  that -- the kind of boxes you would expect to see, say,  11:03:16
2  if you were buying a medication at a pharmacy, or were   11:03:19
3  they another -- a different type of a box?               11:03:25
4      A. No, it looks like something if I ordered         11:03:27
5  something at a pharmacy, or went to the doctor's office, 11:03:32
6  and they pulled something out. That's what it would      11:03:36
7  appear to be like.                                       11:03:38
8      Q. And when you obtained them, were they -- were    11:03:40
9  they in any kind of bigger box, or package, or were they 11:03:43
10 always in that same type of box?                         11:03:48
11     A. I don't recall them being in additional          11:03:50
12 packaging, outside of the packaging that the vials,      11:03:56
13 individual vials come in.                                11:03:59
14     Q. And is it your recollection that you -- that     11:04:01
15 you were holding those individual boxes from the time    11:04:04
16 that you obtained them?                                   11:04:07
17     A. Could you be more -- explain that?               11:04:09
18     Q. Sure. So the boxes that we're talking about      11:04:12
19 that are in the -- or the -- yeah, I suppose that are     11:04:17
20 still in the drawer -- well, how many of those boxes are  11:04:19
21 there for the third set?                                  11:04:22
22     A. I believe there is eight total.                  11:04:24
23     Q. So those eight boxes, how were they -- were      11:04:26
24 they in a bag, or, you know, a suitcase, or something?    11:04:29
25 How were they handed to you?                             11:04:34

Page 85

---

22 (Pages 82 - 85)

Randy Valley, Redacted April 16, 2025

| | |
|---|---|
| 1    A. I don't recall.                              11:04:36 | 1    A. I am not.                                    11:06:49 |
| 2    Q. Okay. You don't remember taking them out of  11:04:37 | 2    Q. You are not familiar with the word Nembutal?  11:06:50 |
| 3  anything larger?                                   11:04:41 | 3    A. No.                                          11:06:55 |
| 4    A. I do not.                                     11:04:42 | 4    Q. Are you familiar with what a package insert  11:07:02 |
| 5    Q. Just a yes or no question. Is the            11:04:46 | 5  is?                                              11:07:05 |
| 6  manufacturer's name on those boxes for the third set?  11:04:49 | 6    A. Yes.                                         11:07:05 |
| 7    A. I don't know. I've never looked for that.    11:04:55 | 7    Q. Were there package inserts for the third set  11:07:05 |
| 8    Q. And the same question for the first and second  11:04:58 | 8  of execution drugs?                               11:07:08 |
| 9  set?                                               11:05:02 | 9    A. Yes.                                         11:07:11 |
| 10   A. Yeah, I've never looked at -- looked for that  11:05:02 | 10   Q. Did you look at those?                       11:07:13 |
| 11 information.                                       11:05:08 | 11   A. I believe so, yes.                           11:07:15 |
| 12   Q. What -- did you look at any of the writing on  11:05:11 | 12   Q. What did you see on those?                   11:07:16 |
| 13 the boxes?                                         11:05:13 | 13   A. I was pulling it out, I believe, there       11:07:20 |
| 14   A. Just the amounts. It's a -- at the -- what   11:05:15 | 14 was -- just to look at the temp range, which I don't  11:07:25 |
| 15 each vial contains, because I have to account for it on  11:05:20 | 15 specifically recall what it is. But just verifying that  11:07:28 |
| 16 the chain of custody, and what the chemical is that's in  11:05:25 | 16 the temperature it was being kept at was within that  11:07:33 |
| 17 it.                                                11:05:30 | 17 range.                                            11:07:40 |
| 18   Q. Nothing else?                                 11:05:30 | 18   Q. And I will have some more questions about the  11:07:40 |
| 19   A. Never really paid much -- well, and the      11:05:31 | 19 temperature range. But just with the package inserts,  11:07:43 |
| 20 expiration date, are the three things on the vial that I  11:05:34 | 20 did you look at those for all three sets?          11:07:47 |
| 21 look at.                                           11:05:39 | 21   A. I was shown one when I did the chain of      11:07:49 |
| 22   Q. Did you, even if you weren't looking for it,  11:05:39 | 22 custody initially with Richardson. I don't know -- I  11:07:54 |
| 23 did you see any other text that you can recall on the  11:05:42 | 23 couldn't tell you if that was first set, second set. I  11:07:58 |
| 24 boxes?                                             11:05:46 | 24 only looked at one. And then I did pull one on the  11:08:04 |
| 25   A. Not specifically.                             11:05:47 | 25 third set.                                        11:08:07 |
| Page 86 | Page 88 |

| | |
|---|---|
| 1    Q. And what about the vials, are you looking --  11:05:48 | 1    Q. Is that a one-page document, the package      11:08:07 |
| 2  what are you --                                    11:05:50 | 2  insert?                                            11:08:13 |
| 3    A. The vials are where I go to get that          11:05:50 | 3    A. It's a single sheet of paper, yes.           11:08:13 |
| 4  information, not from the box.                     11:05:53 | 4    Q. And where is that? That's folded within the  11:08:16 |
| 5    Q. Okay. There is nothing you are looking for on  11:05:57 | 5  box?                                              11:08:21 |
| 6  the box, itself?                                   11:05:59 | 6    A. Yes.                                         11:08:22 |
| 7    A. No.                                           11:06:01 | 7    Q. And those are still in the boxes?            11:08:27 |
| 8    Q. Do you --                                     11:06:01 | 8    A. I believe so, yes.                           11:08:33 |
| 9    A. The --                                        11:06:04 | 9    Q. Was anything redacted on the boxes, or the   11:08:34 |
| 10   Q. Oh, sorry.                                    11:06:04 | 10 vials, or the package insert?                      11:08:45 |
| 11   A. The weight may be on the box, but I don't     11:06:05 | 11   A. Not that I recall.                           11:08:47 |
| 12 believe the expiration dates are. I've typically pulled  11:06:08 | 12   Q. We've talked about this a little bit, but just  11:09:02 |
| 13 the vials to look for that.                        11:06:12 | 13 to make sure we've nailed it down. What was your   11:09:05 |
| 14   Q. And when you say "the weight," that's the    11:06:12 | 14 understanding of how to store the chemicals when you  11:09:09 |
| 15 information about size --                          11:06:14 | 15 obtained the third set?                            11:09:12 |
| 16   A. Yes.                                          11:06:14 | 16   A. The same as previously. That I keep them     11:09:14 |
| 17   Q. -- that you are looking for, for the chain of  11:06:20 | 17 secured, and monitor the temperature at which they are  11:09:19 |
| 18 custody form?                                      11:06:22 | 18 stored at.                                        11:09:23 |
| 19   A. Yes.                                          11:06:23 | 19   Q. And secured in that same drawer in your desk  11:09:24 |
| 20   Q. So if the chain of custody form, Exhibit 3,   11:06:25 | 20 where the first and second sets are?               11:09:28 |
| 21 says pentobarbital, is that the word that you are   11:06:29 | 21   A. Correct.                                     11:09:32 |
| 22 looking for on the vial?                           11:06:35 | 22   Q. And that -- where were those -- or how did you  11:09:32 |
| 23   A. Yes, I believe so.                            11:06:38 | 23 receive that guidance?                             11:09:35 |
| 24   Q. Are you familiar with the other names for this  11:06:42 | 24   A. I don't know that I received it, specifically.  11:09:36 |
| 25 same chemical?                                     11:06:48 | 25 It's just my understanding based on the SOP.       11:09:40 |
| Page 87 | Page 89 |

23 (Pages 86 - 89)

Page 90

```
1    Q. Do you know anything about how that third set   11:09:46
2  got to you, where they might have been before? Just a   11:09:50
3  yes or no.                          11:09:56
4    A. No.                           11:09:57
5    Q. Do you know anything about how long it might   11:09:57
6  have taken for that third set to reach you?          11:09:59
7    A. No. Outside of I know when I -- yeah, not   11:10:03
8  specifically, no.                     11:10:09
9    Q. Do you know anything about the country of   11:10:10
10 origin of the third set?                11:10:17
11   A. No.                          11:10:20
12   Q. Do you know anything about what states the   11:10:20
13 third set might have passed through?          11:10:23
14   A. No.                          11:10:31
15   (Exhibit 5 marked.)                  11:10:31
16   Q. (BY MR. HORWITZ) Let's turn to your      11:10:32
17 declaration. So this is Exhibit 5. This a declaration   11:10:35
18 that was filed in federal district court. It was filed   11:10:39
19 on October 31st, 2024. It's dated October 16th, 2024.   11:10:43
20   MR. SMITH: Wait, what. October 16th?     11:10:55
21   MR. HORWITZ: I think so. Oh, I am sorry. I   11:11:00
22 am looking at the wrong date. No, it's dated October   11:11:01
23 31st, the same date. Thank you, Tanner.       11:11:06
24   Q. (BY MR. HORWITZ) So this is a declaration   11:11:10
25 that you signed. And there is some language in   11:11:12
```

Page 91

```
1  particular that I want to discuss with you in the   11:11:14
2  declaration.                        11:11:21
3    So on page 4, in paragraph 18, you refer to   11:11:22
4  the execution chemicals as "certified manufactured   11:11:29
5  pentobarbital." Do you see the --          11:11:38
6    A. Uh-huh.                       11:11:38
7    Q. -- where I'm looking?              11:11:39
8    All right. Can you tell me what you meant by   11:11:41
9  that? And let's actually break it down. Tell me what   11:11:43
10 you meant by "certified," in particular, to start?   11:11:47
11   A. That was the guidance that was provided.   11:11:51
12   Q. Who provided that guidance to you?      11:11:59
13   A. I don't know the answer to that off the top of   11:12:01
14 my head. This was a while ago.             11:12:04
15   Q. Sure. Do you remember who you worked with on   11:12:06
16 this declaration?                     11:12:10
17   A. Legal and probably Liz Neville.       11:12:13
18   Q. Okay. And you don't remember doing anything   11:12:18
19 in particular to confirm the pentobarbital was   11:12:20
20 certified?                          11:12:25
21   A. Not that I recall.                11:12:25
22   Q. What about the word "manufactured"? How do   11:12:27
23 you know that the pentobarbital is manufactured?   11:12:32
24   A. By my understanding, there are two different   11:12:37
25 types. And so one comes in a liquid form, and one comes   11:12:41
```

Page 92

```
1  in a powdered form. And this is a liquid form.    11:12:46
2    Q. And that was the basis for you describing the   11:12:46
3  drugs --                          11:12:50
4    A. Yes.                        11:12:50
5    Q. -- that's manufactured?             11:12:52
6    You didn't do anything, apart from         11:12:56
7  ascertaining that the drugs were in a liquid form,   11:12:59
8  before stating that they were manufactured?       11:13:03
9    A. Not that I recall, no.              11:13:05
10   Q. Can you tell me what the word "manufactured"   11:13:07
11 means to you? What you understand that to mean?   11:13:13
12   A. I believe I just did. That it comes as a   11:13:16
13 chemical ready to be utilized, versus one that comes in   11:13:20
14 a form that needs to be, by my understanding,      11:13:24
15 compounded. What that entails, I couldn't tell you.   11:13:29
16   Q. Okay. Because that's really what I was   11:13:31
17 getting at, is whether you have an understanding of what   11:13:36
18 the production process has to be in order for a drug to   11:13:37
19 be manufactured?                     11:13:40
20   A. I do not.                     11:13:44
21   Q. Okay. On page 6 of this declaration, so on   11:13:48
22 paragraph 28, you refer to the execution chemicals as   11:14:06
23 being "compliant with all applicable regulations." Can   11:14:10
24 you tell me what you meant by that?           11:14:21
25   A. That that's my understanding, is that all of   11:14:21
```

Page 93

```
1  them meet applicable regulations. It is what I have   11:14:21
2  been informed.                       11:14:27
3    Q. Who informed you of that?            11:14:27
4    A. That when they were delivered to me and   11:14:28
5  through -- yeah, just when they were delivered to me.   11:14:31
6    Q. By the --                      11:14:35
7    A. Individual that delivered them.        11:14:36
8    Q. Is that the language that person used?   11:14:40
9    A. I don't recall exactly what the language was,   11:14:46
10 but that was my understanding when I received them.   11:14:51
11   Q. Apart from these words, do you have a belief   11:14:55
12 about what the applicable regulations are or what they   11:15:01
13 would require?                       11:15:06
14   A. I do not. It's just what I've been informed.   11:15:07
15   Q. And if this phrase did not come from the   11:15:12
16 person who delivered the drugs, where would the phrase   11:15:16
17 have come from?                      11:15:19
18   A. I can't answer that, I don't know.       11:15:22
19   Q. Do you think it's possible that the phrase   11:15:32
20 came from someone that you were working with the   11:15:35
21 declaration on, like counsel?             11:15:38
22   A. Yes.                        11:15:42
23   Q. But you are not sure one way or the other?   11:15:42
24   A. I'm not. I know when I initially received   11:15:45
25 them, I was explained that this is what they are, that   11:15:47
```

**Page 94**

1  they meet compliance, and all of that. How the exact   11:15:50
2  term is used, I couldn't answer.   11:15:56
3      Q. Have you ever looked at any drug regulations?   11:15:58
4      A. No.   11:16:02
5      Q. During that conversation with the person who   11:16:05
6  delivered the drugs, do you think they explained   11:16:08
7  anything to you about drug regulations?   11:16:11
8      A. Specifically to drug regulations, no.   11:16:14
9      Q. Or is there something more general that they   11:16:18
10 discussed with you that might be relevant?   11:16:23
11     A. No, not as it applies to the regulations, no.   11:16:28
12     Q. If -- just as a hypothetical, if IDOC obtained   11:16:46
13 an execution drug that was made by a manufacturer that   11:16:52
14 opposes the use of their products in executions, would   11:16:56
15 you consider that to be in conformity with all   11:17:01
16 applicable regulations?   11:17:04
17     A. No.   11:17:06
18     Q. You would consider that to violate the   11:17:06
19 regulations?   11:17:10
20     A. No, I don't know that I would consider that to   11:17:11
21 violate the regulations. If there -- depending on what   11:17:20
22 the regulations are. I don't -- I can't answer that. I   11:17:23
23 don't know what the regulations are in terms to that   11:17:27
24 specifically.   11:17:32
25     Q. If you knew that about -- well, maybe I'll   11:17:33

**Page 95**

1  just say, do you know whether that is the case with   11:17:40
2  respect to IDOC's execution drugs?   11:17:43
3      A. I do not.   11:17:48
4      MS. SCHINDELE: Objection; confidentiality.   11:17:50
5      Q. (BY MR. HORWITZ) If you had known that,   11:17:54
6  again, in a hypothetical world, where you do know that   11:17:57
7  the drugs were made by a manufacturer that opposes the   11:18:00
8  use of their medications in executions, would you still   11:18:05
9  have been comfortable including this language in your   11:18:12
10 declaration?   11:18:14
11     A. I would have had to seek legal guidance on   11:18:16
12 whether or not that applies to applicable regulations.   11:18:20
13 I would have to seek guidance on that. I couldn't   11:18:23
14 answer that.   11:18:27
15     Q. Do you know anything about the qualifications   11:18:27
16 of the person who delivered the drugs to you?   11:18:30
17     A. I do not.   11:18:32
18     Q. And just a yes or no question. Do you know   11:18:33
19 what their job is?   11:18:36
20     A. Yes.   11:18:38
21     Q. What is their job?   11:18:41
22     MS. SCHINDELE: Objection; confidentiality.   11:18:45
23     Q. (BY MR. HORWITZ) Do you know anything about   11:18:51
24 requirements having to do with controlled substances   11:18:54
25 prescriptions?   11:18:59

**Page 96**

1      A. Could you repeat that?   11:19:00
2      Q. Sure. Do you know anything about requirements   11:19:02
3  that relate to drugs that can only be distributed under   11:19:05
4  a doctor's prescription?   11:19:13
5      A. In general terms, I mean, I'm aware of some   11:19:16
6  that are -- that meet that, that aren't of what we would   11:19:22
7  call over the counter, and have the best way I could   11:19:26
8  describe it. You have over-the-counter medications, and   11:19:30
9  you have medications that have to be -- that are   11:19:33
10 controlled, and have to be dispensed.   11:19:35
11     Q. Do you have an understanding of where the   11:19:37
12 execution chemicals would fall in that?   11:19:40
13     A. I do not.   11:19:44
14     Q. How do you know the job of the person who   11:19:48
15 delivered the drugs to you?   11:20:05
16     MS. SCHINDELE: Objection; confidentiality.   11:20:05
17     Q. (BY MR. HORWITZ) Let me direct you to   11:20:11
18 paragraph 30 in your declaration. So it states here   11:20:11
19 that the pentobarbital was "manufactured by an   11:20:16
20 FDA-approved manufacturer." How do you know that's   11:20:20
21 the case, FDA approval, in particular?   11:20:22
22     A. It is what I was notified of.   11:20:25
23     Q. How were you notified of that?   11:20:30
24     A. When we were going through this process,   11:20:31
25 that's what I was provided for in information.   11:20:34

