# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **IN RE:** | | |
| **SUBPOENA ISSUED TO TENNESSEE** | ) | |
| **DEPARTMENT OF CORRECTION BY** | ) | |
| **GERALD ROSS PIZZUTO, JR.** | ) | |
| | ) | |
| **GERALD ROSS PIZZUTO, JR.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 3:25-mc-00003** |
| | ) | **Judge Trauger/Frensley** |
| **JOSH TEWALT, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

## I.    INTRODUCTION AND BACKGROUND

This matter is before the Court upon the Tennessee Department of Correction's ("The Department") Motion to Quash a subpoena issued to it by Plaintiff Gerald Ross Pizzuto ("Mr. Pizzuto") in *Pizzuto v. Tewalt*, D. Idaho No. 1:21-cv-00359. Docket Nos. 1, 2. The Department has also filed supporting documents. Docket Nos. 1-1 through 1-13. Mr. Pizzuto has filed a Response in Opposition and supporting documents. Docket Nos. 8, 8-1 through 8-17. The Department has filed a Reply. Docket No. 13. For the reasons set forth below, the Department's Motion to Quash (Docket No. 1) is **GRANTED**.

In 1986, Mr. Pizzuto was found guilty of, among other charges, two counts of murder in the first degree "in connection with Berta Louise Herndon and her adult nephew Delbert D. Herndon," for which he received the death penalty. *State v. Pizzuto*, 810 P.2d 680, 686 (Idaho 1991). The Court need not reiterate the details of these crimes, as the facts are well-documented

in Mr. Pizzuto's many legal proceedings. *See*, *e.g.*, *id*. Since his conviction, the State of Idaho

has either dismissed or denied Mr. Pizzuto's six petitions for post-conviction relief. *Id.; see*

*Pizzuto v. State*, 127 Idaho 469 (1995); *Pizzuto v. State*, 134 Idaho 793 (2000); *Pizzuto v. State*,

No. 32679, 2007 Ida. LEXIS 209, at *2 (Nov. 23, 2007); *Pizzuto v. State*, 146 Idaho 720 (2008);

*Pizzuto v. State*, 149 Idaho 155 (2010). On September 9, 2021, Mr. Pizzuto filed a Complaint for

Equitable, Declaratory, and Injunctive Relief pursuant to 41 U.S.C. § 1983 challenging the Idaho

Department of Correction's execution protocol. *Pizzuto v. Tewalt*, No. 1:21-cv-00359, Docket

No. 1, p. 1-2. He claims Idaho's use of pentobarbital at his execution will "create[] a substantial

risk of pain and suffering because of his health conditions [terminal bladder cancer, coronary

artery disease, type 2 diabetes] and medical history, amongst other factors." *Id*. at p. 20. As a part

of his suit against the Idaho Department of Correction, Mr. Pizzuto has issued a subpoena to the

Department requesting "all DOCUMENTS generated between December 1, 2024, and the

present REGARDING any PENTOBARBITAL that YOU obtained for use or potential use in

executions." Docket No. 1-1, p. 7 (citation modified).

## II.    LAW AND ANALYSIS

The Federal Rules of Civil Procedure provide that a party may command documents,

electronically stored information, tangible things, or inspection of premises from a non-party by

subpoena. Fed. R. Civ. P. 45(a)(1)(C); Fed. R. Civ. P. 45(d)(1), Advisory Commission Notes to

1991 Amendment ("the subpoena for documents or tangible things [is subject to] the same scope

as provided in Rule 26(b)"); see generally  Fed. R. Civ. P. 26(b). Parties may only obtain

"nonprivileged," "relevant," and "proportional" matters. Fed. R. Civ. P. 26(b)(1).  Rule 45 sets

forth the conditions under which, on timely motion, a court must or may quash or otherwise

modify a subpoena:

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    (i)      fails to allow a reasonable time to comply;

    (ii)     requires a person to comply beyond the geographical limits specified in Rule 45(c);

    (iii)    requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

    (iv)    subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    (i)      disclosing a trade secret or other confidential research, development, or commercial information; or

    (ii)     disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

    (i)      shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

    (ii)     ensures that the subpoenaed person will be reasonably compensated.

Fed. R. Civ. P. 45(d)(3).

The Department asserts that Mr. Pizzuto's subpoena must be quashed because "the Department is immune" from the subpoena, the discovery sought under the subpoena is subject to a "participant-supplier" privilege, the discovery is "irrelevant to Pizzuto's case," and the

3

burdens imposed by the subpoena are "disproportionate to the needs of Pizzuto's case." Docket No. 2, p. 7-8, 12, 13.

