**EXHIBIT 3**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| IN RE: | Civil No. 3:25-mc-00003 |
| SUBPOENA ISSUED TO TENNESSEE DEPARTMENT OF CORRECTION BY GERALD ROSS PIZZUTO, JR. | Judge Trauger |
| GERALD ROSS PIZZUTO, JR., | |
| Plaintiff, | |
| v. | |
| BREE DERRICK[1] et al., | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF MOTION TO REVIEW MAGISTRATE ORDER**

For the reasons that follow, and pursuant to 28 U.S.C. § 636, Federal Rule of Civil Procedure 72, and Local Rule 72.01, Petitioner Gerald Ross Pizzuto, Jr. respectfully asks the Court to vacate the magistrate judge's order granting the Tennessee Department of Correction's (TDOC's or the Department's) motion to quash. *See* Dkt. 15. As set forth below, the challenged order's relevancy analysis was clearly erroneous and contrary to law because the magistrate required Mr. Pizzuto to *prove* the requested material was connected to his underlying claim while simultaneously failing to deal with the evidence making that connection. In addition, the challenged order's undue-burden analysis was clearly erroneous and contrary to law because the

---

[1] Bree Derrick has been substituted in for Josh Tewalt in the underlying litigation, as Ms. Derrick is now the Director of the Idaho Department of Correction (IDOC). *See Pizzuto v. Derrick,* No. 1:21-cv-359, Dkt. 205 (D. Idaho July 14, 2025). As such, Mr. Pizzuto respectfully suggests that Ms. Derrick should replace Mr. Tewalt on the docket in this action. *See* Fed. R. Civ. P. 25(d).

magistrate became the first judge in the country to hold that every single word on every single piece of paper relating to execution drugs is too sensitive to reveal, even though such material is commonly disclosed without incident—including by TDOC itself.

## I.    Background

Mr. Pizzuto is a state inmate on Idaho's death row. *See* Dkt. 8-2 at 2. In the United States District Court for Idaho, Mr. Pizzuto is litigating an Eighth Amendment challenge to that state's execution procedures under 42 U.S.C. § 1983. *See generally* Dkt. 8-2. Mr. Pizzuto is entitled under the Idaho court's scheduling order to pursue discovery in support of his Eighth Amendment claim as a matter of right. *See* Dkt. 8-12. As part of his claim in Idaho, Mr. Pizzuto is alleging that there are risks that the drugs intended for his execution are unreliable and will potentially subject him to a torturously painful death. *See* Dkt. 8-2 at 6–8. Idaho's chosen execution drug is pentobarbital, which is Tennessee's as well. *See* Death Penalty Information Center, State-by-State Execution Protocols, available at

https://deathpenaltyinfo.org/executions/methods-of-execution/state-by-state-execution-protocols.

To gather evidence relating to that allegation, Mr. Pizzuto served a subpoena on TDOC, seeking information about its pentobarbital, such as testing results. *See* Dkt. 1-1 at 7.[2]

In response to Mr. Pizzuto's lawful subpoena, TDOC did not produce a single word on a single piece of paper. *See* Dkt. 8-1. Nor did TDOC provide a privilege log, as required by Federal Rule of Civil Procedure 45(e)(2)(A)(ii), to describe the documents it was withholding. *See id.* Instead, TDOC filed a motion to quash the subpoena in its entirety. *See* Dkt. 1. In that motion, TDOC asserted a host of justifications for its obstructionism. *See* Dkt. 1-1. The

---

[2] For any document that does not have consecutive pagination, such as the one referenced above, Mr. Pizzuto will refer to the ECF numbers. Otherwise, he will cite to the pages in the document itself.

MEMORANDUM RE: MOTION TO REVIEW MAGISTRATE ORDER - Page 2

magistrate rejected TDOC's theory that it was protected from the subpoena by sovereign immunity and declined the Department's invitation to create a new federal evidentiary privilege based on execution secrecy. *See* Dkt. 15 at 4–12.

However, the magistrate concluded that the subpoena was not relevant to Mr. Pizzuto's claim because it was "entirely undetermined" whether Tennessee and Idaho had the same drug source. *Id.* at 14. In defending that view, the magistrate did not acknowledge—let alone engage with—the extensive evidence that Mr. Pizzuto presented that the two states did indeed share the same source, none of which is disputed by TDOC. *See* Dkt. 8 at 8–10. The magistrate also found that the subpoena imposed an undue burden on TDOC by jeopardizing the anonymity of the Department's drug sources. *See* Dkt. 15 at 17. No reference in the magistrate's order is made to the numerous examples that Mr. Pizzuto had provided in which other states disclosed documents responsive to his subpoena without any drug sources being outed, including in Tennessee. *See* Dkt. 8 at 14–16. Finally, the magistrate announced that a protective order would be insufficient to safeguard the information at issue. *See* Dkt. 15 at 18–20.

Mr. Pizzuto now objects to the magistrate's order granting the motion to quash.

## II.    Standard of Review

Orders by magistrates on non-dispositive pretrial matters are set aside by district judges where they are "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A). An order by a magistrate on a motion to quash a non-party subpoena related to an out-of-district case is considered a non-dispositive matter within the meaning of § 636(b)(1)(A). *See Jordan v. Comm'r, Miss. Dep't of Corrs.*, 947 F.3d 1322, 1327–28 (11th Cir. 2020). Thus, the clearly erroneous and contrary-to-law framework from § 636(b)(1)(A) applies here.

