*Gerald Ross Pizzuto, Jr. v. Bree Derrick, et al.*, U.S. Dist. Ct. No. 1:21-cv-359-BLW
Submitted in Support of Notice Regarding Redacted Filings

# EXHIBIT 1

Jonah J. Horwitz, Idaho Bar No. 10494
Christopher M. Sanchez, Idaho Bar No. 12070
FEDERAL DEFENDER SERVICES OF IDAHO
702 W. Idaho Street, Suite 900, Boise, ID 83702-8929
Telephone: (208) 331-5530; Facsimile: (208) 331-5559
ECF: jonah_horwitz@fd.org
    christopher_m_sanchez@fd.org

Sarah E. Kalman, Pennsylvania Bar No. 325278
(admitted *pro hac vice*)
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street, Suite 500, Philadelphia, PA 19103-7301
Telephone: (215) 656-2438; Facsimile: (215) 656-3301
ECF: sarah.kalman@us.dlapiper.com

*Attorneys for Plaintiff Gerald Ross Pizzuto, Jr.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **GERALD ROSS PIZZUTO, JR.,** | **CASE NO. 1:21-cv-359-BLW** |
| Plaintiff, | |
| v. | **MEMORANDUM IN SUPPORT OF MOTION TO MODIFY SCHEDULING ORDER [DKT. 198]** |
| **BREE DERRICK**, Director, Idaho Dept. of Correction, et al. | |
| Defendants. | |

Plaintiff Gerald Ross Pizzuto, Jr. respectfully asks the Court to modify the scheduling order, *see* Dkt. 198, such that fact discovery closes July 2, 2026.

### I.    Legal Standard

Scheduling orders governing discovery deadlines "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).[1] "Rule 16(b)'s good cause standard

---

[1] Unless otherwise noted, all internal quotation marks are omitted, all emphasis is added, and all citations are cleaned up.

primarily considers the diligence of the party seeking the amendment." *Dotson v. Funderburg*, No. 3:14-cv-159, 2016 WL 1755294, at *1 (D. Idaho May 2, 2016). A "district court may modify the pretrial schedule if it cannot reasonably be met despite the diligence of the party seeking the extension." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). Prejudice to the opposing party is also a permissible factor to consider under appropriate circumstances. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1295 (9th Cir. 2000). "In sum, neither Rule 16 nor Rule 1 expect perfection; both demand no more—and no less—than good-faith efforts to comply with deadlines firmly set." *United States v. Louisiana*, No. 3:11-470, 2016 WL 632492, at *1 (M.D. La. Feb. 17, 2016).

## II.    Argument

There is good cause for extending the discovery deadlines because Mr. Pizzuto needs additional time despite his diligence. Rather than prejudicing the defendants, such an extension is the product of opposing counsel's obstructionism and mishandling of valid discovery requests.

### A.  Mr. Pizzuto has been diligent and requires additional time.

Mr. Pizzuto has been consistently diligent in pursuing discovery. Because that factor is what the Court "primarily considers," *Dotson*, 2016 WL 1755294, at *1, it cuts strongly in favor of granting the motion. Moreover, important discovery remains outstanding despite Mr. Pizzuto's diligence, making the amendment necessary. *See Johnson*, 975 F.2d at 609.

The litigation over Mr. Pizzuto's motions to compel has created a clear record of his diligence. Given how lengthy that litigation has been, and since the Court is familiar with it, Mr. Pizzuto will not recite every development and will instead briefly summarize the history. Discovery opened in October 2022. *See* Dkt. 43. Mr. Pizzuto immediately began serving requests on the defendants to gather evidence in support of his claim. *See, e.g.*, Dkt. 92-2 (reflecting how

the defendants responded to Mr. Pizzuto's first set of interrogatories on November 18, 2022). Since then, and as demonstrated by the attachments to Mr. Pizzuto's motions to compel, he has continued to assiduously serve discovery requests as the case has progressed. *See generally* Dkts. 82, 102, 108, 116, 148, 155, 183. The same citations prove that Mr. Pizzuto has likewise been diligent in seeking judicial intervention when key discovery requests have been challenged. And since every single one of his motions to compel have been at least partially granted, most of them in large measure, there is no question that a substantial majority of Mr. Pizzuto's discovery requests have been legitimate. *See generally* Dkts. 88, 123, 178, 199.