**Page 97**

1      Q. Do you remember who provided that information?   11:20:36
2      A. I do not.   11:20:39
3      Q. The following paragraph, paragraph 31 states,   11:20:42
4  "None of IDOC execution chemicals have been tampered   11:20:46
5  with." How do you know that to be true?   11:20:51
6      A. They have lids on them that, I think, that are   11:20:54
7  to seal them. They can't be reapplied like a chemical   11:20:56
8  would.   11:21:00
9      Q. And the lid is on the vial?   11:21:00
10     A. Correct.   11:21:02
11     Q. And you've checked those lids?   11:21:02
12     A. I've opened the boxes, yes.   11:21:04
13     Q. How do you check the lid?   11:21:08
14     A. It's either on, or it's not. They   11:21:11
15 aren't -- you -- it's not something you can reapply, to   11:21:14
16 my knowledge.   11:21:21
17     Q. It can't be reapplied in the sense that you   11:21:21
18 can't put the top back on after it is taken off?   11:21:21
19     A. No. No, they pop off, and they don't go back   11:21:23
20 on, from my experience.   11:21:26
21     Q. And what is that experience?   11:21:27
22     A. Just personal medication.   11:21:31
23     Q. Let's talk about refrigeration, and then maybe   11:21:37
24 take a lunch break after that, appropriately. Oh, yeah,   11:21:41
25 just actually a couple quick follow-up questions on the   11:21:47

25 (Pages 94 - 97)

Randy Valley, Redacted April 16, 2025

| | |
|---|---|
| 1 lids.                                          11:21:49 | 1     A. The -- I didn't look at them and compare them  11:24:24 |
| 2     Can you tell us anything about what they look  11:21:50 | 2 specifically. I was looking more in terms of was the  11:24:28 |
| 3 like physically, like their color, or the material they  11:21:52 | 3 temperature that they were being maintained at within  11:24:34 |
| 4 are made out of?                              11:21:56 | 4 that range. So as far as I know, they can be exact, but  11:24:36 |
| 5     A. I don't recall.                          11:21:56 | 5 I didn't look at them for that.                  11:24:39 |
| 6     Q. Okay. Okay. Let's talk about refrigeration.  11:22:01 | 6     Q. Do you remember the ranges that you saw?      11:24:40 |
| 7 Is that a subject that you discussed with the person  11:22:03 | 7     A. Not off the top of my head, no.            11:24:42 |
| 8 that delivered the drugs to you, whether the chemicals  11:22:07 | 8     Q. Do you remember anything about them, even  11:24:46 |
| 9 should be refrigerated?                        11:22:16 | 9 roughly?                                      11:24:48 |
| 10     A. No.                                    11:22:16 | 10     A. Other than the fact that the temperature that  11:24:48 |
| 11     MR. SMITH: Are you done with the exhibit?    | 11 they were being kept at was within the range, no.      11:24:51 |
| 12     MR. HORWITZ: Yeah. Yeah, we are done with  | 12     Q. And when you say "the temperature they were  11:24:53 |
| 13 the exhibit. Well -- | 13 being kept at was within the range," you are referring  11:24:55 |
| 14     MR. SMITH: Keep it handy? | 14 to the desk drawer in your office?                11:25:00 |
| 15     MR. HORWITZ: Yeah. Yeah. Yeah. I think, | 15     A. Yes.                                    11:25:00 |
| 16 actually, we are not done. Sorry. Yeah, I think for  11:22:19 | 16     Q. You are not referring to refrigeration?      11:25:03 |
| 17 the refrigeration, we'll keep talking about the exhibit,  11:22:35 | 17     A. I'm not. I've never used a refrigerator, so I  11:25:05 |
| 18 and then we'll be done with it for a little bit.      11:22:38 | 18 couldn't tell you what the temperature was of them when  11:25:05 |
| 19     Q. (BY MR. HORWITZ) Is refrigeration something  11:22:38 | 19 they were in the refrigerator.                    11:25:09 |
| 20 you discussed with anyone else, apart from the person  11:22:38 | 20     Q. This statement about all eight vials, that  11:25:09 |
| 21 who delivered the drugs?                      11:22:38 | 21 would include what I have been calling, the first set of  11:25:14 |
| 22     A. Richardson, when I referred to the word  11:22:38 | 22 execution drugs; right?                        11:25:17 |
| 23 Richardson, when I first assumed operations, I spoke to.  11:22:51 | 23     A. I don't believe so. I think that is in  11:25:20 |
| 24 It's the only person I could think of.            11:22:51 | 24 reference to the third set.                      11:25:24 |
| 25     Q. And what was that conversation?          11:22:51 | 25     Q. Let's go back to page 5, just to see if we can  11:25:41 |
| Page 98 | Page 100 |

| | |
|---|---|
| 1     A. Just in terms of the way they were stored, and  11:23:01 | 1 make sure what the eight-number system refers to. So on  11:25:46 |
| 2 the fact that it changed and why it changed.        11:23:01 | 2 page 5 in photograph 25, the declaration states, "I took  11:25:51 |
| 3     Q. Why did it change?                      11:23:01 | 3 custody of the execution chemicals on June 24, 2024. I  11:26:01 |
| 4     A. They worked within, the refrigeration took  11:23:03 | 4 kept these two 2.5 gram vials of certified --        11:26:08 |
| 5 them below the recommended temperature range was my  11:23:07 | 5     A. Forgive me. Could you tell me, again, where  11:26:10 |
| 6 understanding.                                11:23:11 | 6 you are reading at?                            11:26:14 |
| 7     Q. Which set of drugs was that the case for?    11:23:12 | 7     Q. Oh, sorry. Yeah. And maybe I forgot to      11:26:16 |
| 8     A. I couldn't answer that.                    11:23:16 | 8 mention the paragraph number. So it's paragraph No. 25,  11:26:21 |
| 9     Q. But the third set were never refrigerated?    11:23:17 | 9 at the bottom of page 5. Are you there now?        11:26:21 |
| 10     A. No.                                    11:23:24 | 10     A. I am.                                    11:26:22 |
| 11     Q. So on this Exhibit 5, same page, 5, 6. In  11:23:24 | 11     Q. Okay.                                    11:26:23 |
| 12 paragraph 33, it states, "All eight vials of IDOC's  11:23:34 | 12     A. Thank you.                              11:26:23 |
| 13 execution chemicals have similar temperature regulations  11:23:43 | 13     Q. Yeah, no problem. It says, "I took custody of  11:26:24 |
| 14 listed on their packaging and informational inserts.  11:23:43 | 14 the execution chemicals on June 24th, 2024. I kept  11:26:29 |
| 15 None of the execution chemicals' temperature regulations  11:23:48 | 15 these two 2.5 gram vials of certified manufactured  11:26:30 |
| 16 prohibit them from being kept in cool places or  11:23:56 | 16 pentobarbital in a locked and secure drawer in the desk  11:26:34 |
| 17 refrigerated. All eight vials of IDOC's execution  11:23:56 | 17 in my office. I have labeled these files as 1 and 2 to  11:26:38 |
| 18 chemicals have been kept within the applicable  11:23:57 | 18 identify and distinguish them from the other chemical  11:26:45 |
| 19 temperature ranges."                          11:23:59 | 19 IDOC has acquired."                            11:26:45 |
| 20     Do you see the text that I'm referring to?    11:24:00 | 20     So you can correct me if I'm wrong, but I  11:26:45 |
| 21     A. Yes.                                    11:24:02 | 21 guess I read that to indicate that if vials 1 through 2  11:26:45 |
| 22     Q. So you use the word "similar" here. Do you  11:24:02 | 22 are included in the set that's being described at the  11:26:53 |
| 23 know whether it's similar or whether it's the same?  11:24:06 | 23 end of the declaration that we were talking about, which  11:26:57 |
| 24     A. I have to re-read that. Give me one moment.  11:24:09 | 24 is 1 through 8. That that means that 1 through 2 were  11:27:01 |
| 25     Q. Sure, take your time.                    11:24:13 | 25 not part of the third set?                      11:27:06 |
| Page 99 | Page 101 |

26 (Pages 98 - 101)

Randy Valley, Redacted April 16, 2025

1    A. I do not recall that at this time. I    11:27:08
2  don't -- I don't recall that.    11:27:14
3    Q. Do you -- well, can you tell me how you -- I    11:27:21
4  understand you might not recall drafting this or signing    11:27:27
5  it, because it was some time ago. But can you tell me    11:27:30
6  how you read that? Whether you read that paragraph    11:27:34
7  differently than I'm reading it?    11:27:38
8    A. So, I believe that this didn't happen -- ask    11:28:12
9  your question again? Sorry. Before I go --    11:28:19
10    Q. Yeah, no problem.    11:28:22
11    A. -- through a long -- and not hit the mark.    11:28:24
12    Q. Sure, I appreciate that. I'm just trying to    11:28:27
13  understand how you read the declaration as far as    11:28:30
14  whether vials 1 and 2 are part of the third set, or are    11:28:35
15  part of a previous set?    11:28:38
16    A. I believe reading this, that they were part of    11:28:40
17  a previous set. And so that's where my confusion was,    11:28:43
18  is I did not -- then labeling, I don't believe happened    11:28:48
19  on June 24th. The labeling happened later. But those    11:28:53
20  two vials were labeled at a later date.    11:28:58
21    Q. Okay. Thank you. And if we could just look    11:29:04
22  at the preceding paragraph on page 5, so paragraph 24.    11:29:06
23  And I don't think we need to read this one in it's    11:29:11
24  entirety. But I will just summarize the paragraph as    11:29:14
25  indicating, that there were vials of pentobarbital that    11:29:18
Page 102

1  were intended to be used at Mr. Creech's attempted    11:29:24
2  execution on February 28th, 2024. That some of those    11:29:28
3  vials were returned the warden's office after the    11:29:32
4  conclusion of the attempted execution. Would you agree    11:29:37
5  with that?    11:29:40
6    A. I couldn't answer that. I don't know.    11:29:41
7    Q. Well, maybe -- let's look at the paragraph in    11:29:43
8  particular then. And maybe I will -- I know it's    11:29:47
9  tedious, but I will read it just so we're looking at the    11:29:51
10  language.    11:29:54
11    So it states, "After Mr. Creech's February --    11:29:55
12    MS. SCHINDELE: John, hold on a minute. He's    11:29:59
13  looking at the wrong page.    11:29:59
14    MR. HORWITZ: Oh, I'm sorry.    11:30:03
15    THE WITNESS: Is that the problem?    11:30:03
16    MS. SCHINDELE: Go back a page. Sorry. He's    11:30:09
17  reading from -- what paragraph was it again?    11:30:09
18    MR. HORWITZ: Paragraph 24.    11:30:09
19    MS. SCHINDELE: 24.    11:30:10
20    THE WITNESS: That's why I'm confused.    11:30:11
21    Q. (BY MR. HORWITZ) That would explain it.    11:30:12
22  Yeah, I apologize for I should have been clear about    11:30:13
23  where we were. So let's maybe just start with    11:30:17
24  a -- let's rewind a little bit.    11:30:19
25    So my summary was, there were vials of    11:30:20
Page 103

1  pentobarbital, taken to F Block to be used at    11:30:24
2  Mr. Creech's execution potentially. And some of those    11:30:32
3  vials were returned to the warden's office. Would you    11:30:35
4  agree with that?    11:30:39
5    A. Yes.    11:30:39
6    Q. And the way I read these two paragraphs    11:30:39
7  together, is that those vials are part of 1 and 2?    11:30:43
8    A. I don't know that to be the case.    11:30:55
9    Q. Do you read the paragraphs differently than I    11:30:57
10  do?    11:31:03
11    A. I -- so when -- yeah, I think so, yes.    11:31:03
12    Q. How do you read them?    11:31:07
13    A. So there were chemicals that were taken to F    11:31:09
14  Block to potentially be used, that were brought back    11:31:14
15  after that event. But whether or not those two were    11:31:18
16  chemicals that I signed for months later, I don't know.    11:31:23
17  Because I had more than two vials that I signed for when    11:31:28
18  I took custody.    11:31:32
19    Q. The final sentence of paragraph 24 says, "The    11:31:34
20  two vials of pentobarbital were secured in the locked    11:31:40
21  desk drawer located in Warden Richardson's office and    11:31:40
22  maintained at room temperature after February 28th,    11:31:46
23  2024." Do you see the sentence?    11:31:48
24    A. Uh-huh.    11:31:50
25    Q. And then the very next sentence says, "I took    11:31:51
Page 104

1  custody of the execution chemicals on June 24, 2024."    11:31:56
2  And then the following sentence refers to two times, in    11:31:57
3  particular. And then the next sentence says, "I have    11:32:02
4  labeled these vials as 1 and 2."    11:32:06
5    So do you -- I read that as suggesting that    11:32:10
6  the vials that were taken to F Block that we've been    11:32:12
7  talking about are 1 and 2, but you can't confirm that    11:32:15
8  that?    11:32:20
9    A. I can't confirm that.    11:32:20
10    Q. But do you don't -- do you accept that that is    11:32:22
11  one possibility?    11:32:24
12    A. Yes.    11:32:25
13    Q. Do you have any information about whether    11:32:28
14  those chemicals that were taken to F Block, were in the    11:32:32
15  desk drawer at the time that you signed this    11:32:40
16  declaration?    11:32:43
17    A. I believe they were.    11:32:43
18    Q. And do you have any information about whether    11:32:45
19  they are included in the 1 through 8 category?    11:32:47
20    A. I don't know if they are or not.    11:32:53
21    Q. If they were not, so as I read the    11:32:56
22  declaration, the only chemicals that it's discussing are    11:33:04
23  1 through 8; is that your understanding as well?    11:33:09
24    A. Uh-huh.    11:33:13
25    Q. So --    11:33:13
Page 105

27 (Pages 102 - 105)

Randy Valley, Redacted April 16, 2025

1    A. Well, no, the chemicals that are from February 11:33:14
2    28th, are not necessarily the chemicals that are listed 11:33:17
3    as 1 through 8. So chemicals listed 1 through 8, were 11:33:21
4    two vials that were not expired. And then six vials 11:33:26
5    that were provided to me, if I remember my numbers 11:33:32
6    correctly, in addition to the two. So I had a total of 11:33:35
7    eight when we were -- when -- and I believe that's the 11:33:39
8    right number if I -- without going through all the 11:33:42
9    documentation. 11:33:45
10   But whether or not the two that were not 11:33:46
11   expired in the time that chemicals were returned, were 11:33:48
12   the two that were returned from F Block, I do not know. 11:33:53
13   Q. Would you expect to see -- well, the chemicals 11:34:00
14   that were returned from F Block, was it your 11:34:04
15   understanding that they were still potentially to be 11:34:07
16   used at a future execution? 11:34:09
17   A. Until they were expired, I would expect so, 11:34:11
18   yes. 11:34:16
19   Q. Is there some reason that they would not be in 11:34:16
20   this declaration, that they would not be in 1 through 8? 11:34:21
21   A. Yeah, if they were expired in an earlier date, 11:34:26
22   they would not be included in the 1 through 8. The 1 11:34:29
23   through 8 were chemicals, that's how I labeled them 11:34:34
24   after I got the new batch, so I could identify what I 11:34:38
25   returned and what I kept, based on a chain of custody. 11:34:38

Page 106

1    Q. Do you know what the expiration dates were for 11:34:46
2    the chemicals that were moved to F Block for 11:34:49
3    Mr. Creech's attempted execution? 11:34:53
4    A. I do not. 11:34:54
5    Q. Are you aware of any 11:34:55
6    executions -- sorry -- any chemicals expiring apart from 11:34:58
7    the ones we've talked about that you returned to the 11:35:03
8    person who delivered them? 11:35:07
9    A. I do not. 11:35:08
10   Q. You would be -- you are the only person who 11:35:08
11   has access to the execution drugs? 11:35:12
12   A. Forgive me. Maybe I should ask for clarity. 11:35:14
13   I can tell you, they are the only ones that I know of 11:35:18
14   that had expired while I had custody. Had chemicals 11:35:22
15   expired previous to that, that had been returned? I 11:35:27
16   don't know without looking at chain of custody and that. 11:35:33
17   And even then, it would be -- I would be drawing an 11:35:33
18   assumption based on documentation. 11:35:35
19   Q. Do does anyone have access to the chemicals 11:35:37
20   apart from the warden? 11:35:43
21   A. No. 11:35:43
22   Q. So if drugs were removed for any reason, you 11:35:43
23   would expect to have knowledge of that? 11:35:48
24   A. Yes. 11:35:49
25   Q. And you mentioned the chain of custody. The 11:35:54

Page 107

1    chain of custody refers to the drugs being returned to 11:35:58
2    the supplier, because they were expired; right? 11:36:02
3    A. (Witness nodding head.) 11:36:09
4    Q. If other drugs were returned to the supplier 11:36:10
5    for that same reason, would you expect that to be noted 11:36:17
6    in the chain of custody? 11:36:19
7    A. What I expect in one another individual, and 11:36:21
8    how they would document that, I couldn't answer. 11:36:21
9    Q. If it were on your watch? 11:36:23
10   A. That's how I documented it when it was. 11:36:25
11   Q. What if drugs were disposed of as expired, but 11:36:27
12   returned to the supplier, would you still note that in 11:36:33
13   the chain of custody? 11:36:34
14   A. If that's what I was informed was happening in 11:36:34
15   that they were going to be destroyed in some way, then, 11:36:38
16   yes, I would document it as such. 11:36:42
17   (Exhibit 6 marked.) 11:36:42
18   Q. (BY MR. HORWITZ) I hope this is not too 11:36:51
19   confusing, but I would like to go to the next exhibit, 11:36:53
20   and then return to the declaration. So Exhibit 6 is a 11:36:56
21   set of responses to discovery requests in this case, 11:37:03
22   that was filed on September 13th, 2024, in federal 11:37:07
23   district court. And I want to direct you to page 7. 11:37:13
24   And so Request For Admission 383 asks, "Admit or deny 11:37:28
25   that there is a range of temperature at which the old 11:37:36