### A. <u>Sovereign Immunity</u>

The Department argues the Court must quash the subpoena because the Department is protected under sovereign immunity. Docket No. 2, p. 7. The Department asks this Court to adopt the reasoning of the Fifth Circuit Court of Appeals in *Russell v. Jones*, that because subpoenas are "a coercive judicial process," they fall under the umbrella of sovereign immunity. *Id.* at p. 8. Conversely, Mr. Pizzuto argues that the word "suit" in the Eleventh Amendment is narrower, applying only to "a cause of action seeking relief against a defendant." Docket No. 8, p. 3.

The Eleventh Amendment shields States from "*any* suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." USCS Const. Amend. 11 (emphasis added); *see* USCS Const. Amend. 11 annotations ("This Amendment resulted from the decision in the case of *Chisholm v Georgia*, in which it was held that a state was suable in the Supreme Court by individual citizens of another state") (citation modified). As such, States and their agencies enjoy a "residuary and inviolable sovereignty." The Federalist No. 39, at 245 (James Madison) (C. Rossiter ed. 1961); *see* The Federalist No. 81 (Alexander Hamilton) ("It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent"); *Alabama v. Pugh*, 438 U.S. 781, 781 (1978) (confirming that the State of Alabama and the Alabama Board of Correction is immune from suit "unless Alabama has consented to the filing of such a suit"); *accord Alden v. Maine*, 527 U.S. 706, 743 (1999) ("The concerns voiced at the ratifying conventions, the furor raised by Chisholm, and the speed and unanimity with which the Amendment was adopted,

4

moreover, underscore the jealous care with which the founding generation sought to preserve the sovereign immunity of the States"). A State loses sovereign immunity if Congress abrogates the State's immunity by exercising its power under the Fourteenth Amendment or the State "unequivocally" waives its immunity by consenting to suit. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Edu. Expense Bd.*, 527 U.S. 666, 670 (1999) (affirming the Court of Appeals for the Federal Circuit's dismissal of a Lanham Act suit against a Florida state agency because Congress had not abrogated the agency's immunity and the State did not "unequivocally" waive sovereign immunity).  The Department is correct that neither Congressional abrogation nor State waiver has occurred in this case. Docket No. 2, p. 8.

The reach of state sovereign immunity has expanded beyond the plain language of the Eleventh Amendment.  *See*, *e.g.*, *Hans v. Louisiana*, 134 U.S. 1, 10 (1890) (holding that a State has sovereign immunity when it is "sued as a defendant by one of its *own* citizens") (emphasis added); *Smith v. Reeves*, 178 U.S. 436, 448 (1900) (stating the Eleventh Amendment "appl[ies] equally to a suit of that character brought against the State by a corporation created by Congress); *Principality of Monaco v. Mississippi*, 292 U.S. 313, 329 (1934) ("To suits against a State, without her consent, brought by citizens of another State or by citizens or subjects of a *foreign* State, the Eleventh Amendment erected an absolute bar") (emphasis added). Thus, a "suit against a State" is not merely confined to the "name of the titular parties" but can be established "by the essential nature and effect of the proceeding, as it appears from the entire record." *Ex parte N. Y.*, 256 U.S. 490, 500 (1921). The Supreme Court, in *Dugan v. Rank*, noted "the general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." 371 U.S. 609,

5

620 (1963) (citation modified). If an action "walks, talks, and squawks very much like a lawsuit," then the action is an adjudication, and therefore barred by sovereign immunity. *Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 751 (2002).

The question of whether a subpoena is contemplated under the Eleventh Amendment's meaning of "suit" is a disputed matter between the circuits. *See*, *e.g.*, *U.S. E.P.A. v. Gen. Elec. Co.*, 197 F.3d 592, 597 (2d Cir. 1999) (holding a subpoena issued to EPA by General Electric was "barred by sovereign immunity in the absence of a waiver"); *Russell v. Jones*, 49 F.4th 507 (5th Cir. 2022) (subpoenas are "a coercive judicial process" because they are "issue[d] under the court's authority and are enforced by court order" and thus are barred by sovereign immunity); *In re Missouri Dep't. of Nat. Res.*, 105 F.3d 434, 436 (8th Cir. 1997) ("There is simply no authority for the position that the Eleventh Amendment shields government entities from discovery in federal court"); *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 780 (9th Cir. 1994) (noting that allowing government agencies to be shielded from subpoenas via sovereign immunity would "violate the fundamental principle [of the Supreme Court's *United States v. Bryan* ruling] that the public has a right to every man's evidence") (citation modified); *see generally* Jennifer Lynch, *The Eleventh Amendment and Federal Discovery: A New Threat to Civil Rights Litigation*, 62 FLA. L. REV. 203 (2010).