A factual determination is "clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019).[3] The contrary-to-law test is satisfied if the magistrate "fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Id.*

### III.   The magistrate's relevancy analysis is clearly erroneous and contrary to law.

With respect, there is no evidentiary foundation whatsoever for the magistrate's primary holding on relevancy—that an insufficient link was made between Tennessee's and Idaho's drug sources.

Rather than referring to any evidence in the record on that point, the magistrate relied entirely on its characterization of Mr. Pizzuto's own argument. According to the magistrate, Mr. Pizzuto's stance was: "*If* Tennessee and Idaho have the same supplier and *if* there are chemical flaws in Tennessee's drug, then there *might* be an increased *chance* of deficiencies in Idaho's drug." Dkt. 15 at 13–14 (emphasis in magistrate's order). To begin, these are the words the magistrate selected for emphasis—they do not accurately convey Mr. Pizzuto's presentation. As Mr. Pizzuto made clear in briefing to the magistrate, his "theory of relevance for the Department's records is based on the *likelihood* that Tennessee and Idaho have the same source of execution drugs." Dkt. 8 at 8. There is no question that a likelihood of identity is enough for relevancy purposes. "The standard for relevancy is extremely liberal under the Federal Rules of Evidence." *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009). "The standard for relevance is capacious—evidence is relevant if it has any tendency to make a fact of consequence to the case

---

[3] Unless otherwise noted, all internal quotation marks are omitted, all emphasis is added, and all citations are cleaned up.

more probable or less probable than it would be without the evidence." *Huang v. Ohio State Univ.*, 116 F.4th 541, 564 (6th Cir. 2024). If something is likely, as Mr. Pizzuto contended, it is by definition more probable. The likelihood of the source being the same thus plainly satisfies the "low bar" set by relevance. *United States v. Burrell*, 114 F.4th 537, 556 (6th Cir. 2024). It was clearly erroneous as a factual matter for the magistrate to suggest that Mr. Pizzuto had himself not asserted the requisite level of confidence in the drug connection.

And it was likewise clearly erroneous for the magistrate to ignore all of the evidence on that connection. *See Jones v. Astrue*, No. 09-1168, 2010 WL 3001754, at *3–6 (D. Kan. July 28, 2010) (finding clear error where the decisionmaker at issue failed to consider evidence in the record). In briefing before the magistrate, Mr. Pizzuto outlined the facts pointing to a common source. *See* Dkt. 8 at 8–10.[4] To summarize that presentation, which is incorporated here by reference, a handful of states (including both Idaho and Tennessee) had no access to pentobarbital for more than a decade. *See id.* Then it appeared in all of them within the space of a single year, with each state paying an exorbitant amount of money for the drugs. *See id.* at 9. Those were the undisputed facts that led a federal judge in Indiana to declare, in parallel litigation, that Mr. Pizzuto had "made the minimal showing required to establish that the information requested is relevant to his claim." Dkt. 8-9 at 6. As the Indiana judge noted, the historical developments in pentobarbital access were "more than mere speculation." *Id.* at 7. The judge observed that Mr. Pizzuto "does not need to prove that the supplier is the same; rather he need only show that there is a reasonable likelihood for his belief." *Id.* After considering the sudden materialization of pentobarbital in multiple states, the Indiana judge recognized that there

---

[4] Whenever a source is cited here, the references therein are relied upon as well.

MEMORANDUM RE: MOTION TO REVIEW MAGISTRATE ORDER - Page 5

was such a reasonable likelihood. *See id.* The magistrate here was only able to rationalize the opposite finding by disregarding the same evidence, none of which was contested by TDOC.

Moreover, by emphasizing words like "if," "might," and "chance," the magistrate was effectively demanding that Mr. Pizzuto *prove* the sourcing connection. Yet the test for relevance is far lower than for proof. *See, e.g.*, *Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Assoc.*, No. 10 Civ. 3314, 2015 WL 4033019, at *15 (S.D.N.Y. June 29, 2015) (observing that "the standard for relevance in discovery is much lower than the standard for liability"). "Relevant evidence is, of course, not just facts that carry a party's evidentiary burden by proving an element of a claim." *Huang*, 116 F.4th at 564. "All" a record "needs to do" to be relevant is to "advance the ball by showing that" a fact at issue "is more (or less) likely." *Id.* The magistrate's insistence on proof was accordingly contrary to law.

Although the record was sufficient to establish the sourcing connection at the time the magistrate ruled, subsequent revelations have strengthened the point. Because those new facts were not available at the time the briefing was taking place before the magistrate, they are properly considered now. *See United States v. Howell*, 231 F.3d 615, 623 (9th Cir. 2000) (upholding a district court's decision not to consider new facts where they "were available to the defense before the magistrate judge's proceedings ever began").

After the motion to quash became fully briefed before the magistrate on April 7, 2025, *see* Dkt. 13, IDOC served on Mr. Pizzuto supplemental responses to certain requests for admission. *See* Ex. 1. There, IDOC indicated for the first time that two of its recent pentobarbital batches were made by different manufacturers. *See id.* at 8. Later, IDOC admitted that its drugs were manufactured by companies opposed to the use of their products in executions. *See* Ex. 2 at 7–8. In other discovery responses, IDOC has acknowledged that the manufacturers are listed in

the Orange Book as authorized by the Food and Drug Administration to make pentobarbital. *See* Ex. 3 at 3; Ex. 4 at 3–4; Ex. 5 at 11–12. The Orange Book lists four companies as currently licensed to manufacture pentobarbital: Rising, BPI, Hikma, and Sagent. *See* https://www.accessdata.fda.gov/scripts/cder/ob/search_product.cfm. Hikma and Sagent are both publicly opposed to the use of their products in executions. *See* Lethal Injection Information Center, Industry Statements, available at https://lethalinjectioninfo.org/industry-statements/. To undersigned counsel's knowledge, Rising and BPI have not made similar public statements. Of the four manufacturers mentioned above, the National Library of Medicine lists Hikma and Sagent for pentobarbital—but not Rising and BPI. *See* National Library of Medicine, DailyMed, available at https://dailymed.nlm.nih.gov/dailymed/search.cfm?labeltype=all&query=PENTOBARBITAL.[5] Based on all of this, it is overwhelmingly likely that IDOC's execution drugs were made by *both* Hikma *and* Sagent, i.e., the two companies that are both actively manufacturing pentobarbital and publicly opposed to its use in capital punishment.