Notwithstanding Mr. Pizzuto's diligent pursuit of discovery, more remains to be done. Two good examples are the medical-team-leader and central-line-volunteer depositions. Mr. Pizzuto first noticed the depositions—which are of critical members of the execution team—in October 2024, setting them for January and February of the following year. *See* Dkts. 175-4, 175-5. The depositions were then postponed twice. First, they were deferred so that the defendants could move for the depositions to be blocked in their entirety, *see* Dkt. 175-1, which the Court declined to do, *see* Dkt. 181. Only a day after the Court ruled, Mr. Pizzuto served amended notices of deposition. *See* Dkts. 193-4, 193-5. Again, they were delayed—this time so that the defendants could unsuccessfully request further restrictions on the depositions that they failed to pursue earlier. *See* Dkt. 202 at 2 ("[I]t is frustrating that Defendants did not raise these concerns in February, when they initially challenged the deposition notices," resulting in "piecemeal motion practice that . . . is a poor use of everyone's resources."). Two days after the Court's order, Mr. Pizzuto served new notices of deposition, scheduling them for days agreed upon by the parties. *See* Exs. 1, 2. The first deposition, of the central-line volunteer, finally took place on August 6, 2025. *See* Ex. 3 at 1.

████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

None of those generic questions come close to creating "a reasonable degree of certainty" that Mr.

Pizzuto would be able to "identify" the witness. *Pizzuto v. Tewalt*, 136 F.4th 855, 869 (9th Cir.

2025). ███████████████████████████████████

███████████████████████████████████████

█████████████████ The idea that such questions pose any real confidentiality risk is far-

fetched.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████ Mr. Pizzuto will litigate those issues at the appropriate time. Pursuant to

the parties' agreement, that time has not yet arrived, since the transcript of the deposition has just

been circulated and the witness has thirty days to make corrections before any motion to compel

can be filed. *See* Ex. 3 at 1.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████ *See* Dkt. 199 at 8 (rejecting the defendants' latest confidentiality objection because it was based on "bare speculation" as they had "again failed to explain how" any real threat to anonymity existed). Then the depositions will need to be re-opened so that the witnesses can address the questions they should have answered the first time. All of that will take time, even though Mr. Pizzuto will continue to act with due haste. It would not be appropriate for discovery to end before the process can be completed when the depositions were delayed because of the defendants' unsuccessful attempts to block them and then prolonged because of ███████████████████████████████████████.

A related need for additional time comes from the depositions not yet taken. In October 2024, Mr. Pizzuto deposed Tim Richardson, who was the Warden of the Idaho Maximum Security Institution (IMSI) at the time of the unsuccessful execution attempt against Thomas Creech. *See* Dkt. 177-1. The Idaho Department of Correction (IDOC or the Department) replaced Mr. Richardson as IMSI Warden with Randy Valley in June of 2024. *See id.* at 15. Warden Valley then inherited the extensive execution responsibilities given to the head of IMSI. *See, e.g.*, Dkt. 175-7 at 4, 15–16, 22–23. A deposition of Warden Valley took place in April 2025. *See* Ex. 5. The central-line volunteer did not exist as a position on the medical team until the latest execution protocol was released in October 2024. *Compare* Dkt. 175-7 at 7–8, *with* Dkt. 187-14. Mr. Pizzuto deposed that individual earlier this month. *See* Ex. 3 at 1. Soon, Mr. Pizzuto will depose the medical-team leader and Liz Neville, who is effectively IDOC's point-person for executions. *See, e.g.*, Dkt. 193-2 at 2. Ms. Neville's deposition was scheduled for July 16 and postponed at the request of opposing counsel. *See* Ex. 3 at 2. It was moved to September 5 (a day after discovery

closes) with the agreement of both parties. *See id.* These five witnesses, all pivotal to executions

in Idaho, are essential sources of relevant information. Although the current discovery plan only

allows five non-expert depositions per side, *see* Dkt. 41 at 4, Mr. Pizzuto needs more and he will

seek the Court's leave at the appropriate time if the defendants refuse to consent. At a bare

minimum, Bree Derrick—IDOC's new Director—is an indispensable deposition witness. Among

many other execution-related tasks, IDOC's Director chooses the drug, certifies its availability,

and determines the protocol. *See* Idaho Code § 19-2716(1)(a), (3), (6).