Page 108

1    execution drugs are supposed to be kept." I'm sorry. 11:37:39
2    A. Excuse me. 11:37:42
3    Q. No, I should wait for you. 11:37:43
4    A. Could you say that -- what location are we at 11:37:45
5    again? 11:37:47
6    Q. It's all right. So it's No. 383. 11:37:47
7    A. Okay. I have the correct one. 11:37:49
8    Q. So the question just -- yeah, just to repeat 11:37:52
9    it since I jumped the gun a little bit is, "admit or 11:37:54
10   deny that there is a range of temperature at which the 11:37:55
11   old execution drugs are supposed to be kept." 11:37:58
12   And you are seeing what I'm reading? 11:38:01
13   A. I am. 11:38:03
14   Q. And response was, "Defendant Tewalt admits the 11:38:04
15   manufacturer refers to the USP controlled room 11:38:04
16   temperature. The manufacturer recommends the old 11:38:04
17   execution drugs be stored between" -- and I will just 11:38:04
18   refer to Fahrenheit for our reference -- "68 degrees 11:38:18
19   Fahrenheit and 77 degrees Fahrenheit. The manufacturer 11:38:20
20   approves brief excursions." 11:38:20
21   And then Request For Admission 385, on the 11:38:20
22   same page, asks the same question about what is referred 11:38:34
23   to here as the new execution drugs. Do you see that, 11:38:38
24   that question? 11:38:42
25   A. Uh-huh. 11:38:42

Page 109

28 (Pages 106 - 109)

1  Q. And then there is answer that reads to me as  11:38:43
2  being identical, that 68 degrees Fahrenheit, 77 degrees  11:38:46
3  Fahrenheit is the range; would you agree with that?  11:38:51
4  A. It sounds accurate, yes.  11:38:54
5  Q. So with that in mind, I would like to return  11:38:56
6  to your declaration, and to your reference. And this is  11:39:01
7  Exhibit 5, again. So in Exhibit 5, on page 7, the very  11:39:12
8  final words of the declaration are "applicable  11:39:19
9  temperature ranges."  11:39:25
10  Do you see what I'm looking at?  11:39:26
11  A. Uh-huh.  11:39:28
12  Q. And the sentence in full states, "All eight  11:39:30
13  vials of IDOC's execution chemicals have been kept  11:39:35
14  within the applicable temperature ranges."  11:39:41
15  So my first question is whether you would  11:39:44
16  agree that the applicable temperature ranges in your  11:39:47
17  declaration are the ones that Director Tewalt was  11:40:01
18  referencing in his response?  11:40:03
19  A. I believe so, yes.  11:40:03
20  Q. Okay.  11:40:03
21  (Exhibit 7 marked.)  11:40:03
22  Q. (BY MR. HORWITZ) Let's look briefly at  11:40:06
23  Exhibit 7. So this is a temperature log. And on the  11:40:10
24  very first page, if you look between October 11th, 2023,  11:40:33
25  and I guess, it extends on to the second page -- well,  11:40:38
Page 110

1  actually a part of the ones that I held during that  11:42:19
2  temp.  11:42:22
3  Q. I understand the second part. But could you  11:42:22
4  repeat the first part of what you said?  11:42:25
5  A. By my understanding that is -- and I think  11:42:28
6  it's written in the declaration, that there are moments  11:42:31
7  that it can exceed those temperature ranges, and they  11:42:34
8  still maintain viability.  11:42:39
9  Q. Let's dig into that a little bit then. So in  11:42:44
10  Exhibit 6, which again, is the responses of discovery  11:42:47
11  requests, on page 7. I'll try to go a little slower,  11:42:51
12  because I think I was maybe moving too fast.  11:42:55
13  But you see page 7 of Exhibit 6, RFA 383?  11:42:58
14  A. Page 6. Yes, wait. I'm sorry. What are we  11:43:05
15  looking at?  11:43:09
16  Q. No problem. And I am moving back and forth a  11:43:10
17  lot. So I apologize. But I am looking at plaintiffs'  11:43:14
18  Exhibit 6, and page 7 of that exhibit. So it's the --  11:43:18
19  A. Oh, thank you. I'm like, I've tried to keep  11:43:22
20  them in order. Where did 6 go?  11:43:27
21  Q. Yeah, mine have gotten a little disordered  11:43:30
22  too.  11:43:30
23  A. 383 is what you said?  11:43:32
24  Q. Yes. Yes.  11:43:32
25  A. Okay.  11:43:32
Page 112

1  the entirety of the first page. So October 11th, 2023,  11:40:45
2  to November 7th, 2023, the temperatures are all in the  11:40:50
3  40s and 30s?  11:40:57
4  A. Uh-huh.  11:40:59
5  Q. Do you have any knowledge of why the  11:41:00
6  temperatures were in that range?  11:41:02
7  A. They were -- they were secured in a  11:41:06
8  refrigerator.  11:41:08
9  Q. Do you know which set of drugs are reflected  11:41:11
10  in this -- on this page of the temperature log?  11:41:17
11  A. I do not.  11:41:22
12  Q. If the eight vials that you are  11:41:33
13  describing -- and just to repeat the final sentence of  11:41:37
14  your declaration. "All eight vials of IDOC's execution  11:41:43
15  chemicals have been kept within the applicable  11:41:47
16  temperature ranges."  11:41:48
17  If drugs had been -- let's talk about the  11:41:50
18  drugs specifically that were refrigerated for roughly  11:41:52
19  six weeks. If those drugs were part of the eight vials,  11:41:56
20  would you still agree with this statement in your  11:42:00
21  declaration?  11:42:03
22  A. So by my understanding that these -- that this  11:42:04
23  did not render them outside the range, because of the  11:42:07
24  time frame in which they were secured in that. But I  11:42:11
25  also am unaware if the chemical that I have, were  11:42:14
Page 111

1  Q. RFA 383. So let's talk about the brief  11:43:35
2  excursion language. So in the response to RFA 383,  11:43:41
3  defendant Tewalt said, "the manufacturer approves brief  11:43:45
4  excursions between," and again, just limiting our  11:43:45
5  consideration of Fahrenheit, "59 degrees Fahrenheit, and  11:43:51
6  86 degrees Fahrenheit."  11:43:56
7  Do you see what I'm reading?  11:43:59
8  A. I do now, yes.  11:44:00
9  Q. And then it looks like again, the identical  11:44:01
10  language appears in the response to --  11:44:03
11  A. Yes.  11:44:03
12  Q. -- RFA 385 as well.  11:44:07
13  So if we look at the temperature log, it's  11:44:09
14  about six weeks below 43 degrees consistently, the first  11:44:13
15  page of Exhibit 7?  11:44:19
16  A. Oh, okay. I'm trying to track, but, yeah,  11:44:25
17  you've got to look at dates.  11:44:29
18  Q. Right. So would you agree with me, that that  11:44:31
19  is not a brief excursion, in the sense that Director  11:44:33
20  Tewalt is using that phrase, since it is both  11:44:41
21  below -- well, let's just talk about the range. It's  11:44:46
22  below 59 degrees; correct?  11:44:47
23  A. Yes.  11:44:49
24  Q. So would you agree that then is not a brief  11:44:49
25  excursion?  11:44:53
Page 113

29 (Pages 110 - 113)

Randy Valley, Redacted April 16, 2025

| | |
|---|---|
| 1 A. Not necessarily, no. I think it depends on 11:44:54 | 1 Are you looking at the text that I'm 13:04:21 |
| 2 what the manufacturer considers a brief excursion. 11:44:57 | 2 describing? 13:04:24 |
| 3 Q. Well, the way I read Director Tewalt's 11:45:01 | 3 A. Uh-huh. 13:04:24 |
| 4 statement is, there is this range 68 and 77. But 11:45:06 | 4 Q. And then below that it says, "transferred 2.5 13:04:25 |
| 5 exceptions to that are allowed if it is between 59 and 11:45:14 | 5 grams pentobarbital (2) from previous number sign 1 13:04:27 |
| 6 86. Do you read it differently than I do? 11:45:19 | 6 through 2." 13:04:35 |
| 7 A. Let me read it again. 11:45:23 | 7 A. Yep. 13:04:37 |
| 8 Q. Sure. 11:45:33 | 8 Q. And so I guess my first question is whether 13:04:37 |
| 9 A. Yes. 11:45:34 | 9 those numbers, the 3 through 8 in the first line, and 13:04:40 |
| 10 Q. So given that agreement, let's return to what 11:45:36 | 10 the 1 through 2. Do you understand those to refer to 13:04:44 |
| 11 I think is the same question, which is whatever drugs 11:45:44 | 11 the same numbers that you were using in your 13:04:48 |
| 12 are reflected on this first page of the temperature log 11:45:51 | 12 declaration? 13:04:50 |
| 13 that we have been studying, those cannot be 11:45:55 | 13 A. Could you be specific in what part of the 13:04:51 |
| 14 characterized as a brief excursion in the sense that 11:45:58 | 14 declaration. 13:04:54 |
| 15 Director Tewalt is using that phrase? 11:46:04 | 15 Q. Yeah, I can. So the declaration is Exhibit 6 13:04:54 |
| 16 A. Based on the temperature range given, I would 11:46:07 | 16 and -- I'm sorry -- not Exhibit 6. 13:04:59 |
| 17 say that these exceed that. 11:46:07 | 17 A. I know. I've got Exhibit 5. 13:05:02 |
| 18 Q. And then maybe just to kind of close the loop. 11:46:13 | 18 Q. Exhibit 5. Actually, I have misplaced Exhibit 13:05:05 |
| 19 If we go back to your declaration and the final 11:46:18 | 19 5, myself. Does someone have a copy I could borrow? 13:05:17 |
| 20 sentence, again, "All eight vials of IDOC's execution 11:46:18 | 20 Thanks. 13:05:20 |
| 21 chemicals have been kept within the applicable 11:46:25 | 21 So let's start, in Exhibit 5, let's start with 13:05:32 |
| 22 temperature ranges." If that statement was made about 11:46:27 | 22 paragraph 25, on page 5. Are you there? 13:05:35 |
| 23 the drugs that were refrigerated for six weeks, would 11:46:30 | 23 A. Yeah. 13:05:41 |
| 24 you -- would you consider the statement to be inaccurate 11:46:36 | 24 Q. So that refers to vials 1 and 2. And maybe 13:05:45 |
| 25 then? 11:46:39 | 25 the simplest question to begin with would be 1 and 2 in 13:05:51 |
| Page 114 | Page 116 |

| | |
|---|---|
| 1 A. Yeah, if they were stored at that, I would say 11:46:40 | 1 paragraph 5, do you believe that to be 1 and 2 on the 13:05:56 |
| 2 that was inaccurate. I don't believe when I made that 11:46:43 | 2 chain of custody form? 13:06:02 |
| 3 statement, that I understood that these were not a part 11:46:47 | 3 A. It is, yes. 13:06:04 |
| 4 of the ones that were kept in the fridge. 11:46:50 | 4 Q. And 3 through 8, would you agree with me that 13:06:05 |
| 5 Q. Do you have any understanding of what the 11:46:57 | 5 that is the third set of execution drugs? 13:06:11 |
| 6 manufacturer, itself, considers to be a brief excursion? 11:47:00 | 6 A. Yes. 13:06:16 |
| 7 A. I do not, other than what's listed in the 11:47:04 | 7 Q. And does this shed any light on what we were 13:06:16 |
| 8 declaration. 11:47:07 | 8 talking about, whether 1 and 2 in the declaration were 13:06:22 |
| 9 MR. HORWITZ: Let's call it good for there, 11:47:14 | 9 from the first set that were moved to F Block on 13:06:27 |
| 10 and take a lunch break, if it works for everybody else? 11:47:17 | 10 February 28th, 2024? 13:06:31 |
| 11 THE VIDEOGRAPHER: Okay. We are off the 11:47:21 | 11 A. No. 13:06:34 |
| 12 record. The time is 11:48 a.m. 11:47:25 | 12 Q. Can you elaborate on that? 13:06:34 |
| 13 (Lunch recess.) 11:47:41 | 13 A. I -- out of the chemical that was in the 13:06:37 |
| 14 THE VIDEOGRAPHER: We are back on the record. 13:03:21 | 14 drawer, I don't know what chemical was taken to F Block 13:06:40 |
| 15 The time is 1:04 p.m. 13:03:31 | 15 and brought back up, or what chemical was a part of 13:06:45 |
| 16 Q. (BY MR. HORWITZ) So I would like to just ask 13:03:35 | 16 Batch 1 or Batch 2. 13:06:49 |
| 17 a quick follow-up question about the declaration, and 13:03:38 | 17 Q. Okay. Okay. Let me -- I may -- I may take it 13:06:52 |
| 18 the sets of drugs that we were discussing. Hopefully, 13:03:44 | 18 back, and return to that somewhere before we're done. 13:07:03 |
| 19 we'll be able to move past that after. 13:03:49 | 19 But let me move on to a few just questions to follow up 13:07:07 |
| 20 And my question is about the chain of custody 13:03:53 | 20 on different things that came up this morning before we 13:07:11 |
| 21 form, which is Exhibit 3. So if you could pull that 13:03:57 | 21 move on to some other areas. 13:07:15 |
| 22 out? And on page 1 of that form, in that first box, 13:03:57 | 22 With the trainings, the execution trainings 13:07:17 |
| 23 under "Comments." It says "received 2.5 grams of 13:04:00 | 23 that have been happening since you took over as warden, 13:07:21 |
| 24 pentobarbital," and then in parentheses, it says, "(6)." 13:04:16 | 24 did those include preparations for scenarios in which 13:07:26 |
| 25 And then after that, it says numbers 3 through 8. 13:04:16 | 25 the rescue doctor would intercede in the event? 13:07:31 |
| Page 115 | Page 117 |

Randy Valley, Redacted April 16, 2025

| | |
|---|---|
| 1 | A. No. 13:07:36 |
| 2 | Q. Did they include situations where, I know you 13:07:40 |
| 3 | said there have not been any problems with vein access 13:07:45 |
| 4 | on the people who are acting as the condemned. But do 13:07:49 |
| 5 | the trainings include scenarios where there are -- where 13:07:53 |
| 6 | there sort of is -- where people pretend that there were 13:07:58 |
| 7 | vein access issues? 13:08:02 |
| 8 | A. So I would say, we -- yes. Yes. 13:08:04 |
| 9 | Q. What, can you tell me what that looks like? 13:08:12 |
| 10 | A. So we, after we do a full run through, we have 13:08:15 |
| 11 | taken someone to play the condemned, and went back in 13:08:21 |
| 12 | and set up as if we were going to do a central line. So 13:08:26 |
| 13 | the central line volunteer comes in, uses the 13:08:31 |
| 14 | ultrasounds, assesses the patient, and just doesn't set 13:08:38 |
| 15 | a line. 13:08:41 |
| 16 | Q. Do you have an opinion about why there is no 13:08:42 |
| 17 | training for a rescue doctor type situation? Maybe we 13:08:48 |
| 18 | could just start by saying my understanding is when 13:08:54 |
| 19 | there was, when the previous protocol had more of a set 13:08:57 |
| 20 | sort of account of what the rescue doctor would do, 13:09:01 |
| 21 | which was to intervene to resuscitate the inmate, if 13:09:05 |
| 22 | necessary. Do you have an opinion why trainings don't 13:09:09 |
| 23 | prepare for that, that scenario? 13:09:14 |
| 24 | A. I don't know that I ever thought of it. So I 13:09:16 |
| 25 | don't know that I have an opinion on it one way or the 13:09:20 |

Page 118

| | |
|---|---|
| 1 | other. 13:09:24 |
| 2 | Q. Okay. As I understood your testimony this 13:09:27 |
| 3 | morning, there was an assessment of Mr. Creech's veins, 13:09:31 |
| 4 | that you were a part of during the warrant in October. 13:09:36 |
| 5 | Did you discuss with Mr. Creech, himself, that 13:09:41 |
| 6 | assessment? 13:09:44 |
| 7 | A. In terms of, I spoke to him in advance of it, 13:09:45 |
| 8 | asking if he would willingly participate in an 13:09:49 |
| 9 | assessment of his veins, and explained to him what we 13:09:52 |
| 10 | were going to do, and sought his cooperation, and in terms 13:09:56 |
| 11 | to him afterwards about the experience. But in terms of 13:10:00 |
| 12 | providing any information as to what they found, no. 13:10:05 |
| 13 | Q. How far in advance of the assessment did you 13:10:08 |
| 14 | speak with Mr. Creech? 13:10:12 |
| 15 | A. Maybe five minutes, ten minutes. 13:10:13 |
| 16 | Q. What would you have done if he had declined to 13:10:16 |
| 17 | participate? 13:10:20 |
| 18 | A. I would -- I don't know. I didn't anticipate 13:10:21 |
| 19 | that being an issue. He and I, you know, spoke 13:10:25 |
| 20 | regularly. I didn't expect that to be an issue. So I 13:10:30 |
| 21 | don't know if I gave it any thought as to what I would 13:10:37 |
| 22 | do if he declined. 13:10:39 |
| 23 | Q. Did you document his response to your 13:10:40 |
| 24 | question? 13:10:42 |
| 25 | A. I would have to -- I would have to look at 13:10:42 |