Though the Sixth Circuit precedent on this issue is minimal, the Court can glean some insight from an Eastern District of Kentucky case. In *Adkins v. Fields*, former defendant Ben Fields served a subpoena to the Commonwealth of Kentucky Attorney General's Office seeking unredacted copies of discovery materials in relation to the Commonwealth's previous criminal case against him. 747 F. Supp. 3d 1052, 1054 (E.D. Ky. 2024). The District Court agreed with the Court of Appeals for the Fifth Circuit's analysis in *Russell v. Jones*, holding "subpoenaing the

Attorney General's Office would infringe on its immunity from suit, including discovery . . .

[f]urther, the subpoena would appear to interfere with the public administration of the Attorney

General's office . . . ." *Id*. at 1057-58. The Court also relied on *Mitchell v. Forsyth*, in which the

Supreme Court noted "*Harlow* thus recognized an entitlement not to stand trial or face the other

burdens of litigation . . . The entitlement is an *immunity from suit* . . . and like an absolute

immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* at 1058

(quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). The Court recognizes that the Eastern

District of Kentucky and the Fifth Circuit are in the minority.

Ultimately, a non-party subpoena does not fall under the meaning "suit" for purposes of

sovereignty immunity. First, sovereign immunity is triggered when there is "an *adversarial*

proceeding against a non-consenting state." *S.C. State Ports Auth v. Fed. Mar. Comm'n*, 243 F.3d

165, 172 (4th Cir. 2001), reversed on other grounds by *Fed. Mar. Comm'n v. S.C. State Ports*

*Auth.*, 535 U.S. 743 (2002) (emphasis added). A suit "denotes proceedings instated for the

purpose of enforcing a right or otherwise seeking justice," while a subpoena is a procedural tool

which "order[s] the production of documents or other things." Black's Law Dictionary (12th ed.

2024). While a suit is an inherently an "adversarial proceeding," a subpoena is not because there

is no greater remedy sought in a subpoena itself beyond compliance with its demands. *See*, *e.g.*,

*Cohens v. Virginia*, 19 U.S. 264, 408-410 (1821) (clarifying that a writ of error is not a suit for

purposes of sovereign immunity under the Eleventh Amendment because "to commence suit, is

to demand something by the institution of process in a Court of justice," while "the effect of a

writ of error is simply to bring the record in Court . . ."). In fact, the Supreme Court commented

on a subpoena's limits in *United States v. Nixon*, stating that while "the demands of and the

resistance to the subpoena present an obvious controversy in the ordinary sense, that alone is

7

insufficient to meet constitutional standards," of a controversy for purposes of determining justiciability. 418 U.S. 683, 696 (1974), *superseded by statute on other grounds*.

Second, the Supreme Court has previously declined to extend the Eleventh Amendment to proceedings that are ancillary to a main lawsuit. *See*, *e.g.*, *Florida Department of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697 (1978) (declining to apply sovereign immunity to an admiralty warrant proceeding because the "warrant itself merely secure[d] possession of the property; its execution [did] not finally adjudicate the State's right to the artifacts"); *accord* 62 FLA. L. REV. 203, n. 321 ("While a subpoena may constitute an inconvenience, it is merely a request for documents and information; it is not presumptively 'adversarial' or adversarial in the first instance"). In this case, Mr. Pizzuto — as a death-row inmate in Idaho, contesting the grounds of his impending execution to be carried out by the Idaho Department of Correction — is simply not in a conflict with Tennessee, but with Idaho. *See* Docket No. 2, p. 5. As such, the nature of his discovery requests from the Department are ancillary to his primary suit against the State of Idaho. This subpoena, particularly as a nonparty subpoena, is not "adversarial" because its primary function is to assist in Mr. Pizzuto's case in Idaho rather than an adjudication. Therefore, it is not shielded under sovereign immunity.

### B. Participant-Supplier Privilege

The Department next argues that the Court should enforce a "participant-supplier privilege" rooted in what it describes as a balancing test from *Jaffe v. Redmond* and Tennessee's state secrecy statute to preclude discovery of the lethal injection chemical's supplier. Docket No. 2, p. 8-10; *see Jaffee v. Redmond*, 518 U.S. 1, 9-15 (1996) (upholding a psychotherapist-patient privilege based on the "uniform judgment of the States," the Advisory Committee's proposed privilege rules, and a finding that such privilege "promotes sufficiently important interest to