Such an exceedingly small universe of manufacturer candidates in turn increases the likelihood of commonality between Idaho's and Tennessee's drugs. Put another way, if Tennessee's drugs come from either of the two pentobarbital manufacturers, it would mean that they were made by the same company that produced at least some of Idaho's chemicals. In that scenario, the reliability of Tennessee's drugs would undeniably be relevant to Mr. Pizzuto's claim, because whatever factory they came out of would also have sent drugs to Idaho.

---

[5] Akorn also appears on the website above, but IDOC has indicated that its drugs were not made by that company. *See* Ex. 1 at 3–4.

MEMORANDUM RE: MOTION TO REVIEW MAGISTRATE ORDER - Page 7

One other way of understanding the foregoing logic is to interrogate the unstated assumption in the magistrate's ruling: that the two states have tapped into *different* supply chains. If that were correct, it would mean that pentobarbital was missing from both Idaho and Tennessee for the same lengthy period of time; that pentobarbital abruptly appeared in Idaho and came from two particular manufacturers; and that pentobarbital abruptly appeared in Tennessee during the same period but came from *neither* of them. That scenario is of course possible. Still, it is far from certain. It was unreasonable for the challenged order to criticize as "extremely speculative" Mr. Pizzuto's "claim[] that Tennessee and Idaho have identical suppliers," Dkt. 15 at 14, when the magistrate's own contrary narrative is at best equally speculative. Given how relevance works, the tie goes to Mr. Pizzuto. *See Flanagan v. Wyndham Int'l*, 231 F.R.D. 98, 103 (D.D.C. 2005) ("A court with jurisdiction over a discovery dispute for an action pending in a different district generally has limited exposure to and understanding of the primary action" and "[a] court in such a situation should hence be cautious in determining relevance of evidence, and in case of doubt should err on the side of permissive discovery."); *see also Zientek v. State Farm Fire & Cas. Co.*, No. 1:05-cv-326, 2007 WL 2793361, at *3 (E.D. Tenn. Sept. 26, 2007) (describing material as "of marginal relevance" but resolving to "err on the side of admissibility").

Apart from wrongly rejecting Mr. Pizzuto's account of the supply chain, the magistrate stated that "even if Tennessee and Idaho were to have the same source of drugs . . . information regarding Tennessee's execution protocol would still have little relevance to Mr. Pizzuto's pending execution in Idaho." Dkt. 15 at 14. That largely unexplained belief is even more clearly erroneous and contrary to law than the magistrate's treatment of sourcing.

MEMORANDUM RE: MOTION TO REVIEW MAGISTRATE ORDER - Page 8

As an initial matter, the magistrate was mistaken to suggest that Mr. Pizzuto is pursuing information about "Tennessee's execution *protocol*." *Id.* What Mr. Pizzuto seeks is information about Tennessee's execution *drugs*. *See* Dkt. 1-1 at 7 (subpoenaing documents "regarding any pentobarbital that" TDOC "obtained for . . . executions"). The basis for the documents' relevance is straightforward: if the source is the same, then information about the reliability of TDOC's drugs would bear on the reliability of Idaho's. *See* Dkt. 8 at 10–12. As noted earlier, that is the simple reasoning embraced by the federal judge in Indiana. *See* Dkt. 8-9 at 5 (commenting that "[i]f Indiana and Idaho do in fact have the same supplier, then documents related to the stability of Indiana's pentobarbital" are relevant). The magistrate here did not even respond to that clear-cut line of thought.

Rather than grapple with the briefing before him, the magistrate avoided the facts at issue and reached out to an inapposite case. He cited a single authority for his perspective: *Middlebrooks v. Parker*, 22 F.4th 621, 628 (6th Cir. 2022) (Thapar, J., respecting denial of rehearing en banc). *See* Dkt. 15 at 14. Preliminarily, the citation is somewhat confusing. The parenthetical employed by the magistrate appears to suggest that he is relying on a ruling by the Sixth Circuit. *See id.* However, the language the magistrate quotes is from a statement signed by Judge Thapar alone. *Compare id.*, *with Middlebrooks*, 22 F.4th at 628 (Thapar, J., respecting denial of rehearing). That statement, by a single judge, is not binding law. To the contrary, Judge Thapar was essentially criticizing the result reached by the panel—albeit without suggesting rehearing was appropriate. The panel granted the inmate relief and remanded the matter back to the district court for further proceedings. *See Middlebrooks v. Parker*, 15 F.4th 784, 797 (6th Cir. 2021). Judge Thapar wrote to express his dissatisfaction with that outcome. *See Middlebrooks*, 22 F.4th at 629 (Thapar, J., respecting denial of rehearing) ("This case is a poster child of death

penalty litigation at its worst."). His writing was not an elaboration of the panel's decision, and was if anything at odds with it, making it closer to a dissent and at any rate certainly not precedential. *See United States v. Stevens*, 635 F. Supp. 1356, 1360 (W.D. Mich. 1986) (recognizing that district courts are bound by the published majority opinions of the circuits, not by dissents from the denials of petitions for rehearing en banc).