Mr. Pizzuto has been methodically deposing witnesses in a logical order as the execution

landscape has evolved during the course of the litigation. *See Asarco LLC v. Union Pac. R.R. Co.*,

No. 2:12-cv-283, 2016 WL 1755241, at *12 (D. Idaho May 2, 2016) (concluding that discovery

requests were "fashioned in an attempt to systematically establish material facts informing

(perhaps, even, narrowing) relevant issues surrounding claims and defenses," which "is entirely

proper"). Nevertheless, that process cannot be adequately completed in just two more weeks. And

as the Court knows, the number of depositions Mr. Pizzuto is contemplating for this case is hardly

excessive. The rules establish ten depositions as the default. *See* Fed. R. Civ. P. 30(a)(2)(A)(i).

Although Mr. Pizzuto agreed to five before major changes in the case required more (including a

failed execution, an addition to the execution team, a new protocol, and a remodeling of the

chamber), *see* Dkt. 41 at 4, he is still well within the usual range for a complex case with the

highest possible stakes—another factor calling for an extension to the discovery deadlines.

More time is likewise warranted by the status of associated out-of-district discovery

litigation involving other departments of correction. Most relevant here, in September 2024 and

February 2025, Mr. Pizzuto served subpoenas under Federal Rule of Civil Procedure 45 on the

Indiana Department of Correction (INDOC) and the Tennessee Department of Correction

(TDOC). *See* Exs. 6, 7.[2] Those subpoenas were occasioned in large part by the fact that opposing counsel here has, for the reliability of Idaho's execution drugs, relied almost entirely on a Certificate of Analysis (COA) without disclosing any details to confirm that document's trustworthiness. *See* Dkt. 123 at 14 (rejecting the defendants' attempt to use the COA "to shield themselves from all discovery related to the reliability of the execution drugs" while at the same time refusing to "identif[y] the entity responsible for performing the chemical analysis").

Recently, the defendants made it clear that they have done no meaningful due diligence into the reliability of their COA. After being ordered by the Court to respond to an interrogatory asking about the licensing and certification status of the laboratory that made the COA, *see* Dkt. 199 at 18, the defendants responded with *no* information about that laboratory, *see* Ex. 8 at 6–7. Separately, the defendants were asked whether the COA was produced using testing standards approved by the United States Pharmacopeia (USP), "the gold standard for the pharmaceutical industry." Dkt. 183-10 at 3. They responded: "The COA speaks for itself." Ex. 9 at 9. But it doesn't. For twelve of the thirteen tests administered, the COA does not refer to the USP as a certificate ordinarily would and instead uses "TP" numbers that have no industry-wide significance within the pharmaceutical community. *See* Dkt. 116-7 at 4.[3] Mr. Pizzuto and his expert have no idea what these designations mean or what standards are being referenced. Apparently, the defendants don't either. By closing their eyes to the legitimacy of the COA, while at the same time

---

[2] To the extent it is necessary, Mr. Pizzuto respectfully asks the Court to take judicial notice of any filings in other cases referenced here. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

[3] For previous filings that are not consecutively paginated, Mr. Pizzuto will refer to the ECF page number in the upper-right corner of the document.

refusing to make any other information about it available, the defendants have deprived Mr. Pizzuto of any avenue for assessing the quality of IDOC's execution drugs.