Page 119

| | |
|---|---|
| 1 | the -- my log. I don't know that I did. It was during 13:10:45 |
| 2 | a training session. It was kind of outside the norm of 13:10:50 |
| 3 | he and I's meetings. So I don't know that that 13:10:55 |
| 4 | specifically was documented. 13:10:58 |
| 5 | Q. Is that where you would expect it to be 13:10:58 |
| 6 | documented, in the log? 13:11:02 |
| 7 | A. Yeah. Yes. 13:11:03 |
| 8 | Q. Okay. I think I skipped over a question on 13:11:04 |
| 9 | your background, which is whether you have ever served 13:11:08 |
| 10 | in the military? 13:11:11 |
| 11 | A. I have not. 13:11:12 |
| 12 | Q. Also, on the trainings, are you aware of 13:11:13 |
| 13 | anything that changed in the trainings as a result of 13:11:18 |
| 14 | the attempted execution in February of 2024? 13:11:23 |
| 15 | A. I mean, we have a new process, so, yeah, there 13:11:27 |
| 16 | are changes to our protocol that we had to train to. 13:11:32 |
| 17 | Q. Anything beyond the protocol, itself? 13:11:36 |
| 18 | A. Not that I'm aware of. 13:11:39 |
| 19 | Q. Are different cell phones provided to any IDOC 13:11:40 |
| 20 | personnel in connection with executions? 13:11:53 |
| 21 | A. I don't know that there -- the one I have is 13:11:56 |
| 22 | specific to executions, I -- so, no. We're provided one 13:11:59 |
| 23 | for work purposes at certain levels, but... 13:12:04 |
| 24 | Q. And you -- and the phone that you are provided 13:12:07 |
| 25 | for work purposes, is that the phone you use to conduct 13:12:12 |

Page 120

| | |
|---|---|
| 1 | business related to executions if you are using a phone? 13:12:16 |
| 2 | A. Yeah, that would be. 13:12:20 |
| 3 | Q. What about, do you have a landline in your 13:12:22 |
| 4 | office? 13:12:25 |
| 5 | A. Uh-huh. 13:12:25 |
| 6 | Q. Do you use that phone? 13:12:26 |
| 7 | A. Primarily. 13:12:27 |
| 8 | Q. Maybe this is difficult to answer, but I think 13:12:28 |
| 9 | we have talked about a few conversations that you have 13:12:32 |
| 10 | suggested likely happened over the phone. Do you 13:12:35 |
| 11 | have -- are you able to give me a sense of whether those 13:12:38 |
| 12 | were on your work cell phone versus your office phone? 13:12:41 |
| 13 | A. I'm sure they have been on my office phone. I 13:12:44 |
| 14 | don't know that I've -- since I've been issued my work 13:12:49 |
| 15 | phone, I don't know that I've used it. 13:12:52 |
| 16 | Q. Do you text on your work phone? 13:12:55 |
| 17 | A. No. You might -- are you talking about -- 13:12:58 |
| 18 | Q. I'm sorry. Your -- 13:12:58 |
| 19 | A. -- my cell phone. 13:12:59 |
| 20 | Q. Yeah. Your work cell phone, do you text on 13:13:02 |
| 21 | your work cell phone? 13:13:06 |
| 22 | A. No, I have not yet. 13:13:08 |
| 23 | Q. Do you use your personal cell phone for any 13:13:09 |
| 24 | IDOC business? 13:13:13 |
| 25 | A. Yes, for duty officer stuff, I have for years. 13:13:14 |

Page 121

31 (Pages 118 - 121)

Randy Valley, Redacted April 16, 2025

| | |
|---|---|
| 1 Q. And what does that entail? 13:13:16 | 1 chain of custody forms were filled out? 13:16:19 |
| 2 A. Just reporting for the facility to be notified 13:13:19 | 2 A. Yes. 13:16:25 |
| 3 if there is issues, that kind of thing. 13:13:23 | 3 Q. Let me ask -- I think I will have a few 13:16:27 |
| 4 Q. Does the use of your personal cell phone, has 13:13:25 | 4 questions about the third set of execution drugs, the 13:16:43 |
| 5 that included any execution-related matters? 13:13:29 | 5 ones that entered your possession in October of 2024. 13:16:47 |
| 6 A. I would have to go back and look, but I don't 13:13:34 | 6 Do you know anything about how those -- how 13:16:54 |
| 7 believe so. Not in terms of texts, I don't believe. 13:13:36 | 7 those drugs were purchased? 13:17:00 |
| 8 Q. And apart from you, is it the same situation 13:13:39 | 8 A. No. 13:17:01 |
| 9 with the other people at IDOC, who have work cell 13:13:43 | 9 Q. And you were not involved in the financial 13:17:02 |
| 10 phones? They don't get a different cell phone for 13:13:49 | 10 side of that transaction? 13:17:09 |
| 11 execution-related purposes? 13:13:52 | 11 A. No. 13:17:10 |
| 12 A. No, I -- yeah, not that I'm aware of. 13:13:54 | 12 (Exhibit 10 marked.) 13:17:10 |
| 13 Q. All right. Just one other follow-up on this 13:14:05 | 13 Q. (BY MR. HORWITZ) Let's talk a little bit 13:17:42 |
| 14 morning, which might be a little more involved, but I 13:14:08 | 14 about Exhibit 10, if you don't mind turning to that one. 13:17:44 |
| 15 think pretty straightforward. So on the temperature 13:14:15 | 15 So Exhibit 10 is a DEA Form-222. Is this a document 13:17:53 |
| 16 log -- 13:14:18 | 16 you've seen before? 13:18:01 |
| 17 Well, let's start with your start date as 13:14:21 | 17 A. No. 13:18:02 |
| 18 warden. That was June 10th, 2024; does that sound right 13:14:24 | 18 Q. Do you know anything about this form? 13:18:03 |
| 19 to you? 13:14:30 | 19 A. No. 13:18:05 |
| 20 A. That sounds about right, yes. 13:14:30 | 20 Q. You don't know who filled it out? 13:18:05 |
| 21 Q. Well, maybe we'll just use that as sort of a 13:14:35 | 21 A. No. 13:18:07 |
| 22 first date. On page 5 of your declaration, which again 13:14:48 | 22 Q. And you've never seen -- even apart from this 13:18:08 |
| 23 is Exhibit 5, in paragraph 25. You wrote, "I took 13:14:55 | 23 particular DEA Form-222, have you ever seen any DEA 13:18:18 |
| 24 custody of the execution chemicals on June 24th, 2024." 13:15:02 | 24 Form-222? 13:18:24 |
| 25 Can you tell me why there would have been a 13:15:07 | 25 A. No. 13:18:26 |
| Page 122 | Page 124 |

| | |
|---|---|
| 1 gap between your start date as warden, and when you took 13:15:09 | 1 Q. Was there any kind of paperwork that 13:18:26 |
| 2 custody of the chemicals? 13:15:15 | 2 accompanied the third set of execution drugs? 13:18:29 |
| 3 A. Just when Warden Richardson had an opportunity 13:15:17 | 3 A. Outside of the pocket insert that's in the 13:18:35 |
| 4 to come over to sit down and meet with me, and go over 13:15:21 | 4 boxes, not that I recall. 13:18:38 |
| 5 the chain of custody and get it filled out. 13:15:23 | 5 Q. I have some questions about the temperature 13:18:41 |
| 6 Q. So during that? 13:15:23 | 6 logs. So the temperature logs are Exhibit 7 through 9. 13:19:00 |
| 7 A. That was just when it was scheduled. 13:15:27 | 7 Can you tell me what are the temperature log? 13:19:22 |
| 8 Q. Okay. So during that two-week period, you 13:15:28 | 8 A. Current or past? 13:19:25 |
| 9 were already warden of IMSI, and the chemicals were 13:15:32 | 9 Q. Let's do both. Let's start with past. 13:19:27 |
| 10 still in the desk drawer. And Warden Richardson no 13:15:37 | 10 A. Okay. So originally, when I first began 13:19:28 |
| 11 longer had access to the chemicals during that two-week 13:15:43 | 11 taking these, I, at some point during the day, typically 13:19:32 |
| 12 period? 13:15:48 | 12 right before I left for work at the end of the day, I 13:19:34 |
| 13 A. No, I -- well, I mean, he could have had 13:15:48 | 13 would open the drawer, and there was a thermometer, like 13:19:38 |
| 14 access. He -- they were technically his to manage. So 13:15:54 | 14 a room temperature type device that was in there, that 13:19:42 |
| 15 he would have been provided access had he needed it, 13:15:58 | 15 gave a readout, told me what the temperature was. Most 13:19:47 |
| 16 yes. 13:16:02 | 16 days, I just utilized that. 13:19:52 |
| 17 Q. Where is the key typically to the drawer? 13:16:02 | 17 There was a secondary infrared temperature 13:19:54 |
| 18 A. So, on my person. 13:16:05 | 18 deal as well. And I would occasionally verify just to 13:19:58 |
| 19 Q. And when did that, when did the key change 13:16:06 | 19 make sure that they were consistent, and use that as 13:20:02 |
| 20 hands? 13:16:09 | 20 well just to -- and that was probably once every couple 13:20:05 |
| 21 A. The key changed hands when I came in as the 13:16:09 | 21 two, three weeks, I would just grab it just to make sure 13:20:08 |
| 22 warden. 13:16:14 | 22 that the other one was functioning properly. 13:20:13 |
| 23 Q. So around June 10th? 13:16:14 | 23 Q. Were they ever different? 13:20:15 |
| 24 A. Uh-huh. 13:16:16 | 24 A. Different by a tenth of a degree, but nothing 13:20:18 |
| 25 Q. And June 24th is just a reflection of when the 13:16:17 | 25 ever significant. 13:20:22 |
| Page 123 | Page 125 |

32 (Pages 122 - 125)

Randy Valley, Redacted April 16, 2025

| | |
|---|---|
| 1 | Q. That thermometer is that -- was that in the 13:20:23 |
| 2 | office before you became warden? 13:20:27 |
| 3 | A. Yes, both of those devices were. 13:20:29 |
| 4 | Q. Do you know what kind of thermometer it 13:20:34 |
| 5 | is -- or what -- 13:20:39 |
| 6 | A. I couldn't you tell you the brand or that 13:20:39 |
| 7 | off -- today, no. 13:20:42 |
| 8 | Q. For either device? 13:20:43 |
| 9 | A. Un-huh. 13:20:44 |
| 10 | Q. Did you do anything to confirm that, apart 13:20:45 |
| 11 | from checking with infrared, did you do anything to 13:20:47 |
| 12 | confirm that the thermometer, itself, was working 13:20:51 |
| 13 | appropriately? 13:20:51 |
| 14 | A. No, I mean, that's what the infrared was for 13:20:58 |
| 15 | is to ensure that they were consistent. 13:21:01 |
| 16 | Q. If you will turn to page 5 of Exhibit 7. So 13:21:13 |
| 17 | if you became warden on June 10th, 2024, is it fair for 13:21:21 |
| 18 | me to assume that's when you started taking 13:21:29 |
| 19 | the -- noting the temperature? 13:21:32 |
| 20 | A. I would have to look at a calendar. June 10th 13:21:34 |
| 21 | may have been a Sunday. So Monday would have been my 13:21:38 |
| 22 | first time in the office, which would have been my first 13:21:42 |
| 23 | day in the office, which is when I would have done that. 13:21:46 |
| 24 | Q. And looking at the temperature log in 13:21:49 |
| 25 | particular, that entry on June 11th, 2024, is that one 13:21:52 |

Page 126

| | |
|---|---|
| 1 | that you took? 13:21:58 |
| 2 | A. Yes. 13:21:58 |
| 3 | Q. And you did not take June 4th, 2024? 13:21:59 |
| 4 | A. I did not. 13:22:02 |
| 5 | Q. So between June 11th and June 24th, that's you 13:22:03 |
| 6 | that is recording the temperature? 13:22:10 |
| 7 | A. Yes. 13:22:12 |
| 8 | Q. And the chain of custody still had not been 13:22:12 |
| 9 | completed during that time? 13:22:17 |
| 10 | A. Correct. 13:22:18 |
| 11 | Q. But you were the one with the key to the 13:22:18 |
| 12 | drawer during that time? 13:22:22 |
| 13 | A. Yes. 13:22:24 |
| 14 | Q. Do you know which set of drugs, looking at 13:22:24 |
| 15 | Exhibit 7, do you know which set of drugs this refers 13:22:38 |
| 16 | to? 13:22:42 |
| 17 | A. The only thing I could tell you, is it didn't 13:22:42 |
| 18 | include Set 3. 13:22:46 |
| 19 | Q. And you said you would look at the temperature 13:22:49 |
| 20 | when you were in the office. What is your work schedule 13:22:53 |
| 21 | as warden; is it Monday through Friday or -- 13:22:56 |
| 22 | A. Typically. 13:23:00 |
| 23 | Q. So would you take the temperature on the 13:23:00 |
| 24 | weekends? 13:23:03 |
| 25 | A. Not normally, no. 13:23:04 |

Page 127

| | |
|---|---|
| 1 | Q. Would someone else? 13:23:06 |
| 2 | A. No. No one else has access. 13:23:07 |
| 3 | Q. There is a little bit of a longer gap on page 13:23:11 |
| 4 | 10 of Exhibit 7. 13:23:31 |
| 5 | A. Of Exhibit 7? 13:23:37 |
| 6 | Q. Yeah, which is the final page. 13:23:40 |
| 7 | A. Got you. 13:23:44 |
| 8 | Q. So between July 30th and August 6th, do you 13:23:44 |
| 9 | see where I am? 13:23:48 |
| 10 | A. Yes. 13:23:49 |
| 11 | Q. Do you know why that gap is there? 13:23:49 |
| 12 | A. I would imagine, I was away from the office 13:23:53 |
| 13 | that week. I would have to check my calendar to verify. 13:23:56 |
| 14 | Q. So if you are away from the office, the 13:24:00 |
| 15 | temperature is not being taken either? 13:24:03 |
| 16 | A. No one else has access. 13:24:06 |
| 17 | (Exhibit 8 marked.) 13:24:06 |
| 18 | Q. (BY MR. HORWITZ) Let's move on to Exhibit 8, 13:24:13 |
| 19 | which is another temperature log. Is this your 13:24:16 |
| 20 | handwriting? 13:24:22 |
| 21 | A. It is. 13:24:22 |
| 22 | Q. And you recorded these temperatures? 13:24:23 |
| 23 | A. I did. 13:24:27 |
| 24 | Q. Do you know which batch, or which set of drugs 13:24:28 |
| 25 | this was for? 13:24:31 |

Page 128

| | |
|---|---|
| 1 | A. All I can do is exclude Batch 3. I had not 13:24:32 |
| 2 | received those yet. Yeah, I don't believe. 13:24:38 |
| 3 | Q. Can you tell me what the connection is between 13:24:41 |
| 4 | these two exhibits; so Exhibit 8 on the one hand, and 13:24:49 |
| 5 | Exhibit 7 on the other? Because I believe they have the 13:24:49 |
| 6 | same -- they have some of the same dates? 13:24:53 |
| 7 | A. They should. So at that time, we were running 13:24:57 |
| 8 | two different logs for different batches. Was -- so 13:25:00 |
| 9 | I -- there was a separate log that was original to each 13:25:06 |
| 10 | of the two different chains of custody. And so both 13:25:09 |
| 11 | logs were being maintained. 13:25:14 |
| 12 | Q. And, I mean, it would be the same temperature 13:25:18 |
| 13 | that would be entered on both logs? 13:25:21 |
| 14 | A. Yeah, it should be. Yes. 13:25:23 |
| 15 | Q. With the same thermometer? 13:25:25 |
| 16 | A. Yes. 13:25:32 |
| 17 | Q. And any gaps in the days on any of the logs 13:25:33 |
| 18 | that you are responsible for, would you have the same 13:25:43 |
| 19 | answer, that it was because you were out of the office? 13:25:46 |
| 20 | A. I can't say for certain that I never missed a 13:25:49 |
| 21 | day. But typically, it was only when I was out of the 13:25:52 |
| 22 | office. 13:25:55 |
| 23 | (Exhibit 9 marked.) 13:25:55 |
| 24 | Q. (BY MR. HORWITZ) Let's move on to Exhibit 9. 13:26:04 |
| 25 | This is the final temperature log. And if you turn to 13:26:07 |

Page 129

33 (Pages 126 - 129)

Randy Valley, Redacted April 16, 2025

**Page 130**

1  page 3, the formatting of the document changes, and    13:26:11
2  becomes typed, where before it was handwritten. Can you    13:26:17
3  tell me why that change occurs?    13:26:21
4      A. So to alleviate some of the concerns with gaps    13:26:23
5  in the time frame, and to make it consistent whether I    13:26:27
6  was in the office or not, I purchased a device that    13:26:33
7  actually tracks the temperature, and maintains a log of    13:26:38
8  that.    13:26:42
9          And so I go in, and would connect to that    13:26:42
10  device, and download the data for it into a spreadsheet.    13:26:47
11  And then print it, and sign it, and date it. And that    13:26:55
12  way, I have the temperature twice a day. And it's    13:27:00
13  consistent whether I'm in the office or not in the    13:27:03
14  office. I have the temperature for that day twice a    13:27:05
15  day.    13:27:09
16      Q. Where did you purchase that device?    13:27:09
17      A. I believe I purchased it off of Amazon.    13:27:11
18      Q. Do you remember what brand it is?    13:27:14
19      A. It's a ThermoPro. I don't recall the model    13:27:16
20  number.    13:27:27
21      Q. Was that your decision to buy that device?    13:27:27
22      A. Yes.    13:27:31
23      Q. The typed version, the one that the ThermoPro    13:27:31
24  is generating has a humidity measurement?    13:27:39
25      A. It does.    13:27:42