8

outweigh the need for probative evidence . . .") (quoting *Trammel v. United States*, 445 U.S. 40, 51 (1980)) (citation modified). Rule 501 of the Federal Rules of Evidence empowers federal courts to define new privileges governed by the common law "in light of reason and experience." Fed. R. Evid. 501; *Jaffee*, 518 U.S. at 8. Rule 501's legislative history indicates that its purpose is to provide flexibility for courts to examine privilege on a "case-by-case basis." Fed. R. Evid. 501 Notes of Committee on the Judiciary, Senate Report No. 93-1277 ("Rather, our action should be understood as reflecting the view that the recognition of a privilege based on a confidential relationship and other privileges should be determined on a case-by-case basis"); *see Trammel*, 445 U.S. at 47 ("In rejecting the proposed Rules and enacting Rule 501, Congress manifested an affirmative intention not to freeze the law of privilege"). The common law principle of privilege should be considered in light of a competing right, that "[t]he public . . . has the right to every man's evidence." *United States v. Bryan*, 339 U.S. 323, 331 (1950). Thus, any exceptions "to the demand for every man's evidence are not lightly created nor expansively construed . . . ." *Nixon*, 418 U.S. at 710.

It is clear that the Department has a "significant interest in meting out a sentence of death in a timely fashion." *Nelson v. Campbell*, 541 U.S. 637, 644 (2004); *Cooey v. Strickland*, 604 F.3d 939, 946 (6th Cir. 2010). It is also clear Rule 501 is not meant to encourage "forum shopping" to avoid State privilege laws. *See* Fed. R. Evid. 501, Notes of Committee on the Judiciary, House Report No. 93-650 ("The rationale underlying the proviso is that federal law should not supersede that of the States in substantive areas such as privilege absent a compelling reason."); *cf. McClesky v. Zant*, 499 U.S. 467, 491 (1991) ("[T]he power of a State to pass laws means little if the State cannot enforce them"). Additionally, it is apparent that "state privileges and their policies may not be ignored in applying Rule 501 to discovery disputes" in federal

9

cases. *Farley v. Farley*, 952 F. Supp. 1232, 1236 (M.D. Tenn. 1997). However, the mere presence of the Tennessee "secrecy statute" does not mandate the creation of a federal "participant-supplier" privilege for the suppliers of lethal injection chemicals.

Tennessee's "secrecy statute" states:

> Notwithstanding any other law to the contrary, those parts of the record identifying an individual or entity as a person or entity who or that has been or *may in the future be directly involved in the process of executing a sentence of death shall be treated as confidential and shall not be open to public inspection.* For the purposes of this section "person or entity" includes, but is not limited to, an employee of the state who has training related to direct involvement in the process of executing a sentence of death, a contractor or employee of a contractor, a volunteer who has direct involvement in the process of executing a sentence of death, or *a person or entity involved in the procurement or provision of chemicals*, equipment, supplies and other items for use in carrying out a sentence of death . . . *Information made confidential by this subsection (h) shall be redacted wherever possible* and nothing in this subsection (h) shall be used to limit or deny access to otherwise public information because a file, a document, or data file contains confidential information.

Tenn. Code Ann. § 10-7-504(h)(1)-(2) (emphasis added). Although the identity of the supplier would certainly be a "person or entity involved in the procurement or provision of chemicals," the statute contemplates redactions "whenever possible" and discourages use of the statute as a means to "deny access." *Id*. Further, the Court recognizes the Court of Appeals for the Sixth Circuit has declined to interpret these state secrecy statutes as creating a new privilege that binds courts. *Fears v. Kasich (In re Ohio Execution Protocol Litig.)*, 845 F.3d 231, 239 (6th Cir. 2016) ("[T]his result does not federalize the Ohio secrecy law as a common-law privilege for immunity"). The Tennessee Supreme Court, when asked to consider whether such a privilege exists, decided not to address the issue because the defendants' identities were ultimately irrelevant to the execution protocol itself. *West v. Schofield*, 460 S.W.3d 113, 125 (Tenn. 2015)

10

("Nevertheless, we conclude that it is unnecessary to adopt such a privilege in this case because, as set forth below, we hold that the John Doe Defendants' identities are not relevant to the subject matter of this action"). The Court of Appeals for the Ninth Circuit, in an order responding to Mr. Pizzuto's subpoena against the Idaho Department of Correction, also declined to create a "participant-supplier" privilege. *Pizzuto v. Tewalt*, 131 F.4th 1070, 1083 (9th Cir. 2025) ("We agree with the district court that 'Idaho's secrecy statute does not create an evidentiary privilege that binds federal courts in federal question cases.' And we are not persuaded to declare a new federal evidentiary privilege in the identity of a state's execution drug supplier"). In keeping with the precedent of this circuit and our sister circuit, this Court declines to create a new "participant-supplier" privilege on the basis of the Tennessee secrecy statute in Section 10-7-504(h)(1)-(2).