Even taken on its own terms, Judge Thapar's reasoning does not support the magistrate's result here. In the quoted passage, Judge Thapar wrote that "pentobarbital's continued availability in other jurisdictions is immaterial." *Middlebrooks*, 22 F.4th at 628 (Thapar, J., respecting denial of rehearing). Judge Thapar's reference to pentobarbital was in the context of the Supreme Court's rule that inmates challenging a method of execution must articulate a more humane alternative method. *See id.* at 624 (Thapar, J., respecting denial of rehearing). In *Middlebrooks*, the inmate was attacking a three-drug protocol and proposing pentobarbital as the alternative. *See id.* (Thapar, J., respecting denial of rehearing). Judge Thapar's point was that Mr. Middlebrooks failed to satisfy the more-humane-alternative requirement because, even if pentobarbital was being used elsewhere, it was unavailable to Tennessee. *See id.* at 628 (Thapar, J., respecting denial of rehearing). That has nothing to do with the present case. Mr. Pizzuto is not identifying pentobarbital as his preferred alternative—he is contesting its use as unconstitutional. *See generally* Dkt. 8-2. Both Idaho and Tennessee have now obtained pentobarbital and are *using* it for executions. There is no need here for the kind of speculation about pentobarbital access that Judge Thapar was concerned with in *Middlebrooks*. The pentobarbital here exists, and the question is simply whether it is reliable. By relying entirely on an easily distinguishable writing by a single judge, the magistrate acted in a manner contrary to the law.

When the relevancy question is properly re-framed, the magistrate's error comes into even starker relief. For the magistrate's premise to work, he would need it to be true that when two batches of drugs come from the same source, records on reliability for one are irrelevant to the reliability of the other. Unsurprisingly, the magistrate found no authority for that proposition. Quite the opposite is the case. In method-of-execution litigation, courts routinely compel states to disclose precisely the material Mr. Pizzuto is seeking here, for the very reason that it goes directly to questions of drug reliability. *See Pizzuto v. Tewalt*, 136 F.4th 855, 867–73 (9th Cir. 2025) (affirming the district court's orders requiring IDOC to share various pieces of information relating to drug quality, including on the types and location of sources involved as well as dates associated with purchase orders and testing results); *Brant v. Allen*, No. 3:13-cv-412, 2024 WL 21970, at *5 (M.D. Fla. Jan. 2, 2024) (granting in part plaintiffs' motions to compel in a similar case and ordering the production of various execution-related information, such as material "about [the] purity and efficacy" of the drugs); *Martin v. Ward*, No. 1:18-cv-4617, 2021 WL 1186749, at *5 (N.D. Ga. Mar. 30, 2021) (ordering the correctional department to disclose information about how chemicals were "created, stored, and transported" because the prisoner was "attacking the potency of Georgia's compounded pentobarbital").

A hypothetical illustrates the point. One item requested by Mr. Pizzuto's subpoena is "testing information" for Tennessee's pentobarbital. *See* Dkt. 1-1 at 7. Assume that Tennessee and Idaho have the same source, as the magistrate himself assumed in this part of his order. *See* Dkt. 15 at 14. And assume further that Tennessee's test results showed that its drugs are defective. *See* Dkt. 8-17 at 32 (reporting on test results from previous TDOC execution drugs, unsuccessfully hidden by the Department, in which the chemicals fell short of the required metric). Recall that Mr. Pizzuto's Eighth Amendment challenge rests in part on concerns about

the reliability of pentobarbital. *See* Dkt. 8-2 at 6–8. How could it possibly be, under such circumstances, that Tennessee's testing results are of "little relevance to Mr. Pizzuto's" claim? Dkt. 15 at 14. Yet that is the counterintuitive implication of the magistrate's approach. Because that approach has no foundation in the law, misapplies fundamental relevancy standards, and mischaracterizes the legal questions at issue, it must be set aside.

The other items sought by the subpoena are relevant for reasons similar to those set forth above with respect to testing documents. Drug Enforcement Administration (DEA) forms, along with chain-of-custody documents, would bear on whether the drugs took an extended journey from the manufacturer to the supplier, which could in turn impact their quality. *See* Dkt. 8-10 at 3. Documents like temperature logs and instructions for storage and transportation would speak to the ideal conditions for the drugs, and if they were kept in less-than-ideal circumstances in Idaho that would bolster Mr. Pizzuto's claim. The regulatory records sought in the subpoena might reveal problems like misbranding, which would also go to reliability concerns. *See Cook v. FDA*, 733 F.3d 1, 10–12 (D.C. Cir. 2013) (finding that states had unlawfully imported misbranded drugs for executions into the country).

In short, the material targeted by Mr. Pizzuto's subpoena is connected to his case. Only a clearly erroneous order entered in conflict with the law would proclaim without evaluating the actual documents involved that every single one of them was irrelevant.

## IV.    On undue burden the magistrate clearly erred and acted contrary to law.

The magistrate even more clearly erred on the burden imposed on TDOC by the subpoena, since he departed from the heretofore unanimous approach of other courts and allowed the Department to withhold *every* responsive document without even attempting to show that such an extreme result was necessary to protect the State's limited secrecy interests.