Thus, to explore the reliability of Idaho's drugs, Mr. Pizzuto was forced to seek information from other states that likely share the same source. *See* Ex. 10 at 7–8 (Indiana federal court order accepting Mr. Pizzuto's theory as to relevancy). However, INDOC and TDOC also refused to provide any insights, which obligated Mr. Pizzuto to litigate in those other districts. Mr. Pizzuto has been diligently prosecuting his subpoenas in both Indiana and Tennessee, seeking only a single extension between the two cases. *See* Ex. 3 at 2. In Indiana, Mr. Pizzuto prevailed and a federal magistrate judge denied INDOC's motion to quash. *See* Ex. 10. Afterwards, INDOC produced a single document that would potentially shed light on the reliability of Indiana's execution drugs: a set of COAs. *See* Ex. 11. However, every single word on every single page of the COAs is redacted. *See id.* Mr. Pizzuto has been communicating with INDOC about whether it can provide more substantive information. *See* Ex. 3 at 2. INDOC's counsel continues to discuss the matter with his client, *see id.*, another factor that is adding time to the discovery process and that is outside Mr. Pizzuto's control.

In Tennessee, Mr. Pizzuto lost the first round of litigation and now needs more time for the next stage. *See id.* He undeniably has a good-faith basis for seeking such review when a different federal judge disagreed with the result in Tennessee and enforced an identical subpoena in Indiana. *See* Ex. 10. Simply put, the process in these other jurisdictions involves an appropriate use of discovery tools made available to all civil litigants by the rules and was generated by IDOC's lack of transparency in the present case. It should be given time to play itself out.

Continued discovery is likewise warranted in connection with Mr. Pizzuto's ongoing efforts to obtain material from the contractors working on the renovation of IDOC's execution

facilities. Mr. Pizzuto subpoenaed four such contractors in June 2025: Okland Construction (the general contractor); Cator, Ruma and Associates (the subcontractor); Elevatus Architecture (the architectural firm); and Soundscape Engineering (the acoustic engineering company). *See* Exs. 12, 13, 14, 15. The contractors have records relevant to the litigation because, among other things, the renovation will affect the room in which lethal-injection executions take place, and Mr. Pizzuto has raised Eighth Amendment concerns about the visibility in that space. *See* Dkt. 153 at 31–32. Cator Ruma and Soundscape both produced responsive records by the July deadlines listed in their subpoenas. *See* Ex. 3 at 2. However, neither Okland nor Elevatus has yet provided material in response to their subpoenas. *See id.* at 3. Both companies asked for more time to consider confidentiality interests implicated by the subpoenas. *See id.*

In the meantime, the defendants themselves objected on August 14, 2025 to blueprints and schematics being disclosed in response to the subpoenas and have indicated that they plan to seek a protective order to keep such information secret. *See* Ex. 16. That objection is delaying the production of any records by Elevatus in response to its subpoena, since the defendants have specifically asked the company to withhold responsive materials until IDOC's motion for a protective order is adjudicated. *See* Ex. 3 at 3. Sorting out those issues will of course take time. The defendants cannot fairly ask that discovery end while simultaneously taking measures that will unavoidably prolong the need for additional discovery processes. What the defendants are effectively trying to do is to have their motion for a protective order granted not by virtue of a judicial finding that it is meritorious, but instead by running out the clock on discovery altogether, which is not how litigation is supposed to work.

In overview, Mr. Pizzuto is moving expeditiously on multiple fronts to obtain discovery but his efforts require additional time. That is an unsurprising state of affairs in light of the fact

that substantial factual developments have occurred in the midst of discovery. In February 2024, IDOC "bungled" the "execution of an individual who shares important characteristics with [Mr.] Pizzuto," Dkt. 158 at 6, while using lethal injection for the first time in twelve years. The Department then unveiled an amended execution protocol that made significant changes, including the creation of a critical new position that is potentially integral to lethal injections in Idaho. *See supra* at 5. And now IDOC is in the middle of a major construction project in the building where nearly all of the activity relevant to the lawsuit will take place. Those events, all outside Mr. Pizzuto's control, have necessitated additional discovery, and with it the need for more time.

## B.  IDOC's conduct makes the extension necessary and appropriate.

Far from prejudicing the defendants, the requested modification is a product of their own behavior in discovery.