**Page 131**

1      Q. Was humidity being measured prior to that?    13:27:43
2      A. It never -- it measures it, but it was never a    13:27:49
3  part of the original log, so I don't include it in the    13:27:52
4  data.    13:27:55
5      Q. Was humidity being captured by the thermometer    13:27:56
6  that you were using before?    13:28:02
7      A. No, not that I'm aware of.    13:28:04
8      Q. If you'll turn to page 5 of Exhibit 9, there    13:28:09
9  is a handwritten note that says, "Temperature monitor    13:28:16
10  malfunctioned and stopped recording data. The issue has    13:28:22
11  been corrected. There were no notable temperature    13:28:25
12  deviations in room temperature during that time. HVAC    13:28:28
13  system was operational during this time as well."    13:28:30
14          Do you see the note?    13:28:35
15      A. I do.    13:28:35
16      Q. Is that you that wrote that?    13:28:36
17      A. It is.    13:28:36
18      Q. Can you tell me in more detail, what the    13:28:41
19  malfunction involved?    13:28:44
20      A. Unfortunately, the battery died right after I    13:28:44
21  got done taking the temperature, set an alarm for myself    13:28:48
22  and go and do this, because it will hold data for    13:28:53
23  to -- I believe, a couple of years. I set myself a    13:28:55
24  reminder to go back in a month later, and print out a    13:29:01
25  month's worth at a time. And the battery had died    13:29:02

**Page 132**

1  almost immediately after I set that reminder. So it did    13:29:04
2  not capture that data.    13:29:09
3      Q. And that's the frequency that you used this    13:29:11
4  system was monthly?    13:29:14
5      A. No longer. That happened the one time, and I    13:29:15
6  stopped. I do it weekly now. And I think you see that    13:29:21
7  in the logs, I print it off every week. If I'm not    13:29:24
8  there, and I'm on vacation or something, that I'll print    13:29:26
9  two weeks, just because I'm not in the office that week    13:29:30
10  to do it, but...    13:29:34
11      Q. Sorry for my delay here. I'm getting a little    13:30:01
12  mixed up in all the paperwork.    13:30:05
13          Okay. I think this is my last question about    13:30:07
14  the temperature logs. I wanted to draw your attention    13:30:10
15  to a comparison between temperature log, between Exhibit    13:30:14
16  9 rather, and Exhibit 7. And so if you don't mind    13:30:26
17  having both of those handy.    13:30:26
18          And I'm interested in some texts that appear    13:30:28
19  on page 4 of Exhibit 9. At the very top, the first    13:30:32
20  temperature listed is 67.8 degrees Fahrenheit?    13:30:42
21      A. Are you -- are you on page -- I'm sorry. Are    13:30:49
22  you on exhibit --    13:30:51
23      Q. I'm sorry. Exhibit 9, page 4.    13:30:55
24      A. Page 4.    13:30:58
25      Q. Yeah.    13:30:58

**Page 133**

1      A. Got you. For what date?    13:30:58
2      Q. For 11/1/24.    13:31:02
3      A. Okay.    13:31:02
4      Q. It's the very first temperature. So that day    13:31:08
5  has two entries; one is 67.8, and one is 66.7. On the    13:31:15
6  typewritten. So what I'm looking at is -- do you see    13:31:16
7  the page that looks like this (indicating)?    13:31:20
8      A. Yeah, I have that --    13:31:22
9      Q. All right.    13:31:22
10      A. -- so 66.8. And what was the other?    13:31:22
11      Q. So that's one. And then the other is that    13:31:26
12  first page -- oh, I'm sorry -- not Exhibit 7 or not    13:31:26
13  the -- I've got the years mixed up. I think I -- I    13:31:39
14  think I actually --    13:31:41
15      MR. SANCHEZ: Is it the same exhibit?    13:31:54
16      Q. (BY MR. HORWITZ) Oh, I'm sorry. It is the    13:31:56
17  same exhibit. Exhibit 9, I'm sorry. It is not    13:31:58
18  comparing two exhibits. Just looking at that page of    13:32:01
19  Exhibit 9, and then the first page of the same exhibit.    13:32:04
20  So do you see the entry for 11/1/24 there?    13:32:08
21      A. Yes.    13:32:14
22      Q. And the temperature there is 69.6 degrees?    13:32:15
23      A. Correct.    13:32:20
24      Q. So I'm just wondering why there would be a    13:32:20
25  difference between those two?    13:32:31

34 (Pages 130 - 133)

Randy Valley, Redacted April 16, 2025

| | |
|---|---|
| 1 | A. So I couldn't answer that specifically. I   13:32:32 |
| 2 | could tell you the process in which I recorded those.   13:32:34 |
| 3 | Q. Yes, please.   13:32:37 |
| 4 | A. So when I first got the new device, I tracked   13:32:38 |
| 5 | it with both devices. So I ran both logs for a period   13:32:42 |
| 6 | of time to make sure that it was functioning and within   13:32:46 |
| 7 | range. But just like as you do two logs, so it was two   13:32:48 |
| 8 | different devices that it was being tracked off of. So   13:32:50 |
| 9 | there is a variance. There can be a variance there.   13:32:54 |
| 10 | But also, if I had logged one, and at another   13:32:57 |
| 11 | time. So what the time that this thing -- that the   13:33:01 |
| 12 | ThermoPro recording, would not necessarily be the exact   13:33:07 |
| 13 | time frame that the one that I did personally for the   13:33:10 |
| 14 | log. They aren't necessarily the exact same minute.   13:33:14 |
| 15 | Q. But one being personally for the log being   13:33:18 |
| 16 | with the previous?   13:33:22 |
| 17 | A. With the -- yeah, with the previous   13:33:23 |
| 18 | thermometer that was in the drawer.   13:33:29 |
| 19 | Q. Got it.   13:33:30 |
| 20 | A. But one was done personally. The other one is   13:33:31 |
| 21 | tracked by its data collection. So it is different time   13:33:34 |
| 22 | frames.   13:33:37 |
| 23 | Q. Okay. Thank you. Okay. I think I'm all done   13:33:39 |
| 24 | with the temperature logs for now. I would like to ask   13:33:41 |
| 25 | you some questions about the testing of execution drugs.   13:33:45 |

Page 134

| | |
|---|---|
| 1 | Is that a process you've been involved in at all, the   13:33:52 |
| 2 | testing of these chemicals?   13:33:55 |
| 3 | A. No.   13:33:56 |
| 4 | Q. Do you know anything about their testing?   13:34:00 |
| 5 | A. No.   13:34:00 |
| 6 | Q. Do you know who was involved in that process?   13:34:01 |
| 7 | A. No.   13:34:04 |
| 8 | Q. Is that something you discussed with the   13:34:05 |
| 9 | person who delivered the drugs at all?   13:34:07 |
| 10 | A. No.   13:34:09 |
| 11 | Q. That makes that easy.   13:34:10 |
| 12 | (Exhibit 11 marked.)   13:34:10 |
| 13 | Q. (BY MR. HORWITZ) Let me move to Exhibit 11.   13:34:20 |
| 14 | So this is a "Certificate of Analysis." Is this a   13:34:31 |
| 15 | document you've seen before?   13:34:34 |
| 16 | A. I don't believe so, no.   13:34:37 |
| 17 | Q. Do you know anything about this document?   13:34:39 |
| 18 | A. I do not.   13:34:41 |
| 19 | Q. Have you seen any other certificate of   13:34:42 |
| 20 | analysis?   13:34:46 |
| 21 | A. Not that I recall.   13:34:47 |
| 22 | Q. Or any other documents reflecting test results   13:34:50 |
| 23 | for execution drugs?   13:34:55 |
| 24 | A. Not that I recall.   13:34:57 |
| 25 | (Exhibit 12 marked.)   13:34:57 |

Page 135

| | |
|---|---|
| 1 | Q. (BY MR. HORWITZ) Let's move on to the next   13:35:02 |
| 2 | exhibit, Exhibit 12. This is a letter from Hikma to   13:35:05 |
| 3 | some Idaho State officials, dated May 10th, 2021. Is   13:35:12 |
| 4 | this a document you've seen before?   13:35:18 |
| 5 | A. No.   13:35:25 |
| 6 | Q. I want to read to you just one sentence from   13:35:25 |
| 7 | this letter, which is on the first page, in the fourth   13:35:29 |
| 8 | paragraph. On the second part of that paragraph, it   13:35:35 |
| 9 | says, "We would like to make clear that our objection to   13:35:39 |
| 10 | the use of our medicines in capital punishment should be   13:35:44 |
| 11 | applied to all our products, whether manufactured within   13:35:49 |
| 12 | or outside or the U.S."   13:35:51 |
| 13 | Do you see the language I'm referring to?   13:35:53 |
| 14 | A. I do.   13:35:57 |
| 15 | Q. Would you agree with me that based on that   13:35:58 |
| 16 | paragraph, that Hikma is opposed to the use of its drugs   13:36:02 |
| 17 | in executions?   13:36:07 |
| 18 | MR. SMITH: Object to form. It calls for   13:36:07 |
| 19 | speculation.   13:36:07 |
| 20 | You can answer.   13:36:07 |
| 21 | THE WITNESS: Yes, I would say that's what it   13:36:11 |
| 22 | means, in my eyes.   13:36:13 |
| 23 | Q. (BY MR. HORWITZ) Let me go back to COA just   13:36:15 |
| 24 | for one quick question.   13:36:21 |
| 25 | A. Forgive me. Go back to where?   13:36:21 |

Page 136

| | |
|---|---|
| 1 | Q. I'm sorry. Exhibit 11 again.   13:36:27 |
| 2 | A. Okay.   13:36:27 |
| 3 | Q. So where it says "Sample" at the top, that   13:36:29 |
| 4 | second little box?   13:36:34 |
| 5 | A. Uh-huh.   13:36:34 |
| 6 | Q. And right after that it says "pentobarbital   13:36:35 |
| 7 | sodium." Is that a phrase you've seen before?   13:36:40 |
| 8 | A. I don't know the answer. I don't -- I may   13:36:44 |
| 9 | have. I don't recall.   13:36:47 |
| 10 | Q. So maybe you just answered this, but just to   13:36:48 |
| 11 | make sure that we're not leaving anything out. Can you   13:36:52 |
| 12 | tell me whether the -- either the boxes or the vials   13:36:56 |
| 13 | that you looked at said pentobarbital sodium?   13:37:00 |
| 14 | A. I can't say that.   13:37:05 |
| 15 | Q. Can you say that they included the word   13:37:12 |
| 16 | pentobarbital?   13:37:16 |
| 17 | A. Yes.   13:37:18 |
| 18 | Q. So moving on, again, back to Exhibit 12. In   13:37:25 |
| 19 | this letter, Hikma asked for written confirmation that   13:37:28 |
| 20 | IDOC does not have the company's drugs for executions.   13:37:34 |
| 21 | Do you know whether that confirmation was provided?   13:37:39 |
| 22 | A. No.   13:37:43 |
| 23 | Q. Do you know who might be able to answer that   13:37:44 |
| 24 | question?   13:37:44 |
| 25 | A. Would you imagine, Josh Tewalt.   13:37:46 |

Page 137

35 (Pages 134 - 137)

Randy Valley, Redacted April 16, 2025

Q. Have you had any contact with Hikma?    13:37:51

A. No, not that I'm aware of.    13:37:54

Q. Have you had any contact with any drug    13:37:56
manufacturers?    13:37:56

A. I received notice by one. I don't know who,    13:37:57
and forwarded it on, so...    13:37:57

Q. Can you tell me what kind of notice that was?    13:38:04

A. It was something similar to this.    13:38:06

Q. Okay. When was that; do you recall?    13:38:08

A. I do not.    13:38:12

(Exhibit 13 marked.)    13:38:18

Q. (BY MR. HORWITZ) Exhibit 13 is a similar    13:38:20
letter from Sagent to three Idaho State officials. And    13:38:23
maybe you could tell me. Does this look like the thing    13:38:30
that you were referring to?    13:38:33

A. I couldn't answer that. I don't know.    13:38:35

Q. Okay. And again, I want to read one sentence.    13:38:37
On the first page of this letter, at the top of the    13:38:40
second paragraph. It says, "As documented in our July    13:38:44
correspondence, Sagent specifically objects to any use    13:38:48
of its drug products in connection with any capital    13:38:54
punishment activities."    13:38:57

So the same question about this. Would you    13:39:01
agree that Sagent opposes the use of its products in    13:39:01
executions?    13:39:01

Page 138

MR. SMITH: Object to form. It calls for    13:39:01
speculation.    13:39:01

Go ahead, Randy.    13:39:10

THE WITNESS: Yeah, I would say they object    13:39:12
based on that statement.    13:39:14

Q. (BY MR. HORWITZ) And this is a -- you    13:39:15
probably already answered this sort of by implication,    13:39:18
but just to confirm. This is -- you don't recall seeing    13:39:22
this letter before?    13:39:26

A. I received a notice. I read very little of    13:39:28
it. I wasn't sure it wasn't a scam. So I forwarded it    13:39:32
on to be reviewed.    13:39:36

Q. How did you receive it?    13:39:37

A. It would be via email, I believe.    13:39:37

Q. Did you get any --    13:39:44

A. As a matter of fact, I'm sure it was an email.    13:39:46

Q. Who did you forward it to?    13:39:46

A. I believe legal.    13:39:47

Q. When you say "legal," can you just clarify who    13:40:00
it is that you are referring to?    13:40:05

A. One of our Deputy Attorney Generals.    13:40:06

Q. When you were notified by email, do you recall    13:40:15
who the email came from?    13:40:20

A. I do not.    13:40:21

Q. This is a yes or no question. Do you know    13:40:23

Page 139

whether the third set of execution drugs were    13:40:32
manufactured by a company that opposes the use of its    13:40:36
product in executions?    13:40:41

A. I do not.    13:40:43

Q. If you were to become aware that the answer to    13:40:44
that question was yes, would you do anything based on    13:40:47
that knowledge?    13:40:53

A. Notify our legal department.    13:40:55

Q. All right. I have some questions about    13:41:09
expiration dates, that I don't think will require any    13:41:11
exhibits, thankfully.    13:41:15

So we've talked about this a little bit, but    13:41:17
just to kind of button it up. My understanding is that    13:41:21
some portion of the drugs that were sent to F Block for    13:41:25
Mr. Creech's attempted execution of February 2024, came    13:41:31
back to the warden's office for potential use in a    13:41:36
future execution; is that correct?    13:41:40

A. Yes.    13:41:42

Q. And did that portion later expire?    13:41:42

A. I do not know.    13:41:48

Q. Do you know what was done with those drugs?    13:41:53

A. They were -- well, I know what happened to    13:41:57
them when they returned to the office, but I don't know    13:42:01
since then. There was no tracking between what went to    13:42:05
F Block, and what was returned, versus what was already    13:42:10

Page 140

in the drawer. So I can't say whether or not that two    13:42:14
of those vials that went down there were still 1 and 2,    13:42:19
or if they were just sent back to the --    13:42:23

Q. And the third set of drugs, those expired;    13:42:38
correct?    13:42:50

A. Yes.    13:42:50

Q. When did they expire?    13:42:50

A. I believe they expired in February.    13:42:52

Q. And what was done with them after they    13:42:54
expired?    13:42:57

A. I still have them today. We have not -- they    13:42:57
are still accounted for and checked.    13:43:01

Q. Is there a plan to do something with them?    13:43:03

A. Not that I'm aware of today.    13:43:05

Q. So there were some drugs that were returned to    13:43:08
the supplier after they expired; right?    13:43:15

A. Uh-huh.    13:43:18

Q. Do you know why those drugs were returned;    13:43:19
whereas, these other drugs that expired remain in your    13:43:21
office?    13:43:27

A. I -- we needed to get additional chemical by    13:43:27
my understanding. I would imagine the same thing will    13:43:32
happen with these. But at this point, I'm unaware of    13:43:36
any plan to do so.    13:43:41

Q. So just to make sure I'm understanding you.    13:43:42

Page 141

36 (Pages 138 - 141)

Randy Valley, Redacted April 16, 2025

**Page 142**

1   The drugs were returned to the supplier, because new   13:43:45
2   drugs were being acquired from the supplier; is that --   13:43:52
3       A. By my understanding, yes.   13:43:57
4       Q. And when you say, you would imagine the same   13:44:00
5   thing would happen again. You mean, if drugs were   13:44:00
6   obtained in the future, the expired drugs would again be   13:44:06
7   given to the supplier?   13:44:07
8       A. I would imagine, yes.   13:44:09
9       Q. Okay. Do you know what happened to the   13:44:13
10  expired drugs after the supplier took possession?   13:44:17
11      A. No.   13:44:20
12      Q. What is your understanding of IDOC's plan for   13:44:32
13  obtaining drugs in the future?   13:44:39
14      A. I'm unaware of any plans as of today.   13:44:40
15      Q. Do you know who would be aware of those plans?   13:44:44
16      A. Someone from the administrative team if there   13:44:49
17  is a plan. I don't know.   13:44:51
18      Q. Is it your understanding that when the drugs   13:44:51
19  were returned to the supplier that were expired, that   13:44:55
20  that took place in the same transaction, or the same   13:45:00
21  event at which the new drugs were?   13:45:03
22      MS. SCHINDELE: Objection; confidentiality.   13:45:06
23      Q. (BY MR. HORWITZ) So I believe you said   13:45:14
24  earlier, you have not been involved in the search for   13:45:17
25  drug sources. But I'm wondering whether you are   13:45:23