On the issue of a common law privilege, the balancing test utilized by the Supreme Court in *Trammel* and *Jaffee* is not, as the Department claims, the same as that utilized the Court of Appeals for the Fourth Circuit in *United States v. Cartledge*. Docket No. 2, p. 9; *compare United States v. Cartledge*, 928 F.2d 93, 96 (4th Cir. 1991) (the Court of Appeals reversed a district court order on a Federal Rule of Evidence 501 issue because the district court "did not balance the historical with policy consideration" and "the concerns of comity between state and federal sovereigns" against "the need to enforce the federal criminal statute") *with Trammel*, 445 U.S. at 51 ("We must decide whether the privilege . . . promotes sufficiently important interests to outweigh the need for probative evidence in the administration of criminal justice") *and Jaffee*, 518 U.S. at 9 ("The question we address today is whether a privilege . . . promotes sufficiently important interests to outweigh the need for probative evidence . . .").

There is no doubt that a "participant-supplier" privilege would promote an important interest: namely, the State's ability to carry out executions without unnecessary delay. *See Fears*

*v. Kasich (In re Ohio Execution Protocol Litig.)*, 845 F.3d at 238 ("To ignore [the State's] interest in a capability to perform executions is to ignore the elephant in the room"). It is also apparent there is a countervailing interest in preventing state governments from using their own developed privileges to avoid answering for alleged conduct. *See Farley v. Farley*, 952 F.Supp. 1232, 1238 (M.D. Tenn. 1997) (modifying a protective order to include additional limited disclosure of state child-abuse records in a federal civil-rights case) ("Accordingly, the agency should not be permitted to use a privilege designed to ensure the welfare of those it governs when it is in possession of relevant evidence and is itself the target of a lawsuit"); *see also John B. v. Goetz*, 879 F.Supp. 2d 787, 902 (M.D. Tenn. 2010) ("The federal courts have repeatedly held that the interest in ensuring governmental compliance with federally-guaranteed civil rights is paramount to the state interest in confidentiality") (quoting *Farley*, 952 F.Supp. at 1240). By failing to concede any material, even heavily redacted material, the Department is asking for this Court to create a common law privilege more stringent than Tennessee has statutorily enshrined. Such a privilege would prevent criminal defendants from ever accessing potentially outcome-determinative discovery when seeking relief from the country's harshest penalty. Therefore, in a matter as severe and final as the commission of capital punishment, this Court is reluctant to create an entirely new federal evidentiary privilege on the basis of common law.

C.  **The Undue Burden Standard under Rule 45**

The Department asserts that Mr. Pizzuto's subpoena is not only irrelevant but also imposes burdens on the Department that are disproportionate to the needs of Mr. Pizzuto's case. Docket No. 2, p. 12-13. As relevance is one of the factors the Court considers when evaluating whether a subpoena "subjects a person to undue burden" under Rule 45, the Court will evaluate both relevance and burden here. Fed. R. Civ. P. 45(d)(3)(A)(iv); *In re Modern Plastic Corp.*, 890

F.3d 244, 251 (6th Cir. 2018) (assessing undue burden involves considering "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described, and the burden imposed"). The target of the subpoena's status as a non-party is also a factor for consideration. *In re Modern Plastics Corp.*, 890 F.3d at 251.

    1.  <u>Relevance</u>

For the purposes of discovery, relevance is broadly construed, and courts give parties latitude in their requests. *See*, *e.g.*, *Coleman v. American Red Cross*, 23 F.3d 1091, 1097 (6th Cir. 1994). It is also unquestionable that "neither may a plaintiff be permitted to go fishing and a trial court retains discretion to determine that a discovery request is too broad and oppressive." *In re Ohio Execution Protocol Litig.*, 845 F.3d at 236 (quoting *Surles v. Greyhound Lines, Inc.*, 474 F.3d 288, 305 (6th Cir. 2007)) (citation modified). Mr. Pizzuto argues that the Department's records are relevant "based on the likelihood that Tennessee and Idaho have the same source of execution drugs. If they do, and if there are chemical flaws in TDOC's drugs, that obviously increases the chances that there are likewise deficiencies in Idaho's pentobarbital." Docket No. 8, p. 8. Mr. Pizzuto also cites to the Southern District of Indiana's holding in his favor, that "[i]f Indiana and Idaho do in fact have the same supplier, then documents related to the stability of Indiana's pentobarbital" are relevant. *Id.* at p. 10.