MEMORANDUM RE: MOTION TO REVIEW MAGISTRATE ORDER - Page 12

To defend his conception of undue burden, the magistrate began with two pages of history on how states have faced difficulty securing execution drugs because manufacturers have decided they do not wish for their medical products to be associated with involuntary killings. *See* Dkt. 15 at 15–17. It is hardly a surprise that healthcare companies would prefer their medicines not be turned into lethal poisons. *See* Lethal Injection Information Center, Industry Statements, available at https://lethalinjectioninfo.org/industry-statements/ (quoting one company as explaining: "We stand with other pharmaceutical manufacturers who have taken steps to prevent life-saving medications from being used for capital punishment."). And it also has minimal bearing on the legal issue resolved by the magistrate. While the magistrate concluded this section of his opinion by announcing that TDOC had "clearly demonstrated multiple instances in which activist pressure on suppliers directly burdened its execution protocol," *id.* at 17, the order never elaborates on what such pressure has to do with *Mr. Pizzuto's subpoena*. It is striking that the magistrate's discussion of undue burden never once even mentions the actual documents sought by Mr. Pizzuto's subpoena—let alone demonstrate how they pose a risk to any suppliers.

Rather than delving into that question—the only one that matters—the magistrate flipped the script. He took up one of Mr. Pizzuto's examples of how the unmasking of drug suppliers has *not* come from the kind of discovery at issue here. *See id.* at 17. That example was television host John Oliver, who revealed the federal government's source through public record requests, interviews, internet research, and so forth. *See* Dkt. 8 at 17. According to the magistrate, the John Oliver incident "concretely demonstrates the Department's burden." Dkt. 15 at 17. As the magistrate further reasoned, "[w]hen the identity of a lethal injection chemical supplier is leaked through *any* means, it can frustrate a State's lawful imposition of a death sentence." *Id.* Thus, the

MEMORANDUM RE: MOTION TO REVIEW MAGISTRATE ORDER - Page 13

magistrate was "skeptical of being the vehicle through which such information could be even inadvertently disclosed." *Id.*

Mr. Pizzuto does not dispute any of those statements. The problem is that they do not answer the question presented: is Mr. Pizzuto's subpoena really such a vehicle? There is no analysis in the magistrate's order of what exactly is dangerous about the subpoena. It cannot be the case that because one person found a drug supplier using tools completely different from Mr. Pizzuto's that any request for any piece of information about execution drugs is automatically forbidden. That would be like saying that because Daniel Ellsberg improperly leaked the Pentagon Papers in 1971 every piece of information about every war America ever waged would henceforth be considered top secret.

Presumably, the reason the magistrate did not address the actual documents requested by Mr. Pizzuto is that they manifestly do not pose the kinds of risks he described. Or, at a minimum, it is implausible to say that every single one of them creates such a risk. As mentioned earlier, the kinds of records sought by Mr. Pizzuto's subpoena are commonly ordered by courts to be disclosed in discovery. *See supra* at Part III. After they are disclosed in discovery, many such documents appear in the public record without incident. *See* Dkt. 8-14 (Arizona purchase order); Dkt. 8-6 (Idaho purchase orders); Ex. 6 (Idaho DEA form); Ex. 7 (prior Tennessee purchase orders); Ex. 8 (Virginia certificate of analysis). None of those documents have led to sources being outed. All of them would be responsive to Mr. Pizzuto's subpoena.

Notably, the State of Tennessee itself has not adopted the magistrate's extreme and unsubstantiated conception of execution secrecy. As Mr. Pizzuto pointed out in his briefing before the magistrate, Tennessee's Governor revealed to the public documents that discuss testing performed on execution drugs—again, material responsive to Mr. Pizzuto's subpoena.

*See* Dkt. 8 at 19–21. Evidently, the Governor does not agree with the magistrate's assessment that because a supplier's identity can be "leaked through *any* means," Dkt. 15 at 17 (emphasis in original), it means that no information can ever be disclosed about execution drugs and their reliability.

Nor does TDOC itself agree with that assessment. In May 2025—after the briefing before the magistrate was complete—TDOC's Commissioner filed in state court a declaration by pharmacologist Peter Swaan in a lethal injection case. *See* Ex. 9. The declaration avers that Dr. Swaan reviewed a certificate of analysis (COA) for the pentobarbital in TDOC's possession. *See id.* at 4. Dr. Swaan then recited some purported details from the COA, including the results from specific tests. *See id.* at 5. Apparently, those details were not, in TDOC's view, a "vehicle through which" an identity might be revealed. Dkt. 15 at 17. And those details are directly responsive to Mr. Pizzuto's subpoena. *See* Dkt. 1-1 at 7. Why, then, could TDOC not provide to Mr. Pizzuto its COA—a document we now know to exist—while redacting any identifying information, as other jurisdictions regularly do? *See, e.g.*, Ex. 8. The real upshot of the magistrate's order is not that all of the relevant information is risky. It is that TDOC will have the unilateral power to decide what is risky and what isn't, and to withhold every document while choosing to later disclose the very same information when it suits the Department's purposes. That is not a justifiable dynamic in an adversarial system of justice, whether in a non-party context or in more conventional litigation.

The question of redactions is yet another subject notable for its absence from the magistrate's order. Mr. Pizzuto outlined at length to the magistrate why redactions are adequate to safeguard the secrecy interests invoked by TDOC. *See* Dkt. 8 at 17–21. Yet the magistrate said nothing about redactions. *See generally* Dkt. 15. Redactions are used all the time in execution

litigation. *See, e.g.*, *Brant*, 2024 WL 21970, at *5 ("But, as Plaintiffs propose, documents and information related to how the drugs are manufactured or created can be redacted to provide relevant information about purity and efficacy without disclosing identifying information of the source."); *Martin*, 2021 WL 1186749, at *9 ("With the redaction of any information that could possibly identify any entity or person involved in" executions, "the Court concludes Defendants have not met their burden of showing good cause for the complete withholding of documents sought in" the discovery requests."); Dkt. 8-9 at 16 ("INDOC can redact information that would identify the supplier of its pentobarbital.").