To begin, the defendants have been stubbornly resistant to engaging with lawful discovery requests. As mentioned earlier, this Court has authorized most of the discovery requests presented by Mr. Pizzuto's eight motions to compel. *See generally* Dkts. 88, 123, 178, 199. The Court has also denied the defendants' attempts to stymy pivotal depositions, *see* Dkt. 181, and rebuffed their efforts to preclude subpoenas served on non-parties, *see* Dkt. 97, 158. In this host of orders, the Court has commented on how the defendants have insisted on recycling rejected theories. *See* Dkt. 181 at 6 ("The line is getting old."); Dkt. 199 at 8 ("Defendants cannot merely invoke the specter of John Oliver every time Pizzuto asks for information about the drugs . . . .").

The discovery timeline has been further lengthened by the recent appellate proceedings in this case. After losing an early series of discovery disputes, the defendants took an interlocutory appeal to the Ninth Circuit, *see* Dkt. 130, a type of proceeding that is "the exception, and not the rule," *Coady v. Steil*, 187 F.3d 727, 730 (7th Cir. 1999). In connection with that appeal, the

defendants successfully obtained a stay of the challenged discovery order. *See* Dkt. 150. After full briefing and oral argument, the Ninth Circuit panel unanimously agreed with this Court and repudiated the defendants' position, finding the purported secrecy "risk" they had identified to be "purely speculative." *Pizzuto*, 136 F.4th at 872. The defendants then delayed compliance for another two months so they could seek rehearing en banc, which was denied without any dissents. *See* Dkt. 192. Through these tactics, the defendants were able to defer the disclosures (to the extent they ever occurred) until June 2025, more than eighteen months after the requests were served. It is unpersuasive for the defendants to now complain about an extended timeline they themselves have made inevitable. As the Court has already determined, "discovery in this case has lasted more than three years, largely due to Defendants' own unwillingness to provide information." Dkt. 199 at 13.

Apart from the defendants' aggressive litigation, their mishandling of discovery requests has also made an extension necessary and proper. Mr. Pizzuto highlights several examples. First, the defendants' treatment of the purchase order for the first set of execution drugs was unjustifiable and—standing alone—merits the extension requested here.

The story of the purchase date is a tale about how the defendants obfuscated key information on lethal injections so as to mislead undersigned counsel's office. As it would later turn out, a purchase order for execution drugs was generated on March 4, 2023, and $50,000 was spent on the chemicals on April 1, 2023. *See* Ex. 17; Ex. 16 at 13, 23. But undersigned counsel were not aware of those dates until more than two years later, when the defendants finally lost their fight to keep them secret. *See* Ex. 3 at 3. Nonetheless, the defendants spent the next seven months after March 2023 hiding the facts, sending Mr. Pizzuto down diversionary roads, and creating extensive and unnecessary litigation. During that time, the Idaho Attorney General's Office

(AG)—which represents the defendants here—went out of its way to foster the impression that IDOC lacked a drug source. Heading into this period, that was already the background assumption, as two straight death warrants had expired because of IDOC's supposed inability to obtain drugs. *See* Ex. 19. In March 2023, the AG was lobbying for the firing squad based on the supposed unavailability of execution drugs. Most emblematically, on March 1, 2023, Deputy Attorney General L. LaMont Anderson testified to the legislature about the drugs in support of the firing-squad bill: "We cannot get them. There's no one that will supply them."[4] On March 24, 2023— three weeks after IDOC located a drug source—the Governor signed into law a bill authorizing the firing squad. *See* Ex. 20. The AG did nothing to inform the Court, the public, or Mr. Pizzuto that the problem ostensibly calling for the legislation had already disappeared.

Actually, they did the opposite and mischaracterized the situation to this Court. On October 10, 2023, the AG—through attorneys involved in the present case—sent a proposed order to this Court in connection with a different case brought by Mr. Pizzuto. *See* Ex. 21. In that proposed order, the AG wrote that "the Court understands the Idaho Department of Correction *does not have the present ability to carry out an execution via lethal injection* or firing squad." *Id.* at 1. This Court would later sign the proposed order with no changes. *See Pizzuto v. Tewalt*, D. Idaho, No. 1:23-cv-081-BLW, Dkt. 31. What the AG did not tell the Court then, let alone Mr. Pizzuto, was that IDOC had in fact made arrangements for execution drugs seven months earlier. Indeed, the very next day IDOC's drugs appeared, *see* Dkt. 183-6 at 2, and the day after that, a warrant was

---

[4] A video recording of this hearing is available at
https://lso.legislature.idaho.gov/MediaArchive/ShowCommitteeOrMedia.do (select "2023" from meeting year dropdown; then select "House Standing Committees" from category dropdown; then select "Judiciary, Rules & Administration" from committee dropdown; then select "Download Audio/Video" for March 1, 2023). Mr. Anderson's remarks begin at 16:06.

signed for Mr. Creech's execution, *see* Ex. 22. In the highly compressed emergency stay litigation that followed, IDOC and the AG reaped the substantial benefit of facing an adversary they had lulled into a false sense of complacency with respect to lethal injection.