**Page 143**

1   involved in that -- whether you will be involved going   13:45:31
2   forward in any of that process, in determining a source,   13:45:35
3   approving of a source, that kind of thing?   13:45:41
4       A. I don't believe I will be.   13:45:43
5       Q. Who do you think will have that role?   13:45:46
6       A. I don't know who manages that as a part of the   13:45:50
7   administrative team.   13:45:53
8       Q. After the unsuccessful attempt to execute   13:46:02
9   Mr. Creech in February of 2024, are you aware of any   13:46:07
10  investigation being done by IDOC into that event, to   13:46:11
11  determine what happened, or what mistakes might have   13:46:16
12  been made, so forth?   13:46:20
13      A. I'm unaware of what happened prior to my   13:46:22
14  arrival. I don't believe there has been anything since   13:46:26
15  my arrival in June.   13:46:29
16      Q. Just a quick question about Exhibit 1 again.   13:46:34
17  And I don't even know that you necessarily need it in   13:46:49
18  front of you. But my question is about page 4. So   13:46:52
19  underneath the section for, the section for the warden,   13:47:03
20  about halfway down. It says, "Creating and maintaining   13:47:07
21  a log documenting the events leading up to the execution   13:47:11
22  date, that serves as a permanent record of the execution   13:47:16
23  activities."   13:47:16
24      Do you see what -- where I'm reading?   13:47:24
25      A. Yes.   13:47:26

**Page 144**

1       Q. Is that a log that you created during the   13:47:28
2   warrant for Mr. Creech in October?   13:47:29
3       A. Yes.   13:47:32
4       Q. And is that the log -- when you mentioned an   13:47:32
5   earlier log, is that the log you're referring to?   13:47:35
6       A. Yes.   13:47:37
7       Q. Where is that log now?   13:47:37
8       A. I believe it -- my management assistant has   13:47:38
9   those records.   13:47:41
10      Q. Is that Brett Phillips?   13:47:42
11      A. Yes.   13:47:45
12      Q. Would you write on that log, yourself?   13:47:45
13      A. Yes.   13:47:50
14      Q. Can you give me a sense of what sort of events   13:47:51
15  you would include there?   13:47:54
16      A. So things that were specifically outlined to   13:47:56
17  be completed by certain time frames within the SOP, I   13:48:00
18  logged when those things were completed. And I logged   13:48:06
19  my visits with Mr. Creech. I logged anything   13:48:10
20  significant that would have went on, I would have   13:48:16
21  logged. I don't recall if there was anything   13:48:19
22  significant, but...   13:48:22
23      Q. Would anyone else write on the log, apart from   13:48:22
24  you?   13:48:22
25      A. No.   13:48:23

**Page 145**

1       Q. Just a couple of questions about the physical   13:48:23
2   facilities at F Block. Do you have any role with   13:48:35
3   respect to the equipment that is to be used in an   13:48:42
4   execution?   13:48:45
5       A. No.   13:48:46
6       Q. Who is the person, or who are the people who   13:48:47
7   are involved in that?   13:48:53
8       A. I honestly don't know.   13:48:53
9       Q. And then a few questions about central line.   13:48:59
10  That's a phrase we've used today. But can you tell me   13:49:03
11  what you understand that to refer to?   13:49:06
12      A. It's a larger vein that's a little deeper into   13:49:08
13  access, but more reliable. I believe there are three   13:49:15
14  access points that are frequently used by hospitals to   13:49:19
15  gain access to that.   13:49:22
16      Q. Do you recall where they are on the body?   13:49:25
17      A. I believe there is a clavicle, a jugular, and   13:49:28
18  one in the thigh.   13:49:33
19      Q. And the latest protocol includes some   13:49:36
20  provisions on the central line. Were you involved in   13:49:40
21  the process by which that text was added to the   13:49:46
22  protocol?   13:49:50
23      A. No.   13:49:51
24      Q. Do you know who else was involved in that?   13:49:51
25      A. I do not.   13:49:53

37 (Pages 142 - 145)

Randy Valley, Redacted April 16, 2025

1    Q. Apart from the protocol, were you involved in  13:49:59
2  any discussions about IDOC making arrangements for a  13:50:04
3  potential central line execution?            13:50:12
4    A. No.                    13:50:17
5    Q. Do you have any familiarity with the equipment  13:50:17
6  for the central line?                13:50:17
7    A. Could you be more specific?        13:50:19
8    Q. Yeah, one maybe way to get into it would be to  13:50:20
9  ask at the trainings, do you see -- so my understanding  13:50:25
10  is there is a kit that is designed to be used as central  13:50:29
11  line execution. Is that a kit that you have seen?  13:50:34
12    A. Yes.                    13:50:41
13    Q. And what happens with that kit at the    13:50:41
14  training?                    13:50:41
15    A. I -- I honestly don't -- I've seen it. I know  13:50:42
16  they've pulled it out and went through the parts of it.  13:50:45
17  To what extent it's used when they actually go through  13:50:51
18  the training, I'm not in the room for that, so I don't  13:50:54
19  know.                    13:50:56
20    Q. Who -- who takes it out that you see?    13:50:58
21    A. The medical team.            13:51:00
22    Q. So my understanding is there is what we    13:51:06
23  sometimes called a CCTV system at F Block for    13:51:10
24  executions. I would talk to you a little bit about  13:51:17
25  that.                    13:51:21

Page 146

1    A. No.                    13:52:54
2    Q. Can it be moved?            13:52:54
3    A. Physically, but it can't be adjusted.    13:52:56
4    Q. Do you do anything with the CCTV system during  13:53:02
5  the trainings?                13:53:06
6    A. I'm the one that turns them on, and sets them,  13:53:06
7  and broadcasts them to the monitors.        13:53:10
8    Q. And apart from that, are you -- do you do    13:53:12
9  anything with the CCTV?            13:53:14
10    A. Be more specific.            13:53:16
11    Q. Well, do you adjust any settings or anything  13:53:18
12  like that?                    13:53:22
13    A. The only adjustment that is necessary is the  13:53:22
14  camera that does sit above the gurney in the -- in that  13:53:25
15  room. I -- I zoom in a little bit, so that it has a  13:53:32
16  more tight view of the procedure.        13:53:32
17    Q. How do you determine how far to zoom in?  13:53:37
18    A. I want to make sure that you can see everybody  13:53:40
19  in the room. But not so big that you can't see the  13:53:44
20  condemned. So it's -- I have a specific floor area that  13:53:44
21  I move it to each time.            13:53:55
22    Q. Where are you when you're adjusting the    13:53:55
23  settings?                    13:53:58
24    A. That's all done prior to the event. So I set  13:53:59
25  that up in an office before we begin.        13:54:02

Page 148

1    Can you tell me what part of the execution    13:51:21
2  process will be visible to the witnesses only through  13:51:24
3  the CCTV?                    13:51:28
4    A. Okay. So from the time that he -- the    13:51:36
5  condemned leaves the tier that they are on, on a gurney,  13:51:38
6  taken back to the prep room. That's all covered by  13:51:44
7  CCTV. It's not viewable from the witness areas. The  13:51:47
8  prep room is viewable by the television video    13:51:51
9  monitoring.                    13:51:51
10    And then the video monitoring captures them  13:51:51
11  all the way back, until they enter the chamber. When  13:52:00
12  they enter the chamber, is the only place in which they  13:52:02
13  have visible, eyes on.            13:52:07
14    Q. When will -- so the prep room has the capacity  13:52:09
15  to transmit the audio to the witness gallery?    13:52:15
16    A. Yes.                    13:52:22
17    Q. When will that audio be turned on?    13:52:23
18    A. When we enter the room with the condemned.  13:52:26
19    Q. Does that happen during the trainings as well?  13:52:30
20    A. It does.                13:52:34
21    Q. How is the camera angle and settings, how are  13:52:38
22  those determined?                13:52:43
23    A. The camera sits directly the -- where the    13:52:43
24  gurney is placed, and looks directly down upon it.  13:52:48
25    Q. Does it move?                13:52:52

Page 147

1    Q. An office at F Block?            13:54:04
2    A. Uh-huh.                13:54:07
3    MR. SMITH: Is that a "yes"?        13:54:08
4    THE WITNESS: Sorry. Yes.        13:54:10
5    Q. (BY MR. HORWITZ) Have there ever been any  13:54:12
6  problems with the CCTV system during trainings?  13:54:16
7    A. Yes.                    13:54:25
8    Q. And what sort of problems?        13:54:25
9    A. Early on, I didn't log into the system    13:54:27
10  correctly, and so I was having an issue.        13:54:30
11    Q. And that's been resolved since?        13:54:32
12    A. Yes.                    13:54:34
13    Q. Have there ever been times where the footage  13:54:35
14  has cut out?                    13:54:39
15    A. Yes.                    13:54:43
16    Q. Can you tell me about that?        13:54:46
17    A. Yeah, we had ran multiple sessions. So the  13:54:47
18  event ran -- I had came in and logged into it quite a  13:54:51
19  bit earlier than it would have been done. And we ran  13:54:54
20  several sessions. And it -- the system went out. The  13:54:59
21  computer basically went to sleep prior to the completion  13:55:03
22  of the second event.                13:55:06
23    Q. And it was your understanding that that was  13:55:08
24  just because of how long it was?        13:55:10
25    A. It was.                13:55:13

Page 149

38 (Pages 146 - 149)

**Page 150**

1  Q. What about the audio, has that ever cut out?  13:55:15
2  A. Not that I'm aware of.  13:55:18
3  Q. At the trainings, is the audio being tested?  13:55:20
4  A. Every training.  13:55:24
5  Q. How is it tested?  13:55:25
6  A. We run it.  13:55:27
7  Q. And are people speaking in the preparation  13:55:28
8  room?  13:55:31
9  A. Yes.  13:55:31
10  Q. Who's listening, is someone listening to them  13:55:32
11  in the witness room?  13:55:36
12  A. Uh-huh, yes.  13:55:37
13  Q. Who is listening to them?  13:55:38
14  A. People that play the witnesses for those.  13:55:41
15  Q. Have there ever been reports of issues with  13:55:44
16  the audio, with how much can be heard?  13:55:49
17  A. I want to say, yes. That when we first had  13:55:52
18  the audio installed in the prep room, I had witnesses  13:55:55
19  that had a hard time hearing it. And so I had to have  13:55:59
20  someone come down and adjust it, but not since.  13:56:03
21  Q. And what about the video, people watching the  13:56:06
22  video in the witness room, that's coming from the prep  13:56:10
23  room. Have there been any reports that people are  13:56:13
24  having difficulty seeing things, or anything like that?  13:56:16
25  A. No.  13:56:19

**Page 151**

1  (Exhibit 14 marked.)  13:56:19
2  Q. (BY MR. HORWITZ) Just a couple of quicker  13:56:26
3  exhibits, I think. So Exhibit 14, this is a concern  13:56:28
4  form. This concern was submitted June 17th, 2024. I'll  13:56:38
5  give you a second to get there.  13:56:44
6  MR. SANCHEZ: Just ask one question.  13:56:46
7  Q. (BY MR. HORWITZ) Yes, let me ask one  13:56:49
8  follow-up question before we move on to this exhibit.  13:56:52
9  Are there people playing the witnesses in both witness  13:56:55
10  rooms?  13:56:59
11  A. Generally, yes. Whether I have for clarity,  13:56:59
12  whether I have someone playing a witness, I have escort  13:57:04
13  team members, whose function it is to be in each of  13:57:08
14  those rooms. And they are in each of those rooms for  13:57:13
15  every training.  13:57:18
16  Q. And when there have been issues, the kind of  13:57:18
17  issues you've described with video or audio, have those  13:57:21
18  been in one room, in particular?  13:57:24
19  A. No.  13:57:26
20  Q. Both, both rooms?  13:57:26
21  A. Yes.  13:57:28
22  Q. Is it your understanding that the people in  13:57:29
23  those two rooms are seeing and hearing the exact same  13:57:33
24  thing through the CCTV system?  13:57:36
25  A. Yes.  13:57:39

**Page 152**

1  Q. Okay. On Exhibit 14, is this you that wrote  13:57:42
2  the reply?  13:57:48
3  A. It is.  13:57:49
4  Q. And the reply says, "SOP will be followed in  13:57:50
5  the event of any execution." You've spoken to this a  13:57:55
6  little bit, but I want to ask again. What do you  13:58:03
7  understand the SOP to require for video access for the  13:58:06
8  witnesses?  13:58:10
9  A. Repeat that, please.  13:58:12
10  Q. Sure. What aspects of an execution have to be  13:58:14
11  made visible, and what aspects of the execution have to  13:58:24
12  be seen and heard through CCTV by the witnesses under  13:58:30
13  that SOP? What does the SOP require as far as that  13:58:34
14  goes?  13:58:41
15  A. I don't know that our SOP requires -- I don't  13:58:41
16  know that that's delineated in the SOP.  13:58:45
17  Q. Are you aware of any other source of  13:58:47
18  requirements for that?  13:58:50
19  A. I -- my understanding is there is a legal  13:58:51
20  obligation, that it has to be viewable from the time the  13:58:56
21  procedure begins, or the event begins. And so that we  13:59:00
22  have set up camera viewing to be -- the video monitoring  13:59:06
23  to ensure that's capable.  13:59:10
24  (Exhibit 15 marked.)  13:59:18
25  Q. (BY MR. HORWITZ) All right. Exhibit 15 is  13:59:20

**Page 153**

1  another grievance-type document. And this is relating  13:59:21
2  to the same underlying concern. Is this response  13:59:28
3  something that you prepared? In the Level 1 response  13:59:33
4  area?  13:59:43
5  A. Forgive me. I'm reading this.  13:59:43
6  Q. Oh, no problem.  13:59:46
7  A. I don't recall this. I would imagine this is  13:59:48
8  mine. I -- it doesn't say that it is. And I don't  14:00:10
9  recall -- I don't recall this, specifically. But it is  14:00:14
10  within the time frame that that would have been my  14:00:17
11  responsibility, so...  14:00:20
12  Q. Okay. Let me ask you about one sentence in  14:00:22
13  particular in this response, which I'm curious for your  14:00:25
14  thoughts on, you know, regardless of whether you wrote  14:00:29
15  this or not or remembered or not.  14:00:33
16  So the second to last sentence of this  14:00:35
17  response says that, "IDOC denies that witnesses and  14:00:38
18  counsel have a constitutional right to examine or  14:00:42
19  observe your execution in minute detail."  14:00:46
20  And I'm just wondering if you have any  14:00:50
21  thoughts about what the phrase "minute detail" means  14:00:53
22  here?  14:00:55
23  A. So even from the witness rooms, when the  14:00:56
24  medical team would be in there, and it was a firsthand  14:00:59
25  viewing through the windows. The medical team obscures  14:00:59

Randy Valley, Redacted April 16, 2025

1  view when they are setting IV lines, depending on the    14:01:05
2  side of the body they are on. There is -- there -- the    14:01:07
3  only way to have someone be able to watch the very    14:01:07
4  specific would be to have them standing directly next to    14:01:10
5  a medical professional while they are actually doing    14:01:14
6  that work.                    14:01:18
7       And so there is, by my understanding, there is    14:01:19
8  no constitutional requirement that they have that level    14:01:21
9  of access to view that procedure.            14:01:24
10      Q. What is that understanding based on?    14:01:26
11      A. Just context, conversations, just my    14:01:29
12  experience with it. Just I don't know that I have a    14:01:35
13  legal like background in it, but just education through    14:01:38
14  process.                    14:01:41
15      Q. Got it. We've talked about the prep room    14:01:42
16  video. What about the -- so my understanding is there    14:01:50
17  are monitors in the -- what we often here refer to as    14:02:01
18  the chemical room or the mixing room, so the room    14:02:04
19  directly behind the chamber, where the    14:02:08
20  execution -- where the condemned is on the gurney. Do    14:02:10
21  you have -- do you think we're on the same page about    14:02:19
22  what room?                    14:02:20
23      A. Yes.                14:02:20
24      Q. So there are monitors in that room, is my    14:02:20
25  understanding, that show what's happening with the same    14:02:24

Page 154

1  IV lines; is that fair?                14:02:26
2      A. Yes.                    14:02:29
3      Q. At the trainings, do you look at those    14:02:29
4  monitors at all?                14:02:33
5      A. No.                    14:02:36
6      Q. Who is looking at those monitors?        14:02:36
7      A. The medical team.            14:02:39
8      Q. Have you been made aware of any issues with    14:02:39
9  visibility on those monitors?            14:02:46
10      A. Yes.                    14:02:49
11      Q. What kind of issues?            14:02:50
12      A. So when we replaced the -- when I had the    14:02:51
13  table removed that had been used previously, and brought    14:02:54
14  the gurney in. And we created a system for the gurney    14:02:57
15  to be utilized. The camera angles were no longer    14:03:01
16  adequate for the medical team. So we went through    14:03:08
17  training, and they said, we can't see who we want to    14:03:08
18  see.                    14:03:13
19      And so I would have my maintenance department    14:03:13
20  come out. And we would place them on the gurney, and    14:03:15
21  realigned all those cameras for that team to make sure    14:03:18
22  that they viewed the spaces that they wanted to view    14:03:21
23  based on what they told me they needed. And then they    14:03:21
24  came in and verified that at the next training, that the    14:03:24
25  camera angles for what they were looking for, and showed    14:03:25