This Court disagrees with the Southern District of Indiana's determination and finds that Mr. Pizzuto's claim to relevance is far too attenuated. Mr. Pizzuto's suit is against the Idaho Department of Correction for alleged violations in its execution protocol. *Pizzuto*, 136 F.4th at 858. The weak connection between Mr. Pizzuto's suit and the subpoena before this Court is demonstrated in Mr. Pizzuto's own filing: *If* Tennessee and Idaho have the same supplier and *if*

13

there are chemical flaws in Tennessee's drug, then there *might* be an increased *chance* of deficiencies in Idaho's drug. Docket No. 8, p. 8-10. This is, quite simply, the very definition of a fishing expedition in discovery. Further, even if Tennessee and Idaho were to have the same source of drugs, something which is entirely undetermined, information regarding Tennessee's execution protocol would still have little relevance to Mr. Pizzuto's pending execution in Idaho. *See Middlebrooks v. Parker*, 22 F.4th 621, 618 (6th Cir. 2022) (denying a rehearing *en banc* concerning Middlebrook's challenge of Tennessee's execution protocol as violating the Eight Amendment) ("without more, pentobarbital's continued availability in other jurisdictions is immaterial").

It is true the Court of Appeals for the Ninth Circuit earlier this year ruled in Mr. Pizzuto's favor, holding the district court did not abuse its discretion in finding Mr. Pizzuto's subpoena requesting "[t]he date that the drugs were obtained, the geographic origin of the drugs, and the type of company formulating the drugs" relevant. *Pizzuto*, 131 F.4th at 1802-3. However, the Ninth Circuit was considering a subpoena issued to the *Idaho* Department of Correction, the Department which would be carrying out Mr. Pizzuto's execution. *Id*. The Ninth Circuit also stressed the limits of their holding, clarifying, "we are not holding that those who face execution are always entitled to the challenged discovery Plaintiff sought here." *Id*. at 1087. For the reasons forementioned, the Court does not find this ruling persuasive in determining the relevance of Tennessee's execution protocols.

Further, while Mr. Pizzuto frequently claims that he is *not* seeking the identity of Tennessee's lethal injection chemical supplier, his entire argument for relevancy stems from the extremely speculative claims that Tennessee and Idaho have identical suppliers. This is the exact

14

circuitous disclosure of confidential information about which the Department voiced legitimate concern. Although relevance is a low bar, there must be some bar and Mr. Pizzuto fails to meet it.

    2.  <u>The Burden Imposed on the Department</u>

The Department's primary argument that compliance with Mr. Pizzuto's subpoena would be burdensome is that any disclosure of information sought in the subpoena would hinder the State's ability to carry out executions because "even with the best-intentioned counsel and carefully written protective orders, the disclosure of information [related to lethal injection chemical suppliers] has repeatedly leaked and interrupted executions." Docket No. 2, p. 3. The Court, while also contemplating the subpoena's irrelevance, agrees.

Again, it is undisputed that, "at some point in time, the State has a right to impose a sentence . . . because there is a powerful and legitimate interest in punishing the guilty." *Workman v. Bredesen*, 486 F.3d 896, 913 (6th Cir. 2007) (quoting *Calderon v. Thompson*, 523 U.S. 538, 566 (1998)) (citation modified). Further, "[i]f execution by lethal injection is legal, and the United States Supreme Court has repeatedly said it is, then it follows that there must be some manner of carrying it out." *In re Ohio Execution Protocol Litig.*, No. 2:11-cv-1016, 2015 WL 6446093, 2015 U.S. Dist. LEXIS 144926 at *44 (S.D. Ohio Oct. 26, 2015). Therefore, the Court "should then regard discovery that overly burdens or outright prevents a state from obtaining the drugs, materials, or assistance needed to execute by lethal injection as suspect . . . ." *Id*.

The Supreme Court has recognized that when "anti-death-penalty advocates pressure[] pharmaceutical companies [in]to refus[ing] to supply the drugs used to carry out death sentences," it creates a "practical obstacle" for States to administer the death penalty "in a quick and painless fashion." *Glossip v. Gross*, 576 U.S. 863, 869-870 (2015). The Sixth Circuit also acknowledged that this exact issue, as expressed in *Glossip* and feared by the Department, has

occurred in Tennessee. *Middlebrooks*, 22 F.4th at 625 ("Tennessee had to change its execution protocol despite its courtroom victory . . . [b]ecause anti-death penalty activists had successfully lobbied one manufacturer to stop selling the drug to any state using it for executions"); *cf. In re Ohio Execution Protocol Litig.*, 845 F.3d at 239 ("As the district court's findings support, but for the protective order, Defendants will suffer an undue burden and prejudice in effectuating Ohio's execution protocol and practices"). The Ninth Circuit, in granting the Idaho Department of Correction a protective order regarding Mr. Pizzuto's subpoena, also expressed concern for the state's burden. *Pizzuto*, 131 F.4th at 1080 ("If the identity of the State's execution drug supplier or information leading to the supplier's identity were revealed, there is no way to undo that disclosure").