In ignoring the prospect of redactions, the magistrate inverted the controlling burdens. It is TDOC's obligation to prove that it is entitled to quashing under Rule 45(d)(3)(A). *See, e.g.*, *Hodgdon v. Northwestern Univ.*, 245 F.R.D. 337, 341 (N.D. Ill. 2007). As part of that duty, TDOC must demonstrate that redactions would not suffice to ease the burden it is describing. *See Cody v. City of St. Louis*, No. 4:17-cv-2707, 2018 WL 5634010, at *4 (E.D. Mo. Oct. 31, 2018) (denying a motion to quash in part under Rule 45(d)(3)(A)(iii) because the records could be redacted to reduce the burden on the recipient of the subpoena). The magistrate did not hold TDOC to that burden and in so doing he acted contrary to law. *See In re HIPAA Subpoena*, 961 F.3d 59, 64 (1st Cir. 2020) (affirming a district court that found a magistrate's approach "contrary to law because he had inverted the burden of proof").

When this Court considers de novo whether TDOC discharged its obligation with respect to redactions, the answer is no. The documents requested are easily susceptible to redaction. Something like a "purchase order," Dkt. 1-1 at 7, likely contains only one piece of information that puts the identity of the supplier at risk—its name. In an email with a supplier, there is nothing difficult about finding names or locations and blacking them out. *Cf. Blau v. Ga. Dep't*

*of Corrs.*, 873 S.E.2d 464, 470 (Ga. Ct. App. 2022) (interpreting Georgia's execution-secrecy act as allowing the state to redact only text that "*reveals* a name, residential or business address" or other unique identifying information while requiring the disclosure of records otherwise responsive to open record requests (emphasis in original)).

TDOC has never really said otherwise. The only place where the Department even arguably addresses redactions is in the anonymous declaration it submitted from its staffer involved in executions. *See* Dkt. 1-12. That staffer posited vaguely that they were "aware that other suppliers have been identified through litigation despite the use of redactions." *Id.* at 2. The magistrate seems not to have relied on the declaration, even though it is the only actual evidence TDOC submitted to prove the burden it has alleged. That was another action contrary to law, since TDOC was required to substantiate the risk it faces from the subpoena. *See Scricca v. Boppy Co.*, No. 3:22-cv-1497, 2024 WL 1211061, at *4 (D. Conn. Mar. 21, 2024) ("Whether asserted as a stand-alone objection under Rule 26(c)(1) or as part of a lack-of-proportionality objection under Rule 26(b)(1), a claim of undue burden or expense typically must be supported by an affidavit or other evidence.").

If this Court considers the declaration, it is unpersuasive. As an initial matter, the evidentiary value of the declaration is undermined substantially—if not eliminated altogether—by the anonymity of its source. "Without any record whatsoever of a witness's identity or their signature, a declarant cannot be held to their statements under penalty of perjury." *KeyView Labs, Inc. v. Barger*, No. 8:20-cv-2131, 2020 WL 8224618, at *6 (M.D. Fla. Dec. 22, 2020), *adopted by* 2021 WL 510295 (M.D. Fla. Feb. 11, 2021). While Mr. Pizzuto appreciates the fact that an execution-drug *supplier* would only be able to provide a declaration under a pseudonym, that is not the case with respect to correctional employees who are simply interacting with the

suppliers. To the contrary, such employees routinely provide evidence under their real names.

*See In re Mo. Dep't of Corrs.*, 839 F.3d 732, 734 (8th Cir. 2016) (discussing an affidavit along

those lines by a correctional director in Missouri); Dkt. 8-4 (similar declaration by Utah

correctional official). There is no rationale for the TDOC declaration's anonymity in any of the

Department's filings, and it should be disregarded by the Court. Without the support of the

declaration, the motion to quash fails by definition.

Even if the declaration is considered, though, its statements on the key issues are

"inherently speculative," *In re Mo. Dep't of Corrs.*, 839 F.3d at 735, and insufficient to satisfy

TDOC's burden of proof. The declarant opines that "other suppliers have been identified through

litigation despite the use of redactions or protective orders." Dkt. 1-12 at 2. No examples are

offered. This statement is essentially a legal argument, especially as it is phrased as an assertion

about what has happened "through litigation." *Id.* As such, TDOC's attorneys should have made

the assertion themselves and provided support, if they wished the Court to rely upon it.

When TDOC's declaration ventures into specific types of documents, its unnamed

witness becomes even less credible. Again, without citations, the witness voices anxiety about

"[s]eemingly benign information—like the manner of production of a drug, identities of

independent testing labs, and even the arrangement of information on a suppliers' documentation

about drugs." *Id*. Of course, the identity of a testing laboratory is something TDOC could easily

redact. Furthermore, even the declaration does not make the implausible case that *every*

document responsive to the subpoena risks piercing the veil, which is what TDOC would have to

prove to justify the magistrate's order. Take "temperature logs," a type of document singled out

by the subpoena. *See* Dkt. 1-1 at 7. Those would presumably be compiled solely by TDOC and

have no connection to the supplier. There is no imaginable secrecy danger posed by them.