Another important aspect of IDOC's misdirection campaign relates to the difference between compounded and manufactured pentobarbital. At the time Mr. Pizzuto filed this lawsuit, no state in the country had acquired manufactured pentobarbital for an execution for several years and they had been using compounded products instead. *See, e.g.*, James Gibson & Corinna Barret Lain, *Death Penalty Drugs and the International Moral Marketplace*, 103 Geo. L.J. 1215, 1217, 1233 (2015). Mr. Pizzuto therefore assumed IDOC was much more likely to use compounded pentobarbital than manufactured pentobarbital, *see* Dkt. 1 at 7–12 (addressing compounding in the complaint), and he set his discovery strategy accordingly. That in turn led the Court to deal with the case as one in which "compounded pentobarbital" was "at the heart of [the] claim." Dkt. 88 at 13.

The defendants would much later announce that their pentobarbital was actually not compounded but manufactured. *See* Ex. 23 at 8. Between March 4 and October 11, 2023, though, they said nothing. To the contrary, the defendants repeatedly fed the misimpression that their drugs might well be compounded. For instance, in an order dated July 25, 2025, this Court granted a motion to compel and clarified the scope of the interrogatory at issue by noting that one responsive answer would state "whether [IDOC] will use manufactured or compounded pentobarbital." Dkt. 88 at 25. The defendants offered no such explanation. Instead, in "complying" with the Court's order the defendants informed Mr. Pizzuto, on August 16, 2023, that they were "*attempting* to acquire *any* chemical that would be permissible under" the protocol. Dkt. 92-8 at 4. To reiterate, the defendants were not in reality attempting to acquire any chemical in August 2023—they had

already made arrangements five months earlier to buy one drug (pentobarbital) in one particular form (manufactured) for one particular sum ($50,000). Yet none of those facts appear in the defendants' discovery response.

On December 11, 2023, IDOC finally produced a copy of the purchase order for the first set of execution drugs. *See* Dkt. 102-4. That production was made nine months after the document existed and despite the fact that IDOC had promised to supplement discovery responses within thirty days of new information arising. *See* Ex. 24 at 2. Notably, Mr. Pizzuto's very first request for production (RFP), served on October 14, 2022, asked for all documents "related to obtaining" execution drugs. Dkt. 54-31 at 5. A purchase order would be item number one on such a list. Unaccountably, it was only disclosed nine months later. Significantly, that purchase order had the date redacted and it was signed. *See* Dkt. 102-4. Mr. Pizzuto promptly challenged the redaction, and this Court ordered the defendants to remove it. *See* Dkt. 123 at 11. That order was the one the defendants fought through an unsuccessful appeal, as described above. On June 5, 2025, more than two years after the document was generated, the defendants finally produced a version displaying the date: March 4, 2023. *See* Ex. 3 at 3.

That, however, has not been the end of the story. For the version of the purchase order produced by the defendants is *not* the one they were ordered to disclose by this Court and the Ninth Circuit. The version they were ordered to disclose was signed and the version they produced is unsigned. *Compare* Dkt. 102-4, *with* Ex. 17. Mr. Pizzuto has for more than two months been asking the defendants to produce the signed purchase order with the date unredacted. *See* Ex. 3 at 3. In other words, he has been asking them to produce the document they were ordered by the courts to turn over. The defendants have reported that they cannot find that document. *See id.* Instead, the defendants have given Mr. Pizzuto yet another version of the purchase order. This one appears to

bear the inexplicable date of May 4, 2025, a discrepancy the defendants have yet to account for, *see* Ex. 3 at 3.