Page 155

1  what they needed to see.                14:03:28
2      Q. During that process where renovation was    14:03:30
3  happening in F Block in the new preparation room, and so    14:03:36
4  forth, was there any consideration given to replacing    14:03:41
5  the wall that separates the execution chamber from the    14:03:47
6  mixing room?                    14:03:53
7      A. Not that I'm aware of.            14:03:55
8      Q. And there was no discussion about that being a    14:03:57
9  transparent surface, rather than a solid wall?    14:04:03
10      A. I can't answer that. I -- that was done prior    14:04:07
11  to my arrival.                14:04:10
12      Q. And you have not been part of any discussion    14:04:11
13  of that possibility?                14:04:15
14      A. No.                    14:04:16
15      Q. Has anything been done to allow for CCTV    14:04:22
16  access in the mixing room?            14:04:27
17      A. No.                    14:04:30
18      Q. Moving on to the firing squad.        14:04:32
19      A. Can I go back just for clarity's sake?    14:04:40
20      Q. Yes. Yeah, absolutely.            14:04:40
21      A. You used the term "mixing room." Are you    14:04:45
22  referring to the chemical room?            14:04:49
23      Q. Yes.                14:04:51
24      A. Okay.                14:04:51
25      Q. Yes, the chemical room.            14:04:51

Page 156

1      A. Then, no.                14:04:52
2      Q. Are there any other changes as far as    14:04:53
3  expanding CCTV access, that is under consideration?    14:04:58
4      A. Not that I'm aware of today, no.        14:05:01
5      Q. Have you had any role on the firing squad?    14:05:04
6      A. No.                    14:05:08
7      Q. I'll ask some question about the firing squad,    14:05:10
8  understanding the answer might be "no" to all of them.    14:05:16
9  But has IDOC done anything to the firing squad protocol,    14:05:21
10  to your knowledge?                14:05:26
11      A. Not that I'm aware of.            14:05:27
12      Q. Has IDOC done anything on firing squad    14:05:28
13  renovations, a firing squad facility?        14:05:36
14      A. I believe they are in the planning engineering    14:05:40
15  phase. But I -- there has been no construction that's    14:05:42
16  been done at this point.            14:05:45
17      Q. Do you have an expectation as to when    14:05:46
18  construction could begin?            14:05:48
19      A. I have been told, it could start the first of    14:05:49
20  the year. But I don't have any specific expectation of    14:05:53
21  when that will happen.                14:05:56
22      Q. Who is involved in that process that you know    14:05:57
23  of?                    14:05:59
24      A. The only person that I've spoken to in regards    14:06:00
25  to that, I believe, is the director, or previous    14:06:04

Page 157

40 (Pages 154 - 157)

director, Josh Tewalt.                                14:06:08

Q. Once that construction began, would you expect 14:06:13
to -- what would you expect your responsibilities to be 14:06:16
in terms of the firing squad, or in terms of the 14:06:23
construction, I should say?                             14:06:28

A. I would imagine I would have a role in that. 14:06:29
It's at my facility, and underneath my purview. So I am 14:06:33
responsible for maintenance, and those things that 14:06:40
happen inside of my fence lines. But outside of 14:06:41
managing the construction project in terms of getting 14:06:44
access, and setting up a staff member to, you know, to 14:06:48
be there with a construction team for safety, and those 14:06:51
type things, I would not have much.                     14:06:58

Q. Have you shown anyone around F Block as part 14:07:00
of the firing squad workup?                             14:07:05

A. Not that I recall.                                14:07:07

Q. Do you know who that -- do you know which 14:07:08
people at IDOC would be more involved in the details of 14:07:11
the firing squad process once it got further along? 14:07:17

A. I would imagine the administrative team. I 14:07:26
would think as it got further along, I would get 14:07:31
involved at some level. But at this stage, that hasn't 14:07:34
happened. And I don't know who all is a part of that 14:07:34
engineering planning phase.                             14:07:43

Q. Have you been part of any conversations about 14:07:44

Page 158

what technology might be utilized at a firing squad? 14:07:48

THE REPORTER: You have to --                         14:07:58

THE WITNESS: No.                                     14:07:58

THE REPORTER: -- answer --                           14:08:00

THE WITNESS: Sorry. I caught myself.                 14:08:01

Q. (BY MR. HORWITZ) Have there been any meetings 14:08:04
that you've been a part of on the firing squad? 14:08:06

A. Not that I -- outside of a briefing to let us 14:08:12
know the law was changing, I can't think of anything. 14:08:15

Q. Who gave you that briefing?                        14:08:17

A. We discussed it. I think Tewalt was, that 14:08:20
came out when that law was signed. We had training 14:08:24
pretty shortly thereafter. And we discussed that very 14:08:26
briefly just --                                        14:08:32

Q. Who else was part of that conversation? 14:08:32

A. My escort team, I believe.                        14:08:35

(Exhibit 16 marked.)                                 14:08:35

Q. (BY MR. HORWITZ) So Exhibit 16 is what I 14:08:40
usually call the chemical protocol. Is this a document 14:08:51
you are involved with?                                  14:08:56

A. Very, very minimally.                              14:08:56

Q. Well, I'll just ask, so this document was 14:08:59
created in 2024. Were you involved in the changes made 14:09:02
to the previous version?                                14:09:06

A. No.                                              14:09:08

Page 159

Q. Okay. And what about the protocol? We talked 14:09:09
about there being a new protocol that was issued at that 14:09:12
same time, October of 2024. Were you involved in the 14:09:16
changes of the protocol, the protocol being SOP? 14:09:20

A. I was not involved with any SOP development. 14:09:25

Q. Okay.                                            14:09:36

(Exhibit 17 marked.)                                 14:09:36

Q. (BY MR. HORWITZ) Exhibit 17, the final 14:09:37
concern form that I wanted to talk with you about. So 14:09:46
this is dated October 31st, 2024. And the response 14:09:49
says, "SOP doesn't explain changes from previous 14:09:53
versions. It just explains the current process, nor are 14:09:54
they designed to explain why changes are made." 14:09:55

Is that a response that you wrote?                     14:09:58

A. It is.                                            14:10:00

Q. So the response is that the SOP is not 14:10:01
designed to explain changes. Is there something else 14:10:14
that is designed to explain changes?                    14:10:18

A. Not necessarily.                                 14:10:23

Q. Can you elaborate on that?                         14:10:24

A. Depending on the changes, I -- you know, 14:10:26
things happen at a facility, things change regularly. 14:10:28
We try to provide notice to our population of what's 14:10:32
changing, how we're changing it on the front end. You 14:10:36
know, I'll go down and meet with specific individuals or 14:10:39

Page 160

populations to talk about upcoming things. So, yeah, is 14:10:43
there an avenue sometimes to talk about specific 14:10:46
changes, and how it impacts my population? Yes. But 14:10:49
that's not -- policy is not designed to do that. 14:10:54

Q. With the execution protocol, in particular, 14:10:55
did any of that sort of thing occur with the discussions 14:10:59
with the inmate population, and so forth?               14:11:03

A. I can't answer that, because I can't answer 14:11:06
for what Warden Richardson did or didn't do with that 14:11:18
population.                                            14:11:14

Q. So I guess I am thinking about the latest 14:11:19
execution protocol issued October 11th, 2024. You were 14:11:23
warden at that time; correct?                          14:11:28

A. I was.                                            14:11:30

Q. So wouldn't you be aware if that process had 14:11:31
occurred with the latest execution protocol?           14:11:35

A. I thought policy was sooner than that. 14:11:38
So I know I went down, and I go down and meet with the 14:11:43
death row residents. I answer questions to the best 14:11:44
that I can. But I wasn't a part of that SOP 14:11:48
development. So I wouldn't necessarily be able to 14:11:52
answer why specific changes did or didn't happen. 14:11:55

(Beginning of confidential attorneys' eyes 14:11:55
only portion of transcript.)***                        14:11:55

14:11:55

Page 161

Veritext Legal Solutions
Calendar-Idaho@veritext.com  208-343-4004

09 121989

Randy Valley, Redacted April 16, 2025

| | | | |
|---|---|---|---|
| 1 | 14:12:00 | 1 | 14:14:32 |
| 2 | 14:12:08 | 2 | 14:14:36 |
| 3 | 14:12:13 | 3 | 14:14:40 |
| 4 | 14:12:16 | 4 | 14:14:44 |
| 5 | 14:12:22 | 5 | 14:14:48 |
| 6 | 14:12:25 | 6 | 14:14:52 |
| 7 | 14:12:26 | 7 | 14:14:56 |
| 8 | 14:12:30 | 8 | 14:15:01 |
| 9 | 14:12:32 | 9 | 14:15:05 |
| 10 | 14:12:36 | 10 | 14:15:06 |
| 11 | 14:12:37 | 11 | 14:15:11 |
| 12 | 14:12:42 | 12 | 14:15:11 |
| 13 | 14:12:46 | 13 | 14:15:14 |
| 14 | 14:12:48 | 14 | 14:15:16 |
| 15 | 14:12:50 | 15 | 14:15:19 |
| 16 | 14:12:54 | 16 | 14:15:22 |
| 17 | 14:12:56 | 17 | 14:15:26 |
| 18 | 14:13:00 | 18 | 14:15:30 |
| 19 | 14:13:02 | 19 | 14:15:31 |
| 20 | 14:13:06 | 20 | 14:15:31 |
| 21 | 14:13:10 | 21 | 14:15:35 |
| 22 | 14:13:15 | 22 | 14:15:39 |
| 23 | 14:13:16 | 23 | 14:15:40 |
| 24 | 14:13:17 | 24 | 14:15:42 |
| 25 | 14:13:20 | 25 | 14:15:46 |
| | Page 162 | | Page 164 |
| 1 | 14:13:23 | 1 | 14:15:49 |
| 2 | 14:13:27 | 2 | 14:15:55 |
| 3 | 14:13:29 | 3 | 14:15:58 |
| 4 | 14:13:33 | 4 | 14:16:00 |
| 5 | 14:13:33 | 5 | 14:16:06 |
| 6 | 14:13:36 | 6 | 14:16:11 |
| 7 | 14:13:41 | 7 | 14:16:14 |
| 8 | 14:13:43 | 8 | 14:16:18 |
| 9 | 14:13:47 | 9 | 14:16:23 |
| 10 | 14:13:52 | 10 | 14:16:26 |
| 11 | 14:13:55 | 11 | 14:16:32 |
| 12 | 14:13:56 | 12 | 14:16:32 |
| 13 | 14:13:59 | 13 | 14:16:35 |
| 14 | 14:14:03 | 14 | 14:16:40 |
| 15 | 14:14:06 | 15 | 14:16:41 |
| 16 | 14:14:07 | 16 | 14:16:47 |
| 17 | 14:14:12 | 17 | 14:16:47 |
| 18 | 14:14:12 | 18 | 14:16:47 |
| 19 | 14:14:16 | 19 | 14:16:51 |
| 20 | 14:14:16 | 20 | 14:16:53 |
| 21 | 14:14:19 | 21 | 14:16:53 |
| 22 | 14:14:22 | 22 | 14:16:56 |
| 23 | 14:14:25 | 23 | 14:16:56 |
| 24 | 14:14:29 | 24 | 14:17:00 |
| 25 | 14:14:31 | 25 | 14:17:05 |
| | Page 163 | | Page 165 |

42 (Pages 162 - 165)

Randy Valley, Redacted April 16, 2025

**Page 166**

| Line | Time |
|---|---|
| 1 | 14:17:06 |
| 2 | 14:17:10 |
| 3 | 14:17:11 |
| 4 | 14:17:15 |
| 5 | 14:17:19 |
| 6 | 14:17:22 |
| 7 | 14:17:28 |
| 8 | 14:17:29 |
| 9 | 14:17:33 |
| 10 | 14:17:39 |
| 11 | 14:17:45 |
| 12 | 14:17:51 |
| 13 | 14:17:53 |
| 14 | 14:17:57 |
| 15 | 14:18:03 |
| 16 | 14:18:08 |
| 17 | 14:18:09 |
| 18 | 14:18:14 |
| 19 | 14:18:18 |
| 20 | 14:18:18 |
| 21 | 14:18:22 |
| 22 | 14:18:23 |
| 23 | 14:18:23 |
| 24 | 14:18:29 |
| 25 | 14:18:33 |

**Page 168**

1     14:20:12
2     14:20:12
3     14:20:15
4     14:20:17
5     (Conclusion of confidential portion of   14:20:17
6     transcript.)***   14:20:26
7     MR. HORWITZ: I think that's all I have for   14:20:26
8     now. Would it be okay with you all if we took just   14:20:28
9     maybe a ten-minute break and confer. And maybe we'll   14:20:31
10    have just a handful of additional questions?   14:20:37
11    MR. SMITH: Do you have a room to take --   14:20:40
12    MR. HORWITZ: Yes. Yeah. Yeah.   14:20:42
13    THE VIDEOGRAPHER: We are off the record. It   14:20:44
14    is 2:20 p.m.   14:20:47
15    (Recess.)   14:20:49
16    THE VIDEOGRAPHER: We are back on the record.   14:35:20
17    The time is 2:36 p.m.   14:35:23
18    Q. (BY MR. HORWITZ) I think just a few kind of   14:35:29
19    miscellaneous things to kind of clean up things, and   14:35:32
20    then we'll let you go.   14:35:33
21    Is there a protocol, or sort of guidelines for   14:35:35
22    how communications happen when there is an active death   14:35:42
23    warrant? Are there, you know, is there sort of a text   14:35:46
24    chain, or an email chain? Is there a system in place   14:35:51
25    that directs everyone to communicate in the same way?   14:35:54

**Page 167**

| Line | Time |
|---|---|
| 1 | 14:18:33 |
| 2 | 14:18:36 |
| 3 | 14:18:39 |
| 4 | 14:18:46 |
| 5 | 14:18:50 |
| 6 | 14:18:53 |
| 7 | 14:18:56 |
| 8 | 14:19:01 |
| 9 | 14:19:05 |
| 10 | 14:19:07 |
| 11 | 14:19:10 |
| 12 | 14:19:15 |
| 13 | 14:19:23 |
| 14 | 14:19:25 |
| 15 | 14:19:28 |
| 16 | 14:19:28 |
| 17 | 14:19:31 |
| 18 | 14:19:34 |
| 19 | 14:19:39 |
| 20 | 14:19:42 |
| 21 | 14:19:45 |
| 22 | 14:19:46 |
| 23 | 14:20:00 |
| 24 | 14:20:04 |
| 25 | 14:20:12 |

**Page 169**

1     A. No. In reference to -- can I ask for a little   14:35:58
2    more specifics, like in reference to what regarding   14:36:04
3    executions?   14:36:07
4    Q. Well, I'm interested in anything -- anything   14:36:08
5    covered by that umbrella. But, you know, maybe just to   14:36:12
6    give you a few specific examples. If, say, the   14:36:15
7    administrative team is communicating amongst itself with   14:36:19
8    an active warrant, does that communication happen in a   14:36:25
9    particular way?   14:36:28
10    A. No.   14:36:29
11    Q. Can you tell me sort of the range of ways in   14:36:29
12    which it happens?   14:36:32
13    A. I talked a lot on the phone. I'm sure I get   14:36:33
14    some emails. A lot of it's verbal, just because it's   14:36:38
15    immediate, and I can ask questions, and that kind of   14:36:43
16    thing. It's a little harder to do over Teams, or email,   14:36:47
17    that type of thing, or a text. It's just easier to do   14:36:50
18    over a phone for those things. But there is no protocol   14:36:55
19    specific to how that's done. So it's just a preference   14:36:58
20    for me. I much prefer to use a text when it's viable,   14:37:01
21    but...   14:37:06
22    Q. And Teams, so Microsoft Teams is something?   14:37:06
23    A. Yes.   14:37:11
24    Q. Is that -- what is that used for in connection   14:37:11
25    with executions?   14:37:15

43 (Pages 166 - 169)

Randy Valley, Redacted April 16, 2025

1  A. Nothing by spelled out that I can think of.    14:37:16
2  Q. What do --    14:37:19
3  A. It's just a communication platform that we can    14:37:22
4  chat back and forth, like an instant message.
5  Q. And even apart from what's spelled out in a    14:37:29
6  protocol, are there certain kinds of discussions that    14:37:31
7  tend to happen over Teams with a warrant?    14:37:35
8  A. Not that I can think of.    14:37:37
9  Q. But it is a way that the administrative team    14:37:39
10 communicates amongst itself sometimes?    14:37:44
11 A. Yeah. Yes.    14:37:47
12 Q. And what about communications between you and    14:37:49
13 staff at IMSI in regards to executions, do those happen    14:37:52
14 in a certain way?    14:37:57
15 A. So a couple of different ways. I have a    14:37:58
16 morning meeting in which a lot of my leadership attends.    14:38:02
17 So we have a daily, Monday through Friday briefing at    14:38:05
18 9:00. And so once we had a death warrant, I attended    14:38:12
19 most of those meetings when I was available to kind of    14:38:16
20 give an update of where we're at, and what's going on.    14:38:18
21 Any needs that we had or issues that we were having in    14:38:20
22 terms of the operation of F Block. And then, I believe,    14:38:21
23 I sent out at least an initial email, that we were    14:38:26
24 underneath the death warrant, kind of what to expect    14:38:29
25 with that.    14:38:33
Page 170