In addressing its burden, the Department points to the recent history of Tennessee's execution protocol. Docket No. 2, p. 5. When Tennessee implemented lethal injection as an execution protocol in 1998, it involved the injection of three chemicals, including "5 grams of sodium thiopental." *Workman*, 486 F.3d at 902. In 2011, Hospira, the country's sole provider of sodium thiopental, ceased production after anti-death penalty activists "chased the manufacturer" out of the country. *Id.* at p. 3.[1] This forced Tennessee to change its protocol by using a single drug, pentobarbital. *See* Tenn. Code Ann. § 40-23-114(c) (2012). Pentobarbital shortly also became unavailable after "[a]nti-death-penalty advocates lobbied the Danish manufacturer of the drug to stop selling it for use in executions." *Glossip*, 576 U.S. at 871. This caused Tennessee to revert back to a three chemical injection. *Abdur'Rahman v. Parker*, 558 S.W.3d 606, 611 (Tenn. 2018) ("Tennessee is among those states turning to midazolam"). The Department has clearly

---

[1] *See also* Nathan Koppel, *Drug Halt Hinders Executions in the U.S.*, WALL ST. J. (Jan. 22, 2011), https://www.wsj.com/articles/SB10001424052748704754304576095980790129692?st=37ilor4uduk20v9& [https://perma.cc/2S78-QQ2Q].

16

demonstrated multiple instances in which activist pressure on suppliers directly burdened its execution protocol and thus, its ability to carry out lawful sentences.

Mr. Pizzuto raises the argument that because the identity of the federal government's lethal injection supplier was "leaked" through other means, this Court should allow more information regarding the Department's execution protocol to become available. Docket No. 8, p. 17. Mr. Pizzuto's reasoning is counter-intuitive. In fact, the very reality that a television host and his researchers were able to discover the federal supplier's identity through methods beyond litigation, and that same supplier subsequently told lawmakers several months later that it has "no intention to resume any production or sale of pentobarbital" concretely demonstrates the Department's burden.[2] As the Department opined, this information is highly sought out by activists and the media, creating at the very minimum, a strong incentive for companies to not contract with State agencies for this purpose. Docket No. 2, p. 1-3; *see* Docket Nos. 1-3 through 1-7. When the identity of a lethal injection chemical supplier is leaked through *any* means, it can frustrate a State's lawful imposition of a death sentence. This Court should be skeptical of being the vehicle through which such information could be even inadvertently disclosed.

When considering the burden posed to the department with the irrelevance of Mr. Pizzuto's subpoena, the Court can hardly contemplate a rationale to place the confidentiality of the Tennessee's lethal injection chemical supplier in jeopardy to respond to a subpoena issued by an individual facing the death penalty in a *different* state. Perhaps, if Mr. Pizzuto was a death-row inmate in Tennessee, the Department's burden would not be undue, but the Court need not make that determination here.

---

[2] The Court tracked the supplier's response to the Last Week Tonight Segment through the Death Penalty Information Center. https://deathpenaltyinfo.org/john-olivers-last-week-tonight-criticizes-execution-secrecy-laws-and-sketchy-procurement-of-pentobarbital-by-federal-government and https://deathpenaltyinfo.org/federal-execution-drug-supplier-says-it-will-no-longer-produce-pentobarbital-for-executions .

17

### D.  A Protective Order is Insufficient

Although the Department has not requested a protective order as an alternative relief to quashing the subpoena, the Court can consider a protective order on its own initiative pursuant to the Rules. Fed. R. Civ. P. 45(d)(3); *see also* Red. R. Civ. P. 26(b). Due to the certain irrelevance of Tennessee's execution protocol to Mr. Pizzuto's claim, as well as the burden posed by the Department in carrying out executions, the Court will not consider a protective order in depth.  It is not true that a protective order could never be sufficient when a death penalty defendant seeks discovery regarding execution protocols, but rather that in this case, Mr. Pizzuto's request — even with a protective order in place — would be disproportionate to the needs of his suit against the Idaho Department of Correction.