The magistrate's conclusion here was effectively that it would endanger TDOC's source for the Department to reveal a single word on a single piece of paper about its execution drugs. That is a position that has never previously been taken by any court or any state—including Tennessee. It is likewise a position that is clearly erroneous as a factual matter based on the lack of evidence TDOC provided to prove the risk, and contrary to law based on the inversion of burdens.

The magistrate's repeated references to TDOC's non-party status do not change that calculus. Mr. Pizzuto concedes that "the status of a person as a non-party is a factor that weighs against disclosure." *Am. Elec. Pwr. Co. v. United States*, 191 F.R.D. 132, 136 (S.D. Ohio 1999). Nevertheless, it is not a dispositive one. *See id.* at 137–41 (denying a motion to quash a subpoena served on a non-party). The magistrate stressed that some of the cases cited by the parties involved inmates seeking discovery from the departments of correction in their own states. *See* Dkt. 15 at 19–20. Of course, not all of them did—the Indiana order is the only ruling on all fours with the present case, and it was in Mr. Pizzuto's favor. *See* Dkt. 8-9. More importantly, the non-party status of TDOC was not a license for the magistrate to disregard the evidence on relevancy. Nor does it create a risk of identities being revealed when the same information has been properly determined to pose no risk (after appropriate redactions) in discovery disputes between parties. *See supra* at 15–16. The same record does not somehow become more dangerous when it is produced in Tennessee instead of Idaho. There is nothing about non-party subpoenas in the method-of-execution context that dictates the suppression of all responsive material. *See Va. Dept. of Corrs. v. Jordan*, 921 F.3d 180, 184 (4th Cir. 2019) (noting that in Virginia, where the department of corrections also moved to quash a non-party subpoena in a method-of-execution case, the agency at least demonstrated its good faith and "provided some documents" before

MEMORANDUM RE: MOTION TO REVIEW MAGISTRATE ORDER - Page 19

litigating the disputed material, unlike TDOC here). Non-party subpoenas are a legitimate discovery device under the federal rules, in this case as in any other. The magistrate's over-reliance on TDOC's non-party status to excuse it from disclosing a single document despite a patently insufficient showing by the Department on its burden was clear error and contrary to law.

### V.     At a minimum, TDOC must provide a privilege log.

Mr. Pizzuto's subpoena specifically requested a privilege log. *See* Dkt. 1-1 at 7. TDOC did not provide one. *See* Dkt. 8-1. The magistrate made no reference to privilege logs in his order. *See generally* Dkt. 15. In light of TDOC's legal obligation to produce that log, the magistrate's omission was contrary to law.

When a non-party objects to a federal subpoena, Rule 45 calls for it to "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. P. 45(e)(2)(A)(ii). The importance of privilege logs is reflected by the fact that the failure to provide one constitutes a waiver of the privilege, *see Johnson v. Gross*, 611 F. App'x 544, 547–48 (11th Cir. 2015) (per curiam), and by the fact that "[a] claim of privilege may be defeated by an inadequate log," *United States v. Davita, Inc.*, 301 F.R.D. 676, 684 (N.D. Ga. 2014). A proper privilege log includes 1) the name and title of the author; 2) the recipients of the document; 3) the type of document; 4) its date; and 5) "a general description of the subject matter of the document." *Executive Mgmt. Servs. v. Fifth Third Bank*, 309 F.R.D. 455, 464 (S.D. Ind. 2015). TDOC's refusal to provide any of that information required the magistrate to intervene and order it to do so.

The magistrate's failure to issue such an order is especially problematic in light of TDOC's position on the privilege log. TDOC's only explanation for its stonewalling on the privilege log was that it enjoyed sovereign immunity. *See* Dkt. 13 at 4 n.2. As previously noted, though, the magistrate rejected TDOC's appeal to sovereign immunity. *See* Dkt. 15 at 4–8. Thus, under TDOC's own formulation of the issues, a privilege log became necessary with the magistrate's ruling. The magistrate's lack of recognition of the same reality is contrary to law.

What is more, the magistrate's silence on the privilege log made his errors on undue burden even more damaging. As detailed above, the magistrate's undue-burden analysis implied that every record in TDOC's possession relating to execution drugs is per se off-limits due to amorphous secrecy considerations. The absence of a privilege log means that this expansive and unprecedented protection is being given to TDOC even though neither the Court nor Mr. Pizzuto has any idea what records TDOC actually has. That in turn has resulted in a situation in which the magistrate has blessed a remarkably broad assertion of confidentiality interests while simultaneously blocking the only measure by which the opposing party or the Court could meaningfully "assess[] the claim" to those interests. Fed. R. Civ. P. 45(e)(2)(A)(ii). All of that is equally contrary to law.

## VI.    If necessary, a protective order may be entered.

Unlike with the privilege log, the magistrate did at least acknowledge the availability of a protective order. *See* Dkt. 15 at 18–20. That said, the magistrate's treatment of the matter was clearly erroneous and contrary to law, for it was entirely founded on the incorrect presumption that every record implicated by the subpoena risks the identification of Tennessee's drug supplier.

The magistrate claimed that his result was consistent with *In re Ohio Execution Protocol Litig.*, 845 F.3d 231 (6th Cir. 2016), since the protective order there "would bar the very information sought in Mr. Pizzuto's subpoena." Dkt. 15 at 19. That is not a tenable reading of the Sixth Circuit's opinion. All the Sixth Circuit did there was to affirm a protective order entered by the district court. *See In re Ohio Execution protocol Litig.*, 845 F.3d at 233. At the outset, it is anomalous that the magistrate would regard an opinion *upholding* a protective order as the sole precedent justifying his decision to *refuse* a protective order here.