The defendants' mistreatment of the purchase order embodies a series of different discovery improprieties, ranging from a failure to supplement to "evasive or incomplete disclosure[s]," Fed. R. Civ. P. 37(a)(4), to the apparent spoliation of a document that has been the active subject of litigation for more than two years. That conduct is potentially sanctionable. *See Ryan v. Editions Ltd. West, Inc.*, 786 F.3d 754, 766 (9th Cir. 2015) (explaining that spoliation occurs when the party had "some notice that the documents were potentially relevant to the litigation before they were destroyed"); *Daniel Defense, LLC v. Tactical Edge, LLC*, 677 F. Supp. 3d 1332, 1352 (S.D. Ga. 2023) (discussing how sanctions are available when discovery responses are incomplete); *Ball v. LeBlanc*, 300 F.R.D. 270, 289 (M.D. La. 2013) (sanctioning prison officials for failing to timely supplement their responses to interrogatories with information relevant to inmates' Eighth Amendment claim). A case could also be made that the defendants engaged in sanctionable misconduct for failing to comply with court orders, since they were instructed to answer discovery requests that clearly implicated the compounding-manufacturing distinction, *see supra* at 13, and they nevertheless buried their heads in the sand. *See* Fed. R. Civ. P. 37(b)(2)(A) (authorizing sanctions for non-compliance with a court order to "permit discovery"). One remedy for such sanctionable conduct is "extending the discovery cut-off." *City of Colton v. Am. Promotional Events, Inc.*, No. 09-1864, 2012 WL 13013379, at *14 (C.D. Cal. Mar. 22, 2012).

Whether the extension here is regarded as a Rule 37 sanction or is alternatively granted under the good-cause test for modifying the scheduling order, the misconduct plainly warrants the additional time. The defendants' concealment of the purchase information significantly impeded

Mr. Pizzuto's ability to conduct discovery for the same period of time that he now asks to be added to the deadlines. As outlined above, for the seven months during which the information was hidden, Mr. Pizzuto sought discovery about compounded drugs, based on the reasonable inference that IDOC would most likely use them. Consider for illustrative purposes request for admission (RFA) 54, which asked the defendants whether they would "make inquiries to determine the manufacturer of the API for the execution drugs." Dkt. 82-1 at 7. API stands for "active pharmaceutical ingredient" and it is implicated by compounding, not manufacturing. *See United States v. Bader*, 07-cr-338, 2009 WL 2219258, at *2 (D. Colo. July 23, 2009). In a court filing submitted in May 2023, the defendants responded that "the manufacturer of the API for the chemical (if it is compounded) is protected by the [secrecy] statute." Dkt. 84 at 16. But the defendants had made arrangements two months earlier to obtain *manufactured* pentobarbital. *See* Ex. 17. Apart from formal litigation, the defendants' shell game caused Mr. Pizzuto's counsel to expend significant time and energy chasing non-existent information. *See, e.g.*, Ex. 25 (correspondence from the AG in this case in which the defendants addressed at length requests for information that would only be relevant if the drugs were compounded). In short, the defendants effectively spent seven months obligating Mr. Pizzuto and the Court to expend time and resources delving into imaginary discovery disputes about compounded drugs.

The defendants' bait-and-switch has impacted other, related cases as well. When the State scheduled Mr. Creech's execution for February 2024, he was—like Mr. Pizzuto—pursuing a challenge to "the use of *compounded* pentobarbital." *Creech v. Tewalt*, No. 1:20-cv-114, 2024 WL 756356, at *2 (D. Idaho Feb. 23, 2024), *aff'd*, 94 F.4th 859 (9th Cir.) (per curiam), *cert. denied*, 144 S. Ct. 1027 (2024). The defendants' late-blooming disclosure that they were using manufactured pentobarbital was seen by this Court, when it denied a stay of execution, as having

"moot[ed] many of [Mr.] Creech's allegations." *Id.* Put another way, the defendants lulled Mr. Creech into focusing on compounded pentobarbital so as to disadvantage him as much as possible while he was litigating for an emergency stay of execution under an extremely compressed timeframe.