1      After that, I actually relinquished control of    14:38:34
2  the facility to my deputy warden. And they take over    14:38:38
3  operations. And so I don't recall if I sent any    14:38:42
4  follow-up emails or not. But just in terms of hitting    14:38:46
5  everyone that works in the facility with the pertinent    14:38:49
6  information, an email would be the way to go for that.    14:38:52
7  Q. Who is your deputy warden?    14:38:55
8  A. I have two, Dave Dietz, and Collin Young.    14:38:58
9  Q. And how do you spell Dietz?    14:39:03
10 A. D-i-e-t-z.    14:39:06
11 Q. And which one of those was designated as your    14:39:10
12 stand-in during the warrant?    14:39:12
13 A. During the warrant in October/November?    14:39:14
14 Q. Yes.    14:39:14
15 A. That was Dave Dietz.    14:39:18
16 Q. The key to the drawer that holds execution    14:39:20
17 drugs, is there a copy of that?    14:39:25
18 A. Not that I'm aware of.    14:39:27
19 Q. I know you said you don't look at the monitors    14:39:32
20 in the chemical room during the trainings. I'm just    14:39:36
21 wondering if at any time, even outside of those    14:39:41
22 trainings, you ever looked at those monitors    14:39:44
23 specifically when a person was on the gurney?    14:39:47
24 A. Yes.    14:39:50
25 Q. When was that?    14:39:50
Page 171

1  A. When we were setting up to realign them, I was    14:39:51
2  the one that stayed in the chemical room to watch the    14:39:55
3  monitors, because I knew the view that they wanted. So    14:39:59
4  I was communicating over a radio to the people in the
5  chamber to explain where I needed that camera to move.    14:40:06
6  Q. And they, "they" in that sentence, the changes    14:40:10
7  they wanted. "They" is the medical team?    14:40:15
8  A. Yes.    14:40:17
9  Q. Do you recall how Director Tewalt's departure    14:40:23
10 was announced?    14:40:30
11 A. I was notified on a conference call, a video    14:40:31
12 conference call.    14:40:35
13 Q. And who was it who announced it?    14:40:36
14 A. He did.    14:40:39
15 Q. Who was on the conference call?    14:40:39
16 A. All of his upper level leadership, I believe.    14:40:41
17 All of district managers, wardens, I believe most of the    14:40:45
18 key leadership from headquarters.    14:40:53
19 Q. When was that?    14:40:56
20 A. I don't recall specifically.    14:40:57
21 Q. Did he explain why he was departing in that    14:40:58
22 conference call?    14:41:01
23 A. Not specifically that I recall, just that what    14:41:02
24 he was moving on to.    14:41:07
25 Q. What was he moving on to?    14:41:08
Page 172

1  A. A private industry.    14:41:11
2  Q. Do you know what industry?    14:41:12
3  A. I believe he's going to do consulting work.    14:41:14
4  It's my understanding.    14:41:18
5  Q. Were there any non-IDOC people on that call    14:41:20
6  that you are aware of?    14:41:26
7  A. No.    14:41:28
8  Q. Was there any kind of written announcement of    14:41:30
9  the departure?    14:41:33
10 A. Yeah, he sent out an email, I believe, the    14:41:34
11 next day.    14:41:37
12 Q. And that also did not explain the reason for    14:41:38
13 the departure?    14:41:41
14 A. I don't recall what exactly was in the email.    14:41:42
15 I don't -- you know, what he said in terms of why he was    14:41:45
16 leaving, and just what he was moving on to.    14:41:47
17 Q. Do you know who the email went out to?    14:41:50
18 A. Everyone in the agency, I believe.    14:41:53
19 Q. So we talked about the honoraria, which are in    14:41:56
20 the final exhibit.    14:42:01
21 A. Uh-huh.    14:42:02
22 Q. I don't think we need to get back into the    14:42:02
23 exhibit. I'm wondering, during the times where you've    14:42:05
24 been involved in execution trainings before you were the    14:42:10
25 warden, so when you were playing the part of the    14:42:13
Page 173

44 (Pages 170 - 173)

Randy Valley, Redacted April 16, 2025

| | Page 174 |
|---|---|
| 1 | condemned, are these documents that you had any -- did  14:42:17 |
| 2 | you have any involvement with the honoraria during that  14:42:20 |
| 3 | period of time?  14:42:26 |
| 4 | A. No.  14:42:26 |
| 5 | Q. The device that you purchased to monitor the  14:42:27 |
| 6 | temperature of the drugs, is that something that  14:42:33 |
| 7 | you -- did that device go through any kind of approval  14:42:38 |
| 8 | process within the department?  14:42:41 |
| 9 | A. Explain approval process.  14:42:44 |
| 10 | Q. Is there -- were there any forms that you  14:42:46 |
| 11 | filled out, that someone would have to sign-off and say,  14:42:49 |
| 12 | this is an appropriate expenditure. This is the, you  14:42:52 |
| 13 | know, the model that we approve of, that sort of thing?  14:42:56 |
| 14 | A. Every expenditure has to get approved. So,  14:43:00 |
| 15 | yeah, there were people that signed off on my purchase.  14:43:04 |
| 16 | But I couldn't tell you who that was. But in terms of  14:43:08 |
| 17 | the product that I purchased, or for the immed- -- the  14:43:12 |
| 18 | purpose in which I -- of why I bought it? No, there was  14:43:15 |
| 19 | no review, specific review process for that.  14:43:19 |
| 20 | Q. And even if you can't tell me who the  14:43:22 |
| 21 | individuals were involved in approving it, can you give  14:43:29 |
| 22 | me a sense of sort of where that approval process takes  14:43:33 |
| 23 | place?  14:43:36 |
| 24 | A. Fiscal has to sign off on purchases, spending  14:43:36 |
| 25 | authority has to. So in this particular instance, I  14:43:41 |

| | Page 175 |
|---|---|
| 1 | would, my AA, actually, I went in and said, hey, this is  14:43:43 |
| 2 | what I'd like to have ordered, and she ordered it. It  14:43:48 |
| 3 | was signed off by myself, and another member of my  14:43:51 |
| 4 | management as well, it was someone at fiscal level.  14:43:54 |
| 5 | Q. Your aide being your administrative assistant?  14:43:58 |
| 6 | A. Yes.  14:43:58 |
| 7 | Q. Who is that?  14:43:58 |
| 8 | A. Lalonni (phonetic) Howard.  14:44:02 |
| 9 | Q. And fiscal and spending was that the second?  14:44:02 |
| 10 | A. So one of my -- typically, one of my deputy  14:44:07 |
| 11 | wardens would sign-off on a purchase. He reviews them  14:44:12 |
| 12 | and says, that is a reasonable purchase and that. And  14:44:16 |
| 13 | then it goes to me. I would sign-off, if necessary,  14:44:18 |
| 14 | depending on cost center. So more than likely in that  14:44:22 |
| 15 | situation, it was probably signed off by my deputy  14:44:26 |
| 16 | warden.  14:44:30 |
| 17 | Q. Okay. Can you tell me, I thought you used the  14:44:30 |
| 18 | phrase "fiscal" and the phrase "spending"?  14:44:31 |
| 19 | A. No.  14:44:34 |
| 20 | Q. Maybe I misheard.  14:44:35 |
| 21 | A. No, my fiscal department would --so there is  14:44:37 |
| 22 | like depending on what you are purchasing, and where you  14:44:41 |
| 23 | are purchasing it from, has different people that sign  14:44:44 |
| 24 | off on those.  14:44:47 |
| 25 | Q. Fiscal --  14:44:47 |

| | Page 176 |
|---|---|
| 1 | A. In that case, it's a P-card purchase, and I  14:44:49 |
| 2 | don't know who all has to sign-off on those.  14:44:52 |
| 3 | Q. The P-card, a P-card purchase, the device  14:44:54 |
| 4 | we're talking about is a P-card purchase?  14:44:59 |
| 5 | A. I believe so, yes.  14:45:02 |
| 6 | Q. And fiscal, is that part of headquarters?  14:45:03 |
| 7 | A. Yes.  14:45:07 |
| 8 | Q. When you are -- when you are manipulating the  14:45:08 |
| 9 | data, or not manipulating. But when you are taking in  14:45:17 |
| 10 | the data from the device that monitors the temperature.  14:45:23 |
| 11 | Can you tell me a little more detail what you do? Is  14:45:27 |
| 12 | that through your office computer that that data is  14:45:31 |
| 13 | processed?  14:45:34 |
| 14 | A. So, yes. So I connect to it. I have it send  14:45:35 |
| 15 | that data to my work email. And then I go in, open the  14:45:40 |
| 16 | email. It has the information is there, and in an Excel  14:45:46 |
| 17 | document, because I have the data exported. And then I  14:45:53 |
| 18 | go in, open that up, and print it, and sign it.  14:45:56 |
| 19 | Q. And you connect to that device from your  14:45:59 |
| 20 | computer?  14:46:03 |
| 21 | A. With my cell phone.  14:46:03 |
| 22 | Q. With your cell phone. Is there an app on your  14:46:04 |
| 23 | cell phone that does that?  14:46:08 |
| 24 | A. Uh-huh.  14:46:09 |
| 25 | Q. Do you know the name of that app?  14:46:10 |

| | Page 177 |
|---|---|
| 1 | A. It's the ThermaPro app. You go connect to the  14:46:13 |
| 2 | device, and you connect to it.  14:46:18 |
| 3 | Q. Is that your work cell?  14:46:20 |
| 4 | A. No, actually, it's my personal that I use for  14:46:22 |
| 5 | that. I didn't have a work cell at the time I got the  14:46:27 |
| 6 | device.  14:46:31 |
| 7 | Q. When did you get a work cell?  14:46:31 |
| 8 | A. Probably in December.  14:46:36 |
| 9 | Q. Is that -- why did that happen in December?  14:46:37 |
| 10 | A. The department is moving away from a stipend.  14:46:42 |
| 11 | It is a fiscal thing. We are just moving back to  14:46:43 |
| 12 | issuing phones for people that have on-call  14:46:43 |
| 13 | responsibilities.  14:46:46 |
| 14 | Q. Who has on-call responsibilities?  14:46:48 |
| 15 | A. Myself, my deputy wardens, my captain.  14:46:50 |
| 16 | Q. So this --  14:46:57 |
| 17 | A. That's just my location, so...  14:46:58 |
| 18 | Q. Uh-huh.  14:47:01 |
| 19 | A. There is a lot of other people that have those  14:47:01 |
| 20 | types of responsibilities.  14:47:04 |
| 21 | Q. Those people had work cell phones at some  14:47:06 |
| 22 | point in the past. And then it was they no longer had  14:47:09 |
| 23 | cell phones; is that my understanding?  14:47:13 |
| 24 | A. No. We had our -- we had a stipend for our  14:47:15 |
| 25 | personal cell phones to use for work. And they have  14:47:18 |

45 (Pages 174 - 177)

**Page 178**

1  been slowly going through and issuing people with    14:47:20
2  phones, and withdrawing the stipend.    14:47:25
3      Q.  I see.    14:47:27
4      A.  But not everybody has one.  But we're    14:47:28
5  working -- from what I can tell, we're working to that    14:47:32
6  end.    14:47:35
7      Q.  And with downloading the data from the device,    14:47:35
8  you've got that email from that device, you get only    14:47:40
9  that data when you initiate the process?    14:47:43
10      A.  Yes.    14:47:46
11      Q.  Do you know if that device has the capability,    14:47:46
12  such that you could ask it to alert you if the    14:47:49
13  temperature exceeded, or went below a certain range?    14:47:53
14      A.  I don't believe so.    14:47:59
15      Q.  Can you describe at all, the people who are    14:48:05
16  playing the witnesses during the trainings?  Can you    14:48:10
17  tell me how they are chosen for that role?    14:48:14
18      A.  It -- so people who come down and play the    14:48:17
19  witness, are generally just folks that are down there    14:48:21
20  that don't have a function in the deal.  So if I have a    14:48:24
21  deputy director that is down there that isn't playing    14:48:28
22  one of the main roles.  They will go sit in the witness    14:48:30
23  room to witness from that location.  We have brought in,    14:48:36
24  you know, at times, the wardens group when they are in    14:48:39
25  town, and we've got a meeting.  If we have training    14:48:39

**Page 179**

1  scheduled, we will kind of observe the process, and play    14:48:46
2  witnesses.  I've done the same with the deputy wardens    14:48:48
3  group, and we've brought them out for training.  And so    14:48:52
4  it's kind of a combination.    14:48:55
5      Q.  So what are the groups; the warden group and    14:48:57
6  the deputy warden group?    14:49:01
7      A.  So there is ten wardens for the Idaho    14:49:03
8  Department of Corrections.  So each one runs a facility.    14:49:07
9  So when we have an in-person meeting locally that    14:49:09
10  coincides with that, we've invited everybody out.  It's    14:49:15
11  not mandatory, but most show up.    14:49:16
12      Q.  How many people would you say are in those    14:49:19
13  witness rooms on average, during those trainings?    14:49:21
14      A.  On average, very few, a few people in each.    14:49:24
15      Q.  I believe you said, at one point, there was an    14:49:29
16  issue with the audio from the preparation room.  Can you    14:49:32
17  give me any more detail about what that issue was, if    14:49:37
18  you would discover it, was it a mechanical?    14:49:41
19      A.  No, it was just -- it was just a volume issue.    14:49:43
20  So I brought my maintenance crew out to readjust it.    14:49:47
21      Q.  And they were adjusting it on the mic. itself,    14:49:52
22  or where were they adjusting it?    14:49:56
23      A.  No, all that equipment resides in a secure    14:49:59
24  location out in F Block.  So it's in a locked cabinet.    14:50:05
25  Maintenance came out and adjusted it.  I just don't know    14:50:07

**Page 180**

1  how, so...    14:50:09
2      Q.  If you were to learn that the drugs that IDOC    14:50:10
3  had obtained for use in execution, had been made by a    14:50:16
4  company that was opposed to their use for that purpose,    14:50:21
5  would you still oversee the execution using those drugs?    14:50:24
6      A.  I would oversee my responsibilities as they    14:50:28
7  apply to policy.  What chemical is used for that, is not    14:50:31
8  my decision.    14:50:36
9      MR. HORWITZ:  Okay.  I think we're good.    14:50:38
10      MS. SCHINDELE:  Okay.  Thank you very much.    14:50:46
11      THE VIDEOGRAPHER:  Okay.  This concludes    14:50:48
12  today's videotape deposition.  The time is 2:52 p.m.    14:50:50
13  And we are off the record.    14:50:58
14      (Deposition concluded at 2:50 p.m.)
15      (Signature requested.)

**Page 181**

1      REPORTER'S CERTIFICATE
2      I, COLLEEN P. DOHERTY, CSR No. 345, Certified
3  Shorthand Reporter, certify:
4      That the foregoing proceedings were taken
5  before me at the time and place therein set forth, at
6  which time the witness was put under oath by me;
7      That the testimony and all objections made were
8  recorded stenographically by me and transcribed by me or
9  under my direction;
10      That the foregoing is a true and correct record
11  of all testimony given, to the best of my ability;
12      I further certify that I am not a relative or
13  employee of any attorney or party, nor am I financially
14  interested in the action.
15      IN WITNESS WHEREOF, I set my hand and seal this
16  29th day of April, 2025.
17
18
19
20
21  COLLEEN P. DOHERTY, CSR 345
22  Notary Public
23  1109 West Main Street, Suite 220
24  Boise, Idaho  83702
25  My commission expires September 7, 2029.

46 (Pages 178 - 181)

| | |
|---|---|
| 1   Kristina Schindele, Esq. | 1   Pizzuto, Jr. v. Tewalt, Et Al. |
| 2   krschind@idoc.idaho.gov | 2   Randy Valley, Redacted (#7170133) |
| 3      April 30, 2025 | 3      ACKNOWLEDGEMENT OF DEPONENT |
| 4   RE:   Pizzuto, Jr. v. Tewalt, Et Al. | 4    I, Randy Valley, Redacted, do hereby declare that I |
| 5    4/16/2025, Randy Valley, Redacted (#7170133) | 5   have read the foregoing transcript, I have made any |
| 6    The above-referenced transcript is available for | 6   corrections, additions, or changes I deemed necessary as |
| 7   review. | 7   noted above to be appended hereto, and that the same is |
| 8    Within the applicable timeframe, the witness should | 8   a true, correct and complete transcript of the testimony |
| 9   read the testimony to verify its accuracy. If there are | 9   given by me. |
| 10   any changes, the witness should note those with the | 10 |
| 11   reason, on the attached Errata Sheet. | 11   _____   _____ |
| 12    The witness should sign the Acknowledgment of | 12   Randy Valley, Redacted     Date |
| 13   Deponent and Errata and return to the deposing attorney. | 13   *If notary is required |
| 14   Copies should be sent to all counsel, and to Veritext at | 14    SUBSCRIBED AND SWORN TO BEFORE ME THIS |
| 15   Calendar-Idaho@veritext.com | 15   _____ DAY OF _____, 20___. |
| 16    Return completed errata within 30 days from | 16 |
| 17   receipt of testimony. | 17 |
| 18    If the witness fails to do so within the time | 18   _____ |
| 19   allotted, the transcript may be used as if signed. | 19   NOTARY PUBLIC |
| 20 | 20 |
| 21 | 21 |
| 22      Yours, | 22 |
| 23      Veritext Legal Solutions | 23 |
| 24 | 24 |
| 25            Page 182 | 25            Page 184 |

1   Pizzuto, Jr. v. Tewalt, Et Al.

2   Randy Valley, Redacted (#7170133)

3      E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____   _____

24   Randy Valley, Redacted     Date

25            Page 183

47 (Pages 182 - 184)