The Southern District of Ohio's ruling, and the Sixth Court's subsequent affirmation, in *In re Ohio Execution Protocol Litigation* is persuasive. Both the Department and Mr. Pizzuto agree these cases are "on-point." Docket No. 8, p. 13; *see In re Ohio Execution Protocol Litig.*, 2015 U.S. Dist. LEXIS 144926; *In re Ohio Execution Protocol Litig.*, 845 F.3d 231. On September 28, 2011, fifteen inmates facing execution by the Ohio Department of Correction filed a suit pursuant to 42 U.S.C. § 1983 challenging Ohio's execution protocol and practice. *See, e.g.* Seventh Amended Complaint, at 7-8, *In re Ohio Execution Protocol Litig.*, 2015 U.S. Dist. LEXIS 144926 (Docket No. 1010). The suit included state officials as well as "anonymous drug manufacturers." *In re Ohio Execution Protocol Litig.*, 845 F.3d at 233. The Defendants moved for a protective order, which the District Court granted. *Id*. at 233.

The District Court's broad protective order was as follows:

> The Court therefore ORDERS that any information or record in Defendants' possession, custody, or control that identifies or *reasonably would lead to the identification of any person or entity* who participates in the acquisition or use of the specific drugs,

18

> compounded or not, that Ohio indicates in its execution protocol it will use or will potentially seek to use to carry out executions is protected and not subject to discovery. This protective order is intended to extend to those persons who or entities that have not waived or forfeited its protection and who manufacture, compound, import, transport, distribute, supply, prescribe, prepare, administer, use, or test the compounding equipment or components, the active pharmaceutical ingredients, the execution protocol drugs or combination of drugs, the medical supplies, or the medical equipment used in carrying out any execution under Ohio Revised Code § 2949.22. This protective order governs discovery only in this litigation and does not apply outside this litigation or (in the increasingly unlikely event) after this litigation concludes.

*In re Ohio Execution Protocol Litig.*, 2015 U.S. LEXIS 144926 at *45-46. Mr. Pizzuto correctly points out that the Sixth Circuit affirmed the District Court's issuance of a protective order rather than the quashing on the death penalty inmates' subpoena. Docket No. 8, p. 13-14. However, Mr. Pizzuto is incorrect in stating that what "[T]DOC needs from [the case] is an opinion shutting down any discovery surrounding execution drugs." *Id*. at p. 14. Mr. Pizzuto, in his subpoena to the Department, requests the production of:

> All DOCUMENTS generated between December 1, 2024 and the present REGARDING any PENTOBARBITAL that YOU obtained for use or potential use in executions, including but not limited to testing information, such as certificates of analysis; purchase receipts; purchase orders; invoices; Drug Enforcement Administration forms and other regulatory records; package inserts; chain-of-custody documents; temperature logs; instructions for storage and transportation; COMMUNICATIONS with the supplier, distributor, and/or manufacturer; and so forth.

Docket No. 1-1, p. 7. When the Court compares Mr. Pizzuto's subpoena with the language in the aforementioned protective order, the information sought significantly, if not completely, overlaps. Thus, even if the Court were to grant a protective order in this case, it would bar the very information sought in Mr. Pizzuto's subpoena. Further, as in when the Ninth Circuit granted

19

the Idaho Department of Correction a protective order, the Sixth Circuit was contemplating a

subpoena sought by *Ohio* inmates against the *Ohio* Department of Correction. Given the general

irrelevance of Mr. Pizzuto's subpoena, which the Court has discussed at length, any information

penetrating a protective order in this case would be entirely ancillary to Mr. Pizzuto's suit against

the Idaho Department of Correction. Therefore, such information, especially with a protective

order in place, would be disproportionate to the needs of his case.

### III.    CONCLUSION

There are perhaps few more polarizing facets of our criminal justice system than capital

punishment and this Court is cognizant of the high stakes competing interests at hand. This Court

will also, however, not "assist litigants with using the federal courts as a mechanism to obtain

that which the law currently does not or cannot afford them." *In re Ohio Execution Protocol*

*Litig.*, 2015 U.S. Dist. LEXIS 144926, at *41.

In this case, Mr. Pizzuto's requested information in the subpoena issued to the Tennessee

Department of Correction is simply irrelevant to his suit against the Idaho Department of

Correction. Additionally, the subpoena imposes an undue burden on the Tennessee Department

of Correction in its state function of lawfully carrying out executions. This burden cannot be

mitigated through a protective order. Should the identity of the supplier be inadvertently leaked,

which the Department has demonstrated is an actual, rather than hypothetical, possibility, the

Court cannot "un-ring the bell." For the foregoing reasons, the Department's Motion to Quash

(Docket No. 1) is **GRANTED**.

**IT IS SO ORDERED.**

**Jeffery S. Frensley**
**United States Magistrate Judge**

20