Further consideration of the Ohio litigation underscores how misplaced the magistrate's reliance was. As Mr. Pizzuto clarified for the magistrate, discovery is currently continuing in the Ohio case *nine years* after the Sixth Circuit issued its opinion. *See* Dkt. 8 at 14. No one in Ohio is interpreting the protective order there in the same way the magistrate here has. Consider, for instance, the fact that an employee of the Ohio correctional department testified at a hearing that he was "involved in the process of obtaining execution drugs" and then "discusse[d] his maintenance of the inventory of execution drugs." *In re Ohio Execution Protocol*, No. 2:11-cv-1016, 2019 WL 5799575, at *12 (S.D. Ohio Nov. 7, 2019). The same order also references correspondence between the employee and the DEA "about the importation of drugs for executions." *Id.* Elsewhere, in one of the Ohio defendants' filings, they remark that "photographs of the [execution] drugs . . . are routinely sent to opposing counsel after each and every execution clearly identifying" various pieces of "information" about the chemicals, including "expiration dates" as well as "lot numbers." *In re Ohio Execution Protocol*, No. 2:11-cv-1016, Dkt. 52 at 14 (S.D. Ohio Jan. 6, 2012).[6] Yet another series of exhibits filed publicly by the plaintiff contains

---

[6] Mr. Pizzuto respectfully asks the Court to take judicial notice of any filings from other cases referenced here. *See Elec. Merchant Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023).

more than eighty pages of tracking slips, purchase orders, and so forth—all related to execution drugs and all, according to the docket, "produced in discovery by Defendants." *Id.*, Dkts. 2620 at 5, 2620-3 (Oct. 30, 2019). Every single one of the documents from the Ohio case mentioned in this paragraph would be responsive to Mr. Pizzuto's subpoena. *See* Dkt. 1-1 at 7. They are all being disclosed in Ohio, and the protective order there manifestly does not have the all-encompassing scope the magistrate here ascribed to it.

Ignoring that reality, the magistrate opined that the information requested by Mr. Pizzuto's subpoena "significantly, if not completely, overlaps" with the material precluded by the Ohio protective order. Dkt. 15 at 19. That construct buries the undefended assumption at the heart of the magistrate's conclusion. The Ohio protective order insulates information that "*reasonably would lead to the identification of any person or entity* who participates in the acquisition or use of the specific drugs." *Id.* at 18 (emphasis in magistrate's order). Reading between the lines, it seems the magistrate believed that *any* records about Tennessee's execution drugs satisfy that test. For Mr. Pizzuto's subpoena seeks all such records, and the magistrate allowed TDOC to withhold all of them. What the magistrate overlooked, though, is that no other court in the country has ever construed the risk of identification in such a broad way. The Ohio courts certainly haven't, since execution-related documents have been exchanged in discovery for years there in large quantities. And none of the other courts adjudicating discovery disputes in execution cases have, since they have all utilized similar tests and none of them have blocked access to every single word on every single page. In taking such an outlier view, the magistrate acted contrary to the well-established legal principle that "modification of a subpoena is preferable to quashing it outright." *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004); *see Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 560, 564 (7th Cir. 1984)

(reiterating that "[w]hen a court is confronted with a motion to quash . . . a subpoena, its duty is not to deny any discovery, but to reduce the demand to what is reasonable, considering the discoverer's needs and the discoveree's problems" and that the main mechanism for achieving that balance is a protective order designed "to protect" the recipient from the "loss of confidential information . . . while still giving" the requesting party "discoverable information"). That principle has force in the non-party subpoena realm as well. *See Am. Elec. Power Co.*, 191 F.R.D. at 141 (ordering compliance with a non-party subpoena because the information at issue could "be adequately protected from disclosure outside the context of this litigation by the confidentiality agreement" between the litigants). There was no basis for the magistrate to quash the subpoena in its entirety when more modest methods were available for safely addressing TDOC's concerns. That is what the Sixth Circuit did, and what the magistrate refused to do.

## VII.    Conclusion

In light of the above, Mr. Pizzuto respectfully asks the Court to vacate the magistrate's order, *see* Dkt. 15, deny TDOC's motion to quash, Dkt. 1, if necessary enter a protective order, and at a minimum direct the Department to provide a privilege log.

DATED this 23rd day of July 2025.


/s/ Jonah J. Horwitz
Jonah J. Horwitz (pro hac vice)
Idaho Bar No. 10494
Federal Defender Services of Idaho
702 W. Idaho St., Ste. 702
Boise, ID 83705
208-331-5530
Jonah_Horwitz@fd.org


MEMORANDUM RE: MOTION TO REVIEW MAGISTRATE ORDER - Page 24

*/s/ Kimberly S. Hodde*
Kimberly S. Hodde
Tennessee Bar No. 20128
Hodde & Associates
40 Music Square East
Nashville, TN 37203
615-242-4200
Kim.Hodde@hoddelaw.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of July 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Kim Hodde
Kim.Hodde@hoddelaw.com

Cody Brandon
Cody.Brandon@ag.tn.gov

David Wickenheiser
David.Wickenheiser@ag.tn.gov

Mary McCullohs
Mary.McCullohs@ag.tn.gov

Matthew Kubicek
Matthew.Kubicek@ag.tn.gov

*/s/ L. Hollis Ruggieri*
L. Hollis Ruggieri

MEMORANDUM RE: MOTION TO REVIEW MAGISTRATE ORDER - Page 25