Even now, the consequences of the defendants' ruse continue to reverberate. After finding that they had "barely even attempted to make" the requisite showing, the Court recently overruled the defendants' objection and ordered them to admit or deny that their execution drugs were manufactured by a company that "oppose[s] the use of [its] products in executions." Dkt. 199 at 11. The answer was yes. *See* Ex. 8 at 8. That is an admission of potential significance to Mr. Pizzuto's Eighth Amendment theory, because when drugs are obtained against the wishes of the manufacturer it raises reliability concerns like longer chains of custody, greater risks of improper storage, poor transportation conditions, and unqualified handlers. *See* Dkt. 116-7 at 4–5. And it is an admission Mr. Pizzuto would have no reason to ask for while laboring under the false impression—cultivated by the defendants—that the drugs were compounded. In this way, the defendants' discovery violations delayed Mr. Pizzuto's investigation by at least seven months, and it is accordingly appropriate to now extend the deadline by that same amount of time.

The same outcome is favored by other discovery violations the defendants have committed. *See Bown v. Reinke*, No. 1:12-cv-262-BLW, 2016 WL 107926, at *6 (D. Idaho Jan. 8, 2016) (Jan. 8, 2016) (imposing sanctions on different IDOC attorneys in another case where they made "discovery a miserable slog" for an Eighth Amendment plaintiff by "forcing him at every point to make repeated demands" and to file motions to compel).

Beginning with the most recent violation, RFA 539 asked the defendants to "[a]dmit or deny that the Central Line Volunteer was previously designated to serve as the Rescue Doctor

under the Prior Protocol." Dkt. 183-5 at 3. In a response submitted under oath, Director Tewalt

wrote: "deny." *Id.* at 6. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█

Earlier discovery violations preceded that one. RFA 290 called on Director Tewalt to admit

or deny that the second set of execution drugs had "an expiration date later than February 28,

2025." Dkt. 155-4 at 6. In another response made on penalty of perjury, Director Tewalt wrote:

"[a]dmit." *Id.* at 7, 23. That was also untrue—the drugs expired in September 2024. *See* Dkt. 177-

3 at 7. The error occurred even though the right date was displayed "on the packaging" for the

drugs, *id.* at 8, and therefore could easily have been read by the defendants if they were serious

about complying with their discovery obligations.

In summary, the defendants' own lengthy and persistent history of mishandling proper

discovery requests is the principal reason the deadlines now need to be extended.

### C.  The extension would cause the defendants minimal prejudice.

Finally, whatever minor prejudice would accrue to the defendants from granting this

motion, it does not outweigh the countervailing factors. The extension would only require the

defendants to continue complying with their well-settled discovery obligations under the parameters set by the Court. Discovery has been narrowed significantly by its progress to date and the Court's prior orders have given the parties clear guidelines on what is allowed and what is off-limits. Where the historical delays have been largely attributable to the defendants, they cannot convincingly claim prejudice now, and the factor yields to the others. *See Morgal v. Williams*, No. CV 12-280, 2015 WL 10791884, at *1 (D. Ariz. Dec. 4, 2015) ("[W]hile the Court recognizes the disruption of the scheduling order is not harmless, the Court finds the prejudice to Defendant is minimal.").

### III.    Conclusion

In light of the above, Plaintiff Gerald Ross Pizzuto, Jr. respectfully asks the Court to modify the scheduling order, *see* Dkt. 198, such that fact discovery closes July 2, 2026, and to re-set the other associated deadlines accordingly.

DATED this 20th day of August 2025.

 */s/ Jonah J. Horwitz*
Jonah J. Horwitz
Christopher M. Sanchez
FEDERAL DEFENDER SERVICES OF IDAHO

*/s/ Sarah E. Kalman*
Sarah E. Kalman
DLA PIPER LLP (US)

*Attorneys for Plaintiff Gerald Ross Pizzuto, Jr.*

### CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of August 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Kristina Schindele                     Michael J. Elia
kscchind@idoc.idaho.gov               mje@melawfirm.net

Mary Karin Magnelli                   Tanner J. Smith
kmagnell@idoc.idaho.gov               tanner@melawfirm.net


                          /s/ Julie Hill
                          Julie